IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 17-275 (LPS) C.A. No. 17-1353 (LPS) |
| v. | ) ) | |
| OXFORD NANOPORE TECHNOLOGIES, INC. and OXFORD NANOPORE TECHNOLOGIES, LTD., | ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OF NONINFRINGEMENT AND INDEFINITENESS, OR IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL**

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alexander Piala
Mysha Lubke
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

David G. Wille
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2980
(214) 953-6595

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendants*

April 29, 2020

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND NATURE AND STAGE OF THE PROCEEDINGS ................... 1

II.    LEGAL STANDARDS ................................................................................................ 2

III.   ARGUMENT ............................................................................................................. 3

    A.  Oxford Is Entitled to Judgment as a Matter of Law on PacBio's Infringement
        Claims on the '400, '323, and '056 Patents. ................................................................ 3

        1.  There Is No Evidence That Using Certain of the Accused Products Infringes
           the Asserted Method Claims. ................................................................................ 3

           a.  There Is No Evidence that the Use of RNA Sequencing Kits Infringes
              the '056 Patent. ...................................................................................... 4

           b.  There Is No Evidence that the Use of Sequencing Systems that
              Employ "Flip-Flop Software" Infringes the '400 or '323 Patent. .................... 5

        2.  There Is No Evidence that Certain Steps of the '056 Patent Claims Methods
           Were Performed in the United States. ................................................................... 9

        3.  PacBio Failed to Present Evidence that the "N" Limitation Was Met for Any
           Activity Accused of Infringing the '400 or '323 Patent. ........................................ 10

    B.  Alternatively, Oxford Is Entitled to Vacation of the Infringement Judgments
        and a Conditional New Trial on Infringement of the '400, '323, and '056
        Patents. .............................................................................................................. 15

    C.  Oxford Is Entitled to Judgment as a Matter of Law that the Asserted Claims of
        the '056 Patent are Indefinite. ............................................................................. 16

        1.  Indefiniteness is a matter of claim construction for the Court. .................................... 17

        2.  By finding claim 1 indefinite, the jury resolved the fact issues in Oxford's
           favor. .............................................................................................................. 18

        3.  Claims 2 and 12 are indefinite for the same reason as claim 1. ................................... 19

IV.   CONCLUSION ............................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

*ActiveVideo Networks, Inc. v. Verizon Commc's, Inc.,*
    694 F.3d 1312 (Fed. Cir. 2012)..................................................................................7

*Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.,*
    651 F.3d 1318 (Fed. Cir. 2011)..................................................................................7

*Apeldyn Corp. v. AU Optronics Corp.,*
    831 F. Supp. 2d 837 (D. Del. 2011)...........................................................................7

*Avins v. White,*
    627 F.2d 637 (3d Cir. 1980)......................................................................................16

*BJ Servs. Co. v. Halliburton Energy Servs., Inc.,*
    338 F.3d 1368 (Fed. Cir. 2003)................................................................................17

*Bombardier Recreational Prod. Inc. v. Arctic Cat Inc.,*
    785 F. App'x 858 (Fed. Cir. 2019) ..........................................................................18

*Brokerage Concepts v. U.S. Healthcare, Inc.,*
    140 F.3d 494 (3d Cir. 1998)......................................................................................15

*Centricut, LLC v. The Esab Group, Inc.,*
    390 F.3d 1361 (Fed. Cir. 2004)............................................................................4, 15

*DSU Med. Corp. v. JMS Co., Ltd.,*
    471 F.3d 1293 (Fed. Cir. 2006)................................................................................10

*Duncan Parking Techs., Inc. v. IPS Group Inc.,*
    914 F.3d 1347 (Fed. Cir. 2019)................................................................................12

*Energy Heating, LLC v. Heat On-The-Fly, LLC,*
    889 F.3d 1291 (Fed. Cir. 2018)................................................................................16

*Fujitsu Ltd. v. Netgear Inc.,*
    620 F.3d 1321 (Fed. Cir. 2010)..................................................................................9

*Gemalto S.A. v. HTC Corp.,*
    754 F.3d 1364 (Fed. Cir. 2014)............................................................................8, 13

*Homeland Housewares, LLC v. Whirlpool Corp.,*
    865 F.3d 1372 (Fed. Cir. 2017)................................................................................12

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010)...........................................................................................16

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
    849 F.3d 1034 (Fed. Cir. 2017)........................................................................................14

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
    734 F.3d 1352 (Fed. Cir. 2013)..........................................................................................8

*KCJ Corp. v. Kinetic Concepts, Inc.*,
    223 F.3d 1351 (Fed. Cir. 2000)..........................................................................................8

*L&W, Inc. v. Shertech, Inc.*,
    471 F.3d 1311 (Fed. Cir. 2006)......................................................................................3, 7

*Lightning Lube, Inc. v. Witco Corp.*,
    802 F. Supp. 1180 (D.N.J. 1992), *aff'd*, 4 F.3d 1153 (3d Cir. 1993)..........................2

*Limbach Co. v. Sheet Metal Workers Int'l Assoc.*,
    949 F.2d 1211 (3d Cir. 1991), *aff'd on rehearing en banc*,
    949 F.2d 1241 (3d Cir. 1991)...........................................................................................15

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
    572 U.S. 915 (2014)...........................................................................................................3

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996)...................................................................................................12, 17

*Marra v. Phila. Hous. Auth.*,
    497 F.3d 286 (3d Cir. 2007)...............................................................................................2

*Newell Cos., Inc. v. Kenney Mfg. Co.*,
    864 F.2d 757 (Fed. Cir. 1988)....................................................................................19, 20

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005)........................................................................................10

*Oakley, Inc. v. Sunglass Hut Int'l*,
    316 F.3d 1331 (Fed. Cir. 2003)..........................................................................................7

*Pannu v. Iolab Corp.*,
    155 F.3d 1344 (Fed. Cir. 1998)..........................................................................................2

*Perkin-Elmer Corp. v. Computervision Corp.*,
    732 F.2d 888 (Fed. Cir. 1984)...........................................................................................2

*Praxair, Inc. v. ATMI, Inc.*
   543 F.3d 1306 (Fed. Cir. 2008)...........................................................17

*Regents of the Univ. of Minn. v. AGA Med. Corp.*,
   717 F.3d 929 (Fed. Cir. 2013)...............................................................7

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   574 U.S. 318 (2015)..............................................................................17

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015)..............................................17, 18, 19

*Transamerica Life Ins. Co. v. Lincoln Nat. Life Ins. Co.*,
   597 F. Supp. 2d 897 (N.D. Iowa Jan. 8, 2009) ...................................12

*Wagner v. Firestone Tire & Rubber Co.*,
   890 F.2d 652 (3d Cir. 1989).....................................................................2

*Wilburn v. Maritrans GP Inc.*,
   139 F.3d 350 (3d Cir. 1998)..................................................................15

**Federal Statutes**

35 U.S.C. 271 (a) .....................................................................................10

**Federal Rules**

Fed. R. Civ. P. 50...................................................................................1, 16

Fed. R. Civ. P. 59.............................................................................1, 2, 16

## I.   INTRODUCTION AND NATURE AND STAGE OF THE PROCEEDINGS

After hearing almost 30 hours of testimony and evidence over 7 days, the jury found the asserted claims of all four of PacBio's asserted patents invalid, but also that three of the patents—the '400, '323, and '056 Patents—were infringed.   The jury faced a highly technical and legally-complex case.   It carefully deliberated over a 2-day period and submitted several detailed questions to the Court before returning its verdict.   On the disputed issues where there was proper evidence on both sides to weigh, the jury's verdict should stand.   On infringement, however, there simply was no dispute based on the evidence, and because PacBio made arguments at trial inconsistent with that evidence, the jury's infringement verdict cannot stand as a matter of law.   Thus, Oxford renews its motion for judgment as a matter of law ("JMOL") of noninfringement and indefiniteness under Rule 50 or, in the alternative, requests the Court vacate the infringement judgments and order a conditional new trial under Rule 59 in the event the invalidity judgments are altered.

As PacBio essentially acknowledged at trial, there was no evidence that the use of certain accused products—systems using the Flip-Flop Software and RNA Sequencing Kits—infringed the '400, '323, and '056 Patents.   Oxford is entitled to JMOL that the use of those products does not infringe.   However, because the verdict form asked whether each patent had been infringed, without differentiating between accused products, it is impossible to tell whether the jury found infringement based on these products for which there is insufficient evidence of infringement.   As such, Oxford is entitled to the Court vacating the infringement judgment and ordering a new trial on infringement of those patents conditional on any alteration of the invalidity judgments.   PacBio also failed to present any evidence that certain steps of the '056 Patent method claims were performed in the United States, as required for direct and indirect infringement.   Finally, PacBio gave little more than lip service to the Court's construction of "N" in the '400 and '323 Patents, and thus failed to present any legally sufficient evidence that Oxford infringed those patents.

The jury also found that claim 1 of the '056 Patent was invalid as indefinite, but not claims 2 and 12.   Although the jury verdict on indefiniteness is advisory regarding underlying factual disputes, the ultimate determination of whether the asserted claims are indefinite should be made by the Court.   The relevant evidence supports JMOL that claims 1, 2, and 12 of the '056 Patent are indefinite, or, in the alternative, a new bench trial on those issues.

## II.   LEGAL STANDARDS

A court may grant a renewed motion for JMOL after a jury trial if the moving party shows that "the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (internal quotation marks omitted); *see Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).   "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

A new trial may be warranted under Fed. R. Civ. P. 59(a) where "the verdict is against the clear weight of the evidence [or] substantial errors were made in the admission or rejection of evidence or the giving or refusal of instructions." *Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1186 (D.N.J. 1992), *aff'd*, 4 F.3d 1153 (3d Cir. 1993).   When reviewing a motion for a new trial, a court must view the evidence in the light most favorable to the party for whom the verdict was returned. *Wagner v. Firestone Tire & Rubber Co.*, 890 F.2d 652, 656 (3d Cir. 1989).

## III.    ARGUMENT

### A.    Oxford Is Entitled to Judgment as a Matter of Law on PacBio's Infringement Claims on the '400, '323, and '056 Patents.[1]

#### 1.    There Is No Evidence That Using Certain of the Accused Products Infringes the Asserted Method Claims.

PacBio accused the full panoply of Oxford products of infringing the '056, '400, and '323 Patents, even though it knew that certain basecalling software and consumable kits were not representative of all accused products and were materially different in view of the asserted claims. In particular, PacBio contended that the use of different disposable kits for sequencing RNA and DNA with Oxford's sequencing devices infringed the '056 Patent, and that using several different types of basecalling software in the accused sequencing devices infringed the '400 and '323 Patents. It is undisputed, however, that each of those different types of kits and software differ in ways material to the asserted claims, and PacBio failed to present any evidence at trial that one type of software or consumable kit could be representative of all accused products for purposes of infringement, or evidence that the products that span a range of relevant parameter values.  *See L&W, Inc. v. Shertech, Inc.*, 471 F.3d 1311, 1317-18 (Fed. Cir. 2006) (patentee bears the burden of proof on infringement, and thus "cannot simply 'assume' that all of [defendant's] products are like the one [its expert] tested and thereby shift to [defendant] the burden to show that is not the case."). With no evidence in the record that use of sequencing systems with the RNA Sequencing Kits or the Flip-Flop Software infringes the asserted patent claims, Oxford is entitled to JMOL on PacBio's infringement claims for those products.[2]

---

[1]    Oxford's arguments below establish that there is no evidence of direct infringement of the asserted patent claims.  Since direct infringement is a prerequisite for induced and contributory infringement, Oxford is entitled to JMOL on those issues as well.  *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 920-21 (2014).

[2]    Oxford moved for JMOL on each of these sets of products during trial.  Vol. E, Tr. 1108:5-18; Vol. F, Tr. 1291:14-1292:5.

### a.  There Is No Evidence that the Use of RNA Sequencing Kits Infringes the '056 Patent.

Independent claim 1 of the '056 Patent recites, *inter alia*, "controlling the rate of translocation" of the nucleic acid template through a nanopore "with a translocating enzyme [that] exhibits two kinetic steps" having rate constants within a certain range of ratios.[3]  JTX-3 at 67.  The accused RNA Sequencing Kits undisputedly contain a different type of enzyme than the accused DNA Sequencing Kits.  *See* Vol. B, Tr. 411:25-412:10.  However, PacBio's technical expert Dr. Charles McHenry neither considered nor presented any data relating to the enzymes in the RNA Sequencing Kits, nor did he present any evidence regarding how those enzymes allegedly exhibit two kinetic steps having rate constants within the ratios required by the '056 Patent claims.  In fact, Dr. McHenry admitted that he had no opinion about whether the RNA Sequencing Kits infringed at all.  Vol. B, Tr. 412:11-25, 424:21-426:3 (Q: "So, you would agree, you have no opinion as to whether RNA sequencing in Oxford's products infringes the '056 patent?"  A: "Right, I have no opinion.").[4]  PacBio all but conceded that the RNA Sequencing Kits do not infringe, calling its damages expert on rebuttal primarily to present an alternative damages calculation that deducted sales of RNA Sequencing Kits from the allegedly-infringing royalty base.  Vol. F, Tr. 1403:14-1404:25; *see also* Vol. F, Tr. 1278:16-19.

PacBio presented no expert testimony whatsoever—nor any other evidence—that the RNA Sequencing Kits infringe.  Without such evidence, no reasonable jury could have found that the enzymes in the RNA Sequencing Kits meet this claim element.  *See Centricut, LLC v. The Esab Group, Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004) ("in a case involving complex technology, where the accused infringer offers expert testimony negating infringement, the patentee cannot satisfy its

---

[3]  The other two asserted claims from the '056 Patent depend from independent claim 1.

[4]  This absence of evidence regarding the RNA Sequencing Kits appeared to be intentional as Dr. McHenry testified that he was instructed to only consider DNA sequencing because RNA sequencing "is not part of this matter."  Vol. B, Tr. 425:13-17, 426:21-427:4.

burden of proof" without expert testimony).  Thus, Oxford is entitled to JMOL that uses of Oxford's sequencing systems with the accused RNA Sequencing Kits do not infringe the '056 Patent.

### b.   There Is No Evidence that the Use of Sequencing Systems that Employ "Flip-Flop Software" Infringes the '400 or '323 Patent.

The asserted '400 and '323 Patent claims all require determining the sequence of a template nucleic acid by "comparing" a measured property (*e.g.*, electrical signal) to "calibration information" that is "produced by measuring" or "accounts for" the property "for 4 to the N sequence combinations."  In the accused Oxford sequencing systems, several different versions of software have been used to determine nucleic acid sequences.  The evidence presented at trial categorized the different versions of software as either "Flip-Flop Software"—the most current version of software in Oxford's commercial products —or "RNN Software"—all prior versions of the software in Oxford's products during the period relevant to infringement.  PacBio presented no evidence at trial that Oxford's sequencing systems employing the "Flip-Flop Software" perform the "comparing" step of the '400 and '323 Patent claims.[5]

Oxford first released the Flip-Flop Software for use with its sequencing systems no earlier than the second half of 2018.  Vol. E, Tr. 1027:21-24.  But PacBio only presented evidence relevant to the "comparing" step for Oxford's software related to the previous RNN Software versions.  Most of the Oxford documents and presentations that PacBio's expert Dr. Christophe Dessimoz presented at trial were dated from 2015 and 2016, several years before Oxford developed the Flip-Flop Software, and none provide any information regarding how the Flip-Flop Software works.[6]  The only presentations dated within a year of Flip-Flop's release—PTX-84 and PTX-85—contain no technical information regarding the operation of the Flip-Flop Software, nor did Dr. Dessimoz rely on them

---

[5]   At trial, the "Flip-Flop Software" was sometimes referred to as the "Flappie" software.

[6]   *See* PTX-615 (2015 London Calling presentation); PTX-60 (video of same); PTX-58 (Powerpoint dated 2015); PTX-333 (2016 video describing nanopore structure); PTX-92 (generic description of neural networks last modified May 29, 2015).

for that purpose.  *See* Vol. B, Tr. 463:24-466:7 (opining regarding the value of "N" in certain accused systems).  Similarly, the cited deposition testimony from Oxford's Vice President of Development Dr. Stuart Reid did not describe the Flip-Flop Software or its algorithm.  Vol. B, Tr. 456:12-457:20 (describing RNN (events) model), 458:15-460:2 (describing RNN (events transducer) algorithm), 471:25 – 472:8 (same), 476:17-25 (same), 460:13-23 (PacBio's counsel noting that "the final algorithm you have testimony for is the RNN (raw transducer) algorithm"), & 461:19-462:17 (describing the costs of the RNN (events) and RNN (events transducer) algorithms).  In his infringement analysis, Dr. Dessimoz testified that Oxford's RNN Software performed the "comparing" step (step (d)) of the '400 and '323 Patent claims by "working with the trained [neural] network, then you can fit in current *that corresponds to k-mers for which you may not know the identity*, but if it's been trained properly … *it will predict then the correct k-mers*."[7]  Vol. B, Tr. 475:25-476:7; *see generally id.* at 472:22-477:17.[8]  But Dr. Dessimoz conceded that the Flip-Flop Software does not predict or use the concept of k-mers (Vol. F, Tr. 1487:2-4), admitting that his only analysis of the "comparing" step cannot possibly apply to the Flip-Flop Software.

After describing methods used to train the Flip-Flop Software, Dr. Dessimoz asserted, with no explanation, that the comparison done "later on in the sequencing process" with the Flip-Flop Software is "the same as before."  Vol. B, Tr. 479:10-14; *see also* Vol. F, Tr. 1487:2-11 (stating that Flip-Flop "us[es] a neural network to do the comparison" but failing to specify what comparison the neural network is doing).  But Dr. Dessimoz's perfunctory statements do not establish that the Flip-Flop algorithm actually "compar[es] the electrical signal" that varies based on "N" bases "to calibration information that" is "produced by measuring" or "accounts for the electrical signal for all

---

[7]     *See* also PTX-92-9 ("feeding the ANN input features with known output k-mers" in training RNN Software).
[8]     Emphases have been added to quotations unless otherwise noted.

$4^N$ sequence combinations" as the claims require, and thus cannot support a finding of infringement, either literally or under the doctrine of equivalents.[9]  *See L&W*, 471 F.3d at 1316 (patentee's expert asserted that one product "was 'typical' of all the accused" products, but had "no evidence to support that conclusion" and "no indication of which features of the [tested product] he regarded as 'typical.'"); *see also Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir. 2013) ("Conclusory expert assertions cannot raise triable issues of material fact . . . ."); *ActiveVideo Networks, Inc. v. Verizon Commc's, Inc.*, 694 F.3d 1312, 1330-31 (Fed. Cir. 2012) (granting JMOL where "testimony provided by [the] expert is conclusory and lacks sufficient technical detail."); *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1343 (Fed. Cir. 2003) (conclusory testimony using claim language without explanation is inadequate).

Dr. Dessimoz did not even offer a doctrine of equivalents ("DOE") opinion on the "determining" and "comparing" limitations of the '400 and '323 claims, for either the RNN Software or Flip-Flop Software.  *See Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 651 F.3d 1318, 1338 (Fed. Cir. 2011) ("[E]ssential inquiry" is whether accused product contains elements "equivalent to each claimed element"); *Apeldyn Corp. v. AU Optronics Corp.*, 831 F. Supp. 2d 837, 843 (D. Del. 2011) (upholding summary judgment of noninfringement where expert failed to "provide the limitation-by-limitation discussion of equivalence").  To the contrary, Dr. Dessimoz's only DOE opinion was "about what is our best estimate of N" (Vol. F, Tr. 1483:17-1484:23), where he concluded that "Step 4" of claim 1 "for this issue [of] the value of N" was met under DOE, before he proceeded to "Step 5", which recites the "determining" and "comparing" steps.  Vol. B, Tr. 468:7-473:2.  Dr. Dessimoz essentially vitiated the language describing the "comparing" step by asserting

---

[9]   This assertion also contradicts Dr. Dessimoz's own testimony that the Flip-Flop algorithm is different from that of the RNN Software. *See* Vol. F, Tr. 1487:2-5; *see also* Vol. E, Tr. 1105:4-23 (Oxford's expert confirming that Flip-Flop Software does not use k-mers).

that mere use of an unspecified "comparison" by the Flip-Flop Software's recurrent neural network met the limitation without any "particularized testimony and linking argument" about why differences between the Flip-Flop algorithm and the claimed "determining" and "comparing" steps are allegedly insubstantial. *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014).

Finally, prosecution history estoppel bars applying DOE to the "determining" and "comparing" limitations. In distinguishing the '400 claims from the Hibbs prior art, PacBio added the calibration information and "comparing" elements to claim 1 and argued as follows:

> "[I]n order to obtain reliable sequence information, one first has to understand how many bases within the pore are contributing to the signal (N). Once this is known . . . 4 to the power N calibration measurements must be carried out to produce calibration information for sequence determination. … Not only does Hibbs et al. not describe the instant invention, but it actually teaches away from the invention because it instructs the researcher to only measure a small subset of the 4 to the N sequencing combinations of the instant method. … Not only is carrying out the additional calibration experiments extra work, but ***having to compare the measured property to a larger number of values during sequencing*** is computationally more challenging."

JTX-2 at 391-92. PacBio made virtually identical arguments to distinguish the corresponding limitation in the '323 claims. JTX-8 at 40-41. Having distinguished Hibbs based on allegedly failing to disclose comparing a measured property to calibration information accounting for all $4^N$ combinations, PacBio cannot rest its infringement theory on the notion that any use of a recurrent neural network to perform a comparison, without more, is insubstantially different from the '400 and '323 Patent claims. *See Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1356 (Fed. Cir. 2013); *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1359-60 (Fed. Cir. 2000).

PacBio's experts testified that the "Taiyaki" data file used to train the Flip-Flop Software's algorithm contains the "calibration information" of the '400 and '323 claims because it contains current measurements for at least $4^9$ different combinations of bases. Vol. B, Tr. 479:4-480:7; Vol. C, Tr. 570:10-571:8, 576:19-577:13. At most, this merely "confirms that there is calibration information" present during training for an "N" of 9 or less. Vol. B, Tr. 479:4-480:7; *see also id.* at

478:8-27 (Oxford deposition testimony describing "originating" training method, not any alleged "comparing" step); Vol. F, Tr. 1486:19-1487:9 (Flip-Flop "relies on the same type of training dataset as the other tools, which contain all combinations of k-mer[s]").  But the mere existence of such calibration information (even if correct) cannot establish that the trained Flip-Flop Software "compar[es]" the measured current to the claimed calibration information to "determin[e] the sequence of the template nucleic acid" as the '400 and '323 claims require.  *Cf. Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010) ("Unless the claim language only requires the capacity to perform a particular claim element … it is not enough to simply show that a product is capable of infringement").  Oxford's expert, Dr. Nick Goldman, provided unrebutted testimony that the Flip-Flop Software does not make that comparison, for example, because it considers current measurements corresponding to transitions between individual bases (not combinations of "N" bases), and it uses only 40 possible output states, which is less than the minimum number of 64 values of the "calibration information" in the '400 and '323 claims (*i.e.*, $4^N$ where N=3).  Vol. E, Tr. 1026:10-1027:2, 1027:9-17, 1028:18-1029:1.  Thus, Oxford is entitled to JMOL that uses of its sequencing systems with the Flip-Flop Software do not infringe the '400 and '323 Patents.

## 2. There Is No Evidence that Certain Steps of the '056 Patent Claims Methods Were Performed in the United States.[10]

Independent claim 1 of the '056 Patent is a method claim and recites, in part, that "the *translocating enzyme and the reaction conditions **are selected** such that the translocating enzyme exhibits **two kinetic steps** wherein each of the kinetic steps has a rate constant, and the ratio of the rate constants of the kinetic steps is from 10:1 to 1:10.*"  JTX-3 at 67.  PacBio did not dispute at trial that the only inventive elements of claim 1 are recited in the above-quoted language.  Indeed, PacBio's lead inventor and counsel consistently referred to the '056 Patent as the "two-step enzyme"

---

[10]  During trial, Oxford moved for JMOL that PacBio failed to carry its burden of proof on infringement of the '056 Patent.  Vol. E, Tr. 1107:23-1109:1.

patent, and described the alleged invention with regard to enzymes that exhibited two kinetic steps. *See, e.g.*, Vol. A, Tr. 123:12-124:7, 204:6-10, 206:7-207:5; Vol. B, Tr. 360:15-17.   PacBio's technical expert Dr. Charles McHenry opined that Oxford infringed the '056 Patent because Oxford itself—not the end user of Oxford's accused products—"practiced the step of selecting reaction conditions in a translocating enzyme that exhibits two steps having the claimed ratio."  Vol. B, Tr. 427:5-10, 427:22-428:1.  As Dr. McHenry acknowledged, however, Oxford did not perform that step of selecting reaction conditions within the United States.  Vol. B, Tr. 427:15-21; *see also* Vol. E, Tr. 1035:13-1036:6 (Oxford witness James Clarke confirming that Oxford selected reaction conditions in the United Kingdom).  Because there is ***no*** evidence that Oxford, or anyone else, performed the "selecting" step of '056 claim 1 within the United States, no reasonable jury could have found direct or indirect infringement of the '056 Patent.  *See DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1303 (Fed. Cir. 2006) ("[T]he patentee always has the burden to show direct infringement for each instance of indirect infringement."); *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005) ("[A] process cannot be used 'within' the United States [under § 271(a)] unless each of the steps is performed within this country.").

### 3.  PacBio Failed to Present Evidence that the "N" Limitation Was Met for Any Activity Accused of Infringing the '400 or '323 Patent.

The Court construed "N" in the '400 and '323 Patent claims as "an integer three or greater that equals the number of monomeric units in the pore that affect (*i.e.*, vary) the current measurement of the property being measured."  D.I. 153 at 2.[11]  In its *Markman* opinion, the Court expressly stated that patentee did not "intend[] to draw a line between bases in the pore that largely affect (or vary) the measurement and those that affect the measurement to a lesser extent."  D.I. 152 at 15-16. PacBio, however, ignored the Court's holdings on the meaning of "N" throughout trial and offered

---

[11]   Docket citations are to C.A. No. 17-275 (LPS) unless otherwise noted.

no expert testimony or other evidence applying the Court's construction, as is required to support a finding of infringement.[12]   Instead, PacBio's entire infringement theory at trial, flying in the face of the Court's construction, was that only bases "dominating" the current measurement are relevant to the value of "N", while the bases that affect the measurement to a lesser extent do not count toward "N".

PacBio presented three technical experts to address the subject matter of the '400 and '323 Patents—two of whom (Drs. Joshua Earl and Richard Fair) never applied the Court's claim constructions nor purported to opine about the scope of the '400 or '323 claims.  Vol. C, Tr. 581:15-582:2; *see also* Vol. C, Tr. 562:8-9 (PacBio's counsel stating that Dr. Fair "did not provide an opinion on the contents of the '400 Patent").   Dr. Dessimoz, PacBio's primary expert on those patents, did not perform any measurements, testing, or simulations relating to the number of bases in the pore that affect the signal to determine the value of "N" in Oxford's accused products.  *See e.g.*, Vol. B, Tr. 507:18-20, 509:23-510:1.  Instead, he surmised that "N" was equal to 5 (for the R9 version of nanopores) or 9 (for R10 nanopores) in those products based on material presented by Oxford personnel at conferences and customer presentations allegedly showing 5 bases that "dominate" the measured signal.  Vol. B, Tr. 481:7-18 (describing that for R9 pores "we have seen a lot of evidence already on that point, that N is equal to 5. … And you can see ***approximately 5 bases dominate the current signal***."), 466:1-466:7 ("[W]e have the depiction that we could see in the presentation with a model of the pore, and here again highlighted is ***five bases dominate***"), & 466:14-467:5 (describing that for R10 pores "ONT has highlighted here nine bases as a dose of contribution signal"); Vol. F, Tr. 1514:23-1516:23 ("This very sharp reader head. And so therefore, I think a reasonable expectation would be that it's the basis [sic] that are in this constriction point that

---

[12]   During trial, Oxford moved for JMOL that PacBio failed to carry its burden of proof on infringement of the '400 and '323 Patents.  Vol. E, Tr. 1107:23-1109:1.

will be, you know, ***the most significant.***").[13]

But as the Court held in its *Markman* opinion, whether a certain (lesser) number of bases "dominate" or "significantly" affect or vary the signal is not relevant to determining "N" in the '400 and '323 Patent claims.[14]  *See* D.I. 152 at 15-16.  Dr. Dessimoz repeatedly refused to follow the claim construction that "N" includes ***all*** bases that affect (*i.e.*, vary) the current measurement, disagreeing that "N must count all bases that do affect, impact, contribute to or vary the value of the property being measured at a point in time."  Vol. B, Tr. 516:12-16; *see also* Vol. B, Tr. 516:17-517:15 (disagreeing that "there is nothing in the intrinsic record showing that the patentee intended to draw [a] line between bases in the pore that largely affect or vary the measurement and those that affect the measurement to a lesser extent").  Dr. Dessimoz's opinion that Oxford's products infringe based on a value of "N" that is fewer than all bases that affect or vary the measured signal is contrary to the Court's claim construction and should be given no weight.  *See Duncan Parking Techs., Inc. v. IPS Group Inc.*, 914 F.3d 1347, 1363 (Fed. Cir. 2019); *Transamerica Life Ins. Co. v. Lincoln Nat. Life Ins. Co.*, 597 F. Supp. 2d 897, 911-12 (N.D. Iowa Jan. 8, 2009) ("[N]o party should be allowed to argue to the jury claim constructions that are contrary to the court's claim constructions or to reassert to the jury constructions that the court has already expressly rejected") (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996)).

The only evidence consistent with the Court's construction of "N" showed that all of the

---

[13]  Dr. Dessimoz incorrectly characterized factual evidence about this issue on at least one occasion, incorrectly testifying that an Oxford employee speaking in video exhibit PTX-84 "says approximately five bases contribute to the signal," when the speaker actually stated that "approximately five bases ***dominate*** the signal."  PTX-84; Vol. B, Tr. 464:3-24.  Such expert testimony that "is plainly inconsistent with the record" must be disregarded.  *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1378 (Fed. Cir. 2017).

[14]  PacBio's own experts could not agree on the value of "N" for Oxford's products with R10 nanopores, invoking the very confusion that the Court's construction foreclosed.  *See* Vol. B, Tr. 466:14-16 (Dr. Dessimoz testifying that N=9); Vol. C, Tr. 559:8-561:7 (Dr. Fair testifying that N is no more than 5, but also confirming prior statements that N is no more than 6).

bases in the nanopore, and even some bases outside the nanopore, affect the electrical signal being measured in Oxford's sequencing devices. Oxford's fact and expert witnesses presented actual experimental data generated with Oxford's devices showing that all 15 bases in the nanopore affect the electrical signal being measured.[15] Vol. E, Tr. 1017:22-1019:11, 1093:9-1096:1. And it is undisputed that the use of Oxford's products could not infringe the '400 or '323 Patents with a value of "N" that high. Vol. B, Tr. 479:21-480:5. Dr. Dessimoz, having no experimental data to support his analysis, did not and could not refute this evidence about the correct value of "N". After being confronted with his own prior testimony confirming that "all the bases in the pore will affect the current itself," Dr. Dessimoz first attempted to dodge the point by inexplicably attempting to parse "current" from "current measurement." *See* Vol. B, Tr. 514:2-514:9. Dr. Dessimoz ultimately concluded that he simply did not know if all the bases in the pore affect the current measured in Oxford's products—the very question on which the Court's construction of "N" turns. *See* Vol. B, Tr. 514:20-515:14. Thus, Dr. Dessimoz admitted that he could not determine infringement based on the only experimental evidence presented at trial.

Nor did PacBio provide evidence that Oxford's accused systems use a value of "N" under the doctrine of equivalents. First, as discussed in Section III.A.1.b., *supra*, PacBio's prosecution history estoppel regarding the value of "N" bars its DOE theory. Moreover, Dr. Dessimoz failed to provide particularized testimony establishing that the differences between the claimed "N" and the actual number of bases used in Oxford's accused systems are insubstantial. *See Gemalto*, 754 F.3d at 1374. He merely cited opinions by Dr. Fair (Vol. B, Tr. 469:7-17), who never considered the proper scope of the '400 and '323 claims, and Oxford statements similar to those from his literal infringement

---

[15]   Although PacBio attempted to discredit Oxford's data because it appeared to omit units (*see* Vol. G, Tr. 1593:7-22, 1672:2-21; Vol. F, Tr. 1481:21-1482:1), Oxford testified, and PacBio did not rebut, that the data values were normalized and thus do not have units. Vol. E, Tr. 1059:1-8.

testimony that 5 bases are "dominant" without quantifying or specifying the technical impact of that difference from "N" as claimed (Vol. B, Tr. 469:18-471:16).[16]

Having no evidence that Oxford's products infringe under the Court's construction of "N", PacBio's counsel resorted to arguing in closing that the bases in the "reader head" region of the pore in Oxford's products were the relevant bases for "N," attempting to conflate the "reader head" region with the pore itself.

> "Let's talk about the '400 and '323 patents. … The key issue was N and the current measurement. …  It was explained by Clive Brown, yes, five bases. K-mer equals five. We see five bases over here on the lower right. … They said R9 has a sharp reader head. That's the reader head right there. They are showing three are in there and there's presumably one on each side. They designed it so they could get that control, and their argument is that this one is supposedly affecting the current in a meaningful way, the current measurement. Five bases dominate the current signal. They admitted it. Five bases dominate the signal. They admitted it. Sharper reader head. Let's get it as sharp as we can here. One, two, three, four, five. The first and fifth are outside of the reader head, so it's about five that dominate, really three. Distribution of K-mers in a 5-mer model, five.  Here is the ten, and we'll pull it up and make it a little easier. ***Look at the sharp reader head as they do it. There's three in there and there's one, two on the other side***. If you had a reader head that was designed to read something, it would be like a cassette tape. It has got a reader head. ***Is the tape that's along the whole width of the old-fashioned cassette tape relevant? No. It's what's at the reader head.*** That's why you create a reader head."

Vol. G, Tr. 1590:24-1592:2.  PacBio's bare attorney argument urging the jury to consider the number of bases in a particular portion of the nanopore was not supported by any evidence, the asserted claims, or the Court's construction.  *See Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1046 (Fed. Cir. 2017) ("Attorney argument is not evidence or explanation in support of a conclusion.").  Indeed, none of PacBio's experts testified that only the bases in the "reader head" portion of the pore mattered to determining "N"; instead, PacBio's experts relied on whether their effect on the signal being measured was "dominant" or "significant" (which, as discussed above, was

---

[16]   *See also Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., Inc.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989) ("The evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement.").

also irrelevant to the Court's construction).  Without any supporting evidence, this argument cannot support the jury's infringement verdict.  *See Centricut*, 390 F.3d at 1370.

### B.   Alternatively, Oxford Is Entitled to Vacation of the Infringement Judgments and a Conditional New Trial on Infringement of the '400, '323, and '056 Patents.

As noted in Section III.A.1., *supra*, no reasonable jury could have found based on the evidence that the use of Oxford's sequencing systems with RNA Sequencing Kits infringed the '056 Patent, or that the use of Oxford's sequencing systems with Flip-Flop Software infringed the '400 and '323 Patents.   Despite the complete absence of evidence on these products, PacBio still contended that, and the jury was instructed to consider whether, uses of those products infringe the asserted patents.  Vol. F, Tr. 1538:24-1539:11.  Oxford requested a verdict form containing separate infringement questions on each of these products, but the Court adopted PacBio's proposal that concealed the jury's decisions on specific products within a generic infringement determination.  *See* D.I. 473 at 2-5; Vol. F, Tr. 1291:14-1292:5; *compare* D.I. 473 at 2-5 *with* D.I. 477 at 2-6.  Based on the record, it is impossible to know whether the jury's infringement verdict was based PacBio's defective claims on these products, for which Oxford is entitled to JMOL.  "Where a jury has returned a general verdict and one theory of liability is not sustained by the evidence or legally sound, the verdict cannot stand because the court cannot determine whether the jury based its verdict on an improper ground."  *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 361 (3d Cir. 1998); *see also Brokerage Concepts v. U.S. Healthcare, Inc.*, 140 F.3d 494, 534 (3d Cir. 1998) (where jury instruction invited the jury to find liability on an erroneous basis and a valid basis, "the proper course [was] for [the court] to remand for a new trial rather than to attempt to divine the basis of the jury's verdict"); *Limbach Co. v. Sheet Metal Workers Int'l Assoc.*, 949 F.2d 1211, 1217–18 (3d Cir. 1991) ("[W]e must set aside a general verdict if it was based on two or more independent grounds one of which was insufficient, and we cannot determine whether the jury relied on the valid

ground."), *aff'd on rehearing en banc*, 949 F.2d 1241 (3d Cir. 1991); *Avins v. White*, 627 F.2d 637, 646 (3d Cir. 1980) (same).

This is also not a case where the general verdict may be upheld because there is sufficient evidence to support "alternative factual theories" for how a defendant infringed a particular patent claim. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010). Here the problem is not lack of clarity on the factual theory on which the jury found infringement (*e.g.*, contributory or induced infringement). Rather, the problem is that there is no way to tell which products the jury found infringed the asserted patents. Thus, if the Court grants either of Oxford's motions for JMOL under Section III.A.1.a or III.A.1.b, respectively, *supra*, as to the specified products, but does not grant JMOL for the corresponding patent as per Section III.A.2 and III.A.3, respectively, *supra*, the Court should vacate the judgment of infringement for those patents and also grant (conditionally in the event the invalidity judgments are altered) a new trial under Rule 59 on PacBio's infringement claims for the relevant patent(s) on the other accused products.[17]

## C. Oxford Is Entitled to Judgment as a Matter of Law that the Asserted Claims of the '056 Patent are Indefinite.

Although a jury verdict may provide guidance on underlying factual issues, indefiniteness is a question of law for the Court. The parties disputed at trial whether the term "kinetic steps" in claim 1 of the '056 Patent is indefinite. The jury found that claim 1 of the '056 Patent is indefinite, but did not make the same finding for claims 2 and 12, which depend from claim 1. Although the jury verdict is advisory regarding underlying factual disputes,[18] the ultimate determination as to

---

[17]   Although the Court should vacate and conditionally grant Oxford's motion for a new trial on infringement under those circumstances, there will be no need for that trial provided that the jury's verdict finding the asserted patent claims invalid stands. *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1308 (Fed. Cir. 2018) (no need to reach infringement). Rules 50(c) and 59(a)(1)(A) provide for conditional new trial orders.

[18]   Oxford moves without prejudice to its request for a bench trial on indefiniteness, which was previously denied. *See* D.I. 448 at 65; D.I. 486 (2/28/2020 Pretrial Conf. Tr.) at 45:11-47:2.

whether the asserted claims are indefinite should be made by the Court. The relevant evidence supports JMOL that claims 1, 2, and 12 of the '056 Patent are indefinite.

### 1. Indefiniteness is a matter of claim construction for the Court.

"Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is subject to construction." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008). Thus, as with claim construction, indefiniteness "is exclusively within the province of the court." *Markman*, 517 U.S. at 372.

A jury verdict may help resolve underlying factual disputes. *See BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003). But the presence of such disputes does not negate that "the ultimate question of claim construction is for the judge and not the jury." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015). In *Teva*, the Supreme Court addressed whether "molecular weight" in the asserted claims was indefinite. *Id*. at 321-24. The Court treated the indefiniteness dispute as a matter of claim construction for the court, but held that subsidiary factual findings should be reviewed on appeal for clear error. *Id.* at 333.

The Supreme Court has recognized that "a factual finding may be close to dispositive of the ultimate legal question," but "[n]onetheless, the ultimate question of construction will remain a legal question." *Id*. That there may be conflicting expert testimony on the issue of indefiniteness does not change that indefiniteness is a legal question for the judge. "A party cannot transform into a factual matter the internal coherence and context assessment of the patent simply by having an expert offer an opinion on it. The internal coherence and context assessment of the patent, and whether it conveys claim meaning with reasonable certainty, are questions of law." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015). Accordingly, the indefiniteness of the asserted claims of the '056 Patent remains a legal issue for the Court.

**2.  By finding claim 1 indefinite, the jury resolved fact issues in Oxford's favor.**

The jury found that '056 Patent claim 1, the only asserted independent claim, was invalid for indefiniteness.  "Because the jury found the claims indefinite, we presume that it resolved the underlying factual issues … in [defendant's] favor." *Bombardier Recreational Prod. Inc. v. Arctic Cat Inc.*, 785 F. App'x 858, 867 (Fed. Cir. 2019).  Accordingly, it is presumed that the jury found that a person of skill in the art would not be able to ascertain the bounds of the "kinetic steps" limitation of claim 1, as argued by Oxford.  This finding is supported by the unrebutted evidence.

In particular, Oxford's expert Dr. Taekjip Ha testified that the asserted claims of the '056 Patent are indefinite because the term "kinetic steps" is ambiguous.  Vol. E, Tr. 1185:7-20.  Dr. Ha testified that the term is ambiguous because an enzyme has many steps, all of which can be combined or subdivided, and depending on how one selects the kinetic steps, one will get different results. *Id*. at 1185:21-1186:20. He also testified that the 2006 Dumont reference illustrates how one can get different infringement results depending on how the kinetic steps are grouped. *Id*. at 1186:21-1187:3, 1190:24-1191:19.  This case parallels *Teva Pharms.*, where the Federal Circuit found the term "molecular weight" indefinite because it could be interpreted in different ways that yield different results. 789 F.3d at 1341.

PacBio offered no expert testimony to rebut this evidence.  Vol. F, Tr. 1449:25-1450:10 (PacBio's counsel objecting to cross-examination of its expert on indefiniteness as beyond the scope of direct examination).  Since PacBio provided no expert testimony to rebut the testimony of Dr. Ha, there is no factual basis in the record for any conclusion other than indefiniteness.  Because (a) the jury must have relied upon a factual determination that Dr. Ha's testimony was correct in determining that claim 1 was invalid as indefinite, and (b) Dr. Ha's opinions are undisputed, the Court should grant JMOL that all asserted claims of the '056 Patent are indefinite.

### 3.   Claims 2 and 12 are indefinite for the same reason as claim 1.

Neither party has asserted or provided any evidence that dependent claims 2 and 12 should have a different outcome as to indefiniteness than claim 1 from which they depend.  Claim 2 further specifies that "the translocating enzyme comprises a polymerase, an exonuclease, or a helicase."  But these classes of enzymes still contain millions of different enzymes (Vol. E, Tr. 1168:17-18; Vol. F, Tr. 1437:15-16 & 1475:2-1475:6), and the claim provides no additional details as to how "kinetics steps" should be understood.  Claim 12 specifies that the sequencing method of claim 1 uses "an array of nanopores," but does not address the enzyme or its "kinetic steps" that are at issue in the indefiniteness analysis.  At no point has PacBio argued that the limitations in these dependent claims somehow provide any additional clarity on how a person of skill in the art would ascertain the bounds of the "kinetic steps" in claim 1.  Nor did PacBio present any argument or evidence that any of the asserted dependent claims were definite for different reasons during the Court's consideration of indefiniteness at *Markman* and summary judgment proceedings, or at trial.

The jury found that claims 2 and 12 were not indefinite.  Though one cannot divine the reason for their verdict, it may simply reflect the fact that the indefinite term "kinetic steps" is not explicitly recited in these dependent claims.  But because there are no factual disputes for claims 2 and 12 other than those encompassed by their dependence from claim 1, there is no basis to give deference to the jury's verdict regarding these dependent claims.  *Teva Pharms.*, 789 F.3d at 1342. Put another way, the only relevant fact as to dependent claims 2 and 12 with respect to indefiniteness is that they depend from Claim 1.  Because that sole relevant fact cannot be disputed, PacBio had no right to a jury trial as to indefiniteness on Claims 2 and 12.  *See Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 763 (Fed. Cir. 1988) (". . . where the ultimate legal conclusion of obviousness is disputed, but not the underlying facts, there is no issue of fact requiring a trial, even though some facts favor obviousness, some nonobviousness.").  Thus, the jury verdict on Claims 2 and 12 is not

entitled to deference and this Court may enter judgment of indefiniteness as to the dependent claims based upon the findings with respect to Claim 1.  *Id.* ("A jury verdict need not be obtained and ***may be set aside*** under the common law principles incorporated into the Constitution where there is no fact issue for the jury to decide.").

Claims 2 and 12 incorporate the indefinite term "kinetic steps" because of their dependence from claim 1 and are therefore invalid as indefinite for the same reasons as claim 1.  Thus, the Court should grant JMOL that claims 1, 2, and 12 of the '056 Patent are invalid as indefinite.

## IV.    CONCLUSION

In view of the evidence at trial, the Court should grant JMOL that Oxford has not infringed the '400, '323, and '056 Patents.  At a minimum, the Court should grant JMOL that uses of Oxford's Flip-Flop Software and RNA Sequencing Kits do not infringe the '400, '323, and '056 Patents, and grant Oxford's motion for a new trial on infringement as to those patents.  Moreover, the Court should grant JMOL that claims 1, 2, and 12 of the '056 Patent are invalid as indefinite.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alexander Piala
Mysha Lubke
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendants*

David G. Wille
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2980
(214) 953-6595

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

April 29, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 29, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 29, 2020, upon the following in the manner indicated:

Brian E. Farnan, Esquire                                    *VIA ELECTRONIC MAIL*
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Plaintiff*

Edward R. Reines, Esquire                                 *VIA ELECTRONIC MAIL*
Derek C. Walter, Esquire
Robert S. Magee, Esquire
Shawn Chi, Esquire
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
*Attorneys for Plaintiff*

Doug W. McClellan, Esquire                             *VIA ELECTRONIC MAIL*
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1700
Houston, TX  77002-2755
*Attorneys for Plaintiff*

*/s/ Jennifer Ying*
Jennifer Ying (#5550)