# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 17-cv-275-LPS C.A. No. 17-cv-1353-LPS |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| OXFORD NANOPORE TECHNOLOGIES, INC., and OXFORD NANOPORE TECHNOLOGIES, LTD., | ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

## PLAINTIFF'S MOTION *IN LIMINE* NO. 1 TO PRECLUDE REFERENCE TO ONT'S PRACTICE OF SEEKING ADVICE OF COUNSEL

Pursuant to Federal Rules of Evidence 403, plaintiff Pacific Biosciences of California, Inc. ("PacBio") moves the Court for an order precluding defendants Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd. (collectively, "ONT") from offering evidence or arguing that it sought or received attorney advice relating to PacBio's patents or had a practice of obtaining attorney advice relating to intellectual property or had regular counsel that it relies upon for such advice.

### A.    ONT Prevented Discovery Into Advice Of Counsel

PacBio has asserted claims for willful infringement of U.S. Patent Nos. 9,546,400 (the "400 Patent"), 9,772,323 (the "323 Patent"), 9,678,056 (the "056 Patent"), and 9,738,929 (the "929 Patent") (collectively, the "Asserted Patents").   D.I. 268.   During discovery, PacBio sought documents and communications regarding "any formal or information investigation, analysis, opinion, report, study or observation" conducted by ONT regarding infringement, and "any opinion (whether written or oral) regarding the infringement, validity, patentability, enforceability, or scope" of the asserted claims.  *See* Ex. 1 [ONT's Responses to PacBio's First Set Of Requests For Production] at 9, 11.  ONT objected on the basis of privilege and did not produce any advice of counsel (aka "freedom to operate" opinions).

ONT not only refused to provide documents related to any request for or advice of counsel, but ONT instructed its witnesses, who were specifically designated to testify on these topics, ***not*** to provide substantive testimony regarding the same.  For instance, when asked whether ONT ever analyzed its products to determine whether they infringed the Asserted Patents, Mr. McDonald consistently maintained that such information was protected by attorney-client privilege.  *See, e.g.,* Ex. 2 [McDonald Dep. Tr.] at 64:9-66:2, 100:13-101:10, 109:20-111:10, 119:18-120:23, 121:8-122:6, 122:20-125:13, 130:17-132:20.  Additionally, ONT instructed Dr. Willcocks not to provide substantive answers to questions regarding when he first learned of the Asserted Patents on the

1

basis of privilege.  *See* Ex. 3 [Willcocks Tr.] at 333:19-334:8, 141:15-23, 142:5-16, 143:11-20, 144:19-145:7.

As part of the parties' meet and confer, PacBio asked ONT to confirm it would not argue that it sought or received or that it "normally seeks or relies upon advice of counsel (aka 'freedom to operate') related to patent infringement, nor state or suggest that it did so in this case."  Ex. 4 [Feb. 11, 2020 L. Flannery Email].  ONT agreed that it "did not produce, and thus will not be offering, evidence of advice of counsel specific to the asserted patents."  Ex. 4.  ONT implied that it planned to argue and submit evidence that it normally seeks or relies upon advice of counsel regarding patents.  *Id.*

Allowing evidence or argument that ONT has a practice of receiving advice of counsel implies that it obtained advice here.  That would open the door wide to PacBio arguing that ONT withheld any legal advice it received and thus any such advice (if received at all) must have been adverse.  This situation can be avoided if the Court grants the requested relief

**B.      Evidence Of ONT's Regular Practice With Regard To Advice Of Counsel Is Irrelevant And Prejudicial**

It is well-established that a party may not "rely upon the legal advice it received…without permitting [the opposing party] the opportunity to probe the surrounding circumstances and substance of that advice."  *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006).  Accordingly, this Court has precluded an accused infringer from presenting evidence of advice of counsel where the accused infringer failed to disclose the substance of the advice.  *See* Memorandum Order at 3, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, C.A. No. 08-309-LPS, (D. Del. Oct. 31, 2018), ECF. No. 984.

ONT should not be allowed to argue or present evidence that it sought or received attorney advice relating to PacBio's patents or had a practice of seeking or obtaining attorney advice

relating to intellectual property or had regular counsel that it relies upon for such advice. This would unfairly imply that it sought, and received, exculpatory advice in this case without PacBio ever having a fair opportunity to test what advice ONT *actually* sought and received.

The implication ONT is asking the jury to draw—while hiding any actual request and advice—opens the door to the adverse inference that the advice ONT either failed to seek or withheld is inculpatory. Such an adverse inference is normally precluded absent the type of door-opening that ONT proposes here. *See Ultratec, Inc. v. Sorenson Comm., Inc.*, 2014 WL 4976596 at *2 (W.D. Wisc. Oct. 3, 2014) (infringer implying that it relied on the advice of counsel opens the door to an adverse inference based on a failure to produce the actual advice at trial); *Claffey v. River Oaks Hyundai*, 486 F. Supp. 2d 776, 778-79 (N.D. Ill. 2007) (reliance on evidence that would tend to suggest that procedures included consultation with counsel deemed to waive attorney-client privilege). The Northern District of California addressed a similar issue. *Volterra Semiconductor Corp. v. Primarion, Inc.*, 2013 WL 1366037 at *2 (N.D. Cal. Apr. 13, 2013). In *Volterra,* the Court found that introduction of evidence that the accused infringer's procedures included seeking advice of counsel would be sufficient to put that advice in issue, waive privilege, and prejudice the plaintiff as it "would leave the jury with the impression" that the defendant "relied on the advice of counsel." *Id.* Rather than allowing ONT to open the door, the Court should preclude ONT from implying it sought and received favorable advice as set forth in this motion. The principles of FRE 403 would be advanced by such an order.

For the foregoing reasons, Plaintiff respectfully requests that the Court order that ONT should not be allowed to argue or present evidence that it sought or received attorney advice relating to PacBio's patents or had a practice of seeking or obtaining attorney advice relating to intellectual property or had regular counsel that it relies upon for such advice.

Dated: February 13, 2020

FARNAN LLP

*/s/ Brian E. Farnan*

_____
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff Pacific Biosciences of
California, Inc.*

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Robert S. Magee (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com
robert.magee@weil.com

4

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 17-275 (LPS) ) |
| OXFORD NANOPORE TECHNOLOGIES, INC., | ) ) ) |
| Defendant. | ) |
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 17-1353 (LPS) ) |
| OXFORD NANOPORE TECHNOLOGIES, INC., | ) ) ) |
| Defendant. | ) |

**DEFENDANT OXFORD NANOPORE TECHNOLOGIES, INC.'S RESPONSES TO PLAINTIFF PACIFIC BIOSCIENCES OF CALIFORNIA, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS (NOS. 1-51)**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Delaware ("the Local Rules"), Defendant Oxford Nanopore Technologies, Inc. ("Oxford" or "Defendant") hereby provides its objections and responses to Plaintiff Pacific Biosciences of California, Inc.'s ("PacBio" or "Plaintiff") First Set of Requests for Production of Documents and Things (Nos. 1-51) dated February 15, 2018.

calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.

Oxford will not produce communications between the Defendant and attorneys, agents of attorneys, or other third parties that are protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.  Oxford also will not search for or produce documents relating only to the broad category of Related Patents as presently defined by PacBio.  Subject to and without waiving these General and Specific Objections, after a reasonable search, and to the extent they exist and are in Oxford's possession, custody, or control, Oxford will produce relevant, non-privileged documents and things responsive to this request that relate to the Patents-in-Suit and prior art thereto.

**REQUEST FOR PRODUCTION NO. 2:**

All documents and communications relating to or supporting Defendant's assertion that the Accused Products do not infringe any of the asserted claims of the Patents-in-Suit including but not limited to any formal or informal investigation, analysis, opinion, report, study, or observation regarding whether Oxford Nanopore has infringed any claim of the Patents-in-Suit.

**RESPONSE:**

Oxford incorporates by reference each of its General Objections recited above.  Oxford objects to this request as overly broad, unduly burdensome, and beyond the scope of permissible discovery to the extent it seeks "All documents and communications."  Oxford also objects to this request as calling for contentions, legal conclusions, or expert opinions/testimony with regard to the scope of the subject matter described or claimed in the Patents-in-Suit.  Oxford further objects to this request to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.

Oxford will not produce communications between the Defendant and attorneys, agents of attorneys, or other third parties that are protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.  Subject to and without waiving these General and Specific Objections, after a reasonable search, and to the extent they exist and are in Oxford's possession, custody, or control, Oxford will produce relevant, non-privileged documents and things responsive to this request that relate to the Patents-in-Suit and prior art thereto.

**REQUEST FOR PRODUCTION NO. 3:**

All documents and things relating to Defendant's knowledge of the Patents-in-Suit, including but not limited to documents sufficient to identify the date when and circumstances under which Defendant first became aware of the Patents-in-Suit and any documents relating to any investigations conducted by Defendant and any conclusions that it reached regarding the Patents-in-Suit following such awareness.

**RESPONSE:**

Oxford incorporates by reference each of its General Objections recited above.  Oxford objects to this request as overly broad, unduly burdensome, and beyond the scope of permissible discovery to the extent it seeks "All documents and things."  Oxford further objects to this request to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.

Oxford will not produce communications between the Defendant and attorneys, agents of attorneys, or other third parties that are protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.  Subject to and without waiving these General and Specific Objections, after a reasonable search, and to the extent they exist and are in Oxford's possession, custody, or control, Oxford will produce relevant, non-privileged documents and things responsive to this request that relate to the Patents-in-Suit and prior art thereto.

## REQUEST FOR PRODUCTION NO. 4:

With respect to the Patents-in-Suit or any related patents, all documents relating to any opinion (whether written or oral) regarding the infringement, validity, patentability, enforceability, or scope of any claim of the Patents-in-Suit or related patents, including without limitation all communications concerning any such opinion, all documents generated or reviewed in the drafting or preparation of any opinion, and all searches, investigations, reviews, tests, or analyses performed, whether oral or in writing.

## RESPONSE:

Oxford incorporates by reference each of its General Objections recited above.  Oxford objects to this request as overly broad, unduly burdensome, and beyond the scope of permissible discovery to the extent it seeks "all documents" and "all communications."  Oxford objects to the inclusion of "related patents" as seeking discovery that is overbroad and unduly burdensome, and vague and ambiguous to the extent that it is unclear as to whether this refers to the capitalized defined term "Related Patents."  Oxford also objects to this request as calling for contentions, legal conclusions, or expert opinions/testimony with regard to the scope of the subject matter described or claimed in the Patents-in-Suit.  Oxford further objects to this request to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.

Oxford will not produce communications between the Defendant and attorneys, agents of attorneys, or other third parties that are protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.  Oxford also will not search for or produce documents relating only to the broad category of Related Patents as presently defined by PacBio.  Subject to and without waiving these General and Specific Objections, after a reasonable search, and to the extent they exist and are in Oxford's possession, custody, or control, Oxford will produce relevant, non-privileged documents and things responsive to this request that relate to the Patents-in-Suit and prior art thereto.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

David G. Wille
Johnson K. Kuncheria
BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201-2980
(214) 953-6595

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Yan-Xin Li
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
(212) 408-2500

March 19, 2018

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Defendant*

# EXHIBIT 2

**REDACTED**

# EXHIBIT 3

**REDACTED**

# EXHIBIT 4

| | |
|---|---|
| **From:** | liz.flannery@bakerbotts.com |
| **To:** | Magee, Robert |
| **Cc:** | stephen.hash@bakerbotts.com; JYing@MNAT.com; JBlumenfeld@MNAT.com; DLOxford3@BakerBotts.com; mfarnan@farnanlaw.com; bfarnan@farnanlaw.com; PacBio Oxford Delaware WGM Service |
| **Subject:** | RE: PacBio v. Oxford -- Proposed MiLs |
| **Date:** | Tuesday, February 11, 2020 7:52:38 PM |

Bobby,

We've considered your proposals provided below, and we can agree to some of this but not all.  I've taken a stab at paring back to what we can agree on below.

1.   ONT and its witnesses may not use the terms "patent troll" or "non-practicing entity" in describing or referring to PacBio.  ONT will be permitted to present evidence that PacBio does not practice the patents-in-suit.

2.   The parties' witnesses and counsel may not argue or refer to whether counsel for either party has or lacks personal experience with the technology in the case.

3.   *[We do not agree on this point.  We believe evidence regarding those investigations is relevant in this matter, at least to damages.  Certainly the court's forthcoming rulings on PacBio's motion to exclude Dr. Layne-Farrar's 2nd supplemental report may inform this further, and perhaps we can revisit this issue once we have the Court's ruling.]*

4.   *[We are not agreed on this point.  As we stated during the call, ONT did not produce, and thus will not be offering, evidence of advice of counsel specific to the asserted patents, but we do not believe it would be appropriate to exclude the other aspects you described in your proposal.]*

On the modification of ONT's insert to the PTO, we are fine with adding the statement you provided below (with a slight revision to read "The parties agree that they may not offer argument or evidence argument inconsistent with the Court's Order and Opinion on claim construction.") and including that as an agreed limine order.  However, we still wish to raise the issues regarding claim construction identified in our insert as additional issues in the pretrial order.

Regarding ONT's proposed MiLs, we propose the following orders for agreement:

(for item 2. on ONT's list)  The parties will not make arguments or statements regarding the absence of any witnesses (i.e., failure to appear live) at trial.

(for item 4. on ONT's list)  The parties will not refer to the results or findings of, or evidence provided in, the following judicial proceedings that are not relevant to any issue before the jury: (a) the patent dispute between the parties in the United Kingdom; (b) any IPR proceedings; (c) ONT's motions under Rule 12(b)(6) in this case; (d) ONT's motion to add counterclaims for antitrust / inequitable conduct; and (e) this Court's consideration of and rulings on any discovery disputes.

Let us know if these are acceptable.  Further, just so we have it documented, we confirm that during our call today we agreed that the deadline for exchanging opening briefs on MiLs would be extended to February 13 at 6pm ET.

Thanks,
Liz


**Liz Durham Flannery**
*Partner*

Baker Botts L.L.P.
liz.flannery@bakerbotts.com
T +1.713.229.2104
F +1.713.229.7704

910 Louisiana Street
Houston, Texas 77002
USA



---

**From:** Magee, Robert <Robert.Magee@weil.com>
**Sent:** Tuesday, February 11, 2020 4:31 PM
**To:** Flannery, Liz <liz.flannery@bakerbotts.com>
**Cc:** Hash, Steve <stephen.hash@bakerbotts.com>; EXT Ying, Jennifer <JYing@MNAT.com>; EXT Blumenfeld, Jack <jblumenfeld@MNAT.com>; DL Oxford3 <DLOxford3@BakerBotts.com>; mfarnan@farnanlaw.com; bfarnan@farnanlaw.com; PacBio Oxford Delaware WGM Service <PacBio.Oxford.Delaware.WGM.Service@weil.com>
**Subject:** RE: PacBio v. Oxford -- Proposed MiLs

**[EXTERNAL EMAIL]**

Liz,

Thank you for the meet and confer.  Per our discussion, we have set forth proposed *limine* orders below for our MiLs for which the parties may still be able to reach agreement.

1.   ONT and its witnesses may not use the terms "patent troll," "non-practicing entity," or "paper patent" or otherwise disparage PacBio because it is asserting a patent it does not practice.  For damages purposes, ONT will be permitted to present evidence that PacBio does not practice the patents-in-suit.  Likewise, ONT may not offer argument or evidence that a finding of infringement against ONT may result in injunctive relief, increase prices or lead to the exclusion of nanopore sequencing devices from the United States.

2.   The parties' counsel may not argue to the jury about the technology in the case based on ostensible personal experience.

3.       The parties may not offer argument or evidence about the unsuccessful acquisition of PacBio by Illumina or any related investigations conducted by the U.S. FTC, U.K. CMA or any other regulatory agency.

4.       ONT may not offer argument or evidence that ONT normally seeks or relies upon advice of counsel (aka "freedom to operate") related to patent infringement nor state or suggest that it did so in this case.  The parties may address counsel's role in monitoring patent disclosures of competitors.

Additionally, we propose modifying ONT's insert to the PTO to read:

The parties agree that they may not offer argument or evidence argument inconsistent with the Court's Orders on claim construction.

We are available to discuss telephonically if you believe discussions would be fruitful to narrow or resolve these issues.

Best,
Bobby

**From:** liz.flannery@bakerbotts.com <liz.flannery@bakerbotts.com>
**Sent:** Monday, February 10, 2020 7:57 PM
**To:** Magee, Robert <Robert.Magee@weil.com>
**Cc:** stephen.hash@bakerbotts.com; JYing@MNAT.com; JBlumenfeld@MNAT.com; DLOxford3@BakerBotts.com; mfarnan@farnanlaw.com; bfarnan@farnanlaw.com; PacBio Oxford Delaware WGM Service <PacBio.Oxford.Delaware.WGM.Service@weil.com>
**Subject:** Re: PacBio v. Oxford -- Proposed MiLs

Bobby, let's plan on 10am PT / noon CT. We can use this dial-in:

Dial 1-888-822-7517 (US); passcode 8235186

Sent from my iPhone

On Feb 10, 2020, at 5:00 PM, Magee, Robert <Robert.Magee@weil.com> wrote:

**[EXTERNAL EMAIL]**

Liz,

Per our discussions, below please find a list of proposed motions in limine.  As I mentioned in my previous email, we are available to meet and confer between 8-10:30am PT (11am-1:30pm ET) tomorrow.

Proposed motions in limine:

- Preclude ONT from using the terms "patent troll," "non-practicing entity," "paper patent," or otherwise disparaging PacBio
- Preclude ONT from offering argument or evidence relating to the proposed merger between Illumina and PacBio
- Preclude ONT from offering argument or evidence regarding the exclusion of nanopore sequencing technology from the United States
- Preclude attorneys from ONT from supplementing the trial record with his own scientific testimony or vouching for any witnesses
- Preclude ONT from offering argument or evidence regarding any purported advice of counsel
- Preclude ONT from offering argument or evidence contrary to the Court's claim construction
- Preclude ONT from offering argument or evidence related to any anti-trust claims

Best,
Bobby

<image001.jpg>

**Robert Magee**

Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
Robert.Magee@weil.com
+1 650 802 3985 Direct
+1 650 802 3100 Fax

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such

information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC.,<br><br>                 *Plaintiff*,<br><br>v.<br><br>OXFORD NANOPORE TECHNOLOGIES, INC. and OXFORD NANOPORE TECHNOLOGIES, LTD.,<br>                 *Defendants*. | C.A. No. 17-cv-275-LPS<br>C.A. No. 17-cv-1353-LPS<br><br>JURY TRIAL DEMANDED |

**OXFORD'S OPPOSITION TO PACBIO'S MOTION IN LIMINE NO. 1 TO PRECLUDE
REFERENCE TO ONT'S PRACTICE OF SEEKING ADVICE OF COUNSEL**

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Dated:  February 17, 2020

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Defendants*

As even PacBio notes in its motion, Oxford has expressly stated that it "did not produce, and thus will not be offering, evidence of advice of counsel specific to the asserted patents." Yet, PacBio seeks to prevent Oxford from offering testimony, evidence, and argument regarding Oxford's general business practices of obtaining attorney advice relating to intellectual property and having regular counsel to rely upon for such advice. For the reasons below, Fed. R. Evid. 403 does not support PacBio's broad request to exclude this information.

As an initial matter, PacBio's assertions that Oxford deprived it of relevant and non-privileged discovery rings hollow on this record.[1] Oxford's discovery responses prior to PacBio's willfulness allegations properly asserted attorney-client privilege, and Oxford did not include advice of counsel in response to PacBio's contention interrogatory regarding Oxford's affirmative defenses. Nor did Oxford plead advice of counsel as an affirmative defense. So, it is unsurprising that Oxford's witnesses[2] sought to maintain privilege in response to certain of PacBio's questions regarding advice as it relates to the instant litigation.

The broad testimony PacBio elicited regarding Oxford's business practices was not limited to only the asserted patents or even only to PacBio or its patents.[3] For example, PacBio asked Mr. McDonald generally for details regarding "advice from counsel addressing whether Oxford

---

[1] This Court should reject PacBio's assertion that it was entitled to discovery of trial counsel's communications with its client during a pending litigation. PacBio filed this litigation mere weeks after the earliest asserted patent issued, and many months *before* the remaining asserted patents issued. Thus, the period of any alleged willfulness began *during* the course of this litigation, when Oxford was developing and disclosing through discovery non-privileged trial defenses, non-infringement contentions, and invalidity contentions. These trial defenses are relevant to willfulness, and Oxford's general business practices should be permitted in support of these defenses.

[2] Contrary to PacBio's statement otherwise, Mr. Willcocks was not "specifically designated to testify on these topics," or any Rule 30(b)(6) topic. And PacBio did not even list advice of counsel as a topic for corporate representative testimony. Exhibits 1, 2.

[3] To the extent PacBio continues to oppose Oxford's MIL No. 2 and argue that Oxford's knowledge of unasserted patents should be admissible, PacBio should not be allowed to exclude Oxford's practices regarding unasserted patents. PacBio cannot have it both ways.

Nanopore products were potentially infringing competitor's patents" without limiting the scope to only the asserted patents. Ex. 3, McDonald Tr. at 104:9-12; 105:4-6. PacBio also sought general testimony regarding ███████████████████████████████████████ Ex. 3, at 103:15-17. PacBio posed general questions on ██████████████████████████████ ███████████████████ Ex. 3, at 132:12-15.

Such statements are appropriate for testimony, evidence, and argument at trial. The court in *Canon, Inc. v. Color Imaging, Inc.* held that even if not relying on advice of counsel, the defendant should still "be able to introduce evidence (or arguments) for the narrow purpose of explaining their general business practices." 227 F.Supp.3d 1303, 1308-09 (N.D. Ga. 2016). "Narrowly tailored evidence about such general business practices does not alone inject into the case an affirmative defense that the Defendants relied on advice from counsel." *Id.* Additionally, Oxford would not "waive the attorney-client privilege solely by presenting evidence regarding how they manage and structure their business overall and that their regular business or management process includes the consultation with counsel about an array of topics, including patents." *See id.*

PacBio's cursory readings of the authority on which it relies does not hold otherwise— those cases do not apply to these facts. *See* PacBio MIL No. 1, at 3. Unlike Oxford's intent to refer to its general business practices, the defendant in *Ultratec, Inc. v. Sorenson Comm., Inc.*, sought to present evidence that it had a subjective, good-faith belief of invalidity, even though it did not rely on advice of counsel. 2014 WL 4976596 at *2 (W.D. Wisc. Oct. 3, 2014). *Claffey v. River Oaks Hyundai*, was brought under the Fair Credit Reporting Act (which does not have the protections of 35 U.S.C. § 298), and at issue was whether the defendant was asserting an affirmative defense to willful violation of the FCRA. 486 F. Supp. 2d 776, 778-79 (N.D. Ill. 2007). And the issue in *Volterra Semiconductor Corp. v. Primarion, Inc.* was whether a defendant could

assert advice of counsel at trial after having previously declined to assert reliance on it.  2013 WL 1366037 at *2 (N.D. Cal. Apr. 13, 2013).

Moreover, it would be unfair to permit PacBio to make general, blanket statements regarding Oxford's past business practices with regard to intellectual property, while denying Oxford the ability to respond to those statements.  For example, PacBio has accused Oxford of making "glib dismissal[s] of patents," without limiting that accusation to the asserted patents or any PacBio patent for that matter.   Dkt. 268, at 2.  PacBio also asserts that Oxford is generally dismissive of patents and "Oxford's executives deliberately ignored PacBio patents relating to nanopore sequencing, believing them to be invalid without meaningful analysis."  Ex. 4, PacBio ROG Responses at 8-9.  PacBio also asserts that "Oxford acted with callous disregard for PacBio's patent rights," without limiting such an unduly prejudicial argument to the asserted patents or providing any identification of patent rights.  Ex. 4, at 13.   Considering the breadth and inflammatory nature of such statements,  Oxford must be allowed to respond with evidence of its non-privileged business practices regarding intellectual property and respect of patent rights. Oxford should have the ability to do so at least in accordance with the scope of the deposition testimony elicited by PacBio.

For the foregoing reasons, PacBio's attempt to obtain an overbroad order excluding relevant and permissible testimony, evidence, and argument regarding Oxford's business practices should be denied.  As PacBio acknowledges in its motion, should the Court properly permit Oxford to present argument, testimony, or evidence regarding its non-privileged general business practices, PacBio can cross-examine any witness, offer counter-argument, or present counter-evidence.  *See* PacBio MIL No. 3, at 2.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Oxford Nanopore Technologies,
Inc. and Oxford Nanopore Technologies, Ltd.*

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

PACIFIC BIOSCIENCES OF CALIFORNIA, INC.,

*Plaintiff*,

vs.

OXFORD NANOPORE TECHNOLOGIES, INC.,
and OXFORD NANOPORE TECHNOLOGIES,
LTD.

*Defendants*.

C.A. No. 17-cv-275-LPS

C. A. No. 17-cv-1353-LPS

JURY TRIAL DEMANDED

## FIRST NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(B)(6) TO DEFENDANTS OXFORD NANOPORE TECHNOLOGIES, INC. AND OXFORD NANOPORE TECHNOLOGIES, LTD.

PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure 26 and 30(b)(6), Plaintiff Pacific Biosciences Of California, Inc. ("PacBio") will take the oral deposition of Defendants Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd. (collectively, "ONT") on April 25, 2019 beginning at 9:00 a.m., at the offices of Weil, Gotshal & Manges LLP, 201 Redwood Shores Parkway, Redwood Shores, CA 94065. The deposition will be taken before a notary public or other officer authorized by law to administer oaths and take testimony. The deposition will be recorded stenographically and by videotape, and will continue from day to day, excluding Sundays and holidays, until completed or adjourned.

ONT shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf as to matters known or reasonably available to ONT Inc. ONT Inc. is requested to identify each person so designated and to set forth the matters on which that person will testify at least five business days before the deposition.

1

Dated:   March 22, 2019                    Respectfully submitted,

                                           FARNAN LLP

                                           */s/* Brian E. Farnan
                                           Brian E. Farnan (Bar No. 4089)
                                           Michael J. Farnan (Bar No. 5165)
                                           919 North Market Street, 12th Floor
                                           Wilmington, DE 19801
                                           Telephone: 302-777-0300
                                           Facsimile: 302-777-0301
                                           bfarnan@farnanlaw.com
                                           mfarnan@farnanlaw.com

                                           Edward R. Reines (admitted *pro hac vice*)
                                           Derek C. Walter (admitted *pro hac vice*)
                                           WEIL, GOTSHAL & MANGES LLP
                                           201 Redwood Shores Parkway
                                           Redwood Shores, CA 94065
                                           (650) 802-3000
                                           ed.reines@weil.com
                                           derek.walter@weil.com

                                           *Attorneys for Plaintiff*

2

## SCHEDULE A

## DEFINITIONS

1.      "PacBio" means Plaintiff and Counterclaim Defendant Pacific Biosciences of California, Inc. and its predecessors, successors, affiliates, subsidiaries, parents, assignees, joint venturers, partners, principals, employees, representatives, agents, officers, directors, attorneys, and all other persons or entities acting or purporting to act on their behalf.

2.      "ONT" means Oxford Nanopore Technologies, Ltd., and its predecessors, successors, affiliates, subsidiaries, parents, assignees, joint ventures, partners, principals, employees, representatives, agents, officers, directors, attorneys, and all other persons or entities acting or purporting to act on their behalf, including but not limited to Oxford Nanopore Technologies, Inc.

3.      The "Patents-in-Suit" shall refer to all patents asserted or to be asserted in the future by PacBio in this action, including, without limitation, U.S. Patent Nos. 9,546,400; 9,678,056; 9,738,929; 9,772,323, individually and collectively.

4.      "Related Patents" and "Related Patent" mean all patents and patent applications relating to the patent in question, including any patents or patent applications (including all published and unpublished pending and abandoned applications) from or through which the patent in question claims priority, any patents or patent applications (including all published and unpublished pending and abandoned applications) that claim priority from or through the patent in question, and any foreign counterpart patents or patent applications (including all published and unpublished pending and abandoned applications) of any of the foregoing.

5.      "Accused Products" means all nanopore sequencing devices sold, or marketed by ONT, including without limitation all past and future versions of the MinION, PromethION,

1

GridION, SmidgION, Flongle, and any variant of these devices, as well as flow cells and reagent kits sold in conjunction with nanopore sequencing devices.

6.   "Communication" means any form of oral or written interchange, whether in person, by telephone, by facsimile, by telex, by electronic email, or by any other medium.

7.   "Concerning" means relating or referring to, discussing, describing, summarizing, evidencing, or constituting.

## TOPICS

### TOPIC NO. 1:

All facts and circumstances relating to ONT's efforts to monitor any of the Patents-in-Suit and Related Patents.

### TOPIC NO. 2:

ONT's first awareness of the Patents-in-Suit and Related Patents.

### TOPIC NO. 3:

ONT's first awareness of any patent applications that issued as the Patents-in-Suit and Related Patents, including all time, labor, costs, and expenses associated with any potential workarounds.

### TOPIC NO. 4:

Any proposed design-arounds or workaround contemplated by ONT to the Patents-in-Suit and Related Patents.

### TOPIC NO. 5:

Any non-infringing alternatives to the Patents-in-Suit and Related Patents.

**TOPIC NO. 6:**

Any request for review of any Patent-in-Suit or Related Patent by any foreign patent office or tribunal, including without limitation all documents related to any foreign litigations or European opposition proceedings.

**TOPIC NO. 7:**

All facts and circumstances relating to ONT's involvement in the sale, acquisition, or licensing of any intellectual property related to nucleic acid sequencing, including the decision to license or purchase any patent related to nucleic acid sequencing.

**TOPIC NO. 8:**

All facts and circumstances relating to ONT's licensing practices.

**TOPIC NO. 9:**

All facts and circumstances relating to any current or previous license of any intellectual property related to nucleic acid sequencing involving ONT.

**TOPIC NO. 10:**

All facts and circumstances relating to the success, failure and/or decision to continue or discontinue marketing and development of any previous nanopore sequencing device created by ONT.

**TOPIC NO. 11:**

All facts and circumstances relating to ONT's decision to focus on development of the Accused Products, including when any such decision was made, the basis for that decision and the percent of the budget allocated for the project over time.

**TOPIC NO. 12:**

All facts and circumstances relating to any similarities and/or differences between the Accused Products and the Patents-in-Suit.

**TOPIC NO. 13:**

Any efforts made by ONT to commercialize the Accused Products.

**TOPIC NO. 14:**

The date of first sale of each of the Accused Products.

**TOPIC NO. 15:**

All facts and circumstances related to the design and operation of the Accused Products.

**TOPIC NO. 16:**

All aspects of the bioinformatics analyses used in the Accused Products.

**TOPIC NO. 17:**

All facts and circumstances related to ONT's decision to utilize the bioinformatics analyses employed by the Accused Products.

**TOPIC NO. 18:**

All methods, techniques, or processes of base calling used in the Accused Products, including but not limited to the processes used to identify polynucleotide bases according to levels of ionic current generated from passage of a polynucleotide through a nanopore.

**TOPIC NO. 19:**

The source code used in the Accused Products.

**TOPIC NO. 20:**

All revisions to, or versions of, the source code used in the Accused Products.

**TOPIC NO. 21:**

All aspects of preparing a sample for the Accused Products.

**TOPIC NO. 22:**

The processes, hardware, structures, and methods used in the Accused Products to identify levels of ionic current generated from passage of a polynucleotide through a nanopore.

**TOPIC NO. 23:**

The processes, hardware, structures, and methods used in the Accused Products to reduce error rate associated with nanopore sequencing, including without limitation, all processes involving sequencing both strands of double-stranded polynucleotides.

**TOPIC NO. 24:**

The processes, hardware, structures, and methods used by the Accused Products to control translocation of a polynucleotide through a nanopore.

**TOPIC NO. 25:**

All aspects of the enzymes used in the Accused Products to control translocation of a polynucleotide through a nanopore, including but not limited to their identity, kinetics, and their effectiveness in nanopore sequencing.

**TOPIC NO. 26:**

All aspects of the Accused Products that ONT contends form a basis for noninfringement of the Patents-in-Suit.

**TOPIC NO. 27:**

All facts and circumstances supporting ONT's contention that any aspect of the Accused Products are substantially different or perform a substantially different function in a substantially

different way than one or more limitations of the Patents-in-Suit, including the identity of all such limitations.

**TOPIC NO. 28:**

The detailed financial information related to the Accused Products, including without limitation:

a.) The number of units sold;

b.) All fixed and variable costs and expenses incurred by ONT in connection with the Accused Products;

c.) ONT's net and gross revenue derived from the Accused Products;

d.) ONT's profits and profit margins derived from the Accused Products;

e.) All fixed and variable costs and expenses incurred by ONT in connection with any products or services sold for or intended for use with the Accused Products;

f.) ONT's net and gross revenue derived from any products or services sold for or intended for use with the Accused Products;

g.) ONT's profits and profit margins derived from any products or services sold for or intended for use with the Accused Products;

h.) The quantity of sales of the Accused Products; and .

i.) The quantity of sales of any products or services sold for or intended for use with the Accused Products.

**TOPIC NO. 29:**

ONT's profits or losses related to the Accused Products in each fiscal year including 2014, 2015, 2016, 2017, 2018, and 2019 to date.

**TOPIC NO. 30:**

Customer acceptance for, demand for, or complaints relating to the Accused Products.

**TOPIC NO. 31:**

All facts and circumstances relating to the process by which ONT validates and tests the Accused Products.

**TOPIC NO. 32:**

Any discussion, analysis, or complaints relating to the accuracy of the Accused Products.

**TOPIC NO. 33:**

All facts and circumstances relating to any public statements made by, or on behalf of, ONT regarding the accuracy of the Accused Products.

**TOPIC NO. 34:**

All facts and circumstances, relating to the type, amount, factual bases and support for all damages that ONT believes constitute a reasonable royalty or other appropriate measure of relief, should liability be established, including:

a.) The method used to calculate the reasonable royalty rate;

b.) The data used in such calculations;

c.) The source of the data;

d.) The royalty rate so calculated;

e.) The base to which the royalty rate is to be applied.

**TOPIC NO. 35:**

All facts and circumstances relating to marketing of the Accused Products, including any marketing plans, market analysis, and sales forecasts.

**TOPIC NO. 36:**

The identity of all potential competitors to ONT, including but not limited to manufacturers of single molecule sequencing devices.

**TOPIC NO. 37:**

Any discussion or analysis of any potential competitors to ONT in the market for single molecule sequencing devices.

**TOPIC NO. 38:**

All facts and circumstances relating to ONT's attempts to monitor potential competitors including the sales and marketing of other single molecule sequencing devices.

**TOPIC NO. 39:**

Communications by ONT with investors or potential investors regarding the validity or potential infringement of the Patents-in-Suit.

**TOPIC NO. 40:**

All facts and circumstances supporting any contention that the Patents-in-Suit are anticipated or obvious in light of one or more prior art references including:

a.) The identify of all allegedly invalidating prior art;

b.) The level of ordinary skill in the art;

c.) The basis for any contention that allegedly anticipatory prior art is enabled;

d.) Any teaching, suggestion, or motivation to combine one or more prior art references.

**TOPIC NO. 41:**

All facts and circumstances supporting any contention that practicing the claims of the Patents-in-Suit would require undue experimentation including:

a.) The quantity of experimentation needed;

8

Case 1:17-cv-00275-LPS Document 546-1 Filed 03/23/20 Page 39 of 845 PageID #: 29853

b.) The amount of direction or guidance presented in the Patents-in-Suit;

c.) The presence or absence of working examples in the Patents-in-Suit;

d.) The nature of the invention covered by the Patents-in-Suit;

e.) The state of the prior art;

f.) The relative skill of those in the art;

g.) The predictability or unpredictability of the art;

h.) The breadth of the claims covered by the Patents-in-Suit.

**TOPIC NO. 42:**

The policies and procedures for ONT's record keeping, including without limitation ONT's document destruction policy.

**TOPIC NO. 43:**

ONT's organizational structure.

**TOPIC NO. 44:**

The identity, location, authenticity, and business record status of documents and other tangible things constituting evidence relating to the categories set forth in Topics 1 through 43 above.

**TOPIC NO. 45:**

The identity and location of witnesses knowledgeable about the categories set forth in Topics 1 through 43 above.

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | C. A. No. 17-cv-275-LPS |
| v. | ) ) ) | C. A. No. 17-cv-1353-LPS |
| OXFORD NANOPORE TECHNOLOGIES, INC., and OXFORD NANOPORE TECHNOLOGIES, LTD. | ) ) ) ) | |
| Defendant. | | |

## SECOND NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6) OF OXFORD NANOPORE TECHNOLOGIES, INC. AND OXFORD NANOPORE TECHNOLOGIES, LTD.

PLEASE TAKE NOTICE THAT pursuant to Fed. R. Civ. P. 26 and 30(b)(6), Plaintiff Pacific Biosciences Of California, Inc. ("PacBio") will take the deposition of Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd. (collectively, "ONT") on May 25, 2019 beginning at 9:00 a.m. at the Offices of Weil, Gotshal & Manges, 201 Redwood Shores Pkwy., Redwood Shores, CA. Said deposition will be conducted upon oral examination before a court reporter duly authorized to administer oaths and will be recorded by stenographic and/or audio-visual means. The deposition will continue until completed or adjourned.

ONT shall designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf as to matters known or reasonably available to ONT. ONT is requested to identify each person so designated and to set forth the matters on which that person will testify at least five business days before the deposition.

## DEFINITIONS

1.    "**Oxford Nanopore**," "**ONT**," "**Oxford**," "**You**," "**Your**," and "**Defendants**" shall each mean and refer to Defendants Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd. including their predecessors, successors, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with Oxford Nanopore Technologies, Inc., and others acting on behalf of Oxford Nanopore Technologies, Inc.

2.    "**Oxford Nanopore Technologies, Inc.**" shall mean Oxford Nanopore Technologies, Inc., a U.S. corporation incorporated in Delaware and having its principal place of business in Cambridge, Massachusetts.

3.    "**Oxford Nanopore Technologies, Ltd.**" shall mean Oxford Nanopore Technologies, Inc., a U.K. company having its principal place of business in Oxford, England.

4.    "**PacBio**" and "**Plaintiff**" shall mean Plaintiff Pacific Biosciences of California, Inc. and all predecessors, successors, parents, subsidiaries, and affiliates, and all past or present directors, officers, agents, representatives, consultants, attorneys, or entities acting in joint venture or partnership with PacBio, as well as any previous assignees of the patent-at-issue.

5.    "**Cases**" shall mean the above-captioned proceedings in the United States District Court for the District of Delaware, with case numbers 17-cv-275-LPS-CJB and 17-cv-1353-LPS-CPS.

6.    "Complaints" shall mean the First Amended Complaint (including exhibits) PacBio filed in 17-cv-275 in the District Court of Delaware on August 23, 2018, and any supplements or amendments thereto, and the Third Amended Complaint (including exhibits)

PacBio filed in 17-cv-1353 in the District Court of Delaware on August 23, 2018, and any supplements or amendments thereto.

7.     "**The '400 patent**" shall mean U.S. Patent No. 9,546,400.

8.     "**The '056 patent**" shall mean U.S. Patent No. 9,678,056.

9.     "**The '929 patent**" shall mean U.S. Patent No. 9,738,929.

10.     "**The '323 patent**" shall mean U.S. Patent No. 9,772,323.

11.      "**Patents-in-Suit**" shall refer to all patents asserted or to be asserted in the future by PacBio in these Cases, including, without limitation, United States Patent Nos. 9,546,400 (the "'400 patent"), 9,678,056 (the "'056 patent"), 9,738,929 (the "'929 patent"), 9,772,323 (the "'323 patent"), and any other United States Patent subsequently added to the Cases.

12.     "**Third party**" or "**third parties**" shall mean any person or entity other than Defendant.

13.     "**Person(s)**" shall mean any natural person or any business, proprietorship, firm, partnership, corporation, association, organization, or other legal entity.  The acts of a Person shall include the acts of directors, officers, owners, members, employees, agents, attorneys, or other representatives acting on the Person's behalf.

14.     "**Document(s)**" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, files, or printouts; tapes, discs, belts, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, e-mails; pictures, photographs, slides, films, microfilms, motion pictures; or any other

medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature, including without limitation originals, drafts, electronic documents with included metadata, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or underlining, represents a distinct version). By way of example, the term "document(s)" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; telegraphs; telegrams; telexes; e-mails; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; inter-office and intra-office communications; handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; teletypes; telefax; invoices; worksheets; photographs; tape recordings; and all other tangible items of readable, recorded, or visual material of any kind.

15. "**Thing(s)**" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure.

16. "**Communication(s)**" shall mean any transmission of information in any context or situation by or between two or more persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically or digitally, or on tape, either orally or in writing, including but not limited to conversations; correspondence; electronic mails; telexes; facsimile transmissions; telecopies; recordings in any medium of oral, written, or typed communications; telephone or message logs; notes or memoranda relating to written or oral communications; and any translation thereof.

17. "**Information**" shall mean information in any form, including but not limited to documentary, electronic, graphical, or tabular, and communicated by any means, including but

not limited to orally, in writing, or via electronic communication.

18.     "**Accused Product(s)**" shall mean all nanopore-based single-molecule nucleic acid sequencing systems and reagents, consumables, and software for use with same that have been developed or are in development by Oxford.  Examples of Accused Products include but are not limited to at least the following specific devices and reagents and consumables for use therewith:

- Oxford's MinION sequencing system
- Oxford's PromethION sequencing system
- Oxford's GridION sequencing system
- Oxford's SmidgION sequencing system
- Oxford's Flongle sequencing system

For the avoidance of doubt, the scope of this definition shall not artificially be limited either by the products identified above or by the exemplary products identified in the Complaints.

19.     "**Asserted Claim(s)**" shall mean any claim of the patent-at-issue alleged by PacBio to be infringed, whether directly or indirectly, by any Defendant product, including but not limited to, claims 1-8, 10, and 14-15 of the '400 patent, claim 1 of the '056 patent, claims 1, 2, 6-7, 8, 10-11 of the '929 patent, and claim 1 of the '323 patent.

20.     The term "**Prior Art**," for purposes of these requests, shall mean all things, patents, publications, disclosures, sales, or other acts or occurrences included within the broadest meaning of 35 U.S.C. § 102 (or any subpart thereof) and 35 U.S.C. § 103, and all things, patents, publications, disclosures, sales, or other acts or occurrences that any person or entity has identified as "prior art" or relevant to the invalidity of the patent(s) identified in the relevant interrogatory.

21.     "**Related Patent**" or "**Related Patents**" shall mean any patent or patent application, whether foreign or domestic, that the patent-at-issue claims priority to, or any patent

or patent application, whether foreign or domestic, that claims priority to (i) the patent-at-issue, or (ii) any patent or application to which the patent-at-issue claims priority.

22.     The terms "**concerning**," "**relate to**," "**related to**," "**referring to**," and "**relating to**," when used in reference to a particular subject, shall be construed in its most inclusive sense, and shall be considered a request that you identify and produce documents that refer to, discuss, summarize, reflect, constitute, contain, embody, pertain to, mention, constitute of, comprise, show, comment on, evidence, describe, or in any other manner concern the referenced subject matter.

23.     "**Identify**" and "**Identity**" shall each mean:

(a) as applied to an individual, the individual's full name, present or last known address and telephone number, present or last known employer, present or last known business address and telephone number, present and prior employment positions and corresponding dates of such positions, and his or her present employment responsibilities;

(b) as applied to a Person other than a natural person (including but not limited to any business or other entity), the entity's full name, place and date of incorporation or formation, principal place of business or activity, and the identity of the natural persons within that entity having knowledge of the matter with respect to which that entity is named;

(c) as applied to a Thing (including without limitation any products manufactured, developed, or sold by Defendant), the date that the Thing was first introduced for sale, the date of the Thing's first sale, all versions, parts, or revision numbers or codes, all product names, and all team names or project titles used in connection with the design, development, testing, or engineering of that product; and

(d) as applied to a process, the date that the process was first used, the date the products or goods made by the process were first sold, all numbers or codes used to refer to the process, including but not limited to process revision numbers or codes, all process names, and all team names or project titles used in connection with the design, development, testing, or engineering of that process.

24.     "**Relate to**," "**Related to**," "**Relating to**," or "**Concerning**" shall mean in whole or in part constituting, containing, embodying, reflecting, describing, involving, supporting, contradicting, evidencing, analyzing, identifying, mentioning, stating, referring directly or indirectly to, dealing with, or in any way pertaining to.

25.     The singular shall include the plural and vice versa, as necessary to bring within the scope of the discovery request all information that might otherwise be construed to be outside of its scope.

26.     All pronouns shall be construed to refer to the masculine, feminine, or neutral gender, in singular or plural, as in each case makes the request more inclusive.

27.     The terms "**and**," "**or**," and "**and/or**" shall be construed in the conjunctive or the disjunctive, whichever makes the request more inclusive.

28.     Except where the context does not permit, the term "**including**" shall be without limitation.

29.     Except where the context does not permit, the terms "**each**" and "**any**" shall mean any and all.

# TOPICS

**TOPIC NO. 46:**

The mechanism by which any electrical signal from a nanopore is detected by each Accused Product.

**TOPIC NO. 47:**

The precision of the measurement of any electrical signal that is detected in each Accused Product.

**TOPIC NO. 48:**

The signal to noise ratio of any electrical signal that is detected in each Accused Product.

**TOPIC NO. 49:**

The distribution of signal to noise ratios across different nanopores in a single flow-cell.

**TOPIC NO. 50:**

The average signal to noise ratio for each Accused Product.

**TOPIC NO. 51:**

The methods by which Oxford trains any base callers, or base calling software used in connection with each of the Accused Products.

**TOPIC NO. 52:**

The methods by which Oxford trains any neural networks used in connection with the Accused Products.

**TOPIC NO. 53:**

The data used to train any base callers, base calling software, or neural networks used in connection with the Accused Products.

8

**TOPIC NO. 54:**

The use of kmers of lengths other than 5 in the base callers or base calling software used in connection with the Accused Products.

**TOPIC NO. 55:**

The basis for the decision to use kmers of any given length in the base callers or base calling software used in connection with the Accused Products.

**TOPIC NO. 56:**

Testing, calibration, and reporting requirements imposed on customers in connection with purchase agreements for Oxford devices.

**TOPIC NO. 57:**

The operation of each version of any software written for, by, or on behalf of Oxford that performs methods of determining any portion of a nucleotide sequence using one or more signals measured when one or more template nucleic acids translocates through one or more nanopores.

**TOPIC NO. 58:**

Differences, if any, in how each version of any software written for, by, or on behalf of Oxford determines any portion of a nucleotide sequence using one or more signals measured when one or more template nucleic acids translocates through one or more nanopores.

**TOPIC NO. 59:**

For each version of nanopore used in the Accused Products, the number of nucleotides that reside in the nanopore during translocation by a polynucleotide.

**TOPIC NO. 60:**

For each version of nanopore used in the Accused Products, the number of nucleotides that reside in the narrowest segment of each nanopore during translocation by a polynucleotide.

**TOPIC NO. 61:**

For each version of nanopore used in the Accused Products, the number of nucleotides that contribute to the electrical signal from the nanopore during translocation by a polynucleotide.

**TOPIC NO. 62:**

For each version of ONT software that generates events, the minimum difference in current measurement required for that software to distinguish between events.

**TOPIC NO. 65:**

For each version of ONT software that generates events, the number of distinguishable events that are generated in a single sequence run.

Dated: April 26, 2019

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Edward R. Reines (admitted pro hac vice)
Derek C. Walter (admitted pro hac vice)
WEIL, GOTSHAL &MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

*Attorneys for Plaintiff*

# EXHIBIT 3

**REDACTED**

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

PACIFIC BIOSCIENCES OF
CALIFORNIA, INC.,

           Plaintiff,

v.

OXFORD NANOPORE TECHNOLOGIES,
INC. and OXFORD NANOPORE
TECHNOLOGIES, LTD.,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

C. A. No. 17-cv-275-LPS

C. A. No. 17-cv-1353-LPS

<u>PACIFIC BIOSCIENCES OF CALIFORNIA, INC.'S RESPONSES AND OBJECTIONS
TO DEFENDANTS' FOURTH SET OF INTERROGATORIES TO PLAINTIFF
(NOS. 23-24)</u>

Pursuant to Federal Rules of Civil Procedure 26 and 33, the Local Rules of the United

States District Court for the District of Delaware ("Local Rules"), the District of Delaware

Default Standard for Discovery, the Stipulated Electronic Discovery Order ("E-Discovery

Order"), and any other applicable Orders or rules, Plaintiff Pacific Biosciences of California, Inc.

("PacBio"), by and through their undersigned counsel, hereby responds to the Fourth Set of

Interrogatories (Nos. 23-24) of Defendants Oxford Nanopore Technologies, Inc. and Oxford

Nanopore Technologies, Ltd. ("Oxford").

The failure of PacBio to make a specific objection to any particular aspect of Oxford's

Interrogatories is not, and should not be construed as, an admission that responsive documents or

information exist.  Any statement that PacBio will produce documents or information does not

mean that any such documents or information exist.

## <u>GENERAL OBJECTIONS</u>

PacBio makes the following General Objections, which apply to each of Oxford's definitions, instructions, and interrogatories and, unless otherwise stated, shall have the same force and effect as if set forth in full in response to each of the numbered definitions, instructions, and interrogatories.

1.      PacBio objects to Oxford's Fourth Set of Interrogatories to the extent they seek information disproportionate to the needs of this case inconsistent with the Federal Rules of Civil Procedure.

2.      PacBio objects to each Interrogatory to the extent it seeks information or documents that are protected by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege, protection, or immunity.  PacBio does not waive, intentionally or otherwise, any attorney-client privilege, work-product immunity, or any other privilege, immunity, or other protection that may be asserted to protect any information from disclosure.

3.      PacBio objects to each Interrogatory to the extent it seeks the identification of documents not within PacBio's possession, custody, or control.

4.      PacBio objects to each Interrogatory to the extent it calls for the production of documents or information within the scope of a protective order, confidentiality agreement, or similar agreement.

5.      PacBio objects to each Interrogatory to the extent it seeks information or documents not relevant to the subject matter of this Case or to the claims or defenses of any party, not reasonably calculated to lead to the discovery of admissible evidence, or which is otherwise outside the proper scope of discovery.

6.     PacBio objects to each Interrogatory to the extent it is unduly burdensome or oppressive in nature, including to the extent they are cumulative and/or duplicative of other forms of discovery that are more convenient and less burdensome.

7.     PacBio objects to each Interrogatory to the extent it uses terms that are not defined, understood, or are otherwise vague and ambiguous.  For example, PacBio objects to each Interrogatory using claim language to the extent that Defendants have not provided their proposed definition for that claim language.

8.     PacBio objects to each Interrogatory to the extent it seeks production of "all," "every," or "any" documents that refer or relate to a particular subject on the grounds of overbreadth, undue burden and expense, and that it calls for information outside the scope of discovery.

9.     PacBio objects to each Interrogatory to the extent a response is sought with respect to a question of law or to the extent a response calls for an expert opinion.

10.    PacBio objects to Oxford's definitions of "document," "communication," "person," "identify/identification/identity," "date" as being overly broad, unduly burdensome and oppressive, calling for information protected by the attorney-client privilege or work product doctrine, outside the scope of discovery, and as seeking information and documents beyond PacBio's possession, custody, or control.

11.    PacBio objects to Oxford's definition of "Pacific Biosciences of California, Inc.," "PacBio," "PB," "You," "Your," and "Plaintiff" as being overbroad, unduly burdensome and oppressive, calling for information and documents outside the scope of discovery, and as seeking information and documents beyond PacBio's possession, custody, or control.

12.     PacBio objects to Oxford's definitions of "SMRT$^{\circledR}$ Sequencing Platform" and "Single-Molecule Nucleic Acid Sequencing System" as being overbroad, unduly burdensome and oppressive, and calling for information and documents outside the scope of discovery.

13.     PacBio's agreement to produce any category of information or documents is not a representation that any such information or documents in that category actually exist in PacBio's possession, custody, or control, or can be located through a reasonable search, or that such documents are relevant.

14.     PacBio's investigation is continuing and ongoing, and PacBio reserves its right to supplement its responses and objections as appropriate.

15.     PacBio objects to the temporal scope (or lack thereof) of each Interrogatory as overly broad and unduly burdensome.

16.     PacBio objects to each Interrogatory to the extent it seeks information already in Oxford's possession or is available to Oxford from public sources for which the burden of obtaining such information is the same or less for Oxford as it is for PacBio.  PacBio provides these responses with the understanding that Oxford is in possession of or has access to such sources, including, without limitation, PacBio's website.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 23:**

Describe in detail the complete factual and legal basis for PacBio's contention that Oxford's alleged infringement of the Asserted Patents has been and/or continues to be willful, including in your response an identification of all facts and circumstances you intend to rely upon in support of your contention.

**RESPONSE TO INTERROGATORY NO. 23:**

In addition to its General Objections, PacBio objects to Interrogatory No. 23 to the extent that it seeks information that is protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege. Documents and information relating to the legal conclusion of willful infringement may include communications between PacBio and its counsel and/or reflect legal advice of counsel, and such documents and information may be protected by applicable privilege. While this example is instructive, it is not exhaustive of the scope of privileged documents and information that are otherwise responsive to this interrogatory and to which PacBio objects.

PacBio further objects to Interrogatory No. 23 as it is duplicative of Interrogatory No. 10 and refers Oxford to PacBio's responses to Interrogatory No. 10 as being equally responsive to this interrogatory. PacBio further objects to Interrogatory No. 23 to the extent it calls for documents and information regarding a legal conclusion of willful infringement.

Subject to its General and Specific Objections, PacBio responds as follows:

PacBio refers Oxford to its Responses to Interrogatory No. 10 and incorporates those responses in their entirety.

Oxford's conduct shows that its infringement of PacBio's patents has been and continues to be willful. Substantial documentary and testimonial evidence demonstrates that Oxford

willfully infringes and knew of the Asserted Patents and knew or should have known that the use of the Accused Products infringes the Asserted Claims.

For example, Oxford's CEO, Gordon Sanghera, testified that ONT systematically monitors all competitor patents, including those of PacBio. Sanghera Depo Tr. at 7:18-21. Dr. Sanghera explained that ONT has "search fields" for PacBio, "would look at any applications," and "would review" those applications. *Id.* at 16:14-17:7. Dr. Sanghera testified that ONT's practice was to search for terms like "nanopore, single molecule and a whole host of other search terms and if that threw up competitors like PacBio, then we would take a look at [the patents.]" *Id.* at 18:8-12.

Dr. Sanghera's testimony is supported by substantial documentary evidence. For example, Oxford's documents show that



See, e.g., ONTS.ITC.00029591; ONTS.ITC.0002957; ONTS.ITC.0029693; ONTS.ITC.00090510. Oxford records also

See, e.g., ONTS.ITC.00132806; ONTS.ITC.00117044; ONTS.ITC.00029591; ONTS.ITC.00090509. Oxford internal communications further show that

See, e.g., ONTS.ITC.00000431. Furthermore, internal memos show

See ONTS.ITC.00090505-8

Dr. Sanghera further testified that ONT's internal processes would have included a technical analysis of identified patent assets by ONT subject matter experts. "There's an internal IP team, subject matter experts, and all of that would be referred to general counsel." Sanghera

Depo Tr. at 16:14-17:7.  Dr. Sanghera testified that ███████████████████████

███████████████████████████████████████████████████████████

████████████████████ *Id.* at 26:3-13.  Dr. Sanghera further testified that ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████ *Id.* at 21:11-22; *see also id.* at 23:3-10 (████████████

██████████████.  Dr. Sanghera testified that ██████████████████████████

████████████████████ *Id.* at 49:16-50:2.  He testified, however, that ███████████

███████████████████████████████████████████████████████████

████████████████████ *Id.* at 34:16-35:1; 49:16-50:17.

Substantial documentary evidence supports Dr. Sanghera's testimony that ██████████

███████████████████████████████████████████████████████████

███████████████  For example, communications between Oxford executives show that Oxford

was aware of PacBio's nanopore patents.  In one example, on March 4, 2011, Spike Willcocks

emailed to Gordon Sanghera ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████ Dr. Sanghera testified

that Mr. Willcocks "was on the executive team that reviews competitor landscape" including

patents.  Sanghera Depo Tr. at 23:18-15.

As another example, on February 10, 2015, Mr. Willcocks emailed ██████████████

███████████████████████████████████████████████████████████

ONTS.ITC.00762348.  At deposition, Mr. Willcocks ███████████████████████████

███████████████████████████████████████████████████████████

█████████████████ Willcocks Depo Tr. at 196:10-19; 200:6-9.  Nonetheless, Mr. Willcocks

testified that ████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████ *Id.* at 136:3-17.  Mr. Willcocks further testified that ███

█████████████████████████████████████████████████████████

████████████████████████████████ *Id.* at 144:19-145:7.  Mr. Willcocks

testified that ████████████████████████████████████████████

█████████████████ *Id.* at 198:23-199:2.

Further supporting Dr. Sanghera's testimony, Jim McDonald testified that █████

███████████████████████ McDonald Depo Tr. at 94:5-25.  Mr. McDonald testified that

█████████████████████████████████████████████████████████ *Id.* at

98:14-23.  Mr. McDonald testified that ███████████████████████████

██████████████████████████████████████ *Id.* at 99:7-9.  Mr. McDonald

testified that ████████████████████████████████████████████

███████████████████████████████████████████████████████ *Id.*

at 109:13-110:5.  He further testified that ████████████████████████

███████████████████████████████ *Id.* at 119:25-125:13.  Nonetheless,

Oxford stated in its Interrogatory responses that it first became aware of the '056 and '929

Patents on the date that the complaint was filed.  *See* Oxford's Second Supplemental Responses

To Interrogatory 1.  Instead of later correcting these incorrect responses, Oxford doubled down

on this position in its briefing.  *See* D.I. 273.

Despite Oxford's knowledge of all of PacBio's patent rights through its regular

monitoring of PacBio's patent portfolio, and the escalation to Oxford's executive team, evidence

shows that Oxford's executives deliberately ignored PacBio patents relating to nanopore sequencing, believing them to be invalid without meaningful analysis.  For example, in communications between Mr. Willcocks and Dr. Sanghera discussing PacBio patents, Dr. Sanghera dismissed the patents, saying that "Patent claims on concepts are pointless never stand up in court not enabled etc etc etc."  ONTS.ITC.00004332.  Dr. Sanghera testified that it was his personal view that patent claims on concepts never stand up in court and that he had no factual basis for that conclusion.  Sanghera Depo Tr. at 41:13-29.  Mr. Willcocks confirmed that █

████████████████████████████████████████████████████████████████████████████

████████████  Willcocks Depo Tr. at 210:3-20.  Mr. Willcocks further testified that ████████

█████████████████████████████████████  *Id.* at 210:21-211:3.  In another exchange between Oxford executives, Dr. Sanghera dismissed PacBio patents as "crap." ONTS.ITC.00767700.  As another example, Oxford's CTO, Clive Brown, acknowledged that

████████████████████████████████████████████████████████████████████████████

ONTS.ITC.00600352.

Despite the executive team's knowledge of the Asserted Patents, the technical analysis of those patents, and the executive team's disregard for PacBio's patent rights, Oxford developed and continued to sell certain existing infringing products and further introduced new infringing products.  Gordon Sanghera testified that he, along with the Board of Directions on which he sits, has the "ultimate responsibility" for choosing to sell ONT's products in view of known relevant patents.  Sanghera Depo Tr. at 4:3-13.  Dr. Sanghera further testified that he has no belief one way or the other as to whether the Asserted Patents are infringed.  *Id*. at 51:2-7.  He similarly testified that he has no belief one way or the other whether the Asserted Patents are

valid. *Id*. at 52:21-53:1.  Finally, Dr. Sanghera confirmed that Oxford is not relying on advice of counsel. *Id*. at 57:11-14.

Additionally, the Patent Trial and Appeal Board (PTAB) found that Oxford's asserted invalidity defenses are particularly weak.  Oxford filed three IPR petitions against the '400, '929, and '056 Patents.  *See* IPR2018-00789, IPR2018-01792, and IPR2018-01795.  The PTAB denied institution in the -00789 and -01792 proceedings, finding that Oxford had not demonstrated a reasonable likelihood that it would succeed on any of the challenges to patentability.  In the -01795 proceeding, Oxford withdrew the petition before the PTAB could even reach a determination.  This demonstrates that Oxford's validity challenges to the Asserted Patents are particularly weak.

Furthermore, PacBio's opening and reply expert reports on infringement from Drs. Dessimoz, McHenry, Fair, and Earl demonstrate that Oxford has raised only weak non-infringement arguments.

Finally, Oxford has not identified any meaningful commercially acceptable non-infringing alternatives for any of the Asserted Claims, nor has it identified any potential redesigns of the Accused Products.  *See* Rebuttal Report of Dr. Layne-Farrar; Reply Reports of Drs. Dessimoz, McHenry, and Prowse.

As the above exemplary evidence demonstrates, Oxford was aware of the Asserted Patents, knew or should have known of its infringement, and acted with callous disregard of PacBio's patent rights in selling, offering for sale, making, using, and importing the Accused Products.

**<u>INTERROGATORY NO. 24</u>:**

Describe in detail the complete factual and legal basis for PacBio's contention that it is entitled to an award of enhanced damages, including in your response an identification of all facts and circumstances you intend to rely upon in support of your contention.

**<u>RESPONSE TO INTERROGATORY NO. 24</u>:**

In addition to its General Objections, PacBio objects to Interrogatory No. 24 to the extent that it seeks information that is protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege.   Documents and information relating to the legal conclusion of enhanced damages may include communications between PacBio and its counsel and/or reflect legal advice of counsel, and such documents and information may be protected by applicable privilege.   While this example is instructive, it is not exhaustive of the scope of privileged documents and information that are otherwise responsive to this interrogatory and to which PacBio objects.

PacBio further objects to Interrogatory No. 24 as it is duplicative of Interrogatory No. 10 and refers Oxford to PacBio's responses to Interrogatory No. 10 as being equally responsive to this interrogatory.

PacBio further objects to Interrogatory No. 24 to the extent it calls for documents and information regarding a legal conclusion of enhanced damages.

Subject to its General and Specific Objections, PacBio responds as follows:

PacBio is entitled to an award of enhanced damages due to Oxford's egregious behavior in willfully infringing the Asserted Patents with callous disregard of PacBio's patent rights, and in conducting this litigation.   The award of enhanced damages is within the discretion of the Court, but is generally reserved for egregious cases of culpable behavior.   *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 971 (Fed. Cir. 2018).   While the *Read* factors are not mandatory, they can assist the Court in evaluating the degree of the infringer's culpability.   *Id.*   Several of the *Read* factors weigh in favor of the grant of enhanced damages based on Oxford's behavior.

11

For example, the second factor looks to Oxford's willful infringement.  As described in detail in response to Interrogatory 23, Oxford was aware of the Asserted Patents, investigated those patents, and knew or should have known that its conduct infringed.  Thus, this factor weighs in favor of a determination that this is an exceptional case and a grant of enhanced damages.

As another example, the third factor examines Oxford's behavior as a part to the litigation.  Here, Oxford's litigation conduct weighs in favor of a determination that this is an exceptional case and a grant of enhanced damages.  Oxford has needlessly prolonged this litigation and increased the costs for both parties through meritless counter-claims, discovery challenges, and IPR proceedings.  First, Oxford brought a meritless motion to dismiss under section 101, which was denied by the Court.  D.I. 23.  Next, Oxford asserted a number of anti-trust, and unfair competition counter-claims, which were dismissed by the Court at the pleading stage for a failure to state a claim.  D.I. 146, 147.  Oxford forced unnecessary motion practice by opposing a motion to amend the pleadings to add Oxford Nanopore Ltd. to the case, and it filed a meritless motion to dismiss the claims with respect to Oxford Nanopore Ltd, which was denied by the Court.  D.I. 199, 200.  Oxford refused to present its CEO and CTO for deposition, forcing additional motion practice resulting in the Court ordering Oxford to present Dr. Sanghera and Mr. Brown for deposition.  D.I. 297.  Nonetheless, Oxford resisted producing either Dr. Sanghera or Mr. Brown in a timely fashion, forcing further unnecessary motion practice.  Oxford filed a meritless motion to preclude Dr. Fair from receiving confidential information, which was denied by the Court.  D.I. 297.  Finally, Oxford filed three meritless IPR petitions on the Asserted Patents.  Two of the IPR petitions were denied institution, and the third was withdrawn by Oxford before the Board could decide on institution.  The above examples are a portion of

Oxford's unreasonable litigation conduct, which weighs in favor of a determination that this is an exceptional case and a grant of enhanced damages.

As another example, the fifth factor examines the closeness of the case. As will be demonstrated at trial, this is not a close case as Oxford has willfully infringed the Asserted Patents and has weak non-infringement and invalidity arguments. Thus this factor weighs in favor of a determination that this is an exceptional case and a grant of enhanced damages.

As another example, the eighth factor examines Oxford's motivation for harming PacBio. As described above, Oxford acted with callous disregard for PacBio's patent rights. Moreover, substantial evidence demonstrates that ███████████████████████████████ ███████████████████████████████████████████ ONT_DEL00058800; *see also, e.g.* ONT_DEL00060328; ONT_DEL00354209; ONT_DEL00515506; ONTS.ITC.00004177. Oxford's disregard of PacBio's patent rights in pursuit of capturing PacBio's customer and interfering with PacBio's sales demonstrates egregious conduct that warrant a grant of enhanced damages.

PacBio refers Oxford to its Responses to Interrogatory Nos. 10 and 23 as being equally responsive to this Interrogatory.

Dated: October 11, 2019

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Edward R. Reines (admitted pro hac vice)
Derek C. Walter (admitted pro hac vice)
WEIL, GOTSHAL &MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000

*Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I, Brian E. Farnan, hereby certify that on October 11, 2019, a copy of Pacific Biosciences

of California, Inc.'s Responses and Objections to Defendants' Fourth Set of Interrogatories to

Plaintiff (Nos. 23-24) was served on the following as indicated:

<u>Via E-Mail</u>
Jack B. Blumenfeld
Jennifer Ying
Morris, Nichols, Arsht &Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendants*

<u>Via E-Mail</u>
David G. Wille
Johnson K. Kuncheria
Liz Durham Flannery
BAKER BOTTS L.L.P.
david.wille@bakerbotts.com
johnson.kuncheria@bakerbotts.com
liz.flannery@bakerbotts.com
DLOxford3@BakerBotts.com

*Attorneys for Defendants*

<u>Via E-Mail</u>
Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
BAKER BOTTS L.L.P.
stephen.hash@bakerbotts.com
puneet.kohli@bakerbotts.com
samoneh.kadivar@bakerbotts.com

*Attorneys for Defendants*

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 17-cv-275-LPS |
| | ) | C.A. No. 17-cv-1353-LPS |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| OXFORD NANOPORE TECHNOLOGIES, INC., and OXFORD NANOPORE TECHNOLOGIES, LTD., | ) | |
| | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION *IN LIMINE* NO. 1 TO PRECLUDE REFERENCE TO ONT'S PRACTICE OF SEEKING ADVICE OF COUNSEL**</u>

ONT plans to argue a supposed practice of relying on attorney advice implies that it obtained favorable attorney advice in this case.  Every case on point holds that this is improper and ONT is irresponsible for arguing the law is otherwise.  ONT's own *Canon* decision **prevented** the defendants from doing anything that "implies they thought their challenged infringing actions were legal based on knowledge gleaned from their general or overall consultations with counsel." 227 F.Supp.3d at 1309.  The defendants in *Canon* were narrowly permitted only to state they relied on counsel for their design around—which is not the issue here.  *Id.* at 1308-09.  Likewise, the *Volterra* court reasoned that the defendant could not rebut willfulness by arguing it followed "reasonable procedures to ensure compliance with the law, including documents showing that its usual process included consultation with counsel."  2013 WL 1366037 at *2.  The *Claffey* court also barred the defendant from arguing that its "usual processes included consultation with legal counsel."  486 F.Supp.2d at 778.  ONT's position is baseless legally.

In the face of this law, ONT argues that, because PacBio plans to establish that ONT's executives in non-privileged communications were dismissive of PacBio's patent rights, ONT should be able to show these executives are actually careful and regularly seek legal advice.  Most notably ONT's CEO Mr. Sanghera stated to its President Spike Willcocks that "Patent claims on concepts are pointless never stand up in court not enabled etc. etc. etc."  Ex. 1.  Mr. Sanghera did not contend that this email was based on legal advice.  ONT's attempt to use this to allow it to rely on advice of counsel makes no sense.  An ***undisputedly non-privileged*** document showing senior executives were dismissive of PacBio's patent rights based on an uninformed misstatement of law should not somehow permit ONT to invoke its supposed practice of carefully seeking legal advice.  If that were tolerated, virtually any inculpatory willfulness document would allow the infringer to argue it is actually careful and seeks the advice of counsel—even without waiving privilege.

Dated: February 20, 2020

FARNAN LLP

*/s/ Brian E. Farnan*

_____
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff Pacific Biosciences of California, Inc.*

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Robert S. Magee (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com
robert.magee@weil.com

# EXHIBIT 1

**REDACTED**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 17-cv-275-LPS C.A. No. 17-cv-1353-LPS |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| OXFORD NANOPORE TECHNOLOGIES, INC., and OXFORD NANOPORE TECHNOLOGIES, LTD., | ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

**PLAINTIFF'S MOTION *IN LIMINE* NO. 2 TO PRECLUDE REFERENCE TO
ILLUMINA'S UNSUCCESFUL ACQUISITION OF PACBIO**

ONT has threatened to introduce evidence and argument relating to the unsuccessful attempt by a third party, Illumina, Inc. ("Illumina"), to acquire PacBio for $1.2 billion.  The Court should exclude this collateral, confusing and unfairly prejudicial topic from trial under FRE 403.

Illumina first announced plans to acquire PacBio on November 1, 2018 for $1.2 billion.  Shortly thereafter, competition authorities in both the United States and United Kingdom reviewed the proposed acquisition for antitrust concerns given Illumina's large size.  On October 24, 2019, the U.K.'s Competition and Markets Authority ("CMA") issued a provisional and preliminary finding that the acquisition would lessen competition and suggested it would block the acquisition.  In response, Illumina made several offers in compromise in an attempt to overcome the CMA's objections.  The U.S. Federal Trade Commission reached a similar conclusion and, on December 17, 2019, announced its intent to block the acquisition.  Illumina subsequently abandoned its attempts to acquire PacBio and was forced to pay more than $130 million to PacBio as a breakup fee.

ONT has threatened to introduce argument and evidence regarding provisional findings the CMA made regarding the sequencing market in the UK, as well as statements that ***Illumina*** (not PacBio) made in response to the CMA's investigation.  *See, e.g.*, Ex. 1 [Layne-Farrar 1st Supp. Rep.] ¶¶ 21-22 (discussing CMA findings regarding sequencing market in UK); Ex. 2 [Layne-Farrar 2nd Supp. Rep.] ¶¶ 6-8 (discussing Illumina statements submitted to the CMA).  Although PacBio attempted to persuade ONT not to introduce this complex and collateral subject at trial, it has refused, necessitating this motion.

1

## A.    The CMA Findings Are Collateral, Confusing, And Unfairly Prejudicial

The CMA findings for which ONT seeks to elicit testimony[1] would improperly interfere with the jury's role as fact-finder.  For example, in her first supplementary expert report ONT's expert, Dr. Layne-Farrar quoted from a CMA provisional analysis proposing factual conclusions: "PacBio identifies instances when it believes it can win business from Illumina *and has been trying to do so for some time*."  Ex. 1 ¶ 21 (quoting CMA – Summary of Provisional Findings). There is a serious risk that the proposed CMA findings, especially given that they are provisional, would have overbearing effect on the jury creating unfair prejudice.  *See Price v. Grasonville Volunteer Fire Dep't,* No. CV ELH-14-1989, 2016 WL 6277666, at *4 (D. Md. Oct. 26, 2016) (excluding agency determination because it "comes with the imprimatur of government approval" and therefore "a jury could readily give the [agency's] conclusions greater weight than they should otherwise be accorded, thus usurping the role of the jury as a factfinder").  The provisional character of the CMA findings[2] highlights the unfairness of the prejudice.  *See Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 101, 110 (E.D. Va. 2004) (excluding initial FTC report under FRE 403).

---

[1] To the extent ONT seeks to enter any CMA or FTC documents into evidence (as opposed to merely permitting Dr. Layne-Farrar to opine on them), the Court should also exclude them as inadmissible hearsay not subject to the FRE 803(8) public record exception because of their provisional, preliminary nature.  *See Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 101, 110 (E.D. Va. 2004) ("[T]he fact that the Initial Report is subject to de novo review and thus is preliminary in nature also casts doubt upon its 'trustworthiness' under Fed.R.Evid. 803(8)(C).").

[2] Indeed, the words "provisional" or "provisionally" appear 36 times in the CMA summary that Dr. Layne-Farrar relies upon.  Further underscoring the preliminary nature of the CMA findings, *after the submission of its provisional findings*, the CMA delayed issuance of its final report because "completion of its investigation and the publication of its final report will not be possible within the original reference period."  Ex. 4 [November 26, 2019 Notice of Extension].

## B.     Illumina's Statements Are Irrelevant And Prejudicial

Illumina's contingent compromise offers to the CMA relating to ONT's and Illumina's patents are irrelevant because they were made by Illumina, not PacBio and took place in a very complex and confounding circumstance.  Illumina proposed a conditional royalty-free license to a large number of patents, *if* the billion-dollar merger were approved.  Ex. 3 [Response to Notice of Possible Remedies] at 5 ("***Illumina proposes*** the following two alternative undertakings to remedy the SLC provisionally identified by the CMA…" (emphasis added)).  This contingent proposal was part of an attempt to convince the CMA not to foreclose its planned acquisition of PacBio in 2019.  It says nothing about PacBio's willingness to license its patents to a competitor in 2017 and it is not probative of the value of the patents given a billion-dollar merger was at stake.  To the extent such evidence has any probative value, it is outweighed by risk that the jury will be misled into thinking that Illumina's statements are somehow attributable to PacBio, and that licensing offers made in the context of an effort to salvage a major public company merger are analogous to those that would be made in the context of a hypothetical negotiation.

Moreover, should ONT introduce evidence and argument pertaining to the Illumina acquisition, PacBio should be given the opportunity to introduce evidence regarding Illumina's $1.2 billion valuation of PacBio, and Illumina's payment of more than a $130 million as a result of the termination of the acquisition.  Further, PacBio should be permitted to introduce evidence showing that ONT was a direct participant in and may have influenced the CMA findings.

For the foregoing reasons, Plaintiff respectfully requests that the Court order that ONT is precluded from offering argument or evidence at trial related to Illumina's unsuccessful acquisition of PacBio.

Dated: February 13, 2020

FARNAN LLP

*/s/ Brian E. Farnan*
_____
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff Pacific Biosciences of
California, Inc.*

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Robert S. Magee (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com
robert.magee@weil.com

4

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## OF DELAWARE

| | |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC.<br>*Plaintiff*,<br><br>v.<br><br>OXFORD NANOPORE TECHNOLOGIES, INC.<br><br>*Defendant*. | Civil Action No. 17-cv-275-LPS<br>Civil Action No. 17-cv-1353-LPS |

## SUPPLEMENTAL REPORT OF DR. ANNE LAYNE-FARRAR

**DR. ANNE LAYNE-FARRAR     OCTOBER 30, 2019**

1

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY**

## B.  Dr. Prowse's Reasonable Royalty Analysis

### 1.  The Impact of New Information on Dr. Prowse's Support for a High Royalty Rate

19. In his initial damages report, Dr. Prowse wrote that

> *I understand from PacBio's CEO Mike Hunkapiller, that PacBio would never choose to license the patents-in-suit to a direct competitor, in particular ONT, because of how it could affect PacBio's market position in the long read space. ONT's Accused Products are a direct threat to PacBio's sales and thereby PacBio's revenues and profits. As such, PacBio would demand a royalty sufficient to compensate it for consequent lost sales and lost margins.[22]*

20. Underlying the claim that Oxford is PacBio's closest competitor is the claim that the two firms comprise the totality of the only relevant market or market segment: that for long-read sequencing. In reaching this market definition, Dr. Prowse relies solely on his discussions with PacBio executives and its technical experts, while ignoring all other independent (and contradictory) sources of information on DNA sequencing market definition.

21. One such outside source is the CMA's review of the market prepared during its assessment of Illumina's proposed acquisition of PacBio. I discussed the CMA's analysis in my initial report, but since then (on October 24, 2019) the CMA has released a statement that it intends to block the Illumina-PacBio deal because it "may be expected to result in a substantial lessening of competition due to horizontal competition concerns in the market for the supply of next-generation sequencing systems in the UK."[23] Thus, an independent competition authority that regularly defines markets as part of its core mission to review proposed mergers and acquisitions in order to preserve competition has concluded that, without a remedy of some sort, horizontal competition between

---

[22]  Prowse Report, ¶ 112.

[23]  CMA, "Anticipated acquisition by Illumina, Inc (Illumina) of Pacific Biosciences of California, Inc. (PacBio) Summary of Provisional findings," ¶ 1, available at https://assets.publishing.service.gov.uk/media/5db1685940f0b609bdf449fc/Summary_of_the_provisional_findings.pdf (hereafter, "CMA – Summary of Provisional Findings").

10

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

PacBio and Illumina is too significant to allow the two firms to merge. The CMA's findings completely rejected PacBio's (and Dr. Prowse's) proposed market definition of long-read sequencing only. In reaching this conclusion, the CMA noted (in reliance on company documents and other evidence far more extensive than are available in this case[24]) that

> PacBio's internal documents regularly monitor Illumina and include emails where PacBio identifies instances when it believes it can win business from Illumina and has been trying to do so for some time. Illumina's documents discuss PacBio as a competitive threat and indicate that Illumina has taken action or has considered taking action in response to this competitive threat from PacBio.[25]

22. Furthermore, the CMA found Illumina's plans to enter into the long-read market segment were sufficiently credible for the CMA to be concerned about the acquisition eliminating Illumina's incentives to ever enter long-read sequencing.[26] This conclusion contradicts Dr. Prowse's presumption that any licensing of the asserted patents from PacBio to Oxford would be de facto exclusive because no other party provides long-read sequencing.[27] Indeed, it is his view of the market as a static duopoly that undergirds Dr. Prowse's *Georgia-Pacific* analysis in support of his trebling the highest rate seen in any of Oxford's nanopore license agreements for his hypothetical negotiation royalty rate.[28]

23. In his deposition, Dr. Prowse added a new argument in support of his claim that no (or no sufficient) substitution exists between long-read and short-read sequencing. He posits that the economic theory of revealed preference supports the lack of substitution between long- and short-read instruments:[29]

---

[24]   CMA – Summary of Provisional Findings, ¶ 22.

[25]   CMA – Summary of Provisional Findings, ¶ 38.

[26]   CMA – Summary of Provisional Findings, ¶ 26 (b).

[27]   Prowse Report, ¶ 110.

[28]   *See, e.g.,* Prowse Reply Report, ¶ 12.

[29]   While Dr. Prowse used the words "revealed preference" in his initial report, he did not claim that this theory implied no substitution between long- and short-read systems. *See* Prowse Report at ¶ 60.

11

**HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY**

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
OF DELAWARE**

| | |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC.<br>*Plaintiff*,<br><br>v.<br><br>OXFORD NANOPORE TECHNOLOGIES, INC.<br><br>*Defendant*. | Civil Action No. 17-cv-275-LPS<br>Civil Action No. 17-cv-1353-LPS |

**SECOND SUPPLEMENTAL REPORT OF DR. ANNE LAYNE-FARRAR**

*Anne Layne-Farrar*

**DR. ANNE LAYNE-FARRAR       NOVEMBER 19, 2019**

1

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY

## II. NEW INFORMATION RELATING TO PACBIO'S STANCE ON LICENSING THE ASSERTED PATENTS TO OXFORD

5.  As explained in my prior two reports, the CMA (in addition to the U.S. FTC[2]) opened an investigation into Illumina's proposed acquisition of PacBio. On October 24, 2019, the CMA released a statement that it intended to block the Illumina-PacBio deal because the deal "may be expected to result in a substantial lessening of competition (SLC) due to horizontal competition concerns in the market for the supply of next generation sequencing (NGS) systems in the UK."[3] In its October statement, the CMA noted that absent remedies sufficient to alleviate the "substantial lessening of competition" ("SLC") expected to result from the combination of Illumina and PacBio, it intended to block the merger.[4] The Parties' November 7, 2019 "Response to Notice of Possible Remedies" proposes remedies that the Parties argue would fully address any SLC concerns that CMA has expressed, clearing the path (at least in the UK) for Illumina to acquire PacBio.[5]

### A.  The Parties' Statements

6.  The November 7 Response contains several statements directly relevant to PacBio's damages estimation in the alleged patent infringement matter adverse to Oxford. Most important is the first of two remedies that the Parties propose to the CMA to clear Illumina's deal to acquire PacBio: (i) granting "[a] perpetual, royalty-free, irrevocable, sole licence of PacBio's patents listed in Annex 1 to Oxford Nanopore Technologies ('ONT')"; or (ii) granting "[a] perpetual, royalty-free, irrevocable, licence of PacBio's patents listed in Annex 1 to any interested third-party undertaking for use in the nanopore

---

[2]   The FTC has issued a "second request," which signals concerns over potential anticompetitive effects resulting from the merger. *See*, The National Law Review, "Billion-Dollar Merger of DNA Sequencing Firms Opposed by U.K., Questioned in U.S." November 5, 2019, *available at* https://www.natlawreview.com/article/billion-dollar-merger-dna-sequencing-firms-opposed-uk-questioned-us.

[3]   CMA, "Anticipated acquisition by Illumina, Inc (Illumina) of Pacific Biosciences of California, Inc. (PacBio) Summary of Provisional findings," ¶ 1, *available at* https://assets.publishing.service.gov.uk/media/5db1685940f0b609bdf449fc/Summary_of_the_provisional_findings.pdf.

[4]   *Ibid.,* ¶¶ 48, 56.

[5]   Response, ¶ 5.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY

field."[6] The patent list that the Parties refer to includes the four patents that PacBio has asserted against Oxford, along with several other patents.[7]

7.   In their Response, the Parties argue that[8]

> *A perpetual, royalty-free, irrevocable, sole licence of PacBio's patents listed in Annex 1 would enable ONT to further improve its native long read systems offering. While ONT has technological and competitive advantages over PacBio, one significant perceived weakness of its technology is the accuracy of its systems. All of the patents offered for licence to ONT in this proposal entail methods that improve accuracy.*

8.   In support of their second proposed remedy, the Parties argue that other firms within the Next Generation Sequencing ("NGS") market "have sufficient capabilities" to "effectively compete with the merged entity" upon receipt of a license to PacBio's patents listed in the attachment to the Response.[9] In this argument, the Parties highlight the following companies as meeting the CMA's requirements:[10]

> *Roche (the world's largest biotechnology company and the world leader in IVD and tissue-based cancer diagnostics), Agilent (a leader in life sciences, diagnostics and applied chemicals with almost $5 billion in revenue and more than 24,000 customers in 110 countries), and NanoString (a provider of life science tools for translational research and molecular diagnostics which has had success commercialising its non-sequencing products)[.]*

---

6   *Id.*

7   For a link to the patent list, *see* Gov.UK, "Illumina, Inc./Pacific Biosciences of California, Inc. merger inquiry – Attachment to parties' remedies proposal," (hereafter, "Patent List"), last updated November 13, 2019, *available at* https://www.gov.uk/cma-cases/illumina-inc-pacific-biosciences-of-california-inc-merger-inquiry#parties-response-to-notice-of-possible-remedies.

8   Response, ¶ 7.

9   Response, ¶ 12.

10   *Id.*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY

# EXHIBIT 3

Case ME/6795/18
7 NOVEMBER 2019

## Response to Notice of Possible Remedies

1. This response to the CMA's Notice of Possible Remedies ("NPR") proposes remedies that address the CMA's provisional substantial lessening of competition ("SLC") findings, and identifies the important relevant customer benefits ("RCBs") that would result from the proposed remedies. More specifically, the RCBs of the Transaction include the following:[1]

   (i) Wider distribution of/access to PacBio's products and technology by enabling PacBio to benefit from Illumina's global production, and support and service infrastructure;

   (ii) Increased adoption of PacBio's systems by clinical and diagnostic customers by enhancing PacBio system quality with Illumina's quality systems and system management processes;

   (iii) Improved PacBio systems using Illumina's proprietary technologies;

   (iv) Development of coordinated solutions (including bioinformatics) to enable customers to harness the complementary nature of the Parties' technologies; and

   (v) Accelerated innovation.

2. For the avoidance of doubt, the Parties consider that the Provisional Findings ("PFs") contain important errors that undermine the SLC findings. The Parties will make a separate submission in response to the PFs. The CMA ought to consider the Parties' representations on these points before deciding whether there is an SLC that requires remedy. These representations will also be relevant to the assessment of the appropriateness and proportionality of the proposed remedies.

3. Contrary to the statement in the NPR, prohibition is not the only comprehensively effective solution to address the SLC provisionally found by the CMA. Illumina's remedy proposal described below is a sufficient package that removes any SLC whilst preserving the RCBs.

4. Further, prohibition would not be a proportionate or "*reasonable and practicable*" (under section 36(3) Enterprise Act 2002) solution. Further, the RCBs identified are significant in scale and nature, and the CMA should take into account the RCBs that would be lost as a result of a prohibition. All RCBs would be lost if the Transaction were to be prohibited.

5. As further discussed in **Annex 1**, Illumina proposes the following alternative undertakings to remedy the SLC provisionally identified by the CMA:

   (i) A perpetual, royalty-free, irrevocable, sole licence of PacBio's patents listed in **Annex 1** to Oxford Nanopore Technologies ("ONT"); or

---

[1] See paragraphs 426 to 459 of the Merger Notice.

ONT_DEL00569498

Case ME/6795/18
7 NOVEMBER 2019

(ii)    A perpetual, royalty-free, irrevocable, licence of PacBio's patents listed in **Annex 1** to any interested third-party undertaking for use in the nanopore field.

6.  The CMA Merger Remedies Guidelines recognise that an exclusive, irrevocable, and royalty-free technology licence "*will effectively be treated by the CMA as structural in form and subject to similar consideration and evaluation as an asset divestiture*",[2] and each of the undertakings proposed above would be sufficient on its own to remedy the SLC provisionally identified by the CMA in its PFs.

7.  A perpetual, royalty-free, irrevocable, sole licence of PacBio's patents listed in **Annex 1** would enable ONT to further improve its native long read systems offering.  While ONT has technological and competitive advantages over PacBio, one significant perceived weakness of its technology is the accuracy of its systems.  All of the patents offered for licence to ONT in this proposal entail methods that improve accuracy.  In particular many of the patents cover methods of single-molecule consensu  sequencing.  A license of the patents listed in **Annex 1** would enable ONT to become a significantly stronger competitor in various ways:

(i)     First and with almost immediate effect, it would enable ONT to commercialise its 2D products which it has agreed to refrain from offering in certain European countries until 2023  as part of a settlement of patent infringement lawsuits alleging infringement of one or more of the patents identified in **Annex 1**.[3] Reports from the Genome Sciences meeting in Edinburgh in September 2019 indicate that ONT has a new proven-to-work version of 2D chemistry ready to be brought to market in a matter of weeks.

(ii)    Second, the licenses would remove the threat of an injunction  potentially preventing the sale of all ONT sequencing products in the U.S.[4]

(iii)   Third, the licenses would enable ONT to improve the accuracy of all of the instruments that ONT currently markets and to develop and market new products without fear of litigation regarding these technologies.  The patents offered to ONT or to third parties in paragraph 5 above, for instance, include patents for base calling using n-mers (as opposed to calling individual bases).  ONT's accuracy will be significantly affected if it is unable to call bases using n-mers.  Likewise, ONT's chief executive has described multiple approaches to single-molecule consensus that ONT is considering but which might be challenged as infringing by PacBio.  The licenses being offered would remove the threat of litigation.

8.  The resulting enhanced competition from ONT will further incentivise the merged entity to continue innovating and improving its systems offering in order to compete for customers seeking native long read functionality.

---

[2] Merger Remedies Guidelines, 13 December 2018, paragraph 6.2.

[3] See Response to Issues Paper, 27 May 2019, at paragraph 139; Response to Annotated Issues Statement, 24 September 2019, at paragraphs 114 to 117.

[4] A trial between PacBio and ONT is scheduled to be heard in Delaware in March 2020 on four patents listed in **Annex 1**.

**ONT_DEL00569499**

Case ME/6795/18
7 NOVEMBER 2019

9.  Further, a licence to ONT would directly address the concerns expressed by the CMA in paragraphs 24 and following of the NPR regarding the appropriateness of an IP remedy in the case at hand.  First, ONT is an established player with technical expertise, a developed commercial infrastructure and the potential to raise equity to finance growth from the capital markets in Europe, the United States and Asia (in a way that PacBio does not).  It, therefore, has the capabilities to develop and commercialise an improved offering using the licenced patents in order to compete even more effectively with the merged entity on the market for native long read systems.  Second, the proposed licence of PacBio's patents is perpetual, which would ensure continued access to the licenced patents. Finally, given that ONT already commercialises a nanopore technology, it would be able to develop and commercialise any products incorporating technology reading on PacBio's patents rapidly.

10. A perpetual, royalty-free, irrevocable, licence of PacBio's patents listed in **Annex 1** to third-party undertakings for use in the nanopore field would likewise be a fully effective, reasonable and proportionate undertaking to remedy the SLC provisionally identified by the CMA.  Further, this undertaking addresses the concerns expressed by the CMA in paragraphs 24 and following of the NPR regarding the appropriateness of an IP remedy in the case at hand.

11. First, by making PacBio's patents listed in **Annex 1** fully accessible to third-party undertakings active in developing nanopore technology, one of the most significant barriers to entry identified by the CMA in its NPFs, *i.e.*, IP, is eliminated.

12. Second, the CMA is concerned that "*any licensee would need to have sufficient capabilities*" in "*supporting commercial infrastructure (for example sales and marketing, manufacturing)* […] *to effectively compete with the merged entity, which would retain all of these assets*".[5]  However, in the pool of potential licensees there are a number of large companies, including Roche (the world's largest biotechnology company and the world leader in IVD and tissue-based cancer diagnostics), Agilent (a leader in life sciences, diagnostics and applied chemicals with almost $5 billion in revenue and more than 24,000 customers in 110 countries), and NanoString (a provider of life science tools for translational research and molecular diagnostics which has had success commercialising its non-sequencing products), all of which have significant commercial capabilities.  For example, Roche will be able to leverage its existing distribution infrastructure, relationships with clinical customers (which are more extensive and well-developed than Illumina's), and its previous experience in supplying sequencing systems.

13. Third, the CMA asserts that the potential licensee should be able to leverage "*the potential competitive benefits of existing short read operations*".[6]  In the pool of potential licensees there are companies which are currently offering or developing short read systems, such as BGI, Thermo Fisher, Agilent, and Omniome.

---

[5] See paragraph 28 of NPR.

[6] See paragraph 28 of NPR.

ONT_DEL00569500

Case ME/6795/18
7 NOVEMBER 2019

14. PacBio has the benefit of a licence from Cornell University in respect of nine U.S. patents, which have in turn been sub-licensed to BioNano.[7]  Save for these licenses-in, PacBio does not believe that it has the benefit of any third party licenses that would be required for ONT or any third party to conduct nanopore sequencing under the claims in the patents and patent applications covered by the offer in paragraph 5 above.  PacBio is confident therefore, on the facts, that the concerns set out by the CMA at paragraph 32 of the NPR are unfounded.

15. While the Parties reject the provisional SLC findings, either of the proposed remedies will ensure that any potential SLC is eliminated and that the important RCBs are maintained.  In contrast, a prohibition would involve a loss of all RCBs and would therefore be unnecessary and disproportionate.

---

[7] See PacBio's reply to the CMA's Section 109 notice, 14 August 2019 (consolidated reply), Question 40, page 24.

ONT_DEL00569501

Case ME/6795/18
7 NOVEMBER 2019

**Annex 1 to Response to Notice of Possible Remedies – Remedy Proposal**

1. Illumina proposes the following two alternative undertakings to remedy the SLC provisionally identified by the CMA:

   (i)   A perpetual, royalty-free, irrevocable, sole licence of PacBio's patents listed in the Attachment to Oxford Nanopore Technologies ("ONT"); or

   (ii)  A perpetual, royalty-free, irrevocable, licence of PacBio's patents listed in the Attachment to any interested third-party undertaking for use in the nanopore field.

2. Illumina also proposes compliance mechanisms to address any concerns that Illumina might be incentivised to breach any of its commitments including: (i) the appointment of a monitoring trustee; and (ii) making a fast-track dispute resolution mechanism open to third parties.  The CMA approved monitoring trustee will monitor compliance with the licencing terms and prepare a compliance report every 12 months.  The monitoring trustee will also rule on any disputes between the licensee(s) and Illumina under a fast-track dispute resolution process.  If a party wishes to appeal a ruling by the monitoring trustee, there will be recourse to a fast-track arbitration procedure.  Illumina commits to follow the monitoring trustee/arbitrator's rulings on any disputes and to provide the monitoring trustee with all the information and assistance (including access to confidential documents) as may be reasonably required in order to carry out its mandate effectively.

ONT_DEL00569502

# EXHIBIT 4



# REFERENCE RELATING TO THE ANTICIPATED ACQUISITION BY ILLUMINA, INC OF PACIFIC BIOSCIENCES OF CALIFORNIA, INC.

## Notice of extension of inquiry period under section 39(3) of the Enterprise Act 2002[1]

1.  On 27 June 2019, the Competition and Markets Authority (CMA), in exercise of its duty under section 33(1) of the Enterprise Act 2002 (the Act), referred the anticipated acquisition by Illumina, Inc ('Illumina') of Pacific Biosciences of California, Inc ('PacBio') (together 'the Parties') (the reference) to its Chair for the constitution of a Group of CMA Panel Members ('the Inquiry Group'). The period within which the report on this reference was to be prepared and published (the reference period) was due to expire on 11 December 2019.

2.  On 24 October 2019, the Inquiry Group appointed to consider the reference published its Provisional Findings and a Notice of Possible Remedies.

3.  The Inquiry Group considers that completion of its investigation and the publication of its final report will not be possible within the original reference period and has decided that the reference period should be extended by eight weeks under section 39(3) of the Act. The revised reference period will expire on 5 February 2020. However, the Inquiry Group aims to complete the inquiry as soon as possible and in advance of this date.

4.  In taking this decision, the Inquiry Group had regard to the complexity of the subject matter and the need to allow sufficient time to take full account of representations received in response to the Notice of Possible Remedies and Provisional Findings in our final decision.

Stuart McIntosh
*Inquiry Group Chair*
26 November 2019

---

[1] Published pursuant to section 107(2)(c) of the Enterprise Act 2002

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | |
| *Plaintiff*, | C.A. No. 17-cv-275-LPS |
| | C.A. No. 17-cv-1353-LPS |
| v. | |
| | JURY TRIAL DEMANDED |
| OXFORD NANOPORE TECHNOLOGIES, INC. and OXFORD NANOPORE TECHNOLOGIES, LTD., | |
| *Defendants*. | |

**OXFORD'S OPPOSITION TO PACBIO'S MOTIONS IN LIMINE NO. 2 TO PRECLUDE REFERENCE TO ILLUMINA'S UNSUCCESFUL ACQUISITION OF PACBIO**

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Dated:  February 17, 2020

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Defendants*

Oxford should be permitted to present relevant evidence from antitrust proceedings. PacBio seeks to prevent Oxford from presenting evidence that directly contradicts PacBio's damages claims. PacBio's improper use of a motion in limine to block relevant evidence that rebuts its claims should be rejected.

In addition to lost profits, PacBio seeks a reasonable royalty rate that is three times higher than the highest of any of the comparable licenses, to which it tacks on an additional $1 million in lump-sum damages, a figure that is nearly ten times greater than the greatest of the comparable licenses. PacBio attempts to justify these inflated damages primarily on two grounds. First it seeks to narrow the relevant market so that Oxford is its only competitor. Second it argues that it would never agree to license its patents to a competitor, and if compelled to do so would seek an inflated royalty.

PacBio's claims are contradicted by the factual findings in and party's statements to the UK's Competition and Market Authority (CMA) and the FTC. In particular, both the CMA and the FTC found that the relevant market was not limited to PacBio and Oxford. Exs. 1, 2. Further, in an effort to overcome antitrust concerns, Illumina and PacBio provided an offer to license all of their patents, including the patents in suit, for free and to any party, including Oxford. Ex. 3.

This evidence directly rebuts the bases for PacBio's damages claims and is thus highly relevant to this case. PacBio's attempt to prevent its introduction at trial should be rejected.

## I.     The CMA's and FTC's findings regarding the sequencing market should be allowed.

PacBio maintains in this case that lost profits and a high reasonable royalty are justified because of the "intense competition" between PacBio and Oxford "in a two-player market that is still developing." Prowse Reply at ¶ 15. But both the CMA and the FTC rejected PacBio's position, finding that the relevant market included both long and short read systems and that PacBio and Illumina were direct competitors. *See, e.g.*, Layne-Farrar Rep. at ¶¶ 56-57; Layne-Farrar Supp.

Rep. at ¶¶ 21-22; Ex. 1, at 38, 69-84; Ex. 2, at ¶¶ 4-9, 56-66.

PacBio does not dispute the accuracy of the CMA's and FTC's findings, which are based on PacBio's and Illumina's own internal documents. Yet it nevertheless argues that these findings should be excluded because they come from a governmental agency and because the CMA's findings are entitled "provisional."

The authority PacBio cites, *Price v. Grasonville Volunteer Fire Dep't.*, is inapplicable as it relates to an EEOC determination in a discrimination suit that included only a few sentences of analysis and pertained to the ultimate legal issue of whether discrimination occurred. No. CV ELH-14-1989, 2016 WL 6277666, at *5 (D. Md. Oct. 26, 2016). In this instance, the CMA's factual findings are detailed, and they do not include findings regarding the ultimate issue of what damages may be appropriate. Instead they relate to one of 15 factors considered by the parties' damages experts. Further, if PacBio's contention that governmental agency decisions should be excluded is credited, then PacBio also should be barred from making any statements regarding USPTO determinations regarding the validity of the patents-in-suit.

PacBio has not shown that the CMA's and FTC's findings are untrustworthy such that they should be excluded from trial or fail to qualify for the public record hearsay exception. PacBio makes no argument that the findings are untrustworthy other than noting the inclusion of the word "provisional" in the title. However, these findings followed six months of analysis by the CMA and are consistent with the FTC's own independent investigation. Further, unlike the parties in *Rambus*, PacBio fully participated in the proceedings before the CMA and FTC. *See Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 101, 108–09 (E.D. Va. 2004) Further, PacBio and Illumina ultimately abandoned their merger plans in the face of these findings, resulting in Illumina incurring a $130 million breakup fee. The parties' actions in light of these findings are inconsistent

with PacBio's claims here that they are somehow untrustworthy. *See also In re Plywood Antitrust Litig.*, 655 F.2d 627, 636–37 (5th Cir. 1981) (affirming admission of FTC findings).

## II.     Illumina's and PacBio's offer of a royalty free license should be allowed

PacBio also seeks to exclude the royalty free license proposed by PacBio and Illumina that contradicts PacBio's claims that it would never license the patents-in-suit to a competitor.

Repeating the argument made in its *Daubert* motion, PacBio argues that the royalty free license offered is irrelevant because they claim the offer is allegedly from Illumina, not PacBio. This argument fails for two reasons. First, while the face of the offer states that "Illumina proposes" the royalty free license, the Response was submitted by both parties and was agreed to by PacBio. Ex. 3, at 1-2. This is made clear where Illumina and PacBio agreed to offer the license "to any interested third-party" before the merger closed. *Id*. PacBio has not represented that it did not agree to the proposed license, and it has refused to provide any discovery regarding the CMA's investigation, including into PacBio's role in proposing the royalty free license. *See* Ex. 4, R. Magee Email to Counsel. Further, even if the offer were from Illumina alone, it would still be relevant as it shows the willingness of a presumably rational third-party in PacBio's circumstances to license the patents-in-suit.

If PacBio's motion is granted and Oxford is not allowed to introduce evidence related to the proposed license, then PacBio should be barred from presenting or relying upon evidence and argument that PacBio would be unwilling to license its patents to a competitor. And while PacBio argues that it should be permitted to include evidence regarding PacBio's merger valuation and specific proceedings in the inquiry, it does not explain the relevance. Nor has it produced any such evidence, which appears to be an empty threat merely to complicate the trial evidence if its motion is not granted. For these reasons, the Court should deny PacBio's motion.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Oxford Nanopore Technologies,*
*Inc. and Oxford Nanopore Technologies, Ltd.*

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

# EXHIBIT 1



# Anticipated acquisition by Illumina, Inc. of Pacific Biosciences of California, Inc.

Provisional findings report

24 October 2019

© Crown copyright 2019

You may reuse this information (not including logos) free of charge in any format or medium, under the terms of the Open Government Licence.

To view this licence, visit www.nationalarchives.gov.uk/doc/open-government-licence/ or write to the Information Policy Team, The National Archives, Kew, London TW9 4DU, or email: psi@nationalarchives.gsi.gov.uk.

The Competition and Markets Authority has excluded from this published version of the provisional findings report information which the inquiry group considers should be excluded having regard to the three considerations set out in section 244 of the Enterprise Act 2002 (specified information: considerations relevant to disclosure). The omissions are indicated by [✁]. Some numbers have been replaced by a range. These are shown in square brackets.

**Contents**

*Page*

Provisional Findings ................................................................................ 4
1. The reference ...................................................................................... 4
2. The industry ....................................................................................... 4
Introduction to DNA sequencing ............................................................ 4
Applications of DNA sequencing............................................................ 6
History of DNA sequencing .................................................................... 8
    Other suppliers of DNA sequencing ................................................ 13
    Beijing Genomics Institute (BGI)..................................................... 14
    Oxford Nanopore Technologies (ONT)............................................ 15
    Thermo Fisher Scientific (Thermo Fisher) ...................................... 16
    QIAGEN N.V. (QIAGEN) ................................................................. 17
Spend on DNA sequencing................................................................... 18
3. The Parties ........................................................................................ 19
Illumina ................................................................................................. 19
    Overview of structure and operations ............................................. 19
    Financials ......................................................................................... 20
PacBio ................................................................................................... 24
    Overview of structure and operations ............................................. 24
    Financials ......................................................................................... 25
4. The Proposed Merger ....................................................................... 28
Introduction ........................................................................................... 28
Timeline of discussions......................................................................... 28
Rationale................................................................................................ 29
5. Relevant merger situation ................................................................. 30
Enterprises ceasing to be distinct ........................................................ 30
Jurisdiction test ..................................................................................... 31
Provisional conclusion on the relevant merger situation ..................... 32
6. Counterfactual.................................................................................... 32
Introduction and legal framework ......................................................... 32
Views of the Parties .............................................................................. 33
    PacBio's views................................................................................. 34
    Illumina's views................................................................................ 37
Third party views ................................................................................... 38
CMA assessment................................................................................... 38
    Market context.................................................................................. 38
    Assessment of failing firm arguments............................................. 39
    Considerations which would not exist in the counterfactual............ 45
    Provisional conclusions ................................................................... 46
7. Market definition................................................................................ 46
Introduction and overview ..................................................................... 46
Product market definition ...................................................................... 48
    Sequencing systems ........................................................................ 48
    Short read and long read sequencing.............................................. 50
    Non-NGS methods of ascertaining genetic information.................. 59
    Sequencing services ........................................................................ 63
    Conclusion on product frame of reference....................................... 66
Geographic market definition ................................................................ 66
    The Parties' views ............................................................................ 66

Evidence from third Parties ............................................................ 67
Our assessment ........................................................................... 67
8. Competitive effects of the merger ...................................................... 68
Introduction ...................................................................................... 68
Theory of Harm ................................................................................ 68
Nature of competition ...................................................................... 69
NGS Systems customers .............................................................. 69
Competition beyond the 'use case' level ....................................... 70
Dimensions of competition ............................................................ 80
Price setting ................................................................................... 82
Conclusion on nature of competition ............................................. 84
Evidence of competition between the Parties and with competitors ... 85
The Parties' views ......................................................................... 85
Market shares ................................................................................ 98
Overview of internal documents evidence ................................... 100
Illumina's internal documents ...................................................... 101
PacBio's internal documents ....................................................... 116
Evidence from customers ............................................................ 125
Evidence from competitors .......................................................... 135
Sales and sales forecasts ........................................................... 140
Our assessment of the competitive effects of the Proposed Merger ... 142
The structure of the market is highly concentrated ..................... 143
Current competition between the Parties ..................................... 144
Future competition between the Parties ...................................... 146
Potential competition from Illumina in long read ......................... 149
Constraint from other competitors .............................................. 150
Provisional conclusion ................................................................... 153
Overall provisional finding .............................................................. 156
9. Countervailing factors .................................................................... 156
Barriers to entry and expansion ..................................................... 157
Introduction ................................................................................. 157
Views of the Parties ..................................................................... 157
Views of third parties ................................................................... 159
Our assessment of barriers to entry and expansion ................... 159
Evidence of potential entry .......................................................... 173
Provisional conclusions ............................................................... 176
Countervailing buyer power ............................................................ 177
Introduction ................................................................................. 177
Views of the Parties ..................................................................... 177
Views of third parties ................................................................... 178
Our assessment of countervailing buyer power ........................... 178
Provisional conclusions ............................................................... 179
Rivalry-enhancing efficiencies ....................................................... 179
Introduction ................................................................................. 179
Views of third parties ................................................................... 181
Our assessment of rivalry-enhancing efficiencies ....................... 181
Provisional conclusions ............................................................... 189
10. The provisional decision ................................................................. 190

*Appendices*

A:  Terms of reference
B:  Industry background
C:  Parties' Internal documents
D:  Competitors
E:  Potential Entrants
F:  Valuation

Glossary

# Provisional Findings

## 1.    The reference

1.1    On 27 June 2019, the Competition and Markets Authority (CMA) in exercise of its duty under s33(1) of the Enterprise Act 2002 (the Act), referred the anticipated acquisition by Illumina, Inc. (Illumina) of Pacific Biosciences of California, Inc. (PacBio) (the Proposed Merger) for further investigation and report by a group of CMA panel members on the following questions in accordance with section 36(1) of the Act:

      *(a)* whether arrangements are in progress or contemplation which, if carried into effect, will result in the creation of a relevant merger situation; and

      *(b)* if so, whether the creation of that situation may be expected to result in a substantial lessening of competition (SLC) within any market or markets in the UK for goods or services.

1.2    Throughout this document, Illumina and PacBio are referred to collectively as 'the Parties' and Illumina and PacBio are referred to collectively post the Proposed Merger as 'the Merged Entity'.

1.3    Our terms of reference, along with information on the conduct of the inquiry, are in Appendix A and B. We are required to report by 11 December 2019.

1.4    This document, together with its appendices, constitutes the CMA's provisional findings. Further information including non-confidential versions of submissions including from the Parties, can be found on the CMA case page.[1]

## 2.    The industry

### Introduction to DNA sequencing

2.1    DNA contains the hereditary material for any living organism, encoded as a series of particular molecules called nucleotides (or 'bases'). DNA is composed of four different types of nucleotide that are linked together into strands in the form of a double-helix that can reach lengths into the millions. The nucleotides always bond with the same partner, and so knowing one side of the double-helix is sufficient to provide the full genetic information. These four nucleotides are called adenine (A), which always bonds with thymine (T),

---

[1] https://www.gov.uk/cma-cases/illumina-inc-pacific-biosciences-of-california-inc-merger-inquiry

and cytosine (C), which always bonds with guanine (G). DNA sequencing is the process of determining the order of these nucleotides in a particular sample of DNA.

**Figure 1: Illustration of a DNA sequence:**



Source: Parties' Final Merger Notice

2.2    A strand of DNA contains a code that dictates how proteins are made, and proteins control virtually all living functions. A genome, the collection of DNA for an organism, therefore contains the entire set of instructions for that organism.[2]

2.3    There are a number of specific technological approaches to conducting this sequencing being offered and/or developed by different organisations, many of which rely on patent-protected or proprietary techniques. However, most approaches fundamentally involve incorporating labelled versions of the nucleotides[3] into a strand of DNA sequentially and identifying each base in order as it is incorporated. These processes are often conducted with large numbers of DNA strands simultaneously / in parallel in order to increase the accuracy and decrease the length of time taken.

2.4    Most sequencing processes, or 'workflows', consist of four or five steps depending on the sequencing technology used:[4]

    *(a)*  **Extraction and purification:** The isolation of the DNA from the source material (such as blood, tissue, bone, etc).

---

[2] RNA serves as an intermediate molecule involved in the translation of the DNA code to proteins. It is possible to sequence RNA, using the same principles as DNA, albeit the thymine (T) base on RNA is replaced by uracil (U).
[3] For example, by tagging the nucleotides with different fluorescent markers.
[4] Briefing Note for the CMA, paragraphs 29, 115-121, and 157-160.

5

(b) **Library preparation:** Preparing the DNA itself for sequencing, for example by splitting it into shorter fragments, and adding any indexes[5] or primers[6] required.

(c) **Library immobilisation and amplification (dependent on technology):** If required, involves multiplying the single fragments of prepared DNA sections into large numbers (eg millions) of unique, clonal clusters.

(d) **Sequencing:** Process of identifying the sequence of nucleotides in the DNA fragments, which may use a variety of different technologies depending on the specific instrument.

(e) **Data analysis:** Converts the raw signals produced by the instrument into the sequence of nucleotides, potentially including recombining the shorter fragments to form longer sequences of the original DNA.

2.5   During the sequencing workflow various 'consumables' are used. These primarily consist of reagents, enzymes, and flowcells, and are often (although not always) proprietary to the manufacturer of the particular instruments being used.[7]

## Applications of DNA sequencing

2.6   Variations between organisms are due, in large part, to differences in their DNA sequences. Humans differ by approximately 0.1% of their genome,[8] and this relatively small amount of variation makes individuals unique.

2.7   Genetic variation accounts for many of the physical differences we see between different people (eg, height, hair, eye colour), as well as having medical consequences affecting disease susceptibility, including predisposition to complex genetic diseases such as cancer, diabetes, cardiovascular disease, and Alzheimer. In addition, genetic variation can affect individuals' response to certain drug treatments.[9]

---

[5] Indexes, also known as barcodes or tags, are unique sequences of usually 8 to 12 base pairs long that are ligated to fragments in a sequencing library for identification in subsequent data analysis.
[6] A primer is a short single strand of DNA (generally about 18-22 bases) that serves as a starting point for DNA synthesis.
[7] Briefing Note for the CMA, paragraphs 35 and 125.
[8] https://www.genome.gov/about-genomics/fact-sheets/Genetics-vs-Genomics
[9] Parties' Final Merger Notice, paragraph 60.

2.8     In addition, to human applications, DNA sequencing can be used on non-human species, including plants, livestock and microbes.

2.9     The major types applications that DNA sequencing is currently used for are:[10]

    *(a)*  **Basic Research:** This is broadly defined to include researchers at universities, research centres, government institutions, and biotechnology and pharmaceutical companies, who use DNA sequencing to further scientific discovery.

    *(b)*  **Translation Research:** Builds on basic research to create new therapies, medical procedures, or diagnostics. Its main focus is to "translate" scientific discoveries into new clinical tools and applications that can improve human health.

    *(c)*  **Clinical & diagnostics:** The use of DNA sequencing to evaluate risks, diagnose illness, and design treatments for patients.

    *(d)*  **Agri-genomics:** DNA sequencing is used to explore the genetic and biological basis for productivity and nutritional constitution in crops and livestock.

    *(e)*  **Consumer:** DNA sequencing being provided directly to consumers outside of a clinical setting, and without including a clinician.

    *(f)*  **Pharmaceutical:** Many therapeutics only work, or work optimally, on patients having a certain genetic makeup. Therefore, pharmaceutical companies use pharmacogenomics to analyse how patients' DNA influences their response to new drugs.

2.10    The exact form of variations in the DNA sequence can vary. For example, these can take the form of replacing base pairs with different nucleotides (substitutions), additional base pairs being added or removed (insertions/deletions), sections being moved (translocations), repeats, duplications, etc. The exact length of these variations will differ from a single base pair up to hundreds, thousands, or even millions of base pairs.[11]

2.11    Depending on the application, a number of different methods are used when developing and using DNA sequences. In particular:[12]

    *(a)*  **Whole genome sequencing (WGS)**: This refers to the process of determining the complete DNA sequence of an organism's

---

[10] Parties' Final Merger Notice, paragraph 58.
[11] Parties' Final Merger Notice, paragraphs 64-65.
[12] [✂].

genome. This can consist of 'de novo' sequencing (the development of a brand-new reference genome which can be used as a base comparator for subsequent work) or 'resequencing' (sequencing the genome of an individual organism for which a suitable reference genome exists).[13]

(b) **Targeted sequencing:** This entails the isolation and sequencing of a subset of genes or regions of the genome. This is useful for studies in oncology, microbial genomics, and other research involving analysis of rare cell populations.[14]

(c) **Counting:** This entails counting the number of DNA pieces that match a certain sequence for example, how many chromosomes are present in a sample or how much bacterial/viral DNA is present in a sample. This can be used for applications such as detecting whether there is an elevated quantity of abnormal DNA is present in a patient's blood, indicating the presence of cancer.[15]

## History of DNA sequencing

2.12    The first DNA sequencers were developed based on the work of the British biochemist Frederick Sanger. In 1977, Sanger introduced the "chain termination method" to identify the nucleotides on a DNA strand. This is known as Sanger sequencing method and represents what are now called 'first generation' sequencers or 'Sanger' sequencers.[16]

2.13    In 1987, Applied Biosystems, now part of Thermo Fisher Scientific, commercialised an automatic sequencing instrument based on the sanger sequencing method. This was the main approach used to support the Human Genome Project, which aimed to sequence the entire human genome.[17] This publicly funded project was initiated in 1990 and completed in 2003 at a total estimated cost of $2.7 billion.[18]

2.14    In 2005, a new generation of sequencers emerged. These used a new technological approach to achieve high throughput by sequencing billions of

---

[13] Parties' Final Merger Notice, paragraph 67.
[14] Parties' Final Merger Notice, paragraph 67.
[15] Briefing Note for the CMA, paragraphs 95 and 98.
[16] Briefing Note for the CMA, paragraphs 38-40.
[17] Our understanding of the term project, in this report, is an individual or collaborative enterprise (often a team at a university or research institute), planned to achieve a particular scientific goal.
[18] Briefing Note for the CMA, paragraphs 41-42.

DNA strands in parallel. In large part because of the high throughput, second generation sequencers have a substantially lower cost per base.[19]

2.15   Since 2010, a small number of companies have developed 'single molecule' sequencers (sometimes referred to as third generation sequencing). These primarily differ from previous technologies due to the fact that they do not require fragmenting the DNA into such small pieces, and so are able to produce longer raw DNA sequences. These longer sequences are beneficial as they make reassembly of the original sequence easier, as well as being necessary to identify longer variations (eg studies have found that short read approaches may not be detecting between 30% and 90% of structural variations, with very high false positive rates).[20] As a result of the longer raw sequences produced, this approach is sometimes referred to as 'long read' or 'native long read', with second generation sequencers being referred to as 'short read'.[21,22] In these provisional findings we refer to both second generation (short read) and third generation (long read) sequencing systems, and together as next generation sequencing (NGS) systems.

2.16   As a result of the dynamic nature of the industry and improvements in DNA sequencing, as well as associated activities such as data processing, the costs have decreased significantly over the past c.20 years, as is shown in Figure 2 below:

---

[19] Briefing Note for the CMA, paragraph 44.
[20] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5990442/
[21] A general consensus is that any technology which is capable of sequencing greater than 1,000 continuous base pairs would be referred to as "native long read". However most current native long read sequencers can generate thousands to hundreds of thousands base pairs per read, compared to tens to hundreds of base pairs per read for most current short read instruments; Briefing Note for the CMA, pages 19-20.
[22] There are approaches to try and extend the read lengths of short read platforms to achieve some of the benefits of native long read. These are known as "linked long read" or "associated short read" and consist of using library preparation methods such as labelling the fragments to help with reassembly of the original "parent". For the purposes of this Report, the term 'long read' shall be used to mean native long read, unless indicated otherwise.

**Figure 2: Estimated total cost to sequence a human-sized genome, 2001-19
(logarithmic y-axis)**



Source: National Human Genome Research Institute[23]

2.17 Following the drop in mid-2015 from around $5,000 to slightly above $1,000,
the total cost of sequencing a human-sized genome has been relatively flat for
the past four years, as shown in Figure 3 below. However, we note that the
direct cost of sequencing itself is only one element of this, as this cost also
includes labour, administration, management, etc (see footnote 23).

---

[23] https://www.genome.gov/about-genomics/fact-sheets/DNA-Sequencing-Costs-Data; visited in August 2019;
Cost includes labour, administration, management, utilities, reagents, and consumables, sequencing instruments
and other large equipment (amortized over three years), informatics activities directly related to sequence
production (eg, laboratory information management systems and initial data processing), submission of data to a
public database, and indirect Costs as they relate to the above items.

**Figure 3: Estimated total cost to sequence a human-sized genome using 'second generation' sequencing platforms, 2015-2019**



Source: National Human Genome Research Institute[24]

2.18   The Parties stated that the current cost of sequencing a human-sized genome on its high-end sequencers is around $[✂],[25] which would therefore represent around [✂]% of the current total cost.

2.19   The Parties told us that the recent trend on these charts did not accurately reflect the cost of DNA sequencing. They stated that these charts reflect the total cost of sequencing a human genome on any system rather than just the cost of the sequencing itself on Illumina's latest instrument, that it reflects the cost to the specific institution rather than other customers, that the spikes reflect variations in the volume of samples being run, and that the definition of genome may have changed in terms of the number of megabases included.[26]

2.20   We note that the National Human Genome Research Institute provides equivalent data on a cost per megabase basis which shows the same trend, with a cost decrease of 70% in mid-2015 after which the cost has fluctuated over time, but not shown any decreasing trend.[27] We also note, Illumina references the same data on its own website when discussing the evolution of

---

[24] https://www.genome.gov/about-genomics/fact-sheets/DNA-Sequencing-Costs-Data; visited in August 2019; Cost includes labour, administration, management, utilities, reagents, and consumables, sequencing instruments and other large equipment (amortized over three years), informatics activities directly related to sequence production (eg, laboratory information management systems and initial data processing), submission of data to a public database, and indirect Costs as they relate to the above items.
[25] Parties' Final Merger Notice, paragraph 290; Parties' submissions on third party estimates ([✂]).
[26] Illumina's Hearing with the CMA, pages 17-20, PacBio's Hearing with the CMA, pages 28-31.
[27] https://www.genome.gov/about-genomics/fact-sheets/DNA-Sequencing-Costs-Data.

DNA sequencing costs, although they show the chart ending at the start of 2016.[28]

2.21   Other data provided by the Parties showing the trends of DNA sequencing costs also show that since 2015 the cost reductions appear to have substantially reduced, consistent with the Figures shown above. [✂]:[29]

**Figure 4: Parties' submission on cost and volume of DNA sequencing over time**

[✂].

Source: Parties' response to P1 Decision, page 3.

2.22   While the above Figures reflect the cost of first and second generation sequencing, the cost of long read sequencing has also decreased rapidly, most notably in recent years. For example, in the two years from 2013 to 2015, the consumables cost of sequencing a human-sized genome using PacBio's technology decreased from around $1 million to $360,000. Then, from 2015 to 2019 (the same time period shown in Figure 3 above), these costs decreased from $360,000 to $6,750 per human-sized genome at high accuracy,[30] or potentially even lower.[31]

2.23   Although these figures are not directly comparable in absolute terms, we have plotted this on a logarithmic axis alongside the cost using first/second generation technologies in Figure 5 below in order to show the relative variations observed over time for each:

---

[28] https://www.illumina.com/science/technology/next-generation-sequencing/beginners/ngs-cost.html (accessed on 19 September 2019).
[29] We note that the Parties have not provided the underlying data or analysis to support this figure.
[30] Based on using CCS in order to provide a higher level of accuracy. Using the lower-accuracy CLR approach, these cost figures could be reduced by up to 80%. Parties' Response to Follow-Up Questionnaire, Q1(b) and (c).
[31] PacBio Sequel II can sequence a human-sized genome using CLR for around $1,000 (Parties' Final Merger Notice, paragraph 55), while ONT's public figures indicate that its consumables cost would be around $300 per genome on its high end PromethIONs https://nanoporetech.com/products/comparison (based on $3 per Gb quoted on its website, and 90Gb required per genome (at 30x) as reflected in the national Human Genome Research Institute data).

**Figure 5: Estimated total cost to sequence a human-sized genome via first and second generation sequencing platforms, and consumable-only costs of PacBio sequencing (logarithmic y-axis)**



Source: National Human Genome Research Institute[32] and PacBio data[33]

### *Other suppliers of DNA sequencing*

2.24    In this section we set out the main current providers of DNA sequencing (other than the Parties) and provide some background about their sequencing business. Additional details are included in other chapters where relevant.

2.25    Table 1 below shows the estimated share of the NGS systems market (discussed in more detail in paragraphs 8.117, onwards below):

---

[32] https://www.genome.gov/about-genomics/fact-sheets/DNA-Sequencing-Costs-Data; visited in August 2019; Cost includes labour, administration, management, utilities, reagents, and consumables, sequencing instruments and other large equipment (amortized over three years), informatics activities directly related to sequence production (eg, laboratory information management systems and initial data processing), submission of data to a public database, and indirect Costs as they relate to the above items.
[33] Based on using CCS in order to provide a higher level of accuracy. Using the lower-accuracy CLR approach, these cost figures could be reduced by up to 80%. Parties' Response to Follow-Up Questionnaire, Q1(b) and (c).

**Table 1: Estimated worldwide share of the NGS systems market, 2018**

|  | *Estimated global share* | *Read length* |
|---|---|---|
| Illumina | [80-90%] | Short read |
| BGI | [0-5%] | Short read |
| Thermo Fisher Scientific | [10-20%] | Short read |
| QIAGEN | [0-5%] | Short read |
| PacBio | [0-5%] | Long read |
| ONT | [0-5%] | Long read |

Source: CMA analysis based on internal data from companies

2.26   While the specific estimated shares have fluctuated somewhat from year to year, Illumina has been the largest supplier of DNA sequencing since around 2008, shortly after its acquisition of Solexa, and grew to an estimated 75% share of revenue by 2010 as shown in Figure 6 below:[34]

**Figure 6: Historical revenue shares of next generation sequencing, 2006-11**



Source: Illumina Schedule 14A filing, Investor Presentation, 2012

### *Beijing Genomics Institute (BGI)[35]*

2.27   BGI is a genomics company founded in 1999 to represent China in the Human Genome Project.[36] It operates in Europe through offices and laboratories in Riga and Copenhagen. BGI provides a wide variety of sequencing services (using other suppliers' instruments),[37] and genetic tests

---

[34] https://www.sec.gov/Archives/edgar/data/1110803/000119312512146305/d328837ddefa14a.htm, slide 11.
[35] Consistent with the approach taken by the Parties in their submissions, the CMA uses the name BGI to encompass both BGI and MGI (a subsidiary of BGI Group which specialises in the supply of sequencing instruments and sequencing reagents).
[36] https://en.genomics.cn/en-history.html
[37] https://www.bgi.com/global/resources/sequencing-platforms/

for medical institutions, research institutions and other public and private partners.[38] In 2014, BGI stated that it was the world's largest genomics centre, producing at least a quarter of the world's genomic data.[39]

2.28   In 2013, BGI acquired Complete Genomics, and in 2015 launched its first short read sequencing system based on Complete Genomics' technology. Since then it has released a number of sequencing platforms, building a portfolio of products with a range of different costs and throughputs.[40]

2.29   The BGI subsidiary which focuses on DNA sequencing instrument has around 900 employees,[41] and BGI has stated that it has installed around 1,000 systems in 16 different countries although we understand that it has not currently sold any systems in the UK, to date.[42]

2.30   As well as developing and commercialising its own short read DNA sequencing technology, BGI currently provides a DNA sequencing service for customers who do not want to buy an instrument themselves. This includes the provision of short read and long read sequencing services and involves customers sending the samples to BGI and specifying which technology they would prefer,[43] and BGI sequences them on the customer's behalf.

2.31   BGI has a share of [0-5%] in the NGS systems market on a worldwide basis and is seeking to create a diversified offering across a wide portfolio of products (eg desktop sequencers, high throughput platforms, etc).[44]

### Oxford Nanopore Technologies (ONT)

2.32   ONT is a privately held, UK based, company that was spun out from the University of Oxford in 2005 to develop and commercialise long read DNA sequencing systems. It currently has more than 450 employees[45] generating around £14 million of revenue in 2017.[46] In 2018, ONT completed a funding round which valued the company at around £1.5 billion.[47]

---

[38] https://www.bgi.com/us/company/about-bgi/
[39] https://en.genomics.cn/en-xsyx.html
[40] Cowen Life Science Tools Kit, Overview of Life Science Tools Markets and Technologies, 10th Edition, 2018, pages 63-64.
[41] https://en.mgitech.cn/page/gsjj.html
[42] http://en.mgitech.cn/article/detail/mgiannouncesmiles.html; [✂].
[43] Includes instruments from BGI, Illumina, Thermo Fisher, and PacBio (listed as "coming soon"); https://www.bgi.com/us/resources/sequencing-platforms/
[44] https://www.bgi.com/us/company/about-bgi/
[45] https://nanoporetech.com/about-us/history
[46] ONT 2017 Annual Report; https://beta.companieshouse.gov.uk/company/05386273/filing-history/MzIwNzA3NzQ4MWFkaXF6a2N4/document?format=pdf&download=0
[47] https://www.ft.com/content/df80e218-2b85-11e8-a34a-7e7563b0b0f4

2.33    ONT has commercialised a number of long read sequencers based on its own nanopore technology. It has three main systems available at this point ranging from the smallest MinION (starter pack costing less than $1,000) to the PromethION (starter pack costs starting at around $165,000).[48]

2.34    ONT has stated that its goal is to make DNA/RNA analysis technology accessible to all and open up new sequencing applications. ONT reports that, as of May 2018, it had sold a total of 6,000-7,000 MinION starter packs.[49]

2.35    ONT has a share of [0-5%] in the NGS systems market on a worldwide basis, and we understand its R&D focus to be in producing portable, affordable instruments,[50] as well as improving the accuracy of its existing technology.[51]

### *Thermo Fisher Scientific (Thermo Fisher)*

2.36    Thermo Fisher is the world leader in serving science (including analytical instruments and laboratory products), with global revenues of more than $24 billion and approximately 70,000 employees.[52]

2.37    In 2014, Thermo Fisher acquired Life Technologies, which supplied short read DNA sequencing instruments under the SOLiD and Ion Torrent systems.[53] Thermo Fisher no longer actively markets its SOLiD system,[54] but continues to sell and develop Ion Torrent. According to a third party source, Thermo Fisher now has an installed base of around 4,500 units globally. This estimate would make it the second largest global provider of second generation instruments, after Illumina.[55]

2.38    Thermo Fisher's acquisition of Life Technologies also included the technology developed by Applied Biosystems.[56] As a result of this, Thermo Fisher is now, according to a third party report, the leading global supplier of first-generation Sanger sequencing systems, with the third party report estimating an installed base of around 18,000 instruments globally (equal to around 90% of all

---

[48] Cowen Life Science Tools Kit, Overview of Life Science Tools Markets and Technologies, 10th Edition, 2018, pages 75-76.
[49] https://nanoporetech.com/about-us/news/clive-g-brown-cto-plenary-london-calling
[50] "*The Company has a rich development pipeline that includes solutions to enable any user, anywhere, including the mobile-phone-compatible SmidgION and low cost, portable sample prep Ubik*"; https://nanoporetech.com/about-us
[51] https://nanoporetech.com/about-us/news/new-r10-nanopore-released-early-access
[52] https://ir.thermofisher.com/investors/company-information/company-profile/default.aspx
[53] https://www.chemistryworld.com/news/thermo-fisher-to-buy-life-technologies-in-158bn-deal/6079.article; https://allseq.com/knowledge-bank/ngs-necropolis/solid/
[54] https://allseq.com/knowledge-bank/ngs-necropolis/solid/
[55] Cowen Life Science Tools Kit, Overview of Life Science Tools Markets and Technologies, 10th Edition, 2018, pages 58-60.
[56] In 2008, Applied Biosystems merged with Invitrogen to form Life Technologies; https://www.genomeweb.com/archive/invitrogen-acquire-applied-biosystems-67b#.XV6nJuhKiUk

Sanger sequencing instruments).[57] Based on an estimated total expenditure on first-generation Sanger sequencing was around $450 million per annum,[58] which, the CMA calculates, would indicate Thermo Fisher's share of this to be around $400 million.

2.39   According to third party reports Thermo Fisher has a share of [10-20%] in the NGS systems market on a worldwide basis, although it is primarily focused on targeted clinical and translational application segments.[59] We understand its current R&D focus to be to strengthen its Ion Torrent systems to assist with cancer diagnostics in clinical environments.[60]

### QIAGEN N.V. (QIAGEN)

2.40   Founded in 1986, QIAGEN is a major player in the provision of sample preparation and assay technologies for molecular diagnostics (human healthcare), applied testing (forensics, veterinary testing and food safety), pharma (pharma and biotech companies) and academia (life sciences research). QIAGEN is listed on the New York and Frankfurt Stock Exchanges and has around 5,000 employees generating global revenues of around $1.5 billion.[61]

2.41   In 2012, QIAGEN acquired Intelligent BioSystems (IBS), a company that was developing short read sequencing systems.[62] In late 2015, it launched its new GeneReader system,[63] which aims to simplify the sequencing workflow process "*taking you from primary sample preparation to final report*".[64] At the end of 2017, a third party report estimated that QIAGEN had an installed base of around 130 GeneReaders.[65]

---

[57] Cowen Life Science Tools Kit, Overview of Life Science Tools Markets and Technologies, 10th Edition, 2018, page 45.
[58] Cowen Life Science Tools Kit, Overview of Life Science Tools Markets and Technologies, 10th Edition, 2018, page 83.
[59] Cowen Life Science Tools Kit, Overview of Life Science Tools Markets and Technologies, 10th Edition, 2018, page 45.
[60] "*We continued to strengthen our Ion Torrent line of next-generation sequencing systems with the new Ion GeneStudio S5 Series of benchtop instruments. When combined with our growing menu of Oncomine assays, this new platform offers a complete solution to help researchers bring new cancer diagnostics to the clinic.*" https://s1.q4cdn.com/008680097/files/doc_financials/annual/2018/Thermo-Fisher_2018_Annual-Report.pdf
[61] https://corporate.qiagen.com/-/media/project/qiagen-corporate/corporate-microsite/documents/investor-relations/2019/reports/qia_18_005_gesamt_final_190509_web.pdf, pages 8 and 34.
[62] https://www.genomeweb.com/clinical-sequencing/qiagen-acquires-intelligent-bio-systems-maps-out-sequencing-strategy#.XZ8K8EZKiUk
[63] https://corporate.qiagen.com/newsroom/press-releases/2015/20151104_gr_launch
[64] Parties' Final Merger Notice, paragraph 182 and https://www.qiagen.com/us/applications/ngs?intcmp=home_appl_1
[65] Cowen Life Science Tools Kit, Overview of Life Science Tools Markets and Technologies, 10th Edition, 2018, page 65.

2.42    QIAGEN also supplies universal solutions which can be used with any second generation sequencer, including Illumina's. These sequencing-related solutions include library preparation, assays, and bioinformatics software.[66]

2.43    QIAGEN generated around $140 million from its "portfolio of NGS" in 2018, which includes sales associated with its GeneReader instrument as well as broader DNA sequencing products and services.[67] An analyst report indicated that contributions from GeneReader are likely to be a small proportion of this, at around $15 million.[68]

2.44    QIAGEN has a share of [0-5%] in the NGS systems market on a worldwide basis.[69]

2.45    On 7 October 2019, QIAGEN announced that it was suspending any ongoing NGS instrument development activities, and at the same time announced a new strategic collaboration with Illumina to *"advance the use of NGS technologies in clinical decision-making".*[70]

## Spend on DNA sequencing

2.46    Third party estimates of the global expenditure on DNA sequencing indicate that it is currently between $4-5 billion, and is expected to grow rapidly, achieving double-digit growth for at least the next five years.[71] We note that these estimates appear to include expenditure which is not associated with a manufacturer of DNA sequencers (eg consumables manufactured by third parties without their own instruments), so are not directly comparable with other figures quoted in our Provisional Findings.

2.47    Illumina has developed its own model to forecast future growth in DNA sequencing spend, by application and by method used, for the next 15 years. At a total level, it indicates an expectation that DNA sequencing will [✂]. Some additional details of Illumina's projections are shown in Figure 7 to Figure 9 below.

---

[66] https://www.qiagen.com/gb/products/next-generation-sequencing/library-preparation/
[67] https://corporate.qiagen.com/-/media/project/qiagen-corporate/corporate-microsite/documents/investor-relations/2019/reports/qia_18_005_gesamt_final_190509_web.pdf, page 25.
[68] Cowen Life Science Tools Kit, Overview of Life Science Tools Markets and Technologies, 10th Edition, 2018, pages 66-67.
[69] Cowen Life Science Tools Kit, Overview of Life Science Tools Markets and Technologies, 10th Edition, 2018, pages 66-67.
[70] https://corporate.qiagen.com/newsroom/press-releases/2019/20191007_Q3_preliminary_sales_and_restructuring_charges
[71] Cowen Life Science Tools Kit, Overview of Life Science Tools Markets and Technologies, 10th Edition, 2018, pages 8, 34, and 44; Markets and Markets Next-Generation Sequencing (NGS) Market Global Forecasts to 2022, page 36; [✂].

**Figure 7: [✂].**

**[✂].**

Source: [✂].


**Figure 8: [✂].**

**[✂].**

Source: [✂].


**Figure 9: [✂]**

[✂].

Source: [✂].


2.48    We note that, given the dynamic and rapidly evolving nature of DNA sequencing and the timescales involved in its projections, the specific numbers projected by Illumina are unlikely to be particularly accurate. However, they appear to be consistent with other third-party views and indicate the general speed of progress, as well as the likely avenues of particular growth in applications and methods.

2.49    Illumina submitted an estimate of the future split between short read and long read expenditure.[72] [✂].[73][✂] and would be concerned about placing weight on this without additional evidence to support this approach.

# 3.    The Parties

## Illumina

### *Overview of structure and operations*

3.1    Illumina is a global genomics company that is incorporated in Delaware (US), headquartered in California (US), and is publicly listed on the NASDAQ stock exchange.[74] Illumina develops, manufactures and commercialises systems, consumables, bioinformatics and services used for genetic analysis worldwide. Illumina's systems include second generation, short read DNA

---

[72] Parties' Response to the Annotated Issues Statement, Figure 5.
[73] The source of this data is attributed to the Illumina market model, but the only information on how it might have been extracted is footnote 15 of the Response to the Annotated Issues Statement and Illumina's response to putback.
[74] https://www.sec.gov/Archives/edgar/data/1110803/000111080319000013/fy2018form10-k.htm

sequencing instruments based on its Sequencing by Synthesis (SBS)[75] technology as well as DNA microarray scanners.

3.2     Illumina also provides product support services for its systems as well as genetic analysis services powered by its sequencing and microarray technologies. Illumina's sequencing systems use consumables that include library preparation kits, sequencing kits and flow cells. The sequencing data that they produce is interpreted with specific bioinformatics software and applications.[76]

3.3     Illumina's customers include a variety of government and not-for-profit genomic research institutes, academic institutions, hospitals, genomics centres as well as pharmaceutical, biotechnology, agrigenomics, clinical and diagnostic laboratories, and consumer genomics companies.

3.4     Approximately 89% of Illumina's common stock equivalent is institutionally owned, but no shareholders or group of shareholders has or have sole or joint control. The list of Illumina's top five shareholders as on 29 March 2018 were:[77]

> *(a)*  Bailie Gifford & Co. (12.1%)
>
> *(b)*  Blackrock, Inc (7.9%)
>
> *(c)*  Capital Research & Management Co. (Global Investors) (7.8%)
>
> *(d)*  The Vanguard Group, Inc. (7.0%)
>
> *(e)*  The Growth Fund of America (5.5%)

***Financials***

3.5     Illumina's turnover in 2018 was $3.3 billion derived from an installed base of around 13,000 instruments.[78] Of its 2018 global revenue, $850 million (26%) was attributable to the EMEA region.[79] In 2017, Illumina's turnover was $2.8 billion, of which around $650 million (24%) was attributable to the EMEA region, and $[✂] ([✂]%) to the UK.[80] Illumina had a market capitalisation of

---

[75] SBS technology is responsible for 90% of the world's NGS sequencing. It is a multi-molecular approach to Sequencing; https://www.illumina.com/science/technology/next-generation-sequencing/sequencing-technology.html

[76] The term application is used to refer to the broad category of uses that sequencing technology can be used for, for example, clinical, diagnostic, or agrigenomics applications.

[77] Parties' Final Merger notice, paragraph 12

[78] https://s24.q4cdn.com/526396163/files/doc_presentations/ILMN-at-Barclays-13-March-2019.pdf

[79] Illumina Annual 10-K Report, 31 Dec 2018, page 55.

[80] Illumina Annual 10-K Report, 31 Dec 2018, page 55; Paragraph 25 and Table 1 of the Parties' Final Merger Notice.

around $54 billion on the 1st July 2019. Its recent financial performance is shown below:

**Table 2: Illumina simplified P&L, 2016-18 ($m)**

|  | 2016 | 2017 | 2018 |
|---|---|---|---|
| **Revenue** | **2,398** | **2,752** | **3,333** |
| COGS | -732 | -926 | -1,033 |
| **Gross Profit** | **1,666** | **1,826** | **2,300** |
| R&D Costs | -504 | -546 | -623 |
| SG&A Costs | -584 | -674 | -794 |
| Legal Contingencies | 9 | - | - |
| **Operating Profit** | **587** | **606** | **883** |
| Other Income (and Costs) | -26 | 437 | 11 |
| Provision for income taxes | -133 | -365 | -112 |
| **Net Profit** | **428** | **678** | **782** |
|  |  |  |  |
| *% Gross Margin* | *69%* | *66%* | *69%* |
| *% Operating Margin* | *24%* | *22%* | *26%* |
| *% Net Profit Margin* | *18%* | *25%* | *23%* |

Source: Illumina 2018 10-K.

3.6    The revenue growth seen in the past 3 years (15-20% per annum) is not unusual for Illumina. When it launched its IPO in 2000, it had revenues of around $1.3 million, and has grown substantially over the past 18 years, as shown in Figure 10 below:

**Figure 10: Illumina annual revenue 2000-2018 ($m)**



Source: Illumina 2000-2018 10-Ks.

3.7    Illumina's DNA sequencing instruments include:[81]

---

[81] https://www.illumina.com/systems/sequencing-platforms.html

(a) **iSeq:** Illumina's most recent introduction (launched in 2018) – a low throughput short read benchtop sequencer, with maximum output of 1.2 Gb.

(b) **MiniSeq**: A low throughput short read benchtop sequencer, with maximum output of 7.5Gb.

(c) **MiSeq:** A mid throughput short read sequencer, with maximum output of 15 Gb. Includes versions certified for *in vitro* diagnostic uses (MiSeq Dx) and forensics (MiSeqFGx)

(d) **NextSeq:** A mid throughput short read sequencer, with maximum output of 120 Gb. Includes a version certified for *in vitro* diagnostic uses (NextSeq Dx).

(e) **HiSeq:** A high throughput short read sequencer, with maximum output of 1,500 Gb.

(f) **HiSeq X (discontinued):** A high throughput short read sequencer, with maximum output of 1,800 Gb. This was only available in bundles of five or ten and was originally restricted to human whole-genome sequencing. Subsequently, some of the restrictions were removed to allow other species, but still only whole-genome sequencing.[82]

(g) **NovaSeq:** Illumina's most expensive and highest throughput model. This is a high throughput short read sequencer, with a maximum output of 6,000 Gb.

3.8    Illumina records its sales against three key categories:

(a) Instruments;

(b) Consumables;

(c) Services (including maintenance); and other.

3.9    [✂]:

---

[82] https://www.illumina.com/content/dam/illumina-marketing/documents/products/datasheets/datasheet-hiseq-x-ten.pdf

**Figure 11: Illumina split of revenue and gross profit[83] by product-type, 2018**

[✂].

Source: Illumina 2018 10-K, email from Illumina dated 6 September 2019.

3.10   Illumina increased its nominal R&D spending from $546 million in 2017 to $623 million in 2018, however as a percentage of revenue this has slightly decreased from 19.8% in 2017 to 18.7% in 2018.[84] Illumina is developing a wide range of individual projects in order to improve its existing propositions, and to develop new products. In particular, Illumina highlighted the following in order to continue to compete effectively in a dynamic industry, across read length and output spectra:[85]

(a)  [✂].

(b)  [✂].

(c)  [✂].

3.11   Over the past 3 years, Illumina has generated operating margins of between 22% and 26% and net margins after tax of between 19% and 26%. In the same time period, its absolute net earnings have increased by over 80% from $454 million in 2016 to $826 million in 2018.[86]

3.12   To date, Illumina has never paid a dividend, but has returned funds to shareholders through other mechanisms such as share repurchasing schemes: $250 million was authorised in May 2017; $150 million in May 2018; and, $550 million in the first quarter of 2019).[87]

3.13   Illumina also invests in innovation through a venture capital fund (Illumina Ventures) as well as a business incubator (Illumina Accelerator). Illumina Ventures operates as an independently-managed fund investing in early-stage genomics companies,[88] while Illumina Accelerator provides direct support to start-ups in the form of six-month funding cycles, access to seed investment, access to Illumina systems and facilities, and business coaching.[89]

---

[83] Gross profit figures here exclude R&D spend.
[84] Illumina 10K, 31 Dec 2018, page 29.
[85] [✂].
[86] Illumina 2018 10-K, page 44.
[87] Illumina 2018 10-K, page 25; Illumina Q1 2019 10-Q, page 31.
[88] https://www.illuminaventures.com/our-approach (as visited on 16 July 2019).
[89] https://www.illumina.com/science/accelerator.html (as visited on 16 July 2019).

## PacBio

### *Overview of structure and operations*

3.14    PacBio is a global genetics company that is incorporated in Delaware (US), headquartered in California (US), and is publicly listed on the NASDAQ stock exchange.[90] PacBio develops, manufactures and commercialises third generation, native long read DNA sequencing systems based on its Single Molecule, Real Time (SMRT) technology. PacBio's long read systems run on proprietary consumables that include library preparation kits, sequencing kits and SMRT Cells commercialised by PacBio. The sequencing data produced is interpreted with bioinformatics tools provided by PacBio and by third parties.

3.15    PacBio's customers include government and not-for-profit genomic research institutes, genomics centres, pharmaceutical companies and agricultural companies. PacBio also provides product support services for its native long read sequencing systems.[91]

3.16    PacBio introduced its new Sequel system (Sequel II) on 24 April 2019 following a (reportedly-successful) early access program. Sequel II is based on the same underlying SMRT technology as previous PacBio sequencing systems but now includes the SMRT Cell 8M chip which increases the number of potential observations (the number of DNA molecules analysed) from 1 million to 8 million, increasing output and reducing cost of sequencing considerably as a result.[92] This is discussed in more detail in chapter 8 on the competitive effects of the merger.

3.17    No shareholder or group of shareholders has or have sole or joint control of PacBio's shares. The list of PacBio's top five shareholders at the end of September 2018 (just prior to the Merger) is provided below:[93]

> *(a)*  Consonance Capital Management LP (9.1%);
>
> *(b)*  Maverick Capital Ltd (8.5%);
>
> *(c)*  Oracle Investment Management, Inc (6.5%);
>
> *(d)*  Capital Research Global Investors (6.3%); and

---

[90] https://www.sec.gov/Archives/edgar/data/1299130/000129913019000014/pacb-20181231x10k.htm
[91] Paragraphs 4 and 16 of the Parties' Final Merger Notice.
[92] Paragraphs 52-55 of the Parties' Final Merger Notice.
[93] [✂].

(e)  BlackRock Institutional Trust Company, N.A. (6.0%).

3.18    Prior to the Proposed Merger only BlackRock Fund Advisors represented a common shareholder between PacBio and Illumina with a shareholding greater than 5% in each company.

### *Financials*

3.19    PacBio's turnover in 2018 was $78.6 million, derived from an installed base of over [✕] instruments.[94] Around $[✕] (circa [✕]%) of this global revenue was attributable to the UK.[95] Prior to the announcement of the Merger, it had a market capitalisation of around $700 million. Its recent financial performance is shown in Table 3 below:

**Table 3: PacBio simplified P&L, 2016-18 ($m)**

|  | *2016* | *2017* | *2018* |
|---|---|---|---|
| **Revenue** | **90.7** | **93.5** | **78.6** |
| COGS | -46.6 | -58.8 | -53.5 |
| **Gross Profit** | **44.2** | **34.7** | **25.1** |
| R&D Costs | -67.6 | -65.3 | -62.6 |
| SG&A Costs | -47.8 | -59.1 | -63.5 |
| **Operating Profit (Loss)** | **-71.2** | **-89.8** | **-101.0** |
| Other Income (and Costs) | -3.1 | -2.4 | -1.6 |
| **Net Profit (Loss)** | **-74.4** | **-92.2** | **-102.6** |
|  |  |  |  |
| *% Gross Margin* | *49%* | *37%* | *32%* |
| *% Operating Margin* | *-79%* | *-96%* | *-128%* |
| *% Net Profit Margin* | *-82%* | *-99%* | *-131%* |

Source: PacBio 2018 10-K.

3.20    Since its IPO in 2010, PacBio's revenue has grown substantially, although this growth has not been as steady as Illumina's, as shown below:

---

[94] [✕].
[95] [✕].

**Figure 12: PacBio annual revenue 2010-2018 ($m)**



Source: PacBio Exiting Firm Analysis, Table 1.

3.21   During the period September 2013 until December 2016, PacBio had a development, commercialisation and licencing agreement with Roche to develop diagnostic products based on PacBio's SMRT technology.[96] As PacBio met certain milestones it received $[✂] in aggregate funding from Roche, which contributed to PacBio's revenue profile shown above.

3.22   PacBio's DNA sequencing instruments include:

    *(a)* **RS (discontinued):** PacBio's original long read DNA sequencer, commercially released in 2011.[97]

    *(b)* **RS II (discontinued):** An updated version of PacBio's long read DNA sequencer, commercially released in 2013.[98]

    *(c)* **Sequel:** Making up the majority of PacBio's current installed base, Sequel is a long read DNA sequencer which was released to replace the RS II. Sequel was commercially released in 2015.[99]

---

[96] Parties' Final Merger Notice, paragraphs 49-51.
[97] https://www.genomeweb.com/sequencing/pacbio-ships-first-two-commercial-systems-order-backlog-grows-44
[98] https://www.genomeweb.com/sequencing/new-products-pacbios-rs-ii-cufflinks
[99] https://www.genomeweb.com/business-news/pacbio-launches-higher-throughput-lower-cost-single-molecule-sequencing-system; [✂], Chart 1.

(d) **Sequel II:** PacBio's most recent instrument, which generates 8x more data than its previous Sequel ones. Sequel II was commercially released in 2019.[100]

3.23   PacBio records its sales against the three key categories:

(a) Instruments;

(b) Consumables;

(c) Services and other (including maintenance).

3.24   In recent years PacBio has generated [✂]. [✂] shown in Figure 13 below:

**Figure 13: PacBio split of revenue and gross profit by product-type, 2018**

[✂]

Source: [✂]

3.25   PacBio currently relies on third-party sales and distribution partners for some non-U.S. sales,

3.26   PacBio spends a larger proportion of its funds on R&D than Illumina. This is equivalent to around 70-80% of its annual revenue (for example, $63 million in 2018 and $65 million in 2017 as shown in Table 3 above). PacBio's short term R&D focus is on [✂].[101]

3.27   Since its founding, PacBio has never made an annual operating profit. Its revenues and operating profits since its IPO in 2010 are shown in Table 4 below:

**Table 4: PacBio revenue and operating profits, 2010-18 ($m)**

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | 1.7 | 33.9 | 26.0 | 28.2 | 60.6 | 92.8 | 90.7 | 93.5 | 78.6 |
| Operating Profit (Loss) | -140.2 | -109.4 | -94.5 | -79.3 | -66.2 | -31.7 | -74.4 | -92.2 | -102.6 |

Source: [✂].

3.28   PacBio has funded its operations primarily via equity capital raises. During the period 2004 to 2010, PacBio raised a total of $364 million in equity capital primarily through venture capital funds. In October 2010 PacBio listed on the Nasdaq stock exchange and raised a total of $211 million through the IPO. Then, from 2013 onwards, PacBio has continued to raise equity capital at

---

[100] https://www.pacb.com/press_releases/pacific-biosciences-launches-new-sequel-ii-system-featuring-8-times-the-dna-sequencing-data-output/
[101] [✂].

approximately an annual basis via 'At the Market' (ATM) and Follow on offerings, totalling $307 million.[102]

3.29   In 2013 PacBio also raised $20.5 million in debt funding with an interest rate of 8.75%. The loan is due to be repaid in full by February 2020. PacBio has not accessed the debt capital markets for any additional funding.[103]

# 4.   The Proposed Merger

## Introduction

4.1   On 1 November 2018, the Parties signed a merger agreement (the 'Merger Agreement') to acquire PacBio at $8.00 (equivalent to £6.20) per share in cash, with a total acquisition price of approximately $1.2 billion (£930 million).[104] The completion date was set as 1 November 2019.[105]

4.2   The Proposed Merger is conditional upon approval by PacBio's shareholders, which was given on 24 January 2019, as well as clearance by the US and UK competition authorities.[106]

4.3   On 25 September 2019, the Parties amended the Merger Agreement to, among other things, extend the completion date to 31 December 2019, subject to Illumina's unilateral right to extend until 31 March 2020. During this period, Illumina is required to make a series of cash payments to PacBio, enabling PacBio to fund its continuing operations. These payments become repayable (with no interest) under certain circumstances if the Proposed Merger does not complete.[107]

## Timeline of discussions

4.4   PacBio had been searching for a strategic partner since August 2017. The Parties had a few meetings to discuss the potential for a strategic partnership. PacBio's search for a strategic partner is discussed in more detail in chapter 6 on the Counterfactual.

4.5   On 25 September 2018, Illumina made an offer to acquire PacBio for $7 per share which was rejected as being too low, at which point Illumina's CEO

---

[102] [✂].
[103] [✂].
[104] Parties' Final Merger Notice, paragraphs 6 and 7.
[105] Merger Agreement, Section 10.01(b)(i).
[106] Parties' Final Merger Notice, paragraph 8.
[107] https://sec.report/Document/0001193125-19-254987/

requested additional diligence in order to increase the offer. During October 2018, the Parties' management teams and their financial advisors met several times and Illumina received access to additional due diligence information.[108] Following this, Illumina made a series of increasing offers and PacBio made a counteroffer, culminating in the Illumina offer of $8 (£6.20) per share on 20 October 2018, which PacBio accepted and resulted in the Parties signing the Merger Agreement on 1 November 2018. On the same day, both Parties issued press releases to publicly announce the Proposed Merger.[109]

## Rationale

4.6    The Parties' stated rationale for the Proposed Merger is to:

> *(a)* facilitate wider distribution of / access to PacBio's products and technology by enabling PacBio to benefit from Illumina's global production, and support and service infrastructure;

> *(b)* increase adoption of PacBio's systems by clinical and diagnostic customers by enhancing PacBio system quality with Illumina's quality systems and system management processes;

> *(c)* improve PacBio's systems using Illumina's proprietary technologies, such as through improved processing speeds/computational power and data analytics;

> *(d)* enable Illumina to develop coordinated solutions (including bioinformatics) to enable customers to harness the complementary nature of the technologies; and

> *(e)* accelerate innovation.[110]

4.7    There are a number of internal documents produced in contemplation of the Proposed Merger which support these statements. For example, one document submitted to Illumina's Board in September 2018 stated that [✂].[111]

4.8    Illumina's internal documents produced in contemplation of the deal also indicate that, [✂].[112] The purchase price of $1.2 billion would therefore

---

[108] [✂].
[109] [✂]; Parties' Final Merger Notice, paragraphs 6 and 7; https://www.illumina.com/company/news-center/press-releases/press-release-details.html?newsid=a6aca47a-c296-4c22-9c4f-1fe3ea553471; and https://www.pacb.com/press_releases/illumina-to-acquire-pacific-biosciences-for-approximately-1-2-billion-broadening-access-to-long-read-sequencing-and-accelerating-scientific-discovery/.
[110] Parties' Final Merger Notice, paragraph 10.
[111] [✂].
[112] [✂].

indicate that Illumina expects to retain a large proportion (or possibly all) of the synergies. This is discussed in more detail in Appendix F.

4.9     Finally, Illumina submitted that [✂]. [113] It explained that "*the acquisition of PacBio by [✂] would create a formidable competitor*", and that [✂]. [114] This sentiment is also reflected in Illumina's internal documents. [115] This evidence is consistent with Illumina using an acquisition to eliminate a competitive threat, and so preserve its current market position.

# 5.     Relevant merger situation

5.1     In accordance with section 36 of the Act and pursuant to our terms of reference (see Appendix A) we are required to investigate and report on two statutory questions: (a) whether arrangements are in progress or in contemplation which, if carried into effect, will result in the creation of a relevant merger situation; and (b) if so, whether the creation of that situation may be expected to result in a substantial lessening of competition (SLC) within any market or markets in the United Kingdom (UK) for goods or services.

5.2     We address the first of the statutory questions in this section.

## Enterprises ceasing to be distinct

5.3     A relevant merger situation will be created if, as a result of the Proposed Merger, two or more enterprises cease to be distinct within the statutory period for reference [116] and the turnover test and/or the share of supply test is satisfied. [117]

5.4     The Act defines an 'enterprise' as 'the activities or part of the activities of a business'. [118] A 'business' is defined as including 'a professional practice and includes any other undertaking which is carried on for gain or reward or which is an undertaking in the course of which goods or services are supplied otherwise than free of charge'. [119]

5.5     Illumina and PacBio are active in the supply of DNA sequencing instruments and consumables in the UK. We are therefore satisfied that Illumina and

---

[113] [✂].
[114] [✂].
[115] [✂].
[116] Section 23 and section 24 of the Act.
[117] Section 23 of the Act.
[118] Section 129(1) of the Act.
[119] Section 129(1) and (3) of the Act.

PacBio are businesses and their activities are 'enterprises' for the purposes of the Act.

5.6     The Act provides that two enterprises cease to be distinct if they are brought under common ownership or common control.[120] The Proposed Merger concerns the acquisition by Illumina of the entire issued share capital of PacBio. On completion of the Proposed Merger, the enterprise that constitutes PacBio will be under the common ownership and control of Illumina.

5.7     Accordingly, we are satisfied that arrangements are in contemplation which, if carried into effect, would result in Illumina and PacBio ceasing to be distinct enterprises for the purposes of the Act.

5.8     The Proposed Merger has not yet completed and so Illumina and PacBio remain independent enterprises. Therefore, we are satisfied that the four-month time limit for a relevant merger situation under the Act is not engaged in the present circumstances.[121]

## Jurisdiction test

5.9     The second element of the relevant merger situation test seeks to establish a sufficient nexus with the UK on a turnover and/or share of supply basis to give us jurisdiction to investigate.

5.10    The turnover test, which is that the value of the turnover in the UK of the enterprise being taken over exceeds £70 million. The turnover of PacBio in the UK in its last financial year prior to the Merger Agreement was approximately £[✂<]. The turnover test is therefore not met and we are required to consider whether the share of supply test is met.

5.11    The share of supply test is satisfied where, as a result of enterprises ceasing to be distinct, the following condition prevails or prevails to a greater extent: at least one quarter of goods or services of any description which are supplied in the UK, or in a substantial part of the UK, are supplied either by or to one and the same person.[122]

---

[120] Section 26 of the Act.
[121] Section 24 of the Act. In summary, the four-month time limit applies only where the enterprises *have ceased* to be distinct.
[122] Section 23(2), (3) and (4) of the Act. The reference to supply 'by' or 'to' one and the same person catches aggregations with regard to the supply or purchase of goods or services. The test is also met where at least one quarter of the goods or services is supplied by the persons by whom the enterprises concerned are carried on, or are supplied to or for those persons.

5.12   Illumina's share of supply of next generation sequencing systems[123] in the UK by value of sales in 2018 was [✕] [90-100]% and [✕] [0-5]% for PacBio. As a result of the Proposed Merger the Parties combined share of supply will exceed 25%.

5.13   We are therefore satisfied that the share of supply test in section 23 of the Act is met.

## Provisional conclusion on the relevant merger situation

5.14   In the light of the above, we have provisionally found that the Proposed Merger, if carried into effect, will result in the creation of a relevant merger situation. As a result, we must consider whether the creation of that situation may be expected to result in an SLC within any market or markets in the UK for goods or services.

# 6.   Counterfactual

## Introduction and legal framework

6.1   The counterfactual is an analytical tool used to help answer the question of whether a merger has or may be expected to result in an SLC. It does this by providing the basis for a comparison of the competitive situation on the market with the merger against the likely future competitive situation on the market absent the merger. The latter is called the counterfactual.[124]

6.2   We may examine several possible scenarios to determine the appropriate counterfactual, one of which may be the continuation of the pre-merger situation. Ultimately only the most likely scenario based on the facts available to us and the extent of our ability to foresee future developments will be adopted.[125] The foreseeable period can sometimes be relatively short.[126] However, even if an event or its consequences are not sufficiently certain to be included in the counterfactual, they may be considered in the context of the competitive assessment.[127] Developments which have arisen or are likely to arise as a result of the merger will not form part of the counterfactual assessment.[128]

---

[123] See chapter 7 on market definition for additional details.
[124] MAGs, paragraph 4.3.1.
[125] MAGs, paragraph 4.3.6.
[126] MAGs, paragraph 4.3.6.
[127] MAGs, paragraph 4.3.2.
[128] MAGs, footnote 37.

6.3    However, we seek to avoid importing into the assessment of the appropriate counterfactual any spurious claims to accurate prediction or foresight. Given that the counterfactual incorporates only those elements of scenarios that are foreseeable, it will not in general be necessary to make finely balanced judgements about what is and what is not included in the counterfactual.[129]

6.4    In reaching a view on the appropriate counterfactual, we must determine what future developments we foresee arising absent the merger based on the totality of facts available to us. Insofar as future events or circumstances are not certain or foreseeable enough to include in the counterfactual, the analysis of such events can take place in the assessment of competitive effects.[130] Owing to the inherent uncertainty of predicting future events, the CMA benefits from a margin of appreciation in relation to its conclusion and will have acted rationally provided it has taken account of all relevant information.[131]

6.5    One notable exception when we do not adopt the pre-merger situation as our counterfactual is the exiting firm scenario, sometimes referred to as a 'failing firm'. In this scenario, we would consider:[132]

   *(a)*  whether the firm would have exited (through failure or otherwise); and, if so

   *(b)*  whether there would have been an alternative purchaser for the firm or its assets to the acquirer under consideration; and

   *(c)*  what would have happened to the sales of the firm in the event of its exit.

### Views of the Parties

6.6    The Parties submitted that we should consider PacBio's historical and forward-looking financial circumstances but for the Proposed Merger when assessing its competitive effects.[133] PacBio submitted that [✂].[134]

6.7    The Parties also submitted that we should consider PacBio's search for a potential partner prior to its entering into the current Merger Agreement with

---

[129] MAGs, paragraphs 4.3.2 and 4.3.6.
[130] MAGs, paragraph 4.3.2.
[131] See BAA Ltd v Competition Commission [2012] CAT 3 at [20], *Stagecoach Group Plc v Competition Commission* [2010] CAT 14, paragraph 45.
[132] MAGs, paragraph 4.3.8.
[133] Parties' Final Merger Notice, paragraph 40.
[134] [✂].

Illumina.[135] In particular, the Parties stated that since at least August 2017, PacBio had been actively looking for a strategic partner and/or acquirer, [✂][136] [✂].[137]

6.8    The Parties have told us that [✂].[138] In particular, they stated that [✂]. Therefore, they consider that [✂].[139]

6.9    PacBio has submitted it is a failing firm[140] and that each of the three limbs of our exiting firm test was met:[141]

   *(a)*  [✂];

   *(b)*  [✂]; and

   *(c)*  [✂].

6.10   PacBio's submissions on each of these points are set out below.[142]

**PacBio's views**

*Would the firm exit?*

   *[✂]*

6.11   [✂].[143]

6.12   [✂].[144]

6.13   [✂].[145]

6.14   [✂][146] [✂].[147] [✂].[148]

6.15   [✂].[149]

---

[135] Parties' Final Merger Notice, paragraph 40.
[136] [✂].
[137] [✂].
[138] [✂].
[139] [✂].
[140] [✂].
[141] [✂].
[142] [✂].
[143] [✂].
[144] [✂].
[145] [✂].
[146] [✂].
[147] [✂].
[148] [✂].
[149] [✂].

6.16   [✂].[150]

6.17   [✂].[151]

6.18   [✂].[152] [✂].[153] [✂].[154]

6.19   [✂].[155] [✂].[156]

*[✂]*

6.20   [✂].[157]

6.21   [✂].[158]

6.22   [✂].[159] [✂].[160]

6.23   [✂].[161]

6.24   [✂].[162]

6.25   [✂].[163]

6.26   [✂].[164]

*Would there be an alternative purchaser for the firm or its assets?*

*Background and process*

6.27   In 2013, PacBio signed an agreement with Roche to develop diagnostic products, including sequencing systems and consumables. This involved PacBio developing and manufacturing certain products, then selling exclusively to Roche who had exclusive distribution rights in the field of human in vitro diagnostics. In return, Roche provided $35 million of funding to

---

[150] [✂].
[151] [✂].
[152] [✂].
[153] [✂].
[154] [✂].
[155] [✂].
[156] [✂].
[157] [✂].
[158] [✂].
[159] [✂].
[160] [✂].
[161] [✂].
[162] [✂].
[163] [✂].
[164] [✂].

PacBio upfront, with the plan of additional subsequent investments of $40 million conditional on hitting specific milestones.[165]

6.28    At the end of 2016, Roche chose to terminate this agreement, stating that "*we will have greater focus on our internal development efforts and drive our long term strategy which is to be a leader in clinical diagnostic sequencing*".[166]

6.29    Shortly after this termination, PacBio started considering whether an alternative strategic partner was available to replace Roche. In particular, the Parties state that PacBio was looking to secure:[167]

    *(a)*    resources for the distribution of PacBio's technology and access to a larger sales network; and

    *(b)*    funding and expertise to allow PacBio to expand its R&D efforts and commercialisation of existing and future product lines.

6.30    [✂].[168] [✂].[169] [✂].[170]

6.31    [✂].[171]

6.32    [✂].[172]

    *(a)*    [✂].

    *(b)*    [✂].

    *(c)*    [✂].

    *(d)*    [✂].

*Outcomes*

6.33    [✂].[173]

---

[165] https://www.pacb.com/press_releases/pacific-biosciences-announces-agreement-with-roche-diagnostics-to-develop-and-supply-dna-sequencing-based-products-for-clinical-diagnostics/
[166] https://www.prnewswire.com/news-releases/roche-announces-termination-of-2013-development-commercialization-and-license-agreement-with-pacific-biosciences-300379155.html
[167] [✂].
[168] [✂].
[169] [✂].
[170] [✂].
[171] [✂].
[172] [✂].
[173] [✂].

6.34   [✂]<sup>174</sup> [✂].<sup>175</sup>

6.35   [✂].<sup>176</sup> [✂].<sup>177</sup>

6.36   [✂].<sup>178</sup>

*What would have happened to the sales of the exiting firm?*

6.37   [✂].<sup>179</sup>

6.38   [✂].<sup>180</sup>

6.39   [✂]:<sup>181</sup>

      *(a)*  [✂].

      *(b)*  [✂].

6.40   [✂].<sup>182</sup>

6.41   [✂].<sup>183</sup>

6.42   [✂].<sup>184</sup>

**Illumina's views**

6.43   Illumina told us that [✂], but that it was not in a position to comment on [✂] or whether an alternative acquiror for the company might exist.<sup>185</sup>

6.44   Illumina told us that it considered PacBio's technology to have real value in the market [✂].<sup>186</sup>

---

[174] [✂].
[175] [✂].
[176] [✂].
[177] [✂].
[178] [✂].
[179] [✂].
[180] [✂].
[181] [✂].
[182] [✂].
[183] [✂].
[184] [✂].
[185] Illumina's Hearing with the CMA, page 13 and 67.
[186] Illumina's Hearing with the CMA, page 13.

## Third party views

6.45   A large number of third parties raised concerns with us about PacBio's financial position and whether it would remain financially viable absent the Proposed Merger.[187]

6.46   However, some considered that, having launched its improved Sequel II which has been well received, PacBio is now in a better position to continue to develop independently.[188] This sentiment has also been reflected in a recent equity analyst report (dated October 2019) stating that PacBio as a standalone company *"is worth more now given their commercial achievements and system performance"*.[189]

6.47   We note that third parties have a more limited view of the details of PacBio's financial position as they do not have access to its internal documents.

## CMA assessment

6.48   As stated in paragraph 6.2 above, when selecting a counterfactual for a Phase 2 merger, we will seek to select the most likely foreseeable scenario.

6.49   We therefore start by considering the market context and its foreseeable evolution, before assessing the submissions and evidence submitted by the Parties as to whether PacBio meets the criteria to constitute a "failing firm". Finally, we note some points which have only arisen as a result of the Proposed Merger and so would not exist in the counterfactual, before reaching our provisional conclusions.

### *Market context*

6.50   We have considered the broader market context of NGS systems. As discussed in the industry background, competitive effects, and countervailing factors chapters, the evidence shows that this is a dynamic sector in which all players invest significantly in R&D to improve existing or develop new sequencing technologies. It is not uncommon for companies to experience losses for a number of years while the technology is being developed, as discussed in more detail below.

6.51   In particular, PacBio's recent release and commercialisation of its Sequel II instrument may have a significant impact on its competitive interactions with

---

[187] [✂].
[188] [✂].
[189] https://www.genomeweb.com/sequencing/pacific-biosciences-stock-upgraded-piper-jaffray

Illumina, absent the Proposed Merger. This is discussed in more detail in chapter 8 on the competitive effects of the merger.

### *Assessment of failing firm arguments*

6.52   PacBio has stated that it was a failing firm (within the meaning of our Guidance). As discussed in paragraph 6.5 above, when conducting this assessment, we consider:

> *(a)* whether the firm would have exited (through failure or otherwise); and, if so
>
> *(b)* whether there would have been an alternative purchaser for the firm or its assets to the acquirer under consideration; and
>
> *(c)* what would have happened to the sales of the firm in the event of its exit.

*Would the firm exit?*

6.53   [✂].[190]

6.54   [✂].

        *[✂]*

6.55   [✂].

6.56   [✂].

6.57   [✂]:

**Figure 14: [✂]**

[✂]

Source: [✂].

6.58   [✂].[191]

6.59   [✂].[192] [✂].[193] [✂].

---

[190] [✂].
[191] [✂].
[192] [✂].
[193] [✂].

6.60   [✂][194] [✂][195] [✂].[196]

6.61   [✂].[197] [✂].[198]

6.62   [✂].[199] [✂].

6.63   [✂].[200] [✂].[201] [✂].[202] [✂].[203] [✂].[204]

6.64   [✂].

6.65   [✂].

   *[✂]*

6.66   [✂].

6.67   [✂]:

   *(a)*  [✂].[205]

   *(b)*  [✂].[206]

   *(c)*  [✂].[207]

   *(d)*  [✂]:[208]

   (i)   [✂].

   (ii)  [✂].

   (iii) [✂].

   (iv)  [✂].

---

[194] [✂].
[195] [✂].
[196] [✂].
[197] [✂].
[198] [✂].
[199] [✂].
[200] [✂].
[201] [✂].
[202] [✂].
[203] [✂].
[204] [✂].
[205] [✂].
[206] [✂].
[207] [✂].
[208] [✂].

*(e)* [✂].[209]

6.68 [✂].

6.69 [✂].

*PacBio's existing cash reserves*

6.70 [✂]:

**Table 5: [✂].**

[✂]

*[✂].

Source: [✂].

6.71 [✂]:

*(a)* [✂].[210]

*(b)* [✂].[211]

6.72 [✂].

6.73 [✂] [✂].[212]

6.74 [✂].[213] [✂].[214]

6.75 [✂].

6.76 [✂].

*PacBio's ability to raise additional cash*

6.77 [✂].[215]

6.78 [✂].[216]

---

[209] [✂].
[210] [✂].
[211] [✂].
[212] [✂].
[213] [✂].
[214] [✂].
[215] [✂].
[216] [✂].

6.79   [✂].[217,218]

6.80   [✂].[219] [✂].[220] [✂].[221] [✂].

6.81   [✂]:

      *(a)* [✂].[222]

      *(b)* [✂].[223][✂].[224]

6.82   [✂].[225]

6.83   [✂]:

      *(a)* [✂]. [✂].[226]

      *(b)* [✂]: [✂] [✂].[227]

6.84   [✂][228] [✂].[229] [✂][230] [✂].

6.85   [✂].[231] [✂].

6.86   [✂].

6.87   [✂][232] [✂][233] [✂].[234] [✂].

6.88   [✂].[235] [✂].

6.89   [✂].

6.90   [✂].[236] [✂].

---

[217] https://nanoporetech.com/about-us
[218] [✂].
[219] [✂].
[220] [✂].
[221] [✂].
[222] $[✂].
[223] [✂].
[224] [✂].
[225] [✂].
[226] [✂].
[227] [✂].
[228] [✂].
[229] [✂].
[230] [✂].
[231] [✂].
[232] [✂].
[233] [✂].
[234] [✂].
[235] [✂].
[236] [✂].

6.91    [✖].[237] [✖].[238]

*Provisional conclusion on exit*

6.92    [✖].

6.93    [✖].

6.94    Our provisional conclusion is that the appropriate counterfactual is one in which PacBio is [✖] and would not exit the market due to financial failure in the foreseeable future.

*Would there be an alternative purchaser for the firm or its assets?*

6.95    [✖].[239]

6.96    [✖].[240]

*PacBio's search for a strategic partner*

6.97    [✖].

6.98    [✖].[241]

6.99    [✖]:

  (a)  [✖]: [✖].[242]

  (b)  [✖]: [✖].[243]

  (c)  [✖]: [✖].[244]

  (d)  [✖]: [✖].[245]

6.100  [✖].[246] [✖].[247]

---

[237] [✖].
[238] [✖].
[239] [✖].
[240] [✖].
[241] [✖].
[242] [✖].
[243] [✖].
[244] [✖].
[245] [✖].
[246] [✖].
[247] [✖].

6.101 [✂].[248]

6.102 [✂].[249] [✂].[250] [✂].[251] [✂].[252]

6.103 [✂].[253]

6.104 [✂].

6.105 [✂].

6.106 [✂].[254] [✂].

*Evidence from valuations on potential for alternative purchasers*

6.107 [✂]:

      *(a)* [✂].[255]

      *(b)* [✂].

6.108 [✂].[256] [✂].

6.109 [✂][257] [✂].

*Additional evidence on potential for alternative purchasers*

6.110 [✂].[258]

6.111 [✂].[259] [✂].

6.112 [✂].[260]

6.113 [✂]:[261]

---

[248] [✂].
[249] [✂].
[250] [✂].
[251] [✂].
[252] [✂].
[253] [✂].
[254] [✂].
[255] [✂].
[256] [✂].
[257] [✂].
[258] [✂].
[259] [✂].
[260] [✂].
[261] [✂].

[✂].

6.114  [✂].

6.115  [✂].[262]

6.116  [✂].

*Provisional conclusion on alternative purchasers*

6.117  [✂].

6.118  The evidence presented to us and the actions of each of the Parties, shows that PacBio has substantial underlying value, which would be attractive to alternative purchasers. Although any such alternative offers may not have been as attractive to PacBio shareholders as Illumina's bid, they would have resulted in the competitive constraint between the Parties being maintained.

6.119  [✂].

6.120  [✂].

6.121  [✂].[263] [✂].

*What would have happened to the sales of the exiting firm?*

6.122  [✂].[264]

6.123  [✂].[265] [✂].

6.124  [✂]. However, because we have provisionally concluded that PacBio has not met the first two limbs of the exiting firm test, we have not found it necessary to provisionally conclude on the effect of any sales redistribution.

**Considerations which would not exist in the counterfactual**

6.125  [✂].

6.126  [✂].[266]

---

[262] [✂].
[263] [✂].
[264] [✂].
[265] [✂].
[266] [✂].

6.127 [✂]:

> (a) [✂].[267]
>
> (b) [✂].[268]
>
> (c) [✂].[269]
>
> (d) [✂].[270]
>
> (e) [✂].
>
> (f) [✂].
>
> (g) [✂][271] [✂].
>
> (h) [✂].[272]

**Provisional conclusions**

6.128 Based on the evidence set out above, we do not consider that PacBio meets the criteria of an "exiting firm", as set out in the MAGs.[273] Our provisional conclusion is that the most likely situation absent the Proposed Merger, and therefore the appropriate counterfactual, is one in which PacBio would remain an independent entity and the prevailing conditions of competition would continue. These prevailing conditions would include levels of investment and innovation by both Illumina and PacBio commensurate with their pre-merger business plans. The relevant factors, and implications for these future competitive conditions, are discussed in more detail in chapters 8 and 9 on the competitive effects of the merger and countervailing factors.

# 7.   Market definition

## Introduction and overview

7.1   The purpose of market definition is to provide a framework for the CMA's analysis of the competitive effects of a merger. The relevant market is the market in which a merger may give rise to an SLC and contains the products and/or services that are the most significant competitive alternatives available

---

[267] [✂].
[268] [✂].
[269] [✂].
[270] [✂].
[271] [✂].
[272] [✂].
[273] MAGs, paragraph 4.3.8.

to the customers of the merged companies. Market definition is a useful analytical tool but is not an end in itself, and identifying the relevant market involves an element of judgment. The boundaries of the market do not determine the outcome of the CMA's analysis of the competitive effects of a merger in a mechanistic way. The CMA may, for example, also take into account constraints outside the relevant market, segmentations within the market, or other ways in which some constraints are more important than others.[274]

7.2   In making a judgement on market definition, we have taken into account the dynamic nature of this industry and the forward-looking nature of our assessment. Much of the evidence we rely on in determining the relevant market is also relevant to the competitive assessment as we analyse the closeness of competition between the two companies, which both currently supply sequencing systems employing different technologies, one based on 'short read' technology (Illumina), the other based on 'long read' technology (PacBio). We therefore cross refer as necessary.

7.3   The Parties overlap in the supply of next-generation sequencers (NGS),[275] which includes both short read (second generation) and long read (third generation) sequencing systems. In this chapter we examine two dimensions of market definition: the product dimension and the geographic dimension. For each, we proceed by first setting out the Parties' submissions, then summarising the evidence we have received, and finally explaining our assessment.

7.4   As we explain below we have provisionally found that the relevant product market is NGS systems:

(a)   We have found that long read and short read NGS systems are providing an increasing competitive constraint on each other;

(b)   We have found that there was limited competitive constraint from non-NGS systems and that this is unlikely to change in the future;

(c)   We have found that in purchasing decisions, customers consider the entirety of the sequencing system, including the instrument and consumables; and

---

[274] Merger Assessment Guidelines (CC 2 Revised), paragraphs 5.2.1 and 5.2.2.
[275] Chapter 2 on the Industry, paragraph 2.15.

(d)  We have found that the supply of sequencing services, as opposed to sequencing systems, provides very little constraint on the Parties.

7.5    We have also provisionally found that the relevant geographic market is worldwide.

## Product market definition

7.6    In order to determine the relevant product market, we have considered:

(a)  whether to include consumables alongside the instrument in a 'sequencing system';

(b)  the extent to which short read and long read sequencing system providers constrain each other;

(c)  whether non-NGS technologies should be included; and

(d)  whether DNA sequencing services[276] should be included.

### Sequencing systems

*The Parties' views*

7.7    The Parties submitted that sequencing instruments and their related consumables fall into systems markets on the basis that customers purchase sequencing instruments taking into account the 'total cost of ownership' of the system.[277] This includes the price of both the primary product (ie the sequencing instrument) and consumables (ie library preparation and reagent kits,[278] bioinformatics tools and product support services), so that the price of the sequencing instrument and the price of the consumables are linked.

7.8    The Parties also submitted that suppliers of sequencing instruments adopt different pricing policies, some of which include the price of the consumables together with the sequencing instrument. For example, ONT sells 'starter

---

[276] Sequencing services are offered by some companies. Customers pay to have their DNA samples sequenced (rather than purchase sequencers themselves). Those offering sequencing services often have a variety of different instruments, often from more than one manufacturer.
[277] Parties' Final Merger Notice, paragraphs 129 and 231.
[278] While some consumables, such as sample extraction and library preparation kits can be used across all sequencing technologies and are also provided by third-party providers, some consumables, such as reagent kits and flow cells are exclusively provided by the instrument manufacturer, for use with a particular instrument, see Parties' Final Merger Notice, paragraphs 137 and 173 and Annex 001 and Annex 002 to the Parties' Final Merger Notice. This has also been confirmed by third parties.

packs' which include both sequencers and consumables and QIAGEN applies a 'price per insight' model whereby customers pay for each clinical report generated.[279,280]

*Evidence from third parties*

7.9    Customers also told us that the cost of consumables is a significant factor when deciding which DNA sequencing instrument to purchase, for example:

   (a)    [✄] told us that "*the cost of consumables is one factor taken into account when thinking about purchasing a new technology or instrument*";[281]

   (b)    [✄] told us that the "*consumables cost is what drives a project not the cost of the instrument*";[282] and

   (c)    [✄] told us that "*the cost of consumables is an important factor when purchasing a new instrument*".[283]

*Our assessment*

7.10   The evidence we have seen demonstrates that consumables are an important element of DNA sequencing, accounting for a significant part of the Parties' revenue and profit (see chapter 3 on the Parties, Figure 11 and Figure 13). Third parties confirmed that the costs of consumables account for the majority of sequencing costs and therefore play an important role in a customer's decision regarding which sequencing system to buy.[284]

7.11   In our view, the market for NGS systems should therefore be assessed as a systems market, given that:

   (a)    customers take into account the entire cost of sequencing;

   (b)    the difference in the pricing models used by sequencing suppliers means that direct comparisons of different elements of NGS systems is not straightforward; and

---

[279] Parties' Final Merger Notice, paragraphs 135 – 137, 198, 213, 232 and 246. The Parties made no further submissions in relation to systems markets during our Phase 2 investigation.
[280] We note that QIAGEN announced on 7 October 2019 a joint venture partnership with Illumina to deliver sequencing-based in-vitro diagnostic (IVD) tests and as part of its preliminary Q3 2019 results announced its decision to "*suspend ongoing NGS-related instrument development activities*".
[281] Note of call with [✄].
[282] Note of call with [✄].
[283] Note of call with [✄].
[284] For example, see note of call with [✄].

(c) we have not received any evidence that contradicts the position that the Parties' activities should be analysed on the basis of a 'systems' market.

7.12 We therefore take the view that sales of sequencing instruments and the various types of consumables (eg library preparation kits, reagent kits and data analysis tools) should be assessed within the scope of a single product frame of reference, ie as a systems market.

7.13 We recognise that there are other ways of combining the elements involved in DNA sequencing to define the market. For instance, pragmatically, and based on supply-side substitution,[285] it is possible to combine all the elements of DNA sequencing systems (eg instrument, consumables, etc.) into one product market where the conditions of competition are the same for each element. Given that most consumables are purchased from the instrument manufacturer, this would lead to the same definition with the exception of library preparation kits which can also be purchased from the open market. However, whether or not library preparation kits produced by instrument manufacturers are included in the product market would not have any material impact on our competitive assessment.[286]

**Short read and long read sequencing**

*The Parties' views*

7.14 The Parties submitted that they are not active in the same product market, though they are both suppliers of NGS systems. Instead, the Parties submitted that short read sequencing (as supplied by Illumina) and long read sequencing (as supplied by PacBio) are complementary technologies and therefore fall into distinct product markets for the reasons set out below.[287]

7.15 The Parties submitted that long read and short read sequencing systems are not considered to be substitutable by customers and are instead used for different applications and use cases, or are used in a complementary fashion.

7.16 The Parties submitted that customers cannot use both sequencing systems to 'answer the same questions', due to the inherent strengths and limitations of the two technologies. They told us that short read and long read systems are

---

[285] *Merger Assessment Guidelines*, from paragraph 5.2.17.
[286] In calculating market shares, the exclusion of revenue from library preparation kits would increase Illumina's market share marginally, given that the proportion of customers that use third party supplied library preparation kits is far higher for Illumina than other suppliers.
[287] Parties' Final Merger Notice, paragraph 97 onwards.

technologically distinct, with unique characteristics which mean that they are not substitutes in any given use case. While short read systems sequence up to hundreds of base pairs per read, have high throughput (or run output), and are scalable and economical, long read systems sequence up to thousands of base pairs per read, have lower throughput, are not scalable and are materially more expensive.[288] The Parties submitted that while the vast majority of variants are SNVs (more than 99%) that can be discovered and detected by short read systems, there are classes of structural variants where long read systems are required.[289] The Parties submitted that speed, cost and accuracy would all lead a user inevitably to choose a short read system, if the biological question could be answered by a short read system.[290] The Parties also submitted that "*short read and long read systems are not 'substitutable' and do not compete just because a long read system could 'technically' be used for certain use cases*", instead, customers choose the best approach available to them to "answer" the question at hand. The Parties submitted that customers use native long read systems only when short read systems are unable to provide an answer to the question at hand (eg because the read length required is too long).[291] Since native long read systems are (and will remain) materially more expensive than short read systems, customers will therefore use a short read system if they can.[292]

7.17   The Parties further submitted that while short read and long read sequencing systems could sometimes be used in a complementary fashion within the same application, there are no use cases within any particular existing sequencing applications for which short read and long read technologies can be used interchangeably. The Parties submitted that there are certain applications for which customers can use both short read and native long read technologies to take advantage of their complementary strengths, and that these applications can be broadly categorised in the following groups: reflex testing, initial discovery and coordinated sequencing. The Parties also provided examples of public statements of customers indicating that they saw short read and long read sequencing systems as complementary. The Parties further submitted that evidence of the systems' complementarity is found in the fact that [✂].[293]

---

[288] Parties' Final Merger Notice, paragraph 97 onwards.
[289] Parties' Response to the Annotated Issues Statement, paragraph 29.
[290] Parties' Response to the Annotated Issues Statement, paragraph 29.
[291] Parties' Response to the Annotated Issues Statement, paragraph 35, onwards.
[292] Parties' Response to the Annotated Issues Statement, paragraph 64, onwards.
[293] Parties' Final Merger Notice, paragraph 97 onwards.

7.18    Further, the Parties' submissions (and some third-party responses) indicated that there are certain applications for which either short read or long read technologies might have clear advantages, for example:[294]

   (i)    long read sequencing is more suitable for *de novo* sequencing of large and complex genomes, as well as for discovery and detection of large structural variants, haplotype phasing and applications requiring near real time sequencing; and

   (ii)   short read sequencing is more suitable for certain applications where very high accuracy is needed (eg for clinical and diagnostic sequencing) or where short read technologies have significant cost or throughput advantages (eg counting of short DNA fragments).

7.19    The Parties submitted that as the costs of short read sequencing are lower than those of long read sequencing, customers will only use long read systems where short read systems are unable to provide an answer to the question at hand.[295] The Parties further submitted that operating costs of short read systems are an order of magnitude lower than those of long read systems. The Parties gave the example of a laboratory sequencing 10,000 genomes per year, for whom the cost of each genome sequenced with a Sequel II is $[✄], while the cost of each genome sequenced with NovaSeq is $[✄].[296]

7.20    The Parties submitted that there are fundamental limitations in existing native long read technologies which will prevent the technologies from scaling in a manner that would enable them to deliver run outputs at costs similar to those of Illumina's systems. The Parties submitted that as a result there will continue to be a difference in run output and cost between short read and long read systems for the foreseeable future.[297]

7.21    The Parties also submitted that the growth of PacBio to date has not been at the expense of short read sequencing systems, including Illumina. In support of these statements, the Parties provided some econometric analysis[298] which in their view shows that the purchase of a PacBio sequencing instrument does not reduce the usage of an Illumina sequencing instrument (calculated by reference to consumables' sales).[299]

---

[294] Parties' Final Merger Notice, paragraph 97 onwards.
[295] Parties' Final Merger Notice, paragraph 97 onwards.
[296] Parties' Response to the Annotated Issues Statement, paragraph 33.
[297] Parties' Final Merger Notice, paragraph 97 onwards.
[298] Further detail on the Parties' econometric submission is provided in chapter 8 on competitive effects, below.
[299] Parties' Final Merger Notice, paragraph 97 onwards.

7.22   The Parties also submitted that "*longer read lengths do not inherently add utility*"[300] because the vast majority of use cases do not require long read lengths due to biological realities. Short read systems are used due to their practicality, ability to scale and favourable economics and users will therefore use the shortest read lengths that will answer a given question. The Parties submitted that sequencing longer than the read length required to accomplish this goal adds little or no utility, but adds significant cost, time and complexity.[301]

7.23   The Parties also submitted that the evidence from customers did not support the conclusion that for some use cases customers consider using either short read or long read sequencing.[302] Further detail on this is provided at paragraph 8.231 to 8.233 of chapter 8 on the competitive effects of the merger.

7.24   The Parties submitted that half of the 20 customers interviewed by the CMA explained that short read and native long read systems are not substitutes for any application or use case, while others have described one of two activities to the CMA: either migration from a non-suited technology to a suited technology, or a complementary use of short read and long read systems within the same application (without referring to the specific use cases within those applications).

(a)   In relation to migration, the Parties submitted that "*a limited number of customers have historically used Illumina's short read systems to perform native long read use cases for which short read systems are not suited*".[303] However, as long read technology has improved, these customers have migrated to a better suited system, even though the cost of sequencing on a cost per genome basis is still higher for long read technologies. The Parties have submitted that customers migrating in this way are not substituting competing systems as material differences between short read and long read sequencing will remain; and further the SSNIP test is not met given the materially different costs of short read and native long read systems.

(b)   In relation to complementary uses, the Parties submitted that "*the fact that customers use short read and native long read systems in*

---

[300] Illumina's submission: Longer Read Lengths do not Inherently add Utility.
[301] Illumina's submission: Longer Read Lengths do not Inherently add Utility and Parties' Response to the Annotated Issues Statement.
[302] Illumina's submission: Longer Read Lengths do not Inherently add Utility, paragraph 44.
[303] Parties' Response to the Annotated Issues Statement, paragraph 44.

> *the same applications does not mean that they consider these systems to be substitutes. This will turn on whether they use different or the same technologies in particular use cases (within the same application)*".[304]

7.25   Finally, the Parties submitted the survey conducted on their behalf by the life sciences consulting firm DeciBio, confirmed that there are no use cases where customers' responses suggest they would consider the two technologies to be interchangeable.[305]

*Linked long read sequencing*

7.26   In contrast to PacBio's long read technology (which generates single, contiguous long reads) 'linked long read' solutions, such as that offered by 10x Genomics, use barcoding techniques applied as part of the library preparation workflow to order and assemble short reads (such as those generated by Illumina's instruments) together to create an artificial long read.[306]

7.27   The Parties submitted that linked long read solutions are just 'associated short reads' and cannot fully replicate the advantages of native long read technologies.[307]

*Evidence from third parties*

7.28   As described in more detail in paragraphs 8.213 to 8.214 in chapter 8 on competitive effects, we sent questionnaires to and conducted calls with a number of the Parties' customers. Some customers told us that whether technologies offer short read or long read sequencing is a key consideration when purchasing instruments or deciding which instrument to use for a given project,[308] while around half of customers said that short read and long read are substitutable for at least some projects[309] (often with trade-offs, for example around cost or throughput).[310]

---

[304] Parties' Response to the Annotated Issues Statement, paragraph 54.
[305] DeciBio Survey, Final Report. Parties' Response to the Annotated Issues Statement, paragraph 38.
[306] Parties' Final Merger Notice, paragraph 89.
[307] Parties' Final Merger Notice, paragraph 90.
[308] See paragraph 8.218 in chapter 8 on the competitive effects of the merger.
[309] For some customers this was for a very small portion of their workload however.
[310] Paragraph 8.219 below; [✂].

7.29   Some customers told us that long read systems had already displaced short read systems for some of their work,[311,312] and almost all customers said that long read technologies will be more prevalent in the future, of which some made comments suggesting this will be at the expense of short read technologies.[313]

*Linked long read sequencing*

7.30   One third party[314] told the CMA that there are ways to improve the technical capabilities of short read sequencing technologies, for example through linked long reads. Third parties have also indicated to the CMA that linked long reads and native long reads can be used interchangeably in some circumstances. However, in general, customers said that a linked long read is of lower quality to native long read[315] and, furthermore, some customers said that a linked long read is not necessarily cheaper than native long read. Only one customer the CMA spoke to mentioned 10x Genomics as a loose competitor to PacBio for certain applications, due to linked long read offerings.[316]

*Evidence from the Parties' internal documents*

7.31   Evidence from the Parties' internal documents demonstrates that the Parties consistently and routinely refer to each other as competitors. This is reflected in many documents over a number of years and those documents take a number of different forms, including strategy documents, technical assessments, and sales support documents. As set out in more detail in chapter 8 on competitive effects of the merger, we have identified a number of internal documents relating either to complementarity or to competition between the Parties' technologies and more generally between short and long read NGS systems.[317]

7.32   We have seen references in Illumina's internal documents that the Parties' technologies are used in a complementary fashion either for certain applications or in the short term before one of the two technologies will

---

[311] [✂].
[312] [✂] submitted that they "*have utilized the short systems [that were previously used as part of a hybrid approach] for other projects and applications*".
[313] [✂].
[314] [✂] call note.
[315] Customers said that read length is inferior with linked long read and that linked long read does not resolve the repetitive parts of a genome as well as native long read in the context of *de novo* assembly (see call notes with [✂]).
[316] See call note with [✂].
[317] See paragraphs 8.132, onwards and 8.177, onwards of chapter 8 on competitive effects for more details.

become the preferred choice.[318] We have also seen references in many of Illumina's internal documents to PacBio – either on its own or if acquired by a third party – as a competitive threat to Illumina. The documents also demonstrate that the level of such a threat may increase in the future as long read technology evolves.[319] Illumina's internal documents also demonstrate that there is and has been in recent years, a realistic threat that some instrument purchases or workflow would be lost to PacBio. Furthermore, many of these documents consider both BGI short read and ONT's long read as competing technologies.[320]

7.33   There are only a small number of references in PacBio's internal documents which indicate – and often indirectly – that short read and long read technologies can be used in a complementary fashion.[321] We have also seen a considerable number of documents in which PacBio views Illumina as a competitor whose closeness may increase as PacBio's technology progresses.

*Linked long read sequencing*

7.34   Some of Illumina's internal documents suggest that linked long reads can increase the competitiveness of short read sequencing systems *vis-à-vis* native long read sequencing systems:

   *(a)*   A presentation prepared by a Senior Principal Scientist states that [✂]";[322] and

   *(b)*   Illumina's 2018-2020 strategic plan states that [✂].[323]

7.35   As discussed further in in our analysis of competitive effects, there are a small number of examples in PacBio's internal documents discussing 10x Genomics (a linked long read provider):

   *(a)*   [✂];[324]

   *(b)*   [✂]";[325] and

---

[318] See paragraph 8.132, onwards of chapter 8 on competitive effects for more details.
[319] See paragraph 8.134, onwards of chapter 8 on competitive effects for more details.
[320] See paragraphs 8.141 and 8.142 of chapter 8 on competitive effects for more details.
[321] See paragraph 8.178 of chapter 8 on competitive effects for more details.
[322] Item 1 of Appendix C on internal documents ([✂]). SV refers to Structural Variation.
[323] Item 38 of Appendix C on internal documents ([✂]).
[324] Item 88 of Appendix C on internal documents ([✂]).
[325] Item 89 of Appendix C on internal documents ([✂]).

(c)  [✂].[326]

*Our assessment*

7.36    In order for us to consider that products should be included in the same product market, it is not a requirement that the products, or their prices, should be identical. Rather, the aim when identifying the relevant product market is to include the most significant constraints on the behaviour of the merging firms.[327]

7.37    As set out in the Merger Assessment Guidelines, the relevant product market is a set of products that customers consider to be close substitutes, for example in terms of utility, brand or quality.[328] We agree with the Parties' submission that certain customers currently and in the foreseeable future will likely only use short read and long read systems in a complementary fashion, however other customers told us they view the two sequencing systems as interchangeable for some projects.[329]

7.38    The evidence presented by the Parties and corroborated by third parties suggests that long read sequencing technologies have traditionally been viewed as a poor substitute for short read sequencing technologies (in particular because of their lower accuracy and throughput and higher sequencing costs) and were primarily used for applications, use cases, and projects which cannot be addressed by short read technologies.

7.39    However, the evidence also demonstrates that the two technologies currently constrain each other to some degree, and that this constraint is likely to increase in the future. For instance, when PacBio and ONT first launched NGS systems, we would expect that there was inevitable uncertainty about their capabilities and economics. Illumina's internal documentary evidence demonstrates that they tracked, and in part responded to, what they saw as a competitive threat. In our view, the documentary evidence, as described below in paragraph 7.41and 7.42 and in more detail in paragraphs 8.122, onwards of chapter 8 on competitive effects of the merger, also demonstrates that this competitive process has continued, as the technologies have evolved. Given this is a dynamic industry, we consider this important to our assessment, as it demonstrates the increasing constraint of long read on short read and vice versa.

---

[326] Item 75 of Appendix C on internal documents ([✂]).
[327] *Merger Assessment Guidelines*, from paragraph 5.2.1.
[328] *Merger Assessment Guidelines*, from paragraph 5.2.5(a).
[329] See paragraphs 8.218 to 8.222 in chapter 8 on competitive effects where this is discussed further.

7.40    Given the relevance of closeness of competition between the Parties (now
        and in the future) to our assessment of market definition, the evidence is laid
        out in more detail in the following chapter 8 on competitive effects. Here we
        provide an overview.

7.41    Evidence from internal documents indicates that Illumina has taken action, or
        has considered taking action, in response to the competitive threat from
        PacBio. Customers told us that long read systems had already displaced
        short read systems for some of their work, which the Parties acknowledge as
        'migration'.[330] Furthermore half of customers to whom we spoke noted that
        long and short read systems were substitutable for at least some of their
        work.[331]

7.42    The evidence, from both Parties' internal documents and from customers also
        demonstrates that long read technologies are increasingly viewed as an
        alternative to short read technologies as they continue to improve in terms of
        both technical capabilities and sequencing cost. We consider this to be
        important in our assessment as, in our view, it suggests that the constraint
        between the two technologies will increase in the future. In relation to the
        DeciBio survey, as described below in the section on evidence from
        customers in chapter 8 on competitive effects,[332] we do not place substantial
        weight on this survey given the methodological and reporting issues.

7.43    The sequencing industry is forecast to grow dramatically,[333] with customers
        conducting new uses and applications, and it is not yet clear which technology
        will be the most appropriate for each new use or application.

7.44    As set out below in chapter 8 on competitive effects, we consider that, even if
        customers are indeed migrating from short read sequencing to long read
        sequencing, this is still competition. Those customers may consider switching
        back to short read in the future. In the short term, firms will have an incentive
        to influence the rate of migration. In the longer term, firms will have an
        incentive to innovate, such that they can better compete for migrating (or
        migrated) customers. Further, in relation to the Parties' submission that the
        SSNIP test is not met given the materially different costs of short read and
        native long read systems, it is our view that the SSNIP test is a static test, and
        therefore may not accurately reflect the features of a dynamic market, and
        that the Parties are not necessarily only responding to the competitive
        constraint provided by the other Party with changes to pricing but with

---

[330] See paragraph 8.6 on nature of competition in chapter 8 on competitive effects.
[331] For some customers this was for a very small portion of their workload however.
[332] See paragraph 8.105 onwards.
[333] See chapter 2 above on the Industry.

increased R&D. Finally, the Parties have not presented a SSNIP test to us, so it is not clear whether or not a 5-10% price rise would be profitable.

7.45   In relation to linked long reads (or 'associated short reads'), we acknowledge that such technologies may not represent a perfect alternative to native long read technologies in many cases, indeed, only one customer mentioned a linked long read provider as a competitor to PacBio.[334] However, the available evidence demonstrates that linked long read solutions offer significant enhancements to short read sequencing systems, thus further increasing the ability of short read sequencing technologies to compete with native long read sequencing technologies. This position appears to be supported by the Parties' internal documents and third party views.[335]

7.46   Therefore, while there is currently a distinction between long read and short read sequencing technologies – which leads to differentiation within the NGS market – in our view, in the context of a dynamic assessment there is not, for the purposes of market definition, a clear-cut distinction between sequencing technologies on the basis of read length.

7.47   We recognise that for certain customers, and for certain applications, projects or use cases, long read and short read systems will not be substitutable now or in the future, and we recognise that not all competitors in the market will constitute an equal constraint on each other, just as there may be constraints from outside the market. We take account of these differences in our assessment of competitive effects.

### Non-NGS methods of ascertaining genetic information

7.48   In this section we examine whether non NGS methods of ascertaining genetic information and first generation Sanger sequencing belong in the same product frame of reference as NGS systems.

7.49   Alternative methods of ascertaining genetic information, such as microarrays, polymerase chain reaction (PCR), fluorescence in situ hybridisation (FISH) and DNA mapping can be used to ascertain genetic information, but are not methods of DNA sequencing as they require prior knowledge of the relevant sequence in question, including anticipated variants, which is derived from sequencing.[336]

---

[334] See paragraph 7.30 above.
[335] See paragraphs 7.34 and 7.30 above.
[336] Parties' Final Merger Notice, paragraph 142.

7.50    Sanger sequencing, as explained above in chapter 2 on the Industry, was introduced in 1977 to identify nucleotides on a strand, and was used to sequence the entire human genome between 1990 and 2003. In contrast, NGS was introduced in 2005 and was able to sequence billions of DNA strands in parallel and therefore had a substantially lower cost per base.[337]

*The Parties' views*

7.51    The Parties submitted that alternative methods of ascertaining genetic information such as microarrays, PCR, FISH and DNA mapping are not substitutable with DNA sequencing systems as methods of DNA sequencing.[338] The Parties submitted that such alternative technologies may be used for a number of reasons, including sample volume (eg microarrays), turnaround time (eg PCR), sensitivity (eg digital PCR), established clinical utility (eg FISH), because they provide complementary information (eg mapping), or cost (eg PCR and microarrays). However, they only enable determination of whether known sequences or particular variants are present (or not) in a sample, not actual sequencing of the sample.[339]

7.52    Illumina further submitted that if the CMA takes the view – which the Parties contest – that the use of the word 'competitor' is intended to mean that the relevant company is an actual or potential competitor, then they submit that the relevant market should also include the first generation Sanger sequencing systems (of which Thermo Fisher is the leading supplier), mapping technologies, and alternative methods of ascertaining genetic information (eg, PCR), into the same relevant product market as these are also referred to as 'competitors' by Illumina in their internal documents.[340]

*Evidence from third parties*

7.53    We have examined the extent to which non-NGS methods, in particular Sanger sequencing systems exert a competitive constraint on NGS systems in general and the Parties in particular. We looked at the evidence provided by customers and the Parties' competitors, in particular the evidence from Thermo Fisher which is the major supplier of first generation Sanger sequencing technology.

---

[337] See paragraphs 2.12, onwards of chapter 2 on the Industry.
[338] Parties' Final Merger Notice, paragraph 142.
[339] Parties' Final Merger Notice, paragraph 143.
[340] Illumina's Response to the Internal documents working paper, paragraph 117.

7.54 We found that customers rarely mentioned Sanger sequencing systems and never mentioned other non-NGS methods of ascertaining genetic information as substitutes to NGS technologies. More specifically, out of the 39 customers who responded to our questionnaire:[341]

    *(a)* 4 specifically discussed Applied Biosystems (Thermo Fisher's Sanger platform) and seemed to view Sanger sequencing as a niche segment largely supplied by Thermo Fisher;

    *(b)* 12 commented specifically on Ion Torrent (Thermo Fisher's NGS platform) when asked about Thermo Fisher (therefore these customers were not referring to Sanger sequencing when discussing Thermo Fisher); and

    *(c)* 23 did not comment on Thermo Fisher.

7.55 Thermo Fisher told us that its average R&D spend on Sanger sequencing over the past three years was [✂] of the average total R&D spend on DNA sequencing systems which included Sanger and NGS systems.[342]

7.56 [✂][343][✂].[344]

7.57 [✂].[345] This suggests that any limited constraint currently provided by Sanger sequencing on NGS systems will decrease in future.

7.58 Finally, no other competitor listed Sanger sequencing when asked who their competitors were.[346]

*Evidence from the Parties' internal documents*

7.59 The Parties' internal documents broadly support the position that non-NGS methods of ascertaining genetic information fall into a separate product market to NGS systems for the following reasons:

    *(a)* We found no instances in Illumina's internal documents which mention Non-NGS methods of ascertaining genetic information (including Sanger sequencing) as a credible current or future competitive threat;

---

[341] Analysis of the CMA customer questionnaire responses.
[342] [✂].
[343] Note of call with [✂].
[344] See Appendix D on Competitors' internal documents.
[345] See Appendix D on Competitors' internal documents.
[346] CMA analysis of competitor questionnaires. See paragraph 8.245 in chapter 8 on competitive effects.

(b) While a few of Illumina's internal documents mentioned suppliers of non-NGS technologies, such as [✂]) as competitors with respect to specific [✂]), and suggested that they may compete for new customers,[347] it is not clear whether these references to competition apply to Illumina's activities in the supply of sequencing technologies, or Illumina's activities in the supply of microarrays; and

(c) PacBio does not appear to monitor non-NGS technologies in the internal documents submitted to the CMA.[348]

7.60   In relation to Sanger sequencing, we note that Thermo Fisher (the largest provider of Sanger sequencing) is monitored to a more limited extent than some other competitors in Illumina's internal documents.[349] Where it is monitored it appears to be in relation to its Ion Torrent product rather than its Sanger technology. PacBio's internal documents do not appear to reference Thermo Fisher.[350]

*Our assessment*

7.61   The evidence we have seen demonstrates that non-NGS technologies (such as Sanger sequencing) exert only a limited constraint on the suppliers of NGS systems.

7.62   The Parties' internal documents do not mention non-NGS methods of ascertaining genetic information as a competitive threat. Overall, as set out above, the Parties do not monitor providers of Sanger technology (other than to the extent that they also provide an NGS technology) and do not refer to Sanger technology as a threat or as possibly disruptive, in the way that they monitor other providers of NGS systems (whether short read or long read). Thermo Fisher, in particular, is mostly monitored in relation to its Ion Torrent NGS platform rather than its Sanger Technology. In our view, given the dynamic nature of the NGS systems industry, we consider the diminishing constraint from Sanger technology on NGS systems an important factor in our assessment.

7.63   Thermo Fisher's evidence demonstrates that while there may currently be some degree of substitutability between Sanger sequencing and certain short read technologies, for the majority of applications it is extremely difficult to use

---

[347] See for example, Item 61 of Appendix C on internal documents ([✂]
[348] PacBio submitted emails which it claims highlights monitoring of non-NGS suppliers. Given the timing of this submission we have been unable to assess these emails.
[349] See paragraph 8.143 of chapter 8 on competitive effects for more details.
[350] See paragraph 8.184 of chapter 8 on competitive effects for more details.

Sanger because of the amount of data it generates. We have seen [✂]. In addition, the majority of third parties agreed that alternative technologies (microarrays in particular) are not substitutes for sequencing technologies.

7.64   Other than Sanger sequencing, customers have not mentioned non-NGS technologies as a substitute to NGS systems. Moreover, the few customers who did mention Sanger sequencing suggested that it represents a very niche segment, which is currently dominated by Thermo Fisher.

7.65   Based on this evidence, we are provisionally of the view that non-NGS technologies, including Sanger sequencing and other non-NGS methods of ascertaining genetic information, are not in the same product frame of reference as NGS systems. However, in our competitive assessment, we consider Thermo Fisher and the extent to which it constrains the Parties, both through its Sanger sequencer as an out of market constraint, as well as through its NGS sequencer (Ion Torrent).

**Sequencing services**

*The Parties' views*

7.66   The Parties submitted that customers requiring DNA sequencing have the option to either purchase a sequencing system (for example, from one of the Parties) or to outsource their sequencing requirements to providers of sequencings services, such as Novogene and the Wellcome Sanger Institute.[351]

7.67   The Parties submitted that sequencing services are usually purchased by customers who do not have consistent high-volume demand for sequencing and are, therefore, unwilling to make a significant investment in acquiring a sequencing instrument and the related costs of training staff, and ensuring compliance of their facilities or processes. The Parties also submitted that outsourcing sequencing services tends to be more expensive on a per-sample basis, it may take longer to receive sequencing results and it does not allow customers to oversee the sequencing process (which makes sequencing services less attractive to certain customers).[352]

---

[351] Some suppliers of sequencing instruments, such as Illumina, BGI and QIAGEN also provide sequencing services, Parties' Final Merger Notice, paragraph 214. PacBio does not provide sequencing services. The Parties made no further submissions in relation to sequencing services during our Phase 2 investigation.
[352] Parties' Final Merger Notice, paragraphs 216 – 219.

*Evidence from third parties*

7.68    Of the 39 customers who responded to our questionnaire:[353]

  (a)  17 said they would not consider outsourcing sequencing to service providers. Specific reasons given included: requiring a quick turnaround, insufficient flexibility and insufficient oversight.

  (b)  9 said they would consider outsourcing sequencing. Two of these customers said that this would be subject to them having insufficient capacity, and another two said that this would be subject to the cost being lower. One customer in this group said that although they would consider outsourcing sequencing, sequencing services are inflexible, and there are confidentiality issues with some samples.

  (c)  12 said they do outsource sequencing in certain circumstances. Five customers said that they do so when this provides access to specialist or outdated technology. Six customers said that they do so when they have insufficient capacity in-house. Where customers noted that they tend to sequence in-house, specific reasons given for this included: requiring a quick turnaround, lower cost and greater flexibility.

7.69    A minority of customers we had calls with (around a quarter) said that they do outsource sequencing in certain circumstances or would consider doing so. In general, customers in this group indicated that outsourcing wouldn't account for a large proportion of projects. Specific comments included:

  (a)  "*Occasionally* [✂] *do outsource its sequencing work to another facility in* [✂]. *They will outsource when they have a niche requirement which they are unable to fulfil in-house or when timelines are not easily met at their facility.*"[354]

  (b)  When asked whether they would consider outsourcing sequencing, one customer responded, "*Not a lot, they have outsourced for a few projects, specifically before they bought their NovaSeq. They were sequencing a large number of human genomes which they couldn't do cheaply enough in-house on their HiSeqs so they outsourced these to institutions which had the NovaSeq.*"[355]

---

[353] One customer did not provide a response to the relevant question.
[354] Note of call with [✂].
[355] Note of call with University of [✂].

7.70    None of the customers we spoke noted sequencing service providers as competitors to the Parties, although we recognise customers may only have had manufacturers in mind when answering this question.

7.71    Of the competitors we spoke to, with the one exception of [✂], providers of sequencing services were not identified as competitors by other current suppliers of sequencing systems.[356]

7.72    [✂] submitted that other suppliers of sequencing systems were its main competitors,[357] however in one submission it stated that it also considers service providers as competitors.[358]

*Evidence from the Parties' internal documents*

7.73    The Parties' internal documents rarely mention sequencing services providers either as competitors or as customers. More specifically:

   (a)  In some of Illumina's documents relating to [✂] segment sequencing service providers are mentioned as competitors, and in one document Illumina refers to service providers as customers;[359] and

   (b)  In a couple of internal documents, PacBio mentions service providers as customers.[360]

7.74    Overall, the lack of reference to sequencing service providers in the Parties' internal documents would suggest that providers of sequencing services are not considered a main source of competition by the Parties.

*Our assessment*

7.75    Based on the evidence we have seen, we have provisionally found that:

   (a)  the Parties' internal documents very rarely discuss sequencing service providers;

   (b)  all but one of the Parties' competitors and potential competitors did not mention sequencing service providers as competitors (the

---

[356] [✂] response to the CMA Market Questionnaire dated 3 July 2019. See, paragraph 8.245 of chapter 8 on competitive effects of the merger for more details.
[357] [✂] response to question 3 of the Market Questionnaire dated 3 July 2019.
[358] Note of call with [✂].
[359] Item 67 of Appendix C on internal documents ([✂], undated).
[360] Item 70 of Appendix C on internal documents ([✂]). Item 104 of Appendix C on internal documents ([✂]).

exception being [✁] – who in one submission mentioned service providers as secondary competitors); and

    *(c)*  some customers said that they do outsource sequencing to service providers, although they tend to do so when this provides access to specialist technology (ie for niche applications), or to manage temporary peaks in sequencing demand.

7.76   Accordingly, in our view, taken in the round, the provision of sequencing services exerts a very limited competitive constraint on the supply of sequencing systems. On this basis, in our view the provision of sequencing services is not part of the same market as the market for the provision of sequencing systems. As PacBio does not provide sequencing services, we will not consider the market for sequencing services any further.

***Conclusion on product frame of reference***

7.77   Our provisional view is therefore that the relevant product market in which to assess the effect of the Proposed Merger is the NGS systems market. The NGS systems market includes both second generation short read sequencing systems and third generation long read sequencing systems.

## Geographic market definition

***The Parties' views***

7.78   The Parties submitted that the markets for short read and long read sequencing systems are worldwide in scope[361] and that for customers of short read and long read systems, the location of suppliers is not particularly important. The Parties submitted that suppliers are active on a worldwide basis and typically offer identical products from centralised production facilities regardless of customer location. The Parties also submitted that transport costs are not significant and that there are no significant price differences between jurisdictions worldwide.[362]

7.79   [✁] and its internal documents often track competitive developments in the three key areas: [✁][363][✁].[364]

---

[361] Parties' Final Merger Notice, paragraph 145, onwards.
[362] Parties' Final Merger Notice, paragraph 146.
[363] Annex 001 to the Parties' Final Merger Notice, paragraph 41. Item 45 of Appendix C on internal documents.
[364] Annex 001 to the Parties' Final Merger Notice, paragraph 41.

*Evidence from third Parties*

7.80   With the exception of BGI, all suppliers of sequencing technologies are active on a worldwide basis, although it is possible that some competitors may have certain local advantages. Importantly, key competitive parameters such as innovation, product quality and pricing strategies are decided on a worldwide basis and are, thus, primarily influenced by global competitive conditions.

*Our assessment*

7.81   We have not seen any evidence, whether from internal documents, competitors or customers that contradicts the Parties' submission on the worldwide nature of geographic market.

7.82   However, we have considered whether China should be excluded from the geographic market, on the basis that the strengths of suppliers may differ in China in comparison to the rest of the world. For example, third parties have told us that both BGI and ONT are particularly strong in China in comparison to the Parties.

7.83   We do not consider that the inclusion or exclusion of China would make a material difference to our assessment. Rather we have considered the strength of BGI in the UK as part of our competitive assessment.

*Conclusion on geographic market definition*

7.84   Our provisional view is therefore that the relevant geographic market is worldwide.

7.85   The statutory test for this inquiry is whether the Proposed Merger may be expected to result in an SLC within any market(s) in the UK for goods or services. We will, therefore, focus on competitive effects in the UK and on the effects on UK customers.

7.86   In doing so, we will take account of global matters to the extent that they have competitive effects in the UK, both currently and in the future. We consider both UK and global data from the Parties on matters such as sales, prices and margins, with more detailed data for the UK sales and aggregated data for global sales. We consider all relevant global competitors and analyse any economic incentives of the Parties in the context of their operations in a global market.

# 8.     Competitive effects of the merger

## Introduction

8.1    In this section, we assess the competitive effects of the Proposed Merger in the supply of NGS systems in the UK. This section is structured as follows:

   *(a)* an overview of the theory of harm;

   *(b)* the nature of competition in the NGS systems market;

   *(c)* the evidence on competition between the Parties and with other competitors;

   *(d)* our assessment of the competitive effects of the Proposed Merger, including our assessment of the evidence;

   *(e)* our provisional conclusions regarding the competitive effects of the merger; and

   *(f)* finally, our overall provisional findings.

## Theory of Harm

8.2    Theories of harm describe the possible ways in which an SLC could arise as a result of a merger and provide the framework for our analysis of the competitive effects of a merger. In this case, we have investigated one horizontal unilateral theory of harm: loss of competition as a result of the Proposed Merger in the supply of NGS systems in the UK.

8.3    We have considered whether, through the loss of direct competition between the Parties, the Merged Entity would have less incentive to compete on price now and in the future (whether instrument price, system price or some other price metric), would deteriorate quality[365] and/or, as is particularly relevant in this case, reduce aggregate market levels of innovation or re-focus their own innovation, including the pace of innovation, or delay or reduce the development and/or supply of new products to the market.

8.4    As noted below when discussing the nature of competition in paragraph 8.6 of this chapter, competition in this industry plays out in multiple ways, one of which is the extent to which long read and short read technologies evolve

---

[365] This includes increasing quality less quickly or decreasing prices more slowly than in the counterfactual.

such that they compete for an increasing number of projects.[366] However, some customers may continue to have a strong preference for short read or long read technologies for their specific projects. Our theory of harm therefore also considers whether there would be a loss of competition for these customers who require a very specific technology now or in the future.

8.5     As a result, we have investigated whether the Proposed Merger is likely to lead to the following:

  (a)  The reduction of current and future competition in areas where Illumina and PacBio overlap or are likely to overlap in the future. This competition may take the form of competition in the purchasing decisions of customers over the acquisition of a sequencing system ("competition for sequencing dollars"); competition in the trade-off made by customers between the use of short read and long read technologies in certain projects; and/or

  (b)  A deterioration in the future competitiveness of the long read sub-segment, through, for example, the Proposed Merger's impact on Illumina's incentives to develop technologies that compete directly with PacBio's long read systems and leading to the elimination of Illumina as a potential future, independent competitor in the long read sub-segment.

## Nature of competition

8.6     In this section we describe the nature of competition in NGS systems, which sets out the context and framework for our subsequent assessment of competition between the Parties and their competitors. We cover the Parties' views and any third parties' views, as well as our assessment of this topic.

### NGS Systems customers

8.7     As described in paragraphs 3.3 and 3.15 of chapter 3 on the Parties, a wide range of customers purchase NGS systems from the Parties. The Parties submitted that these include government and not-for-profit research institutes, academic institutions, hospitals and genomic centres, as well as pharmaceutical companies, agricultural companies, consumer genomics companies and clinical and diagnostic laboratories.[367]

---

[366] Our understanding of the term project, in this report, is an individual or collaborative enterprise (often a team at a university or research institute), planned to achieve a particular scientific goal.
[367] Parties' Final Merger Notice, paragraphs 3 and 4.

8.8　　There are a wide range of uses for NGS systems, which, at a very broad level, could be described as basic research, translational research, agrigenomics, pharmacogenomics, consumer genomics or clinical testing, with clinical uses often requiring regulatory approval.[368]

8.9　　[✂] account for the majority of the Parties' revenue.[369] However, [✂] are forecasted to grow more rapidly than [✂].[370]

### Competition beyond the 'use case' level

*Parties' submissions*

8.10　　The Parties' submissions suggest we should only be concerned about competition occurring at the 'use case' level and, while the industry is dynamic, it is not characterised by competition for the market, and nor should we be concerned about the migration of customers from short read systems to native long read systems over time.

*'Use cases'*

8.11　　The Parties submitted that long read and short read technologies have fundamentally different characteristics that determine the 'use cases' for which each technology is used, including read length, scalability, reads per run, run output, accuracy and cost. The Parties therefore submitted that short read and long read systems are not well suited to answering the same sequencing questions.[371]

8.12　　The Parties submitted that "*the terms "application" and "use case", while at times used interchangeably in the sequencing industry, have very different meanings. Application is a broader concept that refers to a collection of use cases. Each use case, in turn, has its own distinct characteristics and requirements which reflect the specific aim of the investigation, the type of starting material, the number of samples involved, any industry-specific regulatory requirements, etc. For example, NIPT is an application which comprises various use cases, including:*

　　(a)  *research and test development: Rhesus D typing;*

　　(b)  *panel-based testing: single gene fetal disorders;*

---

[368] Parties' Final Merger Notice, paragraph 438.
[369] Based on the Parties' 2018 revenue buy customer type taken form their response to the opening letter.
[370] See paragraph 2.47 and Figure 7 of chapter 2 on the Industry.
[371] Parties' Response to the Annotated Issues Statement, paragraph 23.

(c)  *clinical testing: trisomies and sex chromosomes;*

(d)  *clinical testing: all chromosomes and microdeletions;*

(e)  *clinical testing: all chromosomes and partial deletions/duplications; and*

(f)  *research and test development: fetal blood genotyping.*"[372]

8.13  The Parties submitted that *'[e]ach customer has a set of use cases that it needs to perform (e.g., research questions to address or clinical tests to perform), and each use case has a set of requirements which determine whether a short read or native long read system is used'*[373] and as such imply, any competition that takes place, takes place at the 'use case' level only. The Parties argued that their respective instruments are use case specific and that there is therefore no competition between their technologies.[374]

8.14  In particular, PacBio submitted that sequencing providers have a desire to capture 'sequencing dollars' which are controlled budgets and grants available to research institutions to invest in various sequencing platforms year on year.[375] PacBio submitted that this does not constitute competition in the antitrust sense. Similarly, Illumina submitted that ""*the fact that a customer has a finite budget out of which it buys multiple products and services does not support a conclusion that those products and/or services fall into a single relevant product market*"".[376]

8.15  Similarly, in its hearing with the CMA, Illumina stated that "*in a number of customer instances, you are looking at a basket of use cases. Oftentimes, they all map to one technology type....short read sequencing happens to cover a much broader swathe of use cases, again because of the economics, the scale and the accuracy; which is why customers, when they are trying to figure out, "What do I get for this basket?", tend to choose short reads over long reads -- just cover more of that basket. But there are, clearly, cases where customers do the trade off in the other direction*".[377]

---

[372] Parties' Response to opening letter (question 9).
[373] Parties' Response to the Phase 1 Decision, page 6.
[374] For instance in response to the Customer calls Working Paper the Parties submitted that customers expressed the view that short read and native long read systems could be used in the same applications (but not 'use cases'). And that the fact that customers use short read and native long read systems in the same applications does not mean that they consider these systems to be substitutes. These customers, like many involved in sequencing projects, may use different technologies for different 'use cases' (within the same application).
[375] Parties' Response to PacBio's internal documents Working Paper, page 26.
[376] Parties' Response to Illumina's internal documents Working Paper, paragraph 72.
[377] Illumina Hearing Transcript, page 29, lines 17-25.

*Dynamic competition*

8.16    The Parties submitted that sequencing is a dynamic industry, stating "*Sequencing is a nascent, dynamic and rapidly evolving industry with significant untapped and undeveloped potential for growth. For instance, as of today, less than 0.01% of species and less than 0.02% of human genomes have been sequenced, and the understanding of the human genome is in its infancy.*"[378]

8.17    Some markets are subject to competition for the market, whereby firms compete to become the dominant supplier, but there is limited, if any, competition once a supplier has 'won' the market. In other markets customers may 'migrate' from one supplier to another due to factors unrelated to competition. The following subsections describe the Parties' views on these points.

8.18    The Parties submitted that they do not engage in competition for the market[379] and that even if customers were migrating from short read to long read technologies for some 'use cases' these were not competitively relevant.[380]

- *Competition for the market*

8.19    The Parties submitted that there is no competition 'for' the market in relation to NGS systems. Rather that competition takes place 'in' the market.[381] In particular the Parties argued that for there to be competition "*for the market there would need to be a single market where the winner 'takes all'*" and that winner "takes all" markets are usually the "*result of network effects and economies of scale and scope.*"[382] Also, according to the Parties, "*PacBio would need to be or have the potential to be a 'disruptive' technology*".[383]

8.20    The Parties submitted that the legal standard for the review of mergers is the existence of an SLC "on the balance of probabilities", meaning that to find an SLC is that it must be "*more likely than not that the target could displace the acquirer;*"[384] and argued that this will not happen as the vast majority of 'use cases' (including those with the highest volume and most rapidly growing) benefit from the strengths of short read, and as discussed further in paragraph 8.78, onwards of this chapter 8 on competitive effects, the Parties submitted

---

[378] Parties' Response to the P1 Decision, page 3.
[379] Note on competition for the market theory of harm, paragraph 2 and 3.
[380] Parties' Summary statement, page 2.
[381] Note on competition for the market theory of harm, paragraph 2 and 3.
[382] Note on competition for the market theory of harm, paragraph 2 and 3.
[383] Note on competition for the market theory of harm, paragraph 2.
[384] Note on competition for the market theory of harm, paragraph 5.

that PacBio will not close the gap on the metrics that are important for those 'use cases'.[385]

- *Migration*

8.21    The Parties submitted that "*a limited number of customers have historically used Illumina's short read systems to perform native long read use cases for which short read systems are not suited*".[386]

8.22    The Parties submitted that customers were using short read systems in respect of 'use cases' that were better suited to long read technology, but in the past the long read technology did not have the accuracy or throughput to make it a viable option for customers. As "*customers have become aware of these developments [to PacBio's systems], these customers are now 'migrating' that limited amount of sequencing activity to better suited native long read systems. Illumina expects that customers using short read systems in native long read use cases will migrate such use cases to native long read systems in the short- to medium-term*".[387]

8.23    The Parties submitted that such switching from short read to long read technologies constitutes migration since customers are shifting these activities to the technology that is in fact best suited to perform the 'use cases', even though the cost of sequencing (on a cost per genome basis) is at least ten times higher using the PacBio's Sequel II system.[388] The Parties submitted that customers migrating to long read 'use cases' from short read systems are not substituting competing systems, as customers would not switch back in the face of a 5% price rise of the long read system (though no evidence was provided to support this assertion).[389]

8.24    The Parties submitted that based on the reasoning in the *Ladbrokes/Coral* decision,[390] customers migrating native long read 'use cases' from short read to long read systems are not substituting competing systems.[391] Migration of 'use cases' from short read systems to long read systems is predominantly driven by the need for long read lengths, coupled with recent material improvements in accuracy and a relatively small increase in throughput in long read systems. However, the Parties submitted that the material

---

[385] Note on competition for the market theory of harm, paragraph 8.
[386] Parties' Response to the Annotated Issues Statement, paragraph 44.
[387] Parties' Response to the Annotated Issues Statement, paragraph 45.
[388] Parties' Response to the Annotated Issues Statement, paragraph 45.
[389] Parties' Response to the Annotated Issues Statement, paragraph 50.
[390] https://www.gov.uk/cma-cases/ladbrokes-coral-group-merger-inquiry.
[391] Parties' Response to the Annotated Issues Statement, paragraph 51.

remaining differences in throughput, output, accuracy, turnaround time (and cost) preclude the systems from being viable alternatives otherwise.[392]

8.25   The Parties submitted that such migration, to the extent that it occurs, is not competitively relevant, both because of its *de minimis* scale and duration and because customers who choose to pay more to sequence fewer genomes in order to get longer reads will continue to do so because the question that they are trying to answer is not suitable for short read sequencing; "*no market response by Illumina could be expected to slow or stop such migration*".[393]

*Customer views*

8.26   We held telephone calls with 22 of the Parties' customers,[394] to gain a better understanding of the market for NGS systems. These customers were among the Parties' largest in terms of 2018 revenue, and were from research institutes, academic institutions, pharmaceutical companies and government agencies. Furthermore, they use NGS systems for a number of different applications, including HLA typing,[395] cancer panel sequencing, RNA sequencing, single cell transcriptomics and methylation sequencing.

8.27   We asked customers how they determined which sequencer to purchase to better understand how competition works in this market. Some customers told us that they have a very specific remit or research focus, to the extent all, or the vast majority, of their work is for a specific project.[396,397] However, a greater number of customers said that they buy DNA sequencing instruments for use in a range of projects. Specifically, they told us that:

   (a)   "*The first thing that should be understood is what are the questions people want answered by the instrument… it is important to know what do most people want to do most of the time, you then pick the machine which is best suited to most people's needs*".[398]

---

[392] Parties' Response to the Annotated Issues Statement, paragraph 52-53.
[393] Parties' Summary statement, page 2.
[394] [✂].
[395] HLA stands for human leukocyte antigen and is used to match patients and donors for bone marrow or cord blood transplants.
[396] For example, the [✂].
[397] The sequencing organisations carrying out the largest volume of sequencing are often referred to as 'core labs'.
[398] Note of call with [✂].

(b)  "*They talk to investigators and professors to understand their needs over the next few years and target the technology which they think will best fit*".[399]

(c)  "*They will usually want a DNA sequencer for a number of applications and it will be a group decision on what instrument would be best*".[400]

*Our assessment*

*'Use cases'*

8.28   In relation to how competition works, we consider that the Parties have advanced a narrative that is broadly consistent with comments received from customers. In particular, we note that the Parties:

(a) Acknowledge that customers purchase instruments that will "*best perform across… [a] set of applications and use cases*";[401] and

(b) Acknowledge that customers face trade-offs between cost and output (the example given is structural variation (SV), in which, in order to discover structural variations customers may have to use a system that will provide long read length, but that this requires them to sacrifice output and incur higher costs (when compared to short read systems)).[402]

8.29   However, in our view, the Parties take a narrow view of competition, namely, that customers have a specific need and therefore determining the 'use case' is the first and final decision they make, which in turn determines the NGS system they use.

8.30   We have seen evidence from some customers that in some circumstances, there is no choice or decision to make, because their project requires a very specific functionality that can only be conducted economically or effectively on a particular NGS system.[403]

8.31   However, in our view, we do not consider 'use cases' to be determinative of all competition.

---

[399] Note of call with [✂].
[400] Note of call with [✂].
[401] Parties' Final Merger Notice, paragraph 220.
[402] Parties' Response to the Customer Calls Working Paper, paragraph 3.
[403] For example, the [✂] would currently only consider Illumina for whole genome sequencing (Note of call with [✂] and Questionnaire response).

8.32    Firstly, the evidence shows that when customers choose between sequencers which are currently available, their decision-making process is complex. Customers told us that they have projects and research or clinical questions to answer, and often several different projects. Because of time and budget constraints, customers need to make choices about which projects they will undertake and the projects undertaken may determine which sequencing technology is most appropriate. In our view, this evidence from customers shows that they have different needs due to their differing projects and the options, choices and dynamics of competition will vary as between these different customers.

8.33    For example, evidence from the Parties,[404] customers and competitors demonstrates that customers consider a range of factors when choosing which sequencer to purchase or use, including accuracy, cost, read length, throughput and speed. While in some circumstances they may have a clear preference for which system to use for a particular project (eg a short read or a long read system),[405] in other circumstances there may be some degree of substitution between sequencers.[406] Similarly, for customers who have purchased more than one sequencer, the decision of which sequencer to use in a specific project (which also impacts the amount of consumables used and purchased) varies.

8.34    Secondly, we have found that many customers make purchases with multiple projects in mind. Evidence we have seen from customers demonstrates that they may not simply purchase sequencers for individual projects, but rather the majority take into account the full range of different projects within their research portfolio. These customers therefore, rather than make a trade-off for a specific project, instead make trade-offs across projects. These customers may face a trade-off between the technology which is most applicable to the greatest number of projects and the extent to which a different sequencer can be used effectively for some projects, even if it is not the optimal choice.[407]

---

[404] Parties' Response to the Customer Call Working Paper, paragraph 3. Parties' Final Merger Notice, paragraph 220.
[405] One example (noted by the Parties and customers) is counting. The Parties submitted in their Final Merger Notice (paragraph 74) that counting applications do not require long reads in order to verify the presence of a target. For instance, NIPT counts the number of fetal chromosome fragments circulating in a mother's bloodstream. These fragments are short, so 100-200 bp long sequencing reads are sufficient to characterise them. Short read flow cells currently used for NIPT are capable of generating hundreds of millions of reads per run. As a result, they can combine 48 to 96 individual patient samples per run on a single flow cell, enabling users to amortise the cost of the sequencing run across all of the samples.
[406] For example, examples were given in relation to structural variation, metagenomics and the microbial space. See Note of call with [✂], Note of call with [✂], and Note of call with [✂].
[407] See Note of call with [✂] and Note of call with [✂].

8.35 Thirdly, customers can change 'use cases'. We have seen evidence from Illumina that some customers changed the 'use case' of their project when switching from an Illumina to a PacBio system [✂].[408]

8.36 Fourthly, we do not agree with the Parties that all tasks can clearly be classified as a 'use case'. For instance, if long read technology improves and therefore less short read polishing is required, it is not that the polishing 'use case' is changing from short read to long read, but instead that the balance of workflow of the overall task is shifting between long read and short read.[409]

8.37 Lastly, the phrases, context and words that customers used demonstrate competition between suppliers regardless of whether this is occurring at a 'use case' level, application level, project level or across a number of projects, when they are making, have made, or are considering a choice between NGS systems.[410]

8.38 Therefore, whether a choice is made at the 'use case', application, project, institution, or some other level, does not determine whether the Parties are competing.[411] We consider that competing for sequencing dollars, as was described by the Parties,[412] encompasses all the forms of competition described above. In our view, this vying for a share of the available sequencing budget is an example of rivalry playing out between firms over time. Therefore, we provisionally conclude that looking solely at 'use cases' is not an appropriate framework for assessing competition between NGS system suppliers.

*Dynamic competition*

8.39 The evidence shows this is a dynamic market. It is growing and evolving quickly. The Parties submitted evidence showing the evolving nature of this market, and the speed at which new products are launched and features improve.[413] We have also seen evidence that the Parties spend a significant

---

[408] Illumina's response to the working paper on internal documents, paragraph 88. Item 31 of Appendix C on internal documents ([✂]).
[409] See paragraph 8.136 for Illumina internal documents which demonstrate switching workflow, and for PacBio documents ([✂]).
[410] For example: "…*are done on Illumina but could equally be done on either ONT or PacBio*" (note of call with [✂]); "*different technologies have potential to be used interchangeably*" and "…*likely that people will switch to long reads in this field*" (note of call with [✂]); "…*which is now done on PacBio where previously they would have used Illumina…*" (note of call with [✂]); "…*it makes it more of an attractive option to Illumina...*" (note of call with University of [✂]); [✂]; "*it is now feasible to do De Novo long read assemblies using just PacBio or ONT. Previously, this was cheaper to do using hybrid data generated using Illumina plus ONT/PacBio*" (note of call with [✂]); and "*long read is expected to be increasingly used instead of short read*" (note of call with [✂]).
[411] Given this, in the evidence and our assessment that follows, where we refer to projects, applications and use cases this will not necessarily map onto the Parties' own definition of these terms.
[412] See section on the Parties' views on 'use cases' above.
[413] See for instance Section 3a of the Parties' Response to the Phase 1 Decision and chapter 2 on the Industry.

amount on R&D.[414] This evidence shows that manufacturers compete currently through research, development and innovation to improve their market positions in future.[415]

8.40 We have found the Parties' internal documents show that firms are focussed on the future evolution of the market and are likely to react to rivals' activities by making changes in their own R&D efforts,[416] in particular, one of Illumina's internal documents notes that [✂].[417]

8.41 These documents show that R&D and innovation is designed either to incrementally gain a greater share of future workflow within some specific uses or to enable the party to become the clear sequencer of choice that dominates other technologies for a greater number of uses, some of which may be entirely new.[418] A further example of the Parties' focus on the future evolution of the market is Illumina's statement relating to its desire to be in the long read sub-segment "*There is an emerging and growing blue piece of [the graph] that we do not participate in. We want to participate in that. To participate in it, we actually need to have the right technologies because one cannot play in the other. That is simply a statement of that; that we want to be able to participate in it and, therefore, we need the technology*".[419]

8.42 Based on the evidence we have seen, our provisional view is that the Parties are not competing with each other *for* the entire NGS systems market, but rather within that market. We have found that the market is evolving and accordingly, there will be competition for new uses, applications and/or projects. Therefore, it is not necessary, as the Parties submitted, to find that PacBio is so disruptive that it would compete for the entire NGS systems market. However, we do think it is important to assess this Proposed Merger in a dynamic context.

8.43 We consider that switching, which the Parties characterise as migration, represents competition even if the switching was to some extent inevitable eventually (which cannot be assumed). While the Parties' submission that some customers are switching from short read to long read for uses has been corroborated by customers,[420] the available evidence does not show that this

---

[414] As discussed in paragraphs 9.32 of the chapter on countervailing factors, Illumina spends just under 20% of its revenue on R&D, while PacBio spends around 70-80%.
[415] See evidence from the Parties' internal documents below and chapter 2 on the Industry.
[416] See, for example, Items 34, 18, 13 and 38 of Appendix C on internal documents ([✂]).
[417] Item 19 of Appendix C on internal documents ([✂]).
[418] See for example, Items 24, 25 and 27 of Appendix C on internal documents ([✂]).
[419] Illumina's Hearing Transcript, page 7, lines 4-9.
[420] See customer views in paragraph 8.219 below.

switching is necessarily one way.[421] In the short term, firms will have an incentive to compete against each other to try to either reduce or increase the rate of switching, depending on their position in the market. In the longer term, firms will have an incentive to innovate, such that they can better compete for switching (or potentially switching) customers. Indeed, the Parties' documents describe the threat from competitors, including a loss of sales and strategies to mitigate this.[422] The timing and nature of customers' switching will be influenced by the long and short read suppliers' competitive offerings available at that time, and firms compete for customers' sales, whether or not they do actually switch.

8.44   The Parties submitted that we should adopt the same approach to 'migration' taken in *Ladbrokes/Coral*. We consider that there are some fundamental differences between *Ladbrokes/Coral* and this case, namely:

   (a)   Betting shops are not a dynamic industry, with there being limited innovation, in contrast to the rapid developments seen in genome sequencing.

   (b)   In *Ladbrokes/Coral* many customers were moving from offline to online gambling independent of any changes in the relative offerings.[423] In contrast, as discussed below, the evidence suggests that in this case customers appear to be switching to long read due to improvements in long read systems.[424]

8.45   Relatedly, we note that the Parties acknowledge that customers may be using "*short read systems for native long read use cases*" in limited instances and "*will transition such use cases to native long read systems in the short- to medium-term*". We would argue that the suggestion that customers may be using the incorrect technology in the short to medium term appears to contradict the Parties' submission that, depending on what a customer is doing, either a short read or a long read instrument will clearly be more appropriate for their needs.

---

[421] See paragraph 8.136 below.
[422] See paragraphs 8.134, onwards and 8.179, onwards.
[423] '*Migration' is the expected effect whereby the share of customer activity within the online channel is expected to continue to increase independently of any changes in the relative offering of retail and online*', *Ladbrokes/Coral* Final Report, paragraph 6.6, and '*The fact that a number of retail customers appear to have migrated to online operators over time, irrespective of changes in quality or price of the retail offering (or indeed, in spite of improvements in quality or price in the retail channel), does not enable us to draw any strong inferences about the degree of substitutability of the two channels for the remaining retail customers*', *Ladbrokes/Coral* Final Report, paragraph 6.29.
[424] In addition, while in *Ladbrokes/Coral* the CMA did not consider offline and online providers to be in the same product market, it did recognise that the online channel constrains the retail channel to some extent.

### *Dimensions of competition*

#### *The Parties' views*

8.46    The Parties submitted that customers "*first consider the set of applications and use cases that they wish to perform and identify the systems that have the appropriate attributes to best perform across that set of applications and use cases. Then they look at the total cost of ownership of those systems*".[425] The attributes listed by the Parties are: read length; accuracy (raw and consensus); scale; run output; number of reads; throughput; time (turnaround and sequencing); library preparation requirements; regulatory considerations; and DNA source (quality and length). The Parties submitted that customers will then look at cost and finally secondary considerations, such as bioinformatics, automation, reputation, workflow and customer support.[426]

#### *Internal documents*

8.47    The Parties' internal documents also give an indication of what is important to customers when choosing a sequencing provider:

   *(a)*  Illumina's [✂];[427]

   *(b)*  Illumina's [✂];[428]

   *(c)*  [✂][429] and

   *(d)*  [✂].[430]

#### *Customer views*

8.48    We sent questionnaires to the Parties' customers, specifically Illumina's top 100 UK customers in terms of 2017/18 revenue and 100 PacBio customers, including all of PacBio's UK customers and all customers who had had access to the Sequel II, with the remainder made up by customers with the highest 2017/18 revenue. We received 39 responses to these questionnaires.

---

[425] Parties' Final Merger notice, paragraph 220.
[426] Parties' Final Merger Notice, paragraph 220.
[427] Item 13 of Appendix C on internal documents ([✂]).
[428] Item 26 of Appendix C on internal documents ([✂]).
[429] For example, Item 70 of Appendix C on internal documents ([✂]).
[430] Item 102 of Appendix C on internal documents ([✂]).

8.49   We asked customers to rank the importance of different factors when deciding which DNA sequencing instrument to purchase. The following chart provides a visual representation of the average ranking of each factor.

**Figure 15: Customer responses on the importance of different factors when deciding which DNA sequencing instrument to purchase**



Source: CMA analysis of information received from customers.

8.50   As shown in Figure 15 above, read accuracy is clearly viewed as the most important factor and size of instrument is clearly viewed as the least important factor. The position of the other factors in the middle of the chart is driven by a lower level of consensus among customers regarding their relative importance.

8.51   Overall evidence from customer questionnaires and calls suggests that the relative importance of different factors depends on the application or project in question.[431]

---

[431] See, for example, [✂] questionnaire response.

*Our assessment*

8.52   The evidence we have seen shows that NGS instruments are differentiated products with characteristics that vary from instrument to instrument. The evidence from both the Parties and customers is that there are a number of different factors which customers consider important. Read accuracy, read length and throughput / cost are the most important, although the relative importance will depend on the customer, research question or project. We bear in mind these dimensions of competition when assessing the evidence of competition between the Parties below.

**Price setting**

8.53   We considered the extent to which the Parties are able to set prices individually for customers based on the options that are likely to be available to them. If the Proposed Merger reduces the options available to a select group of customers, the Parties have the ability to worsen prices or services selectively for those customers whose options are more limited without increasing prices for others and can consequently avoid the risk that those other customers switch away as a result of the price increase.

8.54   Sequencing instruments cost hundreds of thousands of dollars and may represent a significant capital outlay for a customer.[432] Instruments may be expected to run for a number of years, although in this dynamic market new and updated models are released frequently[433] with significant improvements in performance – for example, speed, price per gigabase and read length.

*The Parties' views*

8.55   While both Illumina and PacBio have price lists for their instruments and consumables, the Parties submitted that the [✂][434]

8.56   [✂][435][✂].[436]

---

[432] Some ONT models are an exception to this (ONT offers leasing models and their MinION is significantly cheaper).
[433] Parties' Final Merger Notice, paragraph 368.
[434] Parties' responses to the s109 requests (27 June) – Annex 1.010 and 109.30. Parties' Final Merger Notice, paragraph 248.
[435] Parties' Final Merger Notice, paragraph 355.
[436] Parties' Final Merger Notice, paragraphs 242 and 254.

8.57    Illumina estimated that approximately [✂] of its sales (in value) in the UK in 2018 were made through a competitive tender process.[437] PacBio has [✂] participated in [✂] formal tender processes in the UK in the last 5 years.[438]

8.58    Illumina's internal emails which discuss customers' use of their instruments suggest that they have a very good understanding of how their customers are using sequencers (see paragraphs 8.129 to 8.144 discussing Illumina's internal documents below).

*Third party views*

8.59    Customers purchase instruments from Illumina and PacBio, and other NGS system suppliers, but often lease instruments from ONT.[439]

8.60    Competitors' written submissions indicate that they understand which applications their NGS systems are used for and are able to tailor their offers to customers' needs. All competitors provided details regarding type of customers and applications their instruments or services are used for.[440] [✂] provided details of applications by customer type[441].

8.61    Most competitors told us that they may offer discounts on instruments or services based on applications or customer characteristics. [✂] submitted that it may offer strategic discounts where the customer is particularly price sensitive and/or in order to gain a foothold in a new lab.[442] [✂].[443] [✂] noted that its prices for services may vary depending on customer characteristics and type of contract.[444]

*Our assessment*

8.62    The evidence provided by the Parties and customers shows that Illumina and PacBio have a good understanding of the type of sequencing their customers conduct. The purchases of flow cells and reagents gives them a good idea of the volume of sequencing conducted. The same is true for the Parties' competitors. Consequently, the Parties are able to set prices individually for

---

[437] Parties' Final Merger Notice, paragraph 274.
[438] Two tenders for the [✂] and one tender for each of the [✂]. Parties' Final Merger Notice, paragraphs 278 to 280.
[439] See paragraph 7.8 of chapter 7 on market definition for different pricing models used by suppliers.
[440] Competitors response to question 2 of the Market Questionnaire dated 3 July 2018.
[441] [✂] response to question 2 of the Market Questionnaire dated 3 July 2018. See also Appendix D on Competitors' internal documents.
[442] [✂] response to question 4 of the Market Questionnaire dated 3 July 2018.
[443] [✂] response to question 6 of the Market Questionnaire dated 3 July 2018.
[444] [✂] response to question 5 of the Market Questionnaire dated 3 July 2018.

customers based on the options that are likely to be available to them and there is no reason why this would change post-merger.

### *Conclusion on nature of competition*

8.63   Competition is a process of rivalry that takes place over time. The evidence we have seen, from the Parties' internal documents and competitors, indicates that this is a dynamic market, which is growing and evolving quickly. We therefore provisionally conclude that it is important to assess the Proposed Merger in a dynamic context.

8.64   The evidence we have seen, including the way that customers think about choosing which NGS systems to use for their projects, also indicates that thinking about competition narrowly, for example, only at the 'use case' level, is not the appropriate way to assess this Proposed Merger. We also provisionally conclude that firms are able to tailor their offerings according to customers and when doing so they take into account that customers think about options at application and project level and also across their differing projects, not just at the 'use case' level. The same is true both for the Parties and other competitors in the NGS systems market.

8.65   We also consider that there are a number of different factors which customers consider important, with read accuracy, length and throughput / cost appearing to be most important, although their relative importance will depend on the customer, research question or project(s). NGS systems are differentiated products and customers will choose between such systems on the basis of the factors which are most important to them, their project, or across a number of projects.

8.66   We have also found that the Parties are able to set prices individually for customers based on the sequencing they wish to conduct and the options that are likely to be available to them. This ability to price discriminate means the Parties have the ability (and would continue to have the ability post-merger) to worsen prices selectively for those customers whose options are more limited without increasing prices for others and can consequently avoid the risk that those other customers switch away as a result of the price increase.

8.67   We therefore consider it important to assess how the Parties view each other now and in the future, how they have reacted to each other in the past, how customers perceive their options, the development of the technologies and the constraint posed by competitors now and in the future.

## Evidence of competition between the Parties and with competitors

8.68    In this section, we set out the evidence of competition between the Parties
and between each of the Parties and their third party competitors. We draw
upon the Parties' views, the market shares of the Parties and their
competitors, the Parties' internal documents, evidence from customers,
evidence from competitors, and forecasts and sales.

***The Parties' views***

8.69    The Parties have made a number of submissions on the competitive
dynamics of the Proposed Merger. At a high level, the Parties submitted that
they do not compete at all because long read and short read technologies
address different 'use cases',[445] that long read technologies (such as that of
PacBio) are in fact complementary to short read technologies (such as that of
Illumina).

8.70    The Parties also made submissions on the constraint they face from
competitors and provided two further pieces of evidence; a survey of
customers and econometric analysis on evidence of the competitive constraint
exerted by ONT on PacBio and the degree of substitutability of the Parties'
systems.

*Long read and short read systems are not suited for the same 'use cases'*

8.71    The Parties submitted that short read will always be used by customers if
possible, unless there is a specific need for a long read length, in which case
a long read technology will be used.[446] According to the Parties, "*[o]nly where
short read systems cannot address a particular use case will a customer use
a native long read system and accept the higher costs, lower output,*

---

[445] The Parties submitted that "*the terms "application" and "use case", while at times used interchangeably in the
sequencing industry, have very different meanings. Application is broader concept that refers to a collection of
use cases. Each use case, in turn, has its own distinct characteristics and requirements which reflect the specific
aim of the investigation, the type of starting material, the number of samples involved, any industry-specific
regulatory requirements, etc. For example, NIPT is an application which comprises various use cases, including:
(a) research and test development: Rhesus D typing;
(b) panel-based testing: single gene fetal disorders;
(c) clinical testing: trisomies and sex chromosomes;
(d) clinical testing: all chromosomes and microdeletions;
(e) clinical testing: all chromosomes and partial deletions/duplications; and
(f) research and test development: fetal blood genotyping.*"
Parties' Response to 1st day letter (Question 9).
[446] Parties' Response to the Annotated Issues Statement, paragraph 35 and the Parties' Response to the
Annotated Issues Statement, paragraph 68.

*potentially lower accuracy, and in many cases, higher amounts of DNA material needed".[447]*

8.72 In relation to how customers decide which sequencer to use, the Parties submitted that *"[customers] consider the set of applications and use cases that they wish to perform and identify the systems that have the appropriate attributes to best perform across that set of applications and use cases".[448]* Furthermore, the Parties submitted that "*customers usually purchase Illumina short read systems first*"[449] and "*only purchase native long read systems if they need to perform use cases that require… long read length*".[450]

8.73 To support this submission, the Parties submitted a survey conducted on their behalf by the life sciences consulting firm, DeciBio, which is discussed in more detail below in paragraph 8.105, onwards. The Parties submitted that this survey confirms that there are no 'use cases' where customers responded that they would consider the two technologies to be interchangeable.

8.74 Finally, the Parties submitted that "*The CMA has not identified a single use case for which both short read and long read systems can both be used*".[451]

*Complementary uses*

8.75 The Parties submitted that short read sequencing and long read sequencing are complementary, such that they fall into different product markets.[452] The Parties submitted that the fact that customers use short read and long read systems for the same applications does not mean that they consider these systems to be substitutes.[453]

8.76 The Parties have described two basic types of complementary 'use cases':[454]

(a) The "*virtuous cycle*", where the use of one technology in one 'use case' drives volumes of sequencing of other samples in another (related) 'use case' using the other technology (for example, the creation of a new reference quality *de novo* genome using a native long read system will create the potential for additional resequencing using short read systems); and

---

[447] Parties' Response to the Phase 1 Decision, page 1.
[448] Parties' Response to the Customer calls working paper, paragraph 2.
[449] Parties' Response to the Customer calls working paper, paragraph 3.
[450] Parties' Response to the Customer calls working paper, paragraph 3.
[451] Parties' Response to the Customer calls working paper, paragraph 22.
[452] Parties' Final Merger Notice, paragraph 97.
[453] Parties' Response to the Annotated Issues Statement, paragraph 54.
[454] Parties' Response to the Annotated Issues Statement, paragraphs 55, 56 and 62.

(b) "*Synergistic*" 'use cases', where both technologies are used on the same sample in different 'use cases', in an effort to obtain as much information as possible about the genome (for example, testing infants that are not thriving for rare and undiagnosed genetic diseases may require sequencing of the blood sample on both short and long read systems, looking for SNVs and small structural variations on the short read system initially, followed by larger structural variations on the long read system as a reflex test).

8.77   The Parties submitted that as Illumina's understanding of PacBio's technology evolved over the spring/summer 2018 such that it became aware of developments in improvements to PacBio's consensus accuracy, it took the view that PacBio's technology would potentially provide a suitable long read system for use in conjunction with Illumina's short read systems (along with 'use cases' suited for long read sequencing alone). It was this improvement in PacBio's accuracy that lead to the timing of the Proposed Merger.[455]

*The gap between short read and long read technologies will remain or even widen in the future*

8.78   The Parties submitted that, even if PacBio were to achieve significant improvements in the foreseeable future, there will remain a material gap in the performance of its systems as compared to short read systems. For example, notwithstanding the launch of PacBio's Sequel II instrument, there remains a "*significant technological and cost gap to short read systems*".[456]

8.79   Illumina submitted that it anticipates the gap will widen as it continues to improve its systems to increase their throughput. In contrast, the Parties submitted that technological limitations of PacBio's methodology would constrain its ability to make improvements, such that the run throughput differential between PacBio's systems and Illumina's medium and high throughput systems will increase over time. "*In other words, the current throughput gap between Illumina's and PacBio's systems is currently the narrowest it will be*".[457] The Parties submitted that, for example [✂].[458]

8.80   The Parties submitted that as a result of this persistent performance gap between short read and long read systems, customers balancing the

[455] Parties' Response to the Annotated Issues Statement, paragraph 7.
[456] Parties' Response to the Annotated Issues Statement, paragraph 70.
[457] Parties' Response to the Annotated Issues Statement, paragraph 71.
[458] Parties' Summary statement, page 2.

parameters such as read length, cost, output and accuracy, will continue to use short read systems for the vast majority of 'use cases'.[459]

8.81    The Parties also submitted that Sequel II has not and will not narrow the gap with short read systems. While the Sequel II has delivered an output improvement, it does not represent the beginning of a reduction in the significant throughput differential to short read systems or the differences in operating costs.[460] "*While Sequel II is an incremental improvement over the Sequel I (in terms of increasing throughput approximately seven times), it is not a game changer. PacBio is orders of magnitude away from offering a system that would be substitutable for Illumina's short read systems, and the evidence is clear that this gap is projected to increase*".[461]

8.82    PacBio submitted that for it to be a competitor in short read 'use cases' it would have to significantly increase its accuracy and run output to match Illumina's. The gap between short read and long read will not close in the foreseeable future, which means that customers will continue to use long read systems only when short read systems are unable to answer the question at hand; while Sequel II delivers 8x the throughput of Sequel I, it is still nowhere near that of Illumina's instruments (PacBio cites an internal document which states [✂]][462]

8.83    PacBio submitted that it is an unsubstantiated assumption that the growth of long read technologies will be at the expense of short read. PacBio submitted that both technologies will grow as overall demand for sequencing grows, and that the throughput, accuracy and output (and resulting cost) advantages of short read are persistent and enduring, and PacBio's focus is on creating new 'use cases' for long read sequencing (where short read is not well-suited).[463]

- *No cost convergence between short read and long read systems*

8.84    PacBio also submitted that there will be no cost convergence between short read and long read systems; PacBio does not (and would not) compete with Illumina on price.[464]

---

[459] Parties' Response to the Annotated Issues Statement, paragraph 75.
[460] Parties' Response to the Annotated Issues Statement, paragraph 88.
[461] Parties' Summary statement, page 2.
[462] Item 96 of Appendix C on internal documents ([✂]). PacBio's Response to the working paper on internal documents, paragraph 19.
[463] Item 97 of Appendix C on internal documents ([✂]). PacBio's Response to the working paper on internal documents, paragraph 20.
[464] PacBio's Response to the working paper on internal documents, paragraph 21 onwards.

8.85   PacBio submitted that it does not benchmark against Illumina for price because Illumina is a competitor, it benchmarks against Illumina because Illumina has established customer expectations about price and other sequencing metrics due to its price leadership in the sequencing space and strong marketing efforts. Differentiating from Illumina is at the heart of PacBio's marketing strategy. PacBio therefore must manage customer expectations regarding price if customers are to justify their decision to use PacBio's more expensive sequencers.[465]

8.86   PacBio also submitted that given the controlled budgets and grants available to research institutions to invest in various sequencing platforms year-on-year, all sequencing providers are looking for a share of that budget. Customers would be more willing to add PacBio to a project if it was two or three times the cost of Illumina, because the purchasing decision would be easier for customers to justify to managers or funding agencies.[466]

8.87   Finally, PacBio submitted that even if it were able to significantly increase its run output and reduce its costs so that it matched those offered by Illumina today, that does not and would not mean that its sequencers would become competitive with short read systems because Illumina (and other short read companies) would continue to increase its own run output and sample throughput and further reduce costs of short read systems. Illumina (and other short read companies) are better placed to reduce costs further over the medium to long term than PacBio.[467]

- *No technical convergence between the Parties' systems*

8.88   PacBio submitted that there will be no technical convergence and that inherent technological limitations will remain.[468]

8.89   PacBio submitted that it is not technically possible to increase PacBio accuracy or throughput, or to decrease costs such that customers could substitute them for Illumina. There are technical barriers inherent to PacBio's technology which are outside of its control and will not go away in the foreseeable future which will prevent this.[469]

8.90   PacBio submitted that it currently uses the fastest data recording and most powerful data processing technology available on the market and still has low

---

[465] PacBio's Response to the working paper on internal documents, paragraph 22.
[466] PacBio's Response to the working paper on internal documents, paragraph 22 and 23.
[467] PacBio's Response to the working paper on internal documents, paragraph 24.
[468] PacBio's Response to the working paper on internal documents, paragraph 25 onwards.
[469] PacBio's Response to the working paper on internal documents, paragraph 26.

raw accuracy and run output relative to Illumina;[470] Similarly, CMOS[471] sensor improvements are incremental and out of PacBio's control.[472]

8.91   PacBio submitted that without significant improvements to data recording and processing and CMOS – which are not expected soon and are out of PacBio's control – PacBio will not be able to match Illumina's accuracy or run output. As a result, the Parties' technologies will not converge any time soon.[473]

8.92   PacBio also submitted that financial constraints [✕].[474]

8.93   The Parties submitted that the fundamental limitations of PacBio's technology will "*prevent it from scaling in a manner that would enable PacBio to deliver run outputs that are closer to, let alone comparable with, those of Illumina's systems*".[475] These fundamental differences are rooted in the nature of the sequencing approach, for example, the single use camera that is contained in the PacBio consumable flow cell and the demanding and costly compute requirements which constrain their scalability.[476]

*Long read will not grow at the expense of short read*

8.94   The Parties submitted that there are significant growth opportunities for the sequencing industry, but that growth of long read will not be at the expense of short read. [477] The Parties submitted that increasing use of long read systems will drive demand for sequencing as a whole and that there is significant potential for materially broader adoption of existing 'use cases' and the development of new 'use cases'. For example, Illumina expects significant growth in clinical short read sequencing.

8.95   Illumina submitted that it is aware of no instances where either PacBio or ONT have had a competitive impact on Illumina sales or prices, or R&D priorities or activities (other than its understanding of the opportunity represented by the long read sub-segment, and consideration of alternative approaches to enable entry to that).[478]

---

[470] PacBio's Response to the working paper on internal documents, paragraph 27.
[471] Complementary Metal Oxide Semiconductor.
[472] PacBio's Response to the working paper on internal documents, paragraph 29.
[473] PacBio's Response to the working paper on internal documents, paragraph 28 to 30.
[474] PacBio's Response to the working paper on internal documents, paragraph 31.
[475] Parties' Response to the Annotated Issues Statement, paragraph 97.
[476] Parties' Response to the Annotated Issues Statement, paragraph 97.
[477] Parties' Response to the Annotated Issues Statement, paragraph 11.
[478] Parties' Response to the Annotated Issues Statement, paragraph 20.

8.96    The Parties also make some specific submissions relating to switching between technologies in *de novo* sequencing:

   (a)    "...*such comments [made by customers in relation to de novo sequencing] must be understood to relate either to researchers producing de novo assemblies for the first time or to researchers who have been using an inappropriate short read system to date*";[479]

   (b)    "*As the single-molecule accuracy of native long read systems continues to improve... it may be the case that less polishing is required. That does not, however, reflect competition*";[480] and

   (c)    "...*the cost differential, which will persist (and may expand) is such that any polishing that is required [in the context of de novo sequencing] will continue to be done using short read systems*".[481]

*Significant competition from other suppliers*

8.97    The Parties submitted that they are not close, let alone each other's closest, competitors and that Illumina's closest competitors are – and will continue to be – BGI, Thermo Fisher and QIAGEN,[482] while PacBio's closest competitor is ONT.[483] The Parties submitted that "*these four competitors will remain equally close competitors post-Transaction and will continue to drive innovation*".[484]

8.98    The Parties submitted that every sale made by Thermo Fisher, QIAGEN or BGI is one that Illumina could have made and Illumina estimates that it has lost over [✂] in revenue opportunities to these companies over the past ten years and [✂] in 2018 alone. Illumina submitted that it expects "*intensified competition over the next [three] years*".[485] Illumina submits that BGI is its strongest competitor and that this is confirmed by its internal documents and by customer evidence. Illumina further submits that BGI has greatly improved its technology, recently launching the MGISEQ-T7, which [✂].[486]

---

[479] Parties' Response to the Customer calls working paper, paragraph 9.
[480] Parties' Response to the Annotated Issues Statement, paragraph 60.
[481] Parties' Response to the Customer calls working paper, paragraph 10.
[482] We note that the Parties' submissions on this subject pre-date the recent announcement from QIAGEN on 7 October 2019 decision to "*suspend ongoing NGS-related instrument development activities*". https://corporate.qiagen.com/newsroom/press-releases/2019/20191007_Q3_preliminary_sales_and_restructuring_charges.
[483] Parties' Response to the Annotated Issues Statement, 24 September 2019.
[484] Parties' Response to the Annotated Issues Statement, paragraph 83.
[485] Item 61 of Appendix C on internal documents ([✂]).
[486] Parties' Note on competition for the market, 4 October 2019.

8.99   The Parties submitted that ONT is a rapidly growing and well-financed company, with demand for its systems, which it submits, according to ONT's Chief Executive Officer, increased exponentially over the last five years. PacBio submits that it has lost [✂] opportunities to ONT in recent years and that ONT's technology has [✂] advantages over PacBio's.[487]

8.100  The Parties submitted that there are numerous companies planning to launch sequencing systems and that most of these potential entrants have received significant funding from investors and many have been acquired by large life science companies.[488] The Parties submitted that of the many companies currently developing sequencing technologies, [✂] are expected to announce, or have announced, the intention to enter in the next 12 to 18 months. The Parties submitted that their competitive behaviour is informed by publicly available information from potential entrants regarding their imminent plans and that until it becomes clear that a new system will not competitively constraint the activities of either or both of the Parties, the behaviour of the Parties will continue to be constrained by the potential entry of the large number of potential entrants.[489] Further detail on potential entry is contained in chapter 9 on countervailing factors, below.

*The future of long read*

8.101  The Parties submitted that Illumina has recognised the benefit of long read technology and that the rationale for the Proposed Merger is "*driven by Illumina's desire to supply native long read systems (in addition to its short read systems)*".[490]

8.102  The Parties submitted that "*Illumina has long recognised that it could benefit from being able to offer a native long read system because it believes that the native long read market has meaningful growth potential*".[491]

8.103  During its hearing with the CMA, Illumina also submitted, with respect to its desire to enter the long read segment that "*It goes back to the graph that we showed you. There is the orange piece of it we participate in. There is an emerging and growing blue piece of it that we do not participate in. We want to participate in that. To participate in it, we actually need to have the right technologies because one cannot play in the other. That is simply a statement*

---

[487] Parties' Note on competition for the market, paragraph 22.
[488] Parties' Final Merger Notice, paragraph 394.
[489] Parties' Response to Annotated Issues Statement, paragraph 168 and Parties' Submission, 2 October 2019, paragraph 56.
[490] Parties' Response to the Annotated Issues Statement, paragraph 2.
[491] Parties' Summary Statement, page 4.

*of that; that we want to be able to participate in it and, therefore, we need the technology*".[492]

8.104   Illumina further stated that in the absence of the Proposed Merger, they would continue their attempts to enter the long read segment: "*we would keep trying. With the acquisition of PacBio, we are still going to have our own internal development [✂], because again PacBio cannot solve all of the long read use cases. There is a lot of work to do there. So no, Illumina would not give up on that, but Illumina would see this as a missed opportunity*".[493]

*The DeciBio survey*

8.105   The Parties commissioned a customer survey and submitted documents related to this in August 2019. DeciBio, the firm that conducted the survey, contacted over 1,000 customers, of whom 49 were interviewed.[494]

8.106   The conclusions of the DeciBio survey, as set out in the 'Final Read-Out', are as follows:

(a)   "*Interviewee feedback indicates that SRS and NLRS[495] have distinct and inherent strengths and weaknesses recognized across application areas*";

(b)   "*At the use case and individual investigator levels, SRS and NLRS are clearly not interchangeable, though at the application level, both technologies may appear to have complementary utility*";

(c)   "*KOLs [Key Opinion Leaders] corroborate that SRS and NLRS are not used for the same use cases*";

(d)   "*KOLs identify a set of complementary use cases*";

(e)   "*Many respondents noted the overall complementarity of SRS and NLRS in the foreseeable future, as opposed to direct competitiveness*";

(f)   "*While NLRS' accuracy and cost have improved over the last few years, they still fall significantly short of Illumina's*";

(g)   "*While KOLs believe NLRS has runway to narrow SRS' technical distinction, they acknowledge that the required maturation to encroach*

---

[492] Illumina's Hearing Transcript, page 7, lines 4-9.
[493] Illumina's Hearing Transcript, page 7, lines 15-21.
[494] DeciBio Survey Methodology.
[495] SRS refers to short read systems and NLRS refers to native long read systems.

*on SRS in the foreseeable future requires aggressive assumptions and is highly unlikely*";

(h) "*Within complementary use cases, current NLRS users state that platform accuracy and expected roadmaps fall significantly short of user requirements, making the technologies non-interchangeable for at least the next 5 years*";

(i) "*Historically, KOLs and users have over-optimistically speculated about the prospect of NGS technologies*"; and

(j) "*Early access Sequel II users note that while throughput, cost, and read length have improved, they don't expect Sequel II to compete with SRS or dramatically change the sequencing landscape*".

8.107  The Parties submitted that the DeciBio survey provides evidence that short read and long read technologies are not interchangeable for any given 'use case', with respondents identifying 41 such 'use cases'.[496]

8.108  We consider that the final report does not contain a balanced representation of the views expressed in the interview notes. For example:

(a) [✂] is quoted[497] by DeciBio as saying that "*Longer read lengths enable us to interrogate parts of the genome inaccessible by SRS… but if we're looking at small mutations, we'd still use SRS*".[498] However, according to the interview note, this customer also said that, "*if LRS can improve the error rate I can see future of replacing SRS with LRS entirely for epigenetics (i.e., independent of what your use case is).*"

(b) [✂] is quoted by DeciBio as saying that "*The scale of reads SRS yields provides accuracy unparalleled by NLRS*". However, according to the interview note, this customer also said that "*a bigger share of the market will be taken up by LRS because of the downstream bottleneck with computational pipelines*".

(c) [✂] is quoted by DeciBio as saying that "*ILMN's ability to continue rapidly cutting costs limits interchangeability of NLRS for many use cases*". However, according to the interview note, this customer also said that "*LR would take over in clinical eventually. LR will take over everything. LR is most ideal technology.*"

---

[496] Parties' Response to the Annotated Issues Statement, paragraph 38.
[497] Quotes in this section are statements sourced from interview notes.
[498] This quote is included in DeciBio's final report, but the CMA has been unable to find it in the 'interview notes' submitted by the Parties.

(d) [✂] is quoted by DeciBio as saying that "*Even within [use cases], there are likely to be sub-use cases / individual research objectives for which investigators will have views that one tech has a clearer or stronger fit for use than the other...*" However, according to the interview note, this customer also said that "*We use LRs to scaffold sequences together and use ILMN for base accuracy to polish base calling... I think as base calling improves with ONT/LRs... hopefully we will get to a point where won't need SR anymore... I think absolutely [workflow] will shift more and more toward LRS as tech improves... I'd give it until 2022 – would think by then we [will] do most of the work with ONT.*"

(e) Finally, a customer at the [✂] is quoted by DeciBio as saying that "*[SRS and NLRS] complement each other but have quite different end goals, so they're used in tandem if we have both goals...*" However, according to the interview note, this customer also said that "*Most people believe LRS is not accurate enough, but… once people try it with us, they often come back for more when [they] realize it works – it's the plunge that's the hurdle*"; and "*De novo: currently is 95% SR / 5% LR. In 5 years we'll get to 75% SR / 25% LR... Reseq: currently is 90% SR / 10% LR and in 5 yrs will be 60% SR / 40% LR, maybe 50/50... Overall, I see LR as the future for some of applications; but doesn't suit everything.*"

8.109 Furthermore, in our view, this survey suffers from the following methodological issues, which substantially reduce the weight we can place on it in the context of this investigation:

(a) The stated aim of the survey appears leading: "*Confirm and clearly demonstrate that short read (SR) and native long read (NLR) systems are not used interchangeably*";[499]

(b) The sample may not be representative of the population (the response rate was less than 5%);[500,501] and

---

[499] DeciBio survey methodology, Annex 1, p 2. See the CMA's guidance, "Good practice in the design and presentation of customer survey evidence in merger cases", 23 May 2018 (the CMA's Survey Guidance), which states: "*We expect good surveys to be neutral and not biased towards one outcome or another.*" (https://www.gov.uk/government/publications/mergers-consumer-survey-evidence-design-and-presentation/good-practice-in-the-design-and-presentation-of-customer-survey-evidence-in-merger-cases).

[500] Customers who expressed an interest in the DeciBio survey were screened out if they had limited knowledge of DNA sequencing. In comparison, for our customer calls we selected a sample of customers and made various attempts to arrange a call, such that our calls were not limited to only those that expressed the greatest interest in taking part.

[501] See eg references to representativeness in the CMA's Survey Guidance.

(c) We were provided with 'interview notes', rather than transcripts, which do not indicate the actual questions asked or the full answers given;[502] and

(d) We would expect to be contacted prior to a survey being conducted, such that we can comment on the methodology, as it has generally been our experience that survey designs not discussed with us in advance have tended to be of insufficient quality. In the absence of first-hand experience of how fieldwork was conducted, we have not been able to conclude that the findings have genuine weight.[503]

8.110 In our view, the quotes in the DeciBio final report have been chosen to show that short read and long read are not currently substitutable. However, our reading of the interview notes suggests a more nuanced view. The notes show that some customers currently face a trade-off between short read and long read and that such a trade-off may exist in the future for more uses, applications and/or projects. The interview notes show more generally that long read sequencing will be more prevalent in the future at the expense of short read and possibly to a significant extent.

8.111 Given the fact that the final DeciBio report is based on selective quotes, and the methodological issues listed above, we do not place material weight on the survey in our provisional assessment.

*The Parties' econometric analysis*

8.112 PacBio submitted an econometric analysis assessing the impact of ONT's entry into China [✂] in China. The Parties submitted that the [✂] following ONT's entry and this provided evidence of the competitive constraint exerted by ONT on PacBio and [✂].

8.113 We consider that the Parties' finding that ONT exerts a competitive constraint on PacBio is consistent with other evidence sources (see for example,

---

[502] See eg references to questionnaires and the expected level of documentation in the CMA's Survey Guidance.
[503] See the CMA's Survey Guidance, for example: "*Parties wishing to conduct a survey for a merger case are strongly encouraged to contact the CMA in the early stages of the survey process to discuss their proposed design, including a draft questionnaire (if available) and wider aspects of the survey methodology*", and "*[w]here Parties do not discuss their survey design with the CMA in advance, and/or do not give the CMA an opportunity to monitor and assess the quality of fieldwork while it is underway, it is not necessarily the case that we will consider the survey findings to have no or only limited evidential weight. The weight to be given to such evidence will be assessed against the same principles and standards for conducting surveys described in this document. However, it has been our experience that survey designs not discussed with us in advance have tended to be of insufficient quality, and in the absence of first-hand experience of how fieldwork was conducted, it has been hard to conclude that the findings have genuine weight. In these circumstances, then, the onus will be on Parties to provide highly compelling information about the survey methodology and the steps taken to assure its quality*".

PacBio's internal documents and evidence from customers). However, we can place only limited weight on the Parties' analysis, for the following reasons:

(a) Notwithstanding any critique of the econometric approach, the Parties' analysis does not demonstrate that PacBio sales would predominantly divert to ONT if PacBio exits the market in the UK. This is because no other competitors are included in the analysis (meaning it doesn't provide evidence that ONT is PacBio's closest competitor in China), and the analysis looks at the effect of ONT's entry into China[504] meaning, even if it did provide evidence that ONT is PacBio's closest competitor in China, this could not be generalised to the UK.

(b) Furthermore, it may suffer from omitted variable bias, meaning the results are biased:[505]

(i) The specification does not control for differences between countries which may confound the analysis. Specifically, customers in a particular country may be relatively price insensitive, because their research is better funded, but there also may be a greater number of them for the same reason. We would therefore give more weight to countries with a greater number of customers.

(ii) The specification does not control for differences in customer characteristics, which may confound the analysis. Specifically, customers of a particular type may pay relatively high prices, and customers of this type may be relatively common in China, but ONT may have entered into China for this reason.

(iii) The specification does not control for time-specific effects. China may be growing at a relatively high rate, leading to prices also increasing at a relatively high rate, but ONT may have entered due to the high rate of economic growth.

8.114  In response PacBio submitted that:[506]

(a) The structure of the analysis controls for differences between countries, and focuses on relative changes in price levels within regions. Specifically, the regression considers changes in price level in the post-period versus the prior-period in China, and then compares these

---

[504] With the rest of the world used as a control group.
[505] Omitted variable bias arises when an econometric analysis looks at the relationship between a dependent variable and independent variable(s), but fails to include other independent variable(s) that have an effect on the dependent variable. Consequently, the results of the analysis are not robust – specifically, the estimated coefficients of the independent variable(s) are biased.
[506] Parties' Response to Counterfactual Working Paper, Annex A, page 18.

changes in the price levels to the changes in price levels in the rest of the world. In our view, the structure of the analysis does not control for differences between countries, as country effects are not included.

(b) Controlling for differences in customer characteristics would only be required if certain customer groups became more or less prevalent in China after the ONT entry in China. The Parties submitted that the CMA had not identified such hypothetical group of concern. We agree but the Parties have conducted no investigation of this issue and we cannot see a basis for concluding that controlling for differences in customer characteristics would not be prudent.

8.115 The Parties submitted two further pieces of analysis assessing the degree of substitutability between the Parties' sequencing systems. The first looked at the impact of purchasing a PacBio instrument on the use of Illumina consumables. The second looked at the impact of purchasing a PacBio instrument on the prices offered by Illumina to the customers who purchased PacBio's system. The Parties submitted that purchasing a PacBio instrument was followed by an increase rather than a reduction in the use of Illumina consumables and did not result in any change in Illumina's pricing to these customers. The Parties submitted that this was evidence of a lack of substitutability between the Parties' sequencing systems.

8.116 Our provisional conclusion on this analysis is that because it is necessarily based on historical data, it therefore does not capture the future competitive constraints different suppliers will exert on each other. This is particularly problematic given the dynamic nature of this market and the recent launch of Sequel II. This launch took place in the second quarter of 2019, but the analysis covers from the first quarter of 2013 to the second quarter of 2019, meaning it will not capture any effect Sequel II has had on the market. For these reasons we place very limited weight on the analysis.

***Market shares***

8.117 In this section we consider the market shares of the Parties and other suppliers in the market for NGS systems.

8.118 The Parties and four other suppliers (BGI, ONT, QIAGEN and Thermo Fisher) provided revenue data for 2016 to 2018, broken down by:

(a) Sequencing instruments;

(b) Reagent kits/other consumables that can only be used with that supplier's sequencing instruments;

(c) Library preparation kits/other consumables that can be used with third-party sequencing instruments;

   (i) For use with that supplier's sequencing instruments;

   (ii) For use with third-party sequencing instruments;

(d) Data analysis and data storage/sharing solutions;

   (i) For use with that supplier's sequencing instruments;

   (ii) For use with third-party sequencing instruments; and

(e) Product support services (including maintenance).

8.119 We calculated combined revenue from categories (a), (b), (c)(i), (d)(i) and (e) above, to give us revenue from NGS systems, which are presented in Table 6.[507]

**Table 6: Market shares for NGS systems (2016 to 2018)**

| Market shares | UK | | | Worldwide | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2016** | **2017** | **2018** |
| Illumina | [80-90]% | [80-90]% | [90-100]% | [80-90]% | [80-90]% | [80-90]% |
| PacBio | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| **Parties combined** | **[90-100]%** | **[90-100]%** | **[90-100]%** | **[80-90]%** | **[80-90]%** | **[80-90]%** |
| BGI | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| ONT | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| QIAGEN | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% | [0-5]% |
| Thermo Fisher | [5-10]% | [5-10]% | [0-5]% | [10-20]% | [10-20]% | [10-20]% |

Source: CMA analysis of data received from the Parties and third parties.

Notes:
(1) Illumina and ONT have not provided a breakdown of revenue from library preparation kits for use with their instruments, and library preparation kits for use with third-party instruments. Total revenue from library preparation kits has been included.
(2) PacBio has not provided UK revenue from product support services. A share of PacBio's worldwide revenue from product support services has been included, based on the UK's share of PacBio's worldwide revenue from NGS instruments, library preparation kits for use with those instruments, and sequencing consumables.

8.120 As shown in Table 1, the market for NGS systems is highly concentrated, both worldwide and in the UK, due to Illumina's very strong market presence. Illumina has over 80% share of the NGS systems market. PacBio has [0-5]%, Thermo Fisher has approximately [10-20]%. BGI has [0-5]%, ONT has [0-5]%,

---

[507] Revenue from categories (c)(ii) and (d)(ii) was not included as we have provisionally found that the market for NGS is a systems market. See chapter 7 on market definition for more detail.

and QIAGEN has [0-5]%. In the UK, Illumina has over 90% market share, PacBio has approximately [0-5]%, Thermo Fisher has approximately [0-5]%, and ONT also has [0-5]%.

8.121   In the UK, Illumina's market share grew over 2016 to 2018 whilst PacBio's market share declined. We consider that this decline was likely driven by customers holding back instrument purchases prior to the launch of Sequel II.[508] Notwithstanding these changes, the Parties' combined share in the UK remained very high over 2016 to 2018, almost entirely due to Illumina's very strong market presence.

***Overview of internal documents evidence***

8.122   Internal documents are a useful source of evidence as they reflect how the merging parties assess the market in the ordinary course of business and when making strategic decisions. We have reviewed the Parties' internal documents to understand their assessment of competitive conditions within the NGS systems market, including their assessments of the positioning and activities of their competitors. Evidence of how rivalry operated prior to the Proposed Merger helps us to understand how rivalry is likely to be affected by the Proposed Merger.

8.123   Below we set out our approach to analysing internal documents:

(a)   In assessing the content of an internal document, we take into account the purpose for which it was prepared. We typically place greater weight on documents ultimately prepared to inform decision making by senior management as these are likely to be most reflective of the Parties' strategic thinking.

(b)   We consider the context in which information appears in a particular document. For example, the fact that a competitor's name appears in a document is less informative than the context in which it appears.

(c)   We also consider what the internal documents overall show. We consider factors such as the different treatment of competitors in different types of documents and the extent to which different competitors are monitored across the total set of internal documents.

8.124   Furthermore, internal documents may not lend themselves to a mechanistic assessment: where there is a heterogenous set of internal documents and a

---

[508] PacBio derived approximately [✂]of its UK revenues from instruments in 2016 and 2017, but revenues from instruments decreased by approximately [✂] in 2018, as compared with an increase of approximately [✂] in revenues from other sources relating to NGS systems.

diversity in the presentation of information even within a particular document, an arithmetic approach to measuring the assessment of competitors in those documents (eg by adding up the number of times a competitor's name is used, or the number of documents in which the competitor is mentioned) is unlikely to be meaningful.

8.125   We looked at documents received or produced by senior management or shareholders of both PacBio and Illumina, including both those prepared internally or by external consultants.

8.126   We also requested background information about the documents including the date the document was produced, the name and role of the author and the names and roles of the recipients, as well as the purpose for which the document was created, in order to fully understand the context and importance of the document. Further details on the background to each of the documents referenced below and screenshots showing the context for the selected quotes are provided at Appendix C to this report.

8.127   The documents referred to below do not reflect all documents received from the Parties, but instead provide examples of themes visible throughout the documents reviewed. Where we rely on quotes from the Parties' internal documents, these are included because they provide the clearest evidence in support of the relevant topic. However, these quotes do not amount to an exhaustive list of all the documentary evidence received from the Parties, and we have instead endeavoured to provide a representative sample of those documents received for each theme.

8.128   Some of the documentary evidence outlined below uses hypothetical language (for example, Illumina's strategic documents outline risks to the business and proposed mitigations). We consider that hypothetical language provides a useful insight into the views of the Parties regarding the potential threats facing their business both at the time and looking to the future. This is particularly true when concrete outcomes or strategic decisions are taken following the review of such documents. Further discussion on the potentially hypothetical nature of certain documents is found in the section on our assessment of Illumina's internal documents below.[509]

### Illumina's internal documents

8.129   The evidence from Illumina's internal documents as set out below is divided into two categories, those which discuss complementarity of PacBio systems

---

[509] See paragraph 8.156, below.

with Illumina's technologies and those which demonstrate competition between the Parties.

8.130  Evidence of competition from third parties discussed in Illumina's internal documents is also outlined below.

8.131  This section is structured as follows:

(a)  We first introduce the evidence;

(b)  We then discuss the Parties' submissions on our analysis of the Parties' internal documents, along with our view on these submissions;

(c)  Finally, we discuss our provisional conclusions in relation to the Parties' internal documents.

*Complementarity in Illumina's internal documents*

8.132  There are a number of Illumina internal documents which note that long read technologies and often PacBio's in particular, are complementary to Illumina's short read technology for certain applications:

(a)  [✂];[510]

(b)  [✂];[511]

(c)  [✂];[512]

(d)  [✂];[513]

(e)  [✂];[514]

(f)  [✂];[515]

(g)  [✂];[516]

(h)  [✂];[517]

---

[510] Item 2 of Appendix C on internal documents ([✂]).
[511] Item 3 of Appendix C on internal documents ([✂]).
[512] Item 4 of Appendix C on internal documents ([✂]).
[513] Item 5 of Appendix C on internal documents ([✂]).
[514] Item 6 of Appendix C on internal documents ([✂]).
[515] Item 7 of Appendix C on internal documents ([✂]).
[516] Item 8 of Appendix C on internal documents ([✂]).
[517] Item 9 of Appendix C on internal documents ([✂]).

*(i)*   [✕];[518]

*(j)*   [✕];[519] and

*(k)*   [✕].[520]

8.133   However, a limited number of Illumina's internal documents also highlight the limitations of using long read and short read technologies in a complementary fashion. These documents show that this may only be required for the short term before one or other platform becomes the preferred choice or that the instruments will only be used in a complementary fashion for certain uses, applications and/or projects:

*(a)*   [✕];[521]

*(b)*   [✕];[522] and

*(c)*   [✕] and [✕].[523]

*Competition in Illumina's internal documents*

8.134   It is evident from Illumina's internal documents that it regularly monitors its competitors. In addition to documents setting out the complementary nature of the Parties' technologies, Illumina's internal documents also reveal that it considers PacBio to be an important competitor in relation to a number of different applications[524] and for sequencing dollars.[525]

8.135   These documents were produced by employees with a variety of functions including scientists, sales teams, staff responsible for strategy documents, and senior management making submissions to the board. We looked at documents received or produced by senior management or shareholders of Illumina. These documents all show a broadly consistent picture of PacBio as an important competitive threat to Illumina at the present time and in the foreseeable future:

---

[518] Item 10 of Appendix C on internal documents ([✕]).
[519] Item 11 of Appendix C on internal documents ([✕]). Pop-seq refers to Population Sequencing.
[520] Item 12 of Appendix C on internal documents ([✕]).
[521] Item 13 of Appendix C on internal documents ([✕]).
[522] Item 14 of Appendix C on internal documents ([✕]). The Parties have been unable to provide details on who this document was produced by and for.
[523] Item 15 of Appendix C on internal documents ([✕]).
[524] See paragraph 8.11, onwards above on the terminology of applications and 'use cases'.
[525] See paragraph 8.14 above for further discussion of competition for sequencing dollars.

    *(a)* [✂];[526]

    *(b)* [✂];[527][528]

    *(c)* [✂];[529]

    *(d)* [✂];[530]

    *(e)* [✂];[531]

    *(f)* [✂][532] [✂];[533]

    *(g)* [✂];[534]

    *(h)* [✂];[535]

    *(i)* [✂];[536] and

    *(j)* [✂].[537]

8.136  Illumina's internal documents provide evidence of customers switching (or Illumina attempting to convert customers) from PacBio to Illumina systems:

    *(a)* [✂];[538] and

    *(b)* [✂].[539]

8.137  Illumina's internal documents also show that Illumina considered that there is, and has been in recent years, a realistic threat that customers would be lost to PacBio. The documents note this may entail moving workflow from Illumina to PacBio, rather than choosing a PacBio instrument over Illumina's. Certain

---

[526] Item 13 of Appendix C on internal documents ([✂]) and Item 18 of Appendix C on internal documents ([✂]).
[527] See chapter 7 above on market definition for further discussion of linked long reads.
[528] Item 13 of Appendix C on internal documents ([✂]). SV refers to structural variation.
[529] Item 19 of Appendix C on internal documents ([✂]).
[530] Item 21 of Appendix C on internal documents ([✂]).
[531] Item 22 of Appendix C on internal documents ([✂]).
[532] Item 26 of Appendix C on internal documents ([✂]).
[533] Item 26 of Appendix C on internal documents ([✂]).
[534] Item 16 of Appendix C on internal documents ([✂]).
[535] Item 17 of Appendix C on internal documents ([✂]).
[536] Item 27 of Appendix C on internal documents ([✂]). LP are believed to refer to Library Preparation. It is not clear what HW refers to.
[537] Item 28 of Appendix C on internal documents ([✂]). The Parties were unable to provide details of who this document was produced by or for.
[538] Item 23 of Appendix C on internal documents ([✂]).
[539] Item 24 of Appendix C on internal documents ([✂]). HS and NS are believed to refer to Illumina's HiSeq and NextSeq instruments. [✂].

Illumina internal documents also detail the countermeasures undertaken or proposed by Illumina in order to mitigate or prevent these losses:

(a)  [✂];[540]

(b)  [✂];[541]

(c)  [✂];[542]

(d)  [✂];[543] and

(e)  [✂].[544]

8.138  Further, the following Illumina internal documents show that Illumina sees PacBio as becoming an increasing threat to Illumina in the future as its technology improves. The following documents contain relatively detailed discussions about the potential impact on Illumina of such improvements and mitigating action that Illumina could take to combat such an impact:

(a)  [✂];[545]

(b)  [✂];[546]

(c)  [✂];[547]

(d)  [✂];[548]

(e)  [✂];[549]

(f)  [✂]:

(i)  [✂];[550]

(ii)  [✂];[551]

---

[540] Item 29 of Appendix C on internal documents ([✂]).
[541] Item 30 of Appendix C on internal documents ([✂]).
[542] Item 31 of Appendix C on internal documents ([✂]).
[543] Item 32 of Appendix C on internal documents ([✂]).
[544] Item 33 of Appendix C on internal documents ([✂]).
[545] Item 35 of Appendix C on internal documents ([✂]).
[546] Item 19 of Appendix C on internal documents ([✂]).
[547] Item 19 of Appendix C on internal documents ([✂]). SNV refers to Single Nucleotide Polymorphism Variant. SNV calling refers to a range of methods for identifying the existence of SNVs using NGS.
[548] Item 19 of Appendix C on internal documents ([✂]). WGS refers to Whole Genome Sequencing and Shotgun sequencing refers to a method used for sequencing random DNA strands. Phasing refers to identifying alleles on maternal and paternal chromosomes rather than the whole genome.
[549] Item 36 of Appendix C on internal documents ([✂]).
[550] Item 13 of Appendix C on internal documents ([✂]).
[551] Item 13 of Appendix C on internal documents ([✂]).

(iii)  [✂];[552]

(iv)  [✂];[553]

*(g)*  [✂];[554]

*(h)*  [✂];[555]

*(i)*   [✂][556] and

*(j)*   [✂].[557]

8.139  In addition to concerns that PacBio's technology is likely to become more of a threat to Illumina in future years, Illumina's internal documents also show an intention by Illumina to develop or acquire its own long read technology. Illumina's documents also show a concern that another short read competitor, or potential competitor, could acquire a long read technology before Illumina and make it more difficult for Illumina to offer a long read sequencer:

*(a)*  [✂];[558]

*(b)*  [✂];[559]

*(c)*  [✂];[560]

*(d)*  [✂];[561]

*(e)*  [✂];[562] and

*(f)*  [✂].[563]

8.140  In relation to whether Illumina is a potential competitor in the long read sub-segment, Illumina's internal documents also detail internal discussions about whether research and development projects into developing, among other

---

[552] Item 13 of Appendix C on internal documents ([✂]).
[553] Item 34 of Appendix C on internal documents ([✂]).
[554] Item 6 of Appendix C on internal documents ([✂]).
[555] Item 37 of Appendix C on internal documents ([✂]).
[556] Item 38 of Appendix C on internal documents ([✂]).
[557] Item 38 of Appendix C on internal documents ([✂]).
[558] Item 17 of Appendix C on internal documents ([✂]).
[559] Item 23 of Appendix C on internal documents ([✂]).
[560] Item 34 of Appendix C on internal documents ([✂]).
[561] Item 13 of Appendix C on internal documents ([✂]).
[562] Item 13 of Appendix C on internal documents ([✂]). [✂].
[563] Item 39 of Appendix C on internal documents ([✂]).

things, long read and linked long read technologies, [✂] would continue post-merger:

(a)  [✂];[564]

(b)  [✂];[565]

(c)  [✂];[566]

(d)  [✂];[567]

(e)  [✂];[568] and

(f)  [✂].[569]

8.141  PacBio is not the only provider monitored by Illumina. Of the other providers of NGS systems (including PacBio) mentioned in Illumina's internal documents, BGI is perhaps the most heavily monitored, with a number of BGI-specific tracking documents having been prepared, but others, including PacBio and ONT, are also regularly mentioned. Illumina internal documents monitoring BGI include the following (though some also note the current focus of BGI on China):

(a)  [✂];[570]

(b)  [✂];[571]

(c)  [✂];[572]

(d)  [✂];[573]

(e)  [✂];[574]

(f)  [✂];[575]

---

[564] Item 17 of Appendix C on internal documents ([✂]). [✂].
[565] Item 40 of Appendix C on internal documents ([✂]).
[566] Item 41 of Appendix C on internal documents ([✂]).
[567] Item 42 of Appendix C on internal documents ([✂]).
[568] Item 43 of Appendix C on internal documents ([✂]).
[569] Item 44 of Appendix C on internal documents ([✂]).
[570] Item 45 of Appendix C on internal documents ([✂]).
[571] Item 46 of Appendix C on internal documents ([✂]).
[572] Item 47 of Appendix C on internal documents ([✂]).
[573] Item 48 of Appendix C on internal documents ([✂]).
[574] Item 49 of Appendix C on internal documents ([✂]).
[575] Item 50 of Appendix C on internal documents ([✂]).

*(g)* [✂];[576]

*(h)* [✂];[577]

*(i)* [✂];[578]

*(j)* [✂];[579]

*(k)* [✂];[580] and

*(l)* [✂].[581]

8.142  We have also seen a number of Illumina internal documents monitoring ONT:

*(a)* [✂];[582]

*(b)* [✂];[583]

*(c)* [✂];[584]

*(d)* [✂];[585]

*(e)* [✂];[586]

*(f)* [✂];[587]and

*(g)* [✂].[588]

8.143  Illumina also, to a more limited extent, monitors Thermo Fisher and QIAGEN, including in pricing committee documents. However, Thermo Fisher and QIAGEN tend to be mentioned only in relation to clinical applications (eg oncology) and are generally not mentioned as a threat or possible disruption

---

[576] Item 51 of Appendix C on internal documents ([✂]).
[577] Item 52 of Appendix C on internal documents ([✂]). BGISEQ-500 is a BGI instrument, NovaSeq is one of Illumina's instruments.
[578] Item 19 of Appendix C on internal documents ([✂]). WGS refers to whole genome sequencing. Counting is a use of sequencing to count the number of times that something appears in a sequence. The Parties provided the following example in their Final Merger Notice: NIPT counts the number of foetal chromosome fragments circulating in a mother's bloodstream. Targeted sequencing is sequencing a small region or set of regions of the genome.
[579] Item 19 of Appendix C on internal documents ([✂]).
[580] Item 13 of Appendix C on internal documents ([✂]) and Item 18 of Appendix C on internal documents ([✂]).
[581] Item 13 of Appendix C on internal documents ([✂]).
[582] Item 53 of Appendix C on internal documents ([✂]).
[583] Item 54 of Appendix C on internal documents ([✂]).
[584] Item 55 of Appendix C on internal documents ([✂]).
[585] Item 19 of Appendix C on internal documents ([✂]).
[586] Item 19 of Appendix C on internal documents ([✂]) and Item 18 of Appendix C on internal documents ([✂]).
[587] Item 13 of Appendix C on internal documents ([✂]).
[588] Item 38 of Appendix C on internal documents ([✂]).

to the same extent as PacBio, ONT and BGI. Some Illumina internal documents mention Thermo Fisher and QIAGEN:

(a)  [✂];[589]

(b)  [✂];[590]

(c)  [✂];[591]

(d)  [✂];[592]

(e)  [✂][593,594]

(f)  [✂];[595] and

(g)  [✂].[596]

8.144  As well as current providers of sequencing technologies, we have seen a small number of documents showing Illumina monitoring potential competitors whose technology is currently still in development. These documents tend to be high-level rather than detailed and tend to show potential competitors as less of a threat than current competitors. Further detail on entry and expansion is provided in chapter 9 on countervailing factors below. Some of Illumina's internal documents discuss potential competitors:

(a)  [✂];[597]

(b)  [✂];[598]

(c)  [✂];[599]

(d)  [✂];[600]

(e)  [✂];[601]

---

[589] Item 56 of Appendix C on internal documents ([✂]).
[590] Item 28 of Appendix C on internal documents ([✂]). The Parties have been unable to provide details on who this document was produced by and for.
[591] Item 61 of Appendix C on internal documents ([✂]).
[592] Item 59 of Appendix C on internal documents ([✂]).
[593] TMO stands for Thermo Fisher.
[594] Item 60 of Appendix C on internal documents ([✂]).
[595] Item 62 of Appendix C on internal documents ([✂]).
[596] Item 63 of Appendix C on internal documents ([✂]).
[597] Item 13 of Appendix C on internal documents ([✂]).
[598] Item 21 of Appendix C on internal documents ([✂]).
[599] Item 64 of Appendix C on internal documents ([✂]).
[600] Item 9 of Appendix C on internal documents ([✂]).
[601] Item 28 of Appendix C on internal documents ([✂]).

*(f)*  [✂];[602]

*(g)*  [✂];[603] and

*(h)*  [✂]".[604]

*Our assessment of Illumina's internal documents*

8.145  Illumina submitted that we have misinterpreted their internal documents.[605, 606] In this section we discuss the Parties' submissions on our analysis of Illumina's internal documents, along with our view on these submissions.

8.146  Our assessment of Illumina's internal documents will be divided according to the following themes:

*(a)*  Terminology used;

*(b)*  "Provocative" documents;

*(c)*  Illumina's understanding of PacBio's technology;

*(d)*  Monitoring of every source of disruption;

*(e)*  Lost sales; and

*(f)*  Innovation.

*Terminology used*

8.147  Illumina submitted that, Illumina refers to any company active in the sequencing space as a 'competitor' in its internal documents:[607]

*(a)*  Illumina uses the term 'competitor' and similar terms in its internal documents regardless of whether the company in question offers sequencing systems or intends to do so, or whether the systems that they offer are substitutable with Illumina's for example, the 'Competition' section of Illumina's annual statutory 10-K filings on financial performance to the US Securities and Exchange Commission.[608] Illumina has referred to companies that offer mapping technologies or

---

[602] Item 46 of Appendix C on internal documents ([✂]).
[603] Item 13 of Appendix C on internal documents ([✂]) and Item 18 of Appendix C on internal documents ([✂]).
[604] Item 39 of Appendix Con internal documents ([✂]).
[605] Illumina's Response to the working paper on internal documents, 22 September 2019.
[606] Illumina's Submission on internal documents relied on in the Phase 1 Decision, 12 August 2019.
[607] Illumina's Response to the working paper on internal documents, paragraph 113 onwards and Illumina's Submission on the internal documents relied on in the Phase 1 decision, paragraph 3 onwards.
[608] [✂].

provide alternative methods of ascertaining genetic information as "competitors"; and

(b) When new technologies are launched their capabilities are not always fully understood and therefore every company supplying or developing sequencing technologies may be monitored by Illumina in its internal documents, regardless of whether they have a substitutable product or not.

8.148   In our view, competitor is a widely used and understood business term and it is not a technical antitrust term.[609] Illumina has applied the natural meaning of the term 'competitor' in the internal documents, referring to competition at different levels. In our assessment, this is the meaning of competition that we adopt, as discussed in our Nature of competition section in paragraphs 8.6 onwards.

8.149   In our view these documents indicate that Illumina views PacBio as a competitive threat, now and into the future. The documents often discuss threats, disruptions and risks when mentioning other sequencing providers, which we consider would be consistent with a traditional view of a competitor. Illumina refers to PacBio as a competitor in various documents created by a number of different senior authors and these documents are presented to senior staff including the board.

8.150   The fact that Illumina notes other companies not active in DNA sequencing as competitors may just reflect that they are competitors to some extent (or in a different market in which Illumina is also present such as library preparation or Arrays) or potential competitors. Further, these other companies are cited far less frequently and do not feature at the top of [✂] in the same way or to the same extent as PacBio does.

*"Provocative" documents*

8.151   [✂].[610] Illumina submitted that [✂], intended to provoke a broad discussion amongst scientists about potential long term changes to the market and to stimulate debate on such topics. Illumina said that the slides do not consider the likelihood of the possible scenarios.

---

[609] If the meaning of the term does differ between antitrust cases and general business use, the meaning in antitrust cases is arguably wider as it includes potential competitors, whereas that might not always be the case in general business use.
[610] Illumina's Response to the working paper on internal documents, paragraph 33 onwards and Illumina's Submission on internal documents relied on in the phase 1 decision, paragraph 21 onwards.

8.152  [✂].

8.153  Illumina submitted that it in fact considered PacBio's systems (and those of ONT) to be complementary to Illumina's short read systems and to have the potential to drive increased demand for both short and long read sequencing. Illumina provided a number of examples of documents (see paragraph 8.132 for documents discussing complementarity) which refer to the complementarity of the Parties' systems.

8.154  [✂].[611]

8.155  In relation to Illumina' submissions that it in fact considers PacBio's systems to be complementary to its own, we recognise that Illumina's internal documents suggest that PacBio's systems are complementary in certain situations. However, the fact that some complementarity exists is not inconsistent with Illumina being concerned about PacBio in other situations and in relation to growing future substitution between the Parties' systems.

8.156  Moreover, the evidence in its totality is not consistent with the explanation that [✂] and similar presentations are entirely hypothetical, given that:

(a)  The Parties have provided no corroborating documentary evidence that the most senior staff had an opposing view (to that presented in the documents) or that the documents were purely hypothetical, or intended to be as such;

(b)  Concrete outcomes were taken away from these meetings (for example, the [✂]);[612]

(c)  In certain slides, the 'likelihood' of an event occurring is taken into account ([✂]);[613] and

(d)  As there were several of such [✂] documents, prepared by a number of experienced authors for discussion with senior staff on a yearly basis, we consider it unlikely that they would contain such a major misunderstanding of a fundamental aspect of competition in the industry (ie, whether PacBio is a competitive threat to Illumina), and in particular, that they would do so repeatedly.

---

[611] [✂].
[612] Illumina's Response to the working paper on internal documents, paragraph 52.
[613] Item 34 of Appendix C on internal documents ([✂]).

*Illumina's understanding of PacBio's technology*

8.157  Illumina submitted that its understanding of PacBio's technology has evolved over time, [✂].[614]

8.158  Illumina told us that the sequencing market is dynamic and when products are launched their utility and limitations are often unclear. Companies, [✂], tend to make optimistic announcements that are later revised down.[615]

8.159  [✂].[616]

8.160  [✂].[617]

8.161  Illumina also submitted that, although the 8M SMRT cell is not the upper limit, future improvements are outside of PacBio's control as it is dependent on the development of third party technology; [✂].[618]

8.162  In our view, based on the evidence we have seen in Illumina's internal documents, Illumina saw an improvement in PacBio's performance during 2018 in relation to its accuracy (as a result of its CCS technology). However, it is unclear whether Illumina's views of PacBio's future throughput became more conservative, [✂][619] and the Parties' submissions in relation to how the technologies will advance. However, in relation to Illumina's submission that its understanding of PacBio's technology has changed since certain of its internal documents were produced, we note the following:

(a)  Illumina has provided no corroborating documentary evidence that its views have changed in relation to throughput or the performance of PacBio in future more generally;

(b)  [✂], individuals at Illumina commented on PacBio's accuracy following its launch of its CCS technology: [✂] suggesting that they were particularly impressed with PacBio's technology at that time;[620]

---

[614] Illumina's Response to the working paper on internal documents, paragraph 98 onwards and Illumina's submission on internal documents relied on in the Phase 1 decision, paragraph 11 onwards.
[615] Illumina's Response to the working paper on internal documents, paragraph 106-107. Illumina's submission on internal documents relied on in the Phase 1 decision, paragraph 11-12.
[616] Illumina's submission on internal documents relied on in the Phase 1 decision, paragraph 14-20.
[617] Illumina's Response to the working paper on internal documents, paragraph 99 and 103-105.
[618] Illumina's Response to the working paper on internal documents, paragraph 109-111.
[619] Illumina's Response to the working paper on internal documents, paragraph 106-107. Illumina's submission on internal documents relied on in the Phase 1 decision, paragraph 11-12.
[620] Item 20 of Appendix C on internal documents ([✂]).

(c) During its hearing with the CMA and when asked about how Illumina's understanding of PacBio had changed since the bid, Illumina stated [✕];[621]

(d) Evidence from customers, as set out more fully below, indicates that Sequel II has generally met or exceeded customer expectations;

(e) Although the [✕] may be out of PacBio's control, it is not clear why the rate of improvement in these technologies would change dramatically at this point in time; and

(f) Illumina still chose to continue with the Proposed Merger, suggesting that its concerns regarding PacBio's development potential were not significant.

*Monitoring of every source of disruption*

8.163 Illumina submitted that it takes into account every potential source of 'disruption' to its business however unlikely it may be:[622]

(a) [✕];[623] and

(b) [✕].[624] [✕].[625]

8.164 In our view, any business forecasting how current and potential competitors will evolve necessarily involves an element of uncertainty. However, despite this lack of certainty, firms are focused on the future evolution of the market. This is particularly the case in dynamic industries such as this one where R&D is important, and technology improves rapidly.

8.165 In our provisional view, Illumina's internal documents present a consistent picture across a large number of documents, produced by a number of different senior authors over time, indicating that PacBio is considered to be a significant competitive threat to Illumina currently, and that this will increase in future.

---

[621] Illumina Hearing transcript, page 10, lines 21-25.
[622] Illumina's submission on internal documents relied on in the Phase 1 decision, paragraph 31 onwards.
[623] Illumina's submission on internal documents relied on in the Phase 1 decision, paragraph 31-32.
[624] Items 13 and 18 of Appendix C on internal documents ([✕]).
[625] Illumina's submission on internal documents relied on in the Phase 1 decision, paragraph 33.

*Customers 'lost' to PacBio*

8.166   Illumina submitted that it has not 'lost' customers to PacBio [✕].[626] [✕].[627]

8.167   [✕].[628]

8.168   [✕].[629]

8.169   In our view, the emails discussed in paragraph 8.137 above are clear evidence of current competition between the Parties. In one example, Illumina changed its offer to a customer ([✕]) in response to the threat of customer switching. Whether or not a customer actually made a switch is of less importance, as Illumina's response in order to prevent switching is still evidence of competition. In the second example, as described in the section above on nature of competition in paragraph 8.6, onwards, the fact that [✕] amended its project by changing 'use case' because of a quality issue with Illumina's system is also evidence of competition between the Parties, as it demonstrates that customers have a choice, and the quality of the offering is one of the factors which may impact their decision.

8.170   In addition, and as set out in more detail below, in relation to our assessment of PacBio's internal documents in paragraph 8.186, PacBio emails show that PacBio is trying to win sales directly from Illumina.

*Innovation*

8.171   With regard to the impact of the acquisition on innovation in the long read segment, Illumina submitted that not one document indicates or implies that [✕] Illumina's research programmes [✕] post-merger.[630]

8.172   [✕].[631]

8.173   Illumina provided further examples of internal documents which explicitly state that its existing research programmes will continue following the Proposed Merger.[632]

8.174   In our provisional view, the internal documents make clear that long read was an important future ambition for Illumina and that while [✕] post-merger,

---

[626] Illumina's Response to the working paper on internal documents, paragraph 67 onwards and Illumina Submission on internal documents relied on in the phase 1 decision, paragraph 36.
[627] Illumina's Response to the working paper on internal documents, paragraph 68-72.
[628] Illumina's Response to the working paper on internal documents, paragraph 78-84.
[629] Illumina's Response to the working paper on internal documents, paragraph 85-91.
[630] Illumina's Response to the working paper on internal documents, paragraph 93.
[631] Illumina's Response to the working paper on internal documents, paragraph 95.
[632] Illumina's Response to the working paper on internal documents, paragraph 97. See also paragraph 8.139 above in the section on Illumina's internal documents.

Illumina would not become an independent competitor to PacBio as the two technologies would be in the hands of the same company. Moreover, the direction of Illumina's research programmes [✂] may [✂] or be otherwise re-focused post-merger to take into account the PacBio technology and complement it, [✂]. Further, the Proposed Merger would preclude Illumina advances in long read technology increasing the level of competition in the long read sub-segment. Thus, while we agree that the evidence does not suggest that Illumina intends to [✂] Illumina's research programmes [✂] post-merger entirely, we are still concerned that the Proposed Merger will impact its development and the emergence of Illumina as a potential independent competitor [✂].

### PacBio's internal documents

8.175  PacBio's internal documents can broadly be divided into two categories: those which discuss complementarity of PacBio systems with Illumina's technologies, and those which indicate competition between the Parties.

8.176  Evidence of third parties (predominantly ONT) discussed in PacBio's internal documents is also outlined below.

*Complementarity in PacBio's internal documents*

8.177  Some of PacBio's internal documents discuss complementarity between long read and short read technologies, though others explicitly reject the idea that PacBio's technologies could be complementary with that of a short read technology such as Illumina's. The documents highlight the decreasing need for short read 'polishing' and other complementary short read uses when PacBio's NGS system is used as a strength of PacBio over other long read and linked long read providers such as ONT and 10x genomics:

   (a)  [✂];[633]

   (b)  [✂];[634]

   (c)  [✂];[635]

---

[633] Item 69 of Appendix C on internal documents ([✂]).
[634] Item 70 of Appendix C on internal documents ([✂]).
[635] Item 71 of Appendix C on internal documents ([✂]).

(d) [✂];⁶³⁶

(e) [✂];⁶³⁷

(f) [✂];⁶³⁸ and

(g) [✂].⁶³⁹

8.178  There is some mention of complementarity between long read and short read technologies in PacBio's internal documents:

(a) [✂];⁶⁴⁰

(b) [✂];⁶⁴¹

(c) [✂];⁶⁴² and

(d) [✂].⁶⁴³

*Competition in PacBio's internal documents*

8.179  The PacBio internal documents we reference below were produced by employees with a variety of functions including scientists, members of the sales teams and submissions to the board.

8.180  PacBio's internal documents seen by us focus almost exclusively on Illumina, ONT and 10x genomics as competitors. Some sales and marketing documents compare PacBio's technology with that of these competitors and include responses to potential customer objections to using PacBio versus those competitors' technology:

(a) [✂].⁶⁴⁴

(b) [✂].⁶⁴⁵

---

⁶³⁸ Item 72 of Appendix C on internal documents ([✂]). SNV refers to Single Nucleotide Polymorphism Variant. Phasing refers to identifying alleles on maternal and paternal chromosomes rather than the whole genome. Haplotypes are groups of alleles in an organism that are inherited together from a single parent.
⁶³⁷ Item 73 of Appendix C on internal documents ([✂]).
⁶³⁸ Item 74 of Appendix C on internal documents ([✂]
⁶³⁹ Item 74 of Appendix C on internal documents ([✂]).
⁶⁴⁰ Item 71 of Appendix C on internal documents ([✂]).
⁶⁴¹ Item 75 of Appendix C on internal documents ([✂]).
⁶⁴² Item 76 of Appendix C on internal documents ([✂]).
⁶⁴³ Item 77 of Appendix C on internal documents ([✂]). The Parties have not provided details on who this document was produced by or for.
⁶⁴⁴ Item 78 of Appendix C on internal documents ([✂]).
⁶⁴⁵ For example, Item 70 of Appendix C on internal documents ([✂]).

*(c)*  [✂].[646]

*(d)*  [✂].[647]

8.181  There are statements in PacBio's internal documents which show ONT is considered to be a significant threat to PacBio and is perhaps regarded by PacBio as its closest current competitor. The following statements illustrate this:

*(a)*  [✂];[648]

*(b)*  [✂];[649]

*(c)*  [✂];[650]

*(d)*  [✂];[651]

*(e)*  [✂];[652]

*(f)*   [✂];[653] and

*(g)*  [✂].[654]

8.182  However, whilst ONT appears the most often in PacBio's documents, there are statements in the internal documents concluding that PacBio should focus on Illumina:

*(a)*  [✂];[655]

*(b)*  [✂];[656]

*(c)*  [✂];[657] and

*(d)*  [✂].[658]

---

[646] Item 79 of Appendix C on internal documents ([✂]).
[647] Item 69 of Appendix C on internal documents ([✂]).
[648] Item 80 of Appendix C on internal documents ([✂]).
[649] Item 78 of Appendix C on internal documents ([✂]).
[650] Item 81 of Appendix C on internal documents ([✂]).
[651] Item 82 of Appendix C on internal documents ([✂]).
[652] Item 83 of Appendix C on internal documents ([✂]).
[653] Item 84 of Appendix C on internal documents ([✂]).
[654] Item 85 of Appendix C on internal documents ([✂]).
[655] Item 74 of Appendix C on internal documents ([✂]).
[656] Item 74 of Appendix C on internal documents ([✂]).
[657] Item 86 of Appendix C on internal documents ([✂]).
[658] Item 87 of Appendix C on internal documents ([✂]).

8.183  PacBio also regularly mentions 10x genomics (a linked long read provider) as a competitor. [✂].[659] Further, in addition to those documents referenced in paragraph 8.180 above, the following PacBio internal documents discuss 10x Genomics:

  (a)  [✂];[660] and

  (b)  [✂].[661]

8.184  PacBio's internal documents do not appear to reference Thermo Fisher or QIAGEN. Nor do they refer to potential competitors by name, with the one exception being [✂].

8.185  PacBio's internal documents also show that any competition with Illumina is increasing due to technical improvements with the PacBio technology including both the release of Sequel II and its CCS technology. Some PacBio documents appear to make plans for how these developments should be capitalised on by PacBio. The following statements are taken from documents discussing these technical improvements and how the market is developing as a result:

  (a)  [✂];[662]

  (b)  [✂];[663]

  (c)  [✂];[664]

  (d)  [✂];[665] and

  (e)  [✂].[666]

8.186  The statements set out below demonstrate that PacBio believes it can win business from Illumina and has been consistently trying to do so for some time. [✂]. We consider benchmarking such as this to be evidence of competition between the Parties.

  (a)  [✂].[667]

---

[659] Item 88 of Appendix C on internal documents ([✂]).
[660] Item 89 of Appendix C on internal documents ([✂]).
[661] Item 75 of Appendix C on internal documents ([✂]).
[662] Item 90 of Appendix C on internal documents ([✂]).
[663] Item 91 of Appendix C on internal documents ([✂]).
[664] Item 92 of Appendix C on internal documents ([✂]).
[665] Item 93 of Appendix C on internal documents ([✂]).
[666] Item 95 of Appendix C on internal documents ([✂]). Iso-seq refers to Isoform Sequencing.
[667] Item 98 of Appendix C on internal documents ([✂]).

(b)  [✂]668

(c)  [✂],669 [✂].670

(d)  [✂];671 and,

(e)  [✂].672

8.187  PacBio's internal documents show that customer surveys were conducted by either PacBio, its investors, or third parties. The surveys that we have seen all clearly focus on Illumina (among others) and the reasons why customers may choose Illumina over PacBio. Surveys submitted as part of PacBio's internal documents include the following:

(a)  [✂].673 [✂].

(b)  [✂].674

8.188  Without detail on the methodology of the surveys, it is difficult for us to ascribe weight to their results, however the focus of the surveys is still of interest as it provides evidence of the views of PacBio (or its investors) when commissioning the survey.

*Our assessment of PacBio's internal documents*

8.189  PacBio submitted that there is no head-to-head competition from Illumina and that ONT is PacBio's head-to-head competitor.675 PacBio submitted that the fact that Illumina appears in many PacBio documents and that PacBio compares its products to Illumina's is not indicative of competition, rather PacBio's internal documents emphasize that PacBio's technology is different from and in many case complements Illumina's technology. It also submitted that the PacBio sales team need to be educated on the differentiating and complementary characteristics of the systems so that PacBio's limited resources can be directed towards selling to the right customers.

8.190  PacBio submitted that while PacBio and Illumina may both be active in the same application space, they are used differently by customers and for

---

668 Item 99 of Appendix C on internal documents ([✂]).
669 [✂].
670 Item 100 of Appendix C on internal documents ([✂]).
671 Item 101 of Appendix C on internal documents ([✂]).
672 Item 102 of Appendix C on internal documents ([✂]).
673 Item 103 of Appendix C on internal documents ([✂]).
674 Item 104 of Appendix C on internal documents ([✂]).
675 PacBio's Response to the working paper on internal documents, paragraph 5 onwards.

different 'use cases'. They told us that while it was theoretically possible to use a long read technology for some short read applications, one wouldn't because of the difference in price / throughput.[676]

8.191  PacBio submitted that it has never focused on growing its business by targeting or attempting to win business from Illumina, and instead it focussed on creating demand by educating customers and raising awareness of the benefits of long read.[677]

8.192  It further submitted that its internal documents "*unambiguously*" show ONT as PacBio's closest competitor[678] and that ONT is a functional substitute for PacBio (unlike Illumina). PacBio told us that ONT [✂]. PacBio submitted that ONT is undoubtedly PacBio's closest competitor, that PacBio [✂] a weaker competitor to ONT, and that the Proposed Merger will therefore increase competition with ONT and make PacBio a more effective competitor.[679]

8.193  PacBio submitted that it sometimes uses the word "competitor" to refer to any other sequencing provider and industry player, even if their technology is not viewed as actually competing with PacBio in real terms and that scientists cannot be expected to properly use antitrust terms of art in a PowerPoint presentation.[680]

8.194  PacBio submitted that when it speaks of 'conversion', this generally refers to the migration towards using long read systems for long read 'use cases' that are new or were "*historically* [✂] *attempted using short read systems*".[681] PacBio submitted that this migration to / adoption of a more appropriate technology for the research question at issue "*simply cannot be characterised as competition or substitution*".[682] "*The development of native long read enabled that specific 'use case' which satisfied previously unmet customer demand*" and those customers would not switch back to short read systems for the relevant 'use case' in the event of a 5-10% price decrease of those systems.[683]

8.195  PacBio submitted that because of the controlled budgets and grants available to research institutions to invest in sequencing platforms year-on-year, references to "competition" can refer to the fact that all sequencing providers

---

[676] PacBio's submission on internal documents relied upon in the Phase 1 decision, page 2.
[677] Item 105 of Appendix C on internal documents ([✂]). PacBio's Response to the working paper on internal documents, paragraph 9-10.
[678] PacBio's response to the working paper on internal documents, paragraph 11.
[679] PacBio's response to the working paper on internal documents, paragraph, 14.
[680] For example, PacBio's Response to the working paper on internal documents, page 14.
[681] PacBio's Response to the working paper on internal documents, page 11.
[682] PacBio's Response to the working paper on internal documents, page 11.
[683] For example, PacBio's Response to the working paper on internal documents, page 11.

are looking for a share of that funding. Purchasing patterns can be explained by a variety of factors, including that customers funds are limited and customers may have simply opted for a proven short read platform at that particular time (given short read is the predominant technology in the sequencing industry in terms of use, versus long read which is used to answer the research questions that short read cannot address) and held off purchasing a PacBio long read platform given the publicly discussed performance issues with the Sequel I system.[684]

8.196  In our view, PacBio's internal documents, including those prepared by scientists, members of the sales team, and by senior managers for submission to the board, show head-to-head competition between the Parties. Whilst we agree that the documents suggest that Illumina may not currently be PacBio's closest competitor, in our view PacBio's internal documents show that Illumina is viewed as a strong competitor and that Illumina is, or at least PacBio's internal documents state that Illumina should be, PacBio's focus because of its size, rather than ONT.[685]

8.197  We have found evidence in the PacBio's internal documents, that currently there is competition between the Parties in the supply of NGS systems. We have also found evidence in the PacBio's internal documents that this competition is likely to increase in the future as the Parties make advances in R&D.[686]

8.198  As stated above in the context of Illumina's internal documents in paragraph 8.148 onwards, we do not accept the Parties' assertion that, when the terms 'competitor' and 'competition' are used in their internal documents, the authors did not intend them to have an 'antitrust' meaning. We consider the terms 'competitor' and 'competition' to be widely used and understood business terms and are not technical antitrust terms. Furthermore, the context in which the terms are used in the documents and the documents themselves indicate that they are used in the ordinary sense of the word. This is also the case for PacBio's internal documents.

8.199  Further, although PacBio told us the intent of its marketing documents was to educate its sales team on the differentiating and complementary characteristics of the systems, it has not provided any evidence corroborating that.

---

[684] For example, PacBio's Response to the working paper on internal documents, page 14.
[685] See paragraphs 8.180 and 8.182 above on PacBio's internal documents.
[686] See paragraph 8.185 above on PacBio's internal documents.

8.200  The Parties' submissions on 'migration' and 'competition for sequencing dollars' are discussed in more detail in our assessment of the evidence on customers and the nature of competition paragraph 8.6 onwards above.

8.201  Finally, PacBio also made a number of specific submissions relating to surveys and survey results amongst its internal documents, such as those described in paragraph 8.187 above:[687]

(a)  Certain surveys provided by PacBio to us were created by third parties (eg the [✂] survey was created by [✂]), and it is therefore inappropriate to attribute them to PacBio;

(b)  The [✂] survey shows a mixed and inconclusive picture and respondents were not necessarily aware of the technical capabilities of the Sequel II system at the time of the survey (June 2018) so any excitement regarding its release may have been hypothetical;

(c)  Survey respondents may be ill-informed about a particular product, technology or company;

(d)  The creator of the [✂] survey would have had an inherent bias regarding the survey results; and

(e)  The results of the [✂] survey have not come true – PacBio's consumables usage is down overall relative to its expectations.

8.202  In our view, the surveys and survey results provided are relevant to our competitive assessment. Without detail on the methodology of the surveys conducted, it is difficult for us to ascribe weight to their results, however the focus of the surveys is still of interest as it can provide evidence of the views of PacBio (or its investors) when commissioning the survey.

8.203  Further, PacBio's discussion of and reliance on surveys or reports prepared by third parties indicates to us that these have probative value. We note that the Customer Field survey which was not entirely conducted by third parties, also tended to show Illumina as a close competitor.

8.204  While we acknowledge that the [✂] survey does not show a unanimous picture from customers, it shows that for at least some customers, the Parties are currently viewed as competing and that the launch of the Sequel II instrument is likely to result in some customers switching workflow to a PacBio instrument. In our view customers are well-placed to give a view on

---

[687] PacBio's Response to the working paper on internal documents, page 21.

how their own purchasing might change with the release of certain instruments even if hypothetical at the time.

8.205  We acknowledge that the creator of the [✄] survey may have had an inherent bias to show the Sequel II instrument in a positive light, but, as stated above, we cannot comment further on the reliability of the survey without further detail regarding its methodology.

8.206  Further, we have evidence from customers that the response to Sequel II has been very positive [✄] (see paragraph 8.215, below). We consider that it is possible that the success of Sequel II [✄].

*Summary of internal documents regarding closeness of competition between the Parties*

8.207  We have found a substantial number of internal documents from Illumina that note that the Parties' technologies are used in a complementary fashion either for certain applications, or in the short term, before one of the two technologies is chosen. In contrast, we found only a small number of internal documents from PacBio that indicate – and often indirectly – that short read and long read technologies can be used in a complementary fashion.

8.208  We have seen from both Parties' internal documents that the Parties regularly track each other and adapt their strategies to reflect each other's developments. This demonstrates that they consider each other as an important competitive threat both on a day-to-day level and a strategic level.

(a)  A large number of Illumina's documents mention PacBio – either on its own or if acquired by a third party – as an important competitive threat to Illumina and show that the level of such threat is likely to increase in the future as its technology evolves.

(b)  Illumina's documents provide evidence that Illumina has taken action, or has considered taking action, in response to this competitive threat from PacBio.

(c)  Illumina's documents show Illumina believing it can win customers from PacBio.

(d)  Illumina's documents show Illumina's intention to develop its own long read sequencing system. Illumina [✄], and internal documents (as well as statements made at its Hearing with the CMA) indicate that Illumina has identified the supply of a long read technology as an important future ambition.

124

(e)   We have also seen a large number of PacBio documents in which PacBio views Illumina as a competitor at the present time, and whose closeness is likely to increase as its own technology progresses.

(f)   PacBio's documents regularly monitor Illumina (along with ONT, and to some extent 10x Genomics), with documents being prepared to educate sales teams on their key differentiating factors.

(g)   PacBio's documents shows PacBio believing it can win customers from Illumina, for example by price benchmarking against Illumina's systems.

(h)   Surveys commissioned by PacBio focus on Illumina (and others) and the reasons why customers may choose Illumina over PacBio, although we ascribe relatively less weight to these than to the Parties' other internal documents.

*Summary of internal documents regarding constraint from competitors*

8.209   The Parties' internal documents indicate that Illumina considers BGI, PacBio and ONT to be its main competitive threats (as is indicated by its use of a [✂] in internal documents), although none of these providers appear to be particularly close competitors. Of these three, Illumina is most focused on BGI on a worldwide basis, although BGI is not currently fully active in the UK. Thermo Fisher and QIAGEN do appear in Illumina's internal documents but appear to be focused on more niche areas of the market, rather than having broader appeal.

8.210   PacBio's internal documents are consistent with its main competitive threats being from ONT and Illumina, with ONT being the closest of these two to PacBio, though the documents show that efforts are being made to increasingly focus on Illumina.

8.211   Neither of the Parties have many internal documents which appear to closely track or monitor the development of new technologies by potential competitors not yet active in the market. Further discussion of potential competition can be found in chapter 9 on countervailing factors.

**Evidence from customers**

8.212   This section presents the evidence gathered from the Parties' customers and is structured as follows:

(a)   The evidence, which we present in the following topics:

(i)   Performance of Sequel II;

(ii) Competition between short read and long read;

(iii) The future role of long read;

(iv) Linked long read sequencing;

(v) Competitors; and

(vi) Views on the Proposed Merger.

(b) Our assessment of the evidence from customers, including the Parties' submissions on our analysis of customer evidence, and our view on these submissions; and

(c) Our summary in relation to this evidence.

8.213 We spoke to the Parties' customers about their views and experiences and sent out questionnaires. As set out above, we sent questionnaires to the Parties' customers, specifically Illumina's top 100 UK customers in terms of 2017/18 revenue and 100 PacBio customers, including all of PacBio's UK customers and all customers who had had access to the Sequel II, with the remainder made up by customers with the highest 2017/18 revenue. We received 39 responses to these questionnaires.[688]

8.214 We also held telephone calls with 22 of the Parties' customers,[689] to gain a better understanding of the market for NGS systems. These customers were from research institutes, academic institutions, pharmaceutical companies and government agencies, and use NGS systems for a number of different applications, including HLA typing, cancer panel sequencing, RNA sequencing, single cell transcriptomics and methylation sequencing.

*Performance of Sequel II*

8.215 All customers we spoke to who have had access to Sequel II said its performance has met or exceeded their expectations. Specific comments included:

(a) "*…it is effectively equivalent to operating 8 Sequel I machines in terms of throughput*";[690]

---

[688] Given the worldwide nature of the relevant market, we believe that the views of customers located both inside and outside the UK are relevant to assessing the future of competition in the UK post-merger.
[689] [✂].
[690] Note of call with [✂].

(b)  *"…[it] works surprisingly well"*;[691]

(c)  [✂].[692]

(d)  [✂].[693]; and

(e)  [✂].[694]

8.216  We asked customers to provide a list of the applications they use DNA sequencing instruments for, and indicate the supplier they use, as well as whether this would be sensitive to the availability of Sequel II. Responses to this question are summarised in the following chart (Figure 16).

**Figure 16: Proportion of applications for which both short and long read instruments are used, and the instrument(s) used is sensitive to the availability of Sequel II**



Source: CMA analysis of information received from customers.

Note: third parties did not provide fully consistent lists of applications.

8.217  As shown in Figure 16, both short and long read instruments are used for almost 15% of applications, and the instrument(s) used is sensitive to the availability of Sequel II for over a quarter of applications.

---

[691] Note of call with [✂].
[692] Note of call with [✂].
[693] Note of call with [✂].
[694] Note of call with [✂].

*Competition between short read and long read*

8.218  Some customers said that they only consider read length when purchasing instruments or deciding which instrument to use for a given project. Comments from these customers included:

(a)  "*…work is generally categorised by the type of sequencing equipment required i.e. short read (Illumina), long read (PacBio), extra-long read (ONT) or sanger sequencing ";*[695] and

(b)  "*When the project comes through, they can quite easily identify which platform would be most suitable".*[696]

8.219  However, roughly half of the customers we spoke to said that short read and long read are currently substitutable for at least some projects[697] (often with trade-offs, for example around cost or throughput). Some customers noted areas where long read sequencing has displaced short read sequencing in their work, for example:

(a)  "*Since the recent improvements to long read platforms, it is now feasible to do De Novo long read assemblies using just PacBio or ONT. Previously, this was cheaper to do using hybrid data generated using Illumina plus ONT/PacBio.* "[698,699]

(b)  [✂].[700]

(c)  "*There is some resequencing (where you have a reference genome but look at different individuals to see how they compare) which is now done on PacBio, whereas previously they would have used Illumina*."[701]

8.220  Furthermore, some customers said that, in some cases, there will be a trade-off between using short read and long read instruments on a given project. For example, if a customer is looking for an unknown structural variation, they may 'trade-off' the likelihood of picking this up against cost or throughput of an instrument. Specific comments included:

---

[695] Note of call with [✂].
[696] Note of call with [✂].
[697] For some customers this was for a very small portion of their workload however.
[698] Note of call with [✂].
[699] [✂] submitted that "*we are now leveraging long read platforms for some projects that would have previously been on short read*"
[700] Note of call with [✂].
[701] Note of call with [✂].

(a) *"Long reads are already used more as the technology improves. Therefore, some questions can now be answered using the optimum technology where they couldn't before. However, it was noted that short read may also go down in price which will again make this a more attractive option.*"[702]

(b) *"If you consider what variation can be detected in a sample using current technology, with Illumina you get good single read variations, good short indel data, whole genome copy number data and differential gene expression, all of these add up to about 85% of the genetic variation that can be detected. To detect the remaining 10-15% of the variation you need longer read technology but this costs almost twice as much as using Illumina. Therefore in many cases, questions are answered using a good tool but maybe not the optimal tool.*"[703]

8.221  Further comments from these customers included:

(a) *"…there are a lot of applications, particularly in the microbial space, which are done on Illumina but could equally be done on either ONT or PacBio, and possibly be done better on these platforms*";[704] and

(b) *"People are switching from Illumina to PacBio for the small / medium sized genomes*";[705] and

(c) [✂].[706]

8.222  Finally, customers in both of these groups said that short read and long read technologies are used in a complementary way in some cases. The [✂] told us:

(a) *"There are times when long and short read are used [in a] complementary [fashion], for example, with genome assembly*".[707]

(b) [✂] told us *"Occasionally they may use long and short read technology in a complementary way*".[708]

---

[702] Note of call with [✂].
[703] Note of call with [✂].
[704] Note of call with [✂].
[705] Note of call with [✂].
[706] Note of call with [✂].
[707] Note of call with [✂].
[708] Note of call with [✂].

*The future role of long read*

8.223  Almost all customers said that long read technologies will be more prevalent in the future. Some customers suggested this will be at the expense of short read technologies. Specific comments included:

(a)  "*…in a couple of years' time, long read technologies will become more mainstream and it will become quite useful for a lot of the projects*";[709][710]

(b)  "*Over time, it is expected that… improvements in accuracy from ONT and PacBio will make them direct competitors to Illumina and BGI*";[711]

(c)  "*There are certain applications where long read is expected to be increasingly used instead of short read such as for whole genome sequencing and RNA transcripts for splice variants*";[712] and

(d)  "*As it gets more affordable, it is thought that people will do more genome resequencing for variants analysis using long reads… At the moment, they advise that two samples are prepared, one PacBio library and then you would do the standard Illumina shotgun prep*".[713]

(e)  "*Arguments are being made that these [short read and long read] are two different technologies and so there is no possible concern over competition. In my view this is wrong - sequencing is sequencing. The benefits of long read sequencing over short read are becoming clear. As of now technologies exist which allow the generation of Tb of sequencing data per day on either short or long read platforms (NovaSeq vs PromethION). Recent announcements around the Sequel II platform suggest that it is gaining ever closer on these types of throughputs. This is the direction of travel for sequencing in the future.*"[714]

---

[709] Note of call with [✂].
[710] [✂] explained that "*It is unlikely a single technology will take over, but more a combination of technologies, often tailored to study objectives will prevail. At present, short read technologies have matured more and have more applications, but this may or may not be the case in the future as long read technologies become more established.*" They further submitted that "*assuming long read technologies mature and advance at the same pace as seen with short read technologies, it is inevitable that the number of applications for which they can be used will grow, making them useful and more applicable to increased numbers of projects i.e. as the input amount needed to make long reads drops to levels currently comparable to short read sequencing. It is essential to take into account however that long reads and short reads will potentially always have core areas or niches where the two will not overlap and have their own strengths. This is due to core parts of their chemistries i.e. the inclusion of amplification in short reads and the exclusion of amplification in long reads.*"
[711] Note of call with [✂].
[712] Note of call with [✂].
[713] Note of call with [✂].
[714] Email from [✂].

8.224  Some customers mentioned factors that could potentially limit the development of long read technologies. Specific comments included:

(a)  "…*there could be a number of variables that are challenging in the further development of long read technologies. This includes biochemical variables, e.g. the formulation of sequencing reagents and how they impact the kinetics of the polymerase enzyme which could both accelerate or limit the speed and hence read length or correct or create errors in the reads*".[715]

(b)  "…*the barrier to entry with the sample quality/amount needed is high which means that PacBio just isn't suitable for most applications*".[716]

*Linked long read sequencing*

8.225  A few customers said there are cases where they would use linked long read solutions, or plan to do so in the future. However, in general, customers said that a linked long read is of lower quality to native long read.[717] Furthermore, some customers said that a linked long read is not necessarily cheaper than native long read.[718]

*Competitors*

8.226  Customers often mentioned BGI as a competitor or potential competitor to Illumina, though many highlighted potential limitations to its growth, such as intellectual property disputes with Illumina. Specific comments included:

(a)  "*Price and quality considered similar to Illumina.*"[719]

(b)  "[✂] *has been actively engaging with BGI in assessing the efficacy, applicability and cost effectiveness of their technology platforms. One of the major hurdles to switching technology providers is the sunk cost infrastructure invested in Illumina platforms by [✂] over many years. There are also ongoing IP infringement issues which may be of concern*"[720]

---

[715] Note of call with [✂].
[716] Note of call with [✂].
[717] Customers said that read length is inferior with linked long read, and that linked long read does not resolve the repetitive parts of a genome as well as native long read in the context of *de novo* assembly.
[718] Note of call with [✂]; Note of call with [✂].
[719] Note of call with [✂].
[720] Note of call with [✂].

8.227  Customers also often mentioned ONT as a competitor to PacBio and made comments suggesting that the choice between PacBio and ONT is closely balanced. ONT was also occasionally mentioned as a potential competitor to Illumina. Specific comments included:

(a) "*Currently it seems that PacBio is better in terms of accuracy and throughput*".[721]

(b) "*…improvements in accuracy from ONT and PacBio will make them a direct competitor to Illumina and BGI.*"[722]

8.228  Thermo Fisher and QIAGEN were mentioned less frequently by customers as competitors to the Parties and were sometimes described as 'niche'. Specific comments included:

(a) "*Thermo Fisher is a niche technology, established for a small market.*"[723]

(b) "*Qiagen is clinically focused.*"[724]

*Views on the Proposed Merger*

8.229  Most customers said that they felt that PacBio's offering would improve under Illumina, either due to concerns about PacBio's current financial position, or due to Illumina's track record of acquiring and improving technology. Some customers said that ONT may find it more difficult to compete post-merger,[725] and some customers said that Illumina could 'slow down' or fail to develop PacBio's technology fully post-merger.

*Our assessment of the evidence from customers*

8.230  In this section we discuss the Parties' submissions on our analysis of customer views, along with our view on these submissions.

8.231  In relation to competition between short read and long read sequencing, the Parties submitted that approximately half of the customers, whose comments were quoted to the Parties in the CMA's Customer Calls Working Paper, explained that short read and native long read are not used for the same use

---

[721] Note of call with [✕].
[722] Note of call with [✕].
[723] Note of call with [✕].
[724] Note of call with [✕].
[725] We also received a written submission from a customer stating that: "*The proposed merger of PacBio with Illumina will reduce competition [in the sequencing market]*".

cases and applications[726] and that the ones who said that they use both systems for the same applications either:

(a) are migrating from short read to long read;[727] or

(b) use both short read and long read within a given application, but not within a given 'use case'.[728]

8.232  On the former point, the Parties submitted that:

(a) "*A limited number of customers have historically used Illumina's short read systems to perform native long read use cases for which short read systems are not suited*";[729] and

(b) "…*customers using short read systems for native long read use cases will transition such use cases to native long read systems in the short- to medium-term*".[730]

8.233  The Parties submitted that when customers explain that "*they 'trade-off' cost and output, for example, in order to discover SV [structural variation]*]", customers are using a long read system because they "*require long-read contiguity*", but are therefore forced to sacrifice lower cost/higher output.[731] The Parties also submitted that "*in order to discover SVs… [customers] have to purchase a native long read system that will provide long read length, but that this requires them to sacrifice output and incur higher costs (compared to short read systems)*".[732]

8.234  In relation to the future role of long read technology, the Parties submitted that growth in long read sequencing will not be at the expense of short read sequencing ("*only two customers expressed the view that native long read may be used instead of short read in the future*").[733] The Parties also submitted that "*Third party comments about the Parties' technologies... rest solely on information in the public domain*".[734]

8.235  In relation to customers' views on the Proposed Merger, the Parties submitted that:

---

[726] Parties' Response to the Customer calls working paper, paragraph 6.
[727] Parties' Response to the Customer calls working paper, paragraph 7.
[728] Parties' Response to the Customer calls working paper, paragraph 11.
[729] Parties' Response to the Annotated Issues Statement, paragraph 44.
[730] Parties' Response to the Customer calls working paper, paragraph 8.
[731] Parties' Response to Customer Calls Working Paper, paragraph 3.
[732] Parties' Response to the Customer Calls Working Paper, paragraph 3.
[733] Parties' Response to the Customer calls working paper, paragraph 21.
[734] Parties' Response to the Customer calls working paper, paragraph 23.

(a)   "…*almost all customers consider that Illumina will improve PacBio's technology and that the Transaction will lead to a better product offering*";[735] and

(b)   "…*several customers explained that the Transaction would lead to lower prices and would enable PacBio to better compete with ONT*".[736]

8.236   In our view, the Parties have inferred that customer evidence regarding using either a short read or long read sequencer was in relation to applications rather than 'use cases' though it is not clear that customers use the terminology of the Parties in relation to applications as against 'use cases'. In any event, as discussed in the section above on the nature of competition, we provisionally consider that competition takes place at all levels and not just the 'use case' level. In addition, based on evidence from customers, we have provisionally concluded that they make a choice to use different technologies for their projects, or across a number of projects, which are not necessarily relevant only at the 'use case' level.

8.237   As for competition between short read and long read sequencing, we provisionally found above[737] that, switching, which the Parties characterise as migration, represents competition even if the switching was to some extent inevitable eventually (which cannot be assumed). As discussed above in relation to the nature of competition, in the short term, firms will have an incentive to compete against each other to try to either reduce or increase the rate of switching, depending on their position in the market. In the longer term, firms will have an incentive to innovate, such that they can better compete for switching (or potentially switching) customers.

8.238   In addition, the customer evidence on the future of long read technology was not explicit that long read sequencing will displace short read sequencing, but there were indications that long read sequencing will increasingly encroach on short read sequencing:

(a)   "*In a couple of years, long read will become more mainstream and quite useful for a lot of projects*";[738] and

(b)   "*Over time, it is expected that… improvements in accuracy from ONT and PacBio… will make them direct competitors to Illumina and BGI.*"[739]

---

[735] Parties' Response to the Customer calls working paper, paragraph 29.
[736] Parties' Response to the Customer calls working paper, paragraph 29.
[737] See paragraph 8.43, above.
[738] Note of call with [✂].
[739] Note of call with [✂].

8.239  However, we accept that the customers' views on the future of long read and short read technologies is based on information in the public domain.

*Summary of evidence from customers*

8.240  We have provisionally found that customers typically purchase NGS sequencing instruments to use in a range of projects and some customers view short read and long read instruments as substitutable in some projects. We found that currently, customers see BGI as competing with Illumina to a limited extent, and ONT competing with PacBio. We found that Thermo Fisher and QIAGEN, although mentioned as competitors to the Parties, provide more limited constraints as they were mentioned less frequently than BGI or ONT.

8.241  Almost all customers said that long read technologies will be more prevalent in the future, and some customers made comments suggesting this will be at the expense of short read technologies.

**Evidence from competitors**

8.242  We sought evidence from the following competitors:

   *(a)* BGI;

   *(b)* ONT;

   *(c)* Thermo Fisher; and

   *(d)* QIAGEN.

8.243  We received senior management level internal documents and written submissions from the Parties' competitors, and have also spoken to the Parties' current competitors via telephone calls. In the following paragraphs we set out the evidence we received and in particular, examine:

   *(a)* Competitors' views on the competitive landscape; and

   *(b)*  Competitors' views on long read and short read technologies.

8.244  We also examine the evidence received from competitors on:

   *(a)* Competitors' expansion plans; and

   *(b)* Competitors' views on the Proposed Merger.

135

*Competitors' views on competitive landscape*

8.245  Competitors view Illumina as the clear market leader with significantly higher market shares than all other competitors combined. PacBio, ONT and BGI are seen as its main competitors while QIAGEN and Thermo Fisher are considered niche players.

8.246  [✂] listed – in order of importance – Illumina, [✂], Agilent, Roche and [✂] as its main competitors [✂].[740,741] [✂] stated that, to compete with Illumina's technology – which represents the standard in the market – competitors have to either offer a different technology or undercut Illumina and offer cheaper products.[742] [✂] also noted that new competitors are likely to enter the market in the future.

8.247  [✂] considers Illumina to be the market leader and PacBio to be Illumina's only effective competitor. [✂].[743]

8.248  [✂] considers Illumina, [✂], PacBio, [✂][744] to be its competitors in [✂], with [✂] being its closest.[745] [✂] also expects future entry of new competitors within the next three years but notes that the effect of this on competitive dynamics is unclear due to uncertainty about product acceptance and differentiation.[746]

8.249  [✂] considers Illumina as its top competitor and mentioned PacBio, [✂] as other relevant competitors.[747]

8.250  [✂] internal documents identify both PacBio and Illumina as strong competitors.[748] [✂] documents identify Illumina as a competitor, but rarely discuss PacBio.[749,750]

*Competitors' views on long read and short read technologies*

8.251  Competitors' submissions noted a number of applications in which long and short read may currently be used as complementary technologies:

---

[740] [✂] response to questions 2 and 3 of the Market Questionnaire dated 3 July 2019.
[741] We note that [✂].
[742] [✂] response to questions 2 and 3 of the Market Questionnaire dated 3 July 2019.
[743] [✂] response to question 3 of the Market Questionnaire dated 3 July 2019.
[744] These are companies that do not manufacture NGS systems but only offer DNA sequencing services on others' systems.
[745] [✂].
[746] [✂] response to question 3 of the Market Questionnaire dated 3 July 2019. See also, note of call [✂].
[747] [✂] response to question 3 of the Market Questionnaire dated 3 July 2019.
[748] See Appendix D on Competitors' internal documents.
[749] See Appendix D on Competitors' internal documents.
[750] We did not consider [✂] documents to be that informative for our assessment.

(a) [✂] submitted that long and short reads are today used as complements for a number of applications, including: the assessment of structural variation in human DNA, human or other agricultural or microbial *de novo* genome assembly, haplotyping of human genomes and HLA testing.[751]

(b) [✂] noted that historically, due to higher cost, long reads have been used in conjunction with short reads in *de novo* assembly and translational areas.[752]

(c) [✂]  stated that the customers who decided to purchase their DNA sequencers along with linked long read solutions, had an interest in specific applications, such as: *de novo* assembly, single variant and SNP/Indel.[753]

(d) [✂] stated that customers are today using long read and short read technologies in a complementary fashion for certain applications. [✂] noted that a combination of technologies may be used for the generation of a reference genome/*de novo* sequencing.[754]

(e) Internal documents from [✂] and [✂] show that the Proposed Merger may be beneficial for Illumina as it will complement its short read technology.[755]

8.252 On the other hand, competitors also submitted that there may currently be some overlap between long read and short read technologies. Moreover, the importance of long read sequencing and its substitutability with short read sequencing is likely to increase going forward. In particular:

(a) [✂] stated that from a technical perspective, long read and short read are substitutable for all applications. The, already substantial, overlap between long read sequencing and short read sequencing will increase across applications as the cost of long read sequencing continues to drop, with customers progressively switching (partly or fully) to long read sequencing. Moreover, [✂] submitted that such switching may be permanent once technologies address a particular need.[756]

---

[751] [✂] response to question 10 of the Market Questionnaire dated 3 July 2019.
[752] [✂] response to question 13 of the Market Questionnaire dated 3 July 2019.
[753] [✂] response to question 12 of the Market Questionnaire dated 3 July 2019.
[754] [✂].
[755] See Appendix D on Competitors' internal documents.
[756] [✂]. See also note of call with [✂].

*(b)* [✁] estimated that currently [✁]% of the market uses long reads but this will increase as cost per sample decreases and throughput capabilities of platforms increase rapidly. In addition, it stated that customers will increasingly consider the possibility of using long read solutions when considering whether to purchase a [✁] sequencing instrument.[757]

*(c)* [✁] stated that having long reads generated at similar cost, speed and accuracy to that of short read may reduce the need for access to short read technologies and may strongly influence customers' decisions.[758]

8.253  Furthermore:

*(a)* [✁] internal documents demonstrate that long read technologies may be increasingly important in the future;[759] and

*(b)* [✁].[760]

*Competitors' expansion plans*

8.254  [✁]:

*(a)* [✁].[761]

*(b)* [✁][762] [✁].[763]

*(c)* [✁].[764]

*Competitors' views on the Proposed Merger*

8.255  Competitors' submissions indicate that they view the Proposed Merger as potentially presenting competition issues as it is likely to lead to higher prices, reduce innovation and/or allow Illumina to hinder rivals through bundling or strategic use of IP. Specifically:

---

[757] [✁] response to question 10 of the Market Questionnaire dated 3 July 2019.
[758] [✁] response to question 13 of the Market Questionnaire dated 3 July 2019.
[759] See Appendix D on Competitors' internal documents.
[760] See Appendix D on Competitors' internal documents.
[761] See Appendix D on Competitors' internal documents. See also, [✁] response to the Market Questionnaire date 3 July 2019.
[762] [✁] stated that "[✁]See note of call with [✁].
[763] See [✁] response to questions 8,14 and 16 of the Market Questionnaire dated 3 July 2019.
[764] See Appendix D on Competitors' internal documents.

(a) [✂] considered that the Proposed Merger would lead to higher prices and a reduction in innovation. [✂].[765] See chapter 9 on countervailing factors, where bundling and the strategic use of patents is discussed.

(b) [✂] noted that it is neutral or agnostic regarding the Proposed Merger due to Illumina and PacBio focusing on different applications but stated that the market needs competition and that the Proposed Merger removes the only competitive threat in the area of long read sequencings at affordable costs (PacBio). Moreover, [✂] noted that the Proposed Merger may enhance Illumina's ability to effectively bundle short and long read technologies.[766]

(c) [✂] stated that the lack of competition following the Proposed Merger will lead to price increases, diminish innovation and lower quality of services in relation to NGS systems.[767]

(d) [✂] stated that the Proposed Merger would remove an emerging source of competition, allowing Illumina to strengthen its already formidable IP portfolio and further consolidate its position across NGS applications by leveraging its dominant position in the short read space into the long read space.[768]

8.256 On the other hand, some competitors stated that the Proposed Merger may allow Illumina to create a better product. In particular:

(a) [✂] submitted that the Proposed Merger might allow Illumina to create a more competitive product/offer thereby, in their view, hindering competitiveness of rivals.[769]

(b) [✂] submitted that with long read and short read platforms in the same organisation, you can tailor your solutions to those data types more comprehensively, making it more efficient for customers to use them in combination.[770]

(c) [✂] internal documents show that PacBio may get more traction with customers as a result of Illumina's existing resources and network.[771]

---

[765] See sections 2 and 3 [✂].
[766] [✂] response to question 14 of the Market Questionnaire dated 3 July 2019.
[767] [✂] response to question 13 of the Market Questionnaire dated 3 July 2019.
[768] [✂] response to the Market Questionnaire, dated 3 July 2019.
[769] [✂] response to question 14 of the Market Questionnaire dated 3 July 2019.
[770] Note of call with [✂], question 22.
[771] See Appendix D on Competitors' internal documents.

*Sales and sales forecasts*

8.257  We analysed the sales of Sequel II, and forecasts of future sales (for the Parties and third parties) in order to determine the degree of competition that will be lost as a result of the Proposed Merger, and the strength of competitive constraints that Illumina could be subject to in the future.

*Sales of Sequel II*

8.258  The sales performance of Sequel II since its launch is indicative of the current competitive constraint exerted by PacBio on its rivals, and in particular Illumina, and therefore the degree of competition that will be lost as a result of the Proposed Merger.

8.259  As noted in chapter 6 on the Counterfactual,[772] PacBio submits that the sales performance of Sequel II [✂]. In particular:

(a)  Sequel II logged [✂] bookings in the first two quarters of 2019, compared with [✂];[773]

(b)  [✂] Sequel II bookings were logged in the second quarter of 2019, compared with [✂];[774] and

(c)  Forecasts of Sequel II bookings for the third and fourth quarter of 2019 were [✂].[775]

8.260  We consider that a comparison between the number of 'early' bookings logged for Sequel I and Sequel II may not be indicative of [✂]. The sequencing market is dynamic, and has experienced significant changes since Sequel I was launched in late 2015. For example, as noted in chapter 2 on the Industry,[776] the cost in consumables of sequencing a human-sized genome using PacBio's technology decreased from $[✂] to $[✂] ([✂]) over 2015 to 2019. Additionally, PacBio has engaged in a public merger proposal which creates uncertainty for buyers

8.261  We disagree that the updated figures indicate that Sequel II [✂]. To the extent that initial sales of Sequel II have been [✂] (consistent with the discussion on Forecasts below) as an understanding of Sequel II's capabilities

---

[772] See paragraph 6.14 above on the counterfactual.
[773] [✂].
[774] [✂].
[775] [✂].
[776] See paragraph 2.22 of chapter 2 on the Industry above.

is disseminated throughout the market (as mentioned previously, customer feedback on Sequel II has been exclusively positive).[777]

*Sales forecasts*

8.262  The Parties' valuation model contains forecasts of the size of different market segments (applications and 'methods'),[778] as well as market shares within these. The model [✂][779], [✂] As such, it is informative to a limited extent.

8.263  We have used these forecasts to calculate forecasted sales for the Parties and third parties.[780] This is relevant to our assessment because it provides an indication of the strength of competitive constraints that Illumina expects to be subject to in the future. We have summarised the forecasted sales figures in the following charts.

**Figure 17: [✂]**

[✂]

**Figure 18: [✂]**

[✂]

8.264  As shown in [✂] and [✂] above:[781]

(a)  Illumina is forecast [✂]; and

(b)  [✂].

8.265  [✂].[782]

Figure 19: **[✂]**

[✂]

8.266  [✂].

---

[777] We also note that at least one equity analyst has stated that Sequel II's commercial performance has exceeded their expectations. https://www.genomeweb.com/sequencing/pacific-biosciences-stock-upgraded-piper-jaffray.
[778] See paragraph 2.11, of chapter 2 on the industry for a description of different sequencing methods.
[779] [✂].
[780] [✂].
[781] See Appendix F on the Valuation for further detail.
[782] [✂].

*Summary of sales and sales forecasts*

8.267  We consider that although [✂], it is still consistent with a degree of competition currently and that PacBio has a solid base from which to compete strongly in the future.[783] [✂]. We would expect Illumina to be concerned about losing this market share, and to therefore innovate such that it can compete with PacBio.

## Our assessment of the competitive effects of the Proposed Merger

8.268  In this section, we first provide a description of the weight we place on different pieces of evidence. We then consider the evidence set out in paragraphs 8.68 onwards above to provide our provisional assessment of the competitive effects of the Proposed Merger in regard to:

   *(a)*  the structure of the market;

   *(b)*  current competition between the Parties;

   *(c)*  future competition between the Parties;

   *(d)*  potential competition from Illumina in long read; and

   *(e)*  the constraint from other competitors.

8.269  Our investigation has collated and assessed a large volume of evidence on the impact of the Proposed Merger. To reach our provisional conclusions we have used our judgement to evaluate the weight we should place on different pieces of this evidence, in particular:

   *(a)*  We place the most weight on the Parties' internal documents which are particularly informative in this dynamic market because they provide context on how the market is developing and how competition takes (and will take) place, while many other forms of evidence provide a more static perspective. In addition, the Parties' internal documents provide us with their actual plans. We note that we have been able to gather a large number of these documents, we have a good understanding of the context in which they were produced, many shed light directly on issues central to our investigation and we are able to discern a clear and consistent picture from them.

   *(b)*  We place substantial weight on customer evidence. This is particularly in relation to technical questions that customers (as scientific researchers)

---

[783] Further, as noted in chapter 6 above on the Counterfactual, [✂].

are well placed to answer, such as on how they currently make purchasing decisions. However, we place limited weight on customers' overall views of the Proposed Merger as these reflect customers' perspectives on the immediate impact of the Proposed Merger – principally the improvements they consider will result in the short term from Illumina's ability to commercialise and fund the development of PacBio's technology. They take no, or limited account, of the broader impact of the Proposed Merger on competition, R&D and future entry, in a highly dynamic market over the short, medium and long term.

(c) We place substantial weight on competitor evidence in relation to their internal documents and expansion plans. In particular, we consider that competitors' internal documents provide evidence on the extent to which they consider the Parties as competitors and the constraint they perceive between different technologies, while their expansion plans provide evidence of how this might change in the future.

(d) With the exception of market shares, which we believe provide useful context in showing the current structure of the market in which the Proposed Merger is taking place, we place only limited weight on the quantitative evidence available, such as the econometric analysis and sales forecasts. In general, such evidence is less informative in the context of a merger in this dynamic market. In this case, even when some forecasts are available, we think their use is limited, given the methodology and very specific purpose they were created for.

### The structure of the market is highly concentrated

8.270 The evidence shows that Illumina is by far the largest supplier of NGS systems both worldwide and in the UK. Illumina's NGS systems are short read systems. Worldwide, Illumina has over 80% share of the NGS systems market. PacBio, one of the only two long read system suppliers, has [0-5]%, with the other long read system supplier ONT having [0-5]%. Thermo Fisher has approximately [10-20]% share worldwide, BGI has [0-5]% and QIAGEN has [0-5]%. In the UK Illumina has over 90% market share, PacBio has [0-5]%, ONT also has [0-5]% and Thermo Fisher has [0-5]%.

8.271 The evidence on market shares shows the market for NGS system is highly concentrated, both worldwide and in the UK, due to Illumina's very strong market presence. Around 10% of the market is currently in the hands of competitors other than Illumina and therefore PacBio's share represents a significant percentage [✂] of that remaining market share.

8.272  Given the strength of Illumina's market position, the removal of a competitor, even one with a currently limited market share like PacBio, is likely to have a significant impact on competition. We have therefore looked carefully at whether there are situations where the Parties are (or would likely become in the foreseeable future) substitutes, which is where any loss of competition would most clearly arise.

***Current competition between the Parties***

8.273  In our provisional view, long read and short read systems are complementary for certain uses, applications or projects. Where there is complementarity, the Parties are not directly competing at that moment in time for those projects, as they are not seen as alternative options. The extent to which the Proposed Merger would result in the complementarity benefiting customers is discussed in chapter 9 on countervailing factors.

8.274  However, being complements in certain situations does not preclude the Parties from being substitutes and rivals in other situations. While the available evidence presents a complex picture, it does show that the Parties place a significant and growing competitive constraint on each other.

8.275  The evidence from the Parties' internal documents shows that the Parties regularly track each other and adapt their strategies to reflect each other's developments. This shows that they consider each other as an important competitive threat both on a day-to-day level and a strategic level. This evidence is consistent across both Parties and across a wide range of internal documents produced by a number of senior authors over a period of time. These documents encompass strategy discussions, technology reviews, the preparation of support materials for sales executives, and commentary on specific competitive situations.

8.276  Illumina's internal documents discuss PacBio as a competitive threat over an extended period of time and across a range of authors and audiences. The documents also show that Illumina has reacted in response to this threat from PacBio. This action consists, in part, of R&D and M&A and also in competitive reactions such as reducing prices to customers and providing temporary sequencers.

8.277  PacBio's internal documents regularly monitor Illumina with documents being prepared to educate sales teams on the key differentiating factors between PacBio and Illumina systems, for example, [✂].[784]

---

[784] Item 79 and 70 of Appendix C on internal documents.

8.278  PacBio's internal documents, including emails between members of PacBio senior staff, show that PacBio believes it can win business from Illumina and has been consistently trying to do so for some time (with varied success). PacBio submissions acknowledge that Illumina is monitored and provides a benchmark for pricing due to its current status as an incumbent and a price leader.

8.279  In addition, the Parties' internal documents acknowledge that they compete for sequencing dollars. This competition manifests itself in each firm seeking to encourage greater uptake of uses which favour their technology; greater proportions of workflow on their systems to increase consumables sales; and education of customers as to the trade-offs required in choosing a sequencing solution.

8.280  Finally, PacBio seek to encourage more rapid switching from Illumina customers who are using instruments for tasks better suited to a long read system. Illumina's internal documents demonstrate they aim to postpone this switching by emphasising the strengths of their instruments.

8.281  Evidence from customers shows that while in some circumstances they may have a clear preference for which instrument to use for a particular project (eg a short read or a long read instrument),[785] in other circumstances there may be some degree of substitution between sequencers.[786]

8.282  This substitution comes about because, although for some projects the differences in the characteristics of the two technologies may be significant, each may offer its own advantages and disadvantages such that there is no clear best choice. In these instances, each customer will face a trade-off between these different features and may be willing to shift a proportion of their workflow between them if the relative balance of their pros and cons were to change.[787] For instance, the probability of success may be higher with one technology over another, but the differences in price make the overall choice closely matched. This trade-off is normal for markets with differentiated products and is not unusual or specific to genome sequencing.

---

[785] One example (noted by the Parties and customers) is counting. The Parties submitted in their Final Merger Notice (paragraph 74) that counting applications do not require long reads in order to verify the presence of a target. For instance, NIPT counts the number of foetal chromosome fragments circulating in a mother's bloodstream. These fragments are short, so 100-200 bp long sequencing reads are sufficient to characterise them. Short read flow cells currently used for NIPT are capable of generating hundreds of millions of reads per run. As a result, they can combine 48 to 96 individual patient samples per run on a single flow cell, enabling users to amortise the cost of the sequencing run across all of the samples.
[786] For example, examples were given in relation to structural variation, metagenomics and the microbial space. See paragraphs 8.218 and 8.219 above.
[787] See paragraphs 8.219 and 8.220 above.

145

8.283  Roughly half of the customers we spoke to noted that short read and long read are substitutable for at least some projects,[788] and some customers noted areas where long read sequencing had already displaced short read sequencing in their work.

8.284  In addition, as discussed in paragraph 8.34, many customers take into account the full range of different projects within their research portfolio when making purchase decisions. These customers may face a trade-off between the technology which is most applicable to the greatest number of projects and the extent to which a different sequencer can be used effectively for some projects, even if it is not the optimal choice

8.285  Finally competitors submitted that there are a number of applications in which long and short read may currently be used as complementary technologies but also agreed that there may currently be some overlap between long read and short read technologies.

*Conclusion on current competition between the Parties*

8.286  We provisionally conclude that the Parties are currently competing. They compete overall for the workflow across projects. On a more granular basis, they compete at different levels, from the wider purchasing decision in relation to one or several projects, to the utilisation of a technology for specific uses.

**Future competition between the Parties**

8.287  The evidence shows that this is a dynamic market and it will continue to evolve in the future.

8.288  The evidence from both Parties' internal documents, shows that the Parties are likely to compete more closely in the future because of recent [✂] improvements to PacBio's technology.

8.289  Illumina's internal documents show a consistent picture - that currently PacBio is a disruptive force in the market. There are internal documents which set out Illumina's predictions of how the market will evolve in the future. This is most clearly demonstrated by the [✂] for Illumina, and [✂] for PacBio.[789] According to Illumina's [✂][790] for example, PacBio (along with BGI and ONT) is likely to substantially impact Illumina's business in the future. These

---

[788] For some customers this was for a very small portion of their workload however.
[789] See items 13, 18, 34, 19, 37, 38, 70, 79 and 98 of Appendix C on internal documents.
[790] See item 19 of Appendix C on internal documents ([✂]).

documents were produced by a range of senior authors across the two businesses over time and we have viewed the Parties' documents as whole.

8.290 However, as the Parties suggest, there may be fundamental aspects of the technology such that differences in some of the factors that matter to customers (throughput and cost in particular) will remain or increase in the future.

8.291 In relation to PacBio's submission that there will be no cost convergence between the Parties' systems,[791] in our provisional view, PacBio does appear to compete with Illumina on price to some extent currently[792] and that this is likely to increase in future. In our view:

(a) While there may be a price gap between the Parties' technologies, as is shown in Illumina's internal documents,[793] the gap between the Parties' technologies has been narrowing, and there is evidence that PacBio benchmarks its price against Illumina currently;[794] and

(b) While the Parties submitted that there will continue to be a cost gap between the Parties, as Illumina will further reduce its own costs, it is not clear to us the extent, nature or timings of Illumina's cost reductions;[795] and

(c) Even if a gap persists, we consider it is likely to narrow further, which combined with other advantages offered by long read over short read for certain uses, applications or projects, enhances competition between the systems as price is only one attribute that is considered by customers when purchasing a system (See Nature of Competition above).

8.292 In relation to technological convergence, in our view:

(a) While some elements of technology may be outside of PacBio's control (eg data processing and CMOS), historically this has not constrained PacBio development and PacBio has provided no evidence to show why further incremental technological developments in this area will now necessarily be limited at this point in time; and

---

[791] See paragraph 8.84 above.
[792] See paragraphs 8.135(f) and 8.186.
[793] Items 13 and 22 of Appendix C ([✂]).
[794] See paragraph 8.186 above.
[795] See paragraphs 8.78 and 8.79.

(b) [✂]796 [✂]. This seems in our view to indicate that any technological limitations will not impact PacBio's trajectory for at least the next few years ([✂]).

8.293 Both the Parties and some customers told us that PacBio has made bold claims in the past and has often failed to meet their performance targets. [✂], all customers told us that the Sequel II instrument met or exceeded their expectations.

8.294 In addition, if, as suggested by the Parties, customers will 'migrate' in the short to medium term for some 'use cases' due to an improvement of PacBio's technology, this would suggest a relative improvement of PacBio compared to Illumina.

8.295 The view that Illumina and PacBio would compete more closely in future was largely corroborated by evidence from customers and competitors. Almost all customers said that long read technologies will be more prevalent in the future, and some customers made comments stating that this is likely to be at the expense of short read technologies, while all competitors noted that the importance of long read sequencing and its substitutability with short read sequencing is likely to increase going forward.

8.296 As we concluded in paragraph 8.297, evidence from a significant number of the Parties' internal documents as well as evidence from customers demonstrates that some customers have already moved and some would consider moving workflow from short read to long read technologies.797 Indeed, even with the Parties appearing to differ in relation to cost and throughput, the Parties' internal documents show that there is current competition for some customers and some applications and projects.798 In our provisional view, the gap between long read and short read technologies would not have to disappear entirely, and would only need to close to some extent, for the Parties to compete even more significantly in relation to a number of existing and new applications and projects.

*Conclusion on future competition between the Parties*

8.297 We provisionally conclude that the Parties,799 customers and competitors all forecast an increase in competition between Illumina and PacBio in the future, through a partial convergence of their technologies, such that they compete

---

796 Figure on page 10 of the Parties' Response to Phase 1 Decision.
797 See paragraphs 8.129-8.211 on internal documents and paragraphs 8.212 and 8.241 on evidence from customers.
798 See paragraph 8.208 above.
799 In their internal documents (see paragraph 8.208 above).

for more workflow for current uses/application and projects, as well as for new uses/applications and projects (including further 'migration').

8.298  We acknowledge that there is some uncertainty regarding the timing and level of convergence. However, the evidence demonstrates that the Parties will compete more closely in the future. We do not believe it likely that long read will completely displace short read technology, but we believe on balance, there will be sufficient convergence, and threat of convergence, such that the loss of future competition will be significant.

8.299  Overall, we therefore provisionally conclude that it is likely the Parties would compete closely in the future.

### Potential competition from Illumina in long read

8.300  The evidence shows that Illumina has recognised the benefit of long read technology and stated that the rationale for the Proposed Merger is "*driven by Illumina's desire to supply native long read systems (in addition to its short read systems)*".[800]

8.301  Illumina submitted that it '*has long wanted to participate in the native long read market… and has long recognised that it could benefit from being able to offer a native long read system because it believes that the native long read market has meaningful growth potential.*'[801]

8.302  During the Hearing with the CMA, Illumina stated, with respect to its desire to enter the long read segment that "*It goes back to the graph that we showed you. There is the orange piece* [short read] *of it we participate in. There is an emerging and growing blue piece* [long read] *of it that we do not participate in. We want to participate in that. To participate in it, we actually need to have the right technologies because one cannot play in the other. That is simply a statement of that; that we want to be able to participate in it and, therefore, we need the technology*".[802]

8.303  Illumina submitted that its desire to enter long read was also to drive demand for short read sequencing used in complementary use cases: "*Broader use of PacBio's native long read systems will accelerate the rate at which accurate and comprehensive reference genomes are created, which will expand the*

---

[800] Parties' Response to the Annotated Issues Statement, paragraph 2.
[801] Illumina Summary Statement, Page 1 and 4.
[802] Illumina's Hearing Transcript, page 7, lines 4-9.

*number of short read resequencing projects using this expanded catalogue of high quality reference genomes.*"[803]

8.304   Illumina further stated that in the absence of the Proposed Merger, they would continue their attempts to enter the long read segment: "*we would keep trying. With the acquisition of PacBio, we are still going to have our own internal development [✂], because again PacBio cannot solve all of the long read use cases. There is a lot of work to do there. So no, Illumina would not give up on that, but Illumina would see this as a missed opportunity*".[804]

8.305   In addition to these statements, there is evidence that [✂].

8.306   While there is uncertainty around when and if Illumina would have launched a commercial long read system absent the Proposed Merger,[805] given the high barriers to entry discussed further in chapter 9 on countervailing factors,[806] our provisional view is that Illumina is well placed, with respect to other firms, given its resources, the extent of their customer relationships,[807] well-established distribution networks,[808] and history of commercialisation[809] to develop and launch such a system.

*Conclusion on potential competition from Illumina in long read*

8.307   We provisionally conclude Illumina had clear incentives [✂] to enter the long read segment and, absent the Proposed Merger, there is evidence that Illumina would be a potential competitor in the long read technology sub-segment of the market. Even the threat of entry by a competitor with the strength of Illumina would be likely to spur competition in the remaining competitors in the long read sub-segment.

**Constraint from other competitors**

8.308   We assessed whether the alternative suppliers, ONT, BGI, Thermo Fisher, and QIAGEN would provide sufficient competitive constraint on the Merged Entity.[810]

---

[803] Parties' Response to the Annotated Issues Statement, paragraph 4.
[804] Illumina's Hearing Transcript, page 7, lines 15-21.
[805] See paragraph 8.172 of this chapter above.
[806] See paragraphs 9.2 onwards in Chapter 9 on Countervailing Factors.
[807] As evidenced by their high market shares. See section on market shares at paragraph 8.117 of this chapter above.
[808] See the section on efficiencies at paragraph 9.90, onwards in chapter 9 on Countervailing Factors.
[809] See paragraph 2.26 in Chapter 2 on the Industry.
[810] For third parties in particular we have considered: (i) competitors' internal documents and submission and (ii) customer views.

*ONT*

8.309  ONT entered the market for sequencing technologies in 2014/15 with a nanopore sequencing system and currently commercialises a number of devices that can read long (or short) fragments of DNA/RNA. As set out in paragraph 8.120, ONT's share of the NGS systems market in 2018 was approximately equal to [0-5]% on a worldwide basis and [0-5]% in the UK.

8.310  As mentioned in paragraph 8.142 and 8.181, the Parties' internal documents show that ONT is closely monitored as one of the strongest competitors to both Illumina and PacBio. In particular, evidence from PacBio's internal documents show that ONT is considered to be a significant threat to PacBio and its closest current competitor.

8.311  This view is largely supported by customers who often mentioned ONT as the closest alternative to PacBio and occasionally considered it as a competitor to Illumina.[811]

8.312  Consistent with the above, [✂].[812]

8.313  We recognise that ONT places some constraint on the Merged Entity and will continue to do so going forward. However, we do not believe that the presence of ONT will be sufficient to replace the loss of the competitive constraint currently provided by PacBio, given the size of the Merged Entity, the lack of remaining competitors and the closeness of competition (now and in the future) between the Parties.

*BGI*

8.314  BGI first commercialised a short read system in 2015, after acquiring Complete Genomics in 2013. BGI provides a variety of short read sequencing systems for medical institutions, research institutions and other public and private partners. Moreover, as set out in paragraph 8.120, BGI's share of the NGS systems market in 2018 was approximately equal to [0-5]% on a worldwide basis and null in the UK.

8.315  As mentioned in paragraph 8.141, BGI are most heavily monitored as a competitor by Illumina, with a number of BGI-specific tracking documents having been prepared.

---

[811] See paragraph 8.227.
[812] See [✂].

8.316  Customers often mentioned BGI as a competitor or potential competitor to Illumina, though many highlighted potential limitations to its growth, such as IP disputes with Illumina.[813]

8.317  In its submissions to us, [✂][814]. [✂].[815] [✂].[816]

8.318  We therefore consider the future constraint posed by BGI to be relatively modest in the UK.

*Thermo Fisher*

8.319  Thermo Fisher entered the NGS systems market in 2014 with its acquisition of Life Technologies which marketed and sold the SOLiD and Ion Torrent short read sequencing systems (Thermo Fisher no longer actively markets the SOLiD system). The Ion Torrent system is based on SBS technology and comprises of low-to-medium throughput benchtop sequencers that are widely used for clinical and translational purposes. As set out in paragraph 8.120, Thermo Fisher's share of the NGS systems market in 2018 was approximately equal to [10-20]% on a worldwide basis and [0-5]% in the UK.

8.320  As mentioned in paragraph 8.143 Thermo Fisher is monitored – albeit to a more limited extent than other providers – by Illumina and does not seem to appear in PacBio's documentary evidence.

8.321  Consistent with the above, Thermo Fisher was mentioned much less frequently by customers as a competitor to the Parties and was sometimes described as 'niche'.[817]

8.322  Evidence from [✂],[818] [✂][819]

8.323  We therefore believe the constraint posed by Thermo Fisher to be focused on particular niches.

*QIAGEN*

8.324  QIAGEN acquired Intelligent BioSystems in 2012, which had released its first system, a short read sequencer called the MAX-Seq, in 2011 and was working on a benchtop sequencer. In November 2015, QIAGEN

---

[813] See paragraph 8.226.
[814] See [✂].
[815] [✂].
[816] http://en.mgitech.cn/article/detail/mgiannouncesmiles.html; [✂].
[817] See paragraph 8.228.
[818] [✂].
[819] [✂].

commercialised its first system (the GeneReader). In addition to the sequencing system, QIAGEN also supplies universal library preparation kits, assays and bioinformatics software which can be used with any NGS systems, including Illumina's. As set out in paragraph 8.120, in 2018 QIAGEN had approximately [0-5]% share of the NGS systems market on a worldwide basis and [0-5]% in the UK.

8.325   As set out in paragraph 8.143, QIAGEN is monitored – albeit to a more limited extent than other providers – by Illumina and does not seem to appear in PacBio's internal documents. Moreover, customers mentioned QIAGEN as competitor to the Parties much less frequently then other providers and sometimes described it as 'niche'.[820]

8.326   Based on its internal documents and submissions to us, [✂]821 [✂].822 [✂], QIAGEN announced on 7 October 2019 a joint venture partnership with Illumina to deliver sequencing-based in-vitro diagnostic (IVD) tests[823] and as part of its preliminary Q3 2019 results announced its decision to "*suspend ongoing NGS-related instrument development activities*".[824]

8.327   We therefore believe the constraint posed by QIAGEN to be very limited, and only in particular niches.

*Provisional conclusion on constraint by competitors*

8.328   Based on the evidence examined, we provisionally consider that the level of competitive constraint exercised by the Parties' competitors, ie ONT, BGI, Thermo Fisher and QIAGEN is currently fairly limited or focused on particular niches, and is not expected to increase significantly in the foreseeable future such that these rivals are not likely to sufficiently constrain the Merged Entity.

## Provisional conclusion

8.329   The market for NGS systems is highly concentrated. Illumina possesses a substantial degree of market power with approximately 80% of the worldwide NGS systems market and 90% share in the UK. Given the strength of Illumina's market position, the removal of a competitor, even one with currently limited market share like PacBio, would result in a significant

---

820 See paragraph 8.228.
821 See [✂].
822 See [✂].
823 https://corporate.qiagen.com/newsroom/press-releases/2019/20191007_QIAGEN_Illumina_NGS_Collaboration
824 https://corporate.qiagen.com/newsroom/press-releases/2019/20191007_Q3_preliminary_sales_and_restructuring_charges

reduction of competition. We have therefore looked carefully at whether there are situations where the Parties are close competitors and/or would become closer in the foreseeable future, which is where any loss of competition would most clearly arise.

8.330   The evidence shows that there are many uses for each of the Parties' instruments and the extent of competition between them will vary due to the differences in the technologies employed. In a significant portion of the current market, the Parties are likely to be seen as complements rather than competitors and direct competition between them would be less likely. However, there is significant evidence of direct competition between the Parties in some situations at present. There is also clear evidence that this market is dynamic and that the competitive overlap and closeness of competition between the Parties is likely to increase in the future as R&D is devoted to improving each Party's technology to address a wider range of uses, applications and/or projects.

8.331   We have therefore provisionally found that currently the Parties are competing for the supply of NGS systems in relation to certain purchasing decisions, uses, applications and/or projects. We have also seen consistent evidence that demonstrates that long read technologies are improving and that Illumina as well as PacBio and ONT see long read sequencing as a critical and growing part of NGS systems in the future. Evidence from Illumina's internal documents, its submissions and current development plans show that Illumina also considers long read sequencing as a critical and growing part of NGS systems in the future and is currently [✄].

8.332   Recent developments of the PacBio system (including the launch of Sequel II) have resulted in customers being increasingly able and willing to move a portion of their workflow and budgets from Illumina's to PacBio's technology, and the evidence suggests that this places important competitive pressure on Illumina. Currently the Parties compete for sales in relation to some types of projects and to overall purchasing decisions. It is likely that this competition will intensify in the future and there is strong evidence from the Parties' internal documents that the Parties also consider this to be true.

8.333   We have provisionally found that innovation is a key aspect of competition in this market and that the Parties perceive each other as important strategic rivals. Their common desire to be the preferred sequencer for as many projects and as large a share of aggregate spend as possible is substantially driving their current innovation efforts and has been a key factor driving their innovation efforts over a number of years. The evidence shows that currently PacBio's improvements to its technology incentivise Illumina to improve, and as the Parties' sequencing systems increasingly overlap in the future, absent

154

the Proposed Merger, this race for innovation is expected to intensify. In our provisional view, the Proposed Merger will eliminate the threat of PacBio on Illumina (and vice versa) which is a factor that currently drives R&D and innovation.

8.334   Our provisional view is that the Proposed Merger is likely to result in a shift in the direction of the Parties' R&D away from research they would have done, and products they would have launched. For example, given the importance Illumina attaches to having a presence in long read sequencing and its current development plans, we think it likely that absent the Proposed Merger Illumina would be researching long read technologies with a view in future to launch its own long read system. The Proposed Merger therefore reduces the potential future number of options for customers and projects that require a long read technology. Similarly, absent the Proposed Merger, PacBio would be likely to invest in research where it would compete with Illumina's instruments, but should the Proposed Merger proceed it will instead be incentivised to focus its R&D towards uses where its systems will be complementary to those of Illumina.

8.335   The Parties' internal documents show that Illumina considers BGI, PacBio and ONT to be its main competitive threats. Of these three, Illumina is most focused on BGI on a worldwide basis, although BGI is not currently fully active in the UK and may not gain any substantial market traction within the UK in the foreseeable future. Illumina also monitors ONT, though some documents note limitations to the accuracy of its technology.[825] PacBio's focus is primarily on ONT and Illumina as the main competitive threats, with ONT being the closest of these two.

8.336   While the Parties face competition from other providers of NGS systems (ONT, BGI, Thermo Fisher and QIAGEN), these rivals are not likely to sufficiently constrain the Merged Entity. They have not made gains in market penetration in comparison to Illumina (and the evidence leads us to believe that this will not change in the foreseeable future). The competitive threat posed by ONT and BGI are discussed above. The remaining two competitors identified, Thermo Fisher and QIAGEN, focus only in a clinical niche, rather than in overall genome sequencing. Moreover, it is unclear whether QIAGEN will remain an independent competitor, following its announcement on 7 October 2019 that it will enter into a collaboration with Illumina.

8.337   Evidence on closeness of competition between the Parties (current and future), as well as the Parties' high combined market share demonstrates that

---

[825] See paragraph 8.142 above.

there would be a substantial loss of competition brought about by the Proposed Merger. Further, evidence on current and likely future strength of the remaining competitors in the market demonstrates that the Proposed Merger would result in the combination of two of only a small number of options in this highly concentrated market. In our provisional view, the Proposed Merger may be expected to result in an SLC in the market for the provision of NGS systems in the UK, absent countervailing factors which are discussed in chapter 9 below.

## Overall provisional finding

8.338  We have provisionally concluded that the Proposed Merger may be expected to result in a substantial lessening of competition in the market for the supply of NGS systems in the UK, absent any countervailing factors, which are discussed below.

# 9.  Countervailing factors

9.1  The Merger Assessment Guidelines (MAGs) indicate that, in considering whether a merger may be expected to result in an SLC, the CMA will consider factors that may mitigate the initial effect of a merger on competition (often known as countervailing factors), which in some cases may mean that there is no SLC. These factors include:

(a) the responses of others in the market (rivals, customers, potential new entrants) to the merger, for instance the entry into the relevant market of new providers or expansion by existing providers;

(b) the ability of customers to exercise buyer power; and

(c) the effect of any rivalry-enhancing efficiencies arising as a result of the merger.[826]

---

[826] Merger Assessment Guidelines (CC 2 Revised).

## Barriers to entry and expansion

### *Introduction*

9.2     Our guidelines state that, as part of the assessment of the effect of a merger on competition, we look at whether entry by new firms or expansion by existing firms may mitigate or prevent an SLC.[827]

9.3     The guidelines state that:[828]

> *"In assessing whether entry or expansion might prevent an SLC, the Authorities will consider whether such entry or expansion would be:*
>
> > *(a)    timely;*
> >
> > *(b)    likely; and*
> >
> > *(c)    sufficient.*
>
> *Potential (or actual) competitors may encounter barriers which adversely affect the timeliness, likelihood and sufficiency of their ability to enter (or expand in) the market. Barriers to entry are thus specific features of the market that give incumbent firms advantages over potential competitors. Where entry barriers are low, the merged firm is more likely to be constrained by entry; conversely, this is less likely where barriers are high. The strength of any given set of barriers to entry or expansion will to some extent depend on conditions in the market, such as a growing level of demand."*

9.4     In this section, we assess the extent to which we consider barriers to entry and expansion exist within the NGS systems market and the implications this might have for any competition issues we identify.

### *Views of the Parties*

9.5     The Parties submitted that there are no significant barriers to entry or expansion in NGS systems (either short read or long read), stating that a

---

[827] MAGs, paragraph 5.8.1
[828] MAGs, paragraphs 5.8.3 – 5.8.4.

number of companies had entered in recent years, and several others are expected to enter in the short term.[829]

9.6    Illumina estimated that it takes between [✂] and on average over eight years to invent, research, develop and commercialise a new sequencing technology and another [✂] years to achieve scaled commercialisation. However, Illumina told us the exact time depends on many variables including company's available financial and human resources and ability to innovate.[830]

**Figure 20: Parties estimated development time[831]**



Source: Parties' Final Merger Notice, paragraphs 361.

9.7    Illumina submitted that it estimated that the invention, research, development and commercialisation of a new sequencing technology would cost a new entrant hundreds of millions of dollars, although these costs would be lower for an existing participant. Illumina estimated that ONT had raised around [✂] when it introduced its first product into open access and PacBio had raised around [✂] by the time it completed its IPO (which was prior to its first customer shipment). Illumina also provided estimates of the fund raising of a number of additional firms which had not yet brought their products to market; these ranged from the [✂] to more than [✂].[832]

9.8    The Parties submitted that the increasing growth in sequencing, driven by technological improvements opening up new applications, has attracted significant investment from a range of companies and that the expected continuation of this growth will maintain these incentives to invest in the future.[833] Therefore, while there are costs to enter associated with development, the potential prize is very significant, and this is reflected in the

---

[829] Parties' Final Merger Notice, paragraph 360.
[830] Parties' Final Merger Notice, paragraph 361.
[831] Time represents the length of time between start of development and first customer shipment.
[832] Parties' Final Merger Notice, paragraphs 362-363.
[833] Parties' Final Merger Notice, paragraphs 373-374.

increasing number of companies purporting to be working on novel sequencing technologies.[834]

9.9     The Parties submitted that when assessing the potential competitive threat posed by new entrants and adjusting their behaviour accordingly, they did not have access to confidential information and so were reliant on publicly available information.[835]

9.10    The Parties also submitted that they believe that the cost of switching is not significant as there are no specific requirements for customised facilities, similar preparation protocols are used for all and data storage solutions are agnostic to the specific instrument. They believe that the primary cost of switching would be the cost of the new sequencing instruments themselves.[836]

### Views of third parties

9.11    Customers and competitors have told us that the barriers to both entry and expansion in NGS systems are very high. We have incorporated these views and any supporting evidence provided, into our assessment section below.

9.12    We asked competitors and potential competitors to provide estimates for how much they have spent on bringing their technologies to market. A number of these estimates [✂]. For example, [✂],[837] [✂].[838]

### Our assessment of barriers to entry and expansion

9.13    Although the Parties stated that they considered there are no significant barriers to entry or expansion,[839] they acknowledged the existence of certain factors which we consider do represent barriers to entry and/or expansion. In particular:[840]

   (a)  the development time and associated costs of developing a new sequencing technology;

   (b)  customers' capital costs of acquiring new instruments (reducing propensity to switch); and

---

[834] Illumina's Hearing with the CMA, page 64.
[835] Parties' Response to the Annotated Issues Statement, paragraphs 167-168.
[836] Parties' Final Merger Notice, paragraphs 368-371.
[837] [✂].
[838] [✂].
[839] Parties' Final Merger Notice, paragraph 360.
[840] Parties' Final Merger Notice, paragraphs 362-363.

(c) the need for any new sequencing technology to offer enough value to warrant customers switching.[841]

*Technological barriers to development*

9.14 The development on NGS systems is a complex endeavour which requires combining skills across a wide range of disciplines such as nanofabrication, physics, photonics, optics, molecular biology, engineering, signal processing, high performance computing, and bioinformatics.[842] Further, the development may need to design around existing patents (see paragraphs 9.21 to 9.31 below), making subsequent developments more challenging. And finally, the technology developed needs to offer a differentiating quality as compared to extant firms.[843]

9.15 The Parties have submitted that the development of a new sequencing technology is a lengthy endeavour (giving examples usually taking around eight years) and costing hundreds of millions of pounds of investment, with no certainty about generating a return on investment. There are numerous instances in the past of potential entrants which were not able to successfully develop and commercialise their NGS system technologies:

(a) Illumina's overview of the competitor landscape [✂].[844]

(b) Numerous other companies have previously attempted to develop and commercialise NGS system technologies but have since either ceased development or exited following an attempted launch. This includes:[845]

(i) 454 (acquired by Roche and subsequently closed);

(ii) Affymetrix (never released a commercial product);

(iii) Genizon Biosciences (never released a commercial product);

(iv) GnuBIO (acquired by Bio-Rad in 2014 and effectively closed when Bio-Rad's Cambridge facility was closed);

(v) Halcyon Molecular (never released a commercial product);

(vi) Manteia (closed, and their technology sold to Solexa);

---

[841] Illumina's Hearing with the CMA, pages 67-68; PacBio's Hearing with the CMA, pages 51-52.
[842] PacBio 2018 Annual report, page 10.
[843] Illumina's Hearing with the CMA, pages 67-68; PacBio's Hearing with the CMA, pages 51-52.
[844] [✂].
[845] https://allseq.com/kb-category/ngs-necropolis/

160

(vii)   Sequenom (never released a commercial product, with technology returning to Harvard University);

(viii)  VisiGen (acquired by Life Technologies, and method deprioritised compared with Ion Torrent approach); and,

(ix)    Xagros Genomics (exited, with technology returning to Stanford University).

(c)   *Despite having an existing clinical business with associated expertise and having invested the necessary resources to develop an NGS system and bring it to market, QIAGEN recently announced a decision to suspend its ongoing NGS-related instrument development activities.[846]*

9.16   The very high costs of development described by both the Parties and third parties, the associated long timelines, the need to respect existing patents, and the intrinsic uncertainty of developing new technologies combine to result in substantial risk for any new entrant which would be likely to deter entry as well as reducing the likelihood of any individual entrant succeeding in producing a viable business. We also consider this combination would likely result in difficulty for any new entrant to access the necessary funds either through external investors or from internal investment committees of existing companies.

9.17   PacBio told us [✂].[847] [✂].[848]

9.18   Having developed a new technology, the new entrant would also likely need to obtain patent protection in each of the relevant geographies to increase the likelihood that it will be able to generate a return on the original investment. This can be a costly, time-consuming and uncertain process (particularly if the application is opposed) which adds to the original development costs and timings.

9.19   In certain applications, such as clinical / diagnostics, the Parties also noted that, even with a well-developed and commercialised technology [✂], it can be difficult to adapt instruments and processes to achieve regulatory approval for clinical use.[849] We note that where potential competitors already have

---

[846] https://corporate.qiagen.com/newsroom/press-releases/2019/20191007_Q3_preliminary_sales_and_restructuring_charges
[847] PacBio's Hearing with the CMA, page 51
[848] PacBio's Hearing with the CMA, pages 50-51.
[849] Parties' Final Merger Notice, paragraph 438.

existing operations in clinical / diagnostic sectors, this barrier may be lower due to the company's existing experience and expertise in developing clinical solutions.

9.20    Because of the long timelines and costs[850] and high risk of failure associated with entry, in order to be considered to have sufficient likelihood of acting as a competitive constraint in the future (and for this to be considered timely),[851] a company would need to be close to commercialising their technology, or at the very least, planning to launch within two to three years. Even then, there are likely to be residual risks around the performance of the new technology.

*Intellectual property*

9.21    NGS technologies are often protected through patents and other intellectual property rights (IP rights). We note that obtaining patents to protect novel inventions is necessary to ensure the initial inventors have a period of exclusivity which provides the opportunity to secure a return on their capital.

9.22    The Parties submitted that patents and other IP rights *"do not represent significant barriers to entry or expansion in either the native long read or short read markets […] not only can variations on the basic methodologies that are used in many currently commercialised sequencing platforms – SBS and nanopore sequencing – readily be adopted by new entrants because they are already in the public domain, but altogether new technologies are also in development (e.g., Roswell)".*[852]

9.23    However, as mentioned at paragraph 9.7 above, Illumina itself submitted that the costs and time associated with invention, research and development of a new technology are substantial. Moreover, innovating around existing intellectual property rights (in particular patents) has been identified as a barrier to entry by the Parties' competitors and a number of potential competitors.[853] For instance:

   (a)   [✂] stated that innovation is critical to succeed in this industry. Accordingly, protecting their IP rights relating to their innovative processes is extremely important for competitors in this sector.

   (b)   [✂] submitted that the largest barrier to entry is the development of novel sequencing technologies that are free from IP constraints. As

---

[850] See paragraphs 9.6 to 9.7 above.
[851] MAGs, paragraph 5.8.11.
[852] Response to the Annotated Issues Statement, paragraph 108.
[853] [✂] have identified IP rights as a barrier to entry in their response to the CMA questionnaire.

such, the cost of development is substantial, and obtaining IP protection is critical.

(c) [✂] noted that IP rights are critical to be able to operate in this sector and are considerable barriers to entry: new entrants must develop a novel technology which requires considerable R&D resources and then obtain patent protection which entails time and legal expenses.

(d) [✂] indicated that IP protection granted to the first mover/entrant may act as a barrier for subsequent entry.

9.24   Based on the evidence submitted to us, we provisionally consider that existing IP rights would still create barriers to entry for new potential competitors who must bear the substantial costs and time associated with the development of such new approaches or technologies. Moreover, as noted at paragraph 9.18 above, having developed a novel approach / technology, new entrants would also likely need to obtain patents in each of the relevant geographies, to help ensure that they are able to generate a return on their original investment. We have evidence that this can be a costly, time-consuming and uncertain process (particularly if the patent's validity is contested by any third parties) which adds to the original development costs and timings. As such the existence of IP rights, contributes to creating high barriers to entry in the NGS systems market.

9.25   It has also been put to us[854] that the combination of Illumina and PacBio's patent portfolios may make entry more difficult. The Parties have submitted that the combination of their patent portfolios will not increase barriers to entry for the following reasons:

(a) The scope of any given patent is fixed by law and does not change as a result of a transaction or the identity of the patent holder.[855]

(b) The Proposed Merger will not reduce licensing of PacBio's patent portfolio [✂].[856]

9.26   However, the CMA notes that:

(a) While the scope of any given patent would not change as a result of the Proposed Merger, deciding whether a new technology infringes on an existing patent may involve – as demonstrated by

---

[854] For example, [✂].
[855] Response to the Annotated Issues Statement, paragraph 104.
[856] Response to the Annotated Issues Statement, paragraph 123-126.

the existence and duration of patent litigation – a complex and finely balanced assessment which may change as a result of the combination of patent portfolios. For instance, in cases where a novel technology may infringe on a combination of PacBio and Illumina patents, the Merged Entity would have a higher probability of success in an infringement case post-merger (as it controls more patents to assert) and may therefore be more likely[857] to commence litigation. In turn, the anticipation of a long and costly litigation process may discourage entry or expansion by a potential competitor.

(b)  [✄]. Nonetheless, as potential competitors attempt to introduce new approaches post-merger, Illumina (which is active in more segments than PacBio) may be less likely (than PacBio would have been) to license PacBio's patented technology to third parties for segments that Illumina would consider – differently from PacBio – to be competitive to its own activities.[858] In addition, absent the Proposed Merger PacBio may have been more likely to use licensing as a funding strategy.

9.27   Any such potential increases in barriers to entry may be more likely if PacBio patents were particularly important for accessing the market. To assess the importance of PacBio patents we relied on data from PatentSight GmbH,[859] a private provider of patent data and analytics used by numerous companies across various industries and by the European Commission in two past merger investigations.[860]

9.28   Our analysis of the data suggest that PacBio possesses a valuable patent portfolio.[861] More specifically:

---

[857] Than the two separate entities would have been absent the merger.
[858] As an example, PacBio may be willing to allow third parties to use one of its patents to develop a new technology for Counting applications (if it was unlikely to compete for Counting applications in the future). However, Illumina may have very different incentives, and so post-merger would prohibit this potential entrant from relying on the necessary patents.
[859] See https://www.patentsight.com/en-us/.
[860] See Dow / DuPont Merger decision, available at https://ec.europa.eu/competition/mergers/cases/decisions/m7932_13668_3.pdf. See also Bayer / Monsanto Merger decision, available at https://ec.europa.eu/competition/mergers/cases/decisions/m8084_13335_3.pdf.
[861] The CMA has particularly looked at metrics based on external citations (albeit including internal citations would not change the overall picture). This is based on the idea – supported in the economic literature – that a patent is more valuable if it is frequently cited by subsequent patents of other companies.

(a) On average, PacBio patents have the second highest External Competitive Impact[862] among current competitors.[863]

(b) Focussing on the top 10%[864] of patents worldwide, PacBio patents have on average the highest External Competitive Impact[865] among current competitors.[866]

9.29   The Parties submitted that this type of metric does not provide a meaningful measure of PacBio's ability to use its patent portfolio to exclude competitors. To measure this, we should have instead looked at the extent to which PacBio patents have provided a basis for the exclusion of a competitor from the market in the past (ie technical or legal score). Moreover, we should have included other relevant patent holders, such as [✂].[867]

9.30   We acknowledge that a number of limitations may apply to the analysis of patent data. Nonetheless, we note that the scope of the analysis is to measure the Merged Entity's ability – rather than PacBio's ability as stated by the Parties – to assert PacBio's patents to increase barriers to entry. As such we believe that metrics based on the number of citations may provide an indication of the extent to which the Merged Entity might be able to increase barriers to entry post-merger through the use of PacBio's patents. Moreover, given the high importance of PacBio's patents the inclusion of a few more competitors would be unlikely to change the overall narrative. In fact, adding [✂] to the analysis would not change the results at paragraph 9.28 above.[868]

9.31   Overall, in our view, this analysis supports the contention that the existence of intellectual property rights creates high barriers to entry and shows that these already high barriers could further increase as a result of the Proposed Merger.

---

[862] The External Competitive Impact is an index developed by PatentSight which estimates how much business value a patent has, based on the combined effect of two further metrics, namely (1) the External Technology Relevance, based on the number of worldwide prior art citations received from third parties' later patents (citations are corrected for patent ages and different citation propensities in different technology fields and among different patent offices), and (2) the Market Coverage of a patent, which measures the global market size that is protected by the patent.
[863] Current competitors include in this analysis: Illumina, ONT, QIAGEN, Thermo Fisher and BGI.
[864] Ranked by Competitive Impact. Differently from the External Competitive Impact (see footnote 862 for more details on this), the Competitive Impact accounts for both internal and external citations received, again corrected for patent ages and different citation propensities in different technology fields and among different patent offices.
[865] See footnote 862.
[866] Current competitors include in this analysis: Illumina, ONT, QIAGEN, Thermo Fisher and BGI.
[867] Response to the Annotated Issues Statement, paragraphs 119 and 120.
[868] Even with [✂], the points raised in paragraph 9.28 (a) and (b) would still be valid.

*Scale*

9.32   The manufacturing of high-quality, complex instruments requires investment in associated production facilities and equipment. Just as important for an NGS systems business are the ongoing research and development costs to ensure that its systems support the growing range of applications for sequencing and remain attractive for customers. For example, while Illumina spent around 20% of its revenue on R&D, PacBio has spent around 70-80% of its revenue on R&D in recent years (see paragraphs 3.10 and 3.26 above). Accordingly, supplying the NGS systems market has a naturally high overhead.

9.33   Both Illumina and PacBio's stand-alone financial models indicate that additional scale is needed before PacBio becomes profitable. Indeed, the Parties have submitted that PacBio would need around [✂] of recurring revenue to reach the point of breakeven cashflows.[869] The issue with reaching scale appears to be [✂].

9.34   In addition, PacBio told us that it is difficult to convert a technology proof of principle into a viable business. It noted that the hurdles to enter have increased over time, and that trying to go head to head against a company with an established technology is usually *"fruitless"* unless a company has access to significant funds (like [✂]). It stated that entering into a technology space usually involves finding a niche and trying to grow from there.[870]

9.35   The Parties stated that certain potential entrants were large entities already (eg [✂]), and start-ups have attracted large amounts of investment such that it is *"unfounded and speculative to assume that none of the start-ups would be able to reach sufficient scale to cover their overheads"*, and provided the example of ONT achieving substantial growth from 2015-2018.[871]

9.36   As discussed above, there are numerous examples of NGS companies which exited due to failing to achieve commercial success. The fact that potential entrants continue to attract funding indicates that investors are willing to take a risk-weighted bet that these companies will generate a return. However, as PacBio noted, investors would expect the large majority of venture-capital startups to fail unless [✂].[872]

9.37   Any new entrant into the NGS systems market would experience issues around reaching sufficient scale to cover its overheads, exacerbating the

---

[869] [✂]; Response to Counterfactual Working Paper, pages 2 and 7.
[870] PacBio's Hearing with the CMA, pages 21, 22 and 51.
[871] Response to the Annotated Issues Statement, paragraphs 147-152.
[872] PacBio's Hearing with the CMA, page 50.

development time discussed above. For an existing company expanding into the NGS systems market, these concerns are likely to be less serious due to the greater ease of accessing cash funding, but it would still need to reach sufficient scale to cover its marginal costs and any allocation of fixed costs (including associated R&D spend) in a timely manner.

*Bundling / tying*

9.38   It has been put to us that post-Merger, Illumina could use its market power to raise barriers or foreclose other competitors from competing for segments of the market.[873] It has been submitted to us that Illumina could adopt a bundling strategy following the Proposed Merger, offering combined packages of Illumina's short read systems with PacBio's long read with different associated prices and commercial terms. We note that while this could provide benefits to customers in some cases (eg if the Parties offered a lower combined price to a customer which wanted both Illumina and PacBio instruments), it might also have the effect of increasing barriers of entry/expansion for other competitors.[874]

9.39   We consider that, due to the nature of the market (eg the prevalence of bespoke bilateral contracts), any such bundles could be targeted at those customers which use short and long read in a complementary fashion in order to minimise the effective costs of implementation (ie minimising lost sales and avoiding giving discounts to those companies which would purchase both long and short read instruments from the Parties in any event).

9.40   We have considered ways in which bundling could be achieved. This is likely to depend on the circumstances of individual customers. An extreme example of this would be if Illumina refused to support its instruments in any lab which was using a long read system other than PacBio's. In principle this could allow Illumina to leverage market power beyond Illumina's core proposition. However, we have not seen evidence supporting this and so our view is that it is likely that any bundling approach would be less extreme. An alternative bundling strategy could consist of either economic incentives (eg offering a reduced price if a customer buys both an Illumina instrument and a PacBio one), or the use of more onerous terms and conditions (eg producing bundles which are restricted to particular applications and ceasing to offer unrestricted products).

---

[873] For example, [✄].
[874] We agree with the Parties that a 'pure' bundling strategy is very unlikely given only a small proportion of customers currently use long read instruments.

9.41   We note that Illumina raised concerns about the possibility of an alternative purchaser for PacBio being able to raise barriers to entry [✂]. Illumina submitted to us that *"the acquisition of PacBio by [✂] would create a formidable competitor"* and *"If [✂] were to acquire PacBio, it would enable [✂] to enter [long read sequencing] and could make it more difficult for Illumina to do so"*. It also stated that the strategy of this alternative acquirer would be able to shape the future of Illumina's short read sequencing.[875]

9.42   Customers have told us that Illumina already undertakes a small amount of bundling within its existing product portfolio. For example, we were told that Illumina sometimes sells bundles of its instruments along with an initial supply of consumable products.[876] During our investigation we have been told that, despite the Proposed Merger not having completed, a number of customers already being offered bundles of Illumina and PacBio instruments.[877]

9.43   Illumina submitted that it does not offer bundles currently [✂].[878]

9.44   In order to meaningfully exploit a bundling strategy and raise the barriers to entry/expansion, Illumina would need to have a degree of market power.[879] We consider that there is good evidence of this, namely, Illumina's very high and persistent existing share within the NGS systems market (see paragraph 8.117, onwards).

9.45   Third parties have also described Illumina as having a high degree of market power.[880] An independent sector report includes statements such as "*Illumina maintains a dominant market share*".[881] At least one customer stated in the survey commissioned by Illumina that "*ilmn [Illumina] is so dominant*".[882]

9.46   We also have evidence indicating behaviours which are consistent with Illumina exercising its market power. In particular:

   (a)   Requiring minimum purchases of 10 instruments and including restrictive terms on the applications they can be used for.[883]

---

[875] [✂].
[876] [✂].
[877] [✂].
[878] Response to the Annotated Issues Statement, paragraphs 133-136, and footnote 75.
[879] In addition, for a bundling strategy to be effective, customers who use long read instruments need to also value the use of short read instruments. Given that nearly all customers of long read instruments also own a short read instrument it seems very likely that customers would value a bundle of long and short read instruments or consumables.
[880] [✂].
[881] Cowen Life Science Tools Kit, Overview of Life Science Tools Markets and Technologies, 10th Edition, 2018, page 36.
[882] DeciBio Survey, Annex 4, page 88.
[883] [✂].

Illumina submitted that less restrictive versions of these instruments were available,[884] but we consider that this does not show that these represented an equivalent, contemporaneous alternative.

(b) Customers told us that they experienced above-inflation price increases on like-for-like sequencing instruments and consumables.[885] Illumina responded that it had a standard practice to increase prices by [✂] but did not provide an explanation or any evidence for this statement.[886]

9.47 Customers we have spoken to have told us that while a bundle of short and long read instruments may be attractive to them, the key consideration would be whether they were getting their preferred choice of technology. For example, we have been told that "*when purchasing a sequencer, you need to be sure this provides the best solution*",[887] and "*the key consideration is which is the best technology*".[888]

9.48 Following the Proposed Merger, the Parties could potentially use a bundling strategy to combine their short and long read propositions to increase their profits by winning market share from rivals or decreasing the size of the addressable market to potential competitors. This is consistent with Illumina's own submissions that it would be concerned that an alternative acquirer of PacBio would be able to limit or prevent Illumina's own expansion into long read sequencing, as well as affecting its future short read financial performance. Therefore, we consider that the Proposed Merger would allow the Merged Entity to increase the barriers to entry and expansion.

9.49 However, we do not consider that there is evidence to support the view that the Merged Entity could adopt a bundling strategy which would be sufficiently harmful to competition (eg through the foreclosure of existing long read providers, such as ONT) so as to represent a substantial lessening of competition in its own right.

*Customer perceptions*

9.50 The Parties submitted that brand image is not an important competitive differentiator as the majority of sequencing system suppliers have positive

---

[884] Response to the Annotated Issues Statement, paragraphs 140-144.
[885] [✂].
[886] Response to the Annotated Issues Statement, paragraph 145.
[887] [✂].
[888] [✂].

reputations.[889] However, they also stated that the Proposed Merger would allow Illumina to *"significantly enhance PacBio's ability to commercialise its native long read systems in the short-term, as a result of its […] brand recognition and quality of customer service"*.[890] They also submitted that *"Illumina has developed an effective customer support and service infrastructure, which customers both value and associate with Illumina."[891]*

9.51    The Parties stated that Illumina's ability to offer an effective customer support service would result in an improved service to PacBio's customers post-Merger. The Parties noted that other sequencing companies are capable of offering similar support to their customers and that Illumina would not be able to constrain others in this regard.[892]

9.52    Customers also told us that a good relationship with their supplier was very valuable, as it allowed them to discuss their requirements in more detail and the supplier had then helped design a better solution.[893]

9.53    In our view, the ability of a supplier to support post-sale services, as well as the associated broader relationship, are important factors for customers when selecting an NGS system supplier.

9.54    PacBio has also submitted that it has needed to raise awareness of its products and educate customers about its novel sequencing technology in order to drive demand.[894] PacBio and Illumina both proactively highlight the numerous academic publications which have used their technologies,[895] and customers have told us that they will often delay potential purchases until there is independent evidence of an instrument's performance (ie not provided by the manufacturer themselves).[896] For example, we were told that *"Every one of the major manufacturers put their new instruments into key labs who generate good data that then generates word of mouth in the research community"*.[897] This indicates that customers' perceptions of the underlying technology (as well as the actual performance) are an important consideration which would need to be addressed by any new entrant.

---

[889] Parties' Final Merger Notice, paragraph 366.
[890] Parties' Final Merger Notice, paragraph 429.
[891] Response to the Annotated Issues Statement, paragraph 154.
[892] Response to the Annotated Issues Statement, paragraphs 155-156.
[893] [✂]
[894] PacBio response to Internal Documents Working Paper, paragraph 9.
[895] https://www.illumina.com/content/dam/illumina-marketing/documents/products/product_information_sheets/iseq100-system-grant-writing-tool-770-2017-037.pdf; https://www.pacb.com/wp-content/uploads/Core-Lab-Brochure-The-most-trusted-long-read-technology.pdf.
[896] [✂].
[897] [✂].

9.55   The evidence shows that customers' perceptions of the technology and service provided are important considerations which any new entrant would need to overcome. Therefore, we consider that customer perceptions are likely to act as a barrier to entry.

*Cost of switching*

9.56   NGS instruments are expensive, and represent a substantial investment on the part of customers.[898] Illumina's instruments cost between $22,000 and $1,000,000,[899] while PacBio's cost around $380,000.[900] Research customers often rely on grants to fund these purchases, which can result in limited opportunities to switch provider (as decisions need to align with the timing of grants). Any capital costs would be substantially higher if a customer had to switch multiple instruments simultaneously (eg if entirely replacing one supplier with another).

9.57   The Parties have told us that the costs of customer switching are negligible, other than instrument purchase and two to five days of training for staff.[901] Customers have told us that switching costs are significant, as substantial infrastructure needs to be built around instruments, to prepare samples for sequencing and handle the data generated. In particular, there are a number of factors which would increase their effective cost of switching some or all of their instruments to a different supplier, such as:

  (a)  Bulk discounts on instrument purchases and consumables can be an important factor which supports single-sourcing and so makes switching more difficult;[902]

  (b)  Workflow integration, which requires the customer to change many of their existing processes such as training of staff, automation of process, and testing/verification of associated consumables.[903] One customer told us that [✂],[904], and another that "*short read libraries are prepared using robots*" so switching away from Illumina would be a *"process of years"*;[905] and

---

898 [✂].
899 [✂]; costs for an iSeq and NovaSeq.
900 [✂].
901 Parties' Final Merger Notice, paragraph 371.
902 [✂].
903 [✂].
904 [✂].
905 [✂].

    *(c)* Data storage and processing, such as differences in software, data types produced, and analysis pipeline.[906]

9.58    Customers have also told us that these costs would be significant and potentially prohibitive.[907]

9.59    The Parties submitted that a material number of customers are new to sequencing and so would not incur any switching costs, while existing customers regularly consider upgrading/refreshing/replacing their instruments every four to six years. They also submitted that each new system has its own workflows, regardless of its specific manufacturer and so existing suppliers face equivalent potential barriers to switching.[908]

9.60    We agree that new customers would not incur the costs associated with switching and so switching costs are not relevant when competing for customers new to sequencing. However, switching costs are relevant to an entrant when competing for important established users such as 'key labs' and/or 'thought leaders' which would face these costs. We were told that these types of customers establish the utility of sequencing in new fields and applications[909] and so are important in order for a sequencing supplier to become established, as they influence other customers' perceptions.[910]

9.61    With regard to the Parties' submission on the upgrade/refresh/replacement cycle of equipment for existing customers, we agree that given the pace of innovation in the market, customers are likely to want to access more up to date technologies. However, we consider that this is not likely to represent a similar cost to customers; switching between companies is likely to be substantially more costly than switching between instruments owned by the same company. This is because a company has the incentive to coordinate and integrate their products in order to minimise these associated upgrade costs. This is consistent with submissions from the Parties (where they argued that the Proposed Merger would allow the Merged Entity to develop coordinated workflows across the two technologies),[911] as well as reflecting statements we have received from customers, such as in paragraph 9.57(b) above, which explicitly discuss the difficulty with moving away from an existing NGS system. In addition, if the upgrade/refresh/replacement cycles are every four to six years, this would have a similar effect to customers having contracts for this length of time, which can act as a barrier to new entrants in

---

[906] [✂].
[907] [✂].
[908] Response to the Annotated Issues Statement, paragraphs 158-159.
[909] Parties' Final Merger Notice, paragraph 415.
[910] [✂].
[911] Parties' Final Merger Notice, paragraph 451.

itself since there would be limited time-windows in which they can compete for these customers.

9.62   However, we note that despite these apparent switching costs, some larger customers are nevertheless able to multisource for their NGS systems, which would indicate that while these factors are likely to act as a barrier to entry/expansion, they are not necessarily insurmountable.

9.63   The evidence set out above shows that the capital cost of equipment and other associated costs of switching supplier or instrument, would act as a barrier to entry or expansion in some circumstances.

*Provisional conclusion on barriers to entry and expansion*

9.64   Based on the evidence set out above, we are provisionally of the view that this market is characterised by high barriers to entry and expansion. These barriers may be further increased as a result of the Proposed Merger.

**Evidence of potential entry**

9.65   As discussed in the previous section, due to the difficulties and cost associated with developing and commercialising an NGS technology, we consider that any company which has not already started to develop this would be unlikely to meet our requirements of being timely, likely, and sufficient.[912]

9.66   In their submissions, the Parties identified 24 companies which they considered were planning to launch either long read or short read NGS systems.[913]

9.67   We contacted all 24 companies to understand their views on the market and where they were in their current development process, but not all responded, despite repeated efforts. We requested internal documents in addition to speaking with those which did respond.

9.68   Some of the 24 companies told us that they are not developing an NGS system, as we have defined it in this investigation.[914] However, we note that even technologies which target sectors or applications which Illumina does not currently compete for are likely to increasingly converge in the future (as

---

[912] As described in MAGs, paragraphs 5.8.8 – 5.8.11.
[913] 7 of these potential entrants were short read, 14 were long read, and 3 were unspecified; Parties' Final Merger Notice, paragraph 395.
[914] For example, [✂].

discussed in chapter 8 on the competitive effects of the merger) and could therefore exert a competitive constraint on the Merged Entity.

9.69   We found that many of the companies identified by the Parties as potential entrants are still very early in the development of their technology and have not started to consider commercialisation of their technologies or the likely effect and implications of them entering the market such as developed business plan projections. For example:

(a)   [✕] is a very small, early stage start-up company, with [✕] full and part time research scientist employees, and [✕] the CEO. It stated that it is *"still doing basic research to establish the capabilities of our technology"*. [✕].[915]

(b)   [✕] is a very small, early stage start-up. It developed a rudimentary, proof of concept platform with very crude data related to DNA sequencing. However, [✕].[916]

(c)   [✕] told us that it is a small R&D company with [✕] employees that is currently focused on achieving a proof of principle of its technology. It has just developed [✕], but it will take at least three years to develop an instrument that is "*remotely ready for market*". [✕] as it is too early for these to be considered.[917]

9.70   We note that for three of these potential competitors, the Parties' Final Merger Notice stated that there was insufficient information for them to specify whether they were short read or long read technologies.[918]

9.71   Some of the companies identified by the Parties appear to have a more developed technology and forward-looking business plans with associated timings. These are more likely to represent a potential entrant which could exert a competitive constraint on the Parties post-merger. Appendix E provides additional information on each of the potential entrants. We have assessed the timeliness, likelihood, and sufficiency of each of these potential entrants.

9.72   The Parties submitted that the competitive constraint imposed by potential entrants results from both actual entry and the fear of potential entry and that it would be *"wholly inappropriate for the CMA to dismiss the competitive*

---

[915] [✕].
[916] [✕].
[917] [✕].
[918] Parties' Final Merger Notice, paragraph 395.

*constraint imposed by that publicly available information on the basis of confidential information of which the Parties are not aware".*[919]

9.73   We contacted the various potential entrants identified by the Parties in order to build the most robust evidence base possible of the likely evolution of the market. However, we agree with the Parties that at any particular point in time, their competitive response will be based on their assessment of the information available to them (through public disclosure and any other market intelligence). We consider that the best evidence of this assessment is how any potential threat is referenced in internal documents:

(a)   In the small number of instances where potential entrants are discussed in Illumina's internal documents, they are described as being a substantially lower threat to Illumina than any of the current providers of NGS systems, including PacBio and ONT.[920] In addition, we have seen no quantitative or financial analysis or assessments of the likely threat of these potential entrants [✂].[921] Illumina stated that it had internal documents where it assessed the competitive impact of potential competitors ([✂]),[922] however it did not subsequently identify these documents to us.

(b)   We have seen no instances in PacBio's internal documents which clearly reference its concerns regarding the threat of potential competitors / new entrants.

9.74   If the Parties viewed these potential entrants as major threats or posing high risk of disruption, we would expect to see more detailed analysis associated with their expected entry, and proposed actions or plans to respond to these perceived risks (similar to that which each Party has done in relation to the other).

*Provisional conclusion on potential entry*

9.75   Overall, in light of the evidence on the Parties' perception of potential entrants and the plans of potential market entrants discussed in Appendix E, our view is that attempted entry (or threat of entry) would not be sufficient to prevent or mitigate any competition concerns arising from the Proposed Merger. The majority of potential entrants have products whose entry to the market does not, at present, seem imminent or likely; and in a small number of cases

---

[919] Response to the Annotated Issues Statement, pages 40-41.
[920] For example, see [✂]; additional information in paragraph 8.144 above.
[921] [✂].
[922] Illumina's Hearing with the CMA, pages 71 to 72.

where the research is more advanced, entry still does not appear to be timely and is likely to be restricted to small or niche parts of the market which would likely be insufficient to deter or defeat attempts by the Parties to exploit any lessening of competition resulting from the Proposed Merger.[923]

***Provisional conclusions***

9.76   Based on the evidence set out above we have provisionally found that the NGS systems market has high barriers to entry and expansion. This is due to the need to develop a novel technology which does not infringe existing patents (and is sufficiently superior or differentiated that it could challenge a strong incumbent), as well as the cost and time associated with developing this technology, obtaining patent protection, and the need to commercialise it by reaching sufficient scale. In addition, there are also significant barriers to customers switching NGS systems.

9.77   Although the high projected growth of the market has resulted in numerous attempts to develop new NGS approaches, many of the potential entrants are so early in their development that it is not possible for us to speculate on how they might evolve in the future with any degree of accuracy. Historically, there have been numerous instances of potential entrants which were not able to successfully develop and commercialise their NGS system technologies. Most potential entrants have told us that it will be a number of years before they intend to launch a viable commercial product and almost all are targeting particular subsegments of the market, often to avoid competing directly with Illumina. This strategy would limit any impact of their entry (or the threat of entry), at least for the foreseeable future. This is also reflected in the Parties' internal documents which do not reflect particular concerns about the competitive threat arising from potential entrants.

9.78   On the basis of the evidence set out above, our provisional conclusions are that there are high barriers to entry and expansion in the NGS systems market, and the evidence does not support the view that timely, likely and sufficient entry or expansion will outweigh the SLC we have provisionally identified.

---

[923] MAGs, paragraph 5.8.10.

# Countervailing buyer power

## *Introduction*

9.79    In some circumstances, an individual customer may be able to use its negotiating strength to limit the ability of a merged firm to raise prices. We refer to this as countervailing buyer power. The existence of countervailing buyer power may make an SLC finding less likely. If all customers of the merged firm possess countervailing buyer power post-merger, then an SLC is unlikely to arise. However, often only some – not all – customers of the merged firm possess countervailing buyer power. In such cases, we assess the extent to which the countervailing buyer power of these customers may be relied upon to protect all customers.[924]

9.80    The extent to which customers have buyer power is dependent on a number of different factors. An individual customer's negotiating position will be stronger if it can easily switch its demand away from the supplier, or where it can otherwise constrain the behaviour of the supplier. Typically, a customer's ability to switch away from a supplier will be stronger if there are several alternative suppliers to which the customer can credibly switch, or the customer has the ability to sponsor new entry or enter the supplier's market itself by vertical integration. Where customers have no choice but to take a supplier's products, they may nonetheless be able to constrain prices by imposing costs on the supplier, for example by refusing to buy other products produced by the supplier.[925]

## *Views of the Parties*

9.81    The Parties stated that, given sequencing adoption is still at a very early stage, certain customers are conducting large scale novel research projects to establish the utility of sequencing in new fields and applications. Therefore, the Parties consider that supporting these customers is critical to their business interests, in particular where translational research is being used to develop new clinical tests.[926]

9.82    The Parties further stated that some customers are particularly well placed to negotiate to achieve highly favourable terms in the UK and globally, and that

---

[924] MAGs, paragraph 5.9.1.
[925] MAGs, paragraphs 5.9.2 and 5.9.3.
[926] Parties' Final Merger Notice, paragraphs 413 – 417.

the Proposed Merger would not reduce these customers' negotiating strength since there is no overlap between the Parties' activities.[927]

9.83   The Parties provided a list of customers which they consider are particularly well placed in these negotiations, in particular those which are relatively large (eg up to tens of million pounds of spend) and so have historically received discounts from Illumina. These customers include [✂].[928]

***Views of third parties***

9.84   However, some customers (including large customers) described Illumina as having a high degree of market power as discussed in more detail in paragraphs 9.45 to 9.46 above.

9.85   This evidence would indicate that even some of the largest customers have limited buyer power over Illumina.

***Our assessment of countervailing buyer power***

9.86   Illumina's very high existing market share and the competitive conditions described in chapter 8 on the competitive effects of the merger, demonstrate that there are very limited existing alternatives to Illumina which could be used to leverage buying power. Even the largest of the customers which Illumina provided as an example ([✂]) makes up less than [✂]% of Illumina's global revenues, and the largest UK customer ([✂]) was around [✂]%.[929]

9.87   Combined with the views of many customers on Illumina's existing market power (discussed in paragraphs 9.45 to 9.46 and 9.84 above), it is unlikely that even large customers would be able to exert sufficient countervailing buyer power on the Merged Entity.

9.88   Furthermore, even if certain customers were able to exercise a degree of countervailing buyer power, NGS customers usually negotiate bespoke prices with suppliers via bilateral negotiations. Therefore, other customers would remain exposed to the effects of any substantial lessening of competition arising from the Proposed Merger.

---

[927] Parties' Final Merger Notice, paragraphs 418 – 425.
[928] Parties' Final Merger Notice, paragraph 419.
[929] Parties' Final Merger Notice, paragraph 419.

***Provisional conclusions***

9.89   We have provisionally concluded that there is insufficient countervailing buyer power to outweigh the SLC we have provisionally identified.

## Rivalry-enhancing efficiencies

***Introduction***

9.90   The CMA's Merger Assessment Guidelines (MAGs) state that:[930]

9.91   *"Efficiencies arising from the merger may enhance rivalry, with the result that the merger does not give rise to an SLC. For example, a merger of two of the smaller firms in a market resulting in efficiency gains might allow the merged entity to compete more effectively with the larger firms.*

> *It is not uncommon for merger firms to make efficiency claims. To form a view that the claimed efficiencies will enhance rivalry so that the merger does not result in an SLC […] the [CMA] must expect, that the following criteria will be met:*
>
> > *(a)  the efficiencies must be timely, likely and sufficient to prevent an SLC from arising (having regard to the effect on rivalry that would otherwise result from the merger); and*
> >
> > *(b)  the efficiencies must be merger specific, ie a direct consequence of the merger, judged relative to what would happen without it.*
>
> *Efficiency claims can be difficult for the Authorities to verify because most of the information concerning efficiencies is held by the merger firms. The Authorities therefore encourage the merger firms to provide evidence to support any efficiency claims whether as part of the SLC analysis or the consideration of relevant customer benefits."*

9.92   The guidance also notes that efficiencies may be taken into account in the form of relevant customer benefits,[931] however, this would take place in the context of remedies for any SLC identified.[932]

---

[930] MAGs, paragraphs 5.7.2, 5.7.4, and 5.7.5.
[931] MAGs, paragraph 5.7.3.
[932] See section 30(1) of the Act, and the Merger Remedies Guidance, paragraphs 3.14 to 3.24.

*Views of the Parties*

9.93   The Parties submitted that the Proposed Merger would result in the following efficiencies and customer benefits:[933]

    *(a)*   Accelerate innovation. Post-Merger, the Merged Entity would intend to invest more in PacBio to accelerate its development roadmap, [✂]. The Parties also submitted that the Proposed Merger would not reduce Illumina's incentives to seek to develop its own native long read technology, since [✂].[934]

    *(b)*   Facilitate wider distribution of / access to PacBio's products and technology by enabling PacBio (which currently has very limited commercial infrastructure) to benefit from Illumina's global production and support and service infrastructure. PacBio would benefit from increased scale of manufacturing, a significantly expanded sales/distribution team and improved brand recognition for providing a quality service. Together, these would result in PacBio achieving [✂]% higher sales compared with the situation absent the Proposed Merger. The Parties state that these claims are consistent with Illumina's behaviour following a number of previous acquisitions.[935]

    *(c)*   Increased adoption of PacBio's systems by clinical and diagnostic customers as a result of enhancing PacBio's system quality with Illumina's quality systems and system management processes. [✂].[936]

    *(d)*   Improve PacBio's data analytics [✂].[937] [✂].[938]

    *(e)*   Developing coordinated workflows to enable customers to harness the complementary nature of the technologies. They submitted that these improvements [✂],[939] [✂].[940]

---

[933] Parties' Final Merger Notice, paragraph 427.
[934] Parties' Final Merger Notice, paragraphs 456-459. Response to the Annotated Issues Statement, paragraphs 185-194.
[935] Parties' Final Merger Notice, paragraphs 428-436; Response to the Annotated Issues Statement, paragraphs 195-198.
[936] Parties' Final Merger Notice, paragraphs 437-445. Response to the Annotated Issues Statement, paragraphs 199-205.
[937] [✂].
[938] Parties' Final Merger Notice, paragraphs 446-449.
[939] Parties' Final Merger Notice, paragraphs 450-455. Response to the Annotated Issues Statement, paragraphs 206-207.
[940] Response to the Annotated Issues Statement, paragraphs 206-207.

9.94    The Parties submitted that any benefits arising from these efficiencies would be passed on to customers, and would ultimately benefit consumers. They highlighted that Illumina had an *"extensive track record of improving technologies that it acquires while reducing costs and expanding access"*.[941]

9.95    The Parties also submitted that [✂].[942]

### Views of third parties

9.96    A prevailing view of customers was that Illumina would invest in PacBio to speed up its development of new products and improve its commercial performance.[943]

9.97    Customers also mentioned that greater levels of integration between Illumina and PacBio may be helpful, as it could improve support and/or prices.[944]

9.98    However, many customers noted that they did not know whether Illumina would choose to provide this additional investment, with some noting that it would depend on whether there was sufficient competition to incentivise this investment.[945]

### Our assessment of rivalry-enhancing efficiencies

9.99    In this section, we assess the evidence presented by the Parties that the Proposed Merger would result in rivalry-enhancing efficiencies which would offset any potential competition concerns.

9.100   First, we set out the test regarding efficiencies as set out in our guidelines, before focusing on each of the particular areas which the Parties have identified.

### Efficiencies test

9.101   Our guidelines state that the Parties must provide compelling evidence that the claimed efficiencies will enhance rivalry so that the Proposed Merger will not result in competition concerns and that we must expect on the basis of compelling evidence,[946] that the efficiencies will be:

---

[941] Response to the Annotated Issues Statement, paragraphs 178-183; Parties' summary statement, page 4.
[942] Response to the Annotated Issues Statement, paragraph 207.
[943] [✂].
[944] [✂].
[945] [✂].
[946] MAGs, paragraph 5.7.4

(a)  timely;

(b)  likely;

(c)  sufficient to prevent an SLC from arising;

(d)  merger-specific; and

(e)  would result in increased rivalry in the relevant market(s).

9.102   In this case, we consider that, while the Parties have submitted arguments relating to potential rivalry-enhancing efficiencies, they have not provided compelling evidence, as required in our guidance, in support of these. The Parties' submissions appear to focus on their ability to implement the changes they describe and not whether the incentive would exist for them to do so, the timing and scale of any effects or whether or how such changes would enhance rivalry and so result in benefits accruing to customers (rather than shareholders).

9.103   The Parties submitted that [✂].[947] [✂]. However, as is made clear in our guidance (and referenced in paragraph 9.91 above), the intrinsic asymmetry of information makes us reliant on the Parties to provide compelling evidence to support any efficiency claims. If such evidence on the timeliness, likelihood, and/or sufficiency (or the other relevant criteria) is not available, this reduces the robustness of any associated statements / conclusions and hence the weight we are able to place on the submissions.

9.104   We also note that the circumstances of this case are very different to the example given in the Guidance of when rivalry-enhancing efficiencies might arise where "*a merger of two of the smaller firms in a market resulting in efficiency gains might allow the Merged Entity to compete more effectively with the larger firms*".[948]

9.105   In general, the Parties' submissions appear to conflate different potential effects of the Proposed Merger, particularly (i) rivalry-enhancing efficiencies, (ii) relevant customer benefits, and (iii) synergies which will benefit Illumina shareholders. While there may be an overlapping evidence-base for rivalry-enhancing efficiencies and relevant customer benefits, they are not interchangeable and we would expect the Parties to distinguish between them in terms of both their arguments and any supporting evidence. Synergies which will benefit Illumina shareholders without increasing rivalry and do not

---

[947] See paragraph 9.95 above.
[948] MAGs, paragraph 5.7.2.

meet the criteria for relevant customer benefits are not relevant for these assessments.

9.106   In particular, we note that where efficiencies are not passed through to customers, then there would be no rivalry-enhancing benefits. One example of this would be any cost savings which are not passed on, since these simply result in the companies generating more profit. Another example would be where improvements in quality, range, or service are offset by degradation in other parameters. For example, while introducing a common library preparation kit may be attractive to some customers, if the Parties are able to increase their price for it as a result, then there is effectively no pass-through of the benefits, and no enhancement of rivalry.

*Incentives*

9.107   The Parties' submissions regarding their incentive to improve their propositions as a result of the Proposed Merger and pass on any potential benefits, appear to rely on their historical behaviour and the deal model they produced. We address each of these before considering the specific sources of potential efficiencies submitted by the Parties.

*Historical behaviour*

9.108   The Parties submitted that Illumina has a track record in its prior sequencing acquisitions of driving the development of the acquired technologies and reducing costs, thereby accelerating customer adoption of that technology.[949] They submitted that Illumina's conduct following previous acquisitions demonstrates that the benefits from the Proposed Merger would flow to their customers and ultimately consumers.[950]

9.109   While the Parties' evidence from Illumina's acquisition of Solexa (and certain other mergers) appears to represent a commercial success, we consider that this example is not evidence of Illumina's current incentives, but rather evidence of their practical ability to conduct R&D. Therefore, it does not necessarily demonstrate or support the claimed rivalry-enhancing efficiencies from the Proposed Merger. In particular:

(a)   There is no counterfactual in which to determine the level of rivalry which would have existed if Solexa had remained independent and had continued to compete with Illumina. As a result, we cannot

---

[949] Parties' Final Merger Notice, paragraph 431.
[950] Parties' summary statement 6Oct19, page 4.

determine the extent to which any claimed efficiencies were specific to the Solexa merger; and,

(b) At the time of the Solexa acquisition, Illumina did not have a viable competing NGS technology. Therefore, the Solexa acquisition is fundamentally different from the Proposed Merger.

9.110 We consider that the commercial success (or otherwise) of previous transactions does not represent compelling evidence for the existence of rivalry-enhancing efficiencies in the Proposed Merger.[951]

### Deal model

9.111 Illumina's valuation model [✂]. Illumina's valuation is discussed in more detail in Appendix F. [✂].[952] However, we have some concerns:

(a) [✂];

(b) [✂];[953]

(c) [✂] [954] and

(d) [✂].[955]

9.112 Furthermore, the Parties' submissions on efficiencies arising from [✂] do not appear to be referenced in the deal model.

### Specific claims by the Parties

9.113 In this section, we assess the specific claims made by the Parties, alongside the evidence provided.

### Accelerate innovation

9.114 When considering the potential efficiencies which could arise from the Proposed Merger in terms of accelerating innovation, there are two relevant mechanisms:

---

[951] We also note that there are other examples of acquisition by Illumina which have not been commercial successes (for example, its acquisitions of [✂] and [✂]); Parties' submission, 2 October 2019, paragraph 33.
[952] [✂].
[953] [✂].
[954] [✂].
[955] [✂].

(a) The benefits which the Proposed Merger would have on PacBio's current levels of innovation; and

(b) The benefits which the Proposed Merger would have on Illumina's current levels of innovation.

9.115 The Parties submitted that access to greater capital and Illumina's support in R&D innovation would accelerate PacBio's development of new products.[956] In support, Illumina relies on its actions following the acquisition of Solexa (and a number of other acquisitions) and the extent to which it has further developed and commercialised these technologies, as well as its valuation model which shows a [✂] acceleration for the release of PacBio's new products.[957]

9.116 As discussed in paragraphs 9.108 to 9.110 above, we do not place significant weight on Illumina's historical behaviour as evidence of the likelihood of rivalry-enhancing efficiencies arising from the Proposed Merger. In addition, we have identified concerns with reliance on the deal model as evidence supporting this submission.

9.117 Furthermore, we consider that a greater level of investment in PacBio's R&D would be likely to result in it developing improved products at a faster rate. However, the nature of these developments is not yet clear and would have a significant impact on the level and form of rivalry in the future. For example, after the Proposed Merger, PacBio would be likely to choose to invest in developing its technology in a manner which complemented Illumina's portfolio rather than competing with it; such as focusing on longer read lengths. This would be likely to result in the level of competitive interaction with Illumina's instruments being lower than would have been the case if R&D had focused on reducing the cost or increasing the throughput of the PacBio instruments. Therefore, after the Proposed Merger, an increased level of investment in PacBio's technology would not necessarily result in an increase in rivalry.

9.118 The Parties submitted that that [✂].[958]

9.119 [✂]. This would not enhance competition and so cannot be considered a rivalry-enhancing efficiency.

9.120 We therefore consider that there is insufficient compelling evidence to conclude that the Proposed Merger would produce rivalry-enhancing

---

[956] Parties' Final Merger Notice, paragraph 433.
[957] Parties' Final Merger Notice, paragraphs 431-433.
[958] Parties' Final Merger Notice, paragraphs 456-459.

efficiencies (which would meet any/all of the criteria set out in paragraph
9.101 above) from accelerated innovation.

*Wider distribution of PacBio*

9.121 The Parties submitted that the Proposed Merger would allow wider distribution
of/access to PacBio's products and technology through Illumina's superior
manufacturing distribution and cross-selling to existing Illumina customers.
The Parties highlighted their deal model which estimates that the merger-
effect on PacBio's revenues would be equivalent to at least [✂].[959]

9.122 We consider that there are some instances in which increased distribution
capability could result in an enhanced level of rivalry in a market. For
example, if the acquirer is able to provide access to a geographic market or to
customer segments which would not be available to the target (such as
operating restrictions associated with the nationality of the parent company),
then a merger could result in the introduction of a new product to a particular
geography or customer group. This would be likely to result in increased
rivalry in the relevant geography and so might be considered a rivalry-
enhancing efficiency.

9.123 However, PacBio is capable of selling its products to customers across the
world, for example it has sold instruments to companies in America, Europe,
Asia, and Australia.[960] Therefore, Illumina would not necessarily be facilitating
access to new markets.

9.124 PacBio has been less successful in growing its market share, and so
expanding access to new customer groups may be valuable. The Parties
have submitted that Illumina would support this by leveraging its current
assets to produce additional revenue synergies through increased sales
volumes. This is also equivalent to the deduplication of a fixed cost overhead
(in this case, avoiding the need for an independent PacBio to grow its own
sales and marketing team).

9.125 Similarly, where the Parties would be able to make cost savings through the
removal of duplicate overhead (eg in manufacturing infrastructure), these
represent fixed cost savings.

9.126 We consider that the Parties have not provided compelling evidence to
support their submission that these types of benefits would be passed through

[959] Parties' Final Merger Notice, paragraph 430.
[960] [✂].

to customers (eg in the form of lower costs). Because these savings are in form of revenue increases and fixed cost savings, they are more likely to benefit shareholders instead.[961] This would have the effect of reducing or eliminating any rivalry-enhancing effects from these efficiencies.

9.127   Finally, we note that PacBio has actively sought to find alternative approaches to distribute its products more effectively, particularly through the use of partnerships. Even in the months leading up to the Proposed Merger, PacBio was exploring a distribution partnership in China with an accompanying investment, and is likely to have succeeded until changes in US regulations prevented this from progressing. Accordingly, in the counterfactual, PacBio would have the incentive to continue to pursue different approaches to achieve improved distribution.

9.128   We therefore consider that, while the Proposed Merger would be likely to widen the distribution of PacBio's products, we do not have compelling evidence that this would result in any significant rivalry-enhancing efficiencies.

*Clinical/diagnostic improvements*

9.129   The Parties submitted that following the Proposed Merger they would be able to leverage Illumina's experience, systems and system management processes to develop clinically-approved instruments.

9.130   We understand that the process to receive regulatory approval for the manufacturing of clinical instruments is complex and expensive. Therefore, if Illumina was able to speed up the development of a clinically-approved PacBio instrument, this could introduce a new competitor for these contracts/requirements earlier than would be likely to occur otherwise. [✂][962].

9.131   [✂].[963] This would indicate that PacBio has the ability to develop a clinical solution, albeit at a slower pace.

9.132   We therefore consider there could be some efficiencies with Illumina speeding up the launch of a PacBio clinical solution. However, it is not clear if the change in the market structure arising from the Proposed Merger would result in the benefits of these developments accruing to customers or shareholders.

9.133   Finally, even if the Proposed Merger was to speed up the entry of PacBio's instruments into clinical settings, this would only affect a subset of customers within the NGS systems market, specifically those which require clinically-

---

[961] Eg see MAGs, paragraph 5.7.9.
[962] [✂].
[963] [✂].

approved sequencing instruments, and would only be a temporary benefit (since PacBio would have likely entered this segment in the counterfactual anyway, it just would have taken longer). This would therefore limit any increases in competition arising from these potential efficiencies.

*Improvements in data analytics*

9.134  The Parties argued that, post-Merger, they would be able to [✂].

9.135  The Parties have not provided any timelines for the developments of any of the improvements, or their expected impact in order to assess the sufficiency of such changes.

9.136  More importantly, while such changes may be attractive to customers, it is unclear how they would increase the level of rivalry present in the NGS systems market. Even if such endeavours were successful, the incentives on the Parties would be to offset these improvements in their proposition with other aspects (eg by charging higher prices than in the counterfactual).

9.137  Finally, we note that Illumina stated that analytics platforms are agnostic to the instrument they are relying on.[964] Therefore, it is also unclear that any such changes would be Merger-specific.

9.138  We therefore consider that there is insufficient compelling evidence to conclude that the Proposed Merger would produce rivalry-enhancing efficiencies (which would meet any/all of the criteria set out in paragraph 9.101 above) from improvements in data analytics.

*Coordinated solutions*

9.139  The Parties argued that, post-Merger, they would be able to develop coordinated solutions to enable customers to harness the complementary nature of the technologies.

9.140  The Parties have not provided any timelines for the developments of any of the improvements or their expected impact in order to assess the sufficiency of such changes.

9.141  In addition, when discussing bundling, the Parties previously submitted that there are very few benefits from a single provider being able to provide both short and long read solutions.[965] If this were true, it would indicate that the Parties do not believe that coordinated solutions would provide significant

---

[964] Illumina's Hearing with the CMA, page 62-63
[965] Illumina's Hearing with the CMA, page 62.

benefits, and so are unlikely to represent a sufficient efficiency to contribute in offsetting any SLC finding.

9.142   More importantly, as with the improvements in data analytics, while such changes may be attractive to customers, it is unclear how they would increase the level of rivalry present in the NGS systems market. Even if such endeavours were successful, the incentives on the Parties would be to offset these improvements in their proposition with other aspects (eg by increasing the cost of these kits).

9.143   Finally, we note that there are numerous examples in the market for a degree of coordination among solutions. It is already the case that multiple manufacturers are producing library prep for a range of different instruments/platforms. Illumina stated that these library prep kits can be used on instruments from different manufacturers already.[966] Therefore, it is also unclear that any such changes would be Merger-specific.

9.144   We therefore consider that there is insufficient compelling evidence to conclude that the Proposed Merger would produce rivalry-enhancing efficiencies (which would meet any/all of the criteria set out in paragraph 9.101 above) from coordinated solutions.

***Provisional conclusions***

9.145   We consider that the Merged Entity would likely have the ability to improve on PacBio's commercial operations, and to speed up the development of PacBio's technology through higher levels of investment and existing know-how. However, the evidence available provides little support that the Merged Entity would have the incentive to implement all of these changes as described (eg whether increasing aggregate research and development in the manner submitted would be the most profitable strategy). We also consider that there is insufficient evidence on the extent to which any of these changes would be expected to result in an increase in rivalry (and benefits to customers), or the extent to which any potential efficiencies are merger-specific, compared to the counterfactual.

9.146   Our provisional conclusion is that there is no compelling evidence that the Proposed Merger would result in rivalry-enhancing efficiencies that would be timely, likely, and sufficient to outweigh the SLC we have provisionally identified.

---

[966] Illumina's Hearing with the CMA, page 62-63.

## 10.  The provisional decision

10.1   We have provisionally concluded that the anticipated acquisition by Illumina of PacBio will result in the creation of a relevant merger situation.

10.2   We have also provisionally concluded that the Proposed Merger may be expected to result in an SLC in relation to the supply of NGS systems for sale in the UK.

10.3   We provisionally conclude that the adverse effect arising from the identified SLC would be that the Merged Entity would have less incentive to compete and that this would result in reduced choice, an increase in prices, deterioration in quality, deterioration in service and/or loss of innovation or re-focus their own innovation.

# EXHIBIT 2

191 0035

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:**     **Joseph J. Simons, Chairman**
**Noah Joshua Phillips**
**Rohit Chopra**
**Rebecca Kelly Slaughter**
**Christine S. Wilson**

| | |
|---|---|
| **In the Matter of**<br><br>**Illumina, Incorporated**<br>     **a corporation,**<br><br>**And**<br><br>**Pacific Biosciences of California,**<br>**Incorporated (PacBio)**<br>     **a corporation.** | **Docket No. 9387**<br><br>**PUBLIC** |

## COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by said Act, the Federal Trade Commission ("FTC" or "Commission"), having reason to believe that Respondents Illumina, Inc. ("Illumina") and Pacific Biosciences of California, Inc. ("Pacific Biosciences" or "PacBio"), have executed an agreement for the acquisition of PacBio by Illumina (the "Acquisition"), which, if consummated, would violate Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint pursuant to Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), stating its charges as follows:

### I.

### NATURE OF THE CASE

1.     Illumina is a monopolist.  It is the self-proclaimed leader in DNA sequencing and dominates DNA sequencing markets in the United States and worldwide.  Its name is often considered synonymous with "next-generation sequencing" ("NGS"), the technology that allows researchers and clinicians quickly, accurately, and efficiently to identify the order of the component blocks—called nucleotides—in a DNA sample.  In the United States, Illumina has complete dominance over the market for these products, with a share of over 90%.  Historically, Illumina has faced little competition for its NGS instruments and consumables (collectively, "systems").

2.   PacBio is one of the few firms that has managed to gain a foothold in the NGS market. PacBio sells a DNA sequencing system that offers substantial benefits over Illumina's systems, including longer individual sequence read lengths, but is a lower throughput and more expensive alternative.

3.   Due to the benefits provided by PacBio's technology, some Illumina customers have shifted certain sequencing projects (or parts of projects) from Illumina to PacBio despite the differences in cost and throughput.

4.   Respondents' internal documents show that PacBio and Illumina consistently and routinely refer to each other as competitors. These include many internal strategy documents, technical assessments, and sales support documents prepared over a period of years.

5.   In the past two years, PacBio has made significant technological advancements, including the release of its "Sequel II" instrument in 2019. These advancements have brought down the cost of sequencing using PacBio systems and increased the accuracy and throughput of PacBio's instruments. Collectively, these improvements have made PacBio a closer alternative to Illumina than ever before.

6.   In advance of the Sequel II's release, PacBio positioned its improved technology as an ever closer competitor to Illumina. By 2018, PacBio executives instructed its marketing department to ████████████████████████████████████████████ ████████████████ In October 2018, one PacBio marketing executive explained, ██ ██████████████████████████████████████████████

7.   Illumina has monitored PacBio as ████████████████ and ██████ from its inception. But as it learned details about PacBio's recent product improvements and the PacBio system's trajectory, Illumina recognized PacBio as ████████████████████████████ ████████████████████████████.

8.   Illumina now proposes to acquire PacBio and extinguish it as a competitive threat. Per an agreement executed November 1, 2018, Illumina will pay $1.2 billion for PacBio, a 71% premium over PacBio's share price at the time.

9.   This Acquisition will eliminate competition between the two companies now and in the future. Accordingly, it will substantially lessen competition and further insulate Illumina's monopoly from PacBio's increasing competitive threat.

## II.

## BACKGROUND

### A.  Jurisdiction

10.  Respondents are, and at all relevant times have been, engaged in commerce or in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

11.     The Acquisition constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

## B.   Respondents

12.     Respondent Illumina is a publicly traded Delaware corporation, headquartered in San Diego, California.  Illumina develops, manufactures, and markets life sciences tools. Illumina's main product offerings are instruments used for DNA sequencing and associated consumable chemistry kits.  Illumina offers seven DNA sequencing systems at a range of different price points and throughput levels.  Its primary customers are leading genomic research centers, academic institutions, government laboratories, and hospitals, as well as companies in the pharmaceutical, biotechnology, agrigenomic, commercial diagnostics, and consumable genomics industries.  Illumina was founded in 1998 and has 7,300 employees worldwide, with commercial offices located in Europe, Asia, Australia, and the Americas.  In 2018, Illumina's worldwide revenue was $3.33 billion, approximately 55% of which was from U.S. sales.

13.     Respondent PacBio is a publicly traded Delaware corporation, headquartered in Menlo Park, California.  PacBio sells DNA sequencing instruments and consumable chemistry kits.  It targets these products toward scientists striving to resolve complex and novel issues in genetics.  PacBio's customer base is broadly similar to that of Illumina and includes research institutions, commercial laboratories, genome centers, pharmaceutical companies, and agricultural companies.  PacBio was founded in 2004 and has about 400 full-time employees, almost all of whom are located in the United States.  In 2018, PacBio's worldwide revenue was $78.6 million, approximately 45% of which was North American sales.

## C.   The Proposed Acquisition

14.     Illumina agreed to acquire PacBio on November 1, 2018, for approximately $1.2 billion. The price per share represents a 71% premium to PacBio's share price as of market close on October 31, 2018.  This agreement (the "Agreement") was set to expire on December 31, 2019.  On September 25, 2019, Illumina and PacBio executed an amendment to this agreement to allow Illumina the unilateral right to extend the end date to March 31, 2020.

## D.   Background on Sequencing Technologies

15.     DNA sequencing is the process of determining the order of nucleotides in DNA molecules from a biological sample.  Scientists use DNA sequencing to ascertain the sequence of individual genes, larger genetic regions, full chromosomes, or the entire genome of any organism.  DNA sequencing is foundational to research spanning the fields of molecular biology, evolutionary biology, genomics, medicine, pharmacology, ecology, and epidemiology.  Other uses for DNA sequencing include clinical medical diagnostics, forensics, biometrics, and consumer genetics.  Additionally, scientists can use DNA sequencing systems to sequence RNA, which has unique scientific utility for research and clinical use.

3

16.     From the 1970s until the mid-2000s, the Sanger method was the predominant method of sequencing.  It was, however, time consuming, costly, and labor intensive.

17.     In the mid-2000s, new technologies—dubbed next-generation sequencing ("NGS")—began to appear.  NGS systems offered much lower cost and higher throughput, with the ability to generate a large number of sequences at once. This technology rapidly eclipsed Sanger as the primary tool for genetic sequencing.

18.     Illumina's technology is known as "short-read" sequencing.  Short-read technology has been the predominant NGS technology for the last decade.

19.     NGS sequencing also includes "long-read" sequencers.  Long-read sequencing became commercially available in 2011.  PacBio has been the leading system of this type since this technology emerged.

20.     Short-read and long-read sequencing systems—and Illumina and PacBio in particular—currently differ on several metrics that drive the ways in which customers use them. Illumina's short-read systems currently have an advantage over PacBio's long-read systems on cost, number of sequence reads, and throughput.  PacBio's system far surpasses Illumina's in terms of the length of DNA that it can cover in each individual sequence read.  Both systems are capable of delivering highly accurate sequence reads.

21.     The characteristics of PacBio's systems have been converging with those offered by Illumina.  As PacBio has improved the individual sequence read length, cost, and throughput of its products over the years, it has become a closer substitute for Illumina's short-read technology for some customers in some projects.  PacBio expects to continue to improve the cost and throughput of its system in the future.  Historically, Illumina's short-read sequencing has been cheaper than long read on a cost per genome basis. However, because of the inherent benefits of long-read sequencing over short-read sequencing for certain applications, use cases, and projects, customers have been willing to pay a price premium to use PacBio for some sequencing projects.  And, as PacBio's cost per genome decreases, customers expect to sequence more samples on PacBio and fewer samples on Illumina.

22.     Sequencing is used for a number of different applications, use cases, projects, and sample sets within projects.  Today, certain applications are best served by short-read systems, other applications are adequately served only by long-read systems, and some applications may be served by either short-read or long-read technology depending upon the objectives, budget, and time for a particular use case or project.  As the cost of PacBio's long-read sequencing has decreased and its accuracy and throughput have increased, sequencing volume has shifted from short read to long read, as long read is able to fit the needs of more use cases and projects within several applications.  Market participants expect this trend to continue for a broader set of projects and use cases.

### III.

### THE NGS PRODUCT MARKET

23.   A relevant product market in which to assess the competitive impact of the proposed Acquisition is no broader than all next-generation sequencing systems (the "NGS Market").

24.   The NGS Market comprises highly differentiated systems, including those of Illumina, PacBio, and a few other small participants.

25.   In internal documents, both Illumina and PacBio routinely recognize the existence of an NGS market, consistently refer to each other as competitors in that market, and refer to competition across NGS systems.  These documents include investor presentations, SEC filings, strategic planning documents, sales plans, and technical assessments.

26.   Other market participants also recognize the existence of an NGS market, and other sequencing companies consider themselves to be competing in the NGS Market. Industry analysts also assess and monitor the NGS Market.

27.   PacBio's long-read systems have characteristics and uses similar to those of Illumina's short-read systems for certain projects and use cases.  As PacBio continues to improve the cost, accuracy, and throughput of its long-read systems, their characteristics and uses will become even more similar to those of Illumina's short-read systems.

28.   In some instances, customers have switched sequencing volume from Illumina to PacBio as a result of past improvements in the cost, accuracy, and throughput of PacBio's systems.  PacBio expects to continue improving its system's cost, accuracy, and throughput in the future, and customers expect to switch additional volume from Illumina to PacBio as a result of those improvements.

29.   Sanger sequencing systems, the only other technology capable of sequencing DNA, are properly excluded from the NGS Market.  It costs much less to sequence DNA with NGS than Sanger sequencing, and the legacy Sanger approach is so much slower that it is impractical for almost all purposes for which scientists employ NGS.

30.   Non-sequencing products, such as microarrays, are properly excluded from the NGS Market.  Microarrays do not sequence DNA.  They merely identify known single nucleotide variants in a genome.  These products lack the throughput and technical capabilities of NGS products, qualities that customers require for their sequencing work.

### IV.

### THE RELEVANT GEOGRAPHIC MARKET

31.   The United States is the relevant geographic market in which to assess the competitive effects of the proposed Acquisition.

32.  U.S. NGS customers cannot practically turn to suppliers that do not have a U.S. presence to purchase an NGS system.  NGS customers require local service and support networks. Reflecting the reality of regional competitive differences, Illumina ███████████ ██████████████████████████████████████

33.  Intellectual property is a significant barrier to entry in the NGS Market.  The strength of incumbent NGS companies' patent portfolios differs depending on the region.  Using intellectual property, incumbent U.S. NGS suppliers (namely, Illumina) exclude other firms from selling NGS products in the United States, including some companies that supply NGS products elsewhere in the world.  Accordingly, intellectual property creates a unique set of entry conditions in the United States.

<div align="center">

**V.**

**MARKET STRUCTURE**

</div>

34.  Illumina is the dominant manufacturer of NGS systems in the United States, where it enjoys a market share of more than 90%.  PacBio is one of three other companies manufacturing and selling NGS systems in the United States.  All of the companies that could, theoretically, enter the U.S. NGS Market at some point in the future ███████ ██████████████████████████████████.

<div align="center">

**A.  Illumina**

</div>

35.  Illumina describes itself as the "global leader in DNA sequencing" and has enjoyed an enduring dominance in the sale of sequencers.  Market participants describe Illumina as "synonymous with sequencing" because its technology generates more than 90% of the world's sequencing data.  Illumina has sustained its dominance for years.

36.  Illumina has possessed since at least 2009, and continues to possess today, monopoly power in the markets in which it sells its DNA sequencing systems, including in the NGS Market.

37.  Substantial direct evidence demonstrates Illumina's durable monopoly power.  For many projects and use cases, customers have few, if any, commercially reasonable alternatives to Illumina.

38.  Customers recognize that they have few commercially reasonable alternatives and lack bargaining leverage to obtain lower prices or better contract terms from Illumina.  When Illumina has implemented price increases, those increases have been profitable and have not driven sales toward other DNA sequencing systems.

39.  Illumina's own documents provide evidence of its monopoly power.  An internal 2016 document answers the question ████████████████████████████████████ █████████.  It also states that ███████████████████████████████ but explains that ████████████████████████████████████.

40.    Illumina is so dominant that it sees limited sales left to compete for.  Illumina's Vice
       President of Regional Sales and Marketing for the Americas explained in an email ███

       ████████████████████████████████████████████████████████████████████

41.    Illumina's monopoly power may also be established through indirect evidence.  Illumina
       possesses an extremely high share of the NGS Market.  It has had a share of over 80%
       since at least 2013, and over 90% since 2015.

42.    Substantial barriers to entry prevent other firms from competing with Illumina in the sale
       of DNA sequencing systems.  DNA sequencing is complex, and any new entrant would
       need to overcome significant scientific, commercial, and intellectual property barriers to
       develop and commercialize a new NGS system successfully.  Since 2013, only one new
       firm, Oxford Nanopore, has entered and remained in the U.S. NGS Market, and three
       years later it holds only a █% market share.

**B.    PacBio**

43.    PacBio systems use an innovative "Single-Molecule, Real-Time" ("SMRT") sequencing
       approach.  With its ability to generate accurate long reads, PacBio can provide more
       comprehensive and higher quality information than short-read sequencing systems like
       Illumina's.  While PacBio's system offers advantages over short read, it currently has
       substantially lower throughput and higher costs than Illumina.

44.    PacBio has continually improved its system with the goal of converting ever more
       sequencing volume from short-read systems to its long-read technology.  Some Illumina
       customers have switched samples, projects, or entire applications from Illumina to
       PacBio already.

45.    PacBio's innovations and sequencing advances over the past two years have enabled the
       company to deliver significantly higher quality sequencing at dramatically lower prices,
       bringing its offerings closer to those of Illumina in terms of both capability and price.

46.    PacBio's share of the NGS Market is 2-3% today.  Both PacBio and Illumina project
       ██████████████████████████████████████████.  Some of that ██████
       ██████████████████████████.

**C.   Other Market Participants**

47.    Oxford Nanopore Technologies ("Oxford Nanopore") is a U.K.-based NGS company that
       markets native long-read sequencing systems based on a nanopore technology.  This
       technology, which functions differently than PacBio's, generates longer—but
       significantly less accurate—reads than other systems.  Oxford Nanopore ████████
       ████████████████████████████████████████████████████████████ a
       unique device that is portable and serves only niche use cases.  The low accuracy of
       Oxford Nanopore's technology has limited its acceptance among customers.

7

48.    Thermo Fisher Scientific ("Thermo Fisher") markets short-read, benchtop sequencing systems. Thermo Fisher is the second-leading provider of NGS systems, albeit well behind Illumina. Thermo Fisher's systems have significant technological limitations that constrain the company's ability to compete for business outside the application of targeted sequencing for clinical use. Thermo Fisher's technology is not an option for most customers of NGS products and services.

49.    No other firm attempting to develop a sequencing system ███████████████████ ██████████████████████████. One firm, Beijing Genomics Institute ("BGI"), currently provides sequencing instruments outside of the United States, but it is deterred from participating in the U.S. NGS Market due to Illumina's claims that BGI's instruments infringe Illumina's patents.

### D.   Market Shares

50.    Illumina makes the dominant NGS system and earns revenues ███████ greater than those of the next-largest firm.

51.    Illumina, which has held its dominant position for years, currently maintains a share of more than 90% of the U.S. NGS Market. PacBio holds a share approximately 2-3% of the NGS Market in the United States.

### VI.

### CONDITIONS OF ENTRY OR EXPANSION

52.    Entry into the U.S. NGS Market is time consuming and extremely difficult. A new entrant into the NGS Market would need to overcome significant scientific, legal, and commercial barriers.

53.    DNA sequencing systems are highly complex systems comprising advanced chemistry, sensitive optics, and powerful semiconductors. Integrating these components into a system that delivers value and performance sufficient to compete with existing systems, is scalable, and is cost effective to manufacture and operate is an immense challenge that requires considerable investment of capital and time.

54.    The intellectual property landscape surrounding existing sequencing technologies is broad, dense, and difficult to invent around. Illumina has an extensive patent portfolio— with hundreds of U.S. patent registrations—that it devotes considerable resources to enforcing. Illumina's patent enforcement efforts have prevented, and likely will continue to prevent, new competitors from emerging in the United States. PacBio, which also owns a substantial patent portfolio, uses a different sequencing technology than Illumina. Accordingly, PacBio is not vulnerable to a patent infringement suit from Illumina, but both Illumina and PacBio have a long history of asserting their patents to exclude competitive technologies from the U.S. NGS Market, and the combined firm will have a strong incentive to exclude any firm seeking to enter the United States with a new long-read or short-read product.

8

55.   Gaining acceptance in the marketplace after launching a product takes significant time and effort.  A new system must prove itself reliable and robust before it can expect significant sales to customers in the research and clinical communities.  New entrants typically must convince key opinion leaders to use their technology and publish papers to support the use of their products by other researchers, which takes a significant amount of time and creates uncertainty about whether new products, even after they are launched, would be able to compete effectively with existing, proven products.

## VII.

## HARM TO COMPETITION

### A.   The Acquisition Removes PacBio as a Competitive Threat to Illumina

56.   By late 2018, improvements to PacBio's sequencing system had positioned PacBio as a significant threat to Illumina's longstanding monopoly.

57.   As early as 2014, Illumina identified PacBio in internal documents as ███████████ ███████████████ and recognized that ████████████████████████████ ████████████████████

58.   As PacBio's continued innovation produced incrementally better sequencing offerings, Illumina became increasingly concerned.  In 2016, Illumina characterized PacBio as a ██████████████████ and one executive commented that, ███████████████ ██████████████████████████████████████████████████████████

59.   Internally, Illumina refers to PacBio specifically as a ██████████████████ ██████████████████████████, with the frequency of references to PacBio as ██████████████████████.

60.   Illumina identified two companies as ██████████████████████.  Of those two companies, only PacBio sells sequencing systems in the United States.

61.   Respondents' internal documents demonstrate intensifying head-to-head competition and a mutual recognition of the threat that an independent PacBio posed to Illumina going forward.  As PacBio's CEO told investors in August 2018, PacBio was getting close to "demonstrat[ing] that a high-quality PacBio analysis of the human genome can be performed at a comparable cost [to short-read technologies]," a "milestone" where it "anticipate[s] seeing larger cohorts of population sequencing samples shift over [from short read] to PacBio."

62.   In early 2018, PacBio senior executives contacted Illumina's top executives to explore potential partnership opportunities, which afforded Illumina the ability to evaluate the sequencing data generated by PacBio's new chemistry.  An Illumina Principal Scientist ████████████████████████—describing it internally as ████████████

63.     In light of PacBio's improving technology and the increasing threat to its monopoly, Illumina in 2018 contemplated specific competitive responses, including discounting its NGS products to protect its market position and developing new products that could compete with PacBio, which Illumina recognized was ██████████████████████ ██████████████████████.

64.     Instead of discounting or accelerating its internal innovation projects to maintain its market share in the face of PacBio's significant advancements, Illumina began evaluating PacBio as an acquisition target, as it had done before with ████████████████████ ██████████████████████████████████████████.   In 2017, Illumina determined that ████████████████████████████████ ████████████████████████████████████.

65.     By August 2018, Illumina recognized ████████████████████████" because of recent PacBio product improvements.

66.     Illumina and PacBio agreed to merge on November 1, 2018, and shortly after, Illumina executives explained in the company's ████████████████ that PacBio was ████████████████████████.

### B.   The Proposed Acquisition Extinguishes All Current and Future Competition Between Illumina and PacBio

67.     The proposed Acquisition will eliminate significant current and future competition between Illumina and PacBio, substantially harming consumers.  As PacBio has improved its technology, customers have benefitted from these cost and quality improvements and moved sequencing volume from Illumina to PacBio systems in certain projects, use cases, and applications.

68.     Respondents, customers, and other market participants recognize that, as an independent company, PacBio is poised to take increasing sequencing volume from Illumina in the future.  In the absence of the merger, Illumina's response to that competition would likely include discounting the prices of its systems, improving their quality, and developing innovative new products.

69.     When the parties entered into the Acquisition agreement, PacBio expected its Sequel II instrument and related chemistry improvements to be an inflection point for the company. The Sequel II will expand the projects and use cases for which customers could use PacBio, and will position PacBio as a much closer alternative to Illumina.

70.     PacBio expected the Sequel II would ████████ the NGS space.  In 2018, as PacBio was planning to introduce a significant chemistry improvement, its executives directed the company's marketing department to ████████████████████████████████ ████████████████████████.   As a marketing executive described PacBio's focus in October 2018, ████████████████████████████████████████.

71.    The merger would harm consumers, in part, by hampering competition, particularly innovation competition.  Both PacBio and Illumina have engaged in innovation efforts to compete with each other for years, they were engaged in such efforts at the time of the merger announcement, and both expected to compete against each other with new products in the future.

72.    PacBio is continually improving its system to reduce costs, increase throughput, and take market share from Illumina.  Illumina, in turn, is ███████████████████████ ███████████████████████, motivated in large part by the competitive threat posed by PacBio.

73.    The merger reduces the combined firm's incentives to innovate and develop new products relative to the incentives PacBio and Illumina faced as independent competitors. Post-acquisition, Illumina will have reduced incentives to develop new long-read systems that would cannibalize its existing short-read business, and Illumina will have little or no incentive to continue its efforts to launch new long-read products after acquiring PacBio's long-read business.  As a result, consumers will have fewer innovative products to choose from, and they will lose the price and quality benefits that competition between Illumina's and PacBio's new products would have created absent the merger.

## C. The Acquisition Presumptively Harms Competition in the NGS Market

74.    The 2010 Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Horizontal Merger Guidelines") and courts measure concentration using the Herfindahl-Hirschman Index ("HHI").  HHI levels are calculated by totaling the squares of the market shares of each firm in the relevant market.  A relevant market is "highly concentrated" if it has an HHI level of 2,500 or more.  A merger or acquisition is presumed likely to create or enhance market power—and presumptively illegal—when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

75.    Post-Acquisition U.S. NGS market concentration, and the change in concentration caused by the Acquisition, will exceed the thresholds established in the Horizontal Merger Guidelines.  Pre-Acquisition, the U.S. NGS Market is highly concentrated, with an HHI of 8,290, which far exceeds the threshold level in the Horizontal Merger Guidelines.  The Acquisition will increase the HHI of the U.S. NGS market by 443 points.  Post-Acquisition, the HHI of the U.S. NGS Market will be 8,733.

76.    The Acquisition is presumptively unlawful under the Horizontal Merger Guidelines and relevant case law.

## VIII.

## EFFICIENCIES AND PROCOMPETITIVE JUSTIFICATIONS

77.    Respondents cannot verify or substantiate any merger-specific efficiencies.  Even if
Respondents could identify some efficiencies that would result from the Acquisition, they
could not show that such savings would likely be passed on to customers.  In any event,
any cognizable efficiencies are far outweighed by the Acquisition's harm and do not
justify the Acquisition.

78.    Respondents' procompetitive justifications for the Acquisition are pretextual.  To the
extent that there are any procompetitive effects flowing from the Acquisition at all, those
effects could be accomplished through other means, without eliminating all competition
between Illumina and PacBio.

## IX.

## VIOLATIONS

## COUNT I—MONOPOLIZATION

79.    The allegations of Paragraphs 1 through 78 above are incorporated by reference.

80.    Respondent Illumina has, and at all relevant times had, monopoly power in the U.S. NGS
Market, as well as in any other market in which it sells DNA sequencing systems.

81.    The Acquisition, if consummated, would eliminate the nascent competitive threat that an
independently owned PacBio poses to Illumina's monopoly power.  The Acquisition is
anticompetitive conduct because it eliminates competition between Illumina and PacBio.
The Acquisition is anticompetitive conduct reasonably capable of contributing
significantly to Illumina's maintenance of monopoly power.

82.    Illumina's claimed procompetitive justifications are pretextual and, in any event, do not
outweigh the anticompetitive effect of the Acquisition.

83.    The Acquisition constitutes monopolization in violation of Section 2 of the Sherman Act,
15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of
Section 5(a) of the FTC Act, as amended, 15 U.S.C. § 45(a).

## COUNT II—ILLEGAL ACQUISITION

84.    The allegations of Paragraphs 1 through 78 above are incorporated by reference.

85.    Respondents currently compete with each other in the highly concentrated NGS Market.
Competition between Respondents has been increasing over time and will increase
substantially in the future.  Respondents cannot show that any cognizable efficiencies are
of a character and magnitude such that the Acquisition is not likely to be anticompetitive.

12

86.     The Acquisition, if consummated, may substantially lessen current and future competition in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, as amended, 15 U.S.C. § 45(a).

## NOTICE

Notice is hereby given to the Respondents that the eighteenth day of August 2020, at 10:00 a.m., is hereby fixed as the time, and the Federal Trade Commission offices at 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580, as the place, when and where an evidentiary hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in this complaint, at which time and place you will have the right under the Federal Trade Commission Act and the Clayton Act to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you. An answer in which the allegations of the complaint are contested shall contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect. Allegations of the complaint not thus answered shall be deemed to have been admitted. If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material facts to be true. Such an answer shall constitute a waiver of hearings as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding. In such answer, you may, however, reserve the right to submit proposed findings and conclusions under Rule 3.46 of the Commission's Rules of Practice for Adjudicative Proceedings.

Failure to file an answer within the time above provided shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions, and a final order disposing of the proceeding.

The Administrative Law Judge shall hold a prehearing scheduling conference not later than ten (10) days after the Respondents file their answers. Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580. Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the pre-hearing scheduling conference (but in any event no later than five (5) days after the Respondents file their answers). Rule 3.31(b) obligates counsel for each party, within five (5) days of receiving the Respondents' answers, to make certain initial disclosures without awaiting a discovery request.

14

## <u>NOTICE OF CONTEMPLATED RELIEF</u>

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the Acquisition challenged in this proceeding violates Section 2 of the Sherman Act, Section 7 of the Clayton Act, as amended, and/or Section 5 of the Federal Trade Commission Act, as amended, the Commission may order such relief against the Respondents as is supported by the record and is necessary and appropriate, including, but not limited to:

1.   If the Acquisition is consummated, divestiture or reconstitution of all associated and necessary assets, in a manner that restores two or more distinct and separate, viable and independent businesses in the relevant market, with the ability to offer such products and services as Illumina and PacBio were offering and planning to offer prior to the Acquisition.

2.   A prohibition against any transaction between Illumina and PacBio that combines their businesses in the relevant market, except as may be approved by the Commission.

3.   A requirement that, for a period of time, Illumina and PacBio provide notice to the Commission of acquisitions, merger, consolidations, or any other combinations of their businesses in the relevant market with any other company operating in the relevant market.

4.   A requirement to file periodic compliance reports with the Commission.

**IN WITNESS WHEREOF**, the Federal Trade Commission has caused this complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this seventeenth day of December, 2019.

By the Commission.

April J. Tabor
Acting Secretary

SEAL:

# EXHIBIT 3

Case ME/6795/18
19 NOVEMBER 2019

## **Response to Notice of Possible Remedies**

1.  This response to the CMA's Notice of Possible Remedies ("NPR") proposes remedies that address the CMA's provisional substantial lessening of competition ("SLC") findings, and identifies the important relevant customer benefits ("RCBs") that would result from the proposed remedies.  More specifically, the RCBs of the Transaction include the following:[1]

    (i)     Wider distribution of/access to PacBio's products and technology by enabling PacBio to benefit from Illumina's global production, and support and service infrastructure;

    (ii)    Increased adoption of PacBio's systems by clinical and diagnostic customers by enhancing PacBio system quality with Illumina's quality systems and system management processes;

    (iii)   Improved PacBio systems using Illumina's proprietary technologies;

    (iv)    Development of coordinated solutions (including bioinformatics) to enable customers to harness the complementary nature of the Parties' technologies; and

    (v)     Accelerated innovation.

2.  For the avoidance of doubt, the Parties consider that the Provisional Findings ("PFs") contain important errors that undermine the SLC findings.  The Parties have made a separate submission in response to the PFs.  The CMA ought to consider the Parties' representations on these points before deciding whether there is an SLC that requires remedy. These representations are also relevant to the assessment of the appropriateness and proportionality of the proposed remedies.

3.  Contrary to the statement in the NPR, prohibition is not the only comprehensively effective solution to address the SLC provisionally found by the CMA.  Illumina's remedy proposal described below is a sufficient package that removes any SLC whilst preserving the RCBs.

4.  Further, prohibition would not be a proportionate or "*reasonable and practicable*" (under section 36(3) Enterprise Act 2002) solution.  Further, the RCBs identified are significant in scale and nature, and the CMA should take into account the RCBs that would be lost as a result of a prohibition.  All RCBs would be lost if the Transaction were to be prohibited.

5.  Illumina proposes the following undertaking to remedy the SLC provisionally identified by the CMA:

    a.  To grant a perpetual, royalty-free, irrevocable, licence to any of Illumina's and PacBio's pre-closing patents and patent applications to any interested third-party undertaking for use in the field of single molecule, native long read sequencing systems and associated sequencing chemistries.  For the avoidance

---

[1] See paragraphs 426 to 459 of the Merger Notice.

of doubt, this commitment also extends to pre-closing inventions that lead to patent applications filed within 12 months after the closing date.

    b. To relinquish any exclusive rights in the field of single molecule, native long read sequencing systems and associated sequencing chemistries that Illumina or PacBio might have in relation to any in-licensed patents held as of the closing date.

    c. To make available, prior to and as a condition to closing the Transaction and thereafter for as long as the patents are in force, to any interested third-party undertaking a complete form license agreement for use in the field of single molecule, native long read sequencing systems and associated sequencing chemistries.

6. A list of Illumina's and PacBio's existing patents, whether owned or exclusively in-licensed, are attached as Annex 1.

7. The CMA Merger Remedies Guidelines recognise that an exclusive, irrevocable, and royalty-free technology licence "*will effectively be treated by the CMA as structural in form and subject to similar consideration and evaluation as an asset divestiture*".[2]  The undertaking proposed above would be sufficient to remedy the SLC provisionally identified by the CMA in its PFs.

8. A perpetual, royalty-free, irrevocable, licence of PacBio's and Illumina's patents to any interested third-party undertaking for use in the field of single molecule, native long read sequencing systems and associated sequencing chemistries would be a fully effective, reasonable and proportionate undertaking to remedy the SLC provisionally identified by the CMA.  Further, this undertaking addresses the concerns expressed by the CMA in paragraphs 24 and following of the NPR regarding the appropriateness of an IP remedy in the case at hand.

9. First, by making these patents fully accessible to third-party undertakings active in developing single molecule, native long read sequencing systems and associated sequencing chemistries, one of the most significant barriers to entry identified by the CMA in its NPFs, *i.e.*, IP, is eliminated.

10. Second, the CMA is concerned that "*any licensee would need to have sufficient capabilities*" in "*supporting commercial infrastructure (for example sales and marketing, manufacturing)* […] *to effectively compete with the merged entity, which would retain all of these assets*".[3]  However, in the pool of potential licensees there are a number of large companies, including Roche (the world's largest biotechnology company and the world leader in IVD and tissue-based cancer diagnostics), Agilent (a leader in life sciences, diagnostics and applied chemicals with almost $5 billion in revenue and more than 24,000 customers in 110 countries), and NanoString (a provider of life science tools for translational research and molecular diagnostics which has had success commercialising its non-sequencing products), all of which have significant commercial capabilities.  For example, Roche will be able to leverage its existing

---

[2] Merger Remedies Guidelines, 13 December 2018, paragraph 6.2.

[3] See paragraph 28 of NPR.

distribution infrastructure, relationships with clinical customers (which are more extensive and well-developed than Illumina's), and its previous experience in supplying sequencing systems.

11. Third, the CMA asserts that the potential licensee should be able to leverage "*the potential competitive benefits of existing short read operations*".[4]   In the pool of potential licensees there are companies which are currently offering or developing short read systems, such as BGI, Thermo Fisher, Agilent, and Omniome.

12. While the Parties reject the provisional SLC findings, the proposed commitment will ensure that any potential SLC is eliminated and that the important RCBs are maintained. In contrast, a prohibition would involve a loss of all RCBs and would therefore be unnecessary and disproportionate.

13. Finally, Illumina proposes compliance mechanisms to address any concerns that Illumina might be incentivised to breach any of its commitments including: (i) the appointment of a monitoring trustee; and (ii) making a fast-track dispute resolution mechanism open to third parties.  The CMA approved monitoring trustee will monitor compliance with the licencing terms and prepare a compliance report every 12 months. The monitoring trustee will also rule on any disputes between the licensee(s) and Illumina under a fast-track dispute resolution process.  If a party wishes to appeal a ruling by the monitoring trustee, there will be recourse to a fast-track arbitration procedure.  Illumina commits to follow the monitoring trustee/arbitrator's rulings on any disputes and to provide the monitoring trustee with all the information and assistance (including access to confidential documents) as may be reasonably required in order to carry out its mandate effectively.  The mandate of the monitoring trustee, and Illumina's commitment to fast-track dispute resolution, will terminate on expiry of the last of the relevant patents.

---

[4] See paragraph 28 of NPR.

# EXHIBIT 4

| | |
|---|---|
| **From:** | Magee, Robert <Robert.Magee@weil.com> |
| **Sent:** | Friday, January 31, 2020 4:25 PM |
| **To:** | Gritton, Jeff; Flannery, Liz; EXT Ying, Jennifer |
| **Cc:** | bfarnan@farnanlaw.com; Hash, Steve; mfarnan@farnanlaw.com; Reines, Edward; Walter, Derek; Chi, Shawn; Dwyer, Anna; Varghese, David; DL Oxford3 |
| **Subject:** | RE: PacBio v. Oxford: discussion about pretrial deadlines |
| **Attachments:** | Oxford_PacBio-Letter to J. Hall Regarding Motion for Discovery Dispute hearing (WGM edits).DOC |

[EXTERNAL EMAIL]

Jeff,

Thank you for confirming that ONT will supplement its financial data as agreed to by Liz Flannery.  I would like to confirm that your reference to ONT's "sales spreadsheet" includes all of the relevant categories of financial data produced during discovery, including at least units, revenue, and material costs broken out by customer (*see* ONT_DEL00557473).  Please confirm that our understanding is correct.

We are disappointed at the mischaracterization of our position on the meet and confer call with respect to ONT's new discovery requests.  We are now just over 5 weeks from trial.  We exchange deposition designations and initial exhibit lists in 5 days, and we will have had to identify our motions *in limine* a week from today.  As we explained on the call, ONT's request is not a routine update to a discovery response but a reopening of discovery, requiring significant bilateral discovery.  Reopening discovery at the same time as the parties are attempting to narrow the issues and prepare exhibits, witnesses and demonstratives for trial would be an undue and unreasonable burden on the parties.  There is no reason to reopen discovery at this time, given the fact that ONT was unquestionably aware of the FTC and CMA investigations since at least the service of Dr. Layne-Farrar's expert report in September 2019.

The scope of re-opened discovery would be expansive.  The FTC and CMA investigations were substantial undertakings— over a year of investigations involving hundreds of bankers boxes of documents.  Moreover, ONT was substantially involved in the investigations, requiring the production of substantial documents from ONT as well.  ONT's CMA related documents are responsive to PacBio's RFP Nos. 79, 80, 81, 90, 94, 105, and 108.  Regardless, in no event should the scope of reopened discovery be one sided.  Following the close of discovery, ONT made multiple highly-relevant presentations regarding the accused products and functionality at issue in this case.  If discovery is reopened, PacBio will seek all communications, presentations, and documents relating to ONT's presentations at the Genome Science 2019 conference held September 3-5, 2019 and the Nanopore Community Meeting held December 5-6, 2019.  In presentations offered at both conferences, ONT discussed single molecule consensus sequencing as well as its intention to offer for sale accused 2D sequencing kits, a product line it asserted to the Court it discontinued.

The deadline for the close of discovery sets boundaries on endless fishing expeditions and forces the parties to marshal their best evidence and focus for trial.  With less than a week to identify our final exhibit lists, it is completely unreasonable to reopen discovery now.  Nonetheless, if ONT wishes to bring this matter to the Court, we have provided a revised letter, attached.

Best,
Bobby



**Robert Magee**

Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
Robert.Magee@weil.com
+1 650 802 3985 Direct
+1 650 802 3100 Fax

---

**From:** jeff.gritton@bakerbotts.com <jeff.gritton@bakerbotts.com>
**Sent:** Wednesday, January 29, 2020 6:07 AM
**To:** Magee, Robert <Robert.Magee@weil.com>; liz.flannery@bakerbotts.com; JYing@MNAT.com
**Cc:** bfarnan@farnanlaw.com; stephen.hash@bakerbotts.com; mfarnan@farnanlaw.com; Reines, Edward <edward.reines@weil.com>; Walter, Derek <Derek.Walter@weil.com>; Chi, Shawn <Shawn.Chi@weil.com>; Dwyer, Anna <Anna.Dwyer@weil.com>; david.varghese@bakerbotts.com; DLOxford3@BakerBotts.com
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines

Bobby,

To follow up on the parties' meet and confer:

As stated on the call, Oxford will supplement its sales spreadsheet, though we cannot commit to the proposed February 3 deadline.

As to Oxford's request regarding PacBio's document production, we confirmed that the parties are at an impasse regarding Oxford's request for PacBio to supplement its discovery to include communications with the Competition and Markets Authority ("CMA") and Federal Trade Commission ("FTC") relating to the proposed merger. These documents would be relevant to the damages portion of the case and responsive to at least RFP Nos. 2, 3, 50, 51, and 96. As explained on the call, Oxford could not have raised these requests during the period of fact discovery as they are premised on findings by the CMA and FDA, and PacBio's responses, that did not occur until recently.

We understand that PacBio contends that the requested production would be burdensome, but that on the call, PacBio did not have an estimate of how many documents would be involved and stated that it would oppose production regardless of the number of documents involved. Further, Oxford stated that it would be willing to narrow its requests to ensure that the production would not be burdensome. In addition, we understand that PacBio will continue to oppose the requested production regardless of whether Oxford agrees to produce its own communications with the CMA and FDA regarding the proposed merger.

We remain willing to discuss ways to tailor the requests to minimize the supposed burden on PacBio and eliminate the need to trouble the court. But given PacBio's stated positions, it appears we will need to seek the court's assistance. Attached is a joint dispute letter to the Court – please advise if you are available at the proposed times so that we can get this letter on file with the Court promptly.

Best,
Jeff

---

**From:** Magee, Robert <Robert.Magee@weil.com>
**Sent:** Monday, January 27, 2020 11:14 AM
**To:** Flannery, Liz <liz.flannery@bakerbotts.com>; EXT Ying, Jennifer <JYing@MNAT.com>
**Cc:** bfarnan@farnanlaw.com; Hash, Steve <stephen.hash@bakerbotts.com>; mfarnan@farnanlaw.com; Reines, Edward

<edward.reines@weil.com>; Walter, Derek <Derek.Walter@weil.com>; Chi, Shawn <Shawn.Chi@weil.com>; Dwyer, Anna <Anna.Dwyer@weil.com>; Gritton, Jeff <jeff.gritton@weil.com>; Varghese, David <david.varghese@bakerbotts.com>; DL Oxford3 <DLOxford3@BakerBotts.com>
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines


**[EXTERNAL EMAIL]**

Liz,

I am available for a call today from 12:30-1:45pm PT and after 3pm PT.

Best,
Bobby

**From:** liz.flannery@bakerbotts.com <liz.flannery@bakerbotts.com>
**Sent:** Friday, January 24, 2020 3:29 PM
**To:** Magee, Robert <Robert.Magee@weil.com>; JYing@MNAT.com
**Cc:** bfarnan@farnanlaw.com; stephen.hash@bakerbotts.com; mfarnan@farnanlaw.com; Reines, Edward <edward.reines@weil.com>; Walter, Derek <Derek.Walter@weil.com>; Chi, Shawn <Shawn.Chi@weil.com>; Dwyer, Anna <Anna.Dwyer@weil.com>; jeff.gritton@weil.com; david.varghese@bakerbotts.com; DLOxford3@BakerBotts.com
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines

Bobby, we will need to meet and confer on the supplemental discovery.  Please let us know your availability for a call on Monday.

**From:** Magee, Robert <Robert.Magee@weil.com>
**Sent:** Friday, January 24, 2020 4:34 PM
**To:** Flannery, Liz <liz.flannery@bakerbotts.com>; EXT Ying, Jennifer <JYing@MNAT.com>
**Cc:** bfarnan@farnanlaw.com; Hash, Steve <stephen.hash@bakerbotts.com>; mfarnan@farnanlaw.com; Reines, Edward <edward.reines@weil.com>; Walter, Derek <Derek.Walter@weil.com>; Chi, Shawn <Shawn.Chi@weil.com>; Dwyer, Anna <Anna.Dwyer@weil.com>
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines


**[EXTERNAL EMAIL]**

Liz,

The proposed change to the schedule is acceptable.

Thank you for agreeing to supplement ONT's financial information.  We request that the supplementation occur by February 3, so that any new documents can identified on the initial exhibit list.

Your request for new discovery into communications with the CMA or FTC regarding the unconsummated merger of Illumina and PacBio is unwarranted.  The request is disproportionate and unduly burdensome, particularly given only six weeks until trial.  Unlike updating financial information, ONT's request would require extensive bilateral discovery from both PacBio and ONT well after the close of discovery.

Best,
Bobby

**From:** liz.flannery@bakerbotts.com <liz.flannery@bakerbotts.com>
**Sent:** Tuesday, January 21, 2020 2:55 PM
**To:** Magee, Robert <Robert.Magee@weil.com>; JYing@MNAT.com
**Cc:** bfarnan@farnanlaw.com; stephen.hash@bakerbotts.com; mfarnan@farnanlaw.com
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines

Bobby,

One issue I noticed with the schedule is that under this proposal we're giving ourselves less than 24 hours to prepare objections to each others' counter designations (since those are due on Feb 19 under this schedule and the PTO is due on Feb 20).  Could we move that back just one day to Feb 18?  Seems like it would be beneficial to give both parties just one more day to prepare objections.  If you're OK with that change, we'll call it done on the schedule.

As to the PTO issues you noted below, ONT is of the following view: (1) JMOLs should be made orally outside of the jury's presence at the appropriate time (e.g., at the close of the case-in-chief for the party bearing the burden of proof on the issue) which would then be supplemented with a written motion not to exceed five (5) pages supporting any oral motions filed within 48 hours if the Court wants the briefing, and for any renewed JMOL, the briefing schedule will be addressed after the conclusion of the jury trial; and (2) objections to expert testimony as being beyond the scope of the reports should be made and ruled upon at trial rather than deferred until later.   Our understanding is that this is consistent with Judge Stark's typical jury trial practice, but if PacBio disagrees, happy to discuss with our respective local counsel.

Finally, regarding the supplementation of ONT's financial information, we are willing to make that supplementation.  Similarly, we note that PacBio has engaged in further communications with the CMA and FTC relating to the present litigation and/or patents-in-suit since the close of discovery.  Documents related to PacBio and Illumina's communications with the CMA and FTC relating to those matters, including but not limited to, communications regarding offering royalty-free licenses to the patents-in-suit and representations to the CMA that PacBio is a failing company, would be responsive to at least RFP Nos. 2, 3, 50, 51, and 96, and so PacBio is obligated to supplement its document production to cover those non-privileged documents created or received since the close of fact discovery.  We are willing to discuss a mutually agreeable date for the parties to make those respective supplementations, but suggest that we aim to provide those by February 10.


**Liz Durham Flannery**
*Partner*

Baker Botts L.L.P.
liz.flannery@bakerbotts.com
T +1.713.229.2104
F +1.713.229.7704

910 Louisiana Street
Houston, Texas 77002
USA



**From:** Magee, Robert <Robert.Magee@weil.com>
**Sent:** Tuesday, January 21, 2020 11:02 AM
**To:** Flannery, Liz <liz.flannery@bakerbotts.com>; EXT Ying, Jennifer <JYing@MNAT.com>
**Cc:** bfarnan@farnanlaw.com; Hash, Steve <stephen.hash@bakerbotts.com>; mfarnan@farnanlaw.com
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines

[EXTERNAL EMAIL]

Liz,

We are agreed on the schedule.

We still need your positions on the sections of Judge Stark's PTO regarding JMOL and Expert Objection procedures.  We will also need updated financial information for ONT from Q2 2019 through today.

I am generally available to discuss  these issues telephonically if needed.

Best,
Bobby

**From:** liz.flannery@bakerbotts.com <liz.flannery@bakerbotts.com>
**Sent:** Friday, January 17, 2020 10:57 AM
**To:** JYing@MNAT.com; Magee, Robert <Robert.Magee@weil.com>
**Cc:** bfarnan@farnanlaw.com; stephen.hash@bakerbotts.com
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines

Just following up.  Bobby – are we agreed on this schedule?

**From:** Ying, Jennifer <jying@MNAT.com>
**Sent:** Wednesday, January 15, 2020 5:58 PM
**To:** Flannery, Liz <liz.flannery@bakerbotts.com>; Robert.Magee@weil.com
**Cc:** bfarnan@farnanlaw.com; Hash, Steve <stephen.hash@bakerbotts.com>
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines

[EXTERNAL EMAIL]

Hi Liz and Bobby:

I do not think we need to file a stipulation with the Court and that an email agreement between the parties is sufficient.  Brian, do you agree?

Thanks
Jen

**From:** liz.flannery@bakerbotts.com [mailto:liz.flannery@bakerbotts.com]
**Sent:** Wednesday, January 15, 2020 11:56 AM
**To:** Robert.Magee@weil.com

**Cc:** Ying, Jennifer; bfarnan@farnanlaw.com; stephen.hash@bakerbotts.com
**Subject:** [EXT] RE: PacBio v. Oxford: discussion about pretrial deadlines

Bobby –

The proposed schedule below is acceptable for ONT.  (I realized that I had 2 dates out of order in the prior version, which is fixed below.)  Unless otherwise noted below, we understand that the deadlines would be at 6pm ET.  Please confirm whether this is acceptable for PacBio.  We can also agree to endorse trial exhibits per the format in your exemplar.

Jen / Brian – assuming PacBio agrees, do we need to file some sort of stipulation about this schedule, or does an email agreement between the parties suffice?

| Deadline | Event | Party Responsible |
|---|---|---|
| Jan 29, 2020 | PacBio to provide draft sections of the PTO | PacBio |
| Jan 29, 2020 | Parties exchange initial witness lists | Both |
| Feb 5, 2020 | Parties exchange initial exhibit list and deposition designations | Both |
| Feb 7, 2020 | Parties to exchange lists of potential motions *in limine* | Both |
| Feb 10, 2020 | Parties meet and confer on motions in limine | Both |
| Feb 10, 2020 | ONT to provide draft sections of the PTO | ONT |
| Feb 11, 2020 | PacBio to provide draft proposed preliminary jury instructions, final jury instructions, verdict form and voir dire | PacBio |
| Feb 12, 2020 | Parties to exchange opening motions *in limine* | Both |
| Feb 17, 2020 | Parties exchange answering motion *in limine* papers | Both |
| Feb 18, 2020 | ONT to provide any comments/edits/objections to the proposed preliminary jury instructions, final jury instructions, verdict form, and voir dire | ONT |
| Feb 19, 2020 | Parties exchange: - objections / counter-designations to exhibit list - objections / counter-designations to deposition designations | Both |
| Feb 20, 2020 (noon ET) | Parties exchange reply motion *in limine* papers | Both |
| **February 20, 2020** | **Parties submit Pretrial Order (PTO)** | **Both** |
| February 24, 2020 - 3 business days before PTC | Parties submit preliminary jury instructions, final jury instructions, verdict form and voir dire | Both |
| **February 27, 2020** | **Pretrial Conference** | **Both** |

Thanks,

Liz


**Liz Durham Flannery**
*Partner*

Baker Botts L.L.P.
liz.flannery@bakerbotts.com
T +1.713.229.2104
F +1.713.229.7704

910 Louisiana Street
Houston, Texas 77002
USA



---

**From:** Magee, Robert <Robert.Magee@weil.com>
**Sent:** Monday, January 13, 2020 6:23 PM
**To:** Flannery, Liz <liz.flannery@bakerbotts.com>
**Cc:** EXT Ying, Jennifer <JYing@MNAT.com>; bfarnan@farnanlaw.com
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines


[EXTERNAL EMAIL]

Liz,

Thanks.  That is consistent with my notes.  Also attached is an example of our proposed trial endorsement format for your team's review.

Best,
Bobby

---

**From:** liz.flannery@bakerbotts.com <liz.flannery@bakerbotts.com>
**Sent:** Monday, January 13, 2020 2:32 PM
**To:** Magee, Robert <Robert.Magee@weil.com>
**Cc:** JYing@MNAT.com; bfarnan@farnanlaw.com
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines

Bobby, subject to the caveats we discussed and needing to discuss with our teams internally, here's the proposal as you and I discussed.  Just wanted to be sure we both had the same notes.

| Deadline | Event | Party Responsible |
|---|---|---|
| Jan 29, 2020 | PacBio to provide draft sections of the PTO | PacBio |

| Jan 29, 2020 | Parties exchange initial witness lists | Both |
|---|---|---|
| Feb 5, 2020 | Parties exchange initial exhibit list and deposition designations | Both |
| Feb 7, 2020 | Parties to exchange lists of potential motions *in limine* | Both |
| Feb 10, 2020 | Parties meet and confer on motions in limine | Both |
| Feb 10, 2020 | ONT to provide draft sections of the PTO | ONT |
| Feb 11, 2020 | PacBio to provide draft proposed preliminary jury instructions, final jury instructions, verdict form and voir dire | PacBio |
| Feb 12, 2020 | Parties to exchange opening motions *in limine* | Both |
| Feb 18, 2020 | ONT to provide any comments/edits/objections to the proposed preliminary jury instructions, final jury instructions, verdict form, and voir dire | ONT |
| Feb 17, 2020 | Parties exchange answering motion *in limine* papers | Both |
| Feb 19, 2020 | Parties exchange:<br>- objections / counter-designations to exhibit list<br>- objections / counter-designations to deposition designations | Both |
| Feb 20, 2020 (noon ET) | Parties exchange reply motion *in limine* papers | Both |
| February 20, 2020 | Parties submit Pretrial Order (PTO) | Both |
| February 24, 2020 - 3 business days before PTC | Parties submit preliminary jury instructions, final jury instructions, verdict form and voir dire | Both |
| **February 27, 2020** | **Pretrial Conference** | **Both** |

**From:** Flannery, Liz
**Sent:** Monday, January 13, 2020 2:17 PM
**To:** 'Magee, Robert' <Robert.Magee@weil.com>
**Cc:** EXT Ying, Jennifer <JYing@MNAT.com>; 'bfarnan@farnanlaw.com' <bfarnan@farnanlaw.com>
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines

Bobby – in the interest of facilitating our discussion, I wanted to share with you a list of the pretrial activities that I thought we should talk about.  Just for brainstorming purposes, we can certainly talk about any changes / additions needed.

| Deadline | Event | Party Responsible |
|---|---|---|
| | PB to provide its sections of the PTO, including:<br>- PB's witness list<br>- PB's exhibit list<br>- PB's deposition designations | PB |

| | | |
|---|---|---|
| | ONT to provide its sections of the PTO, including:<br>- ONT's witness list<br>- ONT's exhibit list<br>- ONT's objections to PB's exhibit list<br>- ONT's deposition designations and any ONT counter-designations to PB's deposition designations | ONT |
| | PB to provide draft proposed preliminary jury instructions, final jury instructions, verdict form and voir dire | PB |
| | Parties to exchange lists of potential motions *in limine* | Both |
| | Parties to exchange opening motions *in limine* | Both |
| | ONT to provide any comments/edits/objections to the proposed preliminary jury instructions, final jury instructions, verdict form, and voir dire | ONT |
| | PB to provide objections to ONT's exhibit list | PB |
| | PB provides any objections / counter-designations to ONT's depo designations | PB |
| | Parties exchange answering motion *in limine* papers | Both |
| | Parties exchange reply motion *in limine* papers | Both |
| February 20, 2020 | Parties submit Pretrial Order | Both |
| | Parties to meet and confer regarding proposed preliminary jury instructions, final jury instructions, verdict form and voir dire | Both |
| February 24, 2020 - 3 business days before PTC | Parties submit preliminary jury instructions, final jury instructions, verdict form and voir dire | Both |
| February 27, 2020 | Pretrial Conference | Both |

**From:** Flannery, Liz
**Sent:** Friday, January 10, 2020 5:41 PM
**To:** Magee, Robert <Robert.Magee@weil.com>
**Cc:** EXT Ying, Jennifer <JYing@MNAT.com>; bfarnan@farnanlaw.com; Hash, Steve <stephen.hash@bakerbotts.com>; PacBio Oxford Delaware WGM Service <PacBio.Oxford.Delaware.WGM.Service@weil.com>; DL Oxford3 <DLOxford3@BakerBotts.com>
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines

That works.  I'll just plan to give you a call then.

**From:** Magee, Robert <Robert.Magee@weil.com>
**Sent:** Friday, January 10, 2020 5:37 PM
**To:** Flannery, Liz <liz.flannery@bakerbotts.com>
**Cc:** EXT Ying, Jennifer <JYing@MNAT.com>; bfarnan@farnanlaw.com; Hash, Steve <stephen.hash@bakerbotts.com>;
PacBio Oxford Delaware WGM Service <PacBio.Oxford.Delaware.WGM.Service@weil.com>; DL Oxford3
<DLOxford3@BakerBotts.com>
**Subject:** RE: PacBio v. Oxford: discussion about pretrial deadlines


[EXTERNAL EMAIL]

Liz,

Why don't we aim to talk initially on Monday at 1pm PT.  I don't think Delaware counsel is necessary for the initial call,
but their insight is always welcome.

Best,
Bobby

**From:** liz.flannery@bakerbotts.com <liz.flannery@bakerbotts.com>
**Sent:** Friday, January 10, 2020 3:30 PM
**To:** Magee, Robert <Robert.Magee@weil.com>
**Cc:** JYing@MNAT.com; bfarnan@farnanlaw.com; stephen.hash@bakerbotts.com; PacBio Oxford Delaware WGM Service
<PacBio.Oxford.Delaware.WGM.Service@weil.com>; DLOxford3@BakerBotts.com
**Subject:** Re: PacBio v. Oxford: discussion about pretrial deadlines

Bobby,

In order to facilitate preparing the materials for the pretrial order (trial exhibits, depo designations, jury instructions,
motions in limine, etc.), we wanted to set up a time to talk through a proposed schedule for exchanging those
materials.  Can you let us know when you would be available to talk about that?  I can be available Monday from noon-
2pm, Tuesday after 10am, or Wednesday 2pm – 5pm (all central times).  I'm happy to include our respective local
counsel in that discussion, although I'm also happy to just have an initial conversation without them if scheduling is
easier.  Let us know.

Thanks,
Liz


**Liz Durham Flannery**
*Partner*

Baker Botts L.L.P.
liz.flannery@bakerbotts.com
T +1.713.229.2104
F +1.713.229.7704

910 Louisiana Street
Houston, Texas 77002
USA

**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

---

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended

recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 17-cv-275-LPS C.A. No. 17-cv-1353-LPS |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| OXFORD NANOPORE TECHNOLOGIES, INC., and OXFORD NANOPORE TECHNOLOGIES, LTD., | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION *IN LIMINE* NO. 2 TO PRECLUDE REFERENCE TO ILLUMINA'S UNSUCCESFUL ACQUISITION OF PACBIO**

ONT's opposition confirms the very concern PacBio highlighted in its opening brief—ONT intends to use the preliminary findings of a foreign agency, made in a collateral proceeding and involving an entirely different body of law and policy concerns, as substantive damages evidence.  If permitted, unfair prejudice, jury confusion, and wasted time are inevitable.

The CMA's findings are preliminary and thus insufficiently trustworthy for that reason alone because the CMA has effectively said as much by labelling them "provisional" and subsequently stating that months of additional work would be needed before completion of its investigation and publication of a final reportis—which never happened.  *See* Mtn. Ex. 4 [November 26, 2019 Notice of Extension].  In *Rambus*, by contrast, the court excluded an *already-completed* ALJ decision because it was subject to further review by the FTC: "[i]n light of the nonfinal and appealable nature of the Initial Decision, the Initial Decision is not the type of document subject to admission under Rule 803(8)(C)."  222 F.R.D. at 109.  The *Rambus* court went on to conclude that, even if admissible, "the jury…likely would give undue weight to the findings of the ALJ," and the decision's admission "would create confusion of the issues and would create a serious risk of misleading the jury."  *Id.*  Every one of those concerns is present in spades here; mini-trials regarding methodology, legal standards applied, the extent of party involvement, and a host of other issues would inevitably result from admission of any CMA (or FTC) evidence.

As to ***Illumina's*** license proposal, ONT's counter-factual insistence that it was made by PacBio ignores that Illumina would have been the sole post-acquisition decision maker, so PacBio's position was irrelevant.  If ONT were to raise Illumina's license offer at trial, that would necessarily implicate what Illumina had to lose if the acquisition did not go through to understand why it made the licensing offer in a bid to save the deal.  That is not an empty threat.  It is a necessary, persuasive and justified response to ONT's argument based on Illumina's offer.

Dated: February 20, 2020

FARNAN LLP

*/s/ Brian E. Farnan*

---

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff Pacific Biosciences of
California, Inc.*

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Robert S. Magee (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com
robert.magee@weil.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 17-cv-275-LPS<br>C.A. No. 17-cv-1353-LPS |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| OXFORD NANOPORE TECHNOLOGIES, INC., and OXFORD NANOPORE TECHNOLOGIES, LTD., | ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

## PLAINTIFF'S MOTION *IN LIMINE* NO. 3 TO PRECLUDE REFERENCE TO PATENT MISUSE AND POTENTIAL REMEDIES

Throughout this litigation, ONT has insinuated that PacBio is a non-practicing entity and accused PacBio of using its patents in an anti-competitive manner.  ONT filed antitrust counterclaims that were dismissed for lack of legal support.  *See* 17-1353 D.I. 64; 17-1353 D.I. 179.  During multiple hearings before the Court, ONT referred to PacBio as an NPE and this case as "the most sinister type of NPE case."  ONT asked PacBio's experts leading questions about the direction of the lawsuit, including whether they agreed that nanopore sequencing should be taken off the market or whether an injunction would be a proper remedy.  During the parties' meet and confer, PacBio asked ONT to agree not to refer to PacBio in pejorative terms and to not introduce evidence or argument about the potential consequences of the litigation such as the exclusion of products, the increase of prices or the reduction in nanopore sequencing innovation.  ONT agreed not to use the specific terms "patent troll" and "NPE," but refused to refrain from using pejorative terms such as "paper patents."  Likewise, ONT agreed not to use the term "injunction," but would not agree to refrain from arguing or eliciting testimony about the consequences of the litigation including exclusion of ONT's products as a result of a finding of infringement.

## A.    USE OF PEJORATIVE TERMS

This Court has repeatedly prevented defendants from using pejorative terms such as "paper patents."  *See, e.g., Personalized User Model, L.L.P. v. Google, Inc.*, C.A. 09-525-LPS, 2014 WL 807736, at *3 (D. Del. 2014) (granting motion precluding use of pejorative terms including "patent troll," "non-practicing entity," and "paper patent"); *Intellectual Ventures I LLC v. Xilinx, Inc.*, C.A. 10-1065-LPS, Tr. 11 (D. Del. 2014) ("There will be no reference to IV as a patent troll. There will be no other pejorative terms referring to IV or its business model and they will not be reference to IV litigation or license activity unrelated to the patent in suit."); *Intellectual Ventures I LLC v. Symantec Corp.*, C.A. 10-1067-LPS, 2015 WL 82052, at *1 (D. Del. 2015) (defendant precluded from disparaging plaintiff's "business model and practices" using pejorative terms such as "patent

troll" or "woodshedding" because "such disparagement is irrelevant").  In this case, such statements would be even more prejudicial, as PacBio is not a non-practicing entity but a direct competitor to ONT and the patents-in-suit bear direct relation to PacBio's research and development work.

**B.     ARGUMENTS ABOUT THE CONSEUQNCES OF THIS CASE ARE IRRELEVANT, CONFUSING AND RISK UNFAIR PREJUICE**

During the course of discovery, ONT repeatedly sought to elicit testimony about the consequences if it lost this case.  ONT has argued about whether if it lost that would increase prices, lead to the exclusion of nanopore sequencing devices from the United States, and harm scientific research.  At the August 15, 2019 discovery hearing, ONT's counsel told the Court that "this is the most sinister type of NPE case" and PacBio is a "nonpracticing NPE."  Ex. 1 [8/15/2019 Hearing Tr.] at 21:3-5.  ONT's counsel, for example, repeatedly asked Dr. Christophe Dessimoz about whether PacBio is trying to harm scientists.  *See, e.g.*, Ex. 2 [Dessimoz Dep. Tr.] at 243:4-5. ("Q. You understand that PacBio is trying to prevent scientists from doing nanopore sequencing?"); 243:12-14 ("Q. If PacBio is successful in this lawsuit, scientists will be prevented from using nanopore sequencing.  Do you understand that?").  ONT's counsel further insinuated that PacBio was "unwilling to settle for anything less than removing ONT from the market."  *Id*. at 244:4-6.  Similarly, ONT's counsel questioned Dr. McHenry regarding "appropriate" remedies. *See* Ex. 3 [McHenry Dep. Tr.] at 321:13-15 ("Q. Do you think it's appropriate -- and so if you understand that there's no other commercially available nanopore sequencing tool -- right?"); 321:18-22 ("If -- if PacBio's successful in getting this injunction, you understand that nanopore sequencing as a research tool will be taken away from scientists in the United States?").

ONT's counsel was more explicit in calling PacBio a non-practicing entity and arguing about the consequences of this case in questioning Dr. Hunkapiller, the CEO of PacBio.  ONT's

counsel asked Dr. Hunkapiller if the "technology covered by the claims of the asserted patents" was "integrated into the current PacBio commercial products" and then asked if he believed "it's okay for a company to deny the public access to technology that it is not itself practicing." Ex. 4 [Hunkapiller Depo. Tr.] at 54:2-6; 56:15-18.  ONT's counsel further asked Dr. Hunkapiller how "denying the public access to nanopore sequencing advance the sciences and useful arts," and if he believes "the purpose of the patent system is to foreclos[e] the public access to technology." *Id.* at 54:9-13; 54:14-55:3.

Courts have precluded parties from presenting evidence regarding the consequences of litigation.  *See Am. Tech. Ceramics Corp. v. Presidio Components, Inc*., No. 14-CV-6544(KAM)(GRB), 2019 WL 2330855, at *8 (E.D.N.Y. May 31, 2019) (precluding "evidence of plaintiffs' request for injunctive relief, enhanced damages, and attorneys' fees and costs"); *Evolved Wireless, LLC v. Apple Inc.*, No. CV 15-542-JFB-SRF, 2019 WL 1100471, at *6 (D. Del. Mar. 7, 2019) (precluding evidence and argument related to a potential injunction as "issues that will be tried to the court"); *Ciena Corp. v. Corvis Corp*., 352 F. Supp. 2d 526, 529 (D. Del.) (Corvis was "not to refer to the injunctive remedy in the presence of the jury.").

For the foregoing reasons, Plaintiff respectfully requests that the Court preclude ONT and its witnesses from using pejorative terms about PacBio or its decision to enforce its patents such as "patent troll," "NPE," and "paper patents."  Likewise, ONT and its witnesses should not be able to argue about the consequences of this case including that a finding of infringement against ONT may result in injunctive relief, enhanced damages, put it out of business, increase prices, hurt scientific research, or exclude nanopore sequencing devices from the United States.

Dated: February 13, 2020

FARNAN LLP

*/s/ Brian E. Farnan*

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff Pacific Biosciences of California, Inc.*

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Robert S. Magee (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com
robert.magee@weil.com

# EXHIBIT 1

# In The Matter Of:

*Pacific Biosciences v.*
*Oxford*

---

*Teleconference*
*August 15, 2019*

---

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE   19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone:  302-655-0477, fax:  302-655-0497*



**WILCOX & FETZER LTD.**

Min-U-Script® with Word Index

1    that it's adequate or could be adequate to

2    state a willful infringement claim at least

3    from the date of the service of the first

4    complaint.  Again, not everyone agrees with

5    that, and you can tell me I'm wrong, that's

6    fair enough, but if I think that that's

7    right, haven't they adequately alleged at

8    least that?

9              MR. HASH:  To the extent that

10   the complaint served as notice that we knew

11   of the patent before, and that's your

12   standard, it would seem that would be

13   sufficient.

14             THE COURT:  All right.  Well,

15   are you arguing that they have failed to

16   adequately allege some other element of the

17   willful infringement standard?

18             MR. HASH:  Well, they've also

19   failed to allege that we knew of

20   infringement.  The one thing they point to

21   as evidence that we knew we infringed was

22   the failed IPRs.  But that's, you know, the

23   fact that we filed two IPRs that were

24   rejected and we withdrew a third based upon

1    the claim construction ruling is somehow

2    evidence that we infringed is just hogwash.

3    I mean, you know, this is the most sinister

4    type of NPE case, you know, there are

5    nonpracticing NPE.  The patents are just

6    amalgams of standard molecular biology

7    techniques applied to Nanopore and, you

8    know, the knowledge of the invalidity of

9    these patents and the fact that they're not

10   infringed is quite clear, that they are

11   extrapolating the filing of IPRs and that

12   those might not have been accepted by the

13   -- those positions have been accepted with

14   an understanding of infringement, there's

15   no linkage between those two points.

16              THE COURT:  All right.  In your

17   papers, you're arguing prejudice to you.

18   What discovery would you need if I allow

19   this amendment to be granted?

20              MR. HASH:  Well, I think we

21   would have to reopen discovery, Your Honor,

22   because it seems to be what they're arguing

23   is that the act of monitoring IP and the

24   relative technical space and that that

1   somehow can create a wanton and reckless

2   disregard for patents and that a policy of

3   a broad-brush approach to monitoring IP

4   can, you know, result in disregard or a

5   wanton and recklessness.  We will need

6   discovery into PacBio's own policies to see

7   how those align.  I mean, if PacBio is

8   acting in the same way, the jury is

9   entitled to understand that, that this is

10  how the industry operates, this is how

11  others in the industry address IP, they

12  monitor it and act in due course.  So, at

13  the very least, we're going to need to

14  written discovery on this issue, as well as

15  to depose or redepose PacBio, and this

16  including, for instance, their patent

17  counsel, Robert Reamey and inventors

18  Stephen Turner as well as a company

19  representative to address the issues

20  related to their own patent monitoring,

21  their own IP monitoring activities.

22              THE COURT:  What -- do you

23  dispute what Mr. Reines said at a general

24  level about the pleading standards for

```
 1                  CERTIFICATE
 2              I, Patrick J. O'Hare, RPR, do
 3    hereby certify that the aforesaid pages
 4    Numbered 1 through 42 contain a true and
 5    correct transcription of the proceedings as
 6    stenographically reported by me at the
 7    hearing in the above cause, on the date
 8    therein indicated.
 9
10              IN WITNESS WHEREOF I have
11    hereunto set my hand at Wilmington, this
12    21st day of August 2019.
13
14
15
16
17              /S/-------------------
18              Patrick J. O'Hare, RPR
19
20
21
22
23
24
```

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

--o0o--

PACIFIC BIOSCIENCES OF

CALIFORNIA, INC.,                    C.A No. 17-cv-275-LPS-CJB

             Plaintiff,             C.A No. 17-cv-1353-LPS-CJB

vs.

OXFORD NANOPORE

TECHNOLOGIES, INC., and

OXFORD NANOPORE

TECHNOLOGIES, LTD.,

            Defendants.

_____/


OUTSIDE ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF

CHRISTOPHE DESSIMOZ, PH.D.

Thursday, October 24, 2019


REPORTED BY:
MARY ANN SCANLAN, CSR NO. 8875 RMR-CRR-CCRR-CLR

APIS WORLDWIDE          Efficiency In Industry

October 24, 2019
Christophe Dessimoz, PhD

1          My understanding or my recollection is

2    that, indeed, in this document it was admitted by

3    PacBio that they had not practiced the patent.

4          So I'm just treading carefully here

5    because I know practice has also some legal meaning,

6    and so if by practice we mean actually implementing

7    all of the elements that are in the patent, then I

8    believe that is -- what you're saying is correct.

9       Q.  Okay.  Do you think it's the proper use of

10   patents to prevent inventions from the hands of

11   scientists?

12          MR. MAGEE:  Objection.  Form.

13          THE WITNESS:  So in general, I do not

14   believe that patents have, you know, have a purpose

15   to prevent innovation from scientists.

16   BY DR. KOHLI:

17       Q.  Do you think PacBio, given that it does

18   not practice these claims, is basically preventing

19   its competitors from using nanopore sequencing?

20          MR. MAGEE:  Objection.  Form.  Beyond the

21   scope.

22          THE WITNESS:  My -- yeah, my impression is

23   that PacBio wants to defend its innovation and, you

24   know, which are described in the teachings of the

25   three patents and, you know, as a result, this is

October 24, 2019
Christophe Dessimoz, PhD

1   why they patented that and I believe this is a

2   legitimate use of the patenting system.

3   BY DR. KOHLI:

4        Q.  You understand that PacBio is trying to

5   prevent scientists from doing nanopore sequencing?

6             MR. MAGEE:  Objection.  Form.  Beyond the

7   scope.

8             THE WITNESS:  This is not my understanding

9   of what PacBio is doing in trying to defend its

10  intellectual property.

11  BY DR. KOHLI:

12       Q.  If PacBio is successful in this lawsuit,

13  scientists will be prevented from using nanopore

14  sequencing.  Do you understand that?

15            MR. MAGEE:  Objection.  Form.  Calls for a

16  legal conclusion.

17            THE WITNESS:  I do not believe that, you

18  know, that one will necessarily lead to the other.

19  For instance, one outcome which would, you know, for

20  instance, result in no change whatsoever to Oxford

21  Nanopore user would be if there is a settlement and

22  if PacBio feels that its intellectual property is

23  not being infringed or is no longer being infringed

24  by the products of nanopore or if there is some

25  contract between the two companies that will result

October 24, 2019
Christophe Dessimoz, PhD

1   in this intellectual property being used in a

2   non-infringement way.

3   BY DR. KOHLI:

4        Q.  You understand that PacBio is unwilling to

5   settle for anything less than removing ONT from the

6   market?

7             MR. MAGEE:  Objection.  Form.  Assumes

8   facts not in evidence.

9             THE WITNESS:  So I -- so first of all,

10  I've not been presented with any evidence or

11  discussion about what might be the outcome of this

12  litigation, and I believe this is beyond, you know,

13  the scope of what my opinion is supposed to be made

14  here.

15            My -- the opinions I formed pertain to the

16  infringement and the validity of these patents.

17  BY DR. KOHLI:

18       Q.  As a scientist, do you think that it is

19  appropriate to deprive scientists of nanopore

20  sequencing tools?

21            MR. MAGEE:  Objection.  Form.  Beyond the

22  scope.

23            THE WITNESS:  As a scientist, I believe

24  that, you know, that innovation should be

25  recognized, and so, you know, that could be done

October 24, 2019
Christophe Dessimoz, PhD

1  depending on the, you know, the different -- in

2  different ways.  This could be done through

3  publications.  This can be done through filing a

4  patent.

5           And I do believe that the system we have

6  has many merits and is good for the scientific

7  enterprise as a whole.

8  BY DR. KOHLI:

9     Q.  Do you understand PacBio's goal is to keep

10 scientists from doing nanopore sequencing?  If that

11 is the case, is it appropriate?

12          MR. MAGEE:  Objection.  Form.  Assumes

13 facts not in evidence.

14          THE WITNESS:  My understanding is not at

15 all that PacBio wants to prevent a scientist from

16 sequencing.  In fact, it offers some products that

17 enable very successful sequencing of this --

18 sequencing of DNA, so this is not my understanding

19 at all.

20 BY DR. KOHLI:

21    Q.  What PacBio practices has nothing to do

22 with nanopore sequencing; is that right?

23    A.  Currently, to the best of my knowledge, I

24 am not aware of PacBio products that uses nanopore

25 sequencing.

October 24, 2019
Christophe Dessimoz, PhD

```
1                    REPORTER CERTIFICATE

2         I, Mary Ann Scanlan, RMR-CRR-CCRR-CLR,

3    Certified Shorthand Reporter licensed in the State

4    of California, No. 8875, hereby certify that the

5    deponent was by me first duly sworn, the testimony

6    was reported and transcribed with computer-aided

7    transcription; that the foregoing is a full,

8    complete, and true record of said proceedings.

9         I further certify that I am not of counsel or

10   attorney for either of any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said

13   caption.

14         In witness whereof, I have hereunto set my hand

15   this day:

16     XXX    Reading and Signing was requested.

17

18   Dated:   November 7, 2019

19         _____
20         MARY ANN SCANLAN RPR-RMR-CRR-CCRR-CLR
           CALIFORNIA CSR No. 8875

21         That the amount of time used by each party at
      the deposition is as follows:
22

23         Dr. Puneet Kohli    (06.45)
           Mr. Robert S. Magee (00:28)
24

25
```

# EXHIBIT 3

IN  THE  UNITED  STATES  DISTRICT  COURT

FOR  THE  DISTRICT  OF  DELAWARE


PACIFIC BIOSCIENCES OF
CALIFORNIA, INC.,

       Plaintiff,

    vs.                     C.A. No. 17-275 (LPS)
                            C.A. No. 17-1353 (LPS)
OXFORD NANOPORE
TECHNOLOGIES, INC. and
OXFORD NANOPORE
TECHNOLOGIES, LTD.,

       Defendants.
_____/




Deposition of

CHARLES S. McHENRY, Ph.D.

Wednesday, October 30, 2019








REPORTED BY:  JOHN WISSENBACH, RDR, CRR, CRC,

         CSR 6862



October 30, 2019
Charles McHenry PhD

```
 1            THE WITNESS:  Yeah, I -- you know, you're
 2  kind of getting into the marketing approach of --
 3  BY MR. HASH:
 4       Q.  I'm not, sir.
 5       A.  Of --
 6       Q.  You're a scientist, and I'm just asking you
 7  questions as a scientist.
 8       A.  But "democratization" is not typically a
 9  term that's used with scientific techniques.
10       Q.  Okay.  Do you think it's appropriate to --
11  to take research tools out of the hands of
12  scientists?
13            MR. MAGEE:  Objection; vague, calls for
14  speculation.
15            THE WITNESS:  I'm not --
16            MR. MAGEE:  Beyond the scope.
17            THE WITNESS:  I'm not aware, in any
18  university environment, of anybody taking research
19  tools out of the hands of people.
20  BY MR. HASH:
21       Q.  Well, you understand if PacBio's successful
22  in getting an injunction, that scientists in the
23  United States will no longer be able to do nanopore
24  sequencing?  Do you understand that?
25            MR. MAGEE:  Objection; lack of foundation,
```

October 30, 2019
Charles McHenry PhD

 1 | assumes facts not in evidence.

 2 | BY MR. HASH:

 3 |     Q.  You understand what an injunction is,

 4 | right?

 5 |     A.  I do.

 6 |     Q.  And you understand that PacBio is seeking

 7 | an injunction in this case?

 8 |         MR. MAGEE:  Objection; lack of foundation.

 9 | BY MR. HASH:

10 |     Q.  You understand that?

11 |         I'll represent to you that that's the case.

12 |     A.  Okay.

13 |     Q.  Do you think it's appropriate -- and so if

14 | you understand that there's no other commercially

15 | available nanopore sequencing tool -- right?  We

16 | talked about that before.

17 |         So if PacBio's successful in getting this

18 | injunction -- I don't mean to point to you.  If --

19 | if PacBio's successful in getting this injunction,

20 | you understand that nanopore sequencing as a

21 | research tool will be taken away from scientists in

22 | the United States?

23 |         MR. MAGEE:  Objection; lack of foundation,

24 | assumes facts not in evidence, beyond the scope.

25 |         THE WITNESS:  Yeah, I -- you know, these

October 30, 2019
Charles McHenry PhD

1  aren't things that, you know, are really in my

2  domain that concern me.  I certainly do think that

3  if -- if -- if ONT is infringing, that they should

4  interact with PacBio in some productive way and come

5  up with a solution.

6  BY MR. HASH:

7     Q.  And what would -- then that solution would

8  be a license?  You think that would be the most

9  appropriate solution?

10          MR. MAGEE:  Objection; calls for --

11  BY MR. HASH:

12     Q.  Or do you think the most appropriate

13  solution would be United States scientists not

14  having access to nanopore sequencing anymore?

15          MR. MAGEE:  Objection; lack of foundation,

16  calls for speculation, beyond the scope.

17          THE WITNESS:  I suspect something would get

18  worked out, but --

19  BY MR. HASH:

20     Q.  Well, and -- and -- but I'm asking this --

21  this question:  Do you think the most appropriate

22  solution is a license or scientists in the United

23  States not having access to nanopore sequencing?  As

24  a scientist, do you believe that it's -- that it's

25  appropriate to take research tools out of your

October 30, 2019
Charles McHenry PhD

```
 1              CERTIFICATE OF REPORTER
 2         I, JOHN WISSENBACH, a Certified Shorthand
 3  Reporter, hereby certify that the witness in the
 4  foregoing deposition was by me duly sworn to tell
 5  the truth, the whole truth, and nothing but the
 6  truth in the within-entitled cause;
 7         That said deposition was taken down in
 8  shorthand by me, a disinterested person, at the time
 9  and place therein stated, and that the testimony was
10  thereafter reduced to typewriting by computer under
11  my direction and supervision and is a true record of
12  the testimony given by the witness;
13         That before completion of the deposition,
14  review of the transcript [X] was [ ] was not
15  requested.  If requested, any changes made by the
16  deponent (and provided to the reporter) during the
17  period allowed are appended hereto.
18         I further certify that I am not of counsel
19  or attorney for either or any of the parties to the
20  said deposition, nor in any way interested in the
21  event of this cause, and that I am not related to
22  any of the parties thereto.
23         DATED:  October 31, 2019
24         _____
25         JOHN WISSENBACH, CSR No. 6862
```

# EXHIBIT 4

Court Reporting | Translations | Video Depositions

Ph: 512-488-5350   Em: info@apisworldwide.com

www.apisworldwide.com

APIS WORLDWIDE

Efficiency In Industry

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


PACIFIC BIOSCIENCES OF
CALIFORNIA, INC.,

      Plaintiff,

    vs.                 C.A. No. 17-275 (LPS)
                       C.A. No. 17-1353 (LPS)

OXFORD NANOPORE
TECHNOLOGIES, INC. and
OXFORD NANOPORE
TECHNOLOGIES, LTD.,

      Defendants.

_____/



Deposition of

MICHAEL W. HUNKAPILLER, Ph.D.

Thursday, October 10, 2019



CONFIDENTIAL - ATTORNEYS' EYES ONLY



REPORTED BY:  JOHN WISSENBACH, RDR, CRR, CRC,

        CSR 6862

Michael W. Hunkapiller, Ph. D.                    Page 53 of 159

53

1          Is it PacBio's position that it is

2    currently practicing the technology covered by any

3    claim of the patents currently asserted against

4    Oxford Nanopore in the Delaware suit?

5          A.   Well, again, I don't know how to interpret

6    the claims.   I think the answer probably is no,

7    certainly in the context of a -- of an Oxford

8    Nanopore-type device.

9          Q.   So this then states "that PacBio would

10   never choose to license the patents-in-suit to a

11   direct competitor, in particular ONT."  Why does

12   Mr. Prowse specifically call out ONT in this

13   statement, that he says is based upon discussions

14   with you?

15         A.   Well, both ONT and PacBio are, first,

16   single-molecule real-time sequencing technology

17   companies.  You know, long-read technologies such as

18   those are not, certainly, the mainstay of DNA

19   sequencing.  Both of us essentially have relatively

20   niche positions in the market.  And so choosing to

21   license in that scenario would severely cut down,

22   potentially, on our ability to thrive as a company.

23   And having invested a lot in generating an IP

24   portfolio broadly looking at the single-molecule

25   sequencing scheme, it would be general decision not

Case 1:17-cv-01353-LPS   Document 546-1   Filed 08/13/20   Page 357 of 845 PageID #: 30171
Michael W. Hunkapiller, Ph. D.                    Page 54 of 199

54

1 to -- to give that away.

2     Q.  Do you believe it's okay for a company to

3 deny the public access to technology that it is not

4 itself practicing?

5     A.  If you own the patent, you own the patent

6 legitimately, and the patent's valid, yes.

7     Q.  And do you --

8     A.  It's what patents are for.

9     Q.  Do you believe the purpose of the patent

10 system is to foreclosure the public access to

11 technology?

12     A.  For a limited period of time, yes, or at

13 least allow a choice about that.

14     Q.  How does -- how does denying the public

15 access to nanopore -- strike that.

16         How does denying the public access to

17 nanopore sequencing advance the sciences and useful

18 arts?

19     A.  I don't think --

20         MR. REINES:  Object.

21         You --

22         THE WITNESS:  I don't think that's the

23 issue with patents.  I mean, the whole concept of

24 patents is that it gives somebody who invents

25 whatever a technology is a limited period of time to

55

1  be the exclusive owner and, if it wishes,

2  practitioner of that IP that's contained in a

3  patent.

4  BY MR. HASH:

5      Q.  So you don't believe the intent of the

6  patent system is to advance the sciences and useful

7  arts?

8      A.  Well, the question is how one gets that

9  done.  And I believe that the concept behind

10  patents -- it goes back to a long time ago -- is

11  that by giving people who are developing new ideas

12  some protection for the use of those new ideas,

13  again, for a limited period of time -- that's one of

14  the things that you agree to do -- has a net

15  fostering effect on innovation and development.

16      Q.  But, sir, you just testified that PacBio

17  was not using the patented technology.  So, again,

18  how does patent -- strike that.

19          So you just testified that PacBio is not

20  using the patented technology.  So how does PacBio

21  foreclosing the public's access to this technology

22  advance science and the useful arts?

23          MR. REINES:  Objection.

24          THE WITNESS:  Well, what I said was that

25  the -- the ability to protect a -- a -- an area, in

Michael W. Hunkapiller, Ph. D.                    Page 56 of 199

56

1  a broad sense, from a commercial perspective can

2  give you the ability to be successful with whatever

3  commercial technology you wind up putting onto the

4  market at a given point in time.  And without that

5  protection, you may not be able to succeed in the

6  technology, say, that you were working on more

7  directly.  And so having a broader, you know,

8  protection for your intellectual discovery

9  absolutely can foster innovation, because otherwise

10 you might not have been able to do it if somebody

11 could make a near enough copy based on things that

12 you developed to compete with you, with your primary

13 products.

14 BY MR. HASH:

15     Q.  But you would agree that the -- the

16 technology covered by the claims of the asserted

17 patents is in no way, shape, or form integrated into

18 the current PacBio commercial products?

19         MR. REINES:  Object to form.

20         THE WITNESS:  Well, as I said before, in

21 terms of a claim, perhaps not, although, again, I

22 won't profess to be a patent attorney in that sense.

23 But in terms of the hurdles that one had to overcome

24 intellectually in order to make the form of the

25 single-molecule sequencing that we do work, it has

57

1  some general applicability to other ways of doing

2  single-molecule sequencing, and by virtue of

3  protecting it not just for the form that you're

4  doing but by alternative forms of how to do

5  single-molecule sequencing, it absolutely promotes

6  the business interest of -- of any company like

7  PacBio.

8  BY MR. HASH:

9      Q.  So PacBio is entitled to patent these

10 concepts underlying the SMRT sequencing technology?

11     A.  Yes.

12     Q.  How would Oxford's -- so you say you would

13 not choose to license the patents "to a direct

14 competitor, in particular ONT, because of how it

15 could affect PacBio's market position in the long

16 read space."  How would licensing the patents to

17 Oxford Nanopore affect PacBio's market position in

18 the long-read space?

19     A.   Well, these technologies are ones that

20 improve the concept of single-molecule sequencing in

21 general.  They make it better.  It doesn't

22 necessarily mean that you can't practice, say,

23 nanopore sequencing without using those

24 technologies, those improvements.  But it would be

25 our view that we improve our market position if you

126

```
 1                    CERTIFICATE OF REPORTER

 2            I, JOHN WISSENBACH, a Certified Shorthand

 3   Reporter, hereby certify that the witness in the

 4   foregoing deposition was by me duly sworn to tell

 5   the truth, the whole truth, and nothing but the

 6   truth in the within-entitled cause;

 7            That said deposition was taken down in

 8   shorthand by me, a disinterested person, at the time

 9   and place therein stated, and that the testimony was

10   thereafter reduced to typewriting by computer under

11   my direction and supervision and is a true record of

12   the testimony given by the witness;

13            That before completion of the deposition,

14   review of the transcript [ ] was [X] was not

15   requested.  If requested, any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18            I further certify that I am not of counsel

19   or attorney for either or any of the parties to the

20   said deposition, nor in any way interested in the

21   event of this cause, and that I am not related to

22   any of the parties thereto.

23            DATED:  October 15, 2019

24

25            _____
             JOHN WISSENBACH, CSR No. 6862
```

APIS WORLDWIDE    Efficiency In Industry

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC.,<br>*Plaintiff*,<br><br>v.<br><br>OXFORD NANOPORE TECHNOLOGIES, INC. and OXFORD NANOPORE TECHNOLOGIES, LTD.,<br>*Defendants*. | C.A. No. 17-cv-275-LPS<br>C.A. No. 17-cv-1353-LPS<br><br>JURY TRIAL DEMANDED |

**OXFORD'S OPPOSITION TO PACBIO'S MOTION IN LIMINE NO. 3 TO PRECLUDE REFERENCE TO PATENT MISUSE AND POTENTIAL REMEDIES**

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Dated:  February 17, 2020

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Defendants*

This Court should deny PacBio's vaguely drafted motion seeking to exclude permissible evidence and argument. As the deposition testimony and hearing arguments PacBio cites in its motion betray, PacBio broadly seeks exclusion of basic facts that might present PacBio's actions regarding the asserted patents in a negative light. Such evidence and argument is unavoidable, not unduly prejudicial and should be permitted.

## I. Oxford should be permitted to use neutral, factual terms to describe PacBio and its business practices; any ruling against pejorative vocabulary should be reciprocal.

Even if this Court grants PacBio's request to broadly exclude terms that PacBio subjectively deems pejorative,[1] PacBio should not be permitted to exclude negative facts under the guise of pejorative language. To the contrary, Oxford should be permitted to use neutral, factual terms to refer to PacBio, its business practices regarding the asserted patents, and its lack of any products practicing the asserted patents. And to the extent PacBio objects to Oxford's descriptions, such objections can be fully addressed with cross-examination and any counter-evidence.

Even the authority on which PacBio relies holds that a defendant is permitted to inform the jury that a plaintiff does not practice the asserted patents. In *Intellectual Ventures I LLC v. Symantec Corp.*, this Court expressly held that the defendant "is permitted to present argument and evidence that [plaintiff] does not practice the patents-in-suit." 10-1067-LPS, 2015 WL 82052, at *1 (D. Del. Jan. 6, 2015). In *Personalized User Model, L.L.P. v. Google Inc.*, along with seeking exclusion of pejoratives, plaintiff sought to preclude the defendant from "otherwise indicating that

---

[1] For example, PacBio makes much of Oxford referring to PacBio as a non-practicing entity, but this term is non-pejorative. *Evolved Wireless, LLC v. Apple Inc.*, CA No. 15-542-JFB-SRF, 2019 WL 1100471, at *7 (D. Del. Mar. 7, 2019) (holding that a defendant "should not be precluded from using neutral terms like 'non-practicing entity'"); *Carucel Investments, L.P. v. Novatel Wireless, Inc.*, No. 16-CV-118-H-KSC, 2017 WL 1215838, at *14 (S.D. Cal. 2017), aff'd, 730 Fed. App'x. 938 (Fed. Cir. 2018) (holding that "it is permissible for Defendants to refer to Plaintiff in neutral, factual terms, such as 'non-practicing entity'") Nevertheless, Oxford has already indicated its willingness to agree that Oxford not use that term. Ex. 1, L. Flannery Email.

[patentee] does not practice the patents at trial."  C.A. No. 09–525–LPS, 2014 WL 807736, at *3 (D. Del. Feb. 27, 2014).  But this Court did not grant that last request and instead granted plaintiff's motion only to the extent the defendant had already agreed not to use pejorative terms.  *Id.*

Additionally, Oxford's ability to present evidence that PacBio does not practice the asserted patents should not be limited to just damages, as PacBio has suggested.[2]  Even in its case-in-chief, Oxford should be permitted to describe PacBio as a company that does not make or sell any products using the accused patents.  *See Digital Reg of Texas, LLC v. Adobe Sys., Inc.*, No. C 12-1971 CW, 2014 WL 4090550, at *12 (N.D. Cal. Aug. 19, 2014) (excluding pejoratives, but permitting the defendant to "describe the nature of [plaintiff's] business with neutral, strictly factual terms, such as … a 'company that does not make anything,' a 'company that does not sell anything'").  Indeed, even this Court has acknowledged that the question of PacBio's work is relevant to enablement, stating that the jury "can expect … to hear that theme and that evidence or lack of evidence from the defendant."  Ex. 2, MSJ Hearing at 38-39.  And to the extent PacBio asserts at trial that the "patents-in-suit bear direct relation to PacBio's research and development work," PacBio MIL No. 3, at 2, Oxford should certainly be permitted to rebut such assertions—outside of any damages presentation.  PacBio has presented no contrary authority.

In fairness, to the extent the Court broadly excludes the use of pejoratives to describe PacBio, any such ruling should be reciprocal.  PacBio should likewise be prohibited from using pejorative, inflammatory, or loaded words such as "copyists" or that Oxford "stole" from PacBio.  *See Deflecto, LLC v. Dundas *Jafine Inc.*, No. 13-0116-CV-W-ODS, 2015 WL 9413148, *1-2 (W.D. Mo. Dec. 22, 2015) (precluding use of "loaded words" such as "copycat," and "stole").

---

[2] PacBio proposed that:  "For damages purposes, ONT will be permitted to present evidence that PacBio does not practice the patents-in-suit."  Exhibit 1, at 2.  The law does provide this limitation.

**II.     Rule 403 does not support PacBio's attempt to bar testimony, evidence, and argument regarding a patent holder's right to prevent others.**

Oxford does not intend to discuss PacBio's requested injunctive relief.  However, this should not limit Oxford's ability to discuss the core of PacBio's alleged patent rights—that patent rights are the right to exclude or to prevent someone from using the patent.  Nor should Oxford be prohibited from discussing the natural commercial and economic effects of exercising patent rights.

PacBio seeks an order precluding any mention of the potential exclusion of Oxford's products that is so broad it would prevent Oxford from merely mentioning the Patent and Copyright Clause's grant of the right to exclude.  *See* US Const. art. I, § 8, cl. 8 (enumerating the power to "secur[e] for limited Times to [] and Inventors the exclusive Right to [the invention].") While courts have excluded evidence of plaintiff's remedies under Rule 403, PacBio has not pointed to any authority preventing a party from giving some explanation of the patent system and effects therefrom.  To the contrary, Rule 403 "does not offer protection against evidence that is merely prejudicial, in the sense of being detrimental to a party's case.  Rather, the rule only protects against evidence that is unfairly prejudicial." *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980). It is not *unduly* prejudicial for the jury to hear that the "legally protected interests in a patent are the exclusionary rights created by the Patent Act." *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264-65 (Fed. Cir. 2010).  That is especially so here, where PacBio maintains that this is a "two-player market" in which Oxford "is PacBio's **only** current competitor" and PacBio seeks to "protect[] its market position."  Prowse Rep., ¶¶ 143, 182.  In taking that position, PacBio itself has put the natural consequences of prevailing on its claims—that competition will be reduced or that prices would increase—squarely at issue in this case.   For these reasons, PacBio's motion should be denied.

3

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd.*

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

# EXHIBIT 1

| | |
|---|---|
| **From:** | Flannery, Liz |
| **Sent:** | Tuesday, February 11, 2020 9:52 PM |
| **To:** | Magee, Robert |
| **Cc:** | Hash, Steve; EXT Ying, Jennifer; EXT Blumenfeld, Jack; DL Oxford3; mfarnan@farnanlaw.com; bfarnan@farnanlaw.com; PacBio Oxford Delaware WGM Service |
| **Subject:** | RE: PacBio v. Oxford -- Proposed MiLs |

Bobby,

We've considered your proposals provided below, and we can agree to some of this but not all.  I've taken a stab at paring back to what we can agree on below.

1.      ONT and its witnesses may not use the terms "patent troll" or "non-practicing entity" in describing or referring to PacBio.  ONT will be permitted to present evidence that PacBio does not practice the patents-in-suit.

2.       The parties' witnesses and counsel may not argue or refer to whether counsel for either party has or lacks personal experience with the technology in the case.

3.      *[We do not agree on this point.  We believe evidence regarding those investigations is relevant in this matter, at least to damages.  Certainly the court's forthcoming rulings on PacBio's motion to exclude Dr. Layne-Farrar's 2nd supplemental report may inform this further, and perhaps we can revisit this issue once we have the Court's ruling.]*

4.      *[We are not agreed on this point.  As we stated during the call, ONT did not produce, and thus will not be offering, evidence of advice of counsel specific to the asserted patents, but we do not believe it would be appropriate to exclude the other aspects you described in your proposal.]*

On the modification of ONT's insert to the PTO, we are fine with adding the statement you provided below (with a slight revision to read "The parties agree that they may not offer argument or evidence argument inconsistent with the Court's Order and Opinion on claim construction.") and including that as an agreed limine order.  However, we still wish to raise the issues regarding claim construction identified in our insert as additional issues in the pretrial order.

Regarding ONT's proposed MiLs, we propose the following orders for agreement:

(for item 2. on ONT's list)  The parties will not make arguments or statements regarding the absence of any witnesses (i.e., failure to appear live) at trial.

(for item 4. on ONT's list)  The parties will not refer to the results or findings of, or evidence provided in, the following judicial proceedings that are not relevant to any issue before the jury: (a) the patent dispute between the parties in the United Kingdom; (b) any IPR proceedings; (c) ONT's motions under Rule 12(b)(6) in this case; (d) ONT's motion to add counterclaims for antitrust / inequitable conduct; and (e) this Court's consideration of and rulings on any discovery disputes.

Let us know if these are acceptable.  Further, just so we have it documented, we confirm that during our call today we agreed that the deadline for exchanging opening briefs on MiLs would be extended to February 13 at 6pm ET.

Thanks,
Liz

**Liz Durham Flannery**
*Partner*

Baker Botts L.L.P.
liz.flannery@bakerbotts.com
T +1.713.229.2104
F +1.713.229.7704

910 Louisiana Street
Houston, Texas 77002
USA



---

**From:** Magee, Robert <Robert.Magee@weil.com>
**Sent:** Tuesday, February 11, 2020 4:31 PM
**To:** Flannery, Liz <liz.flannery@bakerbotts.com>
**Cc:** Hash, Steve <stephen.hash@bakerbotts.com>; EXT Ying, Jennifer <JYing@MNAT.com>; EXT Blumenfeld, Jack <jblumenfeld@MNAT.com>; DL Oxford3 <DLOxford3@BakerBotts.com>; mfarnan@farnanlaw.com; bfarnan@farnanlaw.com; PacBio Oxford Delaware WGM Service <PacBio.Oxford.Delaware.WGM.Service@weil.com>
**Subject:** RE: PacBio v. Oxford -- Proposed MiLs

[EXTERNAL EMAIL]

Liz,

Thank you for the meet and confer.  Per our discussion, we have set forth proposed *limine* orders below for our MiLs for which the parties may still be able to reach agreement.

1. ONT and its witnesses may not use the terms "patent troll," "non-practicing entity," or "paper patent" or otherwise disparage PacBio because it is asserting a patent it does not practice.  For damages purposes, ONT will be permitted to present evidence that PacBio does not practice the patents-in-suit.  Likewise, ONT may not offer argument or evidence that a finding of infringement against ONT may result in injunctive relief, increase prices or lead to the exclusion of nanopore sequencing devices from the United States.
2. The parties' counsel may not argue to the jury about the technology in the case based on ostensible personal experience.
3. The parties may not offer argument or evidence about the unsuccessful acquisition of PacBio by Illumina or any related investigations conducted by the U.S. FTC, U.K. CMA or any other regulatory agency.
4. ONT may not offer argument or evidence that ONT normally seeks or relies upon advice of counsel (aka "freedom to operate") related to patent infringement nor state or suggest that it did so in this case.  The parties may address counsel's role in monitoring patent disclosures of competitors.

Additionally, we propose modifying ONT's insert to the PTO to read:

The parties agree that they may not offer argument or evidence argument inconsistent with the Court's Orders on claim construction.

We are available to discuss telephonically if you believe discussions would be fruitful to narrow or resolve these issues.

Best,
Bobby

---

**From:** liz.flannery@bakerbotts.com <liz.flannery@bakerbotts.com>
**Sent:** Monday, February 10, 2020 7:57 PM
**To:** Magee, Robert <Robert.Magee@weil.com>
**Cc:** stephen.hash@bakerbotts.com; JYing@MNAT.com; JBlumenfeld@MNAT.com; DLOxford3@BakerBotts.com; mfarnan@farnanlaw.com; bfarnan@farnanlaw.com; PacBio Oxford Delaware WGM Service <PacBio.Oxford.Delaware.WGM.Service@weil.com>
**Subject:** Re: PacBio v. Oxford -- Proposed MiLs

Bobby, let's plan on 10am PT / noon CT. We can use this dial-in:

Dial 1-888-822-7517 (US); passcode 8235186

Sent from my iPhone

On Feb 10, 2020, at 5:00 PM, Magee, Robert <Robert.Magee@weil.com> wrote:

[EXTERNAL EMAIL]

Liz,

Per our discussions, below please find a list of proposed motions in limine.  As I mentioned in my previous email, we are available to meet and confer between 8-10:30am PT (11am-1:30pm ET) tomorrow.

Proposed motions in limine:
- Preclude ONT from using the terms "patent troll," "non-practicing entity," "paper patent," or otherwise disparaging PacBio
- Preclude ONT from offering argument or evidence relating to the proposed merger between Illumina and PacBio
- Preclude ONT from offering argument or evidence regarding the exclusion of nanopore sequencing technology from the United States
- Preclude attorneys from ONT from supplementing the trial record with his own scientific testimony or vouching for any witnesses
- Preclude ONT from offering argument or evidence regarding any purported advice of counsel
- Preclude ONT from offering argument or evidence contrary to the Court's claim construction
- Preclude ONT from offering argument or evidence related to any anti-trust claims

Best,
Bobby

&lt;image001.jpg&gt;

**Robert Magee**

Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1134
Robert.Magee@weil.com
+1 650 802 3985 Direct
+1 650 802 3100 Fax

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# EXHIBIT 2

```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                   IN AND FOR THE DISTRICT OF DELAWARE

 3                             - - -

 4    PACIFIC BIOSCIENCES OF CALIFORNIA,
      INC.,                                 :   CIVIL ACTION
 5                 Plaintiff,               :
      v                                     :   NO. 17-275-LPS
 6                                          :
      OXFORD NANOPORE TECHNOLOGIES, INC.,   :        and
 7    and OXFORD NANOPORE TECHNOLOGIES, LTD., :
                                            :   NO. 17-1353-LPS
 8                 Defendants.
                                       - - -
 9
                          Wilmington, Delaware
10                       Tuesday, January 8, 2020
                          Oral Argument Hearing
11
                                 - - -
12
      BEFORE:         HONORABLE LEONARD P. STARK, Chief Judge
13
      APPEARANCES:                     - - -
14

15               FARNAN, LLP
                 BY:  MICHAEL J. FARNAN, ESQ.
16
                         and
17
                 WEIL GOTSHAL & MANGES, LLP
18               BY:  EDWARD R. REINES, ESQ., and
                      DEREK C. WALTER, ESQ.,
19               ROBERT S. MAGEE, ESQ.
                      (Redwood Shores, California)
20
                          Counsel for Plaintiff
21

22               MORRIS NICHOLS ARSHT & TUNNELL, LLP, LLP
                 BY:  JENNIFER YING, ESQ.
23
                         and
24

25                            Brian P. Gaffigan
                              Registered Merit Reporter
```

```
1    APPEARANCES:   (Continued)

2
              BAKER BOTTS, LLP
3             BY:   STEPHEN M. HASH, ESQ.,
                   PUNEET KOHLI, ESQ.,
4                  SAMONEH KADIVAR, ESQ., and
                   ALEXANDER PIALA, ESQ.
5                  (Austin, Texas)

6                  and

7             BAKER BOTTS, LLP
              BY:   ELIZABETH DURHAM FLANNERY, ESQ.
8                  (Houston, Texas)

9                       Counsel for Defendants

10

11

12

13

14

15

16

17

18

19

20

21

22                      - oOo -

23               P R O C E E D I N G S

24          (REPORTER'S NOTE:  The following oral argument

25   hearing was held in open court, beginning at 8:35 a.m.)
```

1               Dr. Ha testified the selection of reaction

2      conditions would be obvious.  I showed you that testimony.

3               There is tons of guidance in the patent.  I

4      showed you that with all kinds of literature references.

5               There is the working example of the 529

6      polymerase.

7               And there is no challenge on the skill level.

8      They just don't even address that.

9               THE COURT:  Is there any dispute that your

10     client had not done this work by the priority date of the

11     patent?

12              MR. REINES:  You mean wet laboratory experiments

13     with the nanopore?

14              THE COURT:  I mean responsive to what Mr. Hash

15     is saying.

16              MR. REINES:  Okay.  I didn't mean to put you on

17     the spot.  I just meant I'm not sure what the argument is.

18     They did the work.  There is no -- they did the work that is

19     described in the patent application, obviously.  So that

20     happened.

21              What happens is that a lot -- and this will be,

22     you know, the theme of the trial.  A lot of the work they

23     used for their single molecule sequencing system.  The smart

24     system is applicable over to the nanopore system.  They

25     ended up not going with the nanopore approach, but they used

1    that teachings in the nanopore context.  They did not have

2    a fully working nanopore system that they used.  And that's

3    what you hear every time we have a hearing.

4              THE COURT:  Right.  So if you prevail on this

5    motion and enablement is an issue for the jury, we can

6    expect we're going to hear that theme and that evidence or

7    lack of evidence from the defendant.

8              MR. REINES:  I think they will say that they

9    never did that, this was a thought experiment and all that,

10   and then our people will explain all the work they did in

11   their massive R&D program for single molecule sequencing

12   broadly which applies.

13             THE COURT:  Okay.

14             MR. REINES:  Right?  Thank you, Your Honor.

15             THE COURT:  Thank you.

16             Mr. Hash.

17             MR. HASH:  Your Honor, all these arguments about

18   what Dr. Ha said, about what Dr. Ha has said in filings and

19   such, that is all again with the caveat that the presumption

20   is those arguments were made with the presumption this

21   patent is enabled.

22             What he said with respect to the IPR again, you

23   can't argue enablement in the Patent Office in the IPR, so

24   there is a presumption that it's enabled.

25             THE COURT:  But he did say the things he said

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PACIFIC BIOSCIENCES OF
CALIFORNIA, INC.,

   Plaintiff,

  v.

OXFORD NANOPORE TECHNOLOGIES,
INC., and OXFORD NANOPORE
TECHNOLOGIES, LTD.,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 17-cv-275-LPS
C.A. No. 17-cv-1353-LPS

**JURY TRIAL DEMANDED**

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION *IN LIMINE* NO. 3 TO PRECLUDE REFERENCE TO PATENT MISUSE AND POTENTIAL REMEDIES

## I.     Pejorative Terms

ONT now agrees to an Order barring the use of terms such as "patent troll," "paper patents," and "non-practicing entity."  Opp at 1.  Accordingly, PacBio's motion should be granted for these and similar pejorative terms.

ONT argues that it should be able to inform the jury that PacBio does not practice the patents-in-suit in a "neutral," "factual" way.  Judging by its *limine* opposition ONT appears ready to keep itself to neutral and factual on this topic.  However, the frequency and vehemence with which ONT has pushed this undisputed fact in oral argument, designated deposition testimony and law firm to law firm communications strongly suggests that ONT will not present this issue in a measured way at all.  Prophylactically, PacBio requests an Order barring argumentative and repetitive attorney statements and questioning regarding the undisputed fact that PacBio does not practice the claimed inventions of the patents-in-suit.

ONT's request that PacBio not use "stole" ignores that it has not and would not use that term because it has criminal overtones.  "Copyist" is proper if supported by evidence of copying.

## II.     Consequences Of Litigation

ONT's response to PacBio's request for an Order concerning the consequences of litigation in fact highlights the need for the requested *limine* protection.  ONT admits that, unless stopped, it will argue to the jury that if the jurors find for PacBio "prices would increase" and "competition will be reduced."  Likewise, it is easy to imagine ONT speculating that cancer will be less likely to be cured.  Leaving aside, the fact that ONT has no opinions or evidence about the consequence of the different verdict scenarios to support such fear-mongering, these types of arguments are unduly prejudicial and demean the system.   Moreover, these arguments do not make any fact that is in dispute on the merits more or less likely to be true.  FRE 403 protects against such arguments.

Dated: February 20, 2020

FARNAN LLP

*/s/ Brian E. Farnan*
_____
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff Pacific Biosciences of
California, Inc.*

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Robert S. Magee (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com
robert.magee@weil.com

2

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., <br> *Plaintiff*, <br><br> v. <br><br> OXFORD NANOPORE TECHNOLOGIES, INC. and OXFORD NANOPORE TECHNOLOGIES, LTD., <br> *Defendants*. | C.A. No. 17-cv-275-LPS <br> C.A. No. 17-cv-1353-LPS <br><br> JURY TRIAL DEMANDED |

## DEFENDANTS OXFORD NANOPORE TECHNOLOGIES, INC. AND OXFORD NANOPORE TECHNOLOGIES, LTD.'S MOTION IN LIMINE #1

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Dated:  February 13, 2020

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Defendants*

Oxford respectfully moves the Court to preclude PacBio from referencing Oxford's products that have not been sold during the relevant period.

At this late date when the parties should be narrowing issues for trial, PacBio should be precluded from expanding its planned discussion of Oxford's products at trial to include Oxford's past, present, or future products that were not sold during the relevant period for this litigation. Pursuant to Fed. R. Evid. 401, 402, and 403, Oxford seeks to preclude PacBio from referencing products that Oxford sold in the U.S. only before the relevant period for any alleged infringement as well as future products that have been announced but not yet developed, produced, or offered for sale.[1]  Testimony, evidence, or argument relating to such products should be precluded because (1) PacBio has not included such products in its live pleadings and infringement contentions and/or (2) it is undisputed that Oxford has not sold, provided, or offered for sale such products during the relevant period for infringement.

First, it would be prejudicial to Oxford to permit PacBio at this late date to put forth infringement theories for Oxford's products that are not accused in PacBio's pleadings or infringement contentions.  It is well-established that PacBio should not be permitted to present argument, testimony, or evidence suggesting that Oxford products that PacBio excluded from its pleadings or infringement contentions infringe the asserted patents.  Exhibit 1, *EON Corp. IP Holdings, LLC v. Flo TV Inc.*, C.A. No. 10-812 (RGA), D.I. 579 at 5-6 (D. Del. Aug. 28, 2013) ("Accused Products must be limited to those which have been both timely accused and the subject

---

[1] Oxford has identified at least three products here: (1) the HMM basecalling algorithm was accused of infringing the '400 and '323 Patents, but Oxford ceased distribution of that algorithm in the U.S. prior to the date the patents-in-suit issued; (2) "SmidgION" was accused of infringing all patents-in-suit, but this product has not been manufactured, distributed, or sold; and (3) "2DC" is a future product that has publicly announced but has not been accused and has not yet been developed, distributed, or sold.

2

of proper infringement contentions. . . . "[A]ny expert opinion or suggested testimony that assumes or attempts to prove that the [unaccused products] infringe the [patent-in-suit] should not be allowed.").

Moreover, any reference to products—past, present, and future—that were not sold in the U.S. during the relevant time period is neither relevant to nor probative of any issue in the case. *Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2006 WL 1627065 (N.D. Cal. June 13, 2006) (excluding from trial product models which had not been used in the U.S.). Particularly as to Oxford's future products, there can be no doubt that such products have no probative value— they cannot infringe because they do not yet exist. Since they do not exist, they could also not have been accused or subjected to discovery, and therefore cannot be relevant. Fed. R. Evid. 401.

Furthermore, admission of testimony, evidence, and arguments regarding products Oxford has not sold during the relevant time period of this case—whether past, present, or future products—would be prejudicial, confusing, and waste valuable trial time. There is no need for the jury to learn of past products that were not sold during the relevant period or future products whose functionality, use cases, and sales have yet to be established. Any probative value of the existence of such products is minimal and does not make the ultimate issues here more or less likely. Fed. R. Evid. 401, 403. Indeed, courts have precluded such argument, testimony, and evidence regarding future products for these very reasons. *See, e.g.*, Exhibit 2, *Paice, LLC v. Hyundai Motor Co.*, Civil Action No. MJG-12-499 at 9 (D. Md. Sept. 18, 2015) (precluding plaintiffs from referring to non-accused products including future products under development); Exhibit 3, *Wisconsin Alumni Research Foundation v. Apple*, No. 14-cv-062-wmc at 15 (W.D. Wis. Sept. 29, 2015) (granting a motion in limine to preclude evidence or argument regarding defendant's future products); *Extreme Networks, Inc. v. Enterasys Networks, Inc.*, 2008 WL 4621440 at *3 (W.D.

Wis. May 16, 2008) (granting motion in limine to exclude evidence relating to non-accused devices).  PacBio's experts' references to discontinued and future Oxford products, particularly without fully opining that those products infringe the asserted patent claims, will only confuse the jury as to how that evidence applies to the products PacBio has in fact accused.  Indeed, in this case, the jury is already being faced with becoming acquainted with a myriad of technological terms, four different patents, no less than 27 patent claims, and at least 20 products that PacBio actually has accused.  Therefore, it would be a waste of trial time for PacBio to confuse the jury with references to products that are not relevant.

For the above reasons, Oxford respectfully requests an order precluding PacBio from arguing, testifying, or admitting evidence relating to Oxford past, present, or future products that were not sold during the relevant period for this litigation.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Oxford Nanopore Technologies,*
*Inc. and Oxford Nanopore Technologies, Ltd.*

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| EON CORP. IP HOLDINGS, LLC, | : | |
|---|---|---|
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | 10-812 (RGA) |
| | : | |
| FLO TV INC., et al. | : | |
| | : | |
| Defendants. | : | |

## RULING AND RECOMMENDATION RELATING TO SPRINT AND SIMPLEXITY'S MOTION TO STRIKE PORTIONS OF EON'S EXPERT REPORT

Defendants Sprint and Simplexity have submitted a motion under Rule 37 to strike portions of EON's Opening Expert Report.[1]  In addition, they have requested attorney fees and costs under Rule 37 and/or 28 U.S.C. §1927.

## I.    THE PARTIES' POSITIONS

### A.    Sprint and Simplexity

Defendants filed this motion following the submission of the Plaintiff's Opening Expert Report, which was authored by David Klausner.

Sprint objects to those portions of the report which rely on Apple products for infringement, i.e., the Apple iPhone and iPad, (collectively referenced as "Apple wireless devices").  The primary basis for its position is my June 19, 2013 ruling which disallowed the Plaintiff's Fourth Supplement of Accused Products.

Simplexity, in addition to Sprint, objects to those portions of the report which state that they infringe the '757 patent by selling or offering for sale various wireless devices that contain third party applications which were not properly accused.

---

[1] This case involves U.S. Patent 5,663,757 referred to as the '757 patent.

B.    EON

Plaintiff contends that it sufficiently accused the Apple wireless devices in its October, 2012 Amended Infringement Contentions. In support of this, it points to five incidental references for the iPhone, iPad or iOS which were contained in its infringement contentions. EON essentially argues that the Special Master's June 19, 2013 ruling, which excluded the products listed in its Fourth Supplement, only applies to products if they were never mentioned in its Contentions. It also argues that the third party applications, which were set out in the Contentions as exemplary products, were properly disclosed.[2]

II.    **Decision**

A.    Background

Plaintiff filed this suit on September 23, 2010 (D.I. 1) and a Scheduling Order was entered on September 7, 2011 (D.I. 152). The Scheduling Order established deadlines for disclosures, including Plaintiff's identification of accused products (September 23, 2011); Defendants' production of Core Technical Documents (November 7, 2011); and the filing of Preliminary Infringement Contentions (December 30, 2011).[3] Document production was to end on June 29, 2012 and fact discovery was initially required to be completed by September 3, 2012.

On September 23, 2011, Plaintiff served its initial Disclosure of Accused Products. (D.I. 180) Plaintiff supplemented this disclosure on December 22, 2011 and served its Preliminary Infringement Contentions on January 9, 2012. (D.I. 208). On June 29, 2012, Plaintiff again supplemented its accused products ("Third Supplement of Accused Products."

---

[2] No claims charts were provided for any of these products. See Transcript of 8/14/13 at 32 and 36.
[3] The same disclosure structure and timeline were subsequently imposed by the establishment of the Default Standard for Discovery in December 2011.

2

(D.I. 235)). Neither of the supplements/disclosures was directed to either Sprint or Simplexity. On September 11, 2012, the Court granted stipulated modifications of the Scheduling Order. (D.I. 303). At that time, the document production deadline was modified to February 28, 2013; the fact discovery completion deadline was moved to June 21, 2013, and Opening Expert Reports were extended to July 12, 2013. On October 16, 2012, Plaintiff served Amended Infringement Contentions. (D.I. 316).

On February 22, 2013, Plaintiff served a "Fourth Supplement of Accused Products." (D.I. 345). The defendants objected on the basis of timeliness. In the Fourth Supplement Plaintiff attempted to add approximately 20 new products. This supplement, as to Sprint, included the Apple devices addressed in Mr. Klausner's report.[4] Simplexity was not involved.

On June 19, 2013, I ruled that the Fourth Supplement of Accused Products would be disallowed as untimely because the document production triggered by the product disclosures could not be completed by the Court's deadline. No exception was taken to the June 19th ruling. At that hearing, I specifically stated that the products named in the Fourth Supplement were not a part of this case.[5]

Plaintiff served its Opening Expert Report on July 26, 2013. In this report, David Klausner opined, *inter alia*, that Sprint directly infringed through its sale of the Apple wireless devices (iPhones and iPads). The report gives a claim-by-claim analysis, including how the Apple wireless devices infringe the '757 patent.

---

[4] At no time did the plaintiff request additional document production from the defendants or amend its discovery responses relative to the products included in the Fourth Supplement. See Transcript of 8/14/15 at 19-20.

[5] In my July 18, 2013 Ruling and Recommendation, I reiterated that the products set out in the Fourth Supplement were not in this case.

3

Based on the inclusion of the Apple wireless devices in Mr. Klausner's report, Sprint moved, under Rule 37, to strike the expert's conclusions which relied on the allegedly infringing Apple wireless devices. Both Sprint and Simplexity also moved to strike Mr. Klausner's references to unaccused third party applications.

B. Ruling

For the third time: The products identified in the Fourth Supplement of Accused Products are not a part of this case. Those products were untimely identified and, if they had been allowed, it would have compromised not only document production[6] but fact discovery as well as the dates and deadlines set out in the agreed Amended Scheduling Order. (D.I. 303).

While it is understandable that the Plaintiff might have wanted to add new products as they came to its attention, particularly when considering that this technology sector is continuously bringing new products to market, there comes a time when the parties must move forward with their case and get to trial on the products which have been timely identified. To allow otherwise would permit cases of this nature to slide on indefinitely as new technologies and products are developed by the Defendants. My June 19, 2013 ruling was intended to prevent that from happening by insisting that the deadlines agreed to by the parties and ordered by the Court would be enforced.

The problem here comes about because the Plaintiff contends that, while they were not set out in its disclosures, the Apple products must be considered "accused" because of their incidental mention in infringement contentions.[7] This mention consisted of four

---

[6] The Fourth Supplement was filed on February 22, 2013. The document production deadline was February 28, 2013.

[7] Interestingly in its May 29, 2013 letter to me in advance of the first status conference, Plaintiff referred to iOS as an *unidentified product.* EON's Ltr at p. 4.

4

references to the iOS operating system and one reference to "iPad and iPhone."[8] I have reviewed the 214 page infringement contentions directed to Sprint. They clearly do not provide the required claim-by-claim contentions against Apple.[9] The mentions of the iPad, iPhone and iOS in the 214 page document are no more than passing references. In no meaningful way do they place the defendants on notice that Sprint is going to be charged in this case with having infringed through Apple devices.[10] "Accused Products" must be limited to those which have been both timely accused and the subject of proper infringement contentions. Succinctly put, in this matter, there was not a proper or timely identification of Apple wireless devices. The report of Mr. Klausner is the first time where the devices received an infringement analysis. Neither were the third party applications referenced by Mr. Klausner[11] ever properly accused.

Having annunciated my ruling excluding the products set out in the Fourth Supplement, as well as the unaccused third party applications, Defendants' submission leaves open the question of what can or should be done about the portions Mr. Klausner's report addressing the alleged infringement by Sprint based on the use of the Apple wireless devices, as well as the mention of the unaccused third party applications. Defendants' request is that I strike the offending portions of the expert report as a discovery sanction under Federal Rule 37(b)(2)(a).

---

[8] The first two pages of the infringement contentions also list over 150 handsets, described as "subscriber units."

[9] See, for example, Round Rock Research v. Lenovo Grp., C.A. No. 11-10 1011-RGA at 1. (D.Del.), Walker Digital LLC v. Google, Inc., C.A. No. 11-309-SLR (D.Del. June 14, 2013)

[10] At the hearing on this motion the parties acknowledged that no discovery responses clearly identifying Apple wireless devices had been supplemented prior to the February 22, 2013 disclosure.

[11] See, for example, Klausner report at 438.

I believe that the case of <u>Wonderland Nurserygoods Co. Ltd. v. Thorley Indus., LLC</u>, 2013 WL 2471801 (W.D.Pa. June 7, 2013) directs my course of action. Federal Rule of Civil Procedure 12(f) governs the Court's authority to strike items from the record. It only permits matters to be stricken from the pleadings. Fed. R. Civ. P. 12(f). 5C <u>Wright and Miller and M. Kane, Federal Practice and Procedure</u> §1380 (3d Ed.). An expert report is not a pleading.

In point of fact, Mr. Klausner is entitled to set out whatever opinions he has concerning infringement. His report has no binding effect and Plaintiff is entitled to obtain an expert opinion on any number of matters related to this case.[12]

So, at this point, what remedies are available? I have ruled that products not properly accused are not a part of the case. If left at that, the trial court, based on the facts before me, would likely not allow offending testimony relative to unaccused products (where the issue of infringement has not been decided). Perhaps that's where the matter should stand.

<u>Rule</u> 37 does, however, speak to the early preclusion of inadmissible evidence and in light of plaintiff's persistent attempts to get around my June 19th ruling it should be considered here. <u>Rule</u> 37(b)(2)(A)(ii) provides for an order prohibiting a party from introducing designated matters into evidence. Instructive is Judge Farnan's ruling in <u>Bridgestone Sports Co., LTD v. Acushnet Co.</u>, 2007 WL 521894 (D. Del. Feb. 15, 2007). In that case, the Court utilized Rule 37 to preclude a party from introducing prior art references that were not timely disclosed. Following that precedent, it is my ruling that, subject to the Judge's discretion, any expert opinion or suggested testimony that assumes or attempts to prove that the Apple wireless devices infringe the '757 patent should not be allowed.

---

[12] As an aside, the judge in <u>Wonderland</u> noted the failure to produce Mr. Klausner's full report and opinions might, in fact, have been a violation of Plaintiff's obligation for disclosures under <u>Rule</u> 26. <u>Id</u>.

6

The parties have spent a significant amount of time articulating arguments for and against Rule 37 sanctions under the case of <u>Meyers v. Pennypack Woods Home Ownership Assn.</u>, 559 F.2d 894 (3d Cir. 1977). Those factors are: (1) the prejudice or surprise to a party against whom the evidence is offered; (2) the ability of the injured party to cure the prejudice; (3) the likelihood of disruption of the trial schedule; (4) bad faith or willfulness involved in not complying with the disclosure rules; and (5) the importance of the evidence to the party offering it. <u>Bridgstone</u>, *supra.* (citing <u>Pennypack</u>, *supra.*). While those factors preponderate in favor of the defendants, and were considered in this ruling, I choose not to impose monetary sanctions and/or make an award of attorney fees here. That will not likely be the case if EON again argues that products not properly accused are in this case.

Finally, EON's report also contained references to ABC Mobile, CBS Mobile, SyFy, Conemax, Direct TV, Fox, Google Play, Windows Store, X-Box Movies, X-Box Live, Facebook, Twitter, iTunes, Youtube, Netflix and other third party video applications. These applications were not listed in the disclosures or accused in the claim-by-claim analysis of the infringement charts. It is possible that reference to these products at trial might be appropriate under some circumstances. Subject to the Court's discretion at trial, Plaintiff's expert might refer to those apps, however, Plaintiff should not be allowed to suggest that they are indirectly infringing devices.

To conclude, it is my ruling that: (1) the Plaintiff is prohibited from presenting evidence at trial which argues or assumes that the Apple devices infringe the '757 patent; (2) Plaintiff's expert may refer to the unaccused third party applications at trial so long as he does not infer or suggest that they indirectly infringe the '757 patent; (3) no monetary sanctions are awarded against Plaintiff.

7

Such are my Rulings and Recommendations.

B. WILSON REDFEARN, ESQUIRE
Special Master
United States District Court for the District of Delaware

Dated:  August 28, 2013

8

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PAICE LLC, et al.,                    *

          Plaintiffs                  *

          vs.                         *   CIVIL ACTION NO. MJG-12-499

HYUNDAI MOTOR COMPANY, et al.,        *

          Defendants                  *

*         *         *         *         *         *         *         *         *

SUPPLEMENTED MEMORANDUM AND ORDER RE: MOTIONS IN LIMINE

The Court has before it Plaintiffs' Motions In Limine [ECF

No. 634], Defendants' Motions In Limine [ECF No. 636] and the

materials submitted by the parties relating thereto.   The Court

has held two hearings, has heretofore issue a Memorandum and

Order Re: Motions In Limine [ECF No. 682], and hereby

supplements and clarifies that Order.

As set forth herein:

- Plaintiffs' Motions In Limine [ECF No. 634] are
  GRANTED IN PART.

- Defendants' Motions In Limine [ECF No. 636] are
  GRANTED IN PART.

- This Order does not prohibit a party from contending
  that developments at trial require reconsideration of
  a ruling herein.



I.    <u>PLAINTIFFS' MOTIONS IN LIMINE</u>

   1.    **Preclude Hyundai from referring to Paice or Abell as a "troll," "NPE," "patent pirate," or similar pejorative.**

   GRANTED.

   Defendants shall, as will Plaintiffs, refer to Paice as a "technology company" that develops technology, seeks to obtain patents to license to other companies to use in manufacturing products, but that Paice does not itself manufacture or sell any products. Defendants shall not refer to the fact (if it is a fact) that Paice has not developed new technology after that included in the patents at issue.

   If Plaintiffs request, I will consider an instruction to the effect that there are some companies that abuse patent rights but that all concerned parties agree that Paice is not one of those.

   2.    **Preclude Hyundai from presenting any argument, evidence, or testimony disparaging the Patent Office or patent examiners.**

   GRANTED IN PART.

   Any argument, evidence, or testimony regarding the Patent Office or patent examiners shall refer to a precise quotation of a statement made by Judge Fogel in the Federal Judicial Center video being shown to the jury.

**3.    Exclude reference to any arrangements—contingent fee or otherwise—to pay attorneys' fees.**

GRANTED.

There shall be no such reference.

**4.    Exclude any argument, evidence, or testimony concerning Defendants' own patents.**

DENIED.

However, in this regard, the Court will provide the jury with a stipulation or, if necessary, an instruction, to the effect that Hyundai is a company that has its own active research and development. It devotes considerable resources to this. Hyundai has received numerous patents for various aspects of all the automobiles that it produces.  However, the Court will make it clear that the fact that Hyundai may have a patent for one feature does not mean that it does not infringe patents on some other feature.

**5.    Exclude any argument, evidence, or testimony concerning Plaintiffs' request for injunctive relief.**

GRANTED.

There shall be none of this.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WISCONSIN ALUMNI RESEARCH
FOUNDATION,

                    Plaintiff,                        OPINION AND ORDER

    v.

                                                      14-cv-062-wmc

APPLE, INC.,

                    Defendant.

This case is set for a jury trial commencing October 5, 2015. Based on the parties'
extensive brief and oral argument at the final pretrial conference, the court issues the
following opinion and order on defendant Apple's numerous motions *in limine*, including
several motions to strike expert testimony.

OPINION

## I. Apple's Motions in Limine

### A. MIL 1: preclude WARF from seeking damages on non-U.S. sales (dkt. #338)

In its first motion in limine, Apple seeks to limit the royalty base, arguing that
WARF should be precluded from seeking damages on non-U.S. sales of the accused
products. Specifically, Apple contends WARF "should not be permitted to try to recover
damages at trial on accused products that were never made, used, sold or offered for sale
in the United States, or imported into the United States." (Def.'s Mot. (dkt. #338) 4.)
*See Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007) (explaining that the Patent

Act "operate[s] only domestically and do[es] not extent to foreign activities") (internal citation and quotation marks omitted)).

First, Apple challenges WARF's claim to damages on processors that were made by Taiwan Semiconductor Manufacturing Company ("TSMC") and Samsung entirely in Taiwan or Korea and never sold in or imported into the United States. In its response, WARF concedes that these damages are no longer available in light of the Federal Circuit's recent decision in *Carnegie Mellon University v. Marvell Technology Group*, --- F.3d ---, No. 2014-1492, 2015 WL 4639309 (Fed. Cir. Aug. 4, 2015). As such, this part of the motion is GRANTED as unopposed.

Second, Apple challenges WARF's position that it may seek damages on processors that were initially fabricated by Samsung in part in Texas but were completed overseas and never sold in or imported into the United States after completion. Apple reasons that these processors cannot "function" -- and therefore cannot infringe -- without the additional manufacturing steps that are performed in Korea. In response, WARF argues that evidence shows these processors are "capable of" performing claimed functions at the time they leave Texas, and therefore infringe before export, or at least there a jury could so find. (Pl.'s Opp'n (dkt. #439) 9-10 (discussing *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204-05 (Fed. Cir. 2010)).) On the present record, it is unclear whether a reasonable jury *could* conclude that these processors manufactured in part in the United States are capable of infringing at the point of their manufacturing in Texas and therefore are properly considered in the damages calculation. Moreover, there appears to be a disagreement as to what proof is required to establish direct infringement

for these processors.[1]  Accordingly, the court RESERVES on this motion pending a final articulation of jury instructions on damages and, if appropriate, a factual proffer from WARF after liability has been submitted to the jury.


**B. MIL 2: preclude reference to Apple's total profits, revenues, net worth, etc. (dkt. #338)**

In this motion, Apple seeks an order precluding WARF "from referring at trial to the total profits, revenues or price of Apple products or Apple's total net worth or stock value."  (Def.'s Mot. (dkt. #338) 11.)  The court is somewhat perplexed by Apple's motion in light of its opposition to WARF's motion to exclude evidence and argument regarding the entire market value rule and its expert's reliance on a $1.7 trillion figure in calculating an effective royalty rate based on five Apple license agreements.  Regardless, Apple argues that the "evidentiary principle" described by the Federal Circuit in *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201 (Fed. Cir 2014), precludes introduction of the value of the entire product.  As the court explained:

> The point of the evidentiary principle is to help our jury system reliably implement the substantive statutory requirement of apportionment of royalty damages to the invention's value. The principle, applicable specifically to the choice of a royalty base, is that, where a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value, *care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product*.  It is not that an appropriately apportioned royalty award could never be fashioned by starting with the entire market value of a multi-component product—by, for instance, dramatically reducing

---

[1] Indeed, the parties continue to brief this issue in supplemental filings.  (*See* Dkt. ##458, 459.)

3

> the royalty rate to be applied in those cases—it is that
> reliance on the entire market value might mislead the jury,
> who may be less equipped to understand the extent to which
> the royalty rate would need to do the work in such instances.

*Id.* at 1226-27 (emphasis added).

In response, WARF agrees that it will not refer to Apple's total net worth or stock value, but argues that the other categories -- total profits, revenue and prices of the accused products -- should not be excluded because WARF's experts rely on these figures as a "starting point for apportioning down a royalty base." (Pl.'s Opp'n (dkt. #439) 16 (emphasis omitted).) In support, WARF cites to the district court's discussions of the entire market value rule in *Ericsson*, which the Federal Circuit affirmed, in which the district court did not strike plaintiff's expert's use of the "value of end products" as a starting point, because the expert's royalty base was not the market value of the full product, but rather the "market value of the contribution of the asserted patents to the end products." *Ericsson, Inc. v. D-Link Sys., Inc.*, No. 6:10-CV-473, 2013 WL 4046225, at *15 (E.D. Tex. Aug. 6, 2013), *aff'd in relevant part*, 773 F.3d 1201 (Fed. Cir. 2014). (*See also* Pl.'s Opp'n (dkt. #439) 19-20 (citing other cases where district courts have allowed figures representing the total value of the end product for purposes of establishing the starting point of an expert's analysis).)

Separate from this general concern about not using the entire value of a product (whether measured in terms of price, profits or revenues) as the royalty base, the Federal Circuit has also expressed concern about the prejudicial effect of a large number being introduced to the jury even as a starting point in the expert's analysis. Even in the face of a cross-examination and a curative instruction, the Federal Circuit vacated a damages

4

award in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011), in part because of the plaintiff's reference to defendant Microsoft's total market value of Office and Windows of $19 billion.  The court explained, "The disclosure that a company has made $19 billion dollars in revenue from an infringing product cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue."  *Id.*  "The $19 billion cat was never put back into bag even by Microsoft's cross-examination."  *Id.*

Given the scale of Apple's total revenues or total profits (or even just those revenues and profits from the accused iPhones and iPads), Apple's concern of prejudice is, if anything, magnitudes greater than Microsoft.

In response, WARF nevertheless points to two particular aspects of its experts' testimony which may be implicated by Apple's motion.  First, WARF's expert Cathy Lawton seeks to rely as an initial step in her analysis on the $100 price premium of the accused iPhone 5s over the unaccused iPhone 5c.  Lawton's use of the figure does not place "undue emphasis on the value of the entire product," *Ericsson*, 773 F.3d at 1226 -- indeed, it does not even disclose the full value.   As such, the court will allow this testimony if only as a starting point.  Second, WARF's expert Christopher Knittel "uses the end-user smartphone and tables prices" as one input in his regression analysis.  (Pl.'s Opp'n (dkt. #439) 19.)  While this may be a closer call, the court similarly finds the disclosure of the price of one of the accused products does not place undue emphasis on the total value of the accused products.  *See Fractus, S.A. v. Samsung Electronics, Co., Ltd.*, 876 F. Supp. 2d 802, 834-35 (E.D. Tex. 2012) (denying motion for judgment as a

matter of law, ruling that it was proper for plaintiff to present evidence of the average overall selling price of the accused cellphone with infringing internal antenna, then determining that the antenna comprised about 10% of the value of the cellphone, and apportioning the patented features from the unpatented features).

Perhaps the jury will have enough information to calculate total revenues or profits, but exclusion of this evidence on that basis is a stretch under current Federal Circuit case law. As such, this motion is GRANTED as unopposed as to Apple's total revenues, total profits, total net worth and stock value, but DENIED as to references to the price of Apple's products consistent with this opinion.

### C. MIL 3: preclude damages on sales of the accused products before the complaint was filed (dkt. #338)

Apple moves to preclude WARF from seeking damages on sales of Apple's accused products before the complaint was filed.[2] In support of its motion, Apple argues that (1) WARF failed to provide Apple with any pre-suit notification of the '752 patent, pointing to two email communications which describe "patented technology" but do not mention the '752 patent or allege that Apple is infringing; and (2) Intel (the only entity practicing the invention) did not mark any of its products with the '752 patent after it obtained a license in 2009.

In response, WARF argues that Apple failed to demonstrate a "forfeiture of damages" under 35 U.S.C. § 287(a) because "there is simply no competent evidence that

---

[2] Apple contends that the significance of this motion is that it would decrease WARF's maximum damages claim from $862.4 million to $674.2 million.

any processor made or sold in the United States by Intel following the 2009 WARF/Intel Settlement Agreement was a 'patented article' that practices the '752 patent." (Pl.'s Opp'n (dkt. #439) 22.) In other words, WARF argues (seemingly contrary to its infringement claim against Intel and $110 million settlement) that there is no evidence that there are Intel products practicing the '752 patent and, therefore, no evidence that there are products to mark.

In fairness, WARF also points to testimony during the course of the *Intel* lawsuit of Intel officers, stating that the alleged infringing feature of Intel's product had been removed from the processor. (*Id.* at 23-24.) As such, WARF argues that Intel has failed to "establish Intel's post-settlement processors practice any claim of the '752 patent." (*Id.* at 24.)

While the court agrees with Apple that WARF bears the burden of demonstrating marking, Apple has the initial burden to demonstrate that there are patented products that require marking in order to forfeit pre-lawsuit damages. (*Id.* at 27-28.) At least in its motion in limine, Apple has failed to make such a showing. Accordingly, this motion is DENED, without prejudice to demonstrating at trial that Intel practiced the patent after the 2009 license and, therefore, WARF forfeited pre-lawsuit damages by failing to mark the patented products.

### D. MIL 4: preclude evidence or argument on this court's and the *Intel* court's summary judgment decisions (dkt. #338)

Apple seeks an order precluding any reference to the court's summary judgment decision in this case or Judge Crabb's decision in the *Intel* case. Specifically, Apple argues

that WARF should not be permitted to: (1) tell the jury that the court and the *Intel* court adopted WARF's proposed construction of "prediction;" (2) refer to the court's summary judgment rulings rejecting Apple's arguments regarding anticipation by Steely and indefiniteness; and (3) refer to the court's rulings that certain of Apple's defenses were not objectively reasonable.

WARF interposes an unqualified opposition to this motion with respect to the willful infringement phase of trial. WARF also opposes the motion for the liability phase of trial with respect to: (1) the court's finding that Steely does not anticipate the '752 patent; and (2) any expert testimony that is contrary to the court's construction of "prediction." (Pl.'s Opp'n (dkt. #439) 31-32.)

Taking each challenge separately, the court agrees with Apple that the jury need not know that the court rejected Apple's construction of the term "prediction" during the liability or damages phases of the trial.[3] Instead, the court will simply instruct the jury on the meaning of that term, without reference to which party proposed that construction. If one of Apple's experts attempts to offer testimony based on the meaning of the word "prediction" which runs counter to the court's interpretation, then WARF should object, but neither WARF nor the court need anticipate that testimony by informing the jury that the court adopted WARF's construction of "prediction" at summary judgment. As for the willful infringement phase, Judge Crabb's construction of

---

[3] As discussed during the final pretrial conference and again below, *see infra Opinion* § I.U, the court intends to try the subjective prong of WARF's willfulness claim (assuming the court does not find that Apple's defenses were objectively reasonable) *after* the jury decides both liability (phase I) and damages (phase II).

the '752 patent in *Intel* may be relevant to Apple's subjective intent.  As such, the court will reserve on whether WARF may introduce the *Intel* construction during the willful infringement phase of trial.

Next, the parties disagree as to whether the jury needs to know that the court already determined that Steely does not anticipate the '752 patent.  In the jury instructions, the court will inform the jury as to what prior art references they may consider in determining whether a specific prior art reference anticipates the '752 patent. Again, the court need not inform the jury that it has already rejected Apple's anticipation claim based on Steely.  To the extent Apple's experts attempt to opine that the '752 patent is anticipated by Steely, then WARF should again object.  Of course, Apple should ensure that its experts are aware of the court's prior rulings and do not testify in a manner contrary to those rulings.

Finally, with respect to the court's summary judgment rulings on the objective prong of the willful infringement claim, the court will inform the jury of that as part of its willfulness instructions, if it finds that Apple's defenses were not objectively reasonable. The jury need not know, however, about *any* findings on the objective prong of the willful infringement -- indeed, they need not know *anything* about willful infringement -- until the third phase of the trial.  Accordingly, Apple's motion in limine is GRANTED IN PART, RESERVED IN PART AND DENIED IN PART as described above.

E.  **MIL 5: preclude evidence or argument on IPR proceedings for the '752 patent (dkt. #338)**

On Federal Rule of Evidence 403 grounds, Apple moves to preclude WARF from offering evidence or argument regarding the Patent Office's *Inter Partes* review (IPR) of the '752 patent.  Apple initiated the IPR proceedings on September 20, 2014, seeking review of the '752 patent on the grounds that two prior art references -- Hesson and Steely -- rendered the claims of the '752 patent obvious and unpatentable.  Apple relied on a declaration of Dr. Robert Colwell, Apple's validity expert in this lawsuit, which made several of the same arguments regarding the Steely and Hesson patents that Apple intends to present to the jury in support of its invalidity defense in this case.  (Colwell Decl. (dkt. #52-2) ¶ 25.)

The Patent Office's Patent Trial and Appeal Board (PTAB) denied Apple's petition on April 15, 2015, concluding in a 27-page decision that Apple "has not shown, under 35 U.S.C. § 314(a), that there is a reasonable likelihood that it will prevail with respect to at least one of the challenged claims."  (Abernethy Decl., Ex. A (dkt. #151-1) 3.)  On August 19, 2015, PTAB denied Apple's request for rehearing, ending that IPR proceeding.

Apple argues that WARF should be precluded from offering evidence or argument regarding the IPR proceeding given its minimal probative value, risk of causing unfair prejudice, and possibility of misleading and confusing the jury.  Naturally, WARF opposes the motion, arguing that PTAB's decision is highly probative of validity of the '752 patent, particularly where Apple intends to present many of the same arguments.

There appears to be no controlling Federal Circuit law on the admissibility of evidence from an IPR proceeding.  As WARF points out, the Federal Circuit has held that the Patent Office's consideration of a prior art reference during prosecution of the patent may affect the weight given to that prior art during a subsequent invalidity challenge in court.  *See, e.g., Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260-61 (Fed. Cir. 2012) ("While the ultimate burden of proof [of proving invalidity] does not change, new evidence not considered by the PTO may carry more weight . . . than evidence previously considered by the PTO, and may go further toward sustaining the attacker's unchanging burden.) (citation and internal quotation marks omitted).

This argument makes sense as far as it goes.  After all, this would be true if prior art was presented to and reviewed by a patent examiner during prosecution who determined that it does not bar issuance of the patent as interpreted and approved by the examiner.

However, an IPR proceeding is different.   An IPR proceeding is not an examination by a patent examiner in which a decision is made about the scope and validity of a patent.  It is an adjudicative proceeding during which PTAB, comprised of three administrative law judges, determine whether the challenger has shown "a reasonable likelihood" that it will prevail on its challenges.  *See Abbott Labs. v. Cordis Corp.*, 710 F.3d 1318, 1326 (Fed. Cir. 2013) ("The purpose of this reform [America Invents Act] was to 'convert[ ] inter partes reexamination from an examinational to an adjudicative proceeding. . . .'") (citation omitted).  Moreover, the prior art that can be considered by PTAB is more limited.  *See* 35 U.S.C. § 311(b) (A petitioner in an inter

11

partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications."). Still, PTAB's rulings *are* generally intended to have a preclusive effect on the parties. *See* 35 U.C.C. § 315(e) (describing estoppel effect of IPR).

Here, Apple sought review of the '752 patent based on two pieces of prior art, and PTAB concluded that Apple had not shown a "reasonable likelihood" of prevailing on its challenges. Even so, PTAB did *not* conclude that the patent was either "valid" or "invalid." In other words, there was no explicit, or even implicit, decision on the validity of the patent as there is during the initial prosecution of the patent.

Several courts, including the Federal Circuit, have considered whether evidence of an *ongoing* reexamination or IPR proceeding is admissible, with the majority concluding that the evidence should be precluded. Although these cases are distinguishable because the IPR proceeding is completed in the present case, the possibility of potential prejudice and jury confusion nonetheless is real. *See, e.g., K–TEC, Inc. v. Vita–Mix Corp.*, 696 F.3d 1364, 1376 (Fed. Cir. 2012) (noting that "[i]t is generally true that evidence of non-final reexamination determinations is of little relevance and presents a risk of jury confusion"); *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1343 (Fed. Cir. 2009) ("The district court did not abuse its discretion in concluding that the prejudicial nature of the evidence concerning the ongoing parallel reexamination proceeding outweighed whatever marginal probative or corrective value it might have had in this case."); *Personalized User Model, L.L.P. v. Google Inc.*, No. CV 09-525-LPS, 2014 WL 807736, at *3 (D. Del. Feb.

27, 2014) ("Given the non-finality of the reexamination proceedings (appeal rights have not been exhausted) and the different standards applicable to reexaminations and litigation, the probative value of the reexamination evidence is substantially outweighed by the risk of unfair prejudice and the risk of confusing the jury.").[4]

A handful of district courts have also considered whether to admit evidence from completed IPR proceedings, with several concluding that the evidence could be admitted in conjunction with jury instructions explaining the different standards applicable to court and IPR proceedings. *See, e.g.*, *StoneEagle Servs., Inc. v. Pay-Plus Solutions, Inc.*, No. 8:13-CV-2240-T-33MAP, 2015 WL 3824208, at *8 (M.D. Fla. June 19, 2015); *Universal Electronics, Inc. v. Universal Remote Control, Inc.*, No. SACV 12-00329 AG, 2014 WL 8096334, at *7 (C.D. Cal. Apr. 21, 2014); *Oracle America, Inc. v. Google, Inc.*, Civ. No. 10–03561, 2012 WL 1189898, *3 (N.D. Cal. Jan. 4, 2012).[5]  In contrast, at least one court

---

[4] *See also IA Labs CA, LLC v. Nintendo Co.*, 857 F. Supp. 2d 550, 552 (D. Md. 2012) ("As for the probative value and potential prejudice of the reexamination proceedings, the Court agrees with the vast majority of courts that such evidence has little relevance to the jury's independent deliberations on the factual issues underlying the question of obviousness and that risk of jury confusion is high." (internal citation and quotation marks omitted)); *Tesco Corp. v. Weatherford Int'l, Inc.*, 750 F. Supp. 2d 780, 794 (S.D. Tex. 2010) (excluding evidence of a reexamination interim determination given the "serious risk that a jury would view the examiners as expert and authoritative"); *Transamerica Life Ins. v. Lincoln Nat'l Life Ins. Co.*, 597 F. Supp. 2d 897, 907 (N.D. Iowa 2009) ("This court agrees with its brethren that evidence of incomplete patent reexamination proceedings is not admissible to prove invalidity of a patent, because it has no probative value on that issue . . . and even if the evidence has some marginal probative value, that probative value is outweighed by its potential for undue prejudice or confusion of the jury about the presumption of validity of the patent.").

[5] WARF suggests that the jury instructions approved by this court in *Ameritox, Ltd. v. Millennium Health, LLC*, No. 3:13-cv-00832-WMC, slip op. at 5 (W.D. Wis. Apr. 15, 2015) (dkt. #411), are an example of instructions that may be provided to a jury on this issue.  In that case, the jury was instructed that, "In deciding whether [defendant] has met its burden of proof, you may consider whether or not the U.S. Patent and Trademark Office previously considered the prior art references or the arguments against validity during patent prosecution."  However, those

has concluded that evidence of an IPR proceeding should be excluded under Rule 403, even where the proceeding was complete. *See, e.g.*, *Interdigital Commc'ns Inc. v. Nokia Corp.*, No. CV 13-10-RGA, 2014 WL 8104167, at *1 (D. Del. Sept. 19, 2014).

Generally, this court agrees with Apple and those courts that have declined to admit evidence of non-dispositive IPR proceedings:  any probative value of this evidence is substantially outweighed by the risk of unfair prejudice, as well as the risk of jury confusion.  The IPR proceeding is subject to different standards, purposes and outcomes than both the original prosecution and this court proceeding.  Not only is PTAB's decision not binding in these proceedings, the law is not even clear on whether and how much the PTAB's decision denying Apple's request for review should affect the *weight* given to the two prior art references presented during the IPR proceedings.  Although the court could attempt to provide instructions to the jury regarding the purpose and current standards applicable to the IPR proceeding, it would be difficult for a jury to understand, much less apply, the nuanced differences between the various proceedings and to determine how much weight should be given to PTAB's decision, if any.  Instead, there is a great risk that the jury would conclude, incorrectly, that the Patent Office has twice held the '752 patent is nonobvious over prior art.  Such a conclusion would likely unfairly prejudice the jury against Apple before being asked to decide the same question.  Accordingly, this motion is GRANTED.

---

instructions do not address the issue here:  whether evidence of a PTAB decision denying a request for IPR review should be admitted over a Rule 403 objection.

### F. MIL 6: exclude WARF's expert Mudge from testifying about IPR proceedings (dkt. #338)

In this motion, Apple moves to preclude WARF's expert Mudge from testifying about the IPR proceedings. WARF has responded that it does not intend to present any testimony from Mudge about the IPR proceedings. (Pl.'s Opp'n (dkt. #439) 49.) Moreover, the court is barring admission of evidence regarding the IPR proceedings. Accordingly, this motion is GRANTED.

### G. MIL 7: preclude evidence or argument regarding Apple's future products (dkt. #338)

This motion is GRANTED as unopposed for the same reasons provided in the court's decision on WARF's motion in limine 4. (*See* 9/28/15 WARF's MIL Op. & Order (dkt. #464) § I.D.)

### H. MIL 8: preclude evidence or argument that Apple copied or stole WARF's alleged invention (dkt. #338)

In this motion, Apple seeks an order precluding WARF from offering evidence or argument suggesting that Apple "copied" or "stole" WARF's invention. In support, Apple principally argues that WARF lacks evidence that the engineers involved in Apple's development of the accused feature were aware of the '752 patent before or during the development of the accused LSD Predictor. In particular, Apple takes issue with WARF's (1) reliance on a 1998 paper purportedly reviewed by Apple's engineers during the development of the LSD Predictor, (2) assertion that the '752 patent was "widely known in the computer architecture world," and (3) argument that the LSD Predictor is "in

15

significant part identical to the working embodiment of the '752 patent specification" as support for WARF's position that "Apple stole or copied the patent." (Def.'s Mot. (dkt. #338) 31-33.)

In its opposition, WARF claims to have substantial evidence that gives rise to a reasonable inference on the part of the jury that Apple copied the '752 patent and discusses in detail: (1) the 1998 paper; (2) WARF's expert Dr. Conte's view of the general awareness of the '752 patent; and (3) Dr. Conte's comparison of Apple's alleged infringing product to the '752 specification. While courts have excluded argument that the defendant copied or stole the patented invention in the face of *no* evidence in support, *see, e.g.*, *Calouri v. One World Techs., Inc.*, No. 07-cv-2035, 2012 WL 2004173, at *2 (C.D. Cal. June 4, 2012), WARF has at least some evidence to support its position. Whether this evidence alone is sufficient -- for the jury to find copying for purposes of secondary considerations of non-obviousness or willful infringement -- is an open question, but the court is in no position to exclude evidence of copying or WARF's argument to that effect at this point.[6] Accordingly, this motion is DENIED.

---

[6] Apple argues that evidence of copying is not necessary to prove infringement. (Def.'s Mot. (dkt. #338) 34 (citing *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1351 (Fed. Cir. 2002)).) Nonetheless, copying *is* relevant to secondary considerations of non-obviousness and willfulness. *See SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1377 (Fed. Cir. 2013) (considering evidence of copying by competitors as objective evidence of non-obviousness); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1127 (Fed. Cir. 1993) (an infringer's "deliberate copying was strong evidence of willful infringement, without any exculpatory evidence to balance the weight").

## I. MIL 9: preclude evidence or argument for secondary considerations that are not tied to the '752 patent (dkt. #338)

Apple moves to exclude 107 exhibits that WARF intends to offer as praise of the invention claimed in the '752 patent. Apple does not dispute that praise of the invention is objective evidence of non-obviousness. *See, e.g. Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327-28 (Fed. Cir. 2008). Instead, Apple argues that WARF's exhibits lack the requisite "nexus between the merits of the claimed invention" and the praise identified. *Id.* (no nexus established where praise was for the patented device but was not tied to the "scope of the claims"); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006) (secondary considerations of non-obviousness are "only significant" if there is a nexus to "the claimed invention").

In briefing and at the final pretrial conference, Apple grouped these exhibits into the following categories: (1) documents that don't actually praise anything, Exs. 15-53; (2) documents praising the inventors' work generally, but not discussing their work on memory dependence prediction, Exs. 54-60; (3) documents commenting on the inventors' work on memory dependence generally, but not identifying any particular aspect that corresponds with the claimed invention of the '752 patent, Exs. 61-92; and (4) the commercial success of Apple's accused products, Exs. 93-121.

In response, WARF points out that the "nexus" between the invention and the praise goes to the weight of the evidence, not its admissibility. *See Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1574 (Fed. Cir. 1996) ("It is within the province of the fact-finder to resolve these factual disputes regarding whether a nexus exists between the commercial success of the product and its patented features, and to

determine the probative value of [plaintiff's] evidence of secondary considerations for rebutting the prima facie case of obviousness.").  In other words, WARF argues, whether the challenged exhibits are evidence of praise of the invention is a question for the jury.

This motion is similar to one filed by Intel during the *Intel* litigation.  In resolving that motion, Judge Crabb declined to address each challenged exhibit individually, and instead precluded "documents containing only general praise for inventors, documents praising the load/store feature described in the invention [because it was not a claimed part of the patent] and statements describing defendant's apparent infringement rather than praising the invention."  *WARF v. Intel Corp.*, No. 9-cv-78-bbc, slip op. at 7 (W.D. Wis. Sept. 24, 2009) (dkt. #442).

This court will adopt a similar approach.  Apple has not identified specific objections to each exhibit it seeks to challenge, and the court will not strike all of the exhibits based on Apple's general arguments.  Certainly, some of Apple's challenges go to the weight that should be given this evidence.  For example, some of the documents discuss the inventors' academic work on "memory dependence prediction."  WARF intends to call an expert to explain the relationship between the aspects of "memory dependence prediction" praised and the asserted claims of the patent.  A jury could conclude that such documents are evidence of praise for the patented invention.  On the other hand, some of the exhibits identified by Apple are troubling.  Documents containing only general praise for the inventors without reference to the patented invention are irrelevant.  Similarly, some of the documents laud the importance of ever

greater processor speed, while documents praising features described in the invention that are "unclaimed" features are irrelevant. *Muniauction*, 532 F.3d at 1328.

Accordingly, this motion is GRANTED IN PART AND DENIED IN PART. WARF is precluded from introducing any of these exhibits that (1) contain only general praise for inventors without praising their work specifically related to the patented invention; (2) praise the inventor's work generally, unless WARF has expert testimony connecting that praise to the patented invention; (3) praise unclaimed features described in the '752 patent; or (4) describe the commercial success of Apple's products, unless WARF has expert testimony connecting that praise to the patented invention. The parties are instructed to confer and agree on which exhibits must be precluded under this ruling. If they are unable to agree on particular exhibits, they should present specific disputes to the court in advance of trial.

### J. MIL 10: preclude evidence or argument regarding infringement under the doctrine of equivalents for certain claims (dkt. #338)

Apple moves to preclude WARF from presenting evidence or arguing that Apple's products satisfy the "predetermined range" or "synchronization table" claim elements under the doctrine of equivalents on the grounds that WARF's infringement expert, Dr. Thomas Conte, did not include an explicit doctrine of equivalents analysis as to those claim limitations in his infringement report. More specifically, Apple asserts that in order to pursue an equivalents theory, WARF was required to disclose particularized expert testimony linking each limitation in the '752 patent to elements in Apple's products and explaining why any differences between Apple's products and the claim limitations are

19

"insubstantial." *See, e.g., Amgen Inc. v. F. Hoffman-La Roche Ltd.,* 580 F.3d 1340, 1382 (Fed. Cir. 2009) ("To support a finding of infringement under [the doctrine of equivalents], [plaintiff] must have presented, on a limitation-by-limitation basis, particularized testimony and linking argument as to the insubstantiality of the differences between [the claim elements] and [accused product], or with respect to the function, way, result test." (citation and internal quotation marks omitted)).

Instead, Apple argues, Dr. Conte's report includes one conclusory paragraph regarding doctrine of equivalents with respect to the "predetermined range" element, and *no* equivalents analysis for "synchronization table." Apple also argues that WARF should not be permitted to rely on Conte's opinions regarding literal infringement to support an infringement claim under the doctrine of equivalents.

This motion will be denied. With respect to the "predetermined range" limitation, Dr. Conte's report includes an explicit analysis of the doctrine of equivalents. (Conte Rept. (dkt. #105) ¶ 1045.) Conte opines in particular that:

> In Apple's design, the use of a combination of an armed flag and a counter threshold in the LSD Predictor is insubstantially different from the use of only a counter threshold condition. In both cases the speculation of a load instruction is blocked only if there is a prediction within a predetermined range.

(*Id.*) He goes on to opine that the function, way and result of the LSD predictor are substantially the same as the predetermined range described in the patented invention, and refers back to his previous discussion of the technical aspects of the invention. (*Id.* ¶¶ 1042, 1045.) Although Apple criticizes the testimony as "conclusory" and inadequate, such critiques go to the weight of the evidence, not their admissibility. Apple is free to

20

argue to the jury that Conte's analysis does not establish infringement of the "predetermined range" under the doctrine of equivalents.

Further, it was acceptable and appropriate for Conte to refer back to and incorporate, either explicitly or implicitly, his earlier opinions on the technology and literal infringement. Although a patentee must provide "particularized testimony and linking argument" to support a finding of infringement under the doctrine of equivalents, the Federal Circuit has explained that:

> [This] standard does not require [an expert] to re-start his testimony at square one when transitioning to a doctrine of equivalents analysis. Indeed, we think it desirable for a witness to incorporate earlier testimony in order to avoid duplication. The fact that [an expert] d[oes] not explicitly do so does not mean he did not implicitly incorporate his earlier testimony.

*Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007). Thus, in *Paice*, the Federal Circuit rejected the argument that the expert's "equivalence testimony [was] strictly limited to the few lines" of testimony in which he referred specifically to the doctrine of equivalence. *Id.*

The court reaches the same conclusion with respect to Dr. Conte's "synchronization table" analysis. His report includes an extensive technical discussion and infringement analysis regarding this element. (Conte Rept. (dkt. #105) ¶¶ 895-918.) This analysis is relevant to the doctrine of equivalents even though Conte did not include a summary paragraph specifically undertaking a function-way-results analysis. Certainly, Dr. Conte cannot provide new infringement opinions under the doctrine of equivalents regarding the "synchronization table," but the court will not preclude Dr.

21

Conte from offering opinions disclosed by his report.  Nor will the court preclude WARF from making an argument under the doctrine of equivalents with respect to these two claim elements at trial.  Accordingly, this motion is DENIED.

### K. MIL 11: preclude testimony from WARF's expert Kunin (dkt. #338)

Apple moves to preclude WARF's expert Stephen Kunin from testifying at trial. WARF has responded that it does not intend to present any testimony at trial from Kunin, as all of his opinions concerned issues that were resolved at summary judgment. (Pl.'s Opp'n (dkt. #439) 82.)  Accordingly, this motion is GRANTED as unopposed.

### L. MIL 12: preclude evidence or argument on the subject of the willfulness test based on any evidence other than knowledge (dkt. #338)

Apple seeks to exclude evidence that purportedly demonstrates knowledge of the '752 patent for purposes of WARF's willful infringement claim on the basis that the evidence either:  (1) does not demonstrate knowledge of the '752 patent specifically; or (2) does not show knowledge on the part of certain employees at Apple.  In response, WARF contends that the evidence, if accepted by the jury, is sufficient to demonstrate constructive knowledge or the jury could infer actual knowledge from this circumstantial evidence.  (Pl.'s Opp'n (dkt. #439) 87-88 (citing *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed. Cir. 2010) ("Based on this circumstantial evidence, the jury could have reasonably inferred that Microsoft knew about the '449 patent.")).)  Notably, Apple did not move on the subjective prong of the willful infringement claim at summary judgment.  Assuming WARF's claim gets past the objective prong, it will be for the jury

to determine whether WARF's evidence creates a reasonable inference that Apple knew about the patent. Accordingly, this motion is DENIED.

### M. MIL 13: exclude Exhibit 5 of Moris deposition (dkt. #338)

In this motion, Apple seeks an order excluding the testimony and opinion of Deanna Moris regarding the cost of development of the alleged invention claimed in the '752 patent. In particular, Apple seeks to exclude Exhibit 5 of her deposition, which is a two-page handwritten estimate created the day before her deposition of the amount of time, in person-months, she calculated was spent on developing the '752 patent. In response, WARF states that it does not intend to introduce the exhibit at issue or call Moris to testify. Accordingly, this motion is GRANTED as unopposed.

### N. MIL 14: preclude WARF from referring to itself as a charity or describing what it does with its money (dkt. #338)

Apple seeks an order precluding WARF from referring to itself as a "charity" or "discuss[ing] what it does with its money other than to pay inventors." (Def.'s Mot. (dkt. #338) 57 (quoting *Wis. Alumni Research Found. v. Intel Corp.*, No. 08-cv-078-bbc, slip. op. at 6 (W.D. Wis. Sept. 24, 2009) (dkt. #442)).) Apple contends that this information is not relevant to any jury issue, and, indeed, such characterization and evidence may bias the jury to increase its damages award.

In response, WARF agrees not to refer to itself as a charity, but contends that Apple's second request "restricts unfairly WARF's ability to provide basic information about itself to the jury." (Pl.'s Opp'n (dkt. #439) 96.) Specifically, WARF contends

that this information is relevant to rebut Apple's position that certain license agreements with "patent assertion entities" -- which WARF describes as "thinly-capitalized" companies that "exist[] solely to produce profits for their owners, and lack the resources to effectively enforce their patents when appropriate" -- are comparable to Apple's hypothetical license agreement with WARF.  To the extent Apple opens the door by attempting to analogize WARF's position to that of a more typical "patent assertion entity," then WARF is free to differentiate itself by reference to its stakeholders, its use of funds, and its position in the hypothetical negotiation.  All of this, of course, is only relevant to the damages phase of trial.

WARF also contends that if Apple is allowed to introduce evidence that WARF uses money to pay inventors -- and exclude this other evidence -- such a ruling "would lead the jury to believe that intellectual property assets of the state were taken from the state and used solely to benefit WARF and the inventors."  (Pl.'s Opp'n (dkt. #439) 96.)  The court does not share WARF's concern.  Regardless, WARF's concern will be ameliorated by the introduction of certain, limited evidence about its role to counter Apple's attempt to analogize WARF to a more typical "patent assertion entity."   As such, this motion is GRANTED IN PART as unopposed and DENIED IN PART unless Apple opens the door.


### O. MIL 15: preclude evidence or argument regarding UW's financial condition (dkt. #338)

Apple also seeks an order precluding evidence or argument concerning the University of Wisconsin's financial condition, arguing that such evidence is not relevant

to any jury issue and would be prejudicial to Apple. WARF does not oppose the motion, but clarifies that it intends to introduce certain evidence about WARF's operations to counter Apple's characterization of WARF as a patent assertion entity -- as discussed above. The motion is GRANTED as unopposed, though nothing about this decision alters the court's ruling with respect to Apple's motion *in limine* 14.

### P. MIL 16: preclude reference to number of attorneys, residence of attorneys, and size and location of law firms representing Apple (dkt. #338)

Next, Apple requests an order precluding any evidence or argument regarding the number of attorneys Apple retained, the residence of those attorneys, the size and location of the law firms employed by Apple, and the fact that some of Apple's attorneys also represented Intel in the *WARF v. Intel* case. WARF does not oppose the motion except to ensure that it "works both ways," precluding the same evidence or argument about WARF's counsel. The court agrees. This motion is GRANTED, and the same ruling applies to WARF's counsel.[7]

---

[7] As one small caveat to this ruling, the court will ask counsel during *voir dire* to introduce themselves for purposes of identifying whether any jury members are familiar with them or their law firms. Typically, this introduction also includes where they practice. In light of the parties' mutual concern, the court directs that all counsel who will appear before the jury at some point, stand and state their name, as well as the name of the law firm with which they practice unless previously introduced to the jury by other counsel for that party.

**Q. MIL 17: preclude evidence and argument of irrelevant aspects of Apple's business (dkt. #338)**

In this motion, Apple seeks an order precluding WARF from "offering evidence or argument relating to irrelevant aspects of Apple's business, including allegations relating to the size of Apple, the compensation paid to Apple's employees, working conditions related to the manufacture of Apple products, or statements made by Apple's former CEO Steve Jobs that are unrelated to the issues in this case." (Def.'s Mot. (dkt. #338) 60.) In response, WARF contends that it does not intend to offer any evidence of the items listed, but nonetheless argues that the motion should be denied because the scope of the motion is not clear. The motion is GRANTED as to the specific list of items quoted above. In all other respects, the motion is RESERVED pending specific examples of other so-called "irrelevant aspects" of Apple's business. The court also reserves on WARF's counter-motion to exclude Apple's introduction of evidence about irrelevant aspects of its own business.

**R. MIL 18: preclude reference to other litigation in which Apple is involved (dkt. #338)**

Apple seeks an order precluding WARF from referring to other litigation involving Apple. In particular, Apple points to WARF's damages expert Catherine Lawton's references in her report to Apple's litigation with Samsung, including damages amount that Apple sought from Samsung for infringement of patents which Apple contends are unrelated to the '752 patent. Apple contends that such evidence would prejudice and confuse the jury.

WARF opposes the motion on the basis that Apple's approach to damages in the *Samsung* case -- an approach embraced by the same damages expert presented here, Julie Davis -- is relevant to WARF's damages claim. In particular, WARF contends that Lawton's use of Davis's apportionment approach cuts off any argument by Apple that her method is unreliable. WARF also argues that certain opinions offered by Davis in this case -- namely, that WARF's damages should be heavily discounted because many patents may read on smartphone and tablets -- is in conflict with her testimony presented in the *Samsung* litigation. WARF also argues that there is evidence that it was aware of the *Samsung* litigation and would have considered it in a hypothetical negotiation with Apple. The court agrees with WARF that a blanket ruling precluding any reference to the *Samsung* litigation is unwarranted. Accordingly, the motion is DENIED. Apple may renew this motion with respect to specific pieces of evidence or testimony not described by WARF in opposing the motion.

### S. MIL 19: preclude reference to discovery disputes or the adequacy of discovery responses (dkt. #338)

Apple seeks an order excluding any reference to discovery disputes or the sufficiency of either party's discovery responses, arguing that such evidence is not relevant and likely to confuse the jury. WARF does not oppose the motion provided that Apple does not argue that "WARF did not sufficiently simulate processor performance, or do more extensive energy testing or benchmark testing during discovery." (Pl.'s Opp'n (dkt. #439) 115.) WARF contends that its testing was thwarted by Apple's blocking of WARF's access to the simulator, in particular, and test phones, more generally. This

motion relates to the Apple's motion to strike WARF's technical experts. (*See infra* Opinion § I.Y.) As explained during the final pretrial conference, this motion is GRANTED so long as Apple does not open the door by asking WARF's experts about the limits of their testing if Apple actually blocked or prohibited such testing, as opposed to WARF failing to request additional equipment, access or time to run additional testing. Apple represented at the final pretrial conference that it would not cross-examine WARF's experts about failing to do tests which it did not allow them to perform. (9/25/15 Hr'g Tr. (dkt .#462) 74.) However, the parties are encouraged to confer as to any remaining areas of dispute on this subject and, if necessary, seek guidance from the court in advance of trial.

### T. MIL 20: preclude WARF from offering into evidence or relying on documents it produced on the last day of discovery (dkt. #338)

Apple seeks to preclude WARF from either offering into evidence or relying on documents produced on the last day of discovery. Without condoning WARF's eleventh hour production, the court cannot evaluate the merits of Apple's motion without reference to specific examples, particularly since WARF represents that: a number of the documents were already in Apple's possession; are variations of documents which were previously provided to Apple; or are public documents (e.g. Wikipedia entries). The court also cannot evaluate at a general level whether: (1) WARF's production was untimely; or (2) Apple was prejudiced by it. As such, this motion is DENIED, but Apple is free to raise objections to WARF attempting to offer into evidence particular exhibits that were unfairly produced on the last day of discovery.

28

**U.  MIL 21: bifurcate trial with phase one consisting of liability and damages and phase two concerning willful infringement (dkt. #338)**

In this motion, Apple requested that the court try liability and damages together and then try the subjective prong of WARF's willful infringement claim in a second phase.  Apple contends that "[t]here is substantial overlap in the testimony and evidence Apple expects to present for both liability and damages," and therefore liability and damages should be tried together.  (Def.'s Mot. (dkt. #338) 65.)  Apple further contends that bifurcation of willfulness is appropriate to "avoid any confusion and unfair prejudice that might result from the inclusion of subjective willfulness-related evidence in the liability/damages phase that might improperly infect the jury's determination of those issues."  (*Id.*)

WARF opposes both prongs of this motion.  First, WARF argues that this case, consistent with the court's practice, is set for a bifurcated trial with liability in a separate phase preceding damages and it should proceed as such.  The court agrees with WARF.  The liability phase will involve both determinations of infringement (and various types of infringement) and invalidity (and various invalidity) challenges.  To add damages to that phase would unnecessarily complicate an already daunting set of tasks for the jury.  In particular, the special verdict form could be difficult to structure if the court were to proceed to try both liability and damages in one phase.

As the court noted during the final pretrial conference, Apple's only argument in support of trying the two phases together is that certain witnesses' testimony covers both liability and damages.  To the extent the testimony covers both, Apple need not -- and, indeed, should not -- recall the witness to provide the same testimony, but can simply

refer to the prior testimony in opening statement and closing argument.  To the extent that one witness must be called twice -- because some of the testimony he or she seeks to provide is only relevant to damages -- then the court is open to either allowing that witness to appear via videoconference during the damages phase of the trial, or otherwise attempting to mitigate any inconvenience.  Any efficiency, however, gained by having a witness only testify one time is far-outweighed by the court's interest in structuring the trial to aid the jury in deciding the various issues before it without confusion or unnecessary expenditure of resources and time.

As for Apple's second request -- that the subjective prong of the willful infringement claim be tried after the jury's consideration of liability and damages -- the court agrees with Apple that a third phase (if necessary) on willful infringement is appropriate to ameliorate any prejudice to Apple based on the evidence that need come in only to prove Apple's subjective intent to infringe.  While the court agrees that WARF's willful infringement claim is relevant to determining damages, it need not be tried in the damages phase.  Accordingly, the court will grant Apple's request to try willful infringement after the damages phase (and, necessarily, after a finding of liability).[8]

---

[8] Curiously, despite there being *no* reference in Apple's motion *in limine* to WARF's license with Intel for the '752 patent, WARF spends most of its opposition arguing that the Intel license *is* relevant to non-obviousness and therefore should come in during the liability phase.  This argument is in no way relevant to the issue raised in Apple's motion.  If WARF failed to bring its own motion to address timely this issue, that's WARF fault, but there are too many other issues properly before the court, for the court to consider an argument raised in an opposition to a motion *in limine* unrelated to that motion.

Accordingly, this motion is GRANTED IN PART AND DENIED IN PART. Apple's request to try liability and damages in a single phase is DENIED, but Apple's request to try the subjective prong of the willful infringement claim in a separate, final phase is GRANTED.

### V. MIL: exclude testimony by WARF's expert Blattberg regarding importance of processor speed in industry (dkt. #308)

In this *Daubert* motion, Apple seeks to exclude the testimony of WARF's marketing expert Dr. Robert Blattberg on the basis that his testimony "fails to assist the jury under Rule 702 and improperly places an expert's sheen on matters of common sense." (Def.'s Mot. (dkt. #308) 2.)[9] Specifically, Apple argues that Blattberg's opinions consist of recitations from: "(1) the bare factual content of documents produced by WARF or Apple in this case; (2) the factual content of a website; and/or (3) the opinion of WARF's technical expert Dr. Conte." (*Id.* at 3.) Apple implicitly argues that for Blattberg's testimony to qualify as expert testimony or to otherwise be helpful to the jury, Blattberg should have conducted his own market research, commissioned surveys or held focus groups. (*Id.* at 4.)

In response, WARF contends that Blattberg's testimony -- and in particular, the three core opinions Apple seeks to strike -- is properly grounded in his source material, and that the criticism that he relies (at times, verbatim) on certain news articles or

---

[9] The court set forth the standard for reviewing challenges to expert testimony under Rule 702 and *Daubert* in the Opinion and Order on WARF's motions *in limine*. (*See* 9/28/15 WARF's MILs Op. & Order (dkt. #464) § I.O.)

representations on competitor websites does not serve as a basis for striking his testimony as not helpful or unreliable.  The court agrees with WARF that Blattberg's testimony *may* assist the jury in synthesizing various marketing materials and connecting those materials to the technical aspects of the alleged infringing product and competitor products. Perhaps his testimony will be of limited value to the jury, but Apple can underscore its flaws and limits through cross-examination.  Accordingly, this motion is DENIED.

### W. MIL: exclude testimony by WARF's expert Knittel on "regression analysis" (dkt. #309)

Apple seeks to exclude the testimony of one of WARF's damages expert Dr. Christopher R. Knittel pursuant to Federal Rule of Evidence 702 and *Daubert*.  WARF's main damages expert Catherine Lawton concluded that the appropriate measure of damages in this case is $2.74 per infringing device, based in part on Knittel's "regression analysis," in which he purports to calculate the dollar value associated with changes in the speed of the processors used in the accused Apple products.  Knittel concludes that for an estimated 8.55% reduction in processor speed (the purported result if Apple were not to use the infringing technology), the average prices of the accused iPhones would decrease by a range of $7.09 to $10.64, and the average price of the accused iPads would decrease by a range of $5.48 to $9.29.  Apple seeks to exclude this testimony as unreliable for four reasons, which the court addresses in turn.

*First*, Apple contends that the analysis violates the entire market value rule because it relies on the entire market value for the end user products at issue in this litigation.  The court has already considered two other motions concerning the entire

market value rule.  (*See* 9/28/15 WARF's MILs Op. & Order (dkt. #464) § I.F; *supra* Opinion § I.B.)  For the reasons described above (*see supra* Opinion § I.B), the court will not exclude Knittel's testimony in which he relies on the price of the accused iPhone and iPads as a starting point for purposes of his regression analysis.  Knittel is not proposing to use the entire value as a royalty base.  Indeed, he does not propose a reasonable royalty number at all.  Rather, Lawton relies on Knittel's analysis in support of her figure, which is also not based on the entire value of the product.  Moreover, the reference to the full price of the product does not place undue emphasis on the total value of the accused products.  *See Fractus, S.A. v. Samsung Electronics, Co., Ltd.*, 876 F. Supp. 2d 802, 834-35 (E.D. Tex. 2012).

*Second*, Apple argues that the analysis "conflicts with the real-world Apple pricing data produced in this case."  (Def.'s Mot. (dkt. #309) 3.)  Specifically, Apple faults Knittel's approach for failing to take into consideration the fact that "Apple sells iPhones containing SoCs with different processor speeds at exactly the same price."  (*Id.*)  In response, WARF points out that Apple's argument concerns the fact that previous generations of iPhones were launched at the same prices as the non-infringing iPhone 5s, and, therefore, fails to consider the effect of time.  (Pl.'s Opp'n (dkt. #392) 19.)  Apple remains free to cross-examine Knittel on whether the evidence he relied on in determining the price differential is sound, but this challenge does not form a basis for excluding his testimony.

*Third*, Apple faults Knittel's "biased selection of which variables to include in his regression models," arguing that the results vary widely depending on the number and

type of variables.  (Def.'s Mot. (dkt. #309) 3.)  Specifically, Apple criticizes Knittel for using a "stepwise methodology," in which a computer program is employed to choose the independent variables, directing the court to general criticism in academia about this approach.  (*Id.* at 10-15.)  In response, WARF counters that Knittel did not use a stepwise methodology.  (Pl.'s Opp'n (dkt. #392) 23-24.)  Instead, WARF explains that Knittel relied on Apple's marketing materials to identify and weight independent variables.  (*Id.* at 24-25.)

While obviously subjective, Apple is free to challenge Knittel's methodology by counter evidence or cross-examination, but the court will not exclude it altogether.  Indeed, the variables chosen do not seem to be the thrust of Apple's concern.  Instead, Apple faults Knittel's judgment on which and how many variables to include, but this criticism also goes to the weight the jury may place on Knittel's testimony and not on the admissibility of his regression analysis.

*Fourth*, and finally, Apple contends that Knittel's analysis depends on his assessment of the value of other features "that cannot possibly be true," including "that a larger display *decreases* value, and that a heavier phone *increases* value."  (Def.'s Mot. (dkt. #309) 3 (emphasis added).)  In response, WARF argues that Apple mischaracterizes Knittel's report.  With respect to the weight example, Knittel himself explained that the weight of the phone does not increase the value; instead, "the likely explanation is that heavier phones have more features, and so features that are not directly controlled for in the model will be captured by the weight variable."  (Pl.'s Opp'n (dkt. #392) 28 (citing Knittel Dep. (dkt. #246) 186-87).)  Knittel also explained at his deposition that the sole

purpose of the regression analysis is to value processor speed, and that the analysis is not intended to isolate and value other attributes, e.g., weight. Apple may well question Knittel about his approach and whether the analysis results in outliers with respect to other variables, but the court does not find that this serves as a basis for striking his testimony.

As such, Apple's motion to strike Knittel's testimony is DENIED.

## X. MIL: exclude testimony by WARF's expert Lawton regarding reasonable royalty (dkt. #313)

Apple also seeks to exclude testimony by WARF's main damages expert Catherine Lawton. In this motion, Apple argues that Lawton's damages number is inflated and falls far short of the reliability standards under Rule 702 and *Daubert*. Apple posits two core reasons to strike her testimony.

*First*, Apple takes issue with Lawton's use of $70.97 to $81.79 as the value of Apple's SoC (system on chip), from which she derives her per unit royalty of $2.74. Specifically, Apple contends that: (1) this number (or, really, range of numbers) is inflated because it does not reflect the actual market value of the SoCs; and (2) Lawton's analysis for calculating the total value of the SoC is flawed in several respects. In support of its argument, Apple points out that the total value assigned by Lawton is more than double the value of any SoC in the marketplace. (Def.'s Mot. (dkt. #313) 10). Still, as WARF argues, there is no dispute that Apple does not sell the particular SoC at issue in this case and therefore its expert must estimate its value. (Pl.'s Opp'n (dkt. #393) 21.) While Apple's criticism appears to have merit, whether Lawton's value is inflated is

proper fodder for cross-examination and does not serve as a basis for excluding her testimony. As for Apple's challenges to Lawton's calculation of the total value of the patented invention, all concern areas which are properly subject to cross-examination, including Lawton's treatment of various features of the phone, her use of Apple's customer data, and the relative value she places on processor speed as compared to other features. Still, this is not enough to strike her testimony as unreliable.[10]

*Second*, Apple contends that Lawton's reliance on the 50% rate Apple obtained in its patent litigation lawsuit with Samsung is not reliable because she failed to explain how that patent license is comparable to the one at stake here. In response, WARF argues that the Apple-Samsung license is just one factor Lawton considered before concluding that 50% is a reasonable royalty rate. For example, Lawton also relied on WARF's "policy of seeking 50% to 70% of the profits generated by the patent when the University shoulders the majority of the investment." (Pl.'s Opp'n (dkt. #393) 35.) Moreover, Lawton relied on WARF's technical expert, Dr. Conte, to compare the technology at issue in the Apple-Samsung patent license with that at issue here. (*Id.* (citing Lawton's use of Conte's Damages Report).) As Apple recognized in its opposition to WARF's motion to strike its own experts testimony on comparable licenses, it is common for pure damages experts to rely on technical experts in their analysis. (*See* Def.'s Opp'n (dkt. #417) 2 (discussing Davis's use of Donaldson and Colwell's technical analysis).)

---

[10] For the reasons already discussed, the court also rejects Apple's challenge to Lawton's testimony as improper under the entire market value rule. (*See supra* Opinion § I.B.)

Moreover, WARF contends that Lawton did not blindly rely on the 50% figure but also took into account certain economic differences between the Apple-Samsung patent and that at issue here.  (Pl.'s Opp'n (dkt. #393) 36 (citing Lawton Rept. (dkt. #243) ¶ 782).)  While Apple is free to challenge Lawton on her conclusion that the Apple-Samsung patent was sufficiently comparable to the one underlying the hypothetical negotiation at issue in this case, as Apple pointed out in its opposition to WARF's motion to strike testimony about comparable licenses (*see* 9/28/15 WARF's Op. & Order (dkt. #464) § I.Q), "disputes regarding license comparability go to weight, not admissibility."  (Def.'s Opp'n (dkt. #417) 6 (citing *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) (holding that testimony about comparable licenses must account for "distinguishing features" but any argument that a license is not "perfectly analogous generally goes to the weight"); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014) ("[W]hether these licenses are sufficiently comparable such that Motorola's calculation is a reasonable royalty goes to the weight of the evidence, not its admissibility.")).)

Accordingly, Apple's motion to strike Lawton's testimony is DENIED.

### Y.  MIL: exclude portions of testimony by four of WARF's technical experts (dkt. #317)

Under *Daubert* and Federal Rule of Evidence 702, Apple moves to preclude WARF's four technical experts from testifying in support of WARF's damages case at trial.  Apple argues that each expert bases his conclusions on unreliable methodologies and gives opinions he is not qualified to give.  As discussed below, however, Apple's

arguments generally go to the *weight* that should be given the experts' opinions, not to the reliability of their methods, the usefulness of their reports, or their qualifications that are of concern in *Daubert* or Rule 702. Accordingly, this motion generally is DENIED.

### 1. Dr. Glenn Reinman

Dr. Reinman was retained by WARF to conduct performance testing on Apple's accused devices in order to determine the performance benefit attributable to the '752 patent within the accused processors in Apple's devices. (Reinman Rept. (dkt. #260) ¶ 2.) Reinman ran tests using "benchmarks," which are individual tests designed to stress particular operations of a processor. Reinman chose to run three benchmark "suites" or applications during his testing: Geekbench, SPEC CPU, and Dhrystone. Reinman explains in his report that he chose these particular suites because he believed them to be: (1) representative of relevant applications on Apple Devices; (2) repeatable, meaning that he could run them many times on different LSD Predictor Mode settings; and (3) readily verifiable. (*Id.* ¶ 35.) Reinman also limited his testing methodology because his tests could be performed only on "engineering devices" owned and controlled by Apple, which permitted Reinman to toggle between the "enabled" and "disabled" modes of the LSD Predictor. (*Id.* ¶ 33.)

As Reinman explains in his report, commercial iPhones containing the LSD Predictor are set to the default operating mode, in which the LSD Predictor predicts dependencies between load and store instructions in a way that allegedly infringes the '752 patent. (*Id.* ¶ 18.) The LSD Predictor also has two "disabled operating modes," however, that are not active on the commercial iPhones. (*Id.* ¶ 20.) The first disabled

mode, called "Mode 2," prevents all load instructions from speculatively executing ahead of any store instructions. The second disabled mode, called "Mode 3," allows load instructions to execute freely and speculatively, but does not attempt to predict load-store dependencies or delay the execution of any instructions. (*Id.*)

For four days at the offices of Apple's counsel, Reinman was given access to Apple's "engineering devices" in order to conduct his tests, which compared the performance of the iPhone processors between the default operating mode and the disabled modes. (*Id.* ¶ 33.) Reinman was also provided with one Macintosh laptop and one cable that allowed him to test these devices, but limited his ability to run tests on multiple devices at the same time. (*Id.* ¶ 29.) After running benchmark tests, Reinman concluded that his tests "represent the performance benefit attributable to the LSD Predictor within the tested devices (default Mode 0), as compared to Modes 2 and 3, in which the LSD Predictor is disabled." *Id.* ¶ 189.

Apple argues that WARF should be precluded from relying on Reinman's test results for three reasons. *First*, Apple contends that Reinman's methodology was flawed at the outset because his tests do not measure the *incremental* value of the allegedly infringing features of the LSD Predictor. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product."). Apple argues that Reinman's performance tests comparing the operational LSD Predictor with the LSD Predictor in disabled modes assume that Apple's accused products would have contained *no* predictor at all if the allegedly infringing LSD

Predictor had been unavailable to Apple.   Because there were other, non-infringing predictors available, including Apple's predecessor A6 chip, Apple argues that the appropriate comparison would have been to measure the performance of the LSD Predictor to the performance of one of these non-infringing alternatives.   (Def.'s Mot. (dkt. #317) 10.)   By failing to make the appropriate comparison, Reinman's testing improperly attributes or at least implicitly suggests the entire performance benefit of the LSD Predictor in its operational mode to WARF's patented invention.   (*Id.* at 11.)

As an initial matter, Apple's argument appears to have merit, at least as to undue prejudice, if one assumes Apple would have chosen an alternative predictor were the LSD Predictor unavailable.   However, WARF defends Reinman's tests on the ground that *none* of the non-infringing alternatives available in the prior art or in Apple's previous products would have been viable in the accused products.   Instead, WARF's technical expert, Dr. Conte, explains in his report that Apple would have obtained the best results with the LSD Predictor set to one of the disabled modes.   (Conte Rept. (dkt. #216) ¶¶ 11-19.) WARF also argues that the type of testing Apple suggests would not have been possible or accurate, in any event, because there are no accused iPhones that contain non-infringing prior art.

Apple's position certainly seems more persuasive on this issue, both as to fact and reasonable inferences, but the court has no basis to reject Dr. Conte's contrary opinion outright.   Accordingly, the court is not persuaded that Dr. Reinman's methodology is clearly unreliable or so flawed that it cannot be presented to a jury.   At worst, it seems the factual premise on which Reinman's opinion depends is shaky.   While Apple is free

to expose Reinman's baseline assumptions and choices through cross-examination and testimony from its own experts, it has not demonstrated a right to exclude it altogether.

Apple's *second* objection to Reinman's performance tests concern the three, specific benchmark suites that Reinman chose to run. Apple spends several pages arguing that Reinman's chosen benchmarks are inadequate to illustrate overall performance, and that Reinman should have tested different or additional benchmarks. Apple also asserts that the test results of its own expert, Dr. August, confirm Reinman's tests were insufficient. In response, WARF provides more than 20 pages of argument explaining why Reinman's benchmarks were appropriate and why it is Dr. August's results that are actually flawed.

Whatever their ultimate merit, WARF's responses again demonstrate that Apple's objections go to the weight of Reinman's choice of benchmarks, not their admissibility. As an initial matter, Apple once again fails to challenge the basic methodology behind Reinman's tests -- testing performance by running various benchmarks on the LSD Predictor. Similarly, Apple neither suggests that Reinman's test results are inaccurate, nor that Reinman made any fundamental errors in running the tests. By merely asserting Reinman's choice of benchmarks could have been better, without establishing that it violates basic, accepted methodology or standard measures of reliability, Apple underscores that its criticism is more appropriately the subject of cross-examination about Reinman's choice and an offer of proof as to which benchmarks are more accurate indications of the overall performance benefit of the LSD Predictor. Apple may also, and certainly intends to, present testimony from Dr. August to undermine the underlying assumptions in Reinman's tests. However, absent proof of a *true* consensus

41

within the relevant field of expertise as to the proper benchmarks, or at least excludable benchmarks, the limitations in *Daubert* and Rule 702 are not at play.

The parties' arguments on this issue also raise a concern about whether WARF's experts were prevented from running more tests by Apple's refusal to provide access to its cSim simulator or engineering devices for further testing. (Pl.'s Opp'n (dkt. #437) 11, n.3, 18-19. If WARF had had access to Apple's cSim, WARF argues, its experts could have tested more benchmarks. Since WARF moved to compel access to the cSim, and its motion to compel was denied, Apple may have to live with the reasonable consequences Reinman testified resulted from that choice.[11] (Dkt. #71). Said another way, because Apple opposed, and ultimately succeeded in preventing WARF's access to the cSim, Apple cannot now raise arguments at trial that WARF should have run tests only available through the cSim.[12]

With respect to other testing of Apple's engineering devices, it is not clear from the record whether Apple flatly refused any request by WARF to conduct additional *performance testing*. As described above, the court encourages the parties to confer as to any remaining dispute over the availability of additional testing and, if necessary, bring that to the court's attention in advance of trial. (*See supra* Opinion § I.S.)

---

[11] Similarly, with respect to the engineering devices, WARF says that Apple limited access to four days; when WARF requested additional access for testing, Apple refused. Reinman relies, in part, on his limited access to Apple's devices in explaining his choice of benchmarks.

[12] In fairness, Apple may not intend to make this argument, but should be on notice that doing so may open the door to such a response.

Apple's *third* and final objection to Reinman's performance tests concern his claimed failure to "account for features that Apple developed and that are not part of or described anywhere in the '752 patent," but that would impact or at least magnify performance. Apple argues that Reinman's testing improperly gives credit to WARF for all of the features of the LSD Predictor, even though it contains features *not* claimed by the '752 patent. (Def.'s Br. (dkt. #317) 12.)

Again, Apple's argument has merit, but this, too, goes largely to the weight that should be given to Reinman's performance testing and results. WARF's experts have opined that any additional features of the LSD Predictor not specifically covered by the '752 patent either (1) do not improve processing speed, or (2) are simply implementation details for the '752 patented invention. (Conte Rept. (dkt. #217) ¶¶ 164-176.) To the extent Apple disagrees with these opinions, it is free to challenge that evidence or to present contrary evidence at trial.

## 2. Dr. Murali Annavaram

Apple next challenges Dr. Annavaram, who submitted a report analyzing the power benefit attributable to the LSD Predictor in Apple's accused products. (Annavaram Rept. (dkt. #249).) Apple raises several objections to Annavaram's report, including several the court already addressed related to Reinman's performance testing, on which Annavaram based some of his power savings calculations. Since the court has already concluded that Apple's arguments regarding Reinman's testing go to the weight

of his opinions, not to admissibility, the court will address that portion of the motion no further.

The remainder of Apple's arguments challenge alleged "assumptions" on which Dr. Annavaram relied in his analysis, including which benchmarks would best show power savings and how performance improvements relate to power savings. Apple's challenges to these assumptions are also disagreements with Annavaram's analysis, but do not undermine the basic reliability of Annavaram's methods. According to WARF, Apple has further misconstrued or misunderstood Annavaram's opinions and analysis. Accordingly, the court will not preclude Annavaram from presenting his opinions at trial.

### 3. Dr. Thomas Conte

Apple challenges Dr. Conte's damages report in which he offered opinions regarding apportionment and the supposed value of the LSD Predictor. (Conte Rept. (dkt. #217).) Apple contends that Conte's report on apportionment and value should be precluded because he: (1) relied on unreliable testing results reported by Reinman and Annavaram; and (2) improperly doubled the performance benefit by positing that the LSD Predictor would have allowed Apple to include *other, unidentified features* in its processors that would have achieved even greater performance benefits. Apple also moves to preclude several specific statements in Conte's reports, which Apple argues he is unqualified to make.

Since the court has (again) concluded that Reinman's and Annavaram's tests and opinions are admissible, the court will not preclude Conte from testifying regarding his

44

analysis and opinions because they incorporated those test results. Further, although Apple implies that it was improper for Conte to rely on the test results of others without conducting his own performance testing, it *is* proper for an expert to rely on the opinions of other experts, so long as all of those opinions are reliable and non-speculative, and subject to weighing by the trier of fact. *See Walker v. Soo Line R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000) ("Indeed, courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable.").

Apple's second argument with respect to Dr. Conte gains more traction. Apple criticizes Conte's conclusion that the LSD Predictor is not only responsible for the 8.55% performance benefit found through Reinman's testing, but is actually responsible for a 17.04% "net performance benefit." To reach this 17.04% number, Conte applied a formula used by Apple when designing products to conclude that the 8.55% performance benefit (shown by Reinman) would result in an 8.49% increase in available enhancements. (Conte Rept. (dkt. #217) ¶¶ 125-28, 153-54.)

Conte admits that he identified *no* particular enhancements that Apple included in its products as a result of this supposed 8.49% increase in available room for enhancements. Thus, Conte is arguably crediting the LSD Predictor with a performance boost derived from whole cloth that may not have actually resulted in *any* increased benefit to the accused products. On the other hand, WARF argues that the fact that the LSD Predictor made that space available for additional enhancements should be considered a benefit for purposes of the damages analysis.

Ultimately, the court believes this is an issue that should be presented to the jury.

45

Indeed, Conte's analysis is easy to understand and his methodology is straightforward, even if it is not particularly persuasive, allowing Apple to argue that Conte's analysis is too speculative and that WARF has identified no additional benefits or enhancements were added to the accused products as a result of the LSD Predictor.

This leaves Apple's objections to various opinions Conte provided in his infringement and damages reports that are lumped together with epithets such as "legal, contractual, and pricing issues as well as 'opinions' regarding Apple's state of mind." (Def.'s Mot. (dkt. #317) 34.) Apple argues that these opinions should be stricken because Conte is not qualified to make them. More persuasively, Apple objects to six, specific categories of testimony by Conte: (1) vicarious liability; (2) induced and contributory infringement; (3) infringement under 35 U.S.C. § 271(f); (4) subjective willfulness; (5) typical device usage by consumers; and (6) comparative pricing data.

Although some of Apple's objections may have merit, Apple fails to conduct any particularized analysis with respect to each opinion it seeks to preclude. For example, Apple does not explain why it believes Conte is unqualified to opine that Apple exercised "direction and control" over its contract manufacturers. Conte states in his report that he is "familiar with the relationship between a company that designs microprocessors and a contract silicon fabricator that performs the actual physical step of fabrication based on my professional experience, including my work for BOPS, Inc. [where he was Chief Micro-Architect]." (Conte Rept. (dkt. #105) ¶ 1056.) It may be that Conte's experience does not actually qualify him to give opinions regarding Apple's relationship with its

fabricators, but the court will not make arguments for Apple.[13]  Accordingly, the court will not strike any of Conte's opinions at this stage.

### 4. Dr. Michael Johnson

Finally, Apple objects to the expert report provided by Michael Johnson, who WARF intends to call as a damages expert to opine on the importance of the '752 patent to Apple.  (Johnson Rept. (dkt. #250) ¶ 8.)  Johnson is an expert in the field of mobile processor design and is the former Chief Architect at AMD, a leading computer processor company.

Apple contends that Johnson is unqualified to provide the opinions set forth in his report because he lacks personal knowledge of the '752 patent and Apple's accused products.  Instead, Johnson relies on the analysis and opinions of WARF's other technical experts, including Reinman, Annavaram, and Conte.  However, as noted previously, an expert's testimony is not improper simply because the expert relied on the opinions of other experts.  Rather, it is *dependent* on the persuasiveness and reliability of those other experts.

Here, the court is satisfied that Johnson is qualified to offer opinions on the limited subjects covered in his expert report.  In particular, Johnson's experience at AMD and in licensing is directly relevant to his opinions regarding the importance of the LSD Predictor to Apple's products and other licensing considerations.  Accordingly, the court

---

[13] As with plaintiff's other experts, Apple's criticism of Conte for relying on the opinions of other experts falls flat.  It is not improper *per se* for an expert to rely on the opinions of others.

will not preclude Johnson's testimony.

## ORDER

IT IS ORDERED that:

1.  Defendant Apple Inc.'s motions *in limine* nos. 1-21 (dkt. #338) are GRANTED IN PART, DENIED IN PART, and RESERVED IN PART as set forth above.

2.  Defendant's motion *in limine* to exclude the expert report and testimony of Robert Blattberg (dkt. #308) is DENIED.

3.  Defendant's motion *in limine* to exclude the expert report and testimony of Christopher R. Knittel (dkt. #309) is DENIED.

4.  Defendant's motion *in limine* to exclude the expert opinions and testimony of Cathy Lawton (dkt. #313) is DENIED.

5.  Defendant's motion *in limine* to exclude certain testimony and opinions from WARF's technical experts (dkt. #317) is DENIED.

Entered this 29th day of September, 2015.

BY THE COURT:


/s/

_____
WILLIAM M. CONLEY
District Judge

48

**6.   Exclude any argument, evidence, or testimony concerning Plaintiffs' requests for enhanced damages and attorneys' fees.**

GRANTED.

There shall be none of this.


**7.   Exclude any argument, evidence, or testimony concerning any IPRs.**

DENIED.

However, there shall be no reference to any ruling by the PTAB, including its ruling regarding the institution or non-institution of certain cases.

Defendants contend that Paice has made statements to the PTAB that it properly may present to the jury in the instant case.  The Court shall determine, prior to any reference to PTAB matters, whether any statements identified by Defendants may be presented and, if so, the instruction to be given regarding the matter.

The instruction would be to the effect that there is a proceeding pending before an administrative board in the Patent Office involving Paice and another company.  The proceeding involves certain patents, some of which are involved in the instant case.  This proceeding has nothing to do with the case before the jury.  However, if Paice has, in that proceeding, made a statement that you find is different from what is being

4

told to you here, you may consider it as part of your evaluation

of the evidence.

      **8.**    **Exclude any argument, evidence, or testimony
concerning comments made by Judge Rader at the Paice-
Toyota oral argument.**

GRANTED.

There shall be none of this.

      **9.**    **Exclude any argument, evidence, or testimony
concerning hearsay statements from any OEM denigrating
Paice or characterizing the novelty of the Paice
technology.**

GRANTED.

There shall be no reference to out-of-court statements from

GM, Chrysler or others regarding denigrating or praising Paice

or its technology.

      **10.**    **Exclude any argument, evidence, or testimony that
Toyota's hybrid technology is a non-infringing
alternative or that any other third-party vehicle is a
non-infringing alternative because Plaintiffs have not
sued the third-party or asserted infringement
allegations against it.**

GRANTED.

There shall be none of this.

      **11.**    **Exclude any argument, evidence, or testimony
inconsistent with the Court's claim constructions.**

GRANTED.

There shall be no argument, evidence, or testimony inconsistent with the Court's claim constructions.

**12.   Exclude any argument, evidence, or testimony regarding portions of the Court's claim construction order other than the Court's claim constructions.**

GRANTED.

The jury shall be provided with the conclusory ruling portion, not the discussion, of Judge Quarle's claim constructions.  There shall be no reference to what was stated by Judge Quarles other than his conclusory statements.

**13.   Exclude any argument, evidence, or testimony regarding evidence not produced during discovery.**

DENIED AS MOOT WITHOUT PREJUDICE.

This motion appears to be moot as relates to a hypothetical design-around, but it may be renewed in the event that Defendants seek to introduce evidence regarding the commercial viability of a proposed non-infringing alternative by disabling what has been referred to as the "motor discharge limit path."

**14.   Defendants must streamline their obviousness case and use only combinations explained in Dr. Ehsani's expert report.**

  A.   Defendants should be required to assert a reasonable number of obviousness combinations at trial.

  B.   Defendants should be precluded from relying on any

combination not explained in Dr. Ehsani's expert report.

DENIED.

However, this ruling does not excuse noncompliance with the generally applicable rule regarding expert opinions not included in the expert's report.

**15. Exclude any argument, evidence, or testimony concerning statements disparaging Plaintiffs and/or their representatives.**

GRANTED.

There shall be none of this.

II. DEFENDANTS' MOTIONS IN LIMINE

**1. Defendants' Motion to Exclude Any Theories, Arguments, Or Evidence Inconsistent With The Court's Claim Construction.**

GRANTED.

There shall be no argument, evidence, or testimony inconsistent with the Court's claim constructions.

**2. Defendants' Motion to Exclude Evidence or Argument Regarding Doctrine of Equivalents.**

DENIED.

However, this denial is due to the prematurity of the motion, objections regarding doctrine of equivalents arguments

shall be considered in light of the precise contentions being made at trial.

**3.   Defendants' Motion to Preclude Plaintiffs From Using The Prius II Or The Toyota Agreement As Evidence of Secondary Considerations of Nonobviousness.**

GRANTED.

There shall be none of this.

**4.   Defendants' Motion to Exclude Reference to the "Hybrid Premium."**

DENIED IN PART.

Plaintiffs' expert may refer to the "hybrid premium" as that term was used by Defendants at times pertinent hereto. However, any such reference shall clearly indicate that the term is used to denote the "premium" for all features of a hybrid automobile, that the inventions in the asserted patents do not relate to all such features and that the expert is not providing an opinion as to the amount of the "hybrid premium" that is attributable to the asserted patents.

**5.   Defendants' Motion to Exclude the Griffith Hack Report and Related Griffith Hack Documents.**

GRANTED.

There shall be none of this.

**6.    Defendants' Motion to Exclude the Ford Agreement.**

GRANTED.

There shall be no reference to the Ford Agreement.


**7.    Defendants' Motion to Exclude Plaintiffs From
      Referring to Prior Litigations.**

GRANTED.

However, absent an agreed stipulation, the Court shall take

judicial notice, and instruct the jury, that at the times

relevant to the instant case, all automobile manufacturers,

including the Defendants, viewed the reduction of pollution as a

positive feature.


**8.    Defendants' Motion to Preclude Plaintiffs From
      Referring to Non-Accused Products Including Future
      Products Under Development.**

GRANTED.

There shall be no reference to future products as allegedly

infringing, or not infringing, the patents at issue.


**9.    Defendants' Motion to Exclude Hyundai's Privilege Log.**

DENIED.

However, what is admissible is the relevant data set forth

in the document, not the identity of the document as a privilege

log.  Plaintiffs may place in evidence an exhibit that – by

agreement or by the Court – shall set forth dates on which

9

Defendants' pertinent employees discussed, or were aware of, specified patents to establish knowledge of the patents in suit. The evidence shall not refer to consultations with attorneys regarding the patents.

**10.    Defendants' Motion to Preclude Plaintiffs From offering Evidence Or Argument Concerning 1) Hyundai Or Kia's total Revenues Or Profits From Accused Products Or Non-Accused Products, 2) Hyundai Or Kia's Overall Corporate Revenues, Profits, and Other Financial Metrics.**

GRANTED.

There shall be none of this.  However, the Court does not foreclose Plaintiffs from seeking an advance on-the-record ruling reversing this decision should Defendants "open the door" during trial.

**11.    Defendants' Motion to Preclude Plaintiffs From Introducing Any Evidence Relating to The Nature of The Abell Foundation's Charitable Purpose Or Charitable Activities.**

GRANTED.

There shall be none of this.

**12.    Defendants' Motion to Preclude Plaintiffs From Referring to The Foreign Background of Defendants, Defendants' Products, Or Witnesses.**

DENIED.

The foreign (Korean) background of persons and products is perfectly obvious, and necessarily will be mentioned in the course of the trial.  Plaintiffs have made it perfectly clear that they will not seek to make the national origin of the Defendants, any witness, or any product pertinent to the issues presented in the instant case.

**13.   Defendants' Motion In Limine to Preclude Irrelevant and Unduly Prejudicial References to Prior Discovery Disputes.**

GRANTED.

There shall be no reference to discovery disputes, sanctions etc.

SO ORDERED, on <u>Thursday, September 17, 2015</u>.

<div align="right">

_____/s/_____
Marvin J. Garbis
United States District Judge

</div>

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 17-cv-275-LPS C.A. No. 17-cv-1353-LPS |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| OXFORD NANOPORE TECHNOLOGIES, INC., and OXFORD NANOPORE TECHNOLOGIES, LTD., | ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 1

The Court should deny ONT's Motion *in Limine* No. 1 ("MIL 1"). As explained below, PacBio should be permitted to present evidence regarding the HMM basecalling algorithm and ONT's 2DC sequencing,[1] as each is highly probative of key issues in the case.

## A.   The HMM Basecalling Algorithm Is Highly Relevant To PacBio's '400 and '323 Patent Infringement Allegations

As established in the report of PacBio's expert Dr. Dessimoz, the operation of ONT's HMM (*i.e.*, Hidden Markov Model) basecalling algorithm plays a key role in PacBio's '400 and '323 Patent infringement allegations. First, ONT witnesses have testified that the HMM basecalling algorithm was likely used to develop *calibration* data for the RNN algorithm version that replaced it. Ex. 1 [Reid Dep. Tr.] at 190:24-191:24; *see also* Ex. 2 [Dessimoz Opening Rpt.] ¶¶ 193-194. Both the '400 and '323 Patents expressly require the use of "calibration information" with certain defined characteristics. *See* '400 Patent at claim 1 (requiring comparison of a measured property to "*calibration information* produced by measuring such property for 4 to the N sequence combinations") (emphasis added); '323 Patent at claim 1 (requiring "*calibration information* that accounts for the electrical signal for 4 to the N sequence combinations") (emphasis added). Consequently, to show that ONT's initial RNN algorithm infringes, PacBio must show that it uses "calibration information" as claimed. In order to do that (according to ONT testimony), PacBio must present evidence regarding the HMM algorithm that generated the calibration information used to train the RNN algorithm. Thus, while PacBio does not dispute that ONT stopped using the HMM algorithm prior to the issuance of the '400 Patent (and thus will not

---

[1] ONT's request for relief should be understood to be limited to the three products it identified in its motion. It has not identified any other product at issue, nor is there any reason to believe a blanket pretrial exclusion order is warranted. With respect to ███████████████████████ █████████████████████████████████████████████████████████ PacBio agrees not to affirmatively discuss the product in front of the jury (some incidental references to it on documents presented to the jury will likely be unavoidable) provided ONT agrees to the same.

1

tell the jury that ONT's prior use of HMM constitutes infringement), PacBio's infringement allegations directly implicate the HMM algorithm. While ONT disputes the extent to which the HMM algorithms influenced subsequent algorithms, that is a factual issue for the jury to decide. *See C & E Servs., Inc. v. Ashland Inc.,* 539 F. Supp. 2d 316, 323 (D.D.C. 2008) ("[A] motion *in limine* should not be used to resolve factual disputes or weigh evidence.").

Second, one of the factual issues the jury must decide is how many monomers are included in the "N" that affect current measurement during translocation as well as the nature of infringing equivalents. On this issue, at times, ONT has played dumb by purporting not to know. The HMM algorithm is significant because, as Dr. Dessimoz explains, ONT's HMM algorithm (like the variants that ultimately replaced it) presumes that only 5 monomers meaningfully affect the signal. Ex. 2 [Dessimoz Opening Rpt.] ¶ 168. Further, ONT experimented with and ultimately rejected an HMM algorithm that used 6 monomers. *Id.* ¶¶ 177-179. This evidence regarding ONT's HMM algorithms is highly probative of ONT's own understanding of the number of monomers that affect the current signal and thus is directly relevant to infringement (both literal and under the doctrine of equivalents).

**B.    ONT's "2DC" Sequencing Constitutes Objective Evidence Of The Non-Obviousness Of The '929 Patent And Is Further Relevant To Injunctive Relief**

PacBio alleges that ONT's use of 2D sequencing infringes the '929 Patent. *See generally* Ex. 2 [Dessimoz Opening Rpt.] ¶¶ 320-438. ONT apparently stopped using 2D sequencing at some point in 2017, but began publicly touting a new "2D 'C'" method (also referred to as "2D version 2) in 2019. Ex. 3 [PCB-DE-1029896]. PacBio should be permitted to introduce evidence relating to this ONT decision to reintroduce 2D sequencing, for multiple reasons.

As Dr. Dessimoz explained, ONT documents pertaining to 2DC praise 2D sequencing—which PacBio has long contended infringes the '929 Patent—as the "best solution for >Q20 single-

2

molecule accuracy."   Ex. 4 [Dessimoz Rebuttal Rpt.] ¶ 339 (quoting PCB-DE-1029896). Consequently, such documents amount to praise for the patented invention from the accused infringer—persuasive evidence of non-obviousness.   *Id.*   ONT keeps coming back to 2D sequencing like forbidden fruit.  This is especially compelling evidence of the validity of the '929 Patent.

Although PacBio does not plan to argue for an injunction for the jury, the fact of ONT's return to 2D sequencing is an important part of the trial record that will help inform the Court's injunction decision.

Finally, to the extent MIL 1 seeks broad exclusion of all evidence pertaining to 2D sequencing, it amounts to an inappropriate end run around the summary judgment process and should be denied on that basis.  ONT already moved for summary judgment of non-infringement with respect to PacBio's 2D sequencing claims, and that issue is now before the Court.  Broad pretrial exclusion of 2D sequencing evidence would deny PacBio the ability to prove claims that remain in the case.

For the foregoing reasons, PacBio respectfully requests that the Court deny ONT's Motion *in Limine* No. 1.

3

Dated: February 17, 2020

FARNAN LLP

*/s/ Brian E. Farnan*

_____
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff Pacific Biosciences of
California, Inc.*

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Robert S. Magee (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com
robert.magee@weil.com

4

# EXHIBIT 1

**REDACTED**

# EXHIBIT 2

**REDACTED**

# EXHIBIT 3



**Matt Loose**
@mattloose

Follow  

# Clive talking about 2D coming back....
# @nanopore at genome science.



7:03 AM - 3 Sep 2019

**11** Retweets  **27** Likes  

💬 1        ↻ 11        27

**Alejandro Gener** @Cas9Bandit · Sep 3
Replying to @mattloose @nanopore
And the synthetic bases are back!

💬        ↻



PCB-DE-1029896

# EXHIBIT 4

Highly Confidential – Outside Attorneys' Eyes Only

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | |
| Plaintiff, | C. A. No. 17-cv-275-LPS |
| v. | C. A. No. 17-cv-1353-LPS |
| OXFORD NANOPORE TECHNOLOGIES, INC., and OXFORD NANOPORE TECHNOLOGIES, LTD. | |
| Defendants. | |

## REBUTTAL EXPERT REPORT OF DR. CHRISTOPHE DESSIMOZ

Highly Confidential – Outside Attorneys' Eyes Only



*Id.*

Highly Confidential – Outside Attorneys' Eyes Only

339.    As recently as September 3, 2019, ONT was presenting its 2D products, which use the inventions of the '929 Patent, as producing unexpected results and offering praise of those results.



PCB-DE-1029895   [ONT's   Presentation   at   GenomeScience   2019   (available   at https://twitter.com/mattloose/status/1168887616705613824)]

Highly Confidential – Outside Attorneys' Eyes Only



PCB-DE-1029896 [ONT's Presentation at GenomeScience 2019 (available at https://twitter.com/mattloose/status/1168887341320155138)].  In this presentation, ONT states that consensus base calling (e.g., "2D") has "been challenging for many years," but is the "best solution for >Q20 single-molecule accuracy."  *Id.*  It is clear from ONT's statements in the scientific community that it views the inventions of the '929 Patent as praiseworthy and valuable in solving a long-felt need.

340.    The benefits of the inventions of the '929 Patent as applied to ONT's products have also been demonstrated in the literature.  For example, Deschamps et al., 2016, "Characterization, correction and *de novo* assembly of an Oxford Nanopore genomic dataset from *Agrobacterium tumefaciens*", Nature Scientific Reports DOI: 10.1038/srep28625 states "A hairpin adapter ligated to the opposite end of the double-stranded DNA template allows the sense and antisense strands to be sequenced consecutively. The resulting data are aligned to create a higher quality consensus "2D" sequence." ONT_DEL00513226 at ONT_DEL00513227.  Deschamps et al. continues to describe how the "2D" reads were used to assemble an accurate sequence, but that the "1D" reads were discarded, and not used in the assembly. Deschamps et al. states "Lower quality 1D reads and "failed" 2D reads (where sense and antisense strand sequences can't be aligned to generate a consensus 2D base call) generated during the sequencing runs were not used in subsequent analyses" *id*.

Highly Confidential – Outside Attorneys' Eyes Only

Dated: September 24, 2019                     By:

                                             Dr. Christophe Dessimoz

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., *Plaintiff*, v. OXFORD NANOPORE TECHNOLOGIES, INC. and OXFORD NANOPORE TECHNOLOGIES, LTD., *Defendants*. | C.A. No. 17-cv-275-LPS C.A. No. 17-cv-1353-LPS JURY TRIAL DEMANDED |

**OXFORD'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE #1**

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Dated:  February 20, 2020

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Defendants*

PacBio's attempts to bootstrap the irrelevance of Oxford's past HMM algorithm and proposed future 2DC sequencing method onto the relevance of accused products should be rejected wholesale as confusing and prejudicial.[1]  Indeed, PacBio's theories of relevance are thin.

PacBio's response confuses "training" data with "calibration data."  The witness never testified as to any "calibration data"—he never even used the term.  *See generally,* Reid Tr. Instead, he testified that the current RNN algorithm was "probably" trained using data from the past HMM algorithm, but he could not "say for sure."  *Id.* at 190:24-191:24.  Nevertheless, even if prior versions of Oxford's algorithms used the same training data, that does not affect whether the accused versions themselves infringe the asserted patents.  Nor is the HMM algorithm probative of the "N" that affects the current measurement, as PacBio posits.  To support this theory of infringement, PacBio intends to point to an "experimental version" of the HMM algorithm.  So not only does PacBio want to inject the trial with prior products, its theory to do so requires PacBio to confuse the jury with the history of Oxford's experimentation on rejected products.

Similarly, PacBio's theory of relevance of "2DC" is misguided.  At its core, PacBio admittedly seeks to incorrectly inform the jury that "2DC" and "2D" are the same, or at least have the same functionality.  The names alone would confuse the jury on that issue.  Oxford's "2D" is a past product, and "2DC" is a potential future product, whose functionality and development have not yet been established.  Contrary to PacBio's assertion otherwise, Oxford's research into potential new products is not at all related to infringement or validity of any asserted patent. Oxford respectfully requests the Court grant its motion.

---

[1] Oxford disagrees that its request for relief should be limited to only three products, and instead should include all products not sold during the relevant timeframe.  PacBio's experts have also suggested that certain undeveloped Oxford concepts (LCS, CCS, and rolling amplification) infringe.  This level of confusion as to accused products should not be permitted so close to trial. Oxford agrees not to mention SmidgION.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

*Attorneys for Oxford Nanopore Technologies,*
*Inc. and Oxford Nanopore Technologies, Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>OXFORD NANOPORE TECHNOLOGIES, INC. and OXFORD NANOPORE TECHNOLOGIES, LTD.,<br><br>*Defendants*. | C.A. No. 17-cv-275-LPS<br>C.A. No. 17-cv-1353-LPS<br><br>JURY TRIAL DEMANDED |

## DEFENDANTS OXFORD NANOPORE TECHNOLOGIES, INC. AND OXFORD NANOPORE TECHNOLOGIES, LTD.'S MOTIONS IN LIMINE #2

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Dated:  February 13, 2020

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Defendants*

1

Oxford respectfully requests that the Court preclude PacBio from presenting any evidence or argument concerning Oxford's alleged knowledge of patents applied for or owned by PacBio, except for those that are alleged to have been infringed in this case or those that are used as prior art. Any argument and evidence regarding Oxford's knowledge of any patents PacBio owns but did not assert in this matter is irrelevant and unduly prejudicial.

The only PacBio patents relevant to Oxford's state of mind regarding the alleged infringement in this case are those that PacBio asserts were infringed. The mere existence of other PacBio patents that are not asserted bears no consequence to the questions of infringement or validity of the asserted patents. Instead, the relevant inquiry is as to the patents actually accused in this case—not just any patents assigned to PacBio. *See Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 981 (Fed. Cir. 1997) (discussing literal infringement which requires comparing the *asserted patent claim* to the accused product); *see also Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) (holding that the relevant inquiry is a party's knowledge as to the *asserted patents*). To be clear, whether Oxford had knowledge of non-asserted patents is wholly irrelevant to the any inquiry. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) ("Knowledge of the *patent alleged* to be willfully infringed continues to be a prerequisite to enhanced damages.") (emphasis added); *Align Tech. Inc. v. 3Shape A/S*, 339 F.Supp.3d 435, 449 (D. Del. 2018) (Stark, J.) (requiring knowledge of the patent-in-suit for a finding of willfulness). Therefore, as an initial matter, evidence of Oxford's knowledge of unasserted patents is irrelevant and therefore inadmissible under Fed. R. Evid. 401, 402.

Furthermore, the Fed. R. Evid. 403 analysis weighs in favor of excluding evidence regarding Oxford's knowledge of unasserted patents as it would confuse the jury and unfairly prejudice Oxford. Such evidence would distract the jury from the facts of this case which already

involves multiple technologies, four patents-in-suit, and 27 asserted claims.  Interjecting irrelevant evidence regarding unasserted patents, with unasserted claims involving unasserted technology, could only cause jury confusion about which technologies and patents are actually patented, asserted, and/or accused.  *See Cordis Corp. v. Medtronic Ave. Inc.*, 511 F.3d 1157, 1184 (Fed. Cir. 2008) (affirming the district court's exclusion of unasserted claims and patents out of concern that it would confuse the jury and not give the jury an adequate basis for assessing the ultimate questions of the litigation).

For these reasons, the Court should preclude PacBio from presenting any evidence or argument concerning Oxford's alleged knowledge of unasserted patents.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 17-cv-275-LPS C.A. No. 17-cv-1353-LPS |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| OXFORD NANOPORE TECHNOLOGIES, INC., and OXFORD NANOPORE TECHNOLOGIES, LTD., | ) ) ) ) | **FILED UNDER SEAL** |
| Defendants. | ) ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 2**

Plaintiff Pacific Biosciences of California, Inc. ("PacBio") opposes ONT's Motion *in Limine* No. 2, which seeks to preclude PacBio from presenting any evidence or argument concerning ONT's knowledge of unasserted PacBio patents.

### A. ONT Seeks to Preclude Crucial Evidence Proving Willful Infringement

PacBio asserts claims for induced and willful infringement of U.S. Patent Nos. 9,546,400 (the "400 Patent"), 9,772,323 (the "323 Patent"), 9,678,056 (the "056 Patent"), and 9,738,929 (the "929 Patent") (collectively, the "Asserted Patents").  D.I. 268.  ONT's knowledge of PacBio's patent rights, and thus its intent, is directly relevant to both these claims.  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766-67 (2011); *Halo Elecs., Inc. v. Pulse Elecs.*, 136 S. Ct. 1923 (2016).

ONT's documents demonstrate that ONT knew of PacBio's nanopore patent rights, brazenly disregarded them, and chose to manufacture and sell infringing products.  For example, in a 2014 e-mail exchange between ONT's senior executives Mr. Sanghera, ONT's CEO, and Dr. Willcocks, who is not only the President of ONT, Inc., but also the head of IP and on ONT's Board of Directors, expressed concern over PacBio's patent rights, but ultimately dismissed them without analysis.  *See* Ex. 1 [ONTS.ITC.00004332].  Specifically, Dr. Willcocks notified Mr. Sanghera of the issuance of a PacBio patent directed to nanopore sequencing and noted that it presented "freedom to operate issues."  *Id*. at 4333.  He expressed frustration that ONT was not able to get patents granted the way PacBio did: "I find remarkable is [sic] how all these people seem to get patents granted and yet hardly any of ours have."  *Id*.  Mr. Sanghera cavalierly responded "Patent claims on concepts are pointless never stand up in court not enabled etc. etc. etc." *Id*. at 4332.

Yet, in depositions, presumably to try to rebut PacBio's willful infringement claims, these same witnesses denied that ONT monitored PacBio's patent portfolio or were aware of PacBio's patent rights.  For example, Dr. Willcocks denied he knew that PacBio was pursuing patent

1

protection for its nanopore technology prior to 2017.  Ex. 2 [Willcocks Dep. Tr.] at 143:3-10. Indeed, when asked whether he ever personally took any steps to educate himself on the patent landscape after 2009, or whether ONT ever searched for patents to determine freedom to operate before this litigation was filed, Dr. Willcocks answered with unqualified "No's".  *Id*. at 144:19-145:7, 136:5-10.  Mr. Sanghera similarly testified that ONT did "absolutely nothing" to monitor PacBio's filings, and denied any knowledge of PacBio's patent filings and patent rights prior to 2014.  Ex. 3 [Sanghera Dep. Tr.] at 24:10-12; 29:22-30:2.  Additionally, Defendants' witness Clive Brown, who is on ONT's Board of Directors and its Chief Technology Officer, similarly denied any knowledge or discussions of PacBio patent rights.  Ex. 4 [Brown Dep. Tr.] at 137:4-138:1.

These denials by ONT's key executives are flatly contradicted by documents demonstrating that ███████████████████████████████████ The fact that some of those documents involved patent rights other than the Asserted Patents does not render them irrelevant.  Indeed, these documents have a lot of probative value because they disprove Dr. Willcocks' and Messrs. Sanghera and Brown's false denials and establish that ONT extensively monitored and analyzed PacBio's nanopore patent rights after 2009 and up to the commencement of this litigation.

For example, in a 2009 internal ONT memorandum, Dr. Willcocks detailed ONT's plan to search for and highlight "key patents that relate to all aspects of nanopore technology" demonstrating that ONT actively monitored nanopore patents starting at least in 2009.  *See* Ex. 5 [ONTS.ITC.00090507].    Several documents show that ONT discovered PacBio patent applications and patents in its patent searches.  Ex. 6 [ONTS.ITC.00029591].  Unsurprisingly, and presumably as a result of ONT's patent monitoring efforts, an ONT employee subsequently alerted ONT management to the existence of patents covering PacBio's nanopore technology.  Ex. 7

[ONTS.ITC.00117044], Ex. 8 [ONTS.ITC.00132806], Ex. 9 [ONTS.ITC.00610433]. Indeed, Dr. Willcocks e-mailed Mr. Sanghera detailing specific patent claims that PacBio filed. Ex. 10 [ONTS.ITC.00762348].  At one point, Mr. Brown warned that ONT should "[b]e mindful of that set of claims in the pacbio filing" to which Mr. Sanghera commented "Stu checked through the Pac Bio Kmer crap and based on that they have a pretty good story." Ex. 11 [ONTS.ITC.00767700]. Additionally, in responding to questions about how to present ONT's patent positions, Dr. Willcocks acknowledged PacBio as a competitor and suggested ONT consider how to cover PacBio's IP: "Within each landscape, sure there'll then be specific bits of IP that are distinct in their own way, which may or may not overlap with other landscapes and distinct pieces therein. . . . How else can we cover PacBio, as an example." Ex. 12 [ONT DEL00295231]. These documents demonstrate that ONT not only knew of PacBio's patent rights, but that it monitored and analyzed PacBio's patent rights extensively for years, perceived them as a concern, and nevertheless chose to manufacture infringing products.

## B.    Excluding This Relevant Evidence Would Prejudice PacBio

This overwhelming evidence is highly relevant to and probative of ONT's state of mind regarding willfulness, because it shows that ONT ███████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Additionally, allowing this evidence would not be prejudicial to ONT, nor would it confuse the jury, and ONT cannot reasonably argue otherwise. Allowing ONT to present testimony from Dr. Willcocks and Messrs. Sanghera and Brown, however, without giving PacBio an opportunity to present essential evidence demonstrating ONT's state of mind, would be highly prejudicial to PacBio.

For the foregoing reasons, Plaintiff respectfully requests that the Court deny ONT's Motion *in Limine* No. 2.

Dated: February 17, 2020

FARNAN LLP

*/s/ Brian E. Farnan*

_____

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff Pacific Biosciences of*
*California, Inc.*

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Robert S. Magee (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com
robert.magee@weil.com

# EXHIBITS 1-12

**REDACTED**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., <br> *Plaintiff*, <br><br> v. <br><br> OXFORD NANOPORE TECHNOLOGIES, INC. and OXFORD NANOPORE TECHNOLOGIES, LTD., <br> *Defendants*. | C.A. No. 17-cv-275-LPS <br> C.A. No. 17-cv-1353-LPS <br><br> JURY TRIAL DEMANDED |

## OXFORD'S REPLY IN SUPPORT OF ITS MOTIONS IN LIMINE #2

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Dated:  February 19, 2020

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Defendants*

1

In all of the testimony, documents, and arguments PacBio has marshaled in support of its willfulness argument in its response motion, not one shred of this alleged evidence concerns the PacBio patents asserted in this case.  In the face of the case law on which Oxford relies that categorically excludes evidence of knowledge of unasserted patents, PacBio did not point to a single case that supports its intention to use such evidence to prove willful infringement here.  For this reason alone, the Court should grant Oxford's motion to exclude Oxford's knowledge of unasserted patents.

Not only is the evidence PacBio seeks to admit irrelevant as to subject matter, it is also from an irrelevant time period, long before the 2017 willfulness period at issue here.  For example, the 2009 ███████████████████████████████████ predates even the applications for the asserted patents.

To the extent the Court permits PacBio to use such evidence, Oxford should be able to rebut such argument with evidence of its knowledge regarding noninfringement and invalidity of other PacBio patents.  PacBio's purported evidence includes ████████████████████ ████████████████████████████████████  If such evidence is permitted, Oxford should be able to provide testimony, evidence, and argument regarding its state of mind around the time of the 2017 willfulness period and regarding certain of the patent families discussed in the evidence PacBio has detailed.  At that time, Oxford had just prevailed in a patent infringement suit PacBio brought in the International Trade Commission where the Commission held on summary determination that Oxford did not infringe PacBio's patents.  That ruling was subsequently upheld by the Federal Circuit.  *Pac. Biosciences of California, Inc. v. Int'l Trade Comm'n*, 753 Fed. App'x. 910, 911 (Fed. Cir. 2019).

For these additional reasons, the Court should grant Oxford's motion.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd.*

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>OXFORD NANOPORE TECHNOLOGIES, INC. and OXFORD NANOPORE TECHNOLOGIES, LTD.,<br><br>*Defendants*. | C.A. No. 17-cv-275-LPS<br>C.A. No. 17-cv-1353-LPS<br><br>JURY TRIAL DEMANDED |

## DEFENDANTS OXFORD NANOPORE TECHNOLOGIES, INC. AND OXFORD NANOPORE TECHNOLOGIES, LTD.'S MOTIONS *IN LIMINE #3*

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Dated:  February 13, 2020

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Defendants*

Oxford respectfully requests that the court exclude testimony, evidence, and arguments regarding legal proceedings that relate solely to issues not before the jury.

Although PacBio has indicated its willingness to refrain from referring to the results or findings of Prior Proceedings,[1] this Court should preclude PacBio from arguing, testifying, and presenting or characterizing evidence from proceedings involving issues the jury need not decide, including prior motions filed in the instant case.  Of note, counsel for PacBio has indicated that it intends to present arguments and evidence from (1) a United Kingdom patent litigation; and (2) an *inter partes review* ("IPR") proceeding.  Not only would such argument and evidence be irrelevant, confusing, time-wasting, and unnecessarily prejudicial, but there is no permissible purpose for which PacBio could offer such evidence.

## I.     The UK Litigation Evidence is Irrelevant and Prejudicial

PacBio's proffered evidence from the UK Litigation checks every box for exclusion.  Even as an initial matter, such evidence is of dubious relevance.  For example, PacBio purports to introduce a letter from Oxford's UK counsel to PacBio's UK counsel during a UK litigation held pursuant to UK procedural rules.  Exhibit 1.  At dispute in the UK litigation were European patents not asserted in this litigation[2] that were ultimately invalidated after PacBio accused Oxford Nanopore Technologies Limited (and another UK entity not a party to this litigation) of infringement.  *See* Hrdlicka Rebuttal Report, at 34, n. 88.  Thus, the letter is irrelevant on every level:  it is from an unrelated proceeding, in an unrelated jurisdiction, involving an irrelevant third-party, about unrelated patents that have since been invalidated.  For these reasons alone, this

---

[1] Prior Proceedings herein refers to (a) the patent dispute between the parties in the United Kingdom; (b) any *inter partes review* (IPR) proceedings; (c) Oxford's motions under Rule 12(b)(6) in this case; (d) Oxford's motion to add counterclaims for antitrust / inequitable conduct; and (e) this Court's consideration of and rulings on any discovery disputes.

[2] Nor are these EU patents counterparts to any patents-at-issue in this case.

evidence should be excluded as irrelevant.

Furthermore, what little probative value this evidence could possibly provide is substantially outweighed by likely jury confusion.  As an initial matter, this UK letter expressly states that the statements made therein "for the purposes of these UK proceedings only and for the streamlining of the UK trial and UK procedural efficiencies."  Exhibit 1.  As such, on its face, it has no bearing on the issues of infringement and invalidity in this case.  Indeed, it has far less probative value compared to the evidence produced for use in these proceedings as well as the fact and expert testimony to be presented at trial.  Admitting this evidence would inevitably waste time in having to explain to the jury the content and context of the letter, such as UK trial procedures, the claims and EU patents at issue, the additional party to that litigation, the litigation stage at which this letter was provided, and the letter's purpose for "streamlining" the UK proceeding, among other aspects.  *Wasica Finance GmbH v. Schrader Int'l, Inc.*, No. 13-1353-LPS, 2020 WL 509181, at *1 (D. Del. Jan. 31, 2020) ("[R]eference to foreign patent litigation, about a different patent and applying different legal standards, is appropriately excluded pursuant to Federal Rule of Evidence 403…as the risks of confusion, waste of time, and unfair prejudice far outweigh whatever minimal probative value such evidence may have.")

Full exclusion of this evidence is warranted.  Although courts have permitted evidence relating to a prior litigation, they have done so "only for impeachment of [the party's] witnesses who testified in that proceeding … or as substantive evidence of a testifying witness's prior sworn testimony."  *Sonos Inc. v. D&M Holdings Inc.*, No. 14-1330-WCB, 2017 WL 5633204, at *1 (D. Del. Nov .21, 2017); *see also Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.*, No. 16-284-LPS, 2019 WL 77046, at *1 (D. Del. Jan. 2, 2019) (permitting such evidence only to the extent it complied with evidentiary and court rules and the parties did not reference the

proceedings).   But the letter at issue here is not a sworn statement and was drafted by UK counsel not involved in this litigation.  *See* Exhibit 1.  Thus, this evidence could not even be used for impeachment of any witness identified by either party.

## II.   Argument and Evidence from Prior Proceedings Should Be Excluded

PacBio should not be permitted to present argument or evidence from any of the Prior Proceedings.  Those proceedings involved different legal standards and evidentiary burdens not before the jury in this case.  For example, this Court has agreed that PTAB decisions are based on different legal standards and "Rule 403 strongly favors exclusion, as the minimal (if any) probative value of the PTAB's decision is far outweighed by the risk of jury confusion and unfair prejudice." *Andover Healthcare, Inc. v. 3M Co.*, No. 13–843–LPS, 2016 WL 6404111, at *2 (D. Del. Oct. 27, 2016).

Additionally, PacBio should not be permitted to argue, reference, or admit into evidence in its case-in-chief any testimony provided by Oxford's experts as part of the IPR proceedings. Such testimony is inadmissible hearsay.  *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 164 (3d Cir. 1995) (holding that expert testimony from prior proceeding was hearsay and is not a party admission).  Moreover, introduction of this evidence would inevitably require explaining the different claim construction standards, scope of prior art, and evidentiary burdens applicable to IPRs.  Such explanations would further confuse the jury and waste time.  *See Andover*, 2016 WL 6505111, at *2.  Thus, pursuant to the evidentiary rules, unless and until PacBio can lay foundation and purpose for such evidence, it should be wholly excluded.

## III.   Conclusion

For the reasons outlined above, any reference to and any evidence from Prior Proceedings or  he UK Litigation should be excluded.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Oxford Nanopore Technologies,*
*Inc. and Oxford Nanopore Technologies, Ltd.*

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

# EXHIBIT 1

**REDACTED**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PACIFIC BIOSCIENCES OF )
CALIFORNIA, INC., )
)
            Plaintiff, )
)     C.A. No. 17-cv-275-LPS
)     C.A. No. 17-cv-1353-LPS
        v. )
)     **JURY TRIAL DEMANDED**
OXFORD NANOPORE TECHNOLOGIES, )
INC., and OXFORD NANOPORE )     **FILED UNDER SEAL**
TECHNOLOGIES, LTD., )
)
            Defendants. )
)

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 3

The Court should deny ONT's Motion *in Limine* No. 3 ("MIL 3").  PacBio will not be presenting evidence to the jury regarding the outcomes of any prior legal proceedings between the parties, but will only refer to documents from these proceedings as generically arising from "another matter."  PacBio should be permitted to show the jury documents (described below) derived from parallel proceedings because they are highly probative of core factual issues in this case and/or the credibility of ONT's witnesses.  ONT's blanket request for exclusion of all documents originating from other proceedings, regardless of their probative value, is overbroad.

### A.    Dr. Ha's IPR Declaration Is An Integral Part Of ONT's Invalidity Theories And Crucial Impeachment Evidence

The unreasonableness of ONT's request is apparent from its own expert reports.  In particular, ONT's proffered expert regarding the '929 Patent expressly relies upon a declaration he submitted in IPR2018-01795 to explain his position on a key issue—ONT's allegation that certain references inherently disclose a requirement of the '929 Patent. Ex. 1 [Ha Reply Rpt.] ¶ 29 ("***As I described in my IPR Declaration***, however, it is my opinion that it is a near mathematical certainty that the enzymes disclosed in Akeson I and II exhibit two kinetic steps having the claimed ratio of rate constants.") (emphasis added).  Indeed, as PacBio pointed out in its summary judgment briefing on the same issue, "Dr. Ha's sole support for this claim is his IPR declaration."  D.I. 383 at 19.  Accordingly, PacBio cannot meaningfully cross-examine Dr. Ha regarding the content and basis for his opinions without using his IPR declaration, and ONT is in no position to claim prejudice given that ONT has placed the IPR declaration at issue.

Dr. Ha's IPR declaration is also relevant to his credibility.  For example, in his opening expert report, Dr. Ha stated that "[a]s of April 10, 2009, it would have been impossible for a POSA to select reaction conditions under which the translocating enzyme exhibits the claimed ratios without undue experimentation."  Ex. 2 [Ha Opening Rpt.] ¶ 580.  In his IPR declaration, however,

which he made under penalty of perjury,  Dr. Ha argued that those same conditions and ratios were disclosed in the prior art: "[t]hus, Akeson teaches the selection of conditions and enzymes that would achieve the claimed ratios of rates."  Ex. 3 [Ha Declaration] ¶ 83.  PacBio should be permitted to use his IPR declaration to impeach Dr. Ha regarding his prior sworn testimony, as the very cases ONT relies upon establish.  *See Sonos, Inc. v. D&M Holdings Inc.,* C.A. No. 14-1330-WCB, 2017 WL 5633204, at \*1 (D. Del. Nov. 21, 2017) (allowing use of prior proceeding evidence "for impeachment"); *Siemens Mobility Inc. v. Westinghouse Air Brake Techs. Corp.,* C.A. No. 16-284-LPS, 2019 WL 77046, at \*2 (D. Del. Jan. 2, 2019) (broadly holding that "evidence – including testimonial and documentary evidence – that has been developed in other litigation . . . may be used at trial, provided that it is done without referencing the other litigation").

### B.    PacBio Should Be Permitted To Present The Jury With Evidence Of ONT's Inconsistent Positions

ONT's IPR petition in IPR2018-01795 is relevant for much the same reason as Dr. Ha's declaration—it demonstrates ONT's inconsistent positions with respect to key factual issues such as the state of the art as of the priority date of the asserted patents.  *Implicit, LLC v. NetScout Sys., Inc.,* C.A. No. 2:18-CV-00053-JRG, 2019 WL 6873030, at \*4 (E.D. Tex. Nov. 21, 2019) (permitting use of prior litigation evidence "to show inconsistencies in opinions or positions"). The petition is admissible as a party admission (*see* FRE 801(d)(2)), and PacBio should have the opportunity to use it to show the jury how ONT's positions as to critical facts have changed. [1]

The same logic applies to other prior inconsistent positions that ONT has taken in this litigation and other proceedings, including IPR and ITC proceedings involving the asserted or

---

[1] ONT's request to exclude evidence of prior motions is unreasonable because ONT's witnesses validated ONT's positions on key factual issues, such as the parties' competitive posture and the state of the art of nanopore sequencing.  PacBio should not be barred from presenting ONT's admissions regarding key issues simply because they arose in connection with prior motions.

related patents, and the parallel UK litigation.  As this Court has held with respect to the use of evidence from other litigations, "provided that it is done without referencing the IPR or other litigation (beyond, if necessary, a generic reference to 'another matter') . . . the probative value of the evidence is not substantially outweighed by the risk of jury confusion, unfair prejudice, or waste of time." *Siemens Mobility*, 2019 WL 77046, at *1.  As PacBio has assured ONT all along, it will limit itself to referring to all these other proceedings generically as "another matter" – assuming ONT does not open any further doors.

C.  **The UK Litigation Documents ONT Seeks To Exclude Are Relevant To ONT's Infringement of the '929 Patent**

ONT's motion should be denied as to PCB-DE-0019529, a document produced in this litigation and generated in parallel UK proceedings between the parties, and other documents derived from the UK litigation that PacBio has relied upon to establish how ONT's accused products work. *See, e.g.*, Ex. 4 [Dessimoz Opening Rpt.] ¶ 366 (citing PCB-DE-0984168, PCB-DE-0984248).  These documents provide highly probative information regarding how ONT understands its own $1D^2$ and 2D sequencing products to operate—fundamental facts that are critical to PacBio's infringement allegations and that do not change depending upon the particular litigation within which they are disclosed.  In PCB-DE-0019529, ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ Ex. 5 [PCB-DE-0019529]. These factual admissions exist independent of any particular litigation and go to the heart of PacBio's '929 Patent infringement contentions. The jury should not be deprived of this highly probative evidence.

For the foregoing reasons, PacBio respectfully requests that the Court deny ONT's Motion *in Limine* No. 3.

Dated: February 17, 2020

FARNAN LLP

*/s/ Brian E. Farnan*

_____

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff Pacific Biosciences of
California, Inc.*

OF COUNSEL:

Edward R. Reines (admitted *pro hac vice*)
Derek C. Walter (admitted *pro hac vice*)
Robert S. Magee (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
(650) 802-3000
edward.reines@weil.com
derek.walter@weil.com
robert.magee@weil.com

# EXHIBIT 1

HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

PACIFIC BIOSCIENCES OF
CALIFORNIA, INC.,

*Plaintiff*,

v.

OXFORD NANOPORE TECHNOLOGIES,
INC. and OXFORD NANOPORE
TECHNOLOGIES, LTD.,

*Defendants*.

C.A. No. 17-cv-275-LPS
C.A. No. 17-cv-1353-LPS

JURY TRIAL DEMANDED


**REPLY EXPERT REPORT OF TAEKJIP HA, PH.D.**
**REGARDING US PATENT NO. 9,678,056**



Confidential work product

the claimed ratios.[12] So, to the extent that, despite this failing, the '056 Patent teaches the claimed reaction conditions, it is my opinion that the citations below also teach the claimed reaction conditions.

### 1. *Dr. McHenry fails to rebut my opinion that Akeson I and II anticipate the '056 Patent.*

28.     I disagree with Dr. McHenry's argument that Akeson I and II do not anticipate the Asserted Claims. Dr. McHenry's argument boils down to this: Akeson I and II do not disclose reaction conditions under which a translocating enzyme would exhibit two kinetic steps, those kinetic steps having rate constants with a ratio of 1:10 to 10:1.[13]

29.     As I described in my IPR Declaration, however, it is my opinion that it is a near mathematical certainty that the enzymes disclosed in Akeson I and II exhibit two kinetic steps having the claimed ratio of rate constants.[14] Dr. McHenry's response is that 1) exhibited steps are only those steps actually observed in a particular experiment, and 2) there is no reason to believe the reaction scheme described in the '056 Patent would apply to the enzymes of Akeson.

30.     As I discuss in detail above in § V, I disagree with Dr. McHenry's definition of the word "exhibit," and it is my opinion that an enzyme exhibits all its steps.

31.     Dr. McHenry then argues that I provide no explanation as to why the '056 Patent's kinetic scheme is appropriate for use in other enzymes.[15] I agree that the polymerase scheme set forth in the '056 Patent is not applicable or translatable to other types of translocating enzymes and indeed may not even be translatable to other polymerases. That said, Akeson I discloses the use of polymerases as translocating enzymes, including the only enzyme disclosed in the '056 patent capable of practicing the Asserted Claims, Φ29.[16] To that extent, at least, this scheme is applicable to Akeson I. Furthermore, I previously explained that all enzymes with at least six forward steps that operate above 75 Hz will exhibit at least two steps that are within 1:10 to 10:1.[17]

32.     Therefore, Dr. McHenry failed to rebut my opinion that Akeson I and II anticipate the Asserted Claims.

### 2. *Dr. McHenry fails to rebut my opinion that Claims 1, 2, 11, 12, and 16 are obvious over Akeson I in view of Hanzel.*

33.     I disagree with Dr. McHenry's argument that there is neither a motivation to combine Hanzel and Akeson, nor would the combination result in an enzyme exhibiting two

---

[12]  *See* Ex. 12 at ¶ 147 (Explaining that it is my opinion that the Asserted Claims are obvious "to the extent that [PacBio] argues that the [A]sserted [C]laims are enabled . . . and have sufficient written description."). *See also* Ex. 12 at §§ XI.B–C.

[13]   *See* Ex. 3 at § V.B.1.

[14]   Ex. 13 at ¶ 82.

[15]   Ex. 3 at ¶ 96.

[16]   Ex. 14 at ¶ [0048].

[17]   Ex. 13 ¶ 82.



HIGHLY CONFIDENTIAL
ATTORNEYS EYES ONLY

Confidential work product

## XI.    COMPENSATION TO BE PAID FOR WORK ON THE CASE

187.    I am being compensated at my usual consulting rate of $490 per hour for my work related to this dispute. My compensation is in no way dependent on the outcome of this dispute or the testimony or opinions that I give. My opinions and conclusions are fully discussed above.


Dated:  October 8, 2019                    By:

_____

**TAEKJIP HA, PH.D.**

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>OXFORD NANOPORE TECHNOLOGIES, INC.,<br><br>*Defendant*. | C.A. No. 17-cv-275-LPS<br>C.A. No. 17-cv-1353-LPS<br><br>JURY TRIAL DEMANDED<br><br><span style="color:red">**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY**</span> |

**INITIAL EXPERT REPORT OF TAEKJIP HA, PH.D. REGARDING
U.S. PATENT NO. 9,678,056**

**C.      The asserted claims are invalid for lack of enablement**

577.     I have reviewed the Asserted Claims of the '056 patent in view of the specification and the state of the prior art, and I conclude that the Asserted Claims are invalid for lack of enablement because a POSA would not be able to make or use the invention without undue experimentation.

1.     **The translocating enzyme and the reaction conditions are selected such that the translocating enzyme exhibits two kinetic steps wherein each of the kinetics steps has a rate constant, and the ratio of the rate constants of the kinetic steps is from 10:1 to 1:10**

578.     It is my opinion that a POSA reviewing the disclosure as filed on April 10, 2009 (or at the time of the earliest alleged priority date) would not have been able to "[select] the translocating enzyme and the reaction conditions . . . such that the translocating enzyme exhibits two kinetic steps wherein each of the kinetics steps has a rate constant, and the ratio of the rate constants of the kinetic steps is from 10:1 to 1:10," without undue experimentation, as discussed in the '056 patent.

579.     As of April 10, 2009, translocating DNA across a nanopore with a translocating enzyme was a nascent technology.

   *a)     Arriving at reaction conditions under which a translocating enzyme exhibits the claimed ratios would require undue experimentation*

580.     As of April 10, 2009, it would have been impossible for a POSA to select reaction conditions under which the translocating enzyme exhibits the claimed ratios without undue experimentation.

581.     The '056 patent explains "[t]he polymerase reaction conditions can also be important for obtaining a two slow-step enzyme system. In particular,

342

OUTSIDE ATTORNEYS' EYES ONLY

polymerase reaction conditions include components selected to produce two slow-step kinetics. Polymerase reaction conditions include components selected to produce two slow-step kinetics. The polymerase reaction conditions include the type and concentration of the buffer, the pH of the reaction, the temperature, the type and concentration of salts, the presence of particular additives which influence the kinetics of the enzyme, and the type, concentration, and relative amounts of various cofactors, including metal cofactors." '056 patent at 32:17–27. But the '056 patent does not actually provide any reaction conditions under which the enzyme exhibits the claimed ratios, nor does it provide any place to start looking.

582.     Further complicating this issue is the difficulty in determining both 1) which kinetic steps are slow, and 2) how fast each step is. Which step is the slow step will determine which conditions to modify to increase the rate of the slow step to bring it within 1:10 of the next-fastest step—but the specification does not describe what the slow step is for any translocating enzyme. Even today, Dr. Turner explained their enzyme originally exhibited a single rate-limiting step at "$k_2$ or $k_3$"—i.e. the slow step is still unknown. Turner Deposition at 98:10.

583.     Similarly, knowing which steps are fast, and knowing how fast those steps are, will inform a POSA which steps to modify. Determining the rate of fast steps can't be done "except in carefully designed separate experiments." Turner Deposition at 89:25–90:1. The '056 patent provides no guidance as to which steps should be slowed down to practice the claimed ratios.

584.     Even if a POSA could determine which steps are slow and which steps are fast, the specification does not explain how changing reaction conditions affects what kinetic steps. For example, the specification does not explain how

343

OUTSIDE ATTORNEYS' EYES ONLY

By:

_____

**TAEKJIP HA, PH.D.**

Dated: _____

350

OUTSIDE ATTORNEYS' EYES ONLY

# EXHIBIT 3

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

OXFORD NANOPORE TECHNOLOGIES, INC.

Petitioner

v.

PACIFIC BIOSCIENCES OF CALIFORNIA, INC.

Patent Owner

_____

Case No. Unassigned

Patent 9,678,056

_____

DECLARATION OF DR. TAEKJIP HA IN SUPPORT OF

PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 9,678,056

Oxford, Exh. 1002, p. 1

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

## TABLE OF CONTENTS

Page

I.      BACKGROUND AND QUALIFICATIONS ............................................... 1

II.     LEGAL UNDERSTANDING ................................................................ 3

    A.      Anticipation .................................................................... 4

    B.      Obviousness .................................................................... 4

    C.      Claim Construction ........................................................ 8

III.    THE PRIOR ART .......................................................................... 10

    A.      Prior Art Considered .................................................... 10

IV.     LEVEL OF ORDINARY SKILL IN THE ART ..................................... 11

V.      STATE OF THE ART ...................................................................... 12

    A.      Sequencing Nucleic Acids using Nanopores and Molecular Motors ................................................................ 12

    B.      Kinetics of Molecular Motors ..................................... 16

VI.     OVERVIEW OF THE '056 PATENT ................................................. 17

    A.      Overview of the Subject Matter of the '056 Patent ...... 17

    B.      Overview of the Prosecution History ........................... 18

VII.    SUMMARY OF PRIOR ART ........................................................... 23

    A.      Nanopore Sequencing using Molecular Motors was Known in the Art Prior to the Earliest Priority Date Claimed by the '056 Patent ............................................ 23

    B.      It Was Well Known That Polymerases and Helicases Exhibit At Least Two Kinetically Observable Steps ........................ 25

VIII.   CLAIM CONSTRUCTION ................................................................ 32

i

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

IX.    **SUMMARY OF COMBINATIONS** ...................................................36

X.    **THERE IS A REASONABLE LIKELIHOOD THAT THE CHALLENGED CLAIMS ARE UNPATENTABLE** ...............................36

    A.    **Ground 1: Claims 1-5, 10-12 and 15-16 are anticipated by Akeson** .................................................................................36

        1.    **Claim 1** ......................................................................36

        2.    **Claim 2** ......................................................................44

        3.    **Claim 3** ......................................................................44

        4.    **Claim 4** ......................................................................45

        5.    **Claim 5** ......................................................................45

        6.    **Claim 10** ....................................................................46

        7.    **Claim 11** ....................................................................47

        8.    **Claim 12** ....................................................................47

        9.    **Claim 15** ....................................................................47

        10.    **Claim 16** ....................................................................48

    B.    **Ground 2: Claims 1-2, 4 and 8-16 are obvious over Akeson and Hanzel** ...........................................................................48

        1.    **A POSA would have been motivated to combine Akeson and Hanzel** ..................................................48

        2.    **Claim 1** ......................................................................50

        3.    **Claim 2** ......................................................................57

        4.    **Claim 4** ......................................................................58

        5.    **Claim 8** ......................................................................59

        6.    **Claim 9** ......................................................................60

Oxford, Exh. 1002, p. 3

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

7.      **Claim 10** ........................................................................ **60**

8.      **Claim 11** ........................................................................ **61**

9.      **Claim 12** ........................................................................ **62**

10.      **Claims 13 and 14** .......................................................... **62**

11.      **Claim 15** ........................................................................ **63**

12.      **Claim 16** ........................................................................ **63**

**C.**      **Ground 3: Claims 1-3 and 5-16 are obvious over Akeson and Liao** ...................................................................................... **64**

1.      **A POSA would have been motivated to combine Akeson and Liao** ....................................................................... **64**

2.      **Claim 1** .......................................................................... **65**

3.      **Claim 2** .......................................................................... **70**

4.      **Claim 3** .......................................................................... **71**

5.      **Claim 5** .......................................................................... **71**

6.      **Claim 6** .......................................................................... **72**

7.      **Claim 7** .......................................................................... **74**

8.      **Claim 8** .......................................................................... **76**

9.      **Claim 9** .......................................................................... **76**

10.      **Claim 10** ........................................................................ **77**

11.      **Claim 11** ........................................................................ **78**

12.      **Claim 12** ........................................................................ **78**

13.      **Claims 13 and 14** .......................................................... **79**

14.      **Claim 15** ........................................................................ **79**

Oxford, Exh. 1002, p. 4

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

15. **Claim 16** ....................................................................80

D. **Ground 4: Claims 1-3, 5-10, and 12-16 are obvious over Akeson and Adelman** .............................................................80

1. **A POSA would have been motivated to combine Akeson and Adelman** ................................................................80

2. **Claim 1** ......................................................................81

3. **Claim 2** ......................................................................86

4. **Claim 3** ......................................................................87

5. **Claim 5** ......................................................................87

6. **Claim 6** ......................................................................88

7. **Claim 7** ......................................................................90

8. **Claim 8** ......................................................................91

9. **Claim 9** ......................................................................92

10. **Claim 10** ....................................................................92

11. **Claim 12** ....................................................................93

12. **Claims 13 and 14** ......................................................94

13. **Claim 15** ....................................................................94

14. **Claim 16** ....................................................................95

XI. **CONCLUSION** ..........................................................96

iv

Oxford, Exh. 1002, p. 5

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

## Declaration of Taekjip Ha

I, Taekjip Ha, declare as follows:

1.     I make this declaration based on my own personal knowledge and, if called upon to testify, would testify competently to the matters contained herein.

2.     I have been asked to provide technical assistance in the *inter partes* review of U.S. Patent No. 9,678,056 ("the '056 Patent").

3.     This declaration is a statement of my opinions on issues related to the unpatentability of claims 1-16 of the '056 Patent.

## I.     BACKGROUND AND QUALIFICATIONS

4.     In forming my opinions, I have relied upon my knowledge, training and experience in the relevant art.  While my qualifications are stated more fully in my curriculum vitae (Ex. 1003), here I provide a brief summary of my qualifications:

5.     I received a B.S. in physics from Seoul National University in 1990 and a Ph.D. in physics from the University of California at Berkeley in 1996.

6.     I am the Bloomberg Distinguished Professor of Biophysics and Biophysical Chemistry, Biophysics and Biomedical Engineering at John Hopkins University.  I am also an investigator with the Howard Hughes Medical Institute. Prior to joining John Hopkins University in 2015, I was a professor of Physics at the University of Illinois at Urbana-Champaign.

Oxford, Exh. 1002, p. 6

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

7.     My research is focused on using single-molecule detection methods to study protein-nucleic acid and protein-protein complexes and the mechanical basis of their interactions and functions—both *in vitro* and *in vivo*—that are important for genome maintenance.  My research uses physical techniques to manipulate and visualize the movements of single molecules to understand basic biological processes involving DNA and other molecules.  Specifically, my team develops biophysical techniques (*e.g.*, multicolor fluorescence, super-resolution imaging, combined force and fluorescence spectroscopy, vesicular encapsulation and single-molecule pull-down) and applies them to study diverse protein-nucleic acid and protein-protein complexes and mechanical perturbation and response of these systems.

8.     I have published 250 peer-reviewed articles in respected peer-reviewed international journals, which have been cited more than 19,000 times by other researchers and my current Hirsch index is 71.

9.     I am a member of the National Academy of Science and an elected fellow of the American Academy of Arts and Sciences.  In 2012, I was named the Scientist of the Year by the Korean-American Scientists and Engineers Association (KSEA) and Korean Federation of Science and Technology Societies (KOFST).  In 2011, I was awarded Ho-Am Prize in Science, which is widely regarded as the Korean equivalent of the Nobel Prize, for my application of fluorescence

Oxford, Exh. 1002, p. 7

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

resonance energy transfer techniques to reveal the behavior and physical characteristics of single biomolecules. In 2007, I received the Michael and Kate Bárány Award of the Biophysical Society for the development and application of novel single molecule physical methods and techniques and for my ground-breaking discoveries in the single molecule research field. In 2005, I was elected to the American Physical Society. In 2003, I was named a Cottrell Scholar and an Alfred P. Sloan Foundation Fellow. The previous year, I received a National Science Foundation CAREER Award and a Fluorescence Young Investigator Award from the Biophysical Society and in 2001, I was named a Searle Scholar. In addition, I serve as a member of the editorial boards for leading scientific journals, including Science, Cell, eLife, Nucleic Acids Research, Structure, PCCP, Physical Biology and Cancer Convergence.

## II. LEGAL UNDERSTANDING

10. My opinions are also informed by my understanding of the relevant law. I understand that the patentability analysis is conducted on a claim-by-claim and element-by-element basis and that there are several possible reasons that a patent claim may be found to be unpatentable.

11. I understand that earlier publications and patents may act to render a patent unpatentable for one of two reasons: (1) anticipation and (2) obviousness.

Oxford, Exh. 1002, p. 8

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

### A.    Anticipation

12.    First, I understand that a single prior art reference, article, patent or publication "anticipates" a claim if each and every element of the claim is disclosed in that prior art reference, arranged as in the claim.  I further understand that, where a claim element is not explicitly disclosed in a prior art reference, the reference may nonetheless anticipate a claim if the missing claim element is necessarily present in the apparatus or a natural result of the method disclosed, *i.e.*, the missing element is "inherent."

### B.    Obviousness

13.    Second, I understand that the prior art may render a patent claim "obvious."  I understand that two or more prior art references (*e.g.*, prior art articles, patents, or publications) that each disclose fewer than all elements of a patent claim may nevertheless be combined to render a patent claim obvious if the combination of the prior art collectively discloses all elements of the claim and one of ordinary skill in the art at the time would have been motivated to combine the prior art in such a way.  I understand that this motivation to combine need not be explicit in any of the prior art, but may be inferred from the knowledge of one of ordinary skill in the art at the time the patent was filed. I also understand that one of ordinary skill in the art is not an automaton, but is a person having ordinary creativity.  I further understand that one or more prior art references, articles,

Oxford, Exh. 1002, p. 9

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

patents or publications that disclose fewer than all of the elements of a patent claim may render a patent claim obvious if including the missing element would have been obvious to one of skill in the art (*e.g.*, the missing element represents only an insubstantial difference over the prior art or a reconfiguration of a known system).

14.    Under the doctrine of obviousness, I understand that a claim may be invalid if the differences between the invention and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains.

15.    I understand that obviousness is based on the scope and content of the prior art, the differences between the prior art and the claim, the level of ordinary skill in the art and secondary indicia of obviousness and non-obviousness to the extent they exist.

16.    I understand that any evidence of secondary indicia of non-obviousness should be considered when evaluating whether a claimed invention would have been obvious to one of ordinary skill at the time of invention. These secondary indicia of non-obviousness may include, for example:

- a long felt but unmet need in the prior art that was satisfied by the claimed invention;

- commercial success of processes claimed by the patent;

5

Oxford, Exh. 1002, p. 10

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

- unexpected results achieved by the invention;

- praise of the invention by others skilled in the art;

- the taking of licenses under the patent by others; and

- deliberate copying of the invention.

17.    I understand that there must be a relationship between any such secondary indicia and the claimed invention.

18.    It is also my understanding that there are additional considerations that may be used as further guidance as to when the above factors will result in a finding that a claim is obvious, including the following:

- the claimed invention is simply a combination of prior art elements according to known methods to yield predictable results;

- the claimed invention is a simple substitution of one known element for another to obtain predictable results;

- the claimed invention uses known techniques to improve similar devices or methods in the same way;

- the claimed invention applies a known technique to a known device or method that is ready for improvement to yield predictable results;

Oxford, Exh. 1002, p. 11

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

- the claimed invention would have been "obvious to try" choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;

- there is known work in one field of endeavor that may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations would have been predictable to one of ordinary skill in the art;

- there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims; and

- there is some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

19.     Finally, I understand that a claim may be deemed invalid for obviousness in light of a single prior art reference, without the need to combine references, if the elements of the claim that are not found in the reference can be supplied by the knowledge or common sense of one of ordinary skill in the relevant art.

Oxford, Exh. 1002, p. 12

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

## C.     Claim Construction

20.     I have been instructed by counsel on the law regarding claim
construction and patent claims and understand that a patent may include two types
of claims, independent claims and dependent claims.  An independent claim stands
alone and includes only the limitations it recites.  A dependent claim can depend
from an independent claim or another dependent claim.  I understand that a
dependent claim includes all the limitations that it recites in addition to all of the
limitations recited in the claim from which it depends.

21.     It is my understanding that the broadest reasonable interpretation of a
claim term may be the same as or broader than the construction of a term under the
standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en
banc) (indicating that claims should be construed in accordance with the ordinary
and customary meaning of such claim as understood by one of ordinary skill in the
art, exercising primary reliance on intrinsic evidence, although extrinsic evidence
may be applicable in certain instances), but it cannot be narrower.

22.     I understand that to determine how a person of ordinary skill would
understand a claim term, one should look to those sources available that show what
one of skill in the art would have understood disputed claim language to mean.
Such sources include the words of the claims themselves, the remainder of the
patent's specification, the prosecution history of the patent (all considered

8

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

"intrinsic" evidence) and "extrinsic" evidence concerning relevant scientific principles, the meaning of technical terms and the state of the art.

23.     I understand that, in construing a claim term, one looks primarily to the intrinsic patent evidence, including the words of the claims themselves, the remainder of the patent specification and the prosecution history.

24.     I understand that extrinsic evidence, which is evidence external to the patent and the prosecution history, may also be useful in interpreting patent claims when the intrinsic evidence itself is insufficient.

25.     I understand that words or terms should be given their ordinary and accepted meaning unless it appears that the inventors were using them to mean something else.  In making this determination, the claims, the patent specification and the prosecution history are of paramount importance.  Additionally, the specification and prosecution history must be consulted to confirm whether the patentee has acted as its own lexicographer (*i.e.*, provided its own special meaning to any disputed terms), or intentionally disclaimed, disavowed, or surrendered any claim scope.

26.     I understand that in general, a term or phrase found in the introductory words of the claim, the preamble of the claim, should be construed as a limitation if it recites essential structure or steps, or is necessary to give life, meaning and vitality to the claim.  Conversely, a preamble term or phrase is not limiting where a

9

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.  In making this distinction, one should review the entire patent to gain an understanding of what the inventors claim they actually invented and intended to encompass by the claims.

27.    I understand that language in the preamble limits claim scope (i) if dependence on a preamble phrase for antecedent basis indicates a reliance on both the preamble and claim body to define the claimed invention; (ii) if reference to the preamble is necessary to understand limitations or terms in the claim body; or (iii) if the preamble recites additional structure or steps that the specification identifies as important.

## III.    THE PRIOR ART

### A.    Prior Art Considered

28.    In addition to the '056 Patent, I have considered the following prior art patents and printed publications.  It is my understanding that all of these references pre-date the '056 Patent.

29.    I have considered the following materials in forming my opinions:

| Exhibit | Title |
|---|---|
| 1004 | U.S. Patent Application Publication No. 2006/0063171 ("Akeson") |
| 1005 | U.S. Patent Application Publication No. 2007/0196846 ("Hanzel") |

10

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

| 1006 | Liao et al., "Mechanochemistry of T7 DNA Helicase," J. Mol. Biol. 350:452-475 (2005) ("Liao") |
| 1009 | U.S. Patent No. 5,795,782 to Church et al. ("Church") |
| 1010 | Prosecution History of U.S. Patent No. 9,678,056 |
| 1011 | Prosecution History of U.S. Patent No. 8,133,672 |
| 1012 | U.S. Patent No. 8,133,672 |
| 1013 | Adelman et al., "Mechanochemistry of Transcription Termination Factor Rho," Mol. Cell 22:611-621 (2006) ("Adelman") |

## IV.   LEVEL OF ORDINARY SKILL IN THE ART

30.    I understand that the person having ordinary skill in the art (POSA) is a hypothetical person who is presumed to know the relevant prior art.  I understand that the actual inventor's skill is not determinative of the level of ordinary skill.  I further understand the factors that may be considered in determining the level of skill include: the types of problems encountered in the art, prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field. I understand that not all such factors may be present in every case and one or more of them may predominate.

31.    In my opinion, a person of ordinary skill in the field relevant to the '056 Patent possesses a Ph.D. or an equivalent amount of experience in molecular biology, genetics, biochemistry or a related field.  The person of ordinary skill in

Oxford, Exh. 1002, p. 16

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

the art area would have experience in DNA sequencing techniques including Maxam-Gilbert and Sanger sequencing, as well as other techniques available on or before the priority date of the '056 Patent, such as Applied Biosystems/Life Technologies, Solexa/Illumina, Helicos and PacBio sequencing.

## V.   STATE OF THE ART

### A.   Sequencing Nucleic Acids using Nanopores and Molecular Motors

32.   One of the techniques used for sequencing of nucleic acids is nanopore sequencing.  The concept of using nanopores to sequence DNA has been around for decades.  A nanopore sequencing system is illustrated in Figure 1 of U.S. Patent No. 5,795,782 to Church et al. ("Church"; Ex. 1009), which issued on August 18, 1998 and is § 102(b) prior art:



FIG.1

Ex. 1009, Figure 1.

12

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

In such a system, two chambers are connected through a nanopore—a hole with a diameter on the order of one nanometer—embedded in a substrate. *Id.*, 1:40-2:58; *see also id.*, Figure 1; *see also* Ex. 1004, Figure 2. As illustrated in the figure, a nucleic acid, *e.g.*, a single-stranded DNA (ssDNA), is added to one chamber and an electric field is applied across the substrate. Ex. 1009, Figure 1. As DNA is negatively charged, the electric field pulls the DNA strand through the nanopore towards the side of the substrate with a positive potential. *Id.* As the strand passes through the nanopore, an electrical signal that varies based on the composition of the DNA strand in the pore is measured. *Id.*, 6:14-22; *see also id.*, Figure 3. Often, the signal that is measured is the conductance of ions through the pore. *Id.* Because each nucleotide has different properties such as size and shape, they each block the pore and consequently alter the flow of ions through the pore, to a differing degree. *Id.* Church provided a schematic of the conductance levels that may be observed as a DNA strand passes through the pore if only a single base contributed to the channel current:

13

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056



**FIG. 3**

*Id.*, Figure 3.

33.    Although Church hypothesized that each nucleotide provides a distinct signal, it was well recognized as of the priority date of the '056 patent that multiple nucleotides contribute simultaneously to the measured signal and that signal must be deconvoluted to obtain the sequence of nucleotides that comprise the DNA.

34.    As the conductance is characteristic of the nucleotides residing in the nanopore at a given time, the conductance data may be analyzed to determine the sequence of the DNA strand that passed through the pore.  Ex. 1009, 6:14-22.  That analysis involves comparing the experimental data to previously measured calibration information representative of the signal indicative of a specific nucleotide or group of nucleotides, *e.g.*, data obtained for nucleic acids with known sequences.

14

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

35.     It was also well recognized as of the priority date of the '056 patent that the rate of nucleic acid translocation through a nanopore could be controlled by incorporating a molecular motor.  In fact, the '056 patent itself cites U.S. Patent Publication No. 2006/0063171 to Akeson et al. ("Akeson") as disclosing nanopore systems that incorporate molecular motors.  Ex. 1001, 23:27-32.  Akeson discloses that "one disadvantage of previous nanopore analysis techniques is controlling the rate at which the target polynucleotide is analyzed," and teaches the use of a molecular motor to modify the rate of translocation of a nucleic acid through a nanopore to allow characterization of the nucleic acid.   Ex. 1004, ¶¶ [0007], [0019], [0036], [0081].  Akeson also discloses that the molecular motor can be, for example, "a DNA polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase," and that the intrinsic rate of such a molecular motor can be modified to decrease the rate of movement of the polynucleotide.  *Id.*, ¶¶ [0013], [0047]-[0051] and [0083]; *see also id.*, Figure 11.  In particular, Akeson discloses that "intrinsic rate of movement of a particular molecular motor may be modified, *e.g.*, by chemical modification of the motor, by changes in temperature, pH, ionic strength, the presence of necessary cofactors, substrates, inhibitors, agonists, or antagonists, by the nature of the medium (*e.g.*, the presence of nonaqueous solvents or the viscosity), by external fields (*e.g.*, electric or magnetic fields), and hydrodynamic pressure."  *Id.*, ¶ [0083].

Oxford, Exh. 1002, p. 20

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

36.     Even before Akeson, others had taught the use of enzymes to translocate a nucleic acid through a nanopore.  For example, Church discloses the use of a "polymerase or other template-dependent polymer replicating catalyst" to move a nucleic acid through an ion permeable pore to allow analysis of the nucleic acid.   Ex. 1009, 4:11-30; *see* also *id.*, Figure 2.   Church discloses polymer replicating catalysts as "nucleotides polymerases of any type, *e.g.*, DNA polymerases, RNA polymerases, tRNA and ribosomes." *Id.*, 4:22-30.   Thus, a POSA would not only be well aware of the use of molecular motors in connection with nanopore-based sequencing, but would also be aware of the types of proteins, *e.g.*, polymerases and helicases, which would be useful to reduce the rate of nucleic acid translocation.

**B.     Kinetics of Molecular Motors**

37.     The kinetic behavior of molecular motors, *e.g.*, DNA polymerases and helicases, has been studied for years.   Experiments, even certain experiments performed by Pacific Biosciences, have indicated that many molecular motors exhibit at least two kinetics steps, if not more, and that the ratios of the rates of those steps fall within 10:1 and 1:10.  *See* Ex. 1005, Ex. 1006, Ex. 1013.

16

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

## VI.   OVERVIEW OF THE '056 PATENT

### A.   Overview of the Subject Matter of the '056 Patent

38.     The claims of the '056 patent are directed to methods for nanopore-based sequencing and, in particular, to methods where a molecular motor is used to control the translocation of the DNA molecule through the pore.  The claims also require that the rate constants of at least two of the reaction steps of the molecular motor, result in particular ratios, *e.g.*, ranging from 10:1 to 1:10.  The '056 patent includes 18 claims, with only claim 1 being independent.

39.     According to the '056 patent, "[d]evices using nanopores to sequence DNA and RNA molecules have generally not been capable of reading sequence at a single-nucleotide resolution."  Ex. 1001, 1:58-60.  The '056 patent states that "[f]or the purposes of single molecule sequencing it can be advantageous to control the translocation of DNA through nanopore structures under applied voltage" and cites to Akeson before suggesting that "[p]rotein components on either the cis or trans side of the nanopore can be utilized to control the rate of the translocation through the nanopore..."  *Id.*, 23:29-34.  Beginning at column 4, line 33, the '056 patent includes a series of paragraphs incorporated into the specification via a preliminary amendment from U.S. Patent Application No. 12/414,191 ("the '191

17

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

application").[1]   These paragraphs note that certain protein components, *e.g.*, polymerases and other enzymes, can be useful in the context of sequencing in that "by providing two or more partially rate-limiting steps within a phase of an enzyme reaction, one improves the ability to monitor that reaction using *optical detection* systems." *Id.*, 24:46-49 (emphasis added).

## B. Overview of the Prosecution History

40.    U.S. Patent Application No. 15/366,849, which matured into the '056 patent, was filed on December 1, 2016 as a Track One application and included 28 claims.  Ex. 1010, 67-69.  On December 2, 2016, a preliminary amendment was filed to incorporate disclosure from the '191 application.  *Id.*, 142-327.  The sections of the '191 application that were incorporated in the specification of the '056 patent related to the use of polymerases, *e.g.*, modified polymerases, or polymerase reaction conditions that result in a polymerase reaction that exhibits two kinetically observable steps.  Patent Owner represented that the basis for this amendment was the incorporation by reference of the '191 application into the '056 patent.  *Id.*, 306; s*ee also* Ex. 1001, 24:28-32.

---

[1] The '191 application, which was filed on March 30, 2009, was issued as U.S. Patent No. 8,133,672 on March 13, 2012.

Oxford, Exh. 1002, p. 23

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

41.    On February 13, 2017, a Restriction Requirement was issued that required the election of a single Invention Group from the following two Groups: claims drawn to a method and claims drawn to a system.   Ex. 1010, 512-518.   In response, Patent Owner elected to prosecute the method claims and canceled the claims directed to a system, *i.e.*, claims 19-28.  *Id.*, 519.  Original claims 1-18 were presented for examination.

42.    On April 13, 2017, a Non-Final Office Action was issued that rejected the pending claims under 35 U.S.C. § 112 grounds.  *Id.*, 530-533.  In addition, claims 1-4 and 6-18 were rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-29 of U.S. Patent No. 8,133,672 ("the '672 patent") in view of Meller et al. (WO 2006/020775; "Meller").  *Id.*, 533-537.  The Examiner contended that "[b]oth sets of claims are drawn to the same steps of sequencing nucleic acids, two kinetic steps, enzymes, rates and rate ratios" and that Meller discloses nanopore sequencing.  *Id.*, 535-536.  Claim 5 was rejected on the ground of nonstatutory double patenting as being unpatentable over claims 1-29 of the '672 patent in view of Meller and in further view of Guo (U.S. Patent Publication No. 2005/0266416) contending that Guo teaches "the claimed functionally equivalent nanomotor [], which is used in nanopore based sequencing devices."  *Id.*, 537.  The Examiner interpreted the term "translocating enzyme" to mean an "enzyme that actively contributes to the translocation of a nucleic acid

19

through nanopore, as opposed to enzymes or proteins that the nucleic acids merely translocate through (*e.g.*, α-hemolysin)," which was not disputed by Patent Owner. *Id.*, 530. Notably, the pending claims were not rejected under any anticipatory or obviousness grounds. In response, Patent Owner filed a terminal disclaimer to the '672 patent. *Id.*, 624 and 648.

43. As evidenced by the rejection of the claims on the ground of nonstatutory double patenting over the '672 patent, which issued from the '191 application and the incorporation of disclosure from the '191 application into the specification of the '056 patent, as discussed above, the prosecution of the '191 application is highly relevant to the claims of the '056 patent.

44. During the prosecution of the '191 application, the Examiner rejected the pending claims as anticipated by Bakhtina et al., Biochemistry 44:5177-518 (2005) ("Bakhtina") and Hanzel.[2] Ex. 1011, 35-38. In addition to the anticipation rejections, the Examiner rejected the claims of the '191 application as obvious over Hanzel in combination with Esteban et al., Biochemistry 31:350-359 (1992) ("Esteban") and Rechkunova et al., Biochemistry (Moscow) 65:609-614 (2000) ("Rechkunova"). *Id.*, 38-39. The Examiner argued that Bakhtina discloses a sequencing method where the polymerase reaction exhibits two kinetically

---

[2] Hanzel is assigned to Pacific Biosciences. Ex. 1005.

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

observable steps within an observable phase of the reaction and that Bakhtina discloses ratios of rate constants between 10:1 to 1:10.  *Id.*, 35-37.  Similarly, the Examiner asserted that Hanzel teaches a sequencing method where the polymerase reaction exhibits two kinetically observable steps within an observable phase of the reaction and the ratios of the product release rates and the branching rates of the polymerases disclosed in Hanzel fall between 10:1 and 1:10.  *Id.*, 38-39.

45.    In response, Pacific Biosciences amended claim 1 of the '191 application, the only independent claim, to recite:

> "each of which kinetically observable steps proceeds from an intermediate in which a nucleotide or a polyphosphate product is bound to the polymerase enzyme or each of which kinetically observable steps proceeds from an intermediate in which the nucleotide and the polyphosphate product are not bound to the polymerase enzyme."

*Id.*, 46.  Pacific Biosciences also acknowledged that Hanzel describes a system that includes two kinetic steps, a first kinetic step proceeding from an intermediate that is bound and a second kinetic step proceeding from an intermediate that is unbound and that Bakhtina discloses two kinetic steps, a single kinetically observable binding step (unbound phase) and a single kinetically observable chemistry step

21

Oxford, Exh. 1002, p. 26

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

(bound phase).  *Id.*, 49-51.  Distinguishing Hanzel and Bakhtina in this fashion underscores the importance of the newly-added limitation, where ***both of the kinetic steps*** proceed from an intermediate "in which the nucleotide and the polyphosphate product are not bound to the polymerase enzyme" or "in which a nucleotide or a polyphosphate product is bound to the polymerase enzyme." *Id.*

46.    Despite the materiality of the art cited by the Examiner during the prosecution of the '191 application (*e.g.*, Hanzel) to the '056 patent's claim limitations relating to enzyme kinetic steps, their rates and corresponding ratios of rates, Pacific Biosciences provided none of the cited references to the Examiner of the '056 patent. None of the amendments made to claim 1 of the '191 application, which were explicitly made to overcome Hanzel and Bakhtina, were mentioned during prosecution of the '056 patent, let alone incorporated into the claims of the '056 patent.

47.    A Notice of Allowance was mailed on May 2, 2017, which resulted in the issuance of the '056 patent.  In the Notice of Allowance, the Examiner states that "while Akeson et al. (U.S. Patent Publication No. US 2006/0063171 A2, published 23 March 2008) teach the use of the translocating enzyme polymerase, the manipulation of the reaction conditions to create the claimed ratio of rate constants is free and clear of the prior art."  Ex. 1010, 659.   While this rationale for allowance is flawed in that ignores express teachings in Akeson (*see infra*

22

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

Section VII.A.1), it also highlights the materiality of the art withheld by Pacific

Biosciences, e.g., Hanzel, -- which teaches the exact limitation the Examiner

alleged was missing from Akeson.  *See infra* Sections VII.B.1 and X.B.

## VII.   SUMMARY OF PRIOR ART

### A.   Nanopore Sequencing using Molecular Motors was Known in the Art Prior to the Earliest Priority Date Claimed by the '056 Patent

#### 1.   U.S. Patent Publication No. 2006/0063171 ("Akeson")

48.   Akeson was filed as U.S. Application No. 11/088,140 on March 23,

2005 and published on March 23, 2006 and is § 102(b) prior art (Ex. 1004).

49.   Akeson discloses methods for sequencing nucleic acids using a

nanopore and a translocating enzyme (referred to as a "molecular motor" in

Akeson).  Ex. 1004, ¶¶ [0008]-[0009].  For example, Akeson discloses the use of a

molecular motor to modify the rate of translocation of a nucleic acid through a

nanopore.  *Id.*, ¶¶ [0019], [0081].  Akeson also discloses that the molecular motor

can be a polymerase, a helicase, a ribosome or an exonuclease.  *Id.*, ¶¶ [0047]-

[0051].  In particular, Akeson discloses that the polymerase can be a "Phi-29 DNA

polymerase" and that the helicase can be a "*E.coli* bacteriophage T7 gp4A"

helicase or a *E. coli* rho helicase.  *Id.*, ¶¶ [0048] and [0051].

50.   Akeson also highlights desirable enzymatic rates for such molecular

motors in the context of nanopore sequencing.  *Id.*, ¶ [0082].  Akeson specifically

23

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

discloses that "for a DNA polymerase, a desirable range is 75-1500 Hz; and for ribosomes, helicases and exonucleases, a desirable range is 50-1500 Hz." *Id.* As discussed in detail below, such rates would only be achievable if the individual kinetic steps of the disclosed molecular motors fell within the ratios claimed in the '056 patent. *See infra* Section X.A.

51.     Akeson was not cited as a prior art reference in a § 102 or § 103 rejection of the claims.  Akeson was only discussed in the Notice of Allowance of the '056 patent.  Ex. 1010, 659.  Although Akeson was discussed by the Examiner in the Notice of Allowance, the Examiner's characterization of the reference fails to contextualize the explicit disclosures in Akeson relevant to the claims of the '056 patent.  *Id.*  For example, the Examiner asserted that "while Akeson et al. (U.S. Patent Publication No. US 2006/0063171 A2, published 23 March 2008) teach the use of the translocating enzyme polymerase, the manipulation of the reaction conditions to create the claimed ratio of rate constants is free and clear of the prior art."  Ex. 1010, 659.  The Examiner failed to cite, however, to Akeson's disclosure that "[t]he intrinsic rate of movement of a particular molecular motor may be modified, *e.g.*, by chemical modification of the motor, by changes in temperature, pH, ionic strength, the presence of necessary cofactors, substrates, inhibitors, agonists, or antagonists, by the nature of the medium (*e.g.*, the presence of nonaqueous solvents or the viscosity), by external fields (*e.g.*, electric or

24

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

magnetic fields), and hydrodynamic pressure. … to start, stop, increase, decrease, or stabilize the rate of movement." Ex. 1004, ¶ [0083]. Moreover, the Examiner failed to indicate that Akeson's disclosure of desirable enzymatic rates could only be achievable if the enzymes operated within the ratios of rates claimed in the '056 patent. *See infra* Section X.A.

52.    Moreover, the Notice of Allowance fails to address Akeson's disclosure in light of Pacific Biosciences' own art, *e.g.*, Hanzel, and arguments submitted in connection with the prosecution of the '191 application. For example, Pacific Biosciences conceded during the prosecution of the '191 application that modified motors were known in the art, including in Hanzel, that satisfy the claimed ratios of rate constants. Ex. 1011, 46-51. Accordingly, reconsideration of the disclosure of Akeson is warranted, and should not be dismissed under 35 U.S.C. § 325(d), particularly in light of the Examiner's failure to articulate all of the relevant aspects of Akeson as well as Pacific Biosciences' knowledge of the state of the art at the time of filing in combination with their failure to bring such material information to the attention of the Examiner.

**B.    It Was Well Known That Polymerases and Helicases Exhibit At Least Two Kinetically Observable Steps**

**1.    U.S. Patent Publication No. 2007/0196846 ("Hanzel")**

25

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

53.     Hanzel was filed as U.S. Application No. 11/645,223 on December 21, 2006 and published on August 23, 2007 and therefore qualifies as § 102(b) prior art (Ex. 1005).  Hanzel is assigned to Pacific Biosciences, the assignee of the '056 patent.  Hanzel was not submitted to, or cited by, the Examiner or otherwise made of record during prosecution of the '056 Patent.

54.     Hanzel discloses Phi 29 DNA polymerases, which is one of the DNA polymerases expressly disclosed in Akeson as useful in connection with the nanopore detection systems disclosed therein, that have been modified to alter their kinetic behavior and, in particular, Hanzel discloses that the polymerase can be modified "to slow [] the overall nucleotide incorporation speed of the polymerase (*e.g.*, depending on the resolution of the equipment used to monitor incorporation)."  Ex. 1005, ¶ [0092]; *see also* Ex. 1004, ¶ [0048].  Hanzel further discloses the modification of reaction conditions by manipulating nucleotide concentrations and the type of nucleotides, *e.g.*, nucleotide analogs, to be used in the polymerase reaction.  *Id.*, ¶ [0080], Table 5.

55.     Hanzel discloses the rates of specific kinetic steps, *e.g.*, the rates of product release and branching, for modified Phi29 DNA polymerases, *e.g.*, recombinant Phi29 DNA polymerases, which have ratios that fall within the ratio ranges claimed in the '056 patent.  Ex. 1005, ¶¶ [0184], [0186]-[0187] and Tables 6 and 7; *see also infra* Section X.B.  The product release rate disclosed in Hanzel

26

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

corresponds to step 112 ($k_5$) of Figure 32 of the '056 patent, which is the step where a product (*e.g.*, PP$_i$) is released from the enzyme. The branching rate, also known as the nucleotide dissociation rate, corresponds to step 104 ($k_{-1}$) of Figure 32 of the '056 patent, which is the step where the nucleotide dissociates from the polymerase that is bound to the polynucleotide.

## 2.    Liao et al. ("Liao")

56.    Liao et al., entitled "Mechanochemistry of T7 DNA Helicase," J. Mol. Biol. 350:452-475 (Ex. 1006) was published online on May 23, 2005 and published in print on July 15, 2005 and therefore qualifies as § 102(b) prior art. Liao was not submitted to, or cited by, the Examiner or otherwise made of record during prosecution of the '056 Patent.

57.    Liao discloses the kinetic analysis of the bacteriophage T7 DNA helicase, which is a "ring-shaped hexameric motor protein that unwinds double-stranded DNA during DNA replication and recombination," in the presence of DNA.  Ex. 1006, 452; *see also id.*, Figure A1(c) (showing a cartoon illustration of the 6 subunits of the T7 helicase and the catalytic sites).  Liao discloses that "[t]he energy source for the T7 helicase is dTTP (deoxythymidine triphosphate), whose function is equivalent to that of ATP in other motor proteins."  *Id.*, 452.  Liao discloses that the T7 helicase, which is one of the helicases expressly disclosed in Akeson as useful in connection with the nanopore detection systems disclosed

27

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

therein, exhibits at least two kinetic steps that have rate constants that when
compared have a ratio that falls within the ratio ranges claimed in the '056 patent.
*See infra* Section X.C; *see also* Ex. 1004, [0051].  Scheme 1 of Liao discloses the
kinetic steps that were analyzed, and the rate constants of such steps are provided
in Table 1 of Liao.  Ex. 1006, 457, 460.  In Scheme 1, "E is the empty state, T* is
the weakly bound dTTP state [corresponding to the nucleotide forming initial
interactions in the nucleotide binding pocket of the enzyme], T is the tightly bound
dTTP state, DP is the dTDP-$P_i$ state (after hydrolysis), and D is the dTDP state
(after $P_i$ release)."  *Id.*, 460.



*Id.*, Scheme 1 (460).

58.    As shown in Scheme 1, and further described in Table 1, Liao
discloses that the kinetic step denoted as "N·T* → N·T" represents the power
stroke of the helicase and corresponds to the forward translocation of the helicase
on DNA.  *Id.*, 457, 460, 462; *see also id.*, 461 (stating that the power strokes "drive
the movement of the [hexameric] ring along the DNA strand").  Liao notes that the
powerstroke is a reversible step, with "N·T → N·T*" described as the "recoil
power stroke" corresponding to a reverse translocation step.  *Id.*, Table 1.

28

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

59.    Liao further discloses that changes in the conformation of the helicase occur during the power stroke.  *Id.*, 461.  Liao discloses two possible mechanisms for the translocation power stroke.  In particular, Liao discloses that dTTP binding can trigger "the alignment of the positive charge groups that constitute the 'arginine finger' with the negatively charged γ-phosphate of dTTP," resulting in the "relative rotation between neighboring subunits [] so that DNA contact residues rotate with it to translocate the DNA" or "dTTP binding directly deforms the local β-sheet structure" to result in DNA translocation.  *Id.*  Accordingly, the rate constant observed for the translocation step also encompasses the enzyme isomerization step.

60.    Liao also describes two "product release" steps.  Upon hydrolysis of dTTP, denoted as "N·T $\rightarrow$ DP" in Scheme 2 and Table 1, two products are formed, $P_i$ and dTDP.  *Id.*, 457, 460.  Liao notes that the "N·T $\rightarrow$ DP" in Scheme 2 encompasses both "N·T $\rightarrow$ DP" and "N·DP $\rightarrow$ DP" of Scheme 1 because "the energy well for [the N·DP] state is not very deep" and "[m]athmatically, it is always possible to lump to states together into one state and use rate constants equivalent to the collective jump probabilities of the original states."  *Id.*, 461. The subsequent kinetic step denoted by "DP $\rightarrow$ D" represents the release of $P_i$ from the helicase.  *Id.*, 460   The kinetic step denoted by "D $\rightarrow$ E" in Scheme 1 and Table 1 represents the release of dTDP from the helicase.  Liao further discloses

29

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

the rate constant for the kinetic step of DNA release, corresponding to the $k_{off}$ rate

identified as "102" in Figure 32 of the '056 patent, and which is denoted as "N·T*

→ T*" in Table 1.  *Id.*, 457.

| Step | Reaction | Rate constant | Lower bound | Upper bound |
|------|----------|---------------|-------------|-------------|
| E→T* | dTTP docking | $5.0\times10^4\,M^{-1}\,s^{-1}$ | $4.8\times10^4\,M^{-1}\,s^{-1}$ | $5.7\times10^4\,M^{-1}\,s^{-1}$ |
| T*→N·T* | DNA binding | $951\,s^{-1}$ | $380\,s^{-1}$ | $>1\times10^6\,s^{-1}$ |
| N·T*→N·T | Power stroke | $778\,s^{-1}$ | $311\,s^{-1}$ | $1.17\times10^4\,s^{-1}$ |
| N·T→DP | dTTP hydrolysis | $66\,s^{-1}$ | $53\,s^{-1}$ | $297\,s^{-1}$ |
| DP→D | $P_i$ release | $15\,s^{-1}$ | $14\,s^{-1}$ | $18\,s^{-1}$ |
| D→E | dTDP release | $159\,s^{-1}$ | $103\,s^{-1}$ | $>1\times10^6\,s^{-1}$ |
| T*→E | dTTP release | $1.5\,s^{-1}$ | $<1\times10^{-5}\,s^{-1}$ | $2.5\,s^{-1}$ |
| N·T*→T* | DNA release | $70\,s^{-1}$ | $<1\times10^{-5}\,s^{-1}$ | $1.35\times10^3\,s^{-1}$ |
| N·T→N·T* | Recoil power stroke | $6.2\,s^{-1}$ | $<1\times10^{-5}\,s^{-1}$ | $120\,s^{-1}$ |
| DP→N·T | dTTP synthesis | $0.03\,s^{-1}$ | $0.028\,s^{-1}$ | $0.041\,s^{-1}$ |
| D→DP | $P_i$ binding | $1.1\times10^3\,M^{-1}\,s^{-1}$ | n/a | n/a |
| E→D | dTDP binding | $1.0\times10^6\,M^{-1}\,s^{-1}$ | n/a | n/a |

*Id.*, Table 1 (457).

### 3.    Adelman et al. ("Adelman")

61.    Adelman et al., entitled "Mechanochemistry of Transcription

Termination Factor Rho," Mol. Cell 22:611-612 (Ex. 1013) was published in print

on June 9, 2006 and therefore qualifies as § 102(b) prior art.  Adelman was not

submitted to, or cited by, the Examiner or otherwise made of record during

prosecution of the '056 Patent.

62.    Adelman discloses the kinetic analysis of the *E. coli* rho helicase,

which is a "ring-shaped hexameric motor protein that translocates along nascent

mRNA transcript and terminates transcription of select genes in bacteria."   Ex.

1013, 611.  Adelman discloses that the *E. coli* rho helicase, which is one of the

helicases expressly disclosed in Akeson as useful in connection with the nanopore

detection systems disclosed therein, exhibits at least two kinetic steps that have rate

30

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

constants that when compared have a ratio that falls within the ratio ranges claimed in the '056 patent. *See infra* Section X.D; *see also* Ex. 1004, ¶ [0051]. Scheme 1 of Adelman discloses the kinetic steps that were analyzed, and the rate constants of such steps are provided in Table 1. Ex. 1013, 615, 618. In Scheme 1, "E, the empty state; T*, weakly bound dATP [corresponding to the nucleotide forming initial interactions in the nucleotide binding pocket of the enzyme]; T, tightly bound dATP; DP, products; ADP·P_i, hydrolysis products; D, dADP; and N·T* and N·T denote the weak and tight binding nucleotide states, respectively." *Id.*, 615.



*Id.*, Scheme 1 (615).

63.    As shown in Scheme 1, and further described in Table 1, Adelman discloses that the kinetic step denoted as "N·T* → N·T" represents the power stroke of the helicase and corresponds to the forward translocation of the helicase on DNA. *Id.*, 615 and Table 1 (618).

64.    Adelman further discloses that changes in the conformation of the helicase occur during the power stroke. *Id.*, 614. Adelman specifically states that, "the power stroke that drives RNA translocation must occur as the ATP anneals into a tight binding configuration in the catalytic site." *Id.* Accordingly, the rate

31

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

constant observed for the translocation step also encompasses the enzyme isomerization step.

65.     Adelman also describes two "product release" steps following ATP hydrolysis.  As shown in Table 1, Adelman discloses that the rate constant of $P_i$ release (*i.e.*, "DP $\to$ D") is 50 s$^{-1}$, and the rate constant of dADP release (*i.e.*, "D $\to$ E") is 350 s$^{-1}$.   *Id.*, 618.  The rate constant of dATP hydrolysis, "N·T $\to$ DP" is 150 s$^{-1}$.  *Id.*  In addition to the rates associated with ATP hydrolysis and product release.   The rate constant for the RNA release step (N·T* $\to$ T*), which corresponds to the $k_{off}$ rate identified as "102" in Figure 32 of the '056 patent, is 87 s$^{-1}$.  *Id.*  The full listing of rate constants is included in Table 1, reproduced below:

**Table 1.  Best-Fit Rate Constants for the Hydrolysis Cycle of Transcription Termination factor Rho**

| Step | Reaction | Rate Constant | Lower Bound | Upper Bound |
|---|---|---|---|---|
| E → T* | ATP docking | $5.69 \times 10^5$ M$^{-1}$s$^{-1}$ | $5.3 \times 10^5$ M$^{-1}$s$^{-1}$ | $6.5 \times 10^5$ M$^{-1}$s$^{-1}$ |
| T* → N·T* | RNA binding | 326 s$^{-1}$ | 310 s$^{-1}$ | 378 s$^{-1}$ |
| N·T* → N·T | Power stroke | 2045 s$^{-1}$ | 1200 s$^{-1}$ | 7410 s$^{-1}$ |
| N·T → DP | ATP hydrolysis | 150 s$^{-1}$ | 144 s$^{-1}$ | 160 s$^{-1}$ |
| DP → D | Pi release | 50 s$^{-1}$ | 48 s$^{-1}$ | 54 s$^{-1}$ |
| D → E | ADP release | 350 s$^{-1}$ | 171 s$^{-1}$ | >$1.0 \times 10^7$ s$^{-1}$ |
| T* → E | ATP release | 6.3 s$^{-1}$ | 4.0 s$^{-1}$ | 12.5 s$^{-1}$ |
| N·T* → T* | RNA release | 87 s$^{-1}$ | 61 s$^{-1}$ | 109 s$^{-1}$ |
| N·T → N·T* | Recoil power stroke | 4.3 s$^{-1}$ | <0.043 s$^{-1}$ | 357 s$^{-1}$ |
| DP → N·T | ATP synthesis | 0.08 s$^{-1}$ | <0.008 s$^{-1}$ | 31.8 s$^{-1}$ |
| D → DP | Pi binding | $2.27 \times 10^3$ M$^{-1}$s$^{-1}$ | N/A | N/A |
| E → D | ADP binding | $1.04 \times 10^7$ M$^{-1}$s$^{-1}$ | N/A | N/A |

*Id.*, Table 1 (618).

## VIII.  CLAIM CONSTRUCTION

66.     I understand that the terms in the challenged claims of the '056 Patent should each be construed according the broadest reasonable interpretation in view of the specification.

32

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

67.     Claim 5 identifies two specific subtypes of translocating enzymes: (1) "a viral genome packaging motor"; and (2) "an ATP-dependent chromatin remodeling complex."   While neither term is specifically defined in the specification, they are included in a larger list of translocating enzyme alternatives, "[o]ptionally, the protein components can be chosen from a broad class of DNA translocation enzymes including DNA and RNA helicases, viral genome packaging motors and chromatin remodeling ATPases."   Ex. 1001, 23:57-60.   Given the identification in the specification of viral genome packaging motors and chromatin remodeling ATPases as alternatives to DNA and RNA helicases, the broadest reasonable construction of those terms cannot be coextensive in scope with DNA and RNA helicases.   *Id.*   This is true despite the fact that some viral genome packaging motors and chromatin remodeling ATPases may have helicase or helicase-like motifs.   Similarly, the broadest reasonable construction for viral genome packaging motor is "a viral protein or complex of proteins having the functions of associating with a viral capsid and translocating viral DNA into a capsid shell."   The broadest reasonable construction for "chromatin remodeling ATPase" is "a protein or complex of proteins having the function of coupling ATP hydrolysis to nucleosome translocation."

68.     Claims 6 and 7 of the '056 patent refer to five distinct kinetic steps: (1) "enzyme isomerization"; (2) "nucleotide incorporation"; (3) "product release";

33

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

(4) "template translocation"; and (5) "nucleotide binding."   The specification

provides an example of each of these steps in the context of a nucleic acid

polymerase, with reference to Figure 32:



Figure 32

Ex. 1001, Figure 32.

Enzyme isomerization is identified as occurring at steps 106 and 110.  *Id*., 25:56-

67.  Nucleotide incorporation is identified as occurring at step 108.  *Id.*  Product

release is identified as occurring at step 112.  *Id.*   Template translocation is

identified as occurring at step 114.  *Id.*   Nucleotide binding is identified as

occurring at step 104.  *Id.* The specification makes clear, however, that "the

scheme in FIG. 32 does not provide a unique representation of the process."  *Id.*,

25:39-42.   The specification goes on to note that the kinetic steps of the

polymerase process may include "fewer steps."  *Id.*  Alternatively, it may include

34

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

additional steps, if those steps are "slow and thus limit the rate of reaction." *Id.*,

25:44-47.   Thus, while Figure 32 may be a guide, it does not provide a

comprehensive listing of all possible steps. *Id.*, claims 1-3 and 5-18.

69.   In view of the statements made in the specification, the broadest

reasonable construction of "enzyme isomerization" as recited in claim 6 is "a step

that involves a change in enzyme configuration." *Id.*, 25:59-64.  In particular, the

'056 patent states that "[s]tep 106 represent the isomerization of the polymerase

from the open to closed configuration," and step 110 represents "polymerase

isomerization [] from the closed to open position." *Id.*

70.   In view of the statements made in the specification, the broadest

reasonable construction of "nucleotide incorporation" as recited in claim 6 is "a

chemistry step where a nucleotide is incorporated into a growing strand." *Id.*,

25:61-63.

71.   In view of the statements made in the specification, the broadest

reasonable construction of "product release" as recited in claim 6 is "a step where a

product is released from the enzyme."  In particular, the '056 patent states that step

112 represents the release of "the polyphosphate component [(PP$_i$)] that is cleaved

upon incorporation" from the complex. *Id.*, 25:64-66.

35

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

72.     In view of the statements made in the specification, the broadest
reasonable construction of "template translocation" as recited in claim 7 is "a step
where the enzyme translocates on the bound nucleic acid." *Id.*, 25:66-67.

73.     In view of the statements made in the specification, the broadest
reasonable construction of "nucleotide binding" as recited in claim 7 is "a step
where a nucleotide forms initial interactions in the nucleotide binding pocket of the
enzyme." *Id.*, 25:58-59.

## IX.    SUMMARY OF COMBINATIONS

| References | '056 Claims |
|---|---|
| Akeson | Claims 1-5, 10-12 and 15-16 |
| Akeson and Hanzel | Claims 1-2, 4 and 8-16 |
| Akeson and Liao | Claims 1-3 and 5-16 |
| Akeson and Adelman | Claims 1-3, 5-10, and 12-16 |

## X.    THERE IS A REASONABLE LIKELIHOOD THAT THE CHALLENGED CLAIMS ARE UNPATENTABLE

### A.    Ground 1: Claims 1-5, 10-12 and 15-16 are anticipated by Akeson

#### 1.    Claim 1

Claim 1[pre].    "A method for sequencing a nucleic acid template comprising:"

74.     Akeson discloses methods for the "analysis of a polynucleotide
sequence" to identify the "number and composition of monomers that make up

36

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

each individual polynucleotide, in sequential order."   Ex. 1004, ¶¶ [0019] and

[0079].  Akeson further discloses methods for "measuring a monomer-dependent

characteristic of the target polynucleotide while the target polynucleotide moves

with respect to the nanopore aperture," where "the monomer dependent property is

the identity of a nucleotide or the number of nucleotides in the polynucleotide."

*Id.*, claims 8 and 9.   Accordingly, to the extent that the preamble is limiting,

Akeson discloses, a "method for sequencing a nucleic acid template," as recited by

the preamble of claim 1.

Claim 1[a].  "providing a substrate having an upper solution above the

substrate and a lower solution below the substrate, the substrate comprising a

nanopore connecting the upper solution and lower solution,"

75.    As shown in Figure 2A, Akeson discloses a nanopore device that

includes "two adjacent pools [that] are located on the cis side and the trans side of

the nanopore device 12 a," where "cis" refers to "the side of a nanopore aperture

through which a polymer enters the pore," and "trans" refers to "the side of a

nanopore aperture through which a polymer [] exits the pore."   Ex. 1004, ¶¶

[0014]-[0015], [0041]; *see also id.*, Figure 2A-2D.  As disclosed in the '056 patent,

the terms "cis" and "upper" are used interchangeably and the terms "trans" and

"lower" are used interchangeably.  Ex. 1001, 8:25-29, 35:51-59, and Figure 11.

Akeson further discloses that the device includes "at least one nanopore aperture

37

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

24 … so dimensioned as to allow sequential monomer-by-monomer translocation
(*i.e.*, passage) from one pool to another of only one polynucleotide at a time."  Ex.
1004, ¶ [0041].



FIG. 1     FIG. 2A

FIG. 2B     FIG. 2C     FIG. 2D

*Id.*, Figures 1 and 2A-2D.

Claim 1[b].  "the nanopore sized to pass a single strand of a nucleic acid;"

76.    Akeson discloses that the aperture of the nanopore "may be
dimensioned so that only a single stranded polynucleotide can pass through the
nanopore aperture."  *Id.*, ¶ [0043].

Claim 1[c].  "providing a voltage across the nanopore to produce a
measurable current flow through the nanopore;"

38

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

77.    Akeson discloses that a "voltage difference can be imposed across the barrier between the pools using appropriate electronic equipment." *Id.*, ¶ [0058]. Akeson further discloses that electrodes associated with the device can be used to detect "ionic current differences across the two pools." *Id.*, ¶ [0042].

Claim 1[d].  "controlling the rate of translocation of a single stranded portion of the nucleic acid template through the nanopore with a translocating enzyme that is associated with the nucleic acid template under reaction conditions"

78.    Akeson discloses that the nanopore device includes "a nanopore aperture and a molecular motor that is capable of moving a target polynucleotide with respect to the nanopore, *e.g.*, at a specified rate." *Id.*, ¶ [0008].  Akeson further discloses that the molecular motor provides "a mechanism for controlling the rate [] of movement of the polynucleotide of interest with respect to a nanopore aperture," and can selectively interact and act upon a single stranded polynucleotide. *Id.*, ¶ [0019].

Claim 1[e].  "whereby the translocating enzyme and the reaction conditions are selected such that the translocating enzyme exhibits two kinetic steps herein each of the kinetic steps has a rate constant and the ratio of the rate constants of the kinetic steps is from 10:1 to 1:10;

79.    Akeson discloses that the molecular motor can be "a DNA polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase," and

39

that "the intrinsic rate of movement of a particular molecular motor may be modified, *e.g.*, by chemical modification of the motor, by changes in temperature, pH, ionic strength, the presence of necessary cofactors, substrates, inhibitors, agonists, or antagonists, by the nature of the medium (*e.g.*, the presence of nonaqueous solvents or the viscosity), by external fields (*e.g.*, electric or magnetic fields), and hydrodynamic pressure." *Id.*, ¶¶ [0009], [0013], [0083] and claim 3. Akeson further discloses that such modifications of the intrinsic rate of the molecular motor can be used to "start, stop, increase, decrease, or stabilize the rate of movement" of the polynucleotide. *Id.*, ¶ [0083].

80.    Akeson also notes that when a DNA polymerase is employed as the molecular motor, the desirable translocation rate of the polymerase is 75-1500 Hz. *Id.*, [0082]. When a helicase is employed, the desirable translocation rate is between 50-1500 Hz. *Id.* For a polymerase or helicase to achieve 75 Hz (cycles per second)[3], it would necessarily include at least one pair (and likely many more) of kinetic steps with rates falling within ratios of 1:10 to 10:1. For example, 75 Hz converts to $1.3 \times 10^{-2}$ seconds (1/75) for each cycle of the polymerase or helicase. Figure 32 of the '056 patent, for example, indicates that there are six kinetic steps

---

[3] *See* https://www.merriam-webster.com/dictionary/hertz, accessed September 13, 2018.

40

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

for each cycle of a polymerase, and each cycle allowing for the polymerase to translocate past a single nucleotide.  Ex. 1001, 26:4-11.  Figure 32 of the '056 patent also indicated that each kinetic step can be characterized as having a forward reaction step and reverse reaction step, where each forward and reverse reaction step can be represented by a rate.  *Id.*, 25:35-38.  During a single cycle of a polymerase, the polymerase will proceed, at minimum, through the forward reactions steps, and each of the forward reactions steps will contribute to the kinetics of a cycle of the polymerase.  Thus, the sum of the duration for each of the six forward steps in a single cycle must amount to no greater than $1.3 \times 10^{-2}$ seconds (*i.e.*, 13 milliseconds).

81.    For the polymerases disclosed in Akeson that cycle every 13 milliseconds to not inherently disclose the instant claim element (*i.e.*, where all of the individual rates of the polymerase be more than a factor of 10 larger or smaller from each other), some of the steps would necessarily have extraordinarily fast rates.  For example, the rates for the individual kinetic steps disclosed in Figure 32 of the '056 patent would, at their nearest to each other, have to be: $1.2 \times 10^{-2}$ seconds per cycle; $1.2 \times 10^{-3}$ seconds per cycle; $1.2 \times 10^{-4}$ seconds per cycle; $1.2 \times 10^{-5}$ seconds per cycle; $1.2 \times 10^{-6}$ seconds per cycle; $1.2 \times 10^{-7}$ seconds per cycle, to complete a single cycle within 13 milliseconds and maintain an order of magnitude (*i.e.*, a factor of 10 difference) between the rate constant of each step.  This would

41

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

require one of the rates of a kinetic step to be 1.2 microseconds and the fastest rate of one of the kinetic steps being 120 nanoseconds. Certain helicases explicitly disclosed in Akeson, *e.g.*, *E. coli* T7 helicase, also have six forward and thus would require the same "nearest" rates to fall outside the ratio range of 1:10 to 10:1. Ex. 1006, Scheme 2 (461).

$$E \leftrightarrow T^* \leftrightarrow N \cdot T^* \leftrightarrow N \cdot T \leftrightarrow DP \leftrightarrow D \leftrightarrow E \qquad (2)$$

*Id.*

82.    That a polymerase or helicase would exhibit individual forward rates at least an order of magnitude apart from each other while still completing a single cycle within 13 milliseconds is scientifically not credible, as there are no known examples of such enzymes. Moreover, to the extent that Akeson's disclosure of the desirability of enzymes cycling at 1500 Hz is used as the base of the calculation, the ability to maintain the claimed order of magnitude separation between all twelve forward and reverse kinetic steps of a polymerase or helicase becomes even more untenable. As noted in Section VI.B, above, this issue was addressed during the prosecution of the '191 application, where Pacific Biosciences amended its claims to refer to specific steps having the order of magnitude difference, rather than any two steps, in order to overcome Hanzel and Bakhtina.

42

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

83.     As was the case with Hanzel and Bakhtina, in the context of the '191 application, the individual kinetic steps of the polymerases and helicases disclosed in Akeson were known to have rates that are orders of magnitude nearer to each other than what would have been required to fall outside of the claimed ratios.  Ex. 1005, Tables 6 and 7 (34), and Ex. 1006, Table 1 (457).  Thus, Akeson teaches the selection of conditions and enzymes that would achieve the claimed ratios of rates.

Claim 1[f].  "measuring the current through the nanopore over time as the nucleic acid template is translated through the nanopore; and determining the sequence of a portion of the nucleic acid template as it translates through the nanopore using the measured current over time."

84.     Akeson discloses the monitoring of current changes across the nanopore aperture, which correspond "to the movement of the target polynucleotide with respect to the nanopore aperture" to determine "the number and composition of monomers that make up each individual polynucleotide, in sequential order."  Ex. 1004, ¶¶ [0009] and [0079]; *see also id.*, claim 1 and ¶ [0040].  Akeson further discloses methods for "measuring a monomer-dependent characteristic of the target polynucleotide while the target polynucleotide moves with respect to the nanopore aperture," where "the monomer dependent property is the identity of a nucleotide or the number of nucleotides in the polynucleotide." *Id.*, claims 8 and 9.  Given that Akeson teaches, as outlined above, each and every

43

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

limitation of the instant claim, expressly or inherently, it renders this claim invalid as anticipated.

### 2.    Claim 2

"The method of claim 1 wherein the translocating enzyme comprises a DNA polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase."

85.    As explained above with reference to claim element 1[e] (*supra* Section X.A.1), Akeson discloses a molecular motor, *i.e.*, a translocating enzyme, that can be "a DNA polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase." *Id.*, claim 3, ¶¶ [0013] and [0047]. Given that Akeson teaches, as outlined above, each and every limitation of the instant claim, expressly or inherently, it renders this claim invalid as anticipated.

### 3.    Claim 3

"The method of claim 1 wherein the translocating enzyme comprises a DNA helicase or an RNA helicase."

86.    As explained above with reference to claim element 1[e] (*supra* Section X.A.1), Akeson discloses a molecular motor, *i.e.*, a translocating enzyme, that can be an "*E-coli* bacteriophage T7 gp4 [] gene protein[]" (*i.e.*, a bacteriophage T7 DNA helicase). *Id.*, ¶ [0051]. Given that Akeson teaches, as outlined above, each and every limitation of the instant claim, expressly or inherently, it renders this claim invalid as anticipated.

44

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

4.     **Claim 4**

"The method of claim 1 wherein the translocating enzyme comprises phi29

DNA polymerase, T7 DNA polymerase, T4 DNA polymerase, *E. coli* DNA pol 1,

Klenow fragment, T7 RNA polymerase, or *E. coli* RNA polymerase."

87.    As explained above with reference to claim element 1[e] (*supra*

Section X.A.1) Akeson discloses that the molecular motor, *i.e.*, a translocating

enzyme, that can be "a DNA polymerase, a RNA polymerase, a ribosome, an

exonuclease, or a helicase." *Id.*, claim 3, ¶¶ [0013] and [0047].  Akeson further

discloses that exemplary DNA polymerases include "*E. coli* DNA polymerase I, *E.

coli* DNA polymerase I Large Fragment (Klenow fragment), phage T7 DNA

polymerase [and] Phi-29 DNA polymerase."  *Id.*, ¶ [0048]; *see also id.*, claim 4.

Akeson also discloses that exemplary RNA polymerases include "T7 RNA

polymerase … and *E. coli* RNA polymerases." *Id.*, ¶ [0049].  Given that Akeson

teaches, as outlined above, each and every limitation of the instant claim, expressly

or inherently, it renders this claim invalid as anticipated.

5.     **Claim 5**

"The method of claim 1 wherein the translocating enzyme comprises a viral

genome packaging motor or an ATP-dependent chromatin remodeling complex."

88.    Claim 5 identifies two specific subtypes of translocating enzyme: (1)

"a viral genome packaging motor"; and (2) "an ATP-dependent chromatin

45

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

remodeling complex."  As outlined in Section VIII, above, the broadest reasonable

construction for viral genome packaging motor is "a viral protein or complex of

proteins having the functions of associating with a viral capsid and translocating

viral DNA into a capsid shell."  As also outlined in Section VIII, above, the

broadest reasonable construction for ATP-dependent chromatin remodeling

complex is "a protein or complex of proteins having the function of coupling ATP

hydrolysis to nucleosome translocation."   To the extent, however, that these terms

are construed to encompass motors capable of simply translocating on a nucleic

acid, such motors (*i.e.*, helicases) are explicitly disclosed in Akeson.  *Id.*, ¶ [0051].

Thus, under such a construction, Akeson teaches, as outlined above, each and

every limitation of the instant claim, expressly or inherently, it renders this claim

invalid as anticipated.

### 6.    Claim 10

"The method of claim 1 wherein the reaction conditions comprise one or

more of metal cofactor concentration, pH, temperature, an enzyme activity

modulator, $D_2O$, an organic solvent, and buffer."

89.    Akeson discloses that the "medium disposed in the pools on either

side of the substrate 22 [*i.e.*, nanopore] may be any fluid that permits adequate

polynucleotide mobility for substrate interaction."  *Id.*, ¶ [0058].  Akeson further

discloses that the medium, *i.e.*, buffer, can be an electrically conductive medium,

46

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

which "generally contain[s] ions as the current-conducting agents (*e.g.*, sodium, potassium, chloride, calcium, magnesium, cesium, barium, sulfate, or phosphate)." *Id.*  Given that Akeson teaches, as outlined above, each and every limitation of the instant claim, expressly or inherently, it renders this claim invalid as anticipated.

### 7.    Claim 11

"The method of claim 1 wherein the nucleic acid template comprises DNA."

90.    Akeson discloses the analysis of a polynucleotide sequence, where the polynucleotide is DNA.  *Id.*, ¶¶ [0017] and [0043].  Given that Akeson teaches, as outlined above, each and every limitation of the instant claim, expressly or inherently, it renders this claim invalid as anticipated.

### 8.    Claim 12

"The method of claim 1 wherein the substrate comprises an array of nanopores."

91.    Akeson also discloses that the structure of the nanopore device can include "one or more nanopore apertures."  *Id.*, ¶ [0043].  Given that Akeson teaches, as outlined above, each and every limitation of the instant claim, expressly or inherently, it renders this claim invalid as anticipated.

### 9.    Claim 15

"The method of claim 1 wherein the nanopore comprises a solid state nanopore."

47

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

92.     Akeson also discloses that the "nanopores may be biological, *e.g.*,

proteinaceous, or solid-state." *Id.*, ¶ [0044].   Given that Akeson teaches, as

outlined above, each and every limitation of the instant claim, expressly or

inherently, it renders this claim invalid as anticipated.

### 10.   Claim 16

"The method of claim 1 wherein the nanopore comprises a protein nanopore

in a lipid bilayer membrane."

93.     Akeson also discloses that nanopores, *e.g.*, protein nanopores such as

α-hemolysin, can be "established in [] lipid bilayers." *Id.*, ¶ [0096].  Given that

Akeson teaches, as outlined above, each and every limitation of the instant claim,

expressly or inherently, it renders this claim invalid as anticipated.

### B.   Ground 2: Claims 1-2, 4 and 8-16 are obvious over Akeson and Hanzel

#### 1.   A POSA would have been motivated to combine Akeson and Hanzel

94.     Akeson discloses nanopore systems for sequencing DNA that include

the use of a molecular motor to control the rate of DNA translocation through the

nanopore.  In particular, Akeson teaches that "the intrinsic rate of movement of a

particular molecular motor may be modified, *e.g.*, by chemical modification of the

motor … to start, stop, increase, decrease, or stabilize the rate of movement of a

polynucleotide."  Ex. 1004, ¶ [0083].  By disclosing that the intrinsic rate, *i.e.*,

48

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

kinetic behavior, of molecular motors can be manipulated by chemical modification, and that those modifications can be tailored to influence kinetics, *i.e.*, to start, stop, increase, decrease, or stabilize the rate of movement of a polynucleotide, Akeson frames the issue to be solved, *i.e.*, the modification of molecular motors' kinetic steps to influence their kinetic behavior.

95.    Hanzel provides a solution to the issue identified by Akeson by expressly identifying polymerases that have been modified to alter their kinetic behavior.    In particular, Hanzel discloses polymerases for use in sequencing applications that exhibit modified activity, which can include slowing "the overall nucleotide incorporation speed of the polymerase."  Ex. 1005, ¶ [0092].  A POSA performing a method for sequencing DNA according to Akeson would have been motivated to use the polymerases disclosed in Hanzel because Akeson identifies the applicability of the very type of modified molecular motor taught by Hanzel. In particular, Akeson discloses that the molecular motor can be a Phi29 polymerase and Hanzel discloses modified Phi29 polymerases.  Ex. 1004, ¶ [0048]; Ex. 1005, ¶¶ [0184], [0186]-[0187].    Further, Hanzel uses reaction conditions that are compatible with the reaction conditions disclosed in Akeson.   Indeed, Hanzel expressly discloses the modification of the kinetic behavior of molecular motors, *e.g.*, polymerases, that are specifically taught by Akeson.   In addition, Hanzel expressly identifies the parameters necessary, including reaction conditions, to

49

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

modify the intrinsic rate of the molecular motor to achieve the claimed ratios of rate constants, which would alter the rate of translocation of the DNA through the nanopore as required by Akeson.

### 2. Claim 1

Claim 1[pre].   "A method for sequencing a nucleic acid template comprising:"

96.   Akeson discloses methods for the "analysis of a polynucleotide sequence" to identify the "number and composition of monomers that make up each individual polynucleotide, in sequential order."   Ex. 1004, ¶¶ [0019] and [0079].   Akeson further discloses methods for "measuring a monomer-dependent characteristic of the target polynucleotide while the target polynucleotide moves with respect to the nanopore aperture," where "the monomer dependent property is the identity of a nucleotide or the number of nucleotides in the polynucleotide." *Id.*, claims 8 and 9.   Accordingly, to the extent that the preamble is limiting, Akeson and thus the combination of Akeson and Hanzel discloses, a "method for sequencing a nucleic acid template," as recited by the preamble of claim 1.

Claim 1[a].   "providing a substrate having an upper solution above the substrate and a lower solution below the substrate, the substrate comprising a nanopore connecting the upper solution and lower solution,"

50

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

97.    Akeson discloses a nanopore device that includes "two adjacent pools [that] are located on the cis side and the trans side of the nanopore device 12 a," where "cis" refers to "the side of a nanopore aperture through which a polymer enters the pore," and "trans" refers to "the side of a nanopore aperture through which a polymer [] exits the pore."  *Id.*, ¶¶ [0014]-[0015], [0041]; *see also id.*, Figure 2A-2D.  As disclosed in the '056 patent, the terms "cis" and "upper" are used interchangeably and the terms "trans" and "lower" are used interchangeably. Ex. 1001, 8:25-29, 35:51-59 and Figure 11.  Akeson further discloses that the device includes "at least one nanopore aperture 24 … so dimensioned as to allow sequential monomer-by-monomer translocation (*i.e.*, passage) from one pool to another of only one polynucleotide at a time."  Ex. 1004, ¶ [0041].

51

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056



*Id.*, Figures 1 and 2A-2D.

Claim 1[b].  "the nanopore sized to pass a single strand of a nucleic acid;"

98.    Akeson discloses that the aperture of the nanopore "may be dimensioned so that only a single stranded polynucleotide can pass through the nanopore aperture." *Id.*, ¶ [0043].

Claim 1[c].  "providing a voltage across the nanopore to produce a measurable current flow through the nanopore;"

99.    Akeson discloses that a "voltage difference can be imposed across the barrier between the pools using appropriate electronic equipment." *Id.*, ¶ [0058].

52

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

Akeson further discloses that electrodes associated with the device can be used to detect "ionic current differences across the two pools." *Id.*, ¶ [0042].

Claim 1[d].  "controlling the rate of translocation of a single stranded portion of the nucleic acid template through the nanopore with a translocating enzyme that is associated with the nucleic acid template under reaction conditions"

100.  Akeson discloses that the nanopore device includes "a nanopore aperture and a molecular motor that is capable of moving a target polynucleotide with respect to the nanopore, *e.g.*, at a specified rate." *Id.*, ¶ [0008].  Akeson further discloses that the molecular motor provides "a mechanism for controlling the rate [] of movement of the polynucleotide of interest with respect to a nanopore aperture," and can selectively interact and act upon a single stranded polynucleotide. *Id.*, ¶ [0019].  Akeson and Hanzel also disclose cross-compatible reaction conditions. *Id.*, ¶ [0058]; Ex. 1005, ¶ [0114].

Claim 1[e].  "whereby the translocating enzyme and the reaction conditions are selected such that the translocating enzyme exhibits two kinetic steps herein each of the kinetic steps has a rate constant and the ratio of the rate constants of the kinetic steps is from 10:1 to 1:10;

101.  Akeson discloses that the molecular motor can be "a DNA polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase." Ex. 1004, claim 3, ¶ [0013].  In particular, Akeson discloses that the DNA polymerase

53

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

can be a "Phi-29 DNA polymerase." *Id.*, claim 4, ¶¶ [0013], [0048]. Akeson also discloses that "the intrinsic rate of movement of a particular molecular motor may be modified, *e.g.*, by chemical modification of the motor, by changes in temperature, pH, ionic strength, the presence of necessary cofactors, substrates, inhibitors, agonists, or antagonists, by the nature of the medium (*e.g.*, the presence of nonaqueous solvents or the viscosity), by external fields (*e.g.*, electric or magnetic fields), and hydrodynamic pressure." *Id.*, ¶¶ [0009], [0013], [0083] and claim 3. Akeson discloses that such modifications of the intrinsic rate of the molecular motor can be used to "start, stop, increase, decrease, or stabilize the rate of movement" of the polynucleotide. *Id.*, ¶ [0083]. Further, Hanzel discloses modified DNA polymerases for use in sequencing applications, where the polymerases exhibit two kinetic steps that have rates that when compared have a ratio that falls within the ratio range of 1:10 to 10:1.

102.   Hanzel discloses polymerases, *e.g.*, Phi29 DNA polymerase, that have been modified to alter their kinetic properties. In particular, Hanzel discloses that the polymerase can be modified "to slow [] the overall nucleotide incorporation speed of the polymerase." Ex. 1005, ¶ [0092]. Hanzel discloses the rates of specific kinetic steps, *e.g.*, the rates of product release and branching, for modified Phi29 DNA polymerases, *e.g.*, recombinant Phi29 DNA polymerases. *Id.*, ¶¶ [0184], [0186]-[0187] and Tables 6 and 7. The product release rate disclosed in

54

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

Hanzel is equivalent to step 112 ($k_5$) of Figure 32 of the '056 patent and the branching rate, which is the nucleotide dissociation rate, is equivalent to step 104 ($k_{-1}$) of Figure 32 of the '056 patent.

103.   Hanzel discloses the branching rate and the product release rate of a Phi29 polymerase that has a N62D mutation ("N62D") as 90 $s^{-1}$ and 55 $s^{-1}$, respectfully, which results in ratios of 1.64 (90 $s^{-1}$/55 $s^{-1}$) and 0.61 (55 $s^{-1}$/90 $s^{-1}$). *Id.*, Tables 6 and 7.  Hanzel further discloses the branching rate and the product release rate of a Phi29 polymerase that has the N62D and E375Y[4] mutations ("N62D:E375Y") as 31 $s^{-1}$ and 117 $s^{-1}$, respectfully, which results in in ratios of 0.26 (31 $s^{-1}$/117 $s^{-1}$) and 3.77 (117 $s^{-1}$/31 $s^{-1}$).  *Id.*  Hanzel further discloses the

---

[4] The '056 patent states that a "modified polymerase (*e.g.*, a modified recombinant Φ29-type DNA polymerase for example, a modified recombinant Φ29 … polymerase) that exhibits one or more slow steps optionally includes a mutation (*e.g.*, an amino acid substitution or insertion) at one or more positions … 372-397 …. For example, relative to wild-type Φ29 a modified recombinant polymerase can include at least one amino acid substitution or combination of substitutions selected from the group consisting of: … E375Y."  Ex. 1001, 29:30-67.  The '056 patent further states that the polymerase "can also include an N62D substitution." *Id.*, 32:2-3.

55

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

branching rate and the product release rate of a Phi29 polymerase that has the

N62D and E375W mutations ("N62D:E375W") as 43 s$^{-1}$ and 76 s$^{-1}$, respectfully,

which results in in ratios of 0.57 (43 s$^{-1}$/76 s$^{-1}$) and 1.77 (76 s$^{-1}$/43 s$^{-1}$).  *Id.*  Each of

the calculated ratios (branching rate to product release rate), *i.e.*, 1.64, 0.61, 0.26,

3.77, 0.57 and 1.77, fall within the claimed range of 1:10 to 10:1 (*i.e.*, 0.1 to 10.0).

TABLE 6

| Product release rate | |
| --- | --- |
| Enzyme | Product Release Rate |
| N62D | 55 s$^{-1}$ |
| N62D:E375Y | 117 s$^{-1}$ |
| N62D:E375W | 76 s$^{-1}$ |

*Id.*, Table 6 (page 34).

TABLE 7

| Branching rate. | |
| --- | --- |
| Enzyme | Branching Rate |
| N62D | 90 s$^{-1}$ |
| N62D:E375Y | 31 s$^{-1}$ |
| N62D:E375W | 43 s$^{-1}$ |

*Id.*, Table 7 (page 34).

Claim 1[f].  "measuring the current through the nanopore over time as the

nucleic acid template is translated through the nanopore; and determining the

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

sequence of a portion of the nucleic acid template as it translates through the
nanopore using the measured current over time."

104.  Akeson discloses the monitoring of current changes across the
nanopore aperture, which correspond "to the movement of the target
polynucleotide with respect to the nanopore aperture" to determine "the number
and composition of monomers that make up each individual polynucleotide, in
sequential order."  Ex. 1004, ¶¶ [0009] and [0079]; *see also id.*, claim 1 and ¶
[0040].  Akeson further discloses methods for "measuring a monomer-dependent
characteristic of the target polynucleotide while the target polynucleotide moves
with respect to the nanopore aperture," where "the monomer dependent property is
the identity of a nucleotide or the number of nucleotides in the polynucleotide."
*Id.*, claims 8 and 9.  Given that a POSA would have been motivated, as described
above, to combine the teachings of Akeson and Hanzel and that the combination
discloses each of the elements of claim 1, the combination renders claim 1 obvious
under § 103.

### 3.    Claim 2

"The method of claim 1 wherein the translocating enzyme comprises a DNA
polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase."

105.  As explained above with reference to claim element 1[e] (*supra*
Section X.B.2), Akeson discloses a molecular motor, *i.e.*, a translocating enzyme,

57

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

that can be "a DNA polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase." Ex. 1004, claim 3, ¶¶ [0013] and [0047]. Further, Hanzel discloses modified DNA polymerases for use in sequencing applications, where the polymerases exhibit two kinetic steps that have rates that when compared have a ratio that falls within the ratio range of 1:10 to 10:1. Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Hanzel and that the resulting combination discloses each of the elements of claim 2, the combination renders claim 2 obvious under § 103.

4.    Claim 4

"The method of claim 1 wherein the translocating enzyme comprises phi29 DNA polymerase, T7 DNA polymerase, T4 DNA polymerase, *E. coli* DNA pol 1, Klenow fragment, T7 RNA polymerase, or *E. coli* RNA polymerase."

106.  As explained above with reference to claim element 1[e] (*supra* Section X.B.2), Akeson discloses that the molecular motor, *i.e.*, a translocating enzyme, that can be "a DNA polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase." Ex. 1004, claim 3, ¶¶ [0013] and [0047]. Akeson further discloses that exemplary DNA polymerases include "*E. coli* DNA polymerase I, *E. coli* DNA polymerase I Large Fragment (Klenow fragment), phage T7 DNA polymerase, [and] Phi-29 DNA polymerase." *Id.*, ¶ [0048]; *see also id.*, claim 4.  Akeson also discloses that exemplary RNA polymerases include

58

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

"T7 RNA polymerase … and *E. coli* RNA polymerases." *Id.*, ¶ [0049].  Similarly,

Hanzel, which discloses modified DNA polymerases, provides examples of DNA

polymerases that can be modified, which include a "Φ29 DNA polymerase or

mutant thereof, [] a DNA Pol I polymerase, a T7 polymerase, [] or a polymerase

corresponding to a Klenow fragment of a DNA Pol I polymerase."  Ex. 1005, ¶

[0011].  Hanzel further discloses modified Phi29 DNA polymerases that exhibit

two kinetic steps that have a ratio that falls within the ratio range of 1:10 to 10:1

(*supra* Section VII.B.2).  Given that, as described above, one of skill in the art

would have been motivated to combine the teachings of Akeson and Hanzel and

that the resulting combination discloses each of the elements of claim 4, the

combination renders claim 4 obvious under § 103.

### 5.    Claim 8

"The method of claim 1 wherein the rate for one of the kinetic steps is less
than 100 per second."

107.  As explained above with reference to claim element 1[e] (*supra*

Section X.B.2), Hanzel discloses the product release rates for N62D and

N62D:E375W as 55 $s^{-1}$ and 76 $s^{-1}$, respectively, which are both less than 100 $s^{-1}$.

Ex. 1005, Tables 6 and 7.  Hanzel further discloses that the branching rates for

N62D, N62D:E375Y and N62D:E375W are 90 $s^{-1}$, 31 $s^{-1}$ and 43 $s^{-1}$, respectively,

which are all less than 100 $s^{-1}$.  *Id.*  Accordingly, Hanzel discloses kinetic steps that

Oxford, Exh. 1002, p. 64

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

have rates less than 100 s$^{-1}$.  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Hanzel and that the resulting combination discloses each of the elements of claim 8, the combination renders claim 8 obvious under § 103.

### 6.    Claim 9

"The method of claim 1 wherein the rate for one of the kinetic steps is between 0.5 per second and 60 per second."

108.  As explained above with reference to claim element 1[e] (*supra* Section X.B.2), Hanzel discloses that the product release rate for N62D is 55 s$^{-1}$, and the branching rates for N62D:E375Y and N62D:E375W are 31 s$^{-1}$ and 43 s$^{-1}$, respectively, which are all between 0.5 per second and 60 per second.  Ex. 1005, Tables 6 and 7.  Accordingly, Hanzel discloses kinetic steps that have rates between 0.5 per second and 60 per second.  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Hanzel and that the resulting combination discloses each of the elements of claim 9, the combination renders claim 9 obvious under § 103.

### 7.    Claim 10

"The method of claim 1 wherein the reaction conditions comprise one or more of metal cofactor concentration, pH, temperature, an enzyme activity modulator, D$_2$O, an organic solvent and buffer."

60

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

109.   Akeson discloses that the "medium disposed in the pools on either side of the substrate 22 [*i.e.*, nanopore] may be any fluid that permits adequate polynucleotide mobility for substrate interaction."  Ex. 1004, ¶ [0058].  Akeson further discloses that the medium, *i.e.*, buffer, can be an electrically conductive medium, which "generally contain[s] ions as the current-conducting agents (*e.g.*, sodium, potassium, chloride, calcium, magnesium, cesium, barium, sulfate, or phosphate)."  *Id.*  Similarly, Hanzel discloses buffer solutions and salt solutions for use with the modified polymerases that include ions such as "divalent metal ions, *i.e.*, $Mg^{++}$, $Mn^{++}$ and/or $Fe^{++}$."  Ex. 1005, ¶ [0114].  Accordingly, both Hanzel and Akeson disclose buffers that contain similar components, such as divalent metal ions, *e.g.*, magnesium.  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Hanzel and that the resulting combination discloses each of the elements of claim 10, the combination renders claim 10 obvious under § 103.

### 8.   Claim 11

<u>"The method of claim 1 wherein the nucleic acid template comprises DNA."</u>

110.   Akeson discloses the analysis of a polynucleotide sequence, where the polynucleotide is DNA.  Ex. 1004, ¶¶ [0017] and [0043].  Hanzel discloses DNA polymerases.  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Hanzel and that the

Oxford, Exh. 1002, p. 66

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

resulting combination discloses each of the elements of claim 11, the combination

renders claim 11 obvious under § 103.

### 9.    Claim 12

"The method of claim 1 wherein the substrate comprises an array of

nanopores."

111.   Akeson also discloses that the structure of the nanopore device can

include "one or more nanopore apertures." *Id.*, ¶ [0043].  Given that, as described

above, one of skill in the art would have been motivated to combine the teachings

of Akeson and Hanzel and that the resulting combination discloses each of the

elements of claim 12, the combination renders claim 12 obvious under § 103.

### 10.    Claims 13 and 14

Claim 13.  "The method of claim 1 wherein the ratio of the rate constants is

from 1:5 and 5:1."

Claim 14.  "The method of claim 1 wherein the ratio of the rate constants is

from 1:2 and 2:1."

112.   As explained above with reference to claim element 1[e] (*supra*

Section X.B.2), Hanzel discloses modified Phi29 DNA polymerases that have

specific branching and product release rates.  Hanzel discloses the branching rates

and product release rates of N62D, N62D:E375Y and N62D:E375W that result in

branching rate to product release rate ratios of 1.64 (or 0.61), 0.26 (or 3.77) and

Oxford, Exh. 1002, p. 67

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

0.57 (or 1.77), respectfully.  *See supra* Section X.B.2.  Each of the calculated ratios, *i.e.*, 1.64 (or 0.61), 0.26 (or 3.77) and 0.57 (or 1.77), fall within the claimed ratio range of 1:5 to 5:1 (*i.e.*, 0.2 to 5.0) and the calculated ratios of 1.64 (or 0.61) and 0.57 (or 1.77) fall within the claimed ratio range of 1:2 to 2:1 (*i.e.*, 0.5 to 2.0). Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Hanzel and that the resulting combination discloses each of the elements of claims 13 and 14, the combination renders claim 13 and 14 obvious under § 103.

### 11.    Claim 15

"The method of claim 1 wherein the nanopore comprises a solid state nanopore."

113.  Akeson also discloses that the "nanopores may be biological, *e.g.*, proteinaceous, or solid-state."  Ex. 1004, ¶ [0044].  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Hanzel and that the resulting combination discloses each of the elements of claim 15, the combination renders claim 15 obvious under § 103.

### 12.    Claim 16

"The method of claim 1 wherein the nanopore comprises a protein nanopore in a lipid bilayer membrane."

Oxford, Exh. 1002, p. 68

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

114.   Akeson also discloses that nanopores, *e.g.*, protein nanopores such as α-hemolysin, can be "established in [] lipid bilayers." *Id.*, ¶ [0096].  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Hanzel and that the resulting combination discloses each of the elements of claim 16, the combination renders claim 16 obvious under § 103.

## C.    Ground 3: Claims 1-3 and 5-16 are obvious over Akeson and Liao

### 1.    A POSA would have been motivated to combine Akeson and Liao

115.   Akeson discloses nanopore systems for sequencing DNA that include the use of a molecular motor to control the rate of DNA translocation through the nanopore.  Akeson discloses a molecular motor, *i.e.*, a translocating enzyme, that can be "a helicase." Ex. 1004, claim 3 and ¶ [0047].   In particular, Akeson discloses that the helicase can be "*E-coli* bacteriophage T7 gp4 and T4 gp41 gene proteins, and the *E. coli* proteins DnaB, RuvB, and rho." *Id.*, ¶ [0051], claim 7. Liao discloses the kinetic analysis of the bacteriophage T7 gene 4 helicase, which is specifically identified by Akeson as an example of a helicase that can be used as a molecular motor in nanopore sequencing.  Liao further discloses that the T7 helicase translocates along DNA at a rate of 130 nt (bp)/second (Ex. 1006, 452), which falls within the 50-1500 Hz range identified in Akeson as desirable when

64

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

using a helicase for nanopore sequencing. Ex. 1004, ¶ [0082]. Based on the express teachings in Akeson, a POSA performing a method for sequencing DNA according to Akeson would therefore have been motivated to use the helicase disclosed in Liao to control the rate of translocation of the DNA through the nanopore.

### 2.   Claim 1

Claim 1[pre].   "A method for sequencing a nucleic acid template comprising:"

116.   Akeson discloses the "analysis of a polynucleotide sequence" to identify the "number and composition of monomers that make up each individual polynucleotide, in sequential order." Ex. 1004, ¶¶ [0019] and [0079].   Akeson further discloses methods for "measuring a monomer-dependent characteristic of the target polynucleotide while the target polynucleotide moves with respect to the nanopore aperture," where "the monomer dependent property is the identity of a nucleotide or the number of nucleotides in the polynucleotide." *Id.*, claims 8 and 9.   Accordingly, to the extent that the preamble is limiting, Akeson, and thus the combination of Akeson and Liao discloses, a "method for sequencing a nucleic acid template," as recited by the preamble of claim 1.

Oxford, Exh. 1002, p. 70

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

Claim 1[a].   "providing a substrate having an upper solution above the substrate and a lower solution below the substrate, the substrate comprising a nanopore connecting the upper solution and lower solution,"

117.   Akeson discloses a nanopore device that includes "two adjacent pools [that] are located on the cis side and the trans side of the nanopore device 12 a," where "cis" refers to "the side of a nanopore aperture through which a polymer enters the pore" and "trans" refers to "the side of a nanopore aperture through which a polymer [] exits the pore."  *Id.*, ¶¶ [0014]-[0015], [0041]; *see also id.*, Figure 2A-2D, provided above.  As disclosed in the '056 patent, the terms "cis" and "upper" are used interchangeably and the terms "trans" and "lower" are used interchangeably.   Ex. 1001, 8:25-29, 35:51-59, and Figure 11.  Akeson further discloses that the device includes "at least one nanopore aperture 24 … so dimensioned as to allow sequential monomer-by-monomer translocation (*i.e.*, passage) from one pool to another of only one polynucleotide at a time."  Ex. 1004, ¶ [0041].

Claim 1[b].  "the nanopore sized to pass a single strand of a nucleic acid;"

118.   Akeson discloses that the aperture of the nanopore "may be dimensioned so that only a single stranded polynucleotide can pass through the nanopore aperture."  *Id.*, ¶ [0043].

66

Oxford, Exh. 1002, p. 71

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

Claim 1[c].   "providing a voltage across the nanopore to produce a measurable current flow through the nanopore;"

119.   Akeson discloses that a "voltage difference can be imposed across the barrier between the pools using appropriate electronic equipment." *Id.*, ¶ [0058]. Akeson further discloses that electrodes associated with the device can be used to detect "ionic current differences across the two pools." *Id.*, ¶ [0042].

Claim 1[d].  "controlling the rate of translocation of a single stranded portion of the nucleic acid template through the nanopore with a translocating enzyme that is associated with the nucleic acid template under reaction conditions"

120.   Akeson discloses that the nanopore device includes "a nanopore aperture and a molecular motor that is capable of moving a target polynucleotide with respect to the nanopore, *e.g.*, at a specified rate." *Id.*, ¶ [0008].   Akeson further discloses that the molecular motor provides "a mechanism for controlling the rate [] of movement of the polynucleotide of interest with respect to a nanopore aperture," and can selectively interact and act upon a single-stranded polynucleotide.  *Id.*, ¶ [0019].   Akeson and Liao also disclose cross-compatible reaction conditions.  *Id.*, ¶ [0058]; Ex. 1006, 468.

Claim 1[e].  "whereby the translocating enzyme and the reaction conditions are selected such that the translocating enzyme exhibits two kinetic steps herein

67

each of the kinetic steps has a rate constant and the ratio of the rate constants of the

kinetic steps is from 10:1 to 1:10;

121.   Akeson discloses that the molecular motor can be "a DNA

polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase," and

that "the intrinsic rate of movement of a particular molecular motor may be

modified, *e.g.*, by chemical modification of the motor, by changes in temperature,

pH, ionic strength, the presence of necessary cofactors, substrates, inhibitors,

agonists, or antagonists, by the nature of the medium (*e.g.*, the presence of

nonaqueous solvents or the viscosity), by external fields (*e.g.*, electric or magnetic

fields), and hydrodynamic pressure."   Ex. 1004, ¶¶ [0009], [0013], [0083] and

claim 3.   Akeson discloses that such modifications of the intrinsic rate of the

molecular motor can be used to "start, stop, increase, decrease, or stabilize the rate

of movement of the polynucleotide." *Id.*, ¶ [0083].

122.   Akeson further discloses that the helicase can be the "*E-coli*

bacteriophage T7 gp4 and T4 gp41 gene proteins." *Id.*, ¶ [0051].   Liao discloses

the kinetic analysis of the bacteriophage T7 helicase.   Ex. 1006, Table 1 (457),

452.   As shown in Table 1 and discussed in Section VII.B.2 *supra*, Liao discloses

that the rate constant of the translocation step (*i.e.*, power stroke) is 778 s$^{-1}$, the rate

constant of P$_i$ release (*i.e.*, a first product release step) is 15 s$^{-1}$, the rate constant of

dTDP release (*i.e.*, a second product release step) is 159 s$^{-1}$ and the rate constant of

Oxford, Exh. 1002, p. 73

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

dTTP hydrolysis is 66 s$^{-1}$.  *Id.*  The ratios of the translocation rate constant and the

dTDP release rate constant are 0.2 (159 s$^{-1}$/778 s$^{-1}$) and 4.9 (778 s$^{-1}$/159 s$^{-1}$).  The

ratios of the dTTP hydrolysis rate constant and the P$_i$ release rate constant are 0.23

(15 s$^{-1}$/66 s$^{-1}$) and 4.4 (66 s$^{-1}$/15 s$^{-1}$).  The ratios of the dTDP release rate constant

and the dTTP hydrolysis rate constant are 0.42 (66 s$^{-1}$/159 s$^{-1}$) and 2.4 (159 s$^{-1}$/66 s$^{-1}$).  Each of the calculated ratios, *i.e.*, 0.2, 0.23, 0.42, 2.4, 4.4 and 4.9, fall within the

claimed range of 1:10 to 10:1 (*i.e.*, 0.1 to 10.0).  Additional ratios falling within the

claimed range are discussed in connection with Claims 6-7 and 13-14, below.

Claim 1[f].  "measuring the current through the nanopore over time as the
nucleic acid template is translated through the nanopore; and determining the
sequence of a portion of the nucleic acid template as it translates through the
nanopore using the measured current over time."

123.  Akeson discloses the monitoring of current changes across the

nanopore aperture, which correspond "to the movement of the target

polynucleotide with respect to the nanopore aperture" over time to determine "the

number and composition of monomers that make up each individual

polynucleotide, in sequential order."  Ex. 1004, ¶¶ [0009] and [0079]; *see also id.*,

claim 1 and ¶ [0040].  *See* also *id.*, ¶ [0079].  Akeson further discloses methods for

"measuring a monomer-dependent characteristic of the target polynucleotide while

the target polynucleotide moves with respect to the nanopore aperture," where "the

69

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

monomer dependent property is the identity of a nucleotide or the number of nucleotides in the polynucleotide." *Id.*, claims 8 and 9.  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Liao and that the resulting combination discloses each of the elements of claim 1, the combination renders claim 1 obvious under § 103.

### 3. Claim 2

"The method of claim 1 wherein the translocating enzyme comprises a DNA polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase."

124.   Akeson discloses a molecular motor, *i.e.*, a translocating enzyme, that can be "a helicase." *Id.*, claim 3 and ¶ [0047].  Akeson discloses that the helicase can be the "*E-coli* bacteriophage T7 gp4 and T4 gp41 gene proteins." *Id.*, ¶ [0051].  Liao discloses the kinetic analysis of the bacteriophage T7 helicase, where the helicase exhibits two kinetics steps that have rate constants that when compared result in a ratio that falls within the ratio range of 1:10 to 10:1.  Ex. 1006, Table 1 (457), 452; *see supra* Sections VII.B.2 and X.C.2.  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Liao and that the resulting combination discloses each of the elements of claim 2, the combination renders claim 2 obvious under § 103.

Oxford, Exh. 1002, p. 75

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

### 4.    Claim 3

<u>"The method of claim 1 wherein the translocating enzyme comprises a DNA</u>

<u>helicase or an RNA helicase."</u>

125.   Akeson discloses a molecular motor, *i.e.*, a translocating enzyme, that

can be "a helicase." Ex. 1004, claim 3 and ¶ [0047].   Akeson discloses that the

helicase can be the "*E-coli* bacteriophage T7 gp4 and T4 gp41 gene proteins." *Id.*,

¶ [0051].   Liao discloses the kinetic analysis of the bacteriophage T7 helicase,

where the helicase exhibits two kinetics steps that have rate constants that when

compared result in a ratio that falls within the ratio range of 1:10 to 10:1.   Ex.

1006, Table 1 (457), 452; *see supra* Sections VII.B.2 and X.C.2.   Given that, as

described above, one of skill in the art would have been motivated to combine the

teachings of Akeson and Liao and that the resulting combination discloses each of

the elements of claim 3, the combination renders claim 3 obvious under § 103.

### 5.    Claim 5

<u>"The method of claim 1 wherein the translocating enzyme comprises a viral</u>

<u>genome packaging motor or an ATP-dependent chromatin remodeling complex."</u>

126.   Claim 5 identifies two specific subtypes of translocating enzyme: (1)

"a viral genome packaging motor"; and (2) "an ATP-dependent chromatin

remodeling complex."   The broadest reasonable construction for viral genome

packaging motor is "a viral protein or complex of proteins having the functions of

71

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

associating with a viral capsid and translocating viral DNA into a capsid shell."
*See* Section VIII *supra*.  The broadest reasonable construction for ATP-dependent chromatin remodeling complex is "a protein or complex of proteins having the function of coupling ATP hydrolysis to nucleosome translocation."  *See* Section VIII *supra*.  To the extent, however, that these terms are construed to encompass motors capable of simply translocating on a nucleic acid, such motors (*i.e.*, helicases) are explicitly disclosed in Liao.  *See supra* Sections VII.B.2, X.C.1 and X.C.2.

127.   Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Liao and that the resulting combination discloses each of the elements of claim 5, should the claim be construed to encompass helicases, the combination renders claim 5 obvious under § 103.

### 6.    Claim 6

"The method of claim 1 wherein the two kinetic steps are selected from a group consisting of enzyme isomerization, nucleotide incorporation and product release."

128.   Claim 6 specifies that the two kinetic steps identified in claim 1 must be selected from following group of three possible steps: (1) "enzyme isomerization"; (2) "nucleotide incorporation"; and (3) "product release."  The

72

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

broadest reasonable construction for "enzyme isomerization" is "a step that involves a change in enzyme configuration." *See* Section VIII *supra*. The broadest reasonable construction for "product release" is "a step where a product is released from the enzyme." *See* Section VIII *supra*.

129. As noted in Section VII.B.2 *supra*, Scheme 1 and Table 1 of Liao outlines the kinetic steps associated with bacteriophage T7 helicase translocation. Ex. 1006, 460 and Table 1 (457). In this model, the translocation of the helicase along the polynucleotide occurs simultaneously with an enzyme isomerization (the "power stroke") driven by tight nucleotide binding. *Id.*, 461. Liao specifically states that dTTP binding can trigger "the alignment of the positive charge groups that constitute the 'arginine finger' with the negatively charged $\gamma$-phosphate of dTTP," resulting in the "relative rotation between neighboring subunits [] so that DNA contact residues rotate with it to translocate the DNA" or "dTTP binding directly deforms the local $\beta$-sheet structure" to result in DNA translocation. *Id.* This isomerization of the enzyme has a rate constant of 778 s$^{-1}$. *Id.*, Table 1 (457). Liao also notes that the release of dTDP, a product of the hydrolysis of dTTP, has a rate constant of 159 s$^{-1}$. *Id.* A POSA would understand that the release of dTDP is a product release step. Liao, therefore, discloses a helicase where the ratios of the rate constant associated with enzyme isomerization (*i.e.*, the power stroke) to the rate constant associated with product release (*i.e.*, dTDP release) are 0.2 (159 s$^{-}$

73

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

$^1$/778 s$^{-1}$) and 4.9 (778 s$^{-1}$/159 s$^{-1}$), which fall within the claimed ratios of 10:1 and

1:10 (*i.e.*, 0.1 to 10.0).  Given that, as described above, one of skill in the art would

have been motivated to combine the teachings of Akeson and Liao and that the

resulting combination discloses each of the elements of claim 6, the combination

renders claim 6 obvious under § 103.

### 7.    Claim 7

"The method of claim 1 wherein the two kinetic steps are template
translocation and nucleotide binding."

130.   Claim 7 specifies that the two kinetic steps identified in claim 1 are:

(1) "template translocation" and (2) "nucleotide binding."  As outlined in Section

VIII, above, the broadest reasonable construction for "template translocation" is "a

step where the enzyme translocates on the bound nucleic acid."  As is also outlined

in that section, the broadest reasonable construction for "nucleotide binding" is "a

step where a nucleotide forms initial interactions in the nucleotide binding pocket

of the enzyme."

131.   As noted in Section VII.B.2 *supra*, the forward translocation step is

identified in Liao as the "power stroke" and the reverse translocation step is

identified as the "recoil power stroke."  Ex. 1006, 460, Table 1.  The recoil power

stroke has a rate constant of 6.2 s$^{-1}$.  *Id.*  That the recoil power stroke is indeed a

"template translocation" kinetic step is evident based on the fact that the '056

74

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

patent expressly defines ***both*** the forward ($K_6$) and reverse ($K_{-6}$) reaction constants associated with step 114 of Figure 32 as polymerase translocation steps: "K6/K-6=polymerase translocation." Ex. 1001, 26:10. This is in contrast to other steps where the '056 patent employs distinct language in describing the forward and reverse reaction constants, *e.g.*, "K1/K-1=nucleotide binding/release" and "K5/K-5=polyphosphate release/ binding." *Id.*, 26:5-9.

132. As noted in Section VII.B.2 *supra*, Liao discloses an initial weak nucleotide binding step, "E $\rightarrow$ T*," which corresponds to a step where a nucleotide forms initial interactions in the nucleotide binding pocket of the enzyme. Ex. 1006, 460. The reaction constant for this step is $5.0 \times 10^4$ $M^{-1}$ $s^{-1}$. *Id.*, Table 1. As noted in the '056 patent, "for comparing the rate or the rate constant of a first order to a second order step, the second order rate constant [] can be treated as a pseudo-first order constant with the value of [(the concentration of the nucleotide) x the rate] where the concentration of the nucleotide [N] is known." Ex. 1001, 27:22-26. In Liao, the concentration of dTTP employed ranged from 60 μM to 500 μM, resulting in rate constants of 3 $s^{-1}$ to 25 $s^{-1}$. Ex. 1006, 468.

133. In view of the foregoing, Liao discloses a helicase where the ratio of the nucleotide binding rate constant and the translocation rate constant for the recoil power stroke falls between 0.48 to 4.03 (3 $s^{-1}$/6.2 $s^{-1}$ to 25 $s^{-1}$/6.2 $s^{-1}$, depending on the dTTP concentration employed) which is within the claimed range

75

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

of 1:10 to 10:1 (*i.e.*, 0.1 to 10.0).  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Liao and that the resulting combination discloses each of the elements of claim 7, the combination renders claim 7 obvious under § 103.

### 8.    Claim 8

"The method of claim 1 wherein the rate for one of the kinetic steps is less than 100 per second."

134.   As noted in Section VII.B.2 *supra*, Liao discloses the T7 helicase has a $P_i$ release (*i.e.*, product release) rate constant of 15 s$^{-1}$ and a dTTP hydrolysis rate constant of 66 s$^{-1}$, which are both less than 100 s$^{-1}$.  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Liao and that the resulting combination discloses each of the elements of claim 8, the combination renders claim 8 obvious under § 103.

### 9.    Claim 9

"The method of claim 1 wherein the rate for one of the kinetic steps is between 0.5 per second and 60 per second."

135.   As noted in Section VII.B.2 *supra*, Liao discloses that the T7 helicase has a $P_i$ release (*i.e.*, product release) rate constant of 15 s$^{-1}$, which falls within the claimed range of 0.5 s$^{-1}$ to 60 s$^{-1}$.  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Liao and

Oxford, Exh. 1002, p. 81

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

that the resulting combination discloses each of the elements of claim 9, the combination renders claim 9 obvious under § 103.

### 10.  Claim 10

"The method of claim 1 wherein the reaction conditions comprise one or more of metal cofactor concentration, pH, temperature, an enzyme activity modulator, $D_2O$, an organic solvent and buffer."

136.   Akeson discloses that the "medium disposed in the pools on either side of the substrate 22 [*i.e.*, nanopore] may be any fluid that permits adequate polynucleotide mobility for substrate interaction."  Ex. 1004, ¶ [0058].  Akeson further discloses that the medium, *i.e.*, buffer, can be an electrically conductive medium, which "generally contain[s] ions as the current-conducting agents (*e.g.*, sodium, potassium, chloride, calcium, magnesium, cesium, barium, sulfate, or phosphate)."  *Id.*  Liao discloses that the kinetic rates of the T7 helicase that exhibited ratios between 1:10 to 10:1 were determined in a "helicase buffer" that included "50 mM Tris-HCl (pH 7.6), 40 mM NaCl, and 10% (v/v) glycerol" and was supplemented with various concentrations of $MgCl_2$.  Ex. 1006, 468. Accordingly, both Liao and Akeson disclose buffers that contain similar components, such as metal ions, *e.g.*, $Mg^{2+}$.  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and

77

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

Liao and that the resulting combination discloses each of the elements of claim 10, the combination renders claim 10 obvious under § 103.

### 11.    Claim 11

<u>"The method of claim 1 wherein the nucleic acid template comprises DNA."</u>

137.   Akeson discloses the analysis of a polynucleotide sequence, where the polynucleotide is DNA.  Ex. 1004, ¶¶ [0017] and [0019].  Liao discloses the kinetic analysis of the bacteriophage T7 helicase in the presence of DNA.  Ex. 1006, 454. Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Liao and that the resulting combination discloses each of the elements of claim 11, the combination renders claim 11 obvious under § 103.

### 12.    Claim 12

<u>"The method of claim 1 wherein the substrate comprises an array of nanopores."</u>

138.   Akeson also discloses that the structure of the nanopore device can include "one or more nanopore apertures."  Ex. 1004, ¶ [0043].  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Liao and that the resulting combination discloses each of the elements of claim 12, the combination renders claim 12 obvious under § 103.

78

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

### 13. Claims 13 and 14

Claim 13.  "The method of claim 1 wherein the ratio of the rate constants is from 1:5 and 5:1."

Claim 14.  "The method of claim 1 wherein the ratio of the rate constants is from 1:2 and 2:1."

139.   As noted in Section VII.B.2 *supra*, Table 1 of Liao discloses the rate constants associated with various kinetic steps associated with translocation of the bacteriophage T7 helicase.   Ex. 1006, Table 1 (457).   For example, Table 1 indicates that the kinetic step of dTTP hydrolysis has a rate constant of 66 s$^{-1}$ and that the kinetic step of DNA release has a rate constant of 70 s$^{-1}$.  The ratios of the rate constants for these two kinetic steps is 0.9 (66 s$^{-1}$/70 s$^{-1}$) and 1.1 (70 s$^{-1}$/66 s$^{-1}$), which fall within the ratios of 1:5 and 5:1 (0.2 to 5.0) of claim 13 as well as 1:2 and 2:1 (0.5 to 2) of claim 14.

140.   Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Liao and that the resulting combination discloses each of the elements of claims 13 and 14, the combination renders claims 13 and 14 obvious under § 103.

### 14. Claim 15

"The method of claim 1 wherein the nanopore comprises a solid state nanopore."

Oxford, Exh. 1002, p. 84

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

141.   Akeson also discloses that the "nanopores may be biological, *e.g.*, proteinaceous, or solid-state." Ex. 1004, ¶ [0044].  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Liao and that the resulting combination discloses each of the elements of claim 15, the combination renders claim 15 obvious under § 103.

### 15.   Claim 16

"The method of claim 1 wherein the nanopore comprises a protein nanopore in a lipid bilayer membrane."

142.   Akeson also discloses that nanopores, *e.g.*, protein nanopores such as α-hemolysin, can be "established in [] lipid bilayers." *Id.*, ¶ [0096].  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Liao and that the resulting combination discloses each of the elements of claim 16, the combination renders claim 16 obvious under § 103.

### D.   Ground 4: Claims 1-3, 5-10, and 12-16 are obvious over Akeson and Adelman

#### 1.   A POSA would have been motivated to combine Akeson and Adelman

143.   Akeson discloses nanopore systems for sequencing DNA that include the use of a molecular motor to control the rate of DNA translocation through the nanopore.  Akeson discloses a molecular motor, *i.e.*, a translocating enzyme, that can be "a helicase." Ex. 1004, claim 3 and ¶ [0047].  In particular, Akeson

80

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

discloses that the helicase can be "*E-coli* bacteriophage T7 gp4 and T4 gp41 gene proteins, and the *E. coli* proteins DnaB, RuvB, and rho." *Id.*, ¶ [0051], claim 7. Adelman discloses the kinetic analysis of the *E. coli* protein rho helicase, which is specifically identified by Akeson as an example of a helicase that can be used as a molecular motor in nanopore sequencing. Ex. 1013, Table 1 (618). Based on the express teachings in Akeson, a POSA performing a method for sequencing RNA according to Akeson would therefore have been motivated to use the helicase disclosed in Adelman to control the rate of translocation of the RNA through the nanopore.

### 2.    Claim 1

Claim 1[pre].    "A method for sequencing a nucleic acid template comprising:"

144.   Akeson discloses the "analysis of a polynucleotide sequence" to identify the "number and composition of monomers that make up each individual polynucleotide, in sequential order." Ex. 1004, ¶¶ [0019] and [0079].   Akeson further discloses methods for "measuring a monomer-dependent characteristic of the target polynucleotide while the target polynucleotide moves with respect to the nanopore aperture," where "the monomer dependent property is the identity of a nucleotide or the number of nucleotides in the polynucleotide." *Id.*, claims 8 and 9.  Accordingly, to the extent that the preamble is limiting, Akeson, and thus the

81

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

combination of Akeson and Adelman discloses, a "method for sequencing a nucleic acid template," as recited by the preamble of claim 1.

Claim 1[a]. "providing a substrate having an upper solution above the substrate and a lower solution below the substrate, the substrate comprising a nanopore connecting the upper solution and lower solution,"

145.   Akeson discloses a nanopore device that includes "two adjacent pools [that] are located on the cis side and the trans side of the nanopore device 12 a," where "cis" refers to "the side of a nanopore aperture through which a polymer enters the pore" and "trans" refers to "the side of a nanopore aperture through which a polymer [] exits the pore."  *Id.*, ¶¶ [0014]-[0015], [0041]; *see also id.*, Figure 2A-2D, provided above.  As disclosed in the '056 patent, the terms "cis" and "upper" are used interchangeably and the terms "trans" and "lower" are used interchangeably.  Ex. 1001, 8:25-29, 35:51-59 and Figure 11.  Akeson further discloses that the device includes "at least one nanopore aperture 24 … so dimensioned as to allow sequential monomer-by-monomer translocation (*i.e.*, passage) from one pool to another of only one polynucleotide at a time."  Ex. 1004, ¶ [0041].

82

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

Claim 1[b].  "the nanopore sized to pass a single strand of a nucleic acid;"

146.   Akeson discloses that the aperture of the nanopore "may be dimensioned so that only a single stranded polynucleotide can pass through the nanopore aperture." *Id.*, ¶ [0043].

Claim 1[c].  "providing a voltage across the nanopore to produce a measurable current flow through the nanopore;"

147.   Akeson discloses that a "voltage difference can be imposed across the barrier between the pools using appropriate electronic equipment." *Id.*, ¶ [0058]. Akeson further discloses that electrodes associated with the device can be used to detect "ionic current differences across the two pools." *Id.*, ¶ [0042].

Claim 1[d].  "controlling the rate of translocation of a single stranded portion of the nucleic acid template through the nanopore with a translocating enzyme that is associated with the nucleic acid template under reaction conditions"

148.   Akeson discloses that the nanopore device includes "a nanopore aperture and a molecular motor that is capable of moving a target polynucleotide with respect to the nanopore, *e.g.*, at a specified rate." *Id.*, ¶ [0008].  Akeson further discloses that the molecular motor provides "a mechanism for controlling the rate [] of movement of the polynucleotide of interest with respect to a nanopore aperture," and can selectively interact and act upon a single-stranded

83

Oxford, Exh. 1002, p. 88

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

polynucleotide.  *Id.*, ¶ [0019].     Akeson and Adelman also disclose cross-
compatible reaction conditions.  *Id.*, ¶ [0058]; Ex. 1013, 619.

Claim 1[e].  "whereby the translocating enzyme and the reaction conditions
are selected such that the translocating enzyme exhibits two kinetic steps herein
each of the kinetic steps has a rate constant and the ratio of the rate constants of the
kinetic steps is from 10:1 to 1:10;

149.  Akeson discloses that the molecular motor can be "a DNA
polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase," and
that "the intrinsic rate of movement of a particular molecular motor may be
modified, *e.g.*, by chemical modification of the motor, by changes in temperature,
pH, ionic strength, the presence of necessary cofactors, substrates, inhibitors,
agonists, or antagonists, by the nature of the medium (*e.g.*, the presence of
nonaqueous solvents or the viscosity), by external fields (*e.g.*, electric or magnetic
fields), and hydrodynamic pressure."   Ex. 1004, ¶¶ [0009], [0013], [0083] and
claim 3.    Akeson discloses that such modifications of the intrinsic rate of the
molecular motor can be used to "start, stop, increase, decrease, or stabilize the rate
of movement of the polynucleotide." *Id.*, ¶ [0083].

150.  Akeson further discloses that the helicase can be the *E-coli* rho
helicase.  *Id.*, ¶ [0051].  Adelman discloses the kinetic analysis of the *E. coli* rho
helicase.  Ex. 1013, Table 1 (618).  As shown in Table 1 and discussed in Section

84

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

VII.B.3 *supra*, Adelman discloses that the rate constant of $P_i$ release (*i.e.*, a first product release step) is 50 $s^{-1}$, the rate constant of dADP release (*i.e.*, a second product release step) is 350 $s^{-1}$ and the rate constant of dATP hydrolysis is 150 $s^{-1}$. *Id.* The ratios of the dATP hydrolysis rate constant and the $P_i$ release rate constant are 3 (150 $s^{-1}$/50 $s^{-1}$) and 0.33 (50 $s^{-1}$/150 $s^{-1}$). The ratios of the dADP release rate constant and the dATP hydrolysis rate constant are 0.43 (150 $s^{-1}$/350 $s^{-1}$) and 2.33 (350 $s^{-1}$/150 $s^{-1}$). Each of the calculated ratios, *i.e.*, 0.33, 0.43, 2.33, and 3, fall within the claimed range of 1:10 to 10:1 (*i.e.*, 0.1 to 10.0). Additional ratios falling within the claimed range are discussed in connection with Claims 6-7 and 13-14, below.

Claim 1[f]. "measuring the current through the nanopore over time as the nucleic acid template is translated through the nanopore; and determining the sequence of a portion of the nucleic acid template as it translates through the nanopore using the measured current over time."

151. Akeson discloses the monitoring of current changes across the nanopore aperture, which correspond "to the movement of the target polynucleotide with respect to the nanopore aperture" over time to determine "the number and composition of monomers that make up each individual polynucleotide, in sequential order." Ex. 1004, ¶¶ [0009] and [0079]; *see also id.*, claim 1 and ¶ [0040]. *See also id.*, ¶ [0079]. Akeson further discloses methods for

Oxford, Exh. 1002, p. 90

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

"measuring a monomer-dependent characteristic of the target polynucleotide while the target polynucleotide moves with respect to the nanopore aperture," where "the monomer dependent property is the identity of a nucleotide or the number of nucleotides in the polynucleotide." *Id.*, claims 8 and 9.  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Adelman and that the resulting combination discloses each of the elements of claim 1, the combination renders claim 1 obvious under § 103.

### 3.    Claim 2

"The method of claim 1 wherein the translocating enzyme comprises a DNA polymerase, a RNA polymerase, a ribosome, an exonuclease, or a helicase."

152.   Akeson discloses a molecular motor, *i.e.*, a translocating enzyme, that can be "a helicase." *Id.*, claim 3 and ¶ [0047].  Akeson discloses that the helicase can be the *E. coli* rho helicase.  *Id.*, ¶ [0051].  Adelman discloses the kinetic analysis of *E. coli* rho helicase, where the helicase exhibits two kinetics steps that have rate constants that when compared result in a ratio that falls within the ratio range of 1:10 to 10:1.  Ex. 1013, Table 1 (618), 452; *see supra* Sections X.D.1 and X.D.2.  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Adelman and that the resulting combination discloses each of the elements of claim 2, the combination renders claim 2 obvious under § 103.

86

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

### 4.    Claim 3

"The method of claim 1 wherein the translocating enzyme comprises a DNA helicase or an RNA helicase."

153.   Akeson discloses a molecular motor, *i.e.*, a translocating enzyme, that can be "a helicase." Ex. 1004, claim 3 and ¶ [0047]. Akeson discloses that the helicase can be the *E. coli* rho RNA helicase. *Id.*, ¶ [0051]. Adelman discloses the kinetic analysis of the *E. coli* rho RNA helicase, where the helicase exhibits two kinetics steps that have rate constants that when compared result in a ratio that falls within the ratio range of 1:10 to 10:1. Ex. 1013, Table 1 (618); *see supra* Section X.D.2. Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Adelman and that the resulting combination discloses each of the elements of claim 3, the combination renders claim 3 obvious under § 103.

### 5.    Claim 5

"The method of claim 1 wherein the translocating enzyme comprises a viral genome packaging motor or an ATP-dependent chromatin remodeling complex."

154.   Claim 5 identifies two specific subtypes of translocating enzyme: (1) "a viral genome packaging motor"; and (2) "an ATP-dependent chromatin remodeling complex." The broadest reasonable construction for viral genome packaging motor is "a viral protein or complex of proteins having the functions of

87

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

associating with a viral capsid and translocating viral DNA into a capsid shell."

*See* Section VIII *supra.*  The broadest reasonable construction for ATP-dependent

chromatin remodeling complex is "a protein or complex of proteins having the

function of coupling ATP hydrolysis to nucleosome translocation."  *See* Section

VIII *supra.*  To the extent, however, that these terms are construed to encompass

motors capable of simply translocating on a nucleic acid, such motors (*i.e.*,

helicases) are explicitly disclosed in Adelman.  *See supra* Sections VII.B.3, X.D.1

and X.D.2.

155.   Given that, as described above, one of skill in the art would have been

motivated to combine the teachings of Akeson and Adelman and that the resulting

combination discloses each of the elements of claim 5, should the claim be

construed to encompass helicases, the combination renders claim 5 obvious under

§ 103.

### 6.    Claim 6

"The method of claim 1 wherein the two kinetic steps are selected from a

group consisting of enzyme isomerization, nucleotide incorporation and product

release."

156.   Claim 6 specifies that the two kinetic steps identified in claim 1 must

be selected from following group of three possible steps: (1) "enzyme

isomerization"; (2) "nucleotide incorporation"; and (3) "product release."  The

88

Oxford, Exh. 1002, p. 93

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

broadest reasonable construction for "enzyme isomerization" is "a step that involves a change in enzyme configuration." *See* Section VIII *supra*. The broadest reasonable construction for "product release" is "a step where a product is released from the enzyme." *See* Section VIII *supra*.

157.    As noted in Section VII.B.3 *supra*, Scheme 1 and Table 1 of Adelman outlines the kinetic steps associated with *E. coli* rho helicase translocation.  Ex. 1013, 615 and Table 1 (618).  In this model, the translocation of the helicase along the polynucleotide occurs simultaneously with an enzyme isomerization (the "power stroke").  *Id.*, 614.  Adelman specifically states that, "the power stroke that drives RNA translocation must occur as the ATP anneals into a tight binding configuration in the catalytic site."  *Id.*   This isomerization of the enzyme has a rate constant of 2045 s$^{-1}$.  *Id.*, Table 1 (618).  Adelman also notes that the release of dADP, a product of the hydrolysis of dATP, has a rate constant of 350 s$^{-1}$.  *Id.*  A POSA would understand that the release of dADP is a product release step. Adelman, therefore, discloses a helicase where the ratios of the rate constant associated with enzyme isomerization (*i.e.*, the power stroke) to the rate constant associated with product release (*i.e.*, dADP release) are 0.17 (350 s$^{-1}$/2045 s$^{-1}$) and 5.84 (2045 s$^{-1}$/350 s$^{-1}$), which fall within the claimed ratios of 10:1 and 1:10 (*i.e.*, 0.1 to 10.0).  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Adelman and that the

89

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

resulting combination discloses each of the elements of claim 6, the combination

renders claim 6 obvious under § 103.

### 7.    Claim 7

"The method of claim 1 wherein the two kinetic steps are template

translocation and nucleotide binding."

158.   Claim 7 specifies that the two kinetic steps identified in claim 1 are:

(1) "template translocation" and (2) "nucleotide binding."  As outlined in Section

VIII, above, the broadest reasonable construction for "template translocation" is "a

step where the enzyme translocates on the bound nucleic acid."  As is also outlined

in that section, the broadest reasonable construction for "nucleotide binding" is "a

step where a nucleotide forms initial interactions in the nucleotide binding pocket

of the enzyme."

159.   As noted in Section VII.B.3 *supra*, the forward translocation step is

identified in Adelman as the "power stroke" and the reverse translocation step is

identified as the "recoil power stroke."  Ex. 1013, Table 1 (618).  The power stroke

has a rate constant of 2045 s$^{-1}$.  *Id.*

160.   As noted in Section VII.B.3, *supra*, Adelman discloses an initial weak

nucleotide binding step, "E $\rightarrow$ T*," which corresponds to a step where a nucleotide

forms initial interactions in the nucleotide binding pocket of the enzyme.  *Id.*, 615.

The reaction constant for this step is 5.69 x 10$^5$ M$^{-1}$ s$^{-1}$.  *Id.*, Table 1.  As noted in

90

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

the '056 patent, "for comparing the rate or the rate constant of a first order to a second order step, the second order rate constant [] can be treated as a pseudo-first order constant with the value of [(the concentration of the nucleotide) x the rate] where the concentration of the nucleotide [N] is known." Ex. 1001, 27:22-26. In Adelman, one of the concentrations of dATP employed is 1000 μM, resulting in a rate constant of 569 s$^{-1}$. Ex. 1013, 614 and Figure 4 (615).

161.   In view of the foregoing, Adelman discloses a helicase where the ratio of the nucleotide binding rate constant and the translocation rate constant for the power stroke is 0.28 (569 s$^{-1}$/2045 s$^{-1}$) or 3.59 (2045 s$^{-1}$/569 s$^{-1}$ which is within the claimed range of 1:10 to 10:1 (*i.e.*, 0.1 to 10.0). Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Adelman and that the resulting combination discloses each of the elements of claim 7, the combination renders claim 7 obvious under § 103.

### 8.    Claim 8

"The method of claim 1 wherein the rate for one of the kinetic steps is less than 100 per second."

162.   As noted in Section VII.B.3 *supra*, Adelman discloses the *E. coli* rho helicase has a P$_i$ release (*i.e.*, product release) rate constant of 50 s$^{-1}$ which is less than 100 s$^{-1}$. Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Adelman and that the

91

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

resulting combination discloses each of the elements of claim 8, the combination

renders claim 8 obvious under § 103.

### 9.   Claim 9

"The method of claim 1 wherein the rate for one of the kinetic steps is

between 0.5 per second and 60 per second."

163.   As noted in Section VII.B.3 *supra*, Adelman discloses that the *E. coli*

rho helicase has a $P_i$ release (*i.e.*, product release) rate constant of 50 s$^{-1}$, which

falls within the claimed range of 0.5 s$^{-1}$ to 60 s$^{-1}$.  Given that, as described above,

one of skill in the art would have been motivated to combine the teachings of

Akeson and Adelman and that the resulting combination discloses each of the

elements of claim 9, the combination renders claim 9 obvious under § 103.

### 10.   Claim 10

"The method of claim 1 wherein the reaction conditions comprise one or

more of metal cofactor concentration, pH, temperature, an enzyme activity

modulator, $D_2O$, an organic solvent and buffer."

164.   Akeson discloses that the "medium disposed in the pools on either

side of the substrate 22 [*i.e.*, nanopore] may be any fluid that permits adequate

polynucleotide mobility for substrate interaction."  Ex. 1004, ¶ [0058].  Akeson

further discloses that the medium, *i.e.*, buffer, can be an electrically conductive

medium, which "generally contain[s] ions as the current-conducting agents (*e.g.*,

92

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

sodium, potassium, chloride, calcium, magnesium, cesium, barium, sulfate, or phosphate)." *Id.* Adelman discloses that the kinetic rates of the rho helicase that exhibited ratios between 1:10 to 10:1 were determined in a "Rho buffer" that included "40 mM TrisHCl (pH 7.7), 100 mM KCl, 10 mM MgCl$_2$, 0.1 mM dithiothreitol, and 10% (v/v) glycerol." Ex. 1013, 619. Accordingly, both Adelman and Akeson disclose buffers that contain similar components, such as metal ions, *e.g.*, Mg$^{2+}$. Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Adelman and that the resulting combination discloses each of the elements of claim 10, the combination renders claim 10 obvious under § 103.

### 11.   Claim 12

"The method of claim 1 wherein the substrate comprises an array of nanopores."

165.   Akeson also discloses that the structure of the nanopore device can include "one or more nanopore apertures." Ex. 1004, ¶ [0043]. Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Adelman and that the resulting combination discloses each of the elements of claim 12, the combination renders claim 12 obvious under § 103.

93

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

### 12.    Claims 13 and 14

Claim 13.  "The method of claim 1 wherein the ratio of the rate constants is from 1:5 and 5:1."

Claim 14.  "The method of claim 1 wherein the ratio of the rate constants is from 1:2 and 2:1."

166.   As noted in Section VII.B.3 *supra*, Table 1 of Adelman discloses the rate constants associated with various kinetic steps associated with translocation of the E. coli rho helicase.  Ex. 1013, Table 1 (618).  For example, Table 1 indicates that the kinetic step of dATP hydrolysis has a rate constant of 150 $s^{-1}$ and that the kinetic step of RNA release has a rate constant of 87 $s^{-1}$.  The ratios of the rate constants for these two kinetic steps is 0.58 (87 $s^{-1}$/150 $s^{-1}$) and 1.72 (150 $s^{-1}$/87 $s^{-1}$), which fall within the ratios of 1:5 and 5:1 (0.2 to 5.0) of claim 13 as well as 1:2 and 2:1 (0.5 to 2) of claim 14.

167.   Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Adelman and that the resulting combination discloses each of the elements of claims 13 and 14, the combination renders claims 13 and 14 obvious under § 103.

### 13.    Claim 15

"The method of claim 1 wherein the nanopore comprises a solid state nanopore."

94

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

168.   Akeson also discloses that the "nanopores may be biological, *e.g.*, proteinaceous, or solid-state."  Ex. 1004, ¶ [0044].  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Adelman and that the resulting combination discloses each of the elements of claim 15, the combination renders claim 15 obvious under § 103.

### 14.   Claim 16

"The method of claim 1 wherein the nanopore comprises a protein nanopore in a lipid bilayer membrane."

169.   Akeson also discloses that nanopores, *e.g.*, protein nanopores such as α-hemolysin, can be "established in [] lipid bilayers."  *Id.*, ¶ [0096].  Given that, as described above, one of skill in the art would have been motivated to combine the teachings of Akeson and Adelman and that the resulting combination discloses each of the elements of claim 16, the combination renders claim 16 obvious under § 103.

95

Declaration of Dr. Taekjip Ha in Support of
Petition for *IPR* of U.S. Patent No. 9,678,056

## XI.    CONCLUSION

170.   All statements made herein of my own knowledge are true and all statements made on information and belief are believed to be true. I further understand that willful false statements and the like are punishable by fine or imprisonment, or both under Section 1001 of Title 18 of the United States Code. I declare under penalty of perjury that the foregoing is true and correct.

_____                    <u>September 25, 2018</u>

Dr. Taekjip Ha                                                      Date

96

# EXHIBIT 4

**REDACTED**

# EXHIBIT 5

# NORTON ROSE FULBRIGHT

18 April 2018

Norton Rose Fulbright LLP
3 More London Riverside
London  SE1 2AQ
United Kingdom

Tel    +44 20 7283 6000
Fax    +44 20 7283 6500
DX 85 London
nortonrosefulbright.com

**By email and fax**

Carpmaels & Ransford LLP
One Southampton Row
London
WC1B 5HA

**Email: PacBio-ONT@carpmaels.com**
**Fax: +44 207 405 4166**

**Direct line**
+44 20 7444 2110

**Email**
Huw.Evans@nortonrosefulbright.com

| Your reference | Our reference |
|---|---|
| LW/KMC/LAS/L010095GB | HEVA/1000241653 |

**FOURTH LETTER**

Dear Sirs

## Pacific Biosciences of California, Inc. – v – Oxford Nanopore Technologies Limited & Metrichor Limited (Claim number: HP-2017-000008)

We refer to our second letter of 5 March 2018.  We now write to inform you that for the purposes of these UK proceedings only and for the streamlining of the UK trial and UK procedural efficiencies, our clients will accept that both 2D and $1D^2$ involve a step of:

1. "*comparing the sequences of the two nucleic acid strands*" – relevant to claim 12 of EP(UK) '542; and,

2. "*Determining the consensus sequence ...... from the sequences of the two complementary strands*" – relevant to claim 1 of EP(UK) '904.

Accordingly our client does not, for the purposes of these UK proceedings only, pursue a non-infringement argument in respect of the additional features provided by claims 6 and 12 of EP(UK) '542 or the aforementioned aspect of integer (d) of claim 1 of EP(UK) '904.

As such, we do not intend to serve a report from Dr Goldman.

Yours faithfully

*Norton Rose Fulbright LLP*

**Norton Rose Fulbright LLP**

DRD-#28345863-v1

Norton Rose Fulbright LLP is a limited liability partnership registered in England and Wales with number OC328697, and is authorised and regulated by the Solicitors Regulation Authority. A list of its members and of the other partners is available at its registered office, 3 More London Riverside, London SE1 2AQ; reference to a partner is to a member or to an employee or consultant with equivalent standing and qualification employed or engaged by Norton Rose Fulbright LLP or any of its affiliates.

Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP, Norton Rose Fulbright South Africa Inc and Norton Rose Fulbright US LLP are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PACIFIC BIOSCIENCES OF CALIFORNIA, INC., <br> *Plaintiff*, <br><br> v. <br><br> OXFORD NANOPORE TECHNOLOGIES, INC. and OXFORD NANOPORE TECHNOLOGIES, LTD., <br> *Defendants*. | C.A. No. 17-cv-275-LPS <br> C.A. No. 17-cv-1353-LPS <br><br> JURY TRIAL DEMANDED |

## OXFORD'S REPLY IN SUPPORT OF ITS  MOTIONS IN LIMINE #3

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

Dated:  February 20, 2020

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Defendants*

PacBio's opposition to the exclusion of evidence and statements made in prior, unrelated proceedings ignores the fact that admitting such evidence would require explanations to the jury about the purposes of those prior proceedings, the patents asserted there, as well as any differences in the parties, claim construction, scope of prior art, and evidentiary burdens.  *See* Oxford MIL 3, at 3.  Such context would be crucial to the jury understanding the nature of the evidence and testimony.  This militates in favor of exclusion due to the high likelihood of jury confusion.[1]

As to the UK Litigation document in particular (PCB-DE-0019529), PacBio cites no legal support for its contentions that the jury should not be deprived of documents from a foreign litigation, regarding foreign patents, providing the opinions of foreign attorneys solely made "for the purposes of these UK proceedings only"[2] and "for the streamlining of the UK trial and UK procedural efficiencies."  Oxford MIL 3, at 2.  Indeed, the language PacBio quotes from the UK letter is the claim language from the European patents in that foreign proceeding—a patent that was ultimately held invalid.  By the express language of the UK letter, the statements therein exist only due to that particular litigation, and have no relevance to the '929 patent in this litigation.

For these reasons and those in Oxford's MIL 3, this Court should grant Oxford's request and exclude evidence from prior proceedings under Rule 403.

---

[1] Demonstrating the jury confusion possible in this case with four patents, multiple claims per patent, and tens of accused products, PacBio incorrectly states that Dr. Ha's IPR Declaration was relevant to the '929 Patent.  Dr. Ha's testimony in this case is being offered as to the '056 Patent.

[2] The additional documents PacBio references in its Responses are likewise designated as having been "provided for the purposes of UK litigation" only.  PCB-DE-0984168, PCB-DE-0984248.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jennifer Ying*

_____
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
Jeffrey J. Lyons (#6437)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com
jlyons@mnat.com

*Attorneys for Oxford Nanopore Technologies,*
*Inc. and Oxford Nanopore Technologies, Ltd.*

OF COUNSEL:

Stephen M. Hash
Puneet Kohli
Samoneh Kadivar
David Varghese
Jeff Gritton
Alex Piala
Mysha Lubke
David Weaver
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, TX 78701-4078
(512) 322-2642

Elizabeth Durham Flannery
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
(713) 229-1234

# EXHIBIT C

Pursuant to D. Del. LR 16.3, Plaintiff Pacific Biosciences of California, Inc. ("Plaintiff") hereby submits its list of deposition designations that Plaintiff may offer at trial.

Plaintiff makes these disclosures without prejudice to amending or supplementing the disclosures in the future if necessary, including but not limited to further reducing the designations set forth below. Plaintiff reserves the right to use any deposition testimony, whether designated or not, for purposes of cross-examination, impeachment, and/or rebuttal. Plaintiff reserves the right to designate additional deposition testimony or call any witness for live testimony in response to any of ONT's deposition designations or for any other reason.  Plaintiff's designations include all exhibits that are referenced in the specified pages and lines, whether or not such exhibits are separately identified. Plaintiff reserves the right to use any deposition testimony designated by ONT.  Inclusion on this list is neither an admission nor a representation as to the admissibility of or relevance to any issue of any deposition designation.  By designating deposition testimony, Plaintiff is neither representing nor admitting that Plaintiff has the burden of proof on any topic.


Plaintiff generally objects to any deposition testimony counter-designated by ONT that is the subject of the parties' stipulations, agreed motions in limine (if any), Plaintiff's motions in limine, motions to exclude certain evidence, Daubert motions and challenges to experts, and any dispositive motions. Plaintiff reserves the right to make additional objections leading up to and at trial.


Plaintiff reserves the right to add to, remove from, and/or supplement these lists of objections to ONT's counter-designations and Plaintiff's counter-counter designations.


Regarding Plaintiff's objections to ONT's counter-designations and Plaintiff's counter-counters, Plaintiff reserves the right to assert any one, part, or all of its objections. Plaintiff also reserves the right to assert additional objections or counter-counter designations. Plaintiff also reserves the right to assert its original affirmative designation as a counter-counter designation to any counter-designation listed by ONT.

| colspan | |
|---|---|
| **Plaintiff's Key of Objections To Defendants' Counter-Designations** | |
| **Code** | **Code Objection** |
| 401 | Objection under Fed. R. Evid. 401 |
| 402 | Objection under Fed. R. Evid. 402 |
| 403 | Objection under Fed. R. Evid. 403 |
| 602 | Objection under Fed. R. Evid. 602 |
| 611 | Objection under Fed. R. Evid. 611 |
| 701 | Objection under Fed. R. Evid. 701 |
| 702 | Objection under Fed. R. Evid. 702 |
| 703 | Objection under Fed. R. Evid. 703 |
| BTS, 611 | Beyond the scope of examination or of 30(b)(6) topic. |
| CP | Compound question. |
| FOW | An objection to form is waived if it was not timely made during the deposition, Fed. R. Civ. P. 32(d)(3)(B). |
| H | Hearsay if offered for the truth of the matter asserted; Fed. R. Evid. 801, 803, 805. |
| I | Incomplete designation; Fed. R. Evid. 106 |
| IH | Incomplete Hypothetical. |
| LW | Witness will be testifying live at trial. |
| MIS | Mischaracterization of testimony or evidence. |
| NARR | Narrative. |
| OB | Attorney Objection improperly designated/Improper designation. |
| P | Privileged; Fed. R. Evid. 501, Fed. R. Civ. P. 26(b)(3),(4) |

| ABBREVIATION AND FEDERAL RULE OF EVIDENCE KEY TO OXFORD'S OBJECTIONS | | |
|---|---|---|
| **Letter** | **Objection** | **Applicable Rules** |
| A | Requires authentication or identification | FRE 901 |
| B | Best evidence rules prohibit introduction | FRE 1001-1002 |
| C | Improper compilation of separate documents | FRE 403, 901 |
| D | Duplicative | |
| E | Improper examination (vague, ambiguous, loaded, leading, etc.) | FRE 402, 403, 602, 611 |
| F | Lack of foundation/personal knowledge (incl. calls for speculation) | FRE 402, 403, 602, 611 |
| H | Hearsay if offered for the truth of the matter asserted | FRE 801, 802 |
| I | Incomplete document or testimony | FRE 106, 403 |
| IP | Reserving objections until party can inspect the exhibit in-person | |
| M | Offer or discussion for settlement or compromise | FRE 408 |
| MIL | Subject of outstanding Motion in Limine | |
| N | Exhibit not produced in discovery | FRE 403 |
| O | Improper opinion testimony | FRE 701-704 |
| P | Privileged or attorney work product | FRE 501, 502 |
| R | Lack of relevance | FRE 401, 402 |
| S | Summary requiring underlying data or information | FRE 1006 |
| U | Unduly prejudicial, wasteful, confusing, misleading or cumulative | FRE 403 |
| OB | Attorney Objection improperly designated/Improper designation | |
| ARG | Argumentative, or attorney argument | FRE 611 |
| NARR | Narrative | |
| MIS | Mischaracterization of testimony or evidence | |
| OS | Outside scope of witness testimony | |
| IH | Incomplete hypothetical | |

| Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies, Inc. | | | | | |
|---|---|---|---|---|---|
| Witness: Clive Brown | | | | | |
| Date of Deposition:  September 30, 2019 | | | | | |
| Plaintiff's Designations | ONT's Objections | ONT's Counter-Designations | Plaintiff's Objections | Plaintiff's Counter-Counter Designations | ONT's Objections |
| 12:9-15 | | | | | |
| 13:3-11 | I | 13:12-13:15 | | | |
| 20:25-21:3 | E | | | | |
| 21:5-18 | | | | | |
| 21:22-24 | I | 21:25-22:2; 80:18-82:4 | 402, 403 (80:18-81:5) | | |
| 22:3-15 | | 22:16-21; 80:18-82:4 | 402, 403 (80:18-81:5) | | |
| 22:22-24 | E | | | | |
| 23:1-24:12 | E, I | | | | |
| 24:14-17 | | | | | |
| 25:20-22 | E | | | | |
| 25:24-26:7 | E, I | 26:8-26:13 | | | |
| 27:12-29:4 | E, I | 29:5-29:11 | | 29:12-22 | |
| 34:13 | E, I | | | | |
| 34:15-25 | E | | | | |
| 35:2-9 | | | | | |
| 35:17-21 | | | | | |
| 37:13-21 | E, I, MIS | 35:22-36:6; 37:22-38:9 | | 36:7-15 | |
| 38:10-15 | E | | | | |
| 38:17-22 | E | 38:23-39:2 | | | |
| 40:24-41:13 | E, I, R | 39:3-39:11; 41:14-42:1 | | 39:12-15; 39:22-40:2 | |
| 42:16-44:2 | E, R | | | | |
| 44:4-21 | E, R | | | | |
| 44:23-45:12 | E, R | | | | |
| 45:14-46:4 | E, R | | | | |
| 46:15-25 | E | | | | |
| 47:2-3 | | | | | |
| 47:5-14 | E, F, I | 47:15-47:16; 47:18-47:19 | | | |
| 49:1-6 | E, F | | | | |
| 49:21-50:1 | E | | | | |
| 50:3-21 | E, F | | | | |
| 50:23-51:14 | E, F | | | | |
| 51:16-52:17 | E, F | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 52:19-53:18 | E, F | | | | |
| 55:5-56:2 | E, F, I | 56:3-56:11 | | | |
| 57:21-22 | E, F | | | | |
| 58:1-24 | E | | | | |
| 59:1-9 | E | | | | |
| 60:9-61:24 | E, F | | | | |
| 63:5-7 | | | | | |
| 63:9-20 | | 64:20-65:13;<br>67:1-68:11 | | | |
| 65:22-24 | E | | | | |
| 66:1-2 | | | | | |
| 66:13-16 | E, F | | | | |
| 66:18-25 | E, I | 67:1-68:11 | | | |
| 68:12-71:3 | E, I | 71:4-71:22 | | | |
| 71:23-73:1 | E, F, I | 73:2-74:7 | | | |
| 75:5-11 | E | | | | |
| 76:21-78:2 | E | | | | |
| 78:15-25 | E | | | | |
| 79:2-80:17 | E | | | | |
| 82:5-6 | E, O | | | | |
| 82:8-15 | E, O | | | | |
| 82:22-25 | | | | | |
| 83:2-24 | E, F, I, R, U | 83:25-84:1 | | | |
| 84:8-85:5 | E, I, R, U | 85:6-86:23 | | | |
| 87:7-14 | E, I, R, U | 87:15-88:16 | | | |
| 88:17-89:17 | E, R, U | | | | |
| 89:25-91:8 | E, R, U | | | | |
| 91:15-92:15 | E, I, R, U | 92:16-93:4 | | | |
| 93:5-14 | E | | | | |
| 94:24-95:3 | E | | | | |
| 95:8-20 | E, R, U | | | | |
| 96:4-8 | | | | | |
| 96:18-97:1 | E, F | | | | |
| 97:13-22 | E, I, MIS, R | 97:24-98:6 | | | |
| 98:7-12 | E, I | 98:13-99:21 | | | |
| 99:22-24 | | | | | |
| 100:1-21 | E, F, R, U | 101:5-18 | | 101:19-21 | |
| 101:22-102:16 | E, F, R, U | 101:5-18 | | 101:19-21 | |
| 102:18-105:4 | E, F | | | | |
| 107:10-24 | E, F | | | | |
| 108:6-8 | | | | | |
| 109:19-24 | E, H | | | | |
| 110:8-111:5 | E, F, H | | | | |
| 111:7-112:6 | E, F, H | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 112:14-22 | E, H | 112:23-113:6 | | | |
| 113:7-114:10 | E, F, MIS | 112:23-113:6 | | | |
| 114:12-19 | E, F, MIS | 112:23-113:6 | | | |
| 116:8-18 | E, F | | | | |
| 116:20-117:1 | | | | | |
| 119:18-24 | E | | | | |
| 120:1-9 | E, F, H | | | | |
| 120:19-121:18 | E, F, H, I | 121:19-121:23 | | | |
| 121:24-122:7 | E, H | | | | |
| 124:10-20 | E, F, R | | | | |
| 125:13-21 | H | | | | |
| 126:13-18 | E, H, I | | | | |
| 126:23-128:9 | E, F | | | | |
| 129:20-130:13 | E, F | 130:15-25 | | | |
| 131:22-132:1 | E, F, H, I | 132:2-132:4; 132:6-132:15 | | | |
| 133:2-18 | E, F | | | | |
| 133:20-24 | E | | | | |
| 134:1-3 | I | 134:8-134:14 | | 134:15-19, 134:21-135:1 | |
| 135:12-136:14 | | | | | |
| 137:4-12 | | | | | |
| 140:16-141:4 | | 140:3-10 | 403, P | | |
| 141:11-142:16 | E, ARG | 142:20-25 | | | |
| 142:18-19 | | 142:20-25 | | | |
| 145:3-6 | F, MIL | | | | |
| 145:8-146:10 | E, F, MIL | | | | |
| 146:16-147:8 | E, F, MIL | | | | |
| 147:11-17 | E, F, MIL | | | | |
| 147:19-25 | E, F, R, O, U, MIL | | | | |
| 148:2 | E, F, I, R, O, U, MIL | 148:2-148:5 | 403, P | | |
| 148:6-7 | E, I, R, O, U, MIL | 148:12-148:19 | 403, P, I | | |
| 151:22-152:9 | E, F, H, R, O, U, MIL | | | | |
| 154:11-12 | | | | | |
| 154:14 | | | | | |
| 155:15-156:5 | E, F, H | | | | |
| 157:22-159:19 | E, F, H | | | | |
| 159:23-160:5 | E, F, H, I | 160:6-161:1 | | | |
| 162:12-18 | E, F, H, R | 162:19-163:6 | | | |
| 163:23-164:4 | E, I | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 164:6-16 | E, I | 165:1-167:2 | I | | |
| 168:6-11 | E, R, O, U | 167:24-167:25; 168:2-168:5 | | | |
| 168:13-18 | E, R, O, U | 167:24-167:25; 168:2-168:5 | | | |
| 168:20 | E, R, O, U | 167:24-167:25; 168:2-168:5 | | | |
| 169:18-20 | E, MIS | | | | |
| 169:22-170:2 | | | | | |
| 172:7-15 | | | | | |
| 173:3-7 | | | | | |
| 173:20-22 | E, F, MIS | | | | |
| 173:24-174:6 | | | | | |
| 174:18-175:20 | E, F, H, MIS | | | | |
| 176:19-21 | I | 177:3-177:10 | I | | |
| 179:4-180:3 | E, F | | | | |
| 180:16-181:15 | | | | | |
| 181:25-182:17 | | 182:18-183:12 | | | |
| 183:13-184:17 | MIS | | | | |
| 184:22-185:7 | MIS | | | | |
| 186:13-22 | E, F, H | | | | |
| 187:1-20 | E, F, H, I | 187:21-188:15 | | | |
| 188:16-189:7 | E, F, H, MIS | | | | |
| 189:20-190:4 | E, F, H, I | 190:6-190:15 | | | |
| 190:16-191:18 | E, F, H, I | 191:19-192:7 | | | |
| 192:8-19 | E, F, H | | | | |
| 193:3-194:15 | B, E, F, H, I | | | | |
| 194:25-195:5 | E, F, H | | | | |
| 195:7-8 | E, F, H, OB | | | | |
| 195:10-23 | E, F, H, OB | | | | |
| 196:16-25 | E, F, MIS, U | | | | |
| 197:11-198:7 | E, F, H | 198:8-21 | | | |
| 200:18-201:2 | E | | | | |
| 203:23-25 | | | | | |
| 204:2 | | | | | |
| 204:8-24 | | | | | |
| 206:6-19 | E, F, H | | | | |
| 207:13-14 | | | | | |
| 207:16-208:2 | | | | | |
| 210:1-211:3 | E, F, H, I | 211:5-16; 216:5-20 | | | |
| 212:1-213:1 | E, F, H, R, U, ARG, MIS | 216:5-20 | | | |
| 213:11-14 | E | 216:5-20 | | | |

| | | | | | |
|---|---|---|---|---|---|
| 213:16-214:1 | E | 214:2-215:3; 216:5-20 | | | |
| 215:4-24 | | 216:5-20 | | | |
| 219:20-220:17 | E, F, I, MIS | 218:16-219:19; 220:18-221:15 | | | |
| 222:9-223:11 | E, F, H, I | 223:12-224:3 | | | |
| 231:18-20 | I, OB | | | | |
| 233:6-17 | F | | | | |
| 234:1-21 | E, F, H | | | | |
| 235:19-20 | | | | | |
| 235:22-24 | I, OB | | | | |
| 240:17-241:25 | E, F, H, R, U, MIL | | | | |
| 242:2-4 | | | | | |
| 244:3-6 | | | | | |
| 244:15-17 | | 244:8-14; 244:18-245:7 | | | |
| 249:10-15 | | | | | |
| 250:1-14 | E, F, H | | | | |
| 258:1-7 | E, R | | | | |
| 259:1-15 | E, R | 259:16-260:1 | | | |
| 264:16-18 | E, F, R | | | | |
| 264:23 | E, F, R | 264:24-265:8 | | | |
| 267:6-8 | | | | | |
| 267:10-19 | E, F, I, R | 267:24-267:25 | | | |
| 268:14-16 | R | | | | |
| 269:4-5 | R | | | | |
| 269:19-270:2 | E, F, H, I, R | 267:13-25; 270:3; 270:5-270:17 | | | |

| Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies, Inc. | | | | | |
|---|---|---|---|---|---|
| **Witness: Rosemary Dokos** | | | | | |
| **Date of Deposition:  June 7, 2019** | | | | | |
| **Plaintiff's Designations** | **ONT's Objections** | **ONT's Counter-Designations** | **Plaintiff's Objections** | **Plaintiff's Counter-Counter Designations** | **ONT's Objections** |
| 9:17-19 | | | | | |
| 15:2-25 | | | | | |
| 16:10-15 | | | | | |
| 18:17-19:3 | | | | | |
| 20:3-9 | | | | | |
| 21:6-22 | | | | | |
| 38:2-4 | E | 37:1-37:2; 37:4-37:9; 37:11-38:1; 38:7-38:11; 38:13-38:14 | | | |
| 38:6 | I | 38:7-38:11; 38:13-38:14 | | | |
| 38:15-16 | E | | | | |
| 38:18-25 | E | | | | |
| 39:2-6 | | | | | |
| 43:6-8 | E | 44:1-44:7 | I, 611 (44:1-7) | | |
| 43:10-14 | | | | | |
| 44:19-22 | E, MIS, OS | | | | |
| 44:24-45:4 | E, MIS, OS | | | | |
| 45:6-7 | MIS, OS, I | 45:8 | | | |
| 45:19-22 | E, IH | | | | |
| 45:24-46:12 | E, IH | | | | |
| 46:14-15 | E, IH | | | | |
| 46:17-25 | E, IH | | | | |
| 47:6-13 | E | | | | |
| 47:15-19 | E | | | | |
| 47:21 | E | | | | |
| 48:10-12 | E | | | | |
| 48:14-19 | E | | | | |
| 48:21-25 | E | | | | |
| 49:2-7 | E | | | | |
| 49:12-14 | E | | | | |
| 49:16-19 | E | 49:20-49:23; 49:25-50:7 | CP, 611 (49:20-23); CP, 611 (49:25-50:7) | 50:8-12; 50:14-19 | |
| 53:13-14 | E, ARG | | | | |

| | | | | |
|---|---|---|---|---|
| 53:16-21 | E, F | | | |
| 53:23-54:7 | F | | | |
| 55:11-12 | E | | | |
| 55:15-23 | | | | |
| 61:23-25 | E | | | |
| 62:2-9 | E | | | |
| 62:11-16 | E | | | |
| 71:3-22 | F | | | |
| 71:24-25 | | | | |
| 82:7-16 | E, F, MIL, R, U, OS | | | |
| 82:18-83:3 | F, OS | | | |
| 83:5-21 | F, OS | | | |
| 100:2-5 | E, F | | | |
| 100:7-19 | E, F | | | |
| 100:21-101:1 | F | | | |
| 103:13-16 | OS | | | |
| 103:22-104:8 | OS | | | |
| 116:24-117:2 | IH, OS, E, U | | | |
| 117:4-8 | IH, OS, E, U | | | |
| 133:15-18 | E | | | |
| 133:20-134:13 | E | | | |
| 134:15-17 | E | | | |
| 134:19-135:11 | E | | | |
| 135:13-136:6 | E | 136:7-136:10 | 136:11-18 | |
| 136:19-137:5 | F | | | |
| 138:25-139:2 | E, F | | | |
| 139:4-10 | E, F | | | |
| 139:12-140:1 | E | | | |
| 140:3-5 | E | | | |
| 140:7-19 | E | | | |
| 140:21-141:2 | E | | | |
| 141:4-8 | | | | |
| 142:11-143:15 | E, F, H | | | |
| 143:17-20 | E, F | | | |
| 143:22-144:1 | F | | | |
| 148:4-7 | E, F, H | | | |
| 148:9-19 | E, F, H | | | |
| 148:21-24 | F | | | |
| 149:3-15 | E, F, H | | | |
| 149:17-150:1 | E, F, H | | | |
| 150:3-17 | E, F, H | | | |
| 150:19-151:7 | E, F, H | | | |
| 151:9-12 | F | | | |
| 152:9-21 | E, F, H | | | |

| | | | | |
|---|---|---|---|---|
| 152:23-153:4 | E, F, H | | | |
| 153:6-15 | E, F, H | | | |
| 153:17-20 | | | | |
| 156:21-157:7 | | | | |
| 158:23-159:2 | | | | |
| 159:14-15 | E | | | |
| 159:17-23 | | | | |
| 160:6-9 | E | | | |
| 160:11-19 | | | | |
| 161:2-5 | H | 161:6-161:15 | 611 | |
| 162:10-11 | E | | | |
| 162:13-18 | E | | | |
| 162:20-23 | | | | |
| 169:14-170:9 | E, F, H | 170:13-170:24 | 611 | 170:25-171:1; 171:3-5 |
| 170:11-12 | F | | | |
| 171:6-11 | O, OS | | | |
| 175:1-6 | | 175:7-175:12 | 401, 402, 403 | |
| 175:13-20 | E | | | |
| 175:22-176:3 | E | | | |
| 176:5-16 | F, H | | | |
| 179:1-13 | E, H | | | |
| 179:15-21 | E, H | | | |
| 179:23-180:5 | | | | |
| 180:12-18 | H | 180:19-181:7; 181:9-181:14 | 611 (180:19-181:7); 611 (181:9-14) | |
| 181:15-182:14 | H | | | |
| 182:24-183:1 | | | | |
| 184:4-14 | E, F, H | | | |
| 184:16-18 | F | | | |
| 185:13-24 | E, F, H | | | |
| 186:1-5 | F | | | |
| 186:19-25 | O, OS | | | |

| Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies, Inc. | | | | | |
|---|---|---|---|---|---|
| Witness: Sissel Juul Jensen | | | | | |
| Date of Deposition:  April 30, 2019 | | | | | |
| Plaintiff's Designations | ONT's Objections | ONT's Counter-Designations | Plaintiff's Objections | Plaintiff's Counter-Counter Designations | ONT's Objections |
| 5:4-10 | | | | | |
| 10:20-11:2 | | | | | |
| 11:12-25 | | | | | |
| 13:6-14 | | | | | |
| 14:7-9 | | | | | |
| 15:21-24 | | | | | |
| 16:23-25 | | | | | |
| 17:21-22 | E | | | | |
| 17:24-18:4 | E, R | | | | |
| 18:24-19:3 | E, R | | | | |
| 19:5-11 | E, R | | | | |
| 19:13-20:5 | E, R | | | | |
| 20:7 | | | | | |
| 20:17-25 | E | | | | |
| 21:3-20 | E | | | | |
| 21:22-22:7 | | | | | |
| 23:3-7 | E, R | | | | |
| 23:9-13 | | | | | |
| 25:24-26:10 | | | | | |
| 26:19-21 | E, R | | | | |
| 26:23-25 | | | | | |
| 27:6-8 | E, R | | | | |
| 27:10-14 | E, R | | | | |
| 27:16-24 | E, R | | | | |
| 28:3-5 | E, R | | | | |
| 29:12-13 | E | | | | |
| 29:15-19 | | | | | |
| 30:7-8 | | | | | |
| 30:11-13 | E | | | | |
| 30:15-17 | E | | | | |
| 30:19-31:20 | I | 32:2-8 | I | | |
| 33:23-34:2 | E, R | | | | |
| 34:5-10 | E, R | | | | |
| 34:12 | | | | | |
| 36:15-18 | E | | | | |
| 36:20-25 | E | | | | |
| 37:3-7 | E | | | | |

| | | | | |
|---|---|---|---|---|
| 37:9-11 | E | | | |
| 37:13-18 | E | | | |
| 37:20-22 | E | | | |
| 37:24-38:9 | E | | | |
| 38:11-21 | E | | | |
| 38:23-39:2 | | | | |
| 40:9-11 | E | | | |
| 40:13-15 | E | | | |
| 40:17-21 | | | | |
| 48:7-9 | E | | | |
| 48:11-17 | E | | | |
| 49:3-7 | E | | | |
| 49:9-12 | | | | |
| 50:13-15 | E | | | |
| 50:17-21 | E | | | |
| 51:8-9 | E | | | |
| 51:11-14 | E | | | |
| 51:16-18 | | | | |
| 53:18-21 | E | | | |
| 53:23 | | | | |
| 56:18-22 | E | | | |
| 56:24-57:3 | E | | | |
| 57:5-8 | E | | | |
| 57:11-20 | | | | |
| 58:10-12 | E | | | |
| 58:14-59:4 | | | | |
| 60:15-19 | E | | | |
| 60:21-22 | | | | |
| 62:19-20 | E | | | |
| 62:22-25 | E | | | |
| 63:3-4 | | | | |
| 63:19-22 | E | | | |
| 63:24 | | | | |
| 64:20-23 | E | | | |
| 64:25 | | | | |
| 68:9-11 | E | | | |
| 68:13-16 | E | | | |
| 68:18-69:7 | E | | | |
| 69:9 | | | | |
| 69:15-16 | E | | | |
| 69:18-70:2 | | | | |
| 70:18-20 | E | | | |
| 70:22-25 | | | | |
| 71:25-72:6 | E | | | |

| | | | | | |
|---|---|---|---|---|---|
| 72:8-15 | E | | | | |
| 72:17 | | | | | |
| 73:9-17 | E | | | | |
| 73:19-23 | | | | | |
| 77:5-6 | E | | | | |
| 77:8-14 | E | | | | |
| 77:16-19 | E | | | | |
| 77:21 | | | | | |
| 78:3-4 | E | | | | |
| 78:6-11 | | | | | |
| 79:14-16 | E | | | | |
| 79:18-24 | E | | | | |
| 80:2-4 | E | | | | |
| 80:6-9 | | | | | |
| 80:18-21 | E | | | | |
| 80:24-25 | | | | | |
| 81:20-23 | E | | | | |
| 81:25 | | | | | |
| 82:2-3 | E | | | | |
| 82:5-14 | E | | | | |
| 82:16-17 | | | | | |
| 86:4-6 | E | | | | |
| 86:8-15 | E | | | | |
| 86:17-21 | E | | | | |
| 86:23-87:2 | E | | | | |
| 87:4-8 | E, R | | | | |
| 87:10-13 | E, R | | | | |
| 87:15-22 | E, R | | | | |
| 87:24 | | | | | |
| 88:8-14 | E | | | | |
| 88:16 | | | | | |
| 88:23-89:3 | E, F, I | 88:17-88:18; 88:20-88:21 | | | |
| 96:5-9 | E | | | | |
| 96:11-13 | E | | | | |
| 96:15 | | | | | |
| 96:17-19 | E, F, R | | | | |
| 96:21-97:7 | | | | | |
| 101:15-16 | E, F, R | | | | |
| 101:18-21 | E, F, R | | | | |
| 101:23-102:6 | E, F, I, R | 102:9-102:20; 102:22-103:2 | 401, 402, 403 | | |
| 102:8 | | | | | |

| | | 103:19-103:21; 103:24-103:25; | | | |
|---|---|---|---|---|---|
| 103:14-16 | E, F, I | 104:3-104:7 | 401, 402, 403 | | |
| 103:18 | | | | | |
| 107:11-12 | E, F | | | | |
| 107:14-19 | E, F | | | | |
| 107:21-108:10 | E, F | | | | |
| 108:12-15 | | | | | |
| 109:5-8 | E | | | | |
| 109:10-11 | E | | | | |
| 109:13-19 | E | | | | |
| 109:21 | | | | | |
| 111:5-7 | E | | | | |
| 111:9-13 | E, F | | | | |
| 111:15-18 | | | | | |
| 112:2-6 | E, F | | | | |
| 112:8-11 | | | | | |
| 116:15-16 | E | | | | |
| 116:18-117:7 | E | | | | |
| 117:9-16 | E | | | | |
| 117:18 | | | | | |
| 120:2-4 | E, F | | | | |
| 120:6-8 | E, F | | | | |
| 122:19-123:2 | | | | | |
| 123:19-124:8 | E, F | | | | |
| 124:10-14 | E, F | | | | |
| 124:17-19 | | | | | |
| 125:3-126:14 | E, F | | | | |
| 126:17-127:6 | E, F | | | | |
| 127:8-9 | | | | | |
| 130:18-21 | | | | | |
| 131:6-7 | E | | | | |
| 131:9-10 | E | | | | |
| 131:12-16 | E | | | | |
| 131:18-22 | | | | | |
| 132:12-133:4 | E, F | | | | |
| 133:6-8 | E, F | | | | |
| 133:10-12 | E, F | | | | |
| 133:14 | | | | | |
| 134:3-5 | E, F | | | | |
| 134:8-17 | E, F | | | | |
| 134:19-24 | E | | | | |
| 135:2-8 | E, F | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 135:10-17 | E, F, ARG | | | | |
| 135:19 | | | | | |
| 146:10-11 | E | | | | |
| 146:13-21 | E | | | | |
| 146:23-25 | E | | | | |
| 147:3-7 | E | | | | |
| 147:9-12 | | | | | |
| 148:10-12 | | | | | |
| 158:4-5 | E, F | | | | |
| 158:7-8 | | | | | |

| Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies, Inc. | | | | | |
|---|---|---|---|---|---|
| **Witness: Jim McDonald** | | | | | |
| **Date of Deposition:  May 29, 2019** | | | | | |
| **Plaintiff's Designations** | **ONT's Objections** | **ONT's Counter-Designations** | **Plaintiff's Objections** | **Plaintiff's Counter-Counter Designations** | **ONT's Objections** |
| 9:16-18 | | | | | |
| 11:17-19 | I, R | 11:2-11:13 | | 11:14-16 | |
| 13:3-4 | I | 13:5-13:10 | | | |
| 14:24-25 | | | | | |
| 15:1-2 | | | | | |
| 43:14-18 | E, F, R | | | | |
| 43:20-21 | F, R | | | | |
| 50:2-25 | E, R | | | | |
| 51:1-5 | I, R | 51:15-52:2 | I | | |
| 53:1-6 | E, I, F, R | 52:9-52:25 | | | |
| 53:8-23 | I, R | | | | |
| 54:11-14 | E, F, I, R | 54:17-56:24 | | | |
| 55:14-17 | R | | | | |
| 59:24-25 | I, F, R | | | | |
| 60:1-3 | I, F, R | 60:4-60:17 | | | |
| 60:18-21 | E, F, R | | | | |
| 60:23-25 | F, R | | | | |
| 61:8-14 | E, F, H, R | | | | |
| | | 63:16-64:16 | 403, P, BTS, 611 | | |
| 64:17-23 | I, O, R | 64:24-65:9; 65:11-65:20; 65:22-66:2 | 403, P (64:11-16), (64:24-65:8), (65:11-20), (65:22-66:2) | | |
| | | 69:5-69:9 | 403, P, BTS, 611 | | |
| 74:19-25 | E, F, R | | | | |
| 75:2-5 | | | | | |
| 78:7-9 | | | | | |
| 78:21-25 | E, F, R | | | | |
| 79:1 | E, F, R | | | | |
| 79:3-13 | E, F, R | | | | |
| 80:22-25 | E, F, R | | | | |
| 81:1-9 | E, F, R | | | | |
| 81:12-13 | E, F, R | | | | |
| 81:15-16 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 81:25 | E, F, R | | | | |
| 82:1-3 | E, F, R | | | | |
| 83:4-6 | E, F, R | | | | |
| 83:8 | | | | | |
| 83:22-24 | E, F, R | | | | |
| 86:23-25 | E, F, R | | | | |
| 87:1 | | | | | |
| 93:22-25 | I | | | | |
| 94:1-8 | I | | | | |
| 94:18-22 | E, I | 95:1-95:3; 95:7-96:8; 96:12-96:16 | 403, P (95:20-96:8), (96:12-16) | | |
| 94:24-25 | I | | | | |
| 99:13-19 | MIS | | | | |
| 99:24-25 | MIS | | | | |
| 100:1-4 | MIS | | | | |
| 100:7-12 | I | 103:15-103:17; 103:19-104:1; 104:5-104:12; 104:15-105:6; 105:8; 108:9-11; 108:15-109:5; 109:16-109:19 | 403, P (103:15-103:17), (103:19-104:1), (104:5-104:12), (104:15-105:6), (105:8) (108:9-11), (108:15-109:5); 403, I, P (109:16-19) | | |
| 120:13-16 | F | | | | |
| 120:19-25 | F | | | | |
| 121:1-5 | E, F | | | | |
| 121:7-11 | E, F, OS | | | | |
| 121:14-19 | E, F | | | | |
| | | 123:2-123:12 | 403, P, BTS, 611 | | |
| 128:21-23 | OS | | | | |
| 128:25 | OS | | | | |
| 131:13-16 | OS | | | | |
| 131:19 | OS | | | | |
| 159:10-13 | E, F, I, R | 157:23-157:25; 158:2-158:22; 158:24-159:5 | | | |
| 159:15-25 | E, F, I, R | | | | |
| 160:1 | | | | | |
| 162:24-25 | | | | | |
| 163:1-13 | | | | | |
| 167:7-15 | E, I, F, R | 166:8-167:6 | | | |

| 173:17-22 | E, F | | | | |
|---|---|---|---|---|---|
| 173:24-25 | | | | | |
| 174:1-5 | E, F, I | 174:19-175:12 | 403 | | |
| 174:7 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| colspan="6" | **Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies, Inc.** |
|  | **Witness: Dr. Stuart Reid** |
|  | **Date of Deposition:  June 6, 2019** |
| **Plaintiff's Designations** | **ONT's Objections** | **ONT's Counter-Designations** | **Plaintiff's Objections** | **Plaintiff's Counter-Counter Designations** | **ONT's Objections** |
| 10:11-14 | | | | | |
| 11:20 | E | | | | |
| 11:22-25 | E | | | | |
| 12:2-6 | E, I | | | | |
| 12:8-9 | I | 12:10-12:12; 12:14-12:18 | 401, 402, 403, 611 | 12:19-13:2, 13:4-7, 13:9-11, 13:13-14 | |
| 13:15-16 | E, I | 13:24-13:25; 14:2-14:21 | 611 | | |
| 13:18-19 | E, I | 13:24-13:25; 14:2-14:21 | 611 | | |
| 26:7-12 | E, F, IH, R, U | | | | |
| 26:14-16 | | | | | |
| 27:8-12 | E, F, IH, R, U | | | | |
| 27:14 | | | | | |
| 27:16-25 | E, F, R, U | | | | |
| 28:2-18 | E, F, R, U | | | | |
| 28:20-29:4 | E, F, R, U | | | | |
| 29:6-10 | | | | | |
| 30:22-31:6 | E, F, R, U | | | | |
| 31:11-17 | E, F, R, U | | | | |
| 31:19-21 | | | | | |
| 33:22-23 | E, F, R, U | | | | |
| 33:25-34:8 | | | | | |
| 34:19-35:19 | E, F, H | | | | |
| 35:21-36:10 | E, F, H | | | | |
| 36:25-37:24 | E, F, H | | | | |
| 38:10-25 | E, F, H | | | | |
| 39:2-9 | E, F, H | | | | |
| 40:3-20 | E, F, H | | | | |
| 40:23-41:2 | | | | | |
| 42:7-18 | E, I | 42:20-42:22 | I | 42:23-24, 43:1-3, 43:5-12, 43:14-15 | |
| 44:21-45:6 | E, F, H, R, U | | | | |
| 45:8-11 | E, F, H, R, U | | | | |
| 45:13-46:2 | E, F, H, R, U | | | | |
| 46:7-23 | E, F, H, R, U | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 46:25-47:3 | | | | | |
| 47:13-14 | E, F, R, U | | | | |
| 47:16-23 | E, F, R, U | | | | |
| 48:8-11 | E | | | | |
| 48:13-15 | E | | | | |
| 48:23-25 | E | | | | |
| 49:2-17 | E, F, H, R, U | | | | |
| 49:23-50:7 | E, OS | | | | |
| 50:17-51:8 | E, OS | | | | |
| 52:16-53:8 | E | | | | |
| 53:10-17 | | | | | |
| 54:16-23 | E, F, H, R, U | | | | |
| 55:10-13 | E, F, MISS, OB | | | | |
| 55:15 | E, F, MISS, OB | | | | |
| 56:17-20 | E, F, MISS | | | | |
| 56:22-24 | E | | | | |
| 57:1-9 | E | | | | |
| 57:11-18 | E | | | | |
| 57:20-58:2 | | | | | |
| 59:23-60:6 | | | | | |
| 60:20-61:5 | E, F, H, R | | | | |
| 61:16-62:6 | E, F, H, R | | | | |
| 62:8-21 | E, F | | | | |
| 62:23-63:1 | | | | | |
| 63:23-64:7 | E, F, O, R, U | | | | |
| 64:9-10 | E, F, O, R, U | | | | |
| 64:13-21 | E, F, R, U | | | | |
| 65:2-3 | E | | | | |
| 65:5-6 | E | | | | |
| 65:8-66:21 | E | | | | |
| 66:23-67:9 | | | | | |
| 68:15-17 | E | | | | |
| 68:19-69:2 | E | | | | |
| 69:4-7 | I | 69:8-69:10; 69:12-69:18; 69:20-69:22 | 401, 402, 403 (69:8-10, 69:12-18, 69:20-22) | | |
| 70:12-18 | E | | | | |
| 70:22-24 | | | | | |
| 71:21-22 | E, OB | | | | |
| 71:24 | E, OB | | | | |
| 72:6-73:8 | | | | | |
| 75:12-14 | E, F | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 75:16 | E, F | | | | |
| 75:18-21 | E, F | | | | |
| 75:23-25 | | | | | |
| 76:8-9 | E, F | | | | |
| 76:11-12 | E, F | | | | |
| 76:16-25 | E | | | | |
| 77:2-18 | E | | | | |
| 77:20-25 | | | | | |
| 78:2-9 | E | | | | |
| 78:11-18 | E | | | | |
| 78:20-23 | | | | | |
| 79:24-80:1 | E | | | | |
| 80:3-5 | | | | | |
| 80:14-16 | E | | | | |
| 80:18-24 | | | | | |
| 81:17 | E, F, MISS | | | | |
| 81:19-20 | I | 81:21-81:24; 82:1-3 | I, 401, 402, 403, 611 | | |
| 83:2-5 | E, I | 83:7-14 | | | |
| 83:16-19 | | | | | |
| 85:9-11 | E, F | | | | |
| 85:13 | | | | | |
| 85:15-19 | E, F | | | | |
| 85:21-23 | | | | | |
| 102:20-103:8 | E, R, U | | | | |
| 107:11-12 | | | | | |
| 107:14-19 | | | | | |
| 107:22-108:4 | E, F | | | | |
| 108:6-9 | I | 108:10-108:18; 108:20-109:4; 109:6-109:14; 109:16-109:22; 109:24-110:3; 110:5-110:8 | 401, 402, 403 (108:10-18, 108:20-109:4, 109:6-14, 109:16-17) | | |
| 110:11-16 | E, I, MISS | 110:17-110:18; 110:20-110:24; 111:1-111:7; 111:9-111:17; 111:19-111:21; 111:23-112:4; 112:6-112:7 | 602, 701, 702 (110:17-18, 110:20-24, 111:1-3); 403 (111:4-7, 111:9-17, 111:19-21, 111:23-112:4) | | |

| | | | | | |
|---|---|---|---|---|---|
| 112:8-16 | E, I | 112:17-112:23; 112:25-113:4; 113:6-113:8; 113:10-114:3; 114:5-114:8; 114:10-114:11 | 401, 402, 403 (112:17-23, 112:25-113:4, 113:6-8, 113:10-11); 403 (113:12-114:3, 114:5-8, 114:10-11) | | |
| 114:12-16 | E | | | | |
| 115:19-25 | E, NARR | | | | |
| 116:3-18 | E | | | | |
| 116:20-117:8 | E | | | | |
| 117:10-23 | E | | | | |
| 117:25-118:5 | E | | | | |
| 118:7-119:10 | E | | | | |
| 119:12-25 | E | | | | |
| 120:1 | E | | | | |
| 120:3-25 | E | | | | |
| 121:2-16 | E | | | | |
| 121:18-122:15 | | | | | |
| 124:21-125:7 | E, F | | | | |
| 125:9-11 | | | | | |
| 126:25-127:14 | E | | | | |
| 128:3-8 | E | | | | |
| 128:10-13 | E | | | | |
| 128:15-20 | | | | | |
| 130:22-23 | E | | | | |
| 130:25-131:10 | | | | | |
| 131:16-20 | | | | | |
| 132:1-5 | | | | | |
| 132:19-133:7 | E | | | | |
| 133:9-14 | | | | | |
| 134:2-6 | | | | | |
| 134:15-17 | E | | | | |
| 134:19-135:16 | E | | | | |
| 135:18-23 | | | | | |
| 136:3-5 | E | | | | |
| 136:7-137:7 | E | | | | |
| 137:9-16 | E | | | | |
| 137:18-138:2 | E | | | | |
| 138:23-139:9 | E, H | | | | |
| 139:20-23 | E | | | | |
| 139:25-140:1 | I | 140:7-140:11; 140:13-140:20 | 611 | | |
| 140:21-141:2 | E, I | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 141:4-5 | I | 141:7-141:10 | 611 | | |
| 141:11-12 | E | | | | |
| 141:14-142:3 | E | | | | |
| 142:5-16 | E | | | | |
| 142:18-143:19 | E, F, H, I | 143:20-143:23; 143:25-144:2; 144:4-144:12 | 611 (144:1-2, 114:4-8); I, 401, 402, 403 (144:9-12) | | |
| 145:1-8 | E, MISS | | | | |
| 145:10-12 | E | | | | |
| 145:14-22 | E | | | | |
| 145:24 | | | | | |
| 146:7-11 | | | | | |
| 146:24-147:25 | E, F, H, R, U | | | | |
| 148:2-3 | I | 148:6-9 | I | | |
| 148:10-16 | | | | | |
| 148:20-21 | E | | | | |
| 148:23-25 | | | | | |
| 149:1-3 | E | | | | |
| 149:5-14 | E | | | | |
| 149:16-19 | | | | | |
| 151:8-10 | E | | | | |
| 151:12-20 | E | | | | |
| 151:22-23 | | | | | |
| 152:10-14 | E, F, H, R, U | | | | |
| 152:16-17 | | | | | |
| 153:1-3 | E | | | | |
| 153:5-16 | E, F | | | | |
| 154:11-15 | E | | | | |
| 154:18 | I | 154:19-155:5 | 611 | | |
| 155:23-25 | E, F, MISS | | | | |
| 156:2-3 | | | | | |
| 159:1-5 | E | | | | |
| 159:7-13 | E, IH | | | | |
| 159:15-18 | E, F | | | | |
| 159:20-160:3 | E, F | | | | |
| 160:5-11 | E | | | | |
| 160:13-21 | | | | | |
| 162:9-13 | E, F | | | | |
| 162:15-163:3 | E, F | | | | |
| 163:5-8 | E, F | | | | |
| 163:10-164:3 | E, F | | | | |
| 164:5-9 | E, F | | | | |
| 164:12 | | | | | |
| 168:25-169:24 | E, F, H | | | | |

| 170:1-4 | E, F | | | | |
|---|---|---|---|---|---|
| 170:6-12 | E, F, H | | | | |
| 170:14-171:1 | E, F, H | | | | |
| 171:3-13 | E, F, H | | | | |
| 171:15-172:1 | E, F, H | | | | |
| 172:7-11 | E, F | | | | |
| 175:14-16 | E, F | | | | |
| 175:18-19 | | | | | |
| 177:11-178:2 | E | | | | |
| 178:4-5 | | | | | |
| 180:16-181:7 | I | 181:8-181:9 | | | |
| 181:10-16 | | | | | |
| 182:1-7 | E | | | | |
| 182:9-14 | | | | | |
| 182:16-22 | E, F | | | | |
| 182:24-25 | | | | | |
| 183:5-16 | E, F, H, R | | | | |
| 183:18-184:25 | | | | | |
| 185:12-20 | | | | | |
| 186:4-18 | E, F | | | | |
| 187:3-22 | E, F, H | | | | |
| 187:24-188:23 | E, F, H | | | | |
| 188:25-189:13 | E | | | | |
| 189:15-25 | | | | | |
| 190:24-191:8 | E, F | | | | |
| 191:10-24 | E, F | | | | |
| 194:18-195:8 | E, F | | | | |
| 195:10-12 | | | | | |
| 195:20-196:21 | E, F | | | | |
| 196:23-197:23 | E, F | | | | |
| 198:4-199:19 | E, F | | | | |
| 199:21-200:1 | E, F | | | | |
| 200:6-201:2 | E, F | | | | |
| 201:6-7 | E, F | | | | |
| 201:9-202:1 | E, F | | | | |
| 202:3-5 | E, F | | | | |
| 202:7-203:9 | E, F | | | | |
| 203:11-12 | | | | | |
| 203:21-204:20 | E, F | | | | |
| 204:22-23 | | | | | |
| 206:6-11 | E, F | | | | |
| 206:13-207:8 | E, F | | | | |
| 207:10-16 | E, F | | | | |
| 207:18-19 | E, F | | | | |
| 207:21-24 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 208:17-21 | E, F | | | | |
| 208:23-209:8 | | | | | |
| 209:19-210:18 | E, F | | | | |
| 210:20-24 | | | | | |
| 211:11-22 | | | | | |
| 211:25-212:1 | | | | | |
| 212:13-213:14 | E, F | | | | |
| 213:16-20 | E, F | | | | |
| 213:22-214:7 | E, F | | | | |
| 214:9-16 | E, F | | | | |
| 215:13-20 | E, F | | | | |
| 215:22-216:1 | E, F | | | | |
| 217:6-219:25 | | | | | |
| 220:18-22 | E, F | | | | |
| 220:24-221:16 | E, F | | | | |
| 221:18 | E, F | | | | |
| 221:20-222:23 | E | | | | |
| 224:1-8 | | | | | |
| 224:15-17 | E, F | | | | |
| 224:19-227:23 | E, F | | | | |
| 227:25-228:1 | E, F | | | | |
| 228:3-6 | E, F | | | | |
| 228:8-23 | E, F | | | | |
| 228:25-229:7 | | | | | |
| 229:19-230:19 | | | | | |
| 230:21-231:6 | E | | | | |
| 231:8-10 | E | | | | |
| 231:12-21 | E | | | | |
| 231:23-233:17 | E | | | | |
| 233:19-25 | E | | | | |
| 234:2-10 | E | | | | |
| 234:12 | E | | | | |
| 234:14-23 | | | | | |
| 235:2-7 | E | | | | |
| 235:9-15 | E | | | | |
| 235:17-236:3 | E, I | 236:4-236:7 | | | |
| 236:8-18 | I | 236:19-236:21; 236:23-237:1; 237:3-237:17; 239:24-240:12; 240:16-241:11 | I (237:16-17, 239:24-240:3); 401, 402, 403 (240:4-11) | 237:18-23, 237:25-238:2, 242:10-17, 243:10-18, 244:9-14 | |
| 245:7-18 | E | | | | |
| 245:20-246:6 | E | | | | |
| 246:8-9 | E, I | 246:12-246:15 | I | | |
| 246:16-24 | E, ARG | | | | |

| | | | | |
|---|---|---|---|---|
| 247:1-18 | E | | | |
| 247:20-248:17 | E | | | |
| 248:22-250:8 | E, F, OS | | | |
| 253:3-6 | E, F, OS | | | |
| 253:8-9 | | | | |
| 253:11-21 | E, F, OS | | | |
| 255:1-14 | E, F, OS | | | |
| 255:16-256:4 | E, F, OS | | | |
| 256:6 | | | | |
| 256:18-22 | E, F, OS | | | |
| 257:2-258:4 | E, F, H, OS | | | |
| 258:6-8 | | | | |
| 259:9-12 | E, F, OS | | | |
| 259:14-20 | | | | |
| 259:22-260:2 | E | | | |
| 260:4-8 | | | | |
| 260:25-261:8 | I | 261:9-261:12; 261:14 | I | |
| 265:14-15 | | | | |
| 265:17 | E | | | |
| 265:22-24 | E | | | |
| 266:1-8 | E | | | |
| 266:10-13 | | | | |
| 267:5-9 | | | | |

| Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies, Inc. | | | | | |
|---|---|---|---|---|---|
| **Witness: Dr. Stuart Reid** | | | | | |
| **Date of Deposition:  July 16, 2020** | | | | | |
| **Plaintiff's Designations** | **ONT's Objections** | **ONT's Counter-Designations** | **Plaintiff's Objections** | **Plaintiff's Counter-Counter Designations** | **ONT's Objections** |
| 280:12-14 | | | | | |
| 281:1-8 | | | | | |
| 285:2-3 | E, R | | | | |
| 285:5-6 | R | | | | |
| 285:7-287:2 | E, R, U | | | | |
| 287:4-288:2 | E, R, U | | | | |
| 288:4-12 | E, R, U | | | | |
| 288:14-16 | | | | | |
| 289:12-290:10 | E, R, U | | | | |
| 297:2-6 | | | | | |
| 297:18-299:10 | E, F, H, I | 299:11-299:17; 299:19-299:22 | 611 | | |
| 300:3-11 | E, F, H | | | | |
| 300:13-24 | I | 300:25-301:3 | 403, 611 | | |
| 301:4-14 | E, F, H, I | 301:15-302:5 | 403, 611 | | |
| 302:18-303:3 | E, F, H | | | | |
| 307:15-308:3 | E, F, R | | | | |
| 311:13-312:20 | E | | | | |
| 312:22-313:10 | E | | | | |
| 313:12-16 | E | | | | |
| 313:18 | I | 313:19-314:2 | 611 | | |
| 314:21-25 | E | | | | |
| 315:2-315:4 | E | | | | |
| 315:6-8 | | | | | |
| 315:23-316:1 | E | | | | |
| 316:3-4 | | | | | |
| 317:15-17 | E | | | | |
| 317:19-20 | | | | | |
| 317:23-318:10 | E | | | | |
| 320:2-15 | E, F, H | | | | |
| 321:11-25 | E, F, H | | | | |
| 322:2-9 | E, F | | | | |
| 322:11-323:16 | E, F | | | | |
| 323:21-324:18 | E | | | | |
| 324:20-325:5 | | | | | |
| 325:21-326:6 | E | | | | |
| 326:19-326:22 | E | | | | |
| 326:24-25 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 328:19-329:13 | E | | | | |
| 329:15-331:17 | E, F, H | | | | |
| 332:5-19 | E | | | | |
| 332:21-333:9 | E, H | | | | |
| 333:11-12 | | | | | |
| 333:24-25 | E | | | | |
| 334:2-7 | E | | | | |
| 334:9 | | | | | |
| 334:12-15 | E, O | | | | |
| 334:21 | | | | | |
| 334:25-335:6 | E | | | | |
| 338:11-25 | E, O | | | | |
| 339:4-5 | | | | | |
| 341:8-342:7 | E, F, H | | | | |
| 342:9-19 | E | | | | |
| 345:17-346:4 | E, F, H, I | 346:24-347:8 | 403, 611 | | |
| 347:9-349:12 | E, F, H, R | | | | |
| 351:14-16 | E | | | | |
| 351:18 | | | | | |
| 356:21-23 | E | | | | |
| 356:25 | | | | | |
| 358:16-18 | E | | | | |
| 358:20-359:2 | E | | | | |
| 359:4-8 | | | | | |
| 359:16-21 | E | | | | |
| 359:23-24 | | | | | |
| 362:19-22 | E, F | | | | |
| 362:24-363:5 | E, F | | | | |
| 363:7-13 | E, F | | | | |
| 363:15-18 | E, F | | | | |
| 363:20-24 | E, F | | | | |
| 364:1-11 | E, F | | | | |
| 364:15-20 | E, F | | | | |
| 364:22-25 | E, F | | | | |
| 365:2 | | | | | |
| 368:9-13 | E, F, R | | | | |
| 368:15-16 | E, F, R | | | | |
| 368:18-21 | E, F, R | | | | |
| 368:23-369:9 | E, F, R, I | 369:10-369:18; 369:20-369:23 | 602, 611, 703 | | |
| 370:18-20 | E, F, R | | | | |
| 370:22-25 | E, F, R | | | | |
| 371:2-4 | I | 371:5-371:9 | 602, 611, 701, 702 | 371:10-20 | |
| 373:10-13 | E, F, R | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 373:15-374:1 | E, F, H, R | | | | |
| 374:3-23 | E, F, H, R | | | | |
| 374:25 | | | | | |
| 380:13 | E | | | | |
| 380:15-22 | E | | | | |
| 381:5-382:1 | E, F, O, OS | | | | |
| 382:5-13 | E, F, O, OS | | | | |
| 382:18-20 | | | | | |
| 385:13-16 | E, F, OS | | | | |
| 385:20-25 | E, F, OS | | | | |
| 386:6-8 | E, F, OS | | | | |
| 390:6-8 | E | | | | |
| 390:11-18 | E | | | | |
| 390:20-23 | E | | | | |
| 390:25-391:9 | E | | | | |
| 391:11-12 | | | | | |
| 392:11-12 | | | | | |
| 393:6-19 | E, F, H, I, R | 392:22-393:5 | 401, 402, 403, 602, 701, 702 | | |
| 393:21-25 | E, F, H, R | | | | |
| 396:18-397:1 | E, F, H, R | | | | |
| 397:3-8 | E, F, H, R | | | | |
| 397:10-12 | E, F, H, R | | | | |
| 397:14-15 | | | | | |
| 398:2-3 | E, F, H, R | | | | |
| 398:5-7 | E, F, H, R | | | | |
| 398:9-22 | E, F, H, R | | | | |
| 398:24-399:18 | E, F, H, R | | | | |
| 404:23-405:11 | E, F, H, R | | | | |
| 407:24-408:4 | E, F, H, R | | | | |
| 408:6-22 | E, F, H, R | | | | |
| 408:24-409:10 | E, F, H, R | | | | |
| 414:17-25 | E, F, H, R | | | | |
| 415:2-417:13 | E, F, H, R | | | | |
| 417:15 | | | | | |
| 418:2-4 | E, F, H, R | | | | |
| 418:6-19 | E, F, H, R | | | | |
| 418:21-419:10 | E, F, H, R | | | | |
| 419:12-18 | E, F, H, R | | | | |
| 419:20-24 | E, F, H, R | | | | |
| 420:1-5 | E, F, H, R | | | | |
| 420:15-421:15 | E, F, H, R | | | | |
| 421:18-422:2 | E, F, H, R | | | | |

| | | | | |
|---|---|---|---|---|
| 422:4-13 | E, F, H, I, R | 422:14-423:12 | 401, 402, 403, 611 | |
| 423:13-424:12 | E, F, H, R | | | |
| 425:9-426:1 | E, F, H, R | | | |
| 426:16-18 | | | | |
| 426:20-427:13 | E, F, H, I | 427:14-428:2 | 403, 602, 701, 702 | |
| 428:24-430:6 | E, F, H | | | |
| 430:8-24 | E, F, H, I | 430:25-431:6 | 602, 701, 702 | |
| 431:7-9 | I | 431:10-431:11; 431:13-431:14 | 403 | |
| 431:18-19 | E, F, H | | | |
| 431:21-24 | | | | |
| 434:3-10 | E, F, H, I | 434:11-434:20 | 401, 402, 403 (434:11-13); 611, I (434:14-20) | |
| 435:12-436:15 | E, F, H | | | |
| 437:23-438:7 | E, F, H, I | 438:8-438:14 | 403 | |
| 438:15-21 | E, F, H, I | 438:22-439:4 | 403 | |
| 439:5-16 | E, F, H | | | |
| 440:10-16 | E, F, H | | | |
| 440:24-441:1 | E, F, H | | | |
| 441:3-4 | | | | |
| 443:6-12 | E, F, H | | | |
| 449:5-10 | E, F, H | | | |
| 450:16-19 | E, F, H | | | |
| 450:23-451:7 | E, F, H | | | |
| 451:10-15 | E, F, H | | | |
| 451:17-21 | E, F, H | | | |
| 451:23-452:7 | E, F, H | | | |
| 452:9-22 | E, F, H | | | |
| 452:24-453:1 | E, F, H | | | |
| 453:3-23 | E, F, H | | | |
| 453:25-454:5 | I | 454:6-454:16 | | |
| 455:24-456:4 | | | | |
| 457:3-20 | E, F, H | 457:21-458:2; 458:4-458:18 | 611 (458:4-18) | 458:19-20 |
| 459:21-24 | E, F, H, R | | | |
| 460:1-2 | | | | |
| 460:10-16 | E, F, H | | | |
| 460:18-461:2 | E, F, H | | | |
| 461:4-462:18 | E, F, H | | | |
| 463:5-14 | E, F, H | | | |
| 463:16 | | | | |

| | | | | |
|---|---|---|---|---|
| 464:14-465:11 | E, F, H | | | |
| 465:13-14 | E, F, H | | | |
| 465:16-22 | E, F, H | | | |
| 465:24-25 | E, F, H | | | |
| 466:18-20 | | | | |
| 466:22-467:3 | E, F, H | | | |
| 470:2-3 | | | | |
| 470:5-18 | E, F, H | | | |
| 471:16-20 | E, F, H, MIL | | | |
| 472:1-473:4 | E, F, H, MIL | | | |
| 473:6 | | | | |
| 473:14-474:1 | E, F, H, MIL | | | |
| 474:19-23 | E | | | |
| 474:25-475:13 | E | | | |
| 475:15-476:22 | E | | | |
| 476:24-477:5 | E | | | |
| 477:8-478:10 | E | | | |
| 478:12-13 | | | | |
| 479:1-4 | E | | | |
| 479:6-9 | | | | |
| 479:17-480:3 | E, O, OS | | | |
| 480:6-7 | | | | |
| 481:19-20 | E, O, OS | | | |
| 481:23-25 | E, O, OS | | | |
| 482:5-8 | | | | |
| 482:25-483:3 | E | | | |
| 483:5-484:1 | E | | | |
| 484:3-8 | E | | | |
| 484:10-21 | E | | | |
| 484:23-485:1 | E | | | |
| 485:3-4 | | | | |
| 487:19-22 | E | | | |
| 487:24-488:2 | | | | |
| 490:9-11 | E, O, OS | | | |
| 490:15-24 | E, O, OS, MIS | | | |
| 491:2-3 | | | | |
| 491:12-492:2 | E, O, OS | | | |
| 492:5-6 | | | | |
| 494:10-13 | E | | | |
| 494:15 | | | | |
| 494:23-495:7 | E, F | 495:8-495:16 | 401, 402, 403, 611 | |
| 496:1-19 | E, F, H | | | |
| 498:1-4 | E, F, H, I | | | |
| 500:4-7 | E, F, H | | | |

| | | | | | |
|---|---|---|---|---|---|
| 500:9-19 | E, F, H | | | | |
| 501:5-11 | E, F, H | | | | |
| 501:13-23 | E, F, H | 501:24-502:6; 502:8-502:11 | 403 | 502:12-15; 502:19-20 | |
| 502:24-503:15 | E, F, H | 503:16-503:22 | 611 (503:16-19); 401, 402, 403, ARG (503:20-22) | | |
| 503:23-504:1 | E, F, H | | | | |
| 504:3-5 | | | | | |
| 504:15-505:4 | E, F, H | | | | |
| 505:6-505:7 | E, F, H | | | | |
| 505:9-506:9 | E, F, H | | | | |
| 506:11-13 | | | | | |
| 511:17-21 | E, F, H | | | | |
| 512:1-13 | E, F, H | 512:18-512:25 | | | |
| 516:17-517:8 | E, F, H | | | | |
| 517:10-12 | | | | | |
| 517:15-21 | | | | | |
| 519:5-9 | E, F, H | | | | |
| 519:11-12 | | | | | |

| Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies, Inc. | | | | | |
|---|---|---|---|---|---|
| Witness: Dr. Gordon Sanghera | | | | | |
| Date of Deposition:  October 1, 2019 | | | | | |
| Plaintiff's Designations | ONT's Objections | ONT's Counter-Designations | Plaintiff's Objections | Plaintiff's Counter-Counter Designations | ONT's Objections |
| 9:11-14 | | | | | |
| 10:16-20 | | | | | |
| 10:23-11:8 | | | | | |
| 11:12-22 | | | | | |
| 12:23-13:1 | | | | | |
| 14:25-15:3 | E, I | 15:4-15:15 | | 15:16-19; 15:21-23 | |
| 19:4-6 | E, OS, R | | | | |
| 19:9-22 | E, I, OS, R | | | | |
| 19:24-20:3 | | | | | |
| 24:10-12 | I | 24:14-25:5; 25:7-25:15 | | | |
| 25:21-26:9 | E, F | | | | |
| 26:11-17 | E, F | | | | |
| 26:19-21 | F | | | | |
| 29:22-25 | E, F | | | | |
| 30:2 | | 30:3-9 | | | |
| 30:17-19 | | | | | |
| 30:21-22 | R, U, MIL | | | | |
| 31:20-32:4 | E, I, R, U, MIL | 30:23-31:15 | 403, P (31:4-12) | | |
| 32:6-16 | F, H, I, R, U, MIL | 32:20-33:2 | 403, I (32:20-33:2) | | |
| 34:20-22 | R, U, MIL | | | | |
| 34:24-35:15 | F, H, I, R, U, MIL | 35:16-36:2 | | | |
| 38:22-24 | F, H, I, R, U, MIL | 39:1-7 | | | |
| 39:1-7 | I, R, U, MIL | 38:22-24 | | | |
| 41:3-8 | F, H, R, U, MIL | | | | |
| 41:13-15 | E, F, H, OS, R | | | | |
| 43:15-20 | E, R, U, MIL | | | | |
| 43:24-44:1 | E, F, R, U, MIL | | | | |
| 44:3-45:3 | E, F, OS, R, U, NARR, MIL | | | | |
| 45:20-46:11 | E, F, I, OS, R, U, MIL | 46:12-47:3 | 403, P (46:12-47:3) | | |
| 51:11-13 | E, F, I, OS, R, U, MIL | | | | |
| 51:16-52:5 | E, F, I, OS, R, U, MIL | | | | |
| 52:7-9 | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 52:16-18 | E, F, I, OS, R, U, MIL | | | | |
| 52:20-53:5 | E, F, I, OS, R, U, MIL | | | | |
| 53:7-13 | E, F, I, OS, R, U, MIL | | | | |
| 53:15-21 | E, F, I, OS, R, U, MIL | | | | |
| 53:24-54:1 | E, F, I, OS, R, U, MIL | | | | |
| 54:13-16 | E, F, I, OS, R, U, MIL | | | | |
| 54:18 | E, F, I, OS, R, U, MIL | | | | |
| 55:20-21 | | | | | |
| 55:23-25 | E, F, I, R, U, MIL | | | | |
| 56:3-11 | E, F, I, R, U, MIL | | | | |
| 56:13-18 | E, F, I, R, U, MIL | | | | |
| 56:20-23 | E, F, I, R, U, MIL | | | | |
| 60:2-4 | E, F, OS, R, U | | | | |
| 60:6 | E, F, OS, R, U | | | | |
| 61:22-24 | E, F, OS, R, U | | | | |
| 62:2 | | | | | |

# EXHIBIT D

**EXHIBIT D TO PRETRIAL ORDER**
**DEFENDANTS' DEPOSITION DESIGNATIONS**

**PLAINTIFF'S KEY OF OBJECTIONS**

| Objection Code | Objection |
|---|---|
| 401 | Objection under Fed. R. Evid. 401 |
| 402 | Objection under Fed. R. Evid. 402 |
| 403 | Objection under Fed. R. Evid. 403 |
| 602 | Objection under Fed. R. Evid. 602 |
| 611 | Objection under Fed. R. Evid. 611 |
| 701 | Objection under Fed. R. Evid. 701 |
| 702 | Objection under Fed. R. Evid. 702 |
| 703 | Objection under Fed. R. Evid. 703 |
| BTS, 611 | Beyond the scope of examination or of 30(b)(6) topic. |
| CP | Compound question. |
| FOW | An objection to form is waived if it was not timely made during the deposition, Fed. R. Civ. P. 32(d)(3)(B). |
| H | Hearsay if offered for the truth of the matter asserted; Fed. R. Evid. 801, 803, 805. |
| I | Incomplete designation; Fed. R. Evid. 106 |
| IH | Incomplete Hypothetical. |
| LW | Witness will be testifying live at trial. |
| MIS | Mischaracterization of testimony or evidence. |
| NARR | Narrative. |
| OB | Attorney Objection improperly designated/Improper designation. |
| P | Privileged; Fed. R. Evid. 501, Fed. R. Civ. P. 26(b)(3),(4) |

Plaintiff makes these disclosures without prejudice to amending or supplementing the disclosures in the future if necessary, including but not limited to further reducing the designations set forth below. Plaintiff's counter-designations include all exhibits that are referenced in the specified pages and lines, whether or not such exhibits are separately identified. Plaintiff reserves the right to use any deposition testimony designated by ONT, including but not limited to any deposition testimony later de-designated by ONT. Inclusion on this list is neither an admission nor a representation as to the admissibility of or relevance to any issue of any deposition designation. By counter-designating deposition testimony, Plaintiff is neither representing nor admitting that Plaintiff has the burden of proof on any topic.

Plaintiff generally objects to any deposition testimony designated by ONT that is the subject of the parties' stipulations, agreed motions in *limine*, Plaintiff's motions in *limine*, motions to exclude certain evidence, Daubert motions and challenges to experts, and any dispositive motions. Plaintiff reserves the right to make additional objections leading up to and at trial.

Plaintiff reserves the right to assert any one, part, or all of its objections.

**DEFENDANTS' KEY OF OBJECTIONS**

| ABBREVIATION AND FEDERAL RULE OF EVIDENCE KEY TO OXFORD'S OBJECTIONS | | |
|---|---|---|
| **Letter** | **Objection** | **Applicable Rules** |
| A | Requires authentication or identification | FRE 901 |
| B | Best evidence rules prohibit introduction | FRE 1001-1002 |
| C | Improper compilation of separate documents | FRE 403, 901 |
| D | Duplicative | |
| E | Improper examination (vague, ambiguous, loaded, leading, etc.) | FRE 402, 403, 602, 611 |
| F | Lack of foundation/personal knowledge (incl. calls for speculation) | FRE 402, 403, 602, 611 |
| H | Hearsay if offered for the truth of the matter asserted | FRE 801, 802 |
| I | Incomplete document or testimony | FRE 106, 403 |
| IP | Reserving objections until party can inspect the exhibit in-person | |
| M | Offer or discussion for settlement or compromise | FRE 408 |
| MIL | Subject of outstanding Motion in Limine | |
| N | Exhibit not produced in discovery | FRE 403 |
| NR | Not Responsive | |
| O | Improper opinion testimony | FRE 701-704 |
| P | Privileged or attorney work product | FRE 501, 502 |
| R | Lack of relevance | FRE 401, 402 |
| S | Summary requiring underlying data or information | FRE 1006 |
| U | Unduly prejudicial, wasteful, confusing, misleading or cumulative | FRE 403 |
| OB | Attorney Objection improperly designated/Improper designation | |
| ARG | Argumentative, or attorney argument | FRE 611 |
| NARR | Narrative | |
| MIS | Mischaracterization of testimony or evidence | |
| OS | Outside scope of witness testimony | |
| IH | Incomplete hypothetical | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  CHIN, Jason (June 26, 2019) |
| 8:19-8:23 | | 18:1-20 <br> 23:11-25:1 | NR, I, NARR <br> NR, I, NARR | 18:21-19:10 |
| 25:12-25:15 | MIS, 401, 402, 403, 611 | 25:18 <br> 25:20-26:1 | | |
| 26:14-26:18 | 401, 402, 403, 701, 702, 611 | | | |
| 26:20-26:20 | 401, 402, 403, 701, 702, 611 | | | |
| 26:22-26:24 | 401, 402, 403, 701, 702, 611 | | | |
| 27:02-27:02 | | 27:13-16 <br> 27:23-25 | | |
| 31:07-31:18 | 403 (31:11-18) | | | |
| 31:20-32:01 | 701, 702, 401, 402, 403 | | | |
| 32:03-32:03 | 701, 702, 401, 402, 403 | | | |
| 32:05-32:08 | 701, 702, 401, 402, 403 | | | |
| 32:10-32:10 | 701, 702, 401, 402, 403 | | | |
| 32:12-32:13 | 611, 701, 702, 401, 402, 403, 602 | | | |
| 32:15-32:15 | 611, 701, 702, 401, 402, 403, 602 | 32:22-24 <br> 33:1-2 | | |
| 33:04-33:05 | 602, 701, 702, 401, 402, 403 | | | |
| 33:06-33:06 | 701, 702, 401, 402, 403, 602 | 33:8-12 <br> 33:15-17 <br> 33:20-34:5 <br> 34:7-8 | NARR | |
| 34:10-34:14 | 611, 701, 702, 401, 402, 403, 602 | | | |
| 34:17-34:17 | 611, 701, 702, 401, 402, 403, 602 | | | |
| 34:20-34:24 | 611, 701, 702, 401, 402, 403, 602 | | | |
| 35:01-35:12 | 701, 702, 401, 402, 403, 611, 602 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  CHIN, Jason (June 26, 2019) | | | | |
| 35:14-35:25 | 701, 702, 401, 402, 403, 611, 602 | 37:4-7<br>37:9-16 | I | |
| 37:18-37:21 | I, MIS, 701, 702, 602 | | | |
| 37:23-38:04 | I, MIS, 701, 702, 602 | 38:5-17<br>38:25-39:3<br>39:6-12<br>39:20-21<br>39:23-25<br>40:9-16 | NARR | |
| 43:10-43:12 | | | | |
| 43:13-43:21 | | | | |
| 43:23-43:25 | | | | |
| 44:02-44:10 | | 44:17-45:21 | NR, NARR | |
| 46:06-46:15 | 401, 402, 403 (46:11-25) | | | |
| 46:16-46:25 | 401, 402, 403 | | | |
| 47:12-48:05 | 401, 402, 403 (47:13-24) | 48:18-19<br>48:21 | NR, I<br>NR, I | 48:6-48:17 |
| 50:14-50:16 | 611, 401, 402, 403 | | | |
| 50:18-50:19 | 611, 401, 402, 403 | 50:21-51:5 | | |
| 51:06-51:07 | 611, 401, 402, 403 | | | |
| 51:09-51:10 | 611, 401, 402, 403 | | | |
| 51:12-51:13 | | | | |
| 51:16-51:16 | | | | |
| 51:19-51:19 | | 51:21-22<br>51:24<br>52:12-14<br>52:16-20 | NR<br>NR<br>NR<br>NARR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  CHIN, Jason (June 26, 2019) | | | |
| 52:21-53:01 | 611, 401, 402, 403, 701, 702 | 53:3 | | |
| 53:05-53:11 | 401, 402, 403, 611, MIS | | | |
| 53:13-53:17 | 401, 402, 403, 611, MIS | | | |
| 53:19-53:19 | 401, 402, 403, 611, MIS | 53:21-23<br>53:25-54:8<br>54:10-11<br>54:13-15 | NR<br>NR, NARR<br>NR<br>NR | |
| 54:17-54:19 | 611, 401, 402, 403 | | | |
| 54:21-54:22 | | 54:24-25<br>55:2 | | |
| 55:06-55:07 | 611, 401, 402, 403 | | | |
| 55:09-55:09 | 611, 401, 402, 403 | | | |
| 55:11-55:12 | 611, 401, 402, 403 | | | |
| 55:14-55:14 | 611, 401, 402, 403 | | | |
| 56:07-56:08 | | | | |
| 56:10-56:11 | | | | |
| 56:13-56:14 | | | | |
| 57:22-57:24 | MIS, 611, 401, 402, 403 | 57:10-16<br>57:18-20 | NR | |
| 58:01-58:01 | | 58:9-11<br>58:13-16<br>59:2-3<br>59:14-18 | NR<br>NR<br>NR<br>NR | |
| 59:19-59:21 | 401, 402, 403 | | | |
| 59:23-59:23 | 401, 402, 403 | | | |
| 59:25-60:02 | 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness:  CHIN, Jason (June 26, 2019)** | | | |
| 60:04-60:05 | 401, 402, 403 | | | |
| 60:07-60:12 | 401, 402, 403 (60:7-12) | 62:13-15 62:17-22 | NR NR | |
| 62:24-63:04 | 401, 402, 403 (63:2-4) | | | |
| 64:03-64:09 | 401, 402, 403 | 65:9-17 65:19-21 67:19-68:1 68:3-7 | NR NR NR NR | |
| 71:03-71:06 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 71:08-71:20 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 71:22-72:11 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 72:22-72:25 | 611, 401, 402, 403, 602, 701, 702, I | 73:1 73:3-4 | | |
| 73:06-74:01 | 611, 401, 402, 403, 602, 701, 702 | 74:2-3 74:5-7 | NR NR | |
| 74:09-74:10 | 611, 401, 402, 403, 701, 702, 602, I | | | |
| 74:12-74:12 | 611, 401, 402, 403, 701, 702, 602, I | 74:14-16 74:18-23 | NR | |
| 75:10-75:12 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 75:14-75:24 | 611, 401, 402, 403, 701, 702, 602 | 76:2-5 76:7-9 76:11-14 76:16-18 | NR NR NR NR | |
| 76:20-76:23 | 611, 401, 402, 403, MIS, 602, 701, 702 | | | |
| 76:25-76:25 | 611, 401, 402, 403, MIS, 602, 701, 702 | | | |
| 77:02-77:05 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 77:07-77:07 | 611, 401, 402, 403, 602, 701, 702 | 77:9-11 77:13 78:5-19 78:21-79:7 | NR NR NR NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  CHIN, Jason (June 26, 2019) |||||
| 79:09-79:12 | MIS, 611, 401, 402, 403, 701, 702 | | | |
| 79:14-79:18 | MIS, 611, 401, 402, 403, 701, 702 | | | |
| 79:20-79:22 | 602, 701, 702, 611, 401, 402, 403 | | | |
| 79:24-79:25 | 602, 701, 702, 611, 401, 402, 403 | 80:17-20<br>80:22-81:8<br>81:10-13<br>81:15-18 | | |
| 82:06-82:07 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 82:09-82:10 | 611, 401, 402, 403, 701, 702, 602 | 82:12-15<br>82:17<br>82:19-20 | | |
| 82:21-82:24 | I, 611, 401, 402, 403, 701, 702, 602 | | | |
| 83:01-83:01 | I, 611, 401, 402, 403, 701, 702, 602 | | | |
| 83:03-83:05 | 611, 401, 402, 403, I | | | |
| 83:07-83:11 | 611, 401, 402, 403, I | 83:12-14 | | |
| 83:16-83:22 | 401, 402, 403, 403 | | | |
| 84:16-84:17 | 701, 611, 401, 402, 403 | | | |
| 84:19-84:19 | 701, 611, 401, 402, 403 | 84:21-24<br>85:1-6 | | |
| 85:08-85:10 | I, 701, 611, 401, 402, 403 | | | |
| 85:12-85:16 | I, 701, 611, 401, 402, 403 | 85:18-19<br>85:21-86:3<br>86:5-14 | NR<br>NR<br>NR | |
| 86:20-86:21 | 611, 401, 402, 403 | | | |
| 86:23-87:04 | 401, 402, 403 | 87:24-25<br>88:2-6 | NR<br>NR | |
| 88:18-88:22 | 611, 401, 402, 403, 701, 702 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  CHIN, Jason (June 26, 2019) |||||
| 88:24-89:07 | | 89:9-11<br>89:13-16<br>89:18-90:4 | | |
| 90:06-90:07 | 611, 401, 402, 403, 701, 702, 602, MIS | | | |
| 90:09-90:10 | 611, 401, 402, 403, 701, 702, 602, MIS | | | |
| 90:12-90:13 | 611, 401, 402, 403, 701, 702 | | | |
| 90:15-90:16 | 611, 401, 402, 403, 701, 702 | 91:1-2<br>91:4-17<br>92:7-10<br>92:12-14 | | |
| 92:16-92:18 | 611, 401, 402, 403 | | | |
| 92:20-93:03 | 611, 401, 402, 403 | | | |
| 93:05-93:16 | | | | |
| 93:18-93:19 | 611, 401, 402, 403, 701, 702 | | | |
| 93:21-94:01 | 611, 401, 402, 403, 701, 702 | | | |
| 94:03-94:09 | 611, 401, 402, 403, 701, 702, 602 | 94:10-12<br>94:14-95:4<br>95:14-15<br>95:17-18 | NR<br>NR<br>NR<br>NR | |
| 95:20-95:21 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 95:23-95:24 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 96:02-96:03 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 96:05-96:06 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 96:19-97:06 | 401, 402, 403, 611 | | | |
| 97:08-97:12 | 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  CHIN, Jason (June 26, 2019) |
| 99:10-99:12 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 99:14-99:14 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 100:05-100:10 | 401, 402, 403 | 107:3-24<br>108:1-10<br>109:7-9<br>110:12-20<br>110:22-25<br>111:2-4<br>111:6-11<br>111:13-14<br>111:16-25<br>112:14-16<br>112:18-21<br>114:4-6<br>114:8-9<br>114:11-16 | NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR | |
| 114:25-115:07 | 611, 401, 402, 403 (114:25-115:3); 611, 401, 402, 403, 602, 701, 702 (115:4-7) | | | |
| 115:09-115:18 | 611, 401, 402, 403, 602, 701, 702 | 115:20-21<br>115:23-116:5<br>116:13-16 | <br>NARR<br>NR | |
| 117:01-117:06 | | | | |
| 117:07-117:17 | 611, 401, 402, 403, 602, 701, 702, 703 (117:15-17) | | | |
| 117:19-117:22 | 611, 401, 402, 403, 602, 701, 702, 703 (117:19-22) | | | |
| 117:24-117:25 | | | | |
| 118:02-118:10 | | | | |
| 118:12-118:13 | | 119:2-3<br>119:5-9 | NR<br>NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: CHIN, Jason (June 26, 2019) |||||
| | | 119:11-13<br>119:15-17 | NR<br>NR | |
| 119:24-120:01 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 120:04-120:11 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 120:13-120:16 | 611, 401, 402, 403, 701, 702, 602 | 120:18-21<br>120:23-121:2 | | |
| 121:07-121:10 | 611, 401, 402, 403 | | | |
| 121:12-121:20 | 401, 402, 403 | 121:24<br>122:1-3<br>122:5-14<br>124:9-10<br>124:12<br>124:21-22<br>124:24<br>125:16-17<br>125:19<br>126:13-24 | <br><br><br>NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR | |
| 126:25-127:03 | 611, 401, 402, 403, 602, 701, 702 | 127:4-6<br>127:8-21<br>128:14-16<br>128:18-21 | NR<br>NR<br>NR<br>NR | |
| 130:15-130:17 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 130:19-130:20 | 611, 401, 402, 403, 701, 702, 602 | 133:24-134:3<br>136:12-14<br>136:16-18 | NR<br>NR<br>NR | |
| 136:20-136:23 | MIS, 701, 611, 401, 402, 403, I, 602 | | | |
| 136:25-137:05 | MIS, 701, 611, 401, 402, 403, I, 602 | 137:6-8 | | |
| 137:10-137:13 | | | | |
| 137:15-137:16 | | | | |
| 137:18-137:21 | CP, 611, 701, 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  CHIN, Jason (June 26, 2019) | | | | |
| 137:23-138:01 | CP, 611, 701, 401, 402, 403, 602 | | | |
| 138:03-138:10 | 611, 401, 402, 403 (138:3-7); MIS, 701, 602, 611, 401, 402, 403 (138:8-10) | | | |
| 138:12-138:15 | 611, 401, 402, 403, MIS, 701, 602 | 139:2-7<br>139:9-25<br>140:2-4 | NR<br>NR<br>NR | |
| 140:06-140:11 | MIS, 611, 401, 402, 403, 602, I, CP | | | |
| 140:13-140:21 | MIS, 611, 401, 402, 403, 602, I, CP (140:13); CP, 602, 611, 401, 402, 403, 701, 702, 602, I (140:15-21) | | | |
| 140:23-141:03 | CP, 602, 611, 401, 402, 403, 701, 702, 602, I | 141:5-142:6<br>142:10<br>142:12-19<br>144:1-4<br>144:7-145:6 | NARR<br>NR<br>NR<br>NR<br>NR, NARR | |
| 145:07-145:12 | 611, I, MIS, 602, 701, 702 | | | |
| 145:14-145:19 | 611, I, MIS, 602, 701, 702 | 146:11-16<br>146:19-147:1 | NARR | |
| 148:02-148:07 | CP, I, 701, 702, 611, MIS | 148:10 | | |
| 148:12-148:12 | | | | |
| 148:14-148:14 | | 148:16-17 | | |
| 149:01-150:02 | 401, 402, 403 | 150:23-151:6<br>151:20-152:6<br>152:8-15 | NR<br>NR<br>NR | |
| 152:17-152:18 | MIS, I, 611, 401, 402, 403, 602, 701, 702 | | | |
| 152:20-152:20 | | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  Corcoran, Kevin (May 31, 2019) |||||
| 5:06-5:07 | | | | |
| 5:13-5:22 | 401, 402, 403 | | | |
| 7:02-7:04 | | | | |
| 15:08-15:25 | | | | |
| 16:01-16:12 | 403 | | | |
| 16:13-16:25 | 403 | | | |
| 17:01-17:19 | | | | |
| 19:19-19:25 | | | | |
| 20:01-20:01 | | | | |
| 20:02-20:03 | 611, 401, 402, 403 | | | |
| 20:05-22:03 | 611, 401, 402, 403 (20:5-11); 611 (20:12-14); 611, 401, 402, 403 (20:15-18); 611 (20:19-21:1); 611, 401, 402, 403 (21:2-5); 401, 402, 403 (21:6-15); 611, 401, 402, 403, 602, 701, 702 (21:16-22:3) | | | |
| 22:05-22:05 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 22:07-22:15 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 22:17-22:17 | 611, 401, 402, 403, 602, 701, 702 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  Corcoran, Kevin (May 31, 2019) | | | | |
| 22:19-22:24 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 22:25-22:25 | | | | |
| 23:01-23:21 | 602, 701, 702 (23:3-4); 611, 401, 402, 403 (23:19-21) | | | |
| 23:22-23:24 | 401, 402, 403, I | 23:25-24:1 | NR | |
| 24:06-24:06 | | | | |
| 24:10-24:11 | 611, 401, 402, 403, 602, 701, 702, I | 24:13 | | |
| 24:15-25:11 | 611, 701, 401, 402, 403 (24:18-22); 401, 402, 403 (25:3-11) | | | |
| 27:12-27:14 | | | | |
| 27:15-27:25 | 611, 401, 402, 403 (27:15-21); 401, 402, 403 (27:22-25) | | | |
| 29:03-29:04 | 401, 402, 403 | | | |
| 29:05-29:20 | 401, 402, 403 (29:8-11); 611, 401, 402, 403 (29:12-17); 701, 401, 402, 403 (29:18-20) | | | |
| 29:21-30:09 | 611, 401, 402, 403, (29:21-24); 611, 401, 402, 403, 701 (30:7-9) | | | |
| 30:10-30:23 | 401, 402, 403 | | | |
| 31:01-31:02 | 611, 401, 402, 403 | | | |
| 31:04-31:11 | 611, 401, 402, 403 (31:8-11) | | | |
| 33:13-33:16 | 611, 401, 402, 403, 602 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness:  Corcoran, Kevin (May 31, 2019)** | | | |
| 35:16-35:20 | 401, 402, 403, 602, 701, 702 | | | |
| 35:21-35:25 | 401, 402, 403, 602, 701, 702, 602 | | | |
| 36:01-36:17 | 401, 402, 403, 602, 701, 702, 602 (36:1); 611, 401, 402, 403 (36:2-7); 401, 402, 403 (36:8-17) | 36:18-23 | | |
| 38:24-38:25 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 39:01-39:08 | 611, 401, 402, 403, I, 602, 701, 702 (39:3-8) | 39:9-18 | NR | |
| 39:19-40:09 | 611, 401, 402, 403, I, 602, 701, 702 (39:19-40:1); 611, 401, 402, 403, 602, 701, 702 (40:2-6) | | | |
| 40:15-40:16 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 40:18-40:19 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 40:21-40:25 | | | | |
| 41:01-41:02 | | | | |
| 41:03-41:04 | | | | |
| 41:11-41:16 | 611, 401, 402, 403 | | | |
| 41:17-41:20 | | | | |
| 41:21-41:23 | 611, 401, 402, 403, 701, 702 | | | |
| 41:24-42:06 | 611, 401, 402, 403, 701, 702 | | | |
| 42:07-42:20 | 611, 401, 402, 403, 701, 702, 602 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: Corcoran, Kevin (May 31, 2019) | | | | |
| 42:25-43:05 | | | | |
| 43:06-43:08 | 401, 402, 403, 611, 602, 701, 702, I | | | |
| 43:10-43:12 | 401, 402, 403, 611, 602, 701, 702, I | | | |
| 43:14-43:15 | 401, 402, 403, 611, 602, 701, 702, I | 43:16-18 | | |
| 43:19-43:20 | 401, 402, 403, 611, 602, 701, 702, I | 43:21-23 | | |
| 43:24-43:25 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 44:01-44:02 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 44:03-44:04 | 611, 401, 402, 403, 602, 701, 702, 403 | | | |
| 44:05-44:07 | 611, 401, 402, 403, 602, 701, 702, | | | |
| 44:09-44:20 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 45:20-45:22 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 45:23-45:24 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 45:25-46:02 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 46:10-46:12 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 46:14-46:14 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 46:24-46:25 | | | | |
| 47:01-47:02 | | | | |
| 47:15-47:25 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 48:01-48:08 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 49:04-49:17 | 611, 401, 402, 403, 602, 701, 702 | 49:22-24 50:1 | NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  Corcoran, Kevin (May 31, 2019) | | | | |
|  |  | 50:3-5<br>50:7-8 |  |  |
| 50:10-50:14 | 611, 401, 402, 403, 602, 701, 702 | 51:23-24<br>52:1<br>52:3-6<br>52:22-23<br>52:25-53:2<br>53:4-6 | NR<br>NR<br>NR<br>NR<br>NR<br>NR |  |
| 53:07-53:12 | I, 611, 401, 402, 403, 602, 701, 702 |  |  |  |
| 53:20-53:22 | 401, 402, 403 |  |  |  |
| 53:23-53:25 | 403, MIS |  |  |  |
| 54:01-54:03 | 611, 401, 402, 403, 701, 702, 602 |  |  |  |
| 54:05-54:20 | 611, 401, 402, 403, 701, 702, 602 (54:5-12); 611, 401, 402, 403 (54:13-17); 611, 401, 402, 403, 701, 702, 602 (54:18-20) |  |  |  |
| 54:22-54:24 | 611, 401, 402, 403, 701, 702, 602 |  |  |  |
| 56:01-56:14 | MIS, 611, 401, 402, 403 (56:1-5); 611, 401, 402, 403, 602, 701, 702 (56:11-14) |  |  |  |
| 56:17-56:25 | 611, 401, 402, 403, 602, 701, 702 (56:17-20); MIS, 611, 401, 402, 403 (56:21-25) |  |  |  |
| 57:01-57:05 | 611, 401, 402, 403, 602, 701, 702 |  |  |  |
| 57:09-57:25 | 611, 401, 402, 403, 602, 701, 702 (57:9-13); 611, 401, 402, 403, 602, 701, |  |  |  |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| **Witness:  Corcoran, Kevin (May 31, 2019)** | | | | |
|  | 702, MIS (57:14-18); 611, 401, 402, 403, 602, 701, 702 (57:19-25) |  |  |  |
| 58:01-58:24 | 611, 401, 402, 403, 602, 701, 702 (58:1-7); 611, 401, 402, 403, 602, 701, 702, MIS (58:8-12); 611, 401, 402, 403, 602, 701, 702 (58:13-24) |  |  |  |
| 58:25-58:25 | 611, 401, 402, 403, 602, 701, 702, MIS |  |  |  |
| 59:01-59:07 | 611, 401, 402, 403, 602, 701, 702, MIS (59:1-4); 611, 401, 402, 403, 602, 701, 702 (59:5-7) |  |  |  |
| 59:09-59:09 | 611, 401, 402, 403, 602, 701, 702 |  |  |  |
| 59:11-59:17 | 611, 401, 402, 403, 602, 701, 702 (59:11-13) |  |  |  |
| 61:11-61:12 | 611, 401, 402, 403 |  |  |  |
| 61:14-61:21 | 611, 401, 402, 403 |  |  |  |
| 61:23-61:25 | 611, 401, 402, 403 |  |  |  |
| 62:01-62:01 | 611, 401, 402, 403 |  |  |  |
| 62:03-62:04 | 611, 401, 402, 403 | 64:4-7<br>64:9-10<br>64:12-14 | NR<br>NR<br>NR |  |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  EID, John (April 30, 2019) | | | | |
| 6:07-6:09 | 401, 402, 403 | | | |
| 6:23-6:25 | | | | |
| 7:06-7:11 | 403 | 10:9-11:3<br>11:6-15<br>14:6-10<br>14:13<br>14:15-24<br>15:1-12 | NR<br>NR<br>NR<br>NR<br>NR<br>NR | |
| 15:13-15:16 | MIS, 611, 401, 402, 403, I | | | |
| 15:18-15:18 | MIS, 611, 401, 402, 403, I | 15:20-16:18 | | 16:19-16:22 |
| 19:01-19:12 | 403, I | | | |
| 19:13-19:15 | 403, I | | | |
| 19:17-19:25 | 403, I | 20:2-6 | NR | |
| 21:18-21:24 | 611, 401, 402, 403 (21:23-24) | | | |
| 21:25-22:01 | 611, 401, 402, 403 | | | |
| 22:03-22:04 | 611, 401, 402, 403 | | | |
| 23:05-23:06 | 611, 401, 402, 403 | | | |
| 23:08-23:11 | 611, 401, 402, 403 | | | |
| 23:13-24:08 | 611, 401, 402, 403, I | 24:9-12<br>24:14-23 | | |
| 24:25-26:01 | MIS, 611, 401, 402, 403, I | 27:14-19<br>27:21-23<br>28:4-7<br>28:9-11<br>28:13-18<br>28:20-23 | NR<br>NR<br>NR<br>NR<br>NR<br>NR | |
| 29:04-29:05 | 611, 401, 402, 403, MIS, I | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| | | Witness:  EID, John (April 30, 2019) | | |
| 29:08-29:20 | 611, 401, 402, 403, MIS, I | 29:22-30:5 30:7-13 | | |
| 30:15-30:23 | 611, 401, 402, 403, MIS, I | 34:22-35:2 35:4-5 35:7-8 | NR NR NR | |
| 35:10-35:11 | 611, 401, 402, 403, 602, 703, MIS, I | | | |
| 35:13-35:20 | 611, 401, 402, 403, 602, 703, MIS, I | | | |
| 35:22-35:23 | 611, 401, 402, 403, 602, 703, MIS, I | 36:8-11 | | |
| 36:12-36:14 | 611, 401, 402, 403, MIS, I | | | |
| 36:16-37:01 | 611, 401, 402, 403, MIS, I | 37:3-4 37:6-16 | NR NR | |
| 37:25-38:10 | 611, 602, 703, 611, 401, 402, 403, MIS, CP | | | |
| 38:12-38:14 | 611, 602, 703, 401, 402, 403, MIS, CP | | | |
| 40:18-40:20 | | | | |
| 40:24-41:02 | 611, 401, 402, 403, 701 | | | |
| 41:04-41:07 | 611, 403 | | | |
| 41:10-41:17 | | 42:23-43:1 43:3-4 43:6-12 | | |
| 43:13-43:15 | 611, 401, 402, 403, I, MIS | | | |
| 43:17-44:02 | 611, 401, 402, 403, I, MIS | | | |
| 44:04-44:16 | 611, 401, 402, 403, I, MIS | | | |
| 44:18-44:25 | 611, 401, 402, 403, I, MIS | | | |
| 45:02-45:03 | | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  EID, John (April 30, 2019) |||||
| 45:05-45:10 | | | | |
| 54:17-54:19 | 611, 401, 402, 403, I | | | |
| 54:21-54:23 | 611, 401, 402, 403, I | 54:25-55:5 | | |
| 56:07-56:13 | 611, 701, 401, 402, 403 (56:9-13) | | | |
| 56:15-57:02 | 602, 703, 611 (56:15-18); 401, 402, 403 (56:19-22); 401. 402, 403, 611 (56:23-57:2) | | | |
| 61:03-61:06 | 611, 401, 402, 403, 701 | | | |
| 61:12-61:13 | 611, 401, 402, 403, 701 | | | |
| 61:15-61:15 | 611, 401, 402, 403, 701 | | | |
| 61:17-62:06 | 611, 401, 402, 403 (61:17-62:3); 611, 401, 402, 403, 701, 702 (62:4-6) | | | |
| 62:08-62:09 | 611, 401, 402, 403, 701, 702 | | | |
| 62:11-62:18 | 611, 401, 402, 403, I | | | |
| 62:20-62:20 | 611, 401, 402, 403, I | 62:22-24 63:2-7 63:13-64:3 | I | 63:9-12 |
| 64:04-64:25 | MIS, 611, 403 (64:4-22); 401, 402, 403 (64:23-25) | | | |
| 65:02-65:04 | 611, 401, 402, 403 | 66:22-67:4 67:6-7 67:9-10 67:12-14 | NR NR NR NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  EID, John (April 30, 2019) | | | | |
| 69:07-69:08 | 611, 401, 402, 403, 701, 702, MIS, I | | | |
| 69:11-69:11 | 611, 401, 402, 403, 701, 702, MIS, I | | | |
| 69:14-69:21 | 611, 401, 402, 403, 701, 702, MIS, I | 69:23-25 70:3-11 | | |
| 70:13-70:18 | 611, 401, 402, 403, I | 70:20-21 | | |
| 70:23-70:25 | 611, 401, 402, 403 | | | |
| 71:02-71:07 | 611, 401, 402, 403 | | | |
| 71:10-71:12 | 611, 401, 402, 403 | | | |
| 71:14-71:16 | | | | |
| 71:18-71:25 | | | | |
| 72:02-72:03 | | | | |
| 72:05-72:06 | 611, 401, 402, 403 | | | |
| 72:08-72:12 | 611, 401, 402, 403 | | | |
| 72:14-72:15 | 611, 401, 402, 403 | | | |
| 74:15-74:16 | 611, 401, 402, 403, I | | | |
| 74:18-74:18 | 611, 401, 402, 403, I | 74:22-75:1 75:3-10 75:12 75:15-16 75:18-23 | NR NARR, NR NR NR NARR, NR | |
| 75:24-75:25 | 611, 401, 402, 403, 602, 701, 702, I | | | |
| 76:01-76:01 | 611, 401, 402, 403, 602, 701, 702, I | | | |
| 76:03-76:03 | 611, 401, 402, 403, 602, 701, 702, I | | | |
| 78:05-78:08 | 611, 401, 402, 403, 701, 702, 602, MIS | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  EID, John (April 30, 2019) | | | | |
| 78:17-78:22 | 611, 401, 402, 403 | | | |
| 78:23-78:25 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 79:01-79:03 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 79:05-79:05 | 611, 401, 402, 403, 602, 701, 702, 602 | | | |
| 79:07-79:11 | 611, 401, 402, 403 | | | |
| 79:13-79:13 | 611, 401, 402, 403 | | | |
| 79:15-79:25 | 611, 401, 402, 403 | | | |
| 80:01-80:01 | 611, 401, 402, 403 | | | |
| 80:03-80:04 | 611, 401, 402, 403 | | | |
| 80:06-80:09 | 611, 401, 402, 403 | | | |
| 80:11-81:03 | 611, 401, 402, 403 | | | |
| 81:06-81:08 | 611, 401, 402, 403 | | | |
| 81:25-82:02 | 611, 401, 402, 403, 701, 702 | | | |
| 82:04-82:09 | 611, 401, 402, 403, 701, 702 | | | |
| 83:10-83:12 | 611 | | | |
| 83:14-83:16 | 611 | | | |
| 84:07-84:16 | 611, 401, 402, 403 (84:10-16) | | | |
| 84:18-84:20 | 611, 401, 402, 403 | | | |
| 85:13-85:17 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 85:20-85:21 | 611, 401, 402, 403, 602, 701, 702 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness:  EID, John (April 30, 2019)** | | | |
| 92:25-93:02 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 93:04-93:08 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 93:10-93:16 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 93:18-94:10 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 94:12-94:17 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 94:20-95:11 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 95:13-96:09 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 96:11-96:12 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 96:14-96:22 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 96:24-96:25 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 97:01-97:02 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 97:04-97:10 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 97:12-97:16 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 101:18-101:25 | 611, 401, 402, 403, MIS (101:18-22); 611, 401, 402, 403 (101:23-25) | | | |
| 102:01-102:08 | 611, 401, 402, 403 | | | |
| 102:11-102:17 | 611, 401, 402, 403 | | | |
| 102:19-102:21 | 611, 401, 402, 403 | 103:13-16<br>104:2-20<br>105:1-4<br>113:11-14<br>113:16-17<br>113:19 | NR<br>NR<br>NR<br>NR<br>NR<br>NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  EID, John (April 30, 2019) | | | | |
| | | 113:21-23 | NR | |
| 113:25-114:03 | 611, 401, 402, 403, I | | | |
| 114:05-114:10 | 611, 401, 402, 403, I (114:5);<br>611, 401, 402, 403 (114:7-10) | | | |
| 114:12-114:12 | 611, 401, 402, 403 | | | |
| 115:13-115:17 | 611, 401, 402, MIS | | | |
| 115:19-115:22 | 611, 401, 402, 403, MIS | | | |
| 115:24-116:07 | 401, 402, 403, 602, 703 (115:24-116:2);<br>611, 401, 402, 403 (116:3-116:7) | | | |
| 116:09-116:10 | 611, 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  FEHR, Adrian (July 9, 2019) | | | | |
| 9:19-9:21 | | | | |
| 9:22-10:12 | | | | |
| 12:20-13:09 | | | | |
| 15:03-15:16 | | | | |
| 15:17-15:20 | | | | |
| 16:12-16:24 | | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  FEHR, Adrian (July 9, 2019) | | | | |
| 16:25-17:07 | 401, 402, 403, 602, 611, 701, 702 (17:6-17:7) | | | |
| 17:13-17:14 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 17:16-17:21 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 17:22-17:23 | 401, 402, 403 | | | |
| 17:25-17:25 | 401, 402, 403 | | | |
| 18:02-18:10 | 401, 402, 403, 611 | | | |
| 18:11-18:12 | 401, 402, 403, 611 | | | |
| 18:14-18:17 | 401, 402, 403, 611 | | | |
| 18:19-19:19 | 401, 402, 403, 611 (18:19-18:25) | | | |
| 19:23-20:04 | | | | |
| 20:16-20:19 | | | | |
| 20:20-20:21 | | | | |
| 20:23-21:05 | | | | |
| 21:06-21:07 | | 21:8-18 | | |
| 21:19-21:25 | | | | |
| 22:01-22:04 | | 22:11-22 23:24-24:1 | I, NR NR | 22:9-10 |
| 26:11-26:12 | | | | |
| 26:14-26:14 | | 26:16-17 26:19-23 | | |
| 26:25-27:19 | 401, 402, 403, 602, 611, 701, 702 (27:5-19) | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  FEHR, Adrian (July 9, 2019) | | | | |
| 27:21-27:24 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 28:02-28:06 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 28:08-28:12 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 28:13-28:14 | | | | |
| 28:23-28:24 | | 28:25-29:2 29:4 | | |
| 29:06-29:13 | MIS, 401, 402, 403, 611 | | | |
| 30:01-30:08 | 403 | | | |
| 30:24-31:02 | 401, 402, 403, 611, 701, 702, I | 31:4 31:6-7 | | |
| 31:09-31:16 | 401, 402, 403, 611, 701, 702, I | 31:18-21 31:23-32:10 | | |
| 32:12-32:12 | MIS, 401, 402, 403, 611, 701, 702 | | | |
| 32:14-32:16 | MIS, 401, 402, 403, 611, 701, 702 | | | |
| 32:17-32:19 | MIS, 401, 402, 403, 611, 701, 702 | 33:8-10 33:12-14 | | |
| 33:16-33:19 | MIS, 401, 402, 403, 611,  701, 702 | | | |
| 33:22-33:23 | MIS, 401, 402, 403, 611,  701, 702 | 33:24-34:1 | NARR | |
| 34:02-34:13 | 401, 402, 403, 611 | | | |
| 34:15-34:19 | 401, 402, 403, 611 | 34:21-23 | NR | |
| 35:04-35:05 | 401, 402, 403, 611 | | | |
| 35:07-35:07 | 401, 402, 403, 611 | 35:9-10 35:12-13 35:15-20 | NR NR NR | |
| 36:02-36:08 | 401, 402, 403, 611, I | 36:12-18 | NARR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| **Witness:  FEHR, Adrian (July 9, 2019)** | | | | |
| 37:06-37:13 | 401, 402, 403, 611 | | | |
| 37:17-37:18 | 401, 402, 403, 611 | | | |
| 37:20-37:21 | 401, 402, 403, 611 | | | |
| 37:23-37:24 | 401, 402, 403, 611 | | | |
| 38:02-38:04 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 38:05-38:16 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 38:18-38:22 | 401, 402, 403, 611 | | | |
| 38:24-38:24 | 401, 402, 403, 611 | | | |
| 39:02-39:03 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 39:05-39:08 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 39:10-39:10 | 401, 402, 403, 611 | | | |
| 39:12-39:12 | 401, 402, 403, 611 | | | |
| 39:18-39:20 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 39:22-39:24 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 40:02-40:10 | 403, 611, MIS | | | |
| 40:17-40:19 | 401, 402, 403, 611, P | | | |
| 40:25-41:01 | 401, 402, 403, 611, P | | | |
| 42:10-42:10 | 401, 402, 403, 611 | | | |
| 42:13-42:17 | 401, 402, 403, 611 | | | |
| 43:03-43:05 | 401, 402, 403, 611 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness:  FEHR, Adrian (July 9, 2019)** | | | |
| 43:09-43:10 | P, 401, 402, 403, 611 | | | |
| 43:14-44:10 | P, 401, 402, 403, 611 | | | |
| 45:22-45:23 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 45:25-46:12 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 47:15-47:18 | 401, 402, 403, 611 | 47:18-19 | NARR | |
| 47:20-47:22 | 401, 402, 403, 611 | | | |
| 51:25-51:25 | 401, 402, 403, 611 | | | |
| 52:02-52:02 | 401, 402, 403, 611 | | | |
| 52:04-52:16 | 401, 402, 403, 611 | | | |
| 52:17-53:14 | 401, 402, 403, 611, CP | 53:15-16<br>53:18-19<br>55:6-13 | NR<br>NR<br>NR | |
| 55:14-55:15 | 401, 402, 403, 611 | | | |
| 55:17-55:17 | 401, 402, 403, 611 | 55:19-25<br>56:11-19 | | |
| 57:20-57:23 | 401, 402, 403 | | | |
| 58:21-58:23 | 401, 402, 403, 611 | | | |
| 58:25-59:04 | 401, 402, 403, 611 | | | |
| 59:09-59:18 | 401, 402, 403, 611, I, MIS | | | |
| 59:20-59:24 | 401, 402, 403, 611, I, MIS | 60:1-11<br>60:24-61:2 | NR<br>NR | |
| 61:23-61:24 | 401, 402, 403, 611 | | | |
| 62:01-62:14 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 62:16-62:25 | 401, 402, 403, 602, 611, 701, 702 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  FEHR, Adrian (July 9, 2019) |||||
| 63:01-63:14 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 63:17-63:19 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 63:21-63:22 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 63:24-64:01 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 64:04-64:09 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 64:11-64:16 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 65:14-65:23 | 401, 402, 403 | 66:4-11 | | |
| 66:12-66:13 | 401, 402, 403, 602, 611 | | | |
| 66:15-66:17 | 401, 402, 403, 602, 611 | 66:19-22 | | |
| 66:23-66:24 | | | | |
| 67:04-67:09 | 401, 402, 403, 602, 611 (67:8-9) | | | |
| 67:11-67:21 | 401, 402, 403, 602, 611 (67:11-18) | | | |
| 68:09-69:06 | 401, 402, 403, 611 (69:2-6) | | | |
| 69:17-70:03 | 401, 402, 403, 602, 611, 701, 702 | 70:9-10 70:12-20 | NR NR | |
| 70:22-70:22 | 401, 402, 403, 611, I | | | |
| 70:24-70:24 | 401, 402, 403, 611, I | | | |
| 71:14-71:25 | | | | |
| 72:01-72:08 | 401, 402, 403, 611 | 72:9-11 72:13-73:1 73:3-5 73:7-8 73:10-16 73:22-74:10 | NR NR NR NR NR NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  FEHR, Adrian (July 9, 2019) | | | | |
| 79:01-79:19 | 401, 402, 403 (79:4-19) | 79:20-80:1 | | |
| 80:02-80:07 | 401, 402, 403, 611 | 80:8-20 | NR | |
| 82:09-82:21 | CP, 401, 402, 403, 602, 611, 701, 702 (82:9-17) | | | |
| 82:25-83:03 | | | | |
| 83:04-83:08 | 401, 402, 403, 602, 611, 703 | | | |
| 83:10-83:18 | 401, 402, 403, 602, 611, 703 | | | |
| 83:20-83:21 | 401, 402, 403, 602, 611, 703, I | | | |
| 83:23-84:01 | 401, 402, 403, 602, 611, 703, I | 84:7-10 84:12 | NR NR | |
| 84:14-84:16 | 401, 402, 403, 602, 611, 703 | | | |
| 84:18-85:05 | 401, 402, 403, 611 (85:2-5) | | | |
| 85:07-85:13 | 401, 402, 403, 611 | 85:15-18 85:20 | NR NR | |
| 85:22-86:05 | 401, 402, 403, 611 | | | |
| 86:06-86:10 | 401, 402, 403, 611 | | | |
| 87:18-88:04 | MIS, CP, 401, 402, 403, 602, 611, 703 | | | |
| 88:12-88:21 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 88:25-89:05 | 401, 402, 403, 611 (88:25-89:2); 401, 402, 403, 611, CP (89:3-5) | 89:6-8 | NR | |
| 89:15-90:01 | | | | |
| 90:02-90:12 | 403, 611, 701, 702 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  FEHR, Adrian (July 9, 2019) | | | | |
| 90:14-90:19 | 401, 402, 403, 611 | | | |
| 90:20-91:02 | 401, 402, 403, 611 | | | |
| 93:04-93:23 | 401, 402, 403, 611 (93:8-11); 401, 402, 403, 602, 611, 701, 702 (93:12-23) | | | |
| 94:15-94:17 | 401, 402, 403, 602, 611, 701, 702, 703 | | | |
| 95:01-95:04 | | | | |
| 95:10-95:18 | 403 (95:12-18) | | | |
| 95:19-95:25 | 403 | | | |
| 96:01-96:15 | 403 (96:1); 401, 402, 403, 611 (96:2-11); 401, 402, 403, 602, 611, 701, 702, 703, MIS (96:12-15) | 96:16-22 | | |
| 96:23-96:25 | | | | |
| 97:10-97:16 | 401, 402, 403 | | | |
| 97:17-97:21 | 401, 402, 403, 611 | 97:22-24 | | |
| 102:15-102:17 | 401, 402, 403, 602 611, 703, CP | | | |
| 102:19-103:01 | 401, 402, 403, 602, 611, 703, CP | 103:3-9 103:11 | | |
| 103:14-103:21 | 401, 402, 403 (103:19-21) | | | |
| 104:12-104:15 | 401, 402, 403 | | | |
| 105:02-105:02 | 401, 402, 403, 602, 611, 701, 702 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  FEHR, Adrian (July 9, 2019) | | | |
| 105:04-105:13 | 401, 402, 403, 602, 611, 701, 702 | 105:15-18<br>105:20-22<br>112:18-22 | NR<br>NR<br>NR | |
| 113:22-114:19 | 401, 402, 403, 611, CP (113:22-114:2); 401, 402, 403, 602, 611, 701, 702 (114:3-19) | 117:5-7<br>117:9<br>117:11-118:7 | | |
| 118:08-118:14 | 401, 402, 403, 611 (118:8-12); 401, 402, 403, 611, I (118:13-14) | | | |
| 118:21-118:24 | 401, 402, 403, 611, I | 119:1-2<br>119:4-5<br>119:7-21<br>120:6-8<br>120:10-11 | | |
| 120:13-120:16 | 611 | | | |
| 120:24-121:01 | 401, 402, 403, 602, 611, 701, 702, CP, I | | | |
| 121:15-121:20 | 401, 402, 403, 602, 611, 701, 702, CP, I | | | |
| 121:21-122:03 | 401, 402, 403, 602, 611, 701, 702, CP, I | | | |
| 122:04-122:08 | 401, 402, 403, 602, 611, 701, 702, CP, I | 122:13-17<br>122:19-20 | | |
| 123:24-124:01 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 124:03-124:07 | 401, 402, 403, 602, 611, 701, 702 (124:3-5); 401, 402, 403, 611 (124:7) | | | |
| 124:08-124:16 | 401, 402, 403, 611 (124:8-16) | 124:23-125:1<br>125:3 | | |
| 125:05-125:08 | 401, 402, 403, 611, I | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  FEHR, Adrian (July 9, 2019) ||||| 
| 125:20-125:22 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 125:24-126:04 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 126:06-126:11 | MIS, 401, 402, 403, 602, 611, 701, 702 (126:6-9); 401, 402, 403, 602, 611, 701, 702 (126:10-11) | | | |
| 126:13-126:14 | 401, 402, 403, 602, 611, 701, 702 | 126:16-17 126:19 | | |
| 126:20-126:21 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 126:23-127:06 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 127:07-127:09 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 127:11-127:12 | 401, 402, 403, 602, 611, 701, 702 | 128:4-7 128:9-18 130:25-131:4 131:6-14 131:16-132:14 | NR NR NR NR NR | |
| 132:15-132:17 | MIS, 401, 402, 403, 611 | | | |
| 132:19-132:20 | MIS, 401, 402, 403, 611 | 132:22-24 133:1-11 | | |
| 133:13-133:14 | 401, 402, 403, 611 | | | |
| 133:16-133:18 | 401, 402, 403, 611 | | | |
| 135:08-135:09 | 401, 402, 403, 611 | | | |
| 135:11-135:20 | 401, 402, 403, 611 (135:11-18); 401, 402, 403, 602, 611, 701, 702 (135:19-20) | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  FEHR, Adrian (July 9, 2019) | | | | |
| 135:22-135:23 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 135:25-136:01 | 401, 402, 403, 611, 701, 702 | | | |
| 136:03-136:03 | 401, 402, 403, 611, 701, 702 | 136:5-8 | | |
| 136:09-136:12 | MIS, 401, 402, 403, 602, 611, 701, 702 | | | |
| 136:14-136:17 | MIS, 401, 402, 403, 602, 611, 701, 702 | | | |
| 141:19-141:25 | 401, 402, 403 | | | |
| 142:01-142:02 | 401, 402, 403 | | | |
| 143:13-143:14 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 143:16-143:21 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 143:23-143:24 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 144:02-144:04 | 401, 402, 403, 602, 611, 701, 702 | | | |
| 144:06-144:06 | 401, 402, 403, 602, 611, 701, 702 | 144:8-11 144:13-17 144:19-21 | | |
| 144:24-145:02 | 401, 402, 403, 611 | | | |
| 145:04-145:04 | 401, 402, 403, 611 | 145:15-19 | | |
| 146:07-146:08 | 401, 402, 403, 602, 611, 703 | | | |
| 146:10-146:11 | 401, 402, 403, 602, 611, 703 | | | |
| 146:13-147:02 | 401, 402, 403, 611 | | | |
| 147:03-147:04 | 401, 402, 403, 602, 611 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  FEHR, Adrian (July 9, 2019) | | | | |
| 147:06-147:06 | 401, 402, 403, 602, 611 | | | |
| 147:08-147:09 | 401, 402, 403, 602, 611 | | | |
| 147:11-147:14 | 401, 402, 403, 602, 611 | 147:16-17 147:19-20 | | |
| 147:22-147:24 | 401, 402, 403, 611 | | | |
| 148:01-148:06 | 401, 402, 403, 611 | 148:14-18 148:20-149:1 149:3-11 151:2-4 151:6-9 | NR NR NR NR NR | |
| 151:11-151:12 | 401, 402, 403, 611, 701, 702, MIS | | | |
| 151:14-151:20 | 401, 402, 403, 611, 701, 702, MIS | 151:22-25 152:2-18 | | |
| 152:20-152:23 | CP, 401, 402, 403, 611, 701, 702 | | | |
| 152:25-153:05 | CP, 401, 402, 403, 611, 701, 702 | | | |
| 153:07-153:10 | 401, 402, 403, 611, 701, 702 | | | |
| 153:13-153:13 | 401, 402, 403, 611, 701, 702 | | | |
| 155:22-156:02 | 403 | 156:3-5 156:7-15 156:17-19 156:21-157:2 | NR NR NR NR | |
| 157:03-157:08 | MIS, 401, 402, 403, 611 | 157:9-11 157:13-23 157:25-158:1 | NR NR NR | |
| 158:09-158:15 | 401, 402, 403, 602, 611, 701, 702, I | 158:19-20 158:22-159:3 | NR NR | |
| 159:14-160:04 | 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  FLUSBERG, Benjamin (May 07, 2019) | | | | |
| 5:17-5:19 | 403 | | | |
| 6:02-6:06 | 401, 402, 403 | 6:7-18 | | |
| 6:20-7:06 | 401, 402, 403 | | | |
| 8:09-8:21 | 401, 402, 403 | 9:5-11<br>9:25-10:24<br>14:7-24 | NR<br>NR<br>NR | |
| 16:03-16:09 | 401, 402, 403 | 16:10-17:3<br>20:13-22 | NR<br>NR | |
| 21:11-21:18 | 401, 402, 403 | | | |
| 21:19-22:03 | 401, 402, 403 | | | |
| 22:10-22:16 | 401, 402, 403, I | | | |
| 22:23-23:12 | 401, 402, 403, I (22:23);<br>602, 703, 401, 402, 403 (22:24-23:12) | | | |
| 23:15-23:20 | 401, 402, 403 | | | |
| 27:08-27:14 | 611, 401, 402, 403 (27:8-11);<br>401, 402, 403 (27:12-14) | | | |
| 27:19-27:24 | 611, 401, 402, 403, 701, 702 | | | |
| 28:05-28:25 | 611, 401, 402, 403, 701, 702 | | | |
| 29:01-29:25 | 611, 401, 402, 403, 701, 702 (29:3-25) | | | |
| 30:01-30:17 | 611, 401, 402, 403, 701, 702 (30:1-8);<br>401, 402, 403 (30:9-13) | 31:20-32:1 | NR | |
| 32:08-32:10 | 611, 401, 402, 403, 701, 702, I | | | |
| 32:15-32:18 | 611, 401, 402, 403, 701, 702, I | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness:  FLUSBERG, Benjamin (May 07, 2019)** | | | |
| 33:07-33:19 | I, 403 (33:7-11); 401, 402, 403 (33:12-19) | 34:18-35:11 | NR | |
| 36:03-36:16 | 401, 402, 403 (36:3-10); 611, 401, 402, 403 (36:11-16) | | | |
| 36:18-36:22 | 401, 402, 403 | | | |
| 37:07-37:16 | 611, 401, 402, 403 | 38:24-40:3 | NR | |
| 41:13-41:21 | 401, 402, 403 | | | |
| 43:04-43:16 | 401, 402, 403, I | 43:24-44:11 | NR | |
| 45:12-45:16 | 611, 401, 402, 403 | | | |
| 45:19-46:05 | 611, 401, 402, 403 | | | |
| 49:20-49:22 | 401, 402, 403 | | | |
| 57:07-57:09 | 401, 402, 403 | 57:10-23 | NR | |
| 62:07-62:13 | 611, I, 401, 402, 403 | | | |
| 63:20-64:03 | 401, 402, 403 (63:20-25) 611, 401, 402, 403, 701 (64:1-3) | | | |
| 64:07-64:12 | 611, 401, 402, 403, 701 | | | |
| 66:14-66:21 | 401, 402, 403 | | | |
| 67:10-68:01 | 401, 402, 403 | 68:9-15 69:2-70:1 | NR NR | |
| 70:02-70:06 | 602, 703, 401, 402, 403 | | | |
| 70:16-71:09 | | 74:5-17 75:7-11 76:12-16 | NR NR NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| **Witness:  FLUSBERG, Benjamin (May 07, 2019)** | | | | |
| 77:02-77:03 | | | | |
| 77:08-77:16 | | 77:17-78:6 | NR | |
| 81:06-81:19 | 401, 402, 403, 701 (81:6-13); 401, 402, 403, 701, I (81:14-19) | | | |
| 81:25-82:04 | 401, 402, 403, 611, 701, 611 | | | |
| 82:08-82:13 | | | | |
| 83:14-83:17 | 611, 401, 402, 403, 701, 702 | | | |
| 83:21-83:22 | 611, 401, 402, 403, 701, 702 | | | |
| 83:23-84:14 | 401, 402, 403 | | | |
| 84:23-85:02 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 85:04-86:06 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 86:16-86:18 | 401, 402, 403, 701, 702 | | | |
| 86:21-87:04 | 401, 402, 403, 701, 702 | | | |
| 88:22-89:03 | CP, 401, 402, 403 | 89:4-14 | I, NR | |
| 89:15-90:07 | I (89:15-18); 401, 402, 403 (89:19-90:7) | | | |
| 93:02-93:05 | 611, 401, 402, 403 | | | |
| 93:14-93:16 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 93:20-93:25 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 94:16-94:19 | 401, 402, 403, I | 94:20-25 | I, NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness:  FLUSBERG, Benjamin (May 07, 2019)** |
| 99:08-99:11 | 611, 401, 402, 403, 701, 702 | | | |
| 99:14-100:10 | 611, 401, 402, 403, 701, 702 | | | |
| 101:18-102:04 | 401, 402, 403 | | | |
| 102:14-102:22 | 401, 402, 403, 701, I | | | |
| 107:16-107:23 | 401, 402, 403 | | | |
| 125:18-125:24 | 401, 402, 403, 701 | 125:25-126:1<br>126:5-13 | NR<br>NR | |
| 133:07-134:14 | 401, 402, 403 (133:7-134:8); 401, 402, 403, 611 (134:9-14) | | | |
| 134:17-135:11 | 401, 402, 403 | | | |
| 135:23-135:25 | 611, 401, 402, 403, MIS | | | |
| 136:04-136:04 | | | | |
| 136:06-137:23 | 401, 402, 403 (136:24-137:23) | | | |
| 141:20-142:04 | 611, 401, 402, 403 | | | |
| 161:22-162:01 | 401, 402, 403 | | | |
| 162:02-162:14 | 401, 402, 403 | | | |
| 162:23-163:06 | 401, 402, 403 | 164:15-166:17<br>169:21-171:16 | NR<br>NR | |
| 210:08-210:11 | 401, 402, 403 | 207:1-7<br>207:10-208:22<br>208:25-209:10<br>209:15-210:7 | I, NR<br>I, NR<br>I, NR<br>I, NR | |
| 227:03-227:09 | 401, 402, 403, I | 224:7-21<br>225:10-17<br>226:1-16 | I, NR<br>I, NR<br>I, NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness:  FLUSBERG, Benjamin (May 07, 2019)** |||||
| 227:13-227:21 | MIS, 401, 402, 403, I | 229:8-13 | I, NR | |
| 229:16-229:23 | 401, 402, 403 | 229:24-230:8 | NR | |
| 231:16-231:25 | 401, 402, 403 | | | |
| 270:07-271:05 | 401, 402, 403 | 271:6-9<br>271:13-25 | NR<br>NR | |
| 272:01-272:21 | 401, 402, 403 | 273:4-12 | NR | |
| 273:13-273:20 | 611, 401, 402, 403 | | | |
| 273:21-273:25 | 602, 401, 402, 403 | | | |
| 274:06-276:17 | 401, 402, 403 (274:6-275:17);<br>401, 402, 403, 611 (275:18-276:1);<br>401, 402, 403, 611 (276:2-8);<br>401, 402, 403 (276:9-17) | | | |
| 276:20-276:25 | 401, 402, 403, 701, 702, 701 | | | |
| 277:04-277:16 | 401, 402, 403, 701, 702 | | | |
| 278:23-278:25 | 401, 402, 403, 701 | | | |
| 279:04-279:09 | 401, 402, 403, 701 | | | |
| 279:11-279:25 | 401, 402, 403 (279:15-25) | | | |
| 280:03-280:12 | 401, 402, 403 (280:3-6);<br>401, 402, 403, 701 (280:7-12) | | | |
| 280:16-280:21 | 401, 402, 403, 701, 702 | | | |
| 280:25-281:13 | | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  FLUSBERG, Benjamin (May 07, 2019) |
| 281:15-282:07 | 401, 402, 403 | | | |
| 282:08-283:16 | 401, 402, 403 | | | |
| 284:07-284:20 | 401, 402, 403 | 286:4-287:21 | NR | |
| 290:04-290:10 | 401, 402, 403 (290:4-7); 401, 402, 403 611 (290:8-10) | 290:11-15 | NR | |
| 294:24-296:03 | 401, 402, 403 | 294:10-23 | NR | |
| 296:06-300:09 | 401, 402, 403 | | | |
| 301:14-302:10 | 401, 402, 403 | | | |
| 302:24-305:08 | 401, 402, 403 | 305:9-306:4 307:2-8 | NR NR | |
| 307:14-308:24 | 401, 402, 403 | | | |
| 316:20-317:02 | 401, 402, 403 | | | |
| 321:07-321:13 | 401, 402, 403 | 319:10-320:8 320:11-321:5 | NR NR | |
| 324:03-325:08 | 401, 402, 403 | 323:6-7 323:10-23 | NR NR | |
| 325:22-327:01 | 401, 402, 403 | | | |
| 330:02-330:07 | 401, 402, 403 | | | |
| 330:08-330:20 | 401, 402, 403 | 330:21-331:16 | NR | |
| 332:24-333:13 | 401, 402, 403 | | | |
| 340:17-341:09 | 401, 402, 403, 611 | 341:12-342:13 | NR | |
| 344:08-344:18 | 401, 402, 403 | | | |
| 347:06-347:11 | 401, 402, 403 | 347:12-349:3 | NR | |
| 350:04-350:10 | 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  FLUSBERG, Benjamin (May 07, 2019) | | | | |
| 352:08-352:17 | | | | |
| 357:06-357:23 | 401, 402, 403 | 356:3-357:5<br>358:13-359:6<br>359:9-13<br>360:24-361:17 | NR<br>NR<br>NR<br>NR | |
| 364:02-364:15 | | | | |
| 376:05-376:12 | 401, 402, 403 | 381:1-383:22 | NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: GONG, Ben (June 7, 2019) | | | | |
| 5:05-5:12 | LW | | | |
| 7:12-8:10 | LW | | | |
| 10:17-11:13 | LW | | | |
| 19:10-21:04 | LW | 21:5-17, 21:25-22:4, 22:6-9 | | |
| 22:11-22:17 | LW | | | |
| 22:22-22:24 | LW | | | |
| 23:01-23:01 | LW | | | |
| 42:08-42:10 | LW, 401, 402, 403, 602, BTS, 611 | | | |
| 42:13-42:13 | LW, 401, 402, 403, 602, BTS, 611 | | | |
| 58:07-58:10 | LW | | | |
| 58:11-58:13 | LW, 611, 401, 402, 403, CP | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| **Witness: GONG, Ben (June 7, 2019)** | | | | |
| 58:19-58:19 | LW, 611, 401, 402, 403, CP | | | |
| 58:23-59:06 | LW, 401, 402, 403, BTS, 611 (58:23-59:4); LW, 611, 401, 402, 403, BTS, 611 (59:5-6) | | | |
| 59:15-60:16 | LW (59:15-60:16); 611, 401, 402, 403, BTS, 611 (59:15-16); 401, 402, 403, BTS, 611 (59:18-21, 60:9-16) | | | |
| 60:18-61:14 | LW (60:18-61:14); BTS, 611, 401, 402, 403, 602, 701, 702 (61:12-14) | | | |
| 61:17-61:18 | LW, BTS, 611, 401, 402, 403, 602, 701, 702 | | | |
| 61:19-61:23 | LW, BTS, 611, 401, 402, 403, 602, 701, 702 | | | |
| 62:01-62:01 | LW | | | |
| 62:04-62:07 | LW     (62:4-62:7); 401, 402, 403 (62:6-7) | | | |
| 62:10-63:04 | LW (62:10-63:4); 401, 402, 403 (62:10); BTS, 611, 401, 402, 403, 602 (63:4) | | | |
| 63:06-63:06 | LW, 611, BTS, 401, 402, 403, 602 | | | |
| 63:08-63:09 | LW, BTS, 611, 401, 402, 403, 602 | | | |
| 63:11-63:14 | LW, BTS, 611, 401, 402, 403, 602 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: GONG, Ben (June 7, 2019) | | | | |
| 63:16-63:16 | LW, BTS, 611, 401, 402, 403, 602 | | | |
| 63:18-63:21 | LW, BTS, 611, 401, 402, 403, 602 | | | |
| 63:23-64:05 | LW (63:23-64:5); BTS, 611, 401, 402, 403, 602 (63:23); 611, 701, 702 (64:4-5) | | | |
| 64:07-64:17 | LW (64:7-64:17); 611, 701, 702 (64:7-13); 611 (64:15-17) | | | |
| 64:19-65:15 | LW (64:19-65:15); 602, 701, 702, BTS, 611 (65:11-15) | | | |
| 65:18-65:19 | LW, 401, 402, 403, BTS, 611, 602, 701 | | | |
| 65:22-65:24 | LW, 611, 401, 402, 403, BTS, 611, 602, 701 | | | |
| 66:01-66:06 | LW, 611, 401, 402, 403, BTS, 611, 602, 701 | | | |
| 66:08-66:08 | LW, 401, 402, 403, BTS, 611, 602, 701 | | | |
| 66:10-66:13 | LW, 401, 402, 403, BTS, 611, 602 | | | |
| 66:15-66:15 | LW, 611, 401, 402, 403, BTS, 611, 602 | | | |
| 66:19-66:25 | LW | | | |
| 67:11-68:06 | LW | | | |
| 68:08-68:14 | LW | | | |
| 69:06-69:20 | LW, 401, 402, 403 | | | |
| 82:25-83:01 | LW, 611 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness: GONG, Ben (June 7, 2019) |
| 83:03-84:08 | LW (83:3-84:8); 611 (83:3-4, 84:7-8) | | | |
| 84:10-85:07 | LW (84:10-85:7); 611 (84:10-15) | | | |
| 85:08-85:24 | LW | | | |
| 87:21-88:14 | LW (87:21-88:14); 401, 402, 403 (87:24-88:14) | | | |
| 92:20-93:06 | LW, 401, 402, 403, BTS, 611 | | | |
| 93:22-93:24 | LW, 401, 402, 403, BTS, 611 | | | |
| 97:15-97:24 | LW, 401, 402, 403, BTS, 611 | | | |
| 101:07-102:01 | LW, 401, 402, 403, BTS, 611 | 102:5-7, 102:9-13, 102:20-22, 102:24-103:3, 103:5-6 | NR | |
| 102:03-102:03 | LW, 401, 402, 403, BTS, 611 | | | |
| 103:07-103:10 | LW, 401, 402, 403, BTS, 611 | | | |
| 103:12-103:13 | LW, 401, 402, 403, BTS, 611 | | | |
| 104:09-104:18 | LW, 401, 402, 403, BTS, 611 | | | |
| 104:20-104:20 | LW, 401, 402, 403, BTS, 611 | | | |
| 105:08-105:11 | LW, 611, MIS, 401, 402, 403, BTS, 611 | | | |
| 105:13-105:15 | LW, 611, MIS, 401, 402, 403, BTS, 611 | | | |
| 105:17-106:08 | LW (105:17-106:8); 611, 401, 402, 403, BTS, 611 (106:8) | | | |
| 106:10-106:10 | LW, 401, 402, 403, BTS, 611 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: GONG, Ben (June 7, 2019) | | | | |
| 107:10-107:13 | LW, BTS, 611, 403 | | | |
| 107:15-107:15 | LW, BTS, 611, 403 | | | |
| 107:17-107:19 | LW, BTS, 611, 403 | | | |
| 107:21-107:24 | LW, BTS, 611, 403 | | | |
| 108:05-108:12 | LW, BTS, 611, 403 | | | |
| 108:14-108:22 | LW, BTS, 611, 403 | | | |
| 108:24-109:18 | LW (108:24-109:18); BTS, 611, 403 (108:24); 401, 402, 403, BTS, 611 (109:1-9); 401, 402, 403, BTS, 611 (109:10-18) | | | |
| 109:20-109:20 | LW, 401, 402, 403, BTS, 611 | | | |
| 115:06-115:17 | LW, 401, 402, 403, BTS, 611 | | | |
| 121:08-121:13 | LW, 401, 402, 403, BTS, 611 | 120:22-23, 120:25-121:6 | NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  GONG, Ben (October 2, 2019) | | | | |
| 6:18-6:22 | LW, 403 | | | |
| 7:03-7:11 | LW, 401, 402, 403 | | | |
| 8:20-8:22 | LW, 401, 402, 403 | 11:7-21 | NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  GONG, Ben (October 2, 2019) |
| 11:22-12:16 | LW | 12:17-23<br>13:3-14:17 | NR<br>NR | |
| 14:23-15:01 | LW | 15:2-7 | NR | |
| 17:04-18:02 | LW | | | |
| 18:03-20:03 | LW | 22:20-23:9 | NR | |
| 24:23-25:14 | LW | | | |
| 25:25-27:14 | 401, 402, 403 (26:10-13), (26:24-27:4); LW (25:25-27:14) | 27:15-23<br>28:2-6<br>28:14-24 | NR<br>NR<br>NR | |
| 28:25-31:17 | 401, 402, 403 (30:11-15), (31:12-17); LW (28:25-31:17) | | | |
| 31:18-33:25 | LW, 401, 402, 403, BTS, 611 | 34:1-22<br>35:13-23 | NR<br>NR | |
| 35:24-36:09 | LW | 36:10-20<br>37:23-38:2<br>38:8-20<br>39:20-24<br>40:9-12 | | |
| 41:05-41:19 | 401, 402, 403 (41:10-12), (41:18-19), (41:22-24); LW (41:5-41:19) | | | |
| 41:22-41:24 | LW, 401, 402, 403 | 42:2-13<br>43:1-6<br>43:11-14 | NR | |
| 44:13-44:25 | LW, 401, 402, 403, BTS, 611 | | | |
| 45:11-46:01 | LW, 401, 402, 403, BTS, 611 | | | |
| 46:23-46:25 | LW, 401, 402, 403, BTS, 611 | | | |
| 49:12-49:21 | LW | 49:6-11<br>49:22-50:15 | NR<br>NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  GONG, Ben (October 2, 2019) |
| 50:16-50:19 | LW | | | |
| 51:08-52:02 | LW | 52:3-11 | | |
| 52:12-52:20 | LW | | | |
| 53:04-55:12 | LW, I | 55:13-17 56:3-11 | NR | |
| 56:12-56:19 | LW | 56:20-57:1 57:12-18 | | |
| 57:19-59:14 | LW | | | |
| 59:15-59:20 | LW | 59:21-61:14 62:18-63:11 | NR NR | |
| 63:12-63:22 | LW, 401, 402, 403 | 64:1-5 | NR | |
| 64:10-64:24 | LW, 401, 402, 403 | | | |
| 66:18-66:25 | LW, 401, 402, 403, BTS, 611 | | | |
| 67:01-68:22 | 401, 402, 403, BTS, 611 (67:1-14); 401, 402, 403 (68:18-22); LW 67:1-68:22 | 68:23-69:7 | NR | |
| 69:08-70:24 | 401, 402, 403, BTS, 611 (69:8-21); LW (69:8-70:24) | | | |
| 70:25-74:04 | 401, 402, 403 (72:7-17); 401, 402, 403, BTS, 611 (72:18-25), (73:1-8); LW 70:25-74:4 | | | |
| 74:19-76:23 | LW | 76:24-77:5 | NR | |
| 77:06-77:13 | LW | 77:14-78:4 | NR | |
| 78:05-78:19 | LW | 78:20-80:5 80:18-21 80:24-81:21 | NR NR NR | |
| 86:04-86:06 | LW, 401, 402, 403, 611, MIS | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  GONG, Ben (October 2, 2019) | | | | |
| 86:09-86:12 | LW, 611, 401, 402, 403, MIS | | | |
| 86:24-87:03 | LW | | | |
| 87:10-87:12 | LW | | | |
| 87:14-87:18 | LW | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: HEINER, Cheryl (May 20, 2019) | | | | |
| 7:20-7:21 | | | | |
| 7:22-7:25 | 401, 402, 403 | | | |
| 8:04-8:08 | 401, 402, 403 | | | |
| 9:03-9:22 | 401, 402, 403 | | | |
| 13:16-13:18 | | | | |
| 13:19-13:22 | | 13:23-14:24 | NR | |
| 15:08-15:11 | 401, 402, 403 | | | |
| 15:19-15:25 | 401, 402, 403 (15:19-24) | | | |
| 16:02-16:08 | 401, 402, 403, I | | | |
| 16:13-16:19 | 401, 402, 403 | | | |
| 16:20-16:21 | 401, 402, 403 | | | |
| 16:24-16:25 | 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: HEINER, Cheryl (May 20, 2019) | | | | |
| 17:01-17:04 | 401, 402, 403 | | | |
| 17:05-17:07 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 17:09-17:11 | 611, 401, 402, 403, 602, 701, 702 | 17:12-13<br>17:15-16<br>17:18-22 | NR<br>NR | |
| 22:21-22:23 | 401, 402, 403 | | | |
| 22:24-23:16 | 401, 402, 403 | | | |
| 25:20-25:23 | 401, 402, 403 | | | |
| 44:06-44:08 | 611, 401, 402, 403, 701, 702, 602 | 43:18-19<br>43:21<br>43:23-44:1<br>44:3-4 | NR<br>NR<br>NR<br>NR | |
| 44:10-44:15 | 611, 401, 402, 403, 701, 702, 602 | 44:17-18<br>44:20 | NR<br>NR | |
| 48:21-49:04 | 401, 402, 403 | | | |
| 49:05-49:11 | 401, 402, 403 | | | |
| 55:08-55:13 | 401, 402, 403 (55:8-10); 611, 401, 402, 403, 602, 701, 702 (55:11-13) | | | |
| 55:15-55:16 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 56:07-56:17 | 611, 401, 402, 403 | | | |
| 56:18-56:19 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 56:21-56:24 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 57:02-57:09 | 401, 402, 403 (57:2-6); 611, 401, 402, 403 (57:7-9) | | | |
| 57:11-57:12 | 611, 401, 402, 403 | 57:20-22<br>57:24-58:1<br>58:3-5 | NR<br>NR<br>NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| **Witness: HEINER, Cheryl (May 20, 2019)** | | | | |
| | | 58:7-11 | NR | |
| 58:13-58:21 | 401, 402, 403, (58:13-18); 611, 401, 402, 403, MIS (58:19-21) | | | |
| 58:23-59:02 | 611, 401, 402, 403, MIS | | | |
| 59:09-59:14 | 611, 401, 402, 403, MIS | | | |
| 59:16-59:19 | 401, 402, 403, 611, MIS | | | |
| 59:22-59:24 | 401, 402, 403, 611, MIS | | | |
| 60:02-60:03 | 611, 401, 402, 403, MIS | | | |
| 60:05-60:12 | 611, 401, 402, 403, MIS (60:5-9); 611, 401, 402, 403 (60:11-12) | | | |
| 60:14-60:16 | 611, 401, 402, 403 | | | |
| 60:18-60:20 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 60:22-60:24 | 611, 401, 402, 403, 602, 701, 702 | 61:19<br>61:21<br>61:23-62:9 | NR<br>NR<br>NR | |
| 62:10-62:11 | 611, 401, 402, 403, 701, 702 | | | |
| 62:13-62:14 | 611, 401, 402, 403, 701, 702 | | | |
| 62:16-62:17 | 611, 401, 402, 403, 701, 702 | | | |
| 62:19-62:19 | 611, 401, 402, 403, 701, 702 | | | |
| 62:21-63:05 | 611, 401, 402, 403 (63:3-5) | | | |
| 63:07-63:14 | 611, 401, 402, 403 (63:7-9); 401, 402, 403, 701, 702, 602 (63:11-14) | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: HEINER, Cheryl (May 20, 2019) | | | | |
| 63:16-63:20 | 401, 402, 403, 602, 701, 702 | | | |
| 63:22-63:22 | 401, 402, 403, 602, 701, 702 | | | |
| 64:02-64:06 | 401, 402, 403, 602, 701, 702 | | | |
| 65:13-65:15 | 611, 401, 402, 403 | | | |
| 65:17-65:19 | 611, 401, 402, 403 | | | |
| 65:21-65:21 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 65:23-65:25 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 66:14-66:16 | 611, 401, 402, 403 | | | |
| 66:18-66:18 | 611, 401, 402, 403 | | | |
| 67:07-67:08 | 611, 401, 402, 403 | | | |
| 67:10-67:11 | 611, 401, 402, 403 | 67:13 67:15-18 | | |
| 67:22-67:24 | 401, 402, 403 | | | |
| 69:08-69:11 | 401, 402, 403 | | | |
| 69:17-69:20 | 401, 402, 403 | | | |
| 69:24-70:01 | 401, 402, 403 | 70:5-7 70:9-11 | NR NR | |
| 71:02-71:04 | 401, 402, 403 | 71:24-72:3 72:5-7 | | |
| 71:06-71:09 | 401, 402, 403 | | | |
| 71:11-71:13 | | | | |
| 72:09-72:11 | 401, 402, 403 | | | |
| 72:12-72:14 | 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: HEINER, Cheryl (May 20, 2019) | | | | |
| 72:16-72:17 | 401, 402, 403 | | | |
| 73:15-73:17 | 401, 402, 403 | | | |
| 73:20-74:12 | 401, 402, 403 | | | |
| 75:11-75:15 | 401, 402, 403 | 75:16-17<br>75:19-20 | NR<br>NR | |
| 76:04-76:05 | 611, 401, 402, 403 | | | |
| 76:07-76:08 | 611, 401, 402, 403 | | | |
| 76:10-76:11 | 611, 401, 402, 403 | | | |
| 76:13-76:13 | 611, 401, 402, 403 | | | |
| 76:15-76:16 | 611, 401, 402, 403 | | | |
| 76:18-76:24 | 611, 401, 402, 403 | | | |
| 77:02-77:05 | 401, 402, 403 | | | |
| 77:06-77:14 | 401, 402, 403 | 77:15-16<br>77:18 | NR<br>NR | |
| 77:20-77:24 | 401, 402, 403 | | | |
| 78:02-78:18 | 401, 402, 403 | 78:19<br>78:21-24 | | |
| 80:12-80:15 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 80:17-80:18 | 611, 401, 402, 403, 602, 701, 702 | 80:20-22<br>81:1-2<br>81:4-6<br>81:8-10<br>81:12-15 | NR<br>NR<br>NR<br>NR<br>NR | |
| 84:24-85:05 | 401, 402, 403 (84:24-85:3); 401, 402, 403, 611, 602 (85:4-5) | | | |
| 85:07-85:07 | 401, 402, 403, 611, 602 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness: HEINER, Cheryl (May 20, 2019)** | | | |
| 85:09-85:10 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 85:12-85:12 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 87:18-88:01 | 401, 402, 403 | | | |
| 88:03-88:04 | 611, 401, 402, 403, 701 | | | |
| 88:06-88:06 | 611, 401, 402, 403, 701 | | | |
| 88:08-88:09 | 611, 401, 402, 403, 701 | | | |
| 88:11-88:12 | 611, 401, 402, 403, 701 | | | |
| 88:21-88:24 | 611, 401, 402, 403, 701 | | | |
| 89:01-89:05 | 611, 401, 402, 403, 701 | | | |
| 89:07-89:09 | 611, 401, 402, 403, 701 | | | |
| 89:11-89:13 | 611, 401, 402, 403, 701 | | | |
| 89:15-89:18 | 611, 401, 402, 403, 701 | | | |
| 89:20-89:24 | 611, 401, 402, 403, 701 | | | |
| 90:01-90:05 | 611, 401, 402, 403, 701 | | | |
| 90:07-90:11 | 611, 401, 402, 403, 701 | | | |
| 90:13-90:16 | 611, 401, 402, 403, 701 | | | |
| 90:18-90:24 | 611, 401, 402, 403, 701 | 91:5<br>91:7-8<br>91:10-12<br>91:14-21<br>92:8<br>92:10-11 | | |
| 92:15-92:19 | 611, 401, 402, 403, 701 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| **Witness: HEINER, Cheryl (May 20, 2019)** | | | | |
| 92:21-92:25 | 611, 401, 402, 403, 701 | | | |
| 93:01-93:01 | 611, 401, 402, 403, 701 | | | |
| 93:03-93:04 | 611, 401, 402, 403, 701 | | | |
| 93:05-93:07 | 611, 401, 402, 403, 701 | | | |
| 93:09-93:16 | 611, 401, 402, 403, 701 | | | |
| 93:18-93:22 | 611, 401, 402, 403, 701 | | | |
| 94:14-94:19 | 611, 401, 402, 403, 701 | | | |
| 94:22-94:24 | 611, 401, 402, 403, 701 | | | |
| 95:08-95:25 | 401, 402, 403, 611 | | | |
| 96:01-96:09 | 401, 402, 403, 611 | | | |
| 96:14-96:17 | 611, 401, 402, 403, 701, I | | | |
| 96:19-96:20 | 611, 401, 402, 403, 701, I | | | |
| 97:07-97:08 | 611, 401, 402, 403, 701, 702 | | | |
| 97:10-97:11 | 611, 401, 402, 403, 701, 702 | | | |
| 103:23-103:25 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 104:02-104:02 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 104:04-104:07 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 104:09-104:10 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 104:12-104:13 | 611, 401, 402, 403 | | | |
| 104:15-104:16 | 611, 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness: HEINER, Cheryl (May 20, 2019)** |||||
| 105:13-105:15 | | | | |
| 105:16-105:18 | 611, 401, 402, 403, 701 (105:17-18) | | | |
| 105:20-105:21 | 611, 401, 402, 403, 701 | | | |
| 106:03-106:10 | 611, 401, 402, 403, 701 | | | |
| 106:12-106:17 | 611, 401, 402, 403, 701 | | | |
| 106:19-106:19 | 611, 401, 402, 403, 701 | | | |
| 107:03-107:09 | 611, 401, 402, 403, 701, I (107:8-9) | | | |
| 107:11-107:11 | 611, 401, 402, 403, 701, I | 107:14-15 | NR | |
| 108:03-108:06 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 108:09-108:09 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 108:11-108:11 | | | | |
| 108:13-108:16 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 108:18-108:18 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 108:20-108:22 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 108:24-108:24 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 109:02-109:02 | 401, 402, 403 | | | |
| 109:04-109:05 | 401, 402, 403 | | | |
| 109:10-109:13 | 611, 401, 402, 403, 701 | | | |
| 109:15-109:15 | 611, 401, 402, 403, 701 | | | |
| 110:22-111:01 | 401, 402, 611, 403, 701 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| colspan across: **Witness: HEINER, Cheryl (May 20, 2019)** ||||| 
| 111:03-111:09 | 401, 402, 403, 611, 701 (111:3-5); 401, 402, 403, 611; 701, 702 (111:7-9) | | | |
| 111:11-111:12 | 401, 402, 403, 611, 701, 702 | | | |
| 117:08-117:10 | 611, 401, 402, 403 | | | |
| 117:12-117:13 | 611, 401, 402, 403 | | | |
| 117:15-117:15 | 611, 401, 402, 403 | | | |
| 117:17-117:23 | 611, 401, 402, 403 | | | |
| 117:25-118:02 | 611, 401, 402, 403 | | | |
| 118:04-118:06 | 611, 401, 402, 403 | | | |
| 118:08-118:12 | 611, 401, 402, 403 | 118:14-18<br>118:20-22<br>118:24-25<br>119:3-5<br>119:7-8<br>119:10-21<br>119:23-24 | NR<br>NR<br>NR<br>NR<br>NR<br><br>NR | |
| 120:12-120:14 | 403 | | | |
| 121:05-121:13 | 611, MIS, 401, 402, 403 | | | |
| 121:16-121:17 | 611, MIS, 401, 402, 403 | | | |
| 121:19-122:01 | 401, 402, 403, (121:19-24); 611, 403, 401, 402 (121:25-122:1) | | | |
| 122:03-122:10 | 611, 401, 402, (122:3-8); 602 611, 403, 401, 402 (122:9-10) | | | |
| 122:12-122:15 | 611, 401, 402, 403, 602 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: HEINER, Cheryl (May 20, 2019) | | | | |
| 122:20-122:25 | 611, 401, 402, 403, 602 | | | |
| 123:02-123:09 | 611, 401, 402, 403, 602 (123:2-8); 611, 401, 402, 403, 602, 701 (123:9) | | | |
| 123:11-123:15 | 611, 401, 402, 403, 602, 701 (123:11-12); 611, 401, 402, 403 (123:14-15) | | | |
| 123:17-123:22 | 611, 401, 402, 403 (123:17-18); 401, 402, 403 (123:20-22) | 123:23-25 124:2-4 | | |
| 127:17-127:18 | 611, 403, 701, 602, 702 | | | |
| 127:20-127:25 | 611, 403, 701, 602, 702 | | | |
| 128:02-128:03 | 611, 403, 701, 602, 702 | | | |
| 128:05-128:07 | 401, 402, 403 | | | |
| 128:11-128:17 | 403 | 128:24-129:17 | NR | |
| 130:04-130:05 | 611, MIS, 401, 402, 403 | | | |
| 130:07-130:09 | 611, MIS, 401, 402, 403 | | | |
| 130:11-130:20 | 401, 402, 403, 701 (130:11-15); 611, 401, 402, 403 (130:16-20) | | | |
| 130:21-130:24 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 131:01-131:06 | 611, 401, 402, 403, 701, 702, 602 (131:1-2); 611, 401, 402, 403, 701, 702 (131:4-6) | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness: HEINER, Cheryl (May 20, 2019) | | | |
| 131:08-131:10 | 611, 401, 402, 403, 701, 702 | | | |
| 131:12-131:23 | I, 401, 402, 403 | | | |
| 131:25-131:25 | I, 401, 402, 403 | | | |
| 132:02-132:07 | 611, 401, 402, 403, 701, 702 (132:6-7) | | | |
| 132:09-132:10 | 611, 401, 402, 403, 701, 702 | | | |
| 132:12-132:13 | 611, 401, 402, 403, 701, 702 | | | |
| 132:16-132:19 | 611, 401, 402, 403, 701, 702 | | | |
| 133:16-133:17 | 611, 401, 402, 403, 701 | 133:7-8<br>133:11-15 | NR<br>NR | |
| 133:19-133:21 | 611, 401, 402, 403, 701 | | | |
| 134:09-134:19 | 401, 402, 403 (134:11-19) | | | |
| 137:14-137:25 | 401, 402, 403 | 136:18-19<br>136:21-23<br>137:1-2<br>138:1-6 | NR<br>NR<br>NR<br>NR | |
| 142:20-142:23 | 611, 401, 402, 403 | | | |
| 144:10-144:13 | 403 | | | |
| 145:03-145:06 | 403 | | | |
| 147:02-147:03 | 611, 401, 402, 403, 701, 702 | | | |
| 147:05-147:06 | 611, 401, 402, 403, 701, 702 | | | |
| 147:08-147:10 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 147:12-147:17 | 611, 401, 402, 403, 701, 702, 602 | 147:19-21<br>147:23-148:4 | NR<br>NR | |
| 148:06-148:12 | 611, 401, 402, 403, 701, 702 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: HEINER, Cheryl (May 20, 2019) |||||
| 148:14-148:18 | 611, 401, 402, 403, 701, 702 | | | |
| 148:20-148:25 | 611, 401, 402, 403, 701, 702 (148:20-21); 401, 402, 403 148:23-25) | | | |
| 149:01-149:03 | 611, 401, 402, 403, 701, 702 | | | |
| 149:05-149:11 | 611, 401, 402, 403, 701, 702 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  HUNKAPILLER, Michael (October 10, 2019) |||||
| 5:02-5:04 | | | | |
| 5:05-5:10 | | | | |
| 7:19-8:02 | | | | |
| 9:01-9:04 | | | | |
| 9:10-9:16 | | 9:17-20 | NR | |
| 10:05-10:09 | | | | |
| 10:16-11:07 | | 11:8-17 | | |
| 11:20-12:03 | | | | |
| 12:08-12:12 | | | | |
| 12:16-12:18 | | | | |
| 12:23-13:08 | | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: HUNKAPILLER, Michael (October 10, 2019) | | | | |
| 13:15-13:20 | | | | |
| 13:25-14:22 | | | | |
| 15:01-15:09 | | | | |
| 15:22-15:25 | | 16:8-17:1 | NR | |
| 19:03-19:09 | | 19:10-18 | NR | |
| 19:24-20:05 | | | | |
| 20:06-20:09 | | | | |
| 20:10-20:19 | | | | |
| 21:22-22:01 | | | | |
| 23:02-24:07 | | | | |
| 24:08-25:25 | | 27:2-15 | NR | |
| 27:20-29:09 | | | | |
| 29:18-31:10 | | | | |
| 32:03-32:06 | | 32:7-10 | I | |
| 34:24-36:03 | | 37:8-10<br>37:17-23 | NR<br>NR | |
| 37:25-38:12 | | 38:13-14 | I, NR | |
| 39:01-39:07 | 602, 703 | | | |
| 39:09-40:03 | 602, 703 | 41:16-23 | NR | |
| 42:03-42:07 | | 42:8-43:9 | NR | |
| 45:14-45:25 | | | | |
| 48:14-49:13 | | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  HUNKAPILLER, Michael (October 10, 2019) | | | | |
| 49:21-50:12 | | | | |
| 50:17-51:01 | | | | |
| 51:02-51:15 | | 52:5-21 | NR | |
| 53:01-53:08 | | | | |
| 53:09-54:06 | 403, 402 (54:2-6) | 55:5-15<br>55:19-22<br>55:24-56:13 | NR<br>NR<br>NR | |
| 56:15-56:18 | 403, 402 | | | |
| 56:20-58:05 | 403, 402 (56:20-57:7) | 58:6-14 | NR | |
| 58:24-59:23 | | | | |
| 59:24-60:08 | | 63:5-17<br>64:1-5<br>64:15-65:16<br>66:21-67:10<br>67:18-68:11<br>68:19-21 | I<br>NR<br>NR<br>NR<br>NR<br>NR | |
| 70:23-71:03 | | | | |
| 71:09-72:01 | I | | | |
| 74:24-75:15 | | | | |
| 75:21-76:12 | | | | |
| 77:11-78:17 | | | | |
| 78:18-78:24 | | | | |
| 79:04-80:05 | | | | |
| 84:03-84:10 | | | | |
| 85:11-85:15 | | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| **Witness:  HUNKAPILLER, Michael (October 10, 2019)** | | | | |
| 85:23-86:24 | | | | |
| 86:25-87:02 | | | | |
| 87:11-87:15 | I | | | |
| 87:16-87:25 | | 88:1-16, 88:19-89:1 | I, NR | |
| 89:03-89:06 | | | | |
| 89:07-89:11 | | | | |
| 89:12-89:18 | | | | |
| 90:07-90:17 | | | | |
| 91:08-91:10 | | | | |
| 91:13-92:03 | 402, 403 (91:23-92:3) | | | |
| 92:11-92:18 | | | | |
| 94:10-94:23 | | | | |
| 94:24-96:02 | | 96:3-11, 96:13-20 | NR | |
| 100:06-100:11 | | 99:15-21 | NR | |
| 100:12-100:20 | | | | |
| 102:11-102:15 | 602, 703 | 101:10-16, 101:18-102:2 | NR | |
| 108:09-108:11 | | | | |
| 108:15-109:03 | | | | |
| 110:16-110:24 | 402, 403 | | | |
| 111:04-111:05 | I, 402, 403 | | | |
| 111:14-111:16 | 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  HUNKAPILLER, Michael (October 10, 2019) | | | | |
| 111:17-112:12 | 402, 403 | | | |
| 113:15-114:02 | 402, 403 | 116:3-14 | NR | |
| 118:18-118:24 | | | | |
| 119:24-120:06 | | 119:15-23 | | |
| 120:11-120:25 | 402, 403 | | | |
| 121:01-122:01 | 402, 403 | | | |
| 124:10-125:07 | | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  KEHO, Kathryn (June 11, 2019) | | | | |
| 7:25-8:05 | | | | |
| 8:10-8:12 | | | | |
| 9:22-11:25 | 401, 402, 403 | 12:1-4<br>12:10-18<br>14:6-15:16 | NR<br>NR<br>NR | |
| 19:16-20:23 | 401, 402, 403, 611, BTS | | | |
| 20:25-21:09 | 401, 402, 403, 611, BTS (20:25-21:1); 401, 402, 403, 611 (21:3-21:09) | | | |
| 21:11-21:25 | 401, 402, 403, 611 (21:11), (21:13-25); 401, 402, 403, 611, BTS | | | |
| 22:02-25:07 | 401, 402, 403, 611 (22:2-6), 401, 402, | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness:  KEHO, Kathryn (June 11, 2019)** | | | |
|  | 403, 611, BTS (22:8-25:7) |  |  |  |
| 25:09-26:22 | 401, 402, 403, 611, BTS |  |  |  |
| 26:24-28:18 | 401, 402, 403, 611, BTS |  |  |  |
| 28:20-30:24 | BTS, 401, 402, 403, 611 (29:1-30:24) |  |  |  |
| 31:01-31:01 | BTS, 401, 402, 403, 611 | 43:24-44:17<br>48:9-49:21 | NR<br>NR |  |
| 50:06-50:17 | 401, 402, 403, 611, BTS |  |  |  |
| 50:18-50:22 | 401, 402, 403, 611, BTS | 53:1-54:6 | NR |  |
| 68:07-68:13 | 403, 602, 611, 701, 702, BTS, I | 66:23-68:6<br>69:3-14 | H, NR<br>NR |  |
| 70:09-73:06 | 401, 402, 403, 602, 611, BTS | 73:7-10<br>73:12-22<br>73:24-74:3 | NR<br>NR<br>NR |  |
| 74:04-74:10 | 401, 702, 403, 611, BTS |  |  |  |
| 74:11-74:22 | 401, 702, 403, 611, BTS |  |  |  |
| 74:23-75:19 | 401, 702, 403, 611, BTS | 75:20-22<br>77:21-80:12 | NR<br>NR |  |
| 81:01-81:03 | BTS, 401, 402, 403, 602, 611 |  |  |  |
| 81:05-81:08 | BTS, 401, 402, 403, 602, 611 | 81:10-14<br>81:16-19<br>82:3-9<br>82:11-83:2<br>83:4-8<br>83:10-13 | NR<br>NR<br>NR<br>NR<br>NR<br>NR |  |
| 85:04-85:09 | BTS, 401, 402, 403, 611 | 85:20-87:7<br>87:17-20<br>87:22-89:11<br>89:13-22<br>89:24-90:2 | H, NR<br>H, NR<br>H, NR<br>H, NR<br>H, NR |  |
| 96:22-97:04 | 401, 402, 403, 602, 611, BTS | 94:10-96:10<br>96:12 | H, NR<br>H, NR |  |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  KEHO, Kathryn (June 11, 2019) | | | | |
| | | 96:14-21 | H, NR | |
| 99:23-100:06 | 401, 402, 403, 602, 611, BTS | | | |
| 100:07-100:13 | 401, 402, 403, 602, 611, BTS | | | |
| 100:18-100:22 | 401, 402, 403, 602, 611, BTS | | | |
| 100:24-100:25 | 401, 402, 403, 602, 611, BTS | | | |
| 101:02-101:07 | 401, 402, 403, 602, 611, BTS | 101:8-11<br>101:13-15<br>101:17-102:2 | H, NR<br>H, NR<br>NR | |
| 107:24-108:06 | BTS | | | |
| 108:08-108:20 | BTS (108:8-11), (108:13-18); I, BTS, 401, 402, 403, 611 (108:19-20) | | | |
| 109:01-109:08 | 401, 402, 403 | 109:9-111:8 | NR | |
| 111:12-111:15 | 401, 402, 403, 611, BTS | 111:16-17<br>111:19-113:8<br>113:10-18<br>113:20-114:2<br>114:13-16<br>114:18-22<br>115:9-10<br>115:12-116:18 | NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR | |
| 118:04-120:13 | 401, 402, 403, 611, BTS | 117:3-20<br>117:22-118:2<br>120:23-122:17<br>122:19-22<br>122:24-123:8 | I, NR<br>I, NR<br>I, NR<br>NR<br>NR | |
| 126:17-126:21 | 401, 402, 403, 611, BTS | 128:23-129:1<br>129:3-8<br>129:10-11<br>129:13-15 | NR<br>NR<br>I, NR<br>I, NR | |
| 130:23-131:09 | 401, 402, 403, 611, BTS | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  KEHO, Kathryn (June 11, 2019) |||||
| 131:25-132:05 | 401, 402, 403, 602, 611, BTS | 132:6-7 | I, NR | |
| 132:20-132:25 | 401, 402, 403, 602, 611, BTS | 133:1-4 | I, NR | |
| 133:23-134:09 | 401, 402, 403, 602, 611, BTS | | | |
| 134:11-134:17 | 401, 402, 403, 602, 611, BTS | | | |
| 134:19-136:05 | 401, 402, 403, 602, 611, BTS | 136:11-137:14<br>137:16<br>137:18-21 | I, NR<br>NR<br>NR | |
| 138:07-139:10 | 401, 402, 403, 602, 611, BTS, I | | | |
| 139:11-139:11 | 401, 402, 403, 611, BTS | | | |
| 139:13-140:12 | 401, 402, 403, 611, BTS | | | |
| 142:21-143:04 | 401, 402, 403, 602, 611, BTS | 143:5-6<br>143:8<br>143:10-11<br>143:13-14<br>143:16-18 | NR<br>NR<br>NR<br>NR<br>NR | |
| 144:08-144:16 | 401, 402, 403, 602, 611, BTS | | | |
| 151:02-151:04 | 401, 402, 403, 611, MIS, BTS | 149:2-5<br>149:7-23<br>150:6-7<br>150:9-25 | NR<br>NR<br>I, NR<br>I, NR | |
| 151:07-151:10 | 401, 402, 403, 611, MIS, BTS | 151:12<br>151:14-17<br>151:19-20<br>151:22-152:4<br>152:6-7<br>152:9-10 | I, NR<br>I, NR<br>NR<br>NR<br>NR<br>NR | |
| 152:18-152:23 | 401, 402, 403, 611, BTS | | | |
| 153:06-153:09 | 401, 402, 403, 611, BTS | 153:10-12<br>153:14-22 | NR<br>NR | |
| 153:24-155:01 | 401, 402, 403, 611, BTS | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  KEHO, Kathryn (June 11, 2019) | | | | |
| 155:05-156:02 | 401, 402, 403, 611, BTS | | | |
| 156:06-156:23 | 401, 402, 403, 611, BTS | | | |
| 157:02-158:07 | 401, 402, 403, 611, BTS | | | |
| 159:15-159:23 | 401, 402, 403, 611, BTS | | | |
| 159:24-160:08 | 401, 402, 403, 611, BTS | 160:16-22<br>160:24-161:2 | NR<br>NR | |
| 163:23-164:11 | 401, 402, 403, 611, BTS (164:1-11) | | | |
| 168:20-168:22 | 401, 402, 403, 611, BTS | | | |
| 168:23-169:23 | 401, 402, 403, 611, BTS | | | |
| 170:01-170:01 | 401, 402, 403, 611, BTS | | | |
| 170:05-171:24 | 401, 402, 403, 611, BTS (170:5-171:20); 401, 402, 403, 602, 611, 701, 702, BTS (171:21-24) | | | |
| 172:01-173:07 | 401, 402, 403, 602, 611, 701, 702, BTS | | | |
| 173:09-173:11 | 401, 402, 403, 602, 611, 701, 702, BTS, I | | | |
| 173:13-174:14 | 401, 402, 403, 602, 611, 701, 702, BTS, I | 174:22-175:5<br>175:7-176:15 | NR<br>NR | |
| 176:19-177:02 | 401, 402, 403, 611, BTS | | | |
| 180:11-180:18 | 401, 402, 403, 611, BTS | | | |
| 181:13-181:19 | BTS, 401, 402, 403, 611 | 181:20-21<br>181:23-24<br>182:1-12<br>182:14-17 | NR<br>NR<br>NR<br>H, NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  KEHO, Kathryn (June 11, 2019) |||||
| 182:21-183:03 | 401, 402, 403, 611, BTS, I | 183:4-185:22<br>185:24-25<br>186:2-3 | NR<br>NR<br>NR | |
| 186:19-186:20 | 401, 402, 403, 611, BTS | | | |
| 186:22-187:02 | 401, 402, 403, 611, BTS | | | |
| 187:04-187:06 | 401, 402, 403, 611, BTS | 187:8-10<br>187:13-14<br>188:19-189:5<br>189:7-8<br>189:24-190:7<br>190:12-14<br>190:16-19 | NR<br>NR<br>NR<br>I, NR<br>H, I, NR<br>H, I, NR<br>H, I, NR | |
| 191:17-191:21 | 401, 402, 403, 611, BTS | 191:6-10<br>191:12-15<br>192:3-11 | NR<br>NR<br>I, NR | |
| 193:21-194:01 | 401, 402, 403, 611, BTS | | | |
| 206:11-206:13 | 401, 402, 403, 611, BTS | 204:1-205:7<br>205:9-206:5 | NR<br>NR | |
| 206:15-206:16 | 401, 402, 403, 611, BTS | | | |
| 206:18-206:20 | 401, 402, 403, 611, BTS | | | |
| 206:23-206:24 | 401, 402, 403, 611, BTS | | | |
| 207:01-207:06 | 401, 402, 403, 611, BTS | | | |
| 207:07-207:09 | BTS, 401, 402, 403, 602, 611, 701, 702 | | | |
| 207:11-207:12 | BTS, 401, 402, 403, 602, 611, 701, 702 | 209:4-5<br>209:7<br>209:9-20<br>210:4-5<br>210:7-10<br>210:17-24 | NR<br>NR<br>I, NR<br>NR<br>NR<br>NR | |
| 212:09-212:11 | 401, 402, 403, 602, 611, 701, 702, BTS | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  KEHO, Kathryn (June 11, 2019) | | | | |
| 212:13-212:24 | 401, 402, 403, 602, 611, 701, 702, BTS | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  KORLACH, Jonas (June 13, 2019) | | | | |
| 4:20-4:21 | | | | |
| 5:08-5:19 | 403 | | | |
| 12:25-13:10 | | 12:7-12:19<br>13:11-23<br>14:6-9<br>14:20-15:3<br>15:13-15<br>16:11-22<br>17:5-12 | NR<br>NR<br>NR<br>NR<br>I, NR<br>NR<br>NR | |
| 17:19-18:15 | | 19:1-2<br>19:4-25<br>20:11-13<br>20:15-19 | NR<br>NR<br>NR<br>NR | |
| 21:22-22:08 | 611, 401, 402, 403 | | | |
| 22:10-22:21 | 611, CP, 401, 402, 403 | | | |
| 22:23-23:02 | 611, CP, 401, 402, 403 | 23:8-9<br>23:11-17<br>23:19-25<br>24:2-8<br>24:10-12 | NR<br>NR<br>NR<br>NR<br>NR | |
| 27:03-27:10 | MIS, 611, 401, 402, 403, 701, 702 | | | |
| 27:12-27:16 | MIS, 611, 401, 402, 403, 701, 702 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness:  KORLACH, Jonas (June 13, 2019)** | | | |
| 27:18-27:20 | MIS, 611, 401, 402, 403, 701, 702 | | | |
| 27:22-27:24 | MIS, 611, 401, 402, 403, 701, 702 | 28:1-6<br>28:8-11 | NR<br>NR | |
| 31:02-31:04 | 401, 402, 403 | 30:8-21<br>30:23-25<br>31:5-32:6 | NR<br>NR<br>NR | |
| 32:07-32:07 | 611, 401, 402, 403 | | | |
| 32:09-32:09 | 611, 401, 402, 403 | | | |
| 32:11-32:12 | 611, 401, 402, 403, 602 | | | |
| 32:14-32:15 | 611, 401, 402, 403, 602 | | | |
| 32:17-32:18 | 611, 401, 402, 403 | | | |
| 32:20-32:20 | 611, 401, 402, 403 | | | |
| 33:01-33:10 | 611, 401, 402, 403, 602 | | | |
| 33:12-33:18 | 611, 401, 402, 403, 602 | | | |
| 48:01-48:03 | 611, 401, 402, 403, 602, 701, 702 | 46:7-9<br>46:11-47:5<br>47:7-25 | NR<br>NR<br>NR | |
| 48:05-48:25 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 49:02-49:05 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 49:07-49:20 | 611, 401, 402, 403, 602, 701, 702 | 49:22-24<br>50:1-12 | NR<br>NR | |
| 50:13-50:16 | I, 611, 401, 402, 403, 602, 701, 702 | | | |
| 50:19-51:02 | I, 611, 401, 402, 403, 602, 701, 702 (50:19-50:22); 50:23-51:02 (CP, 611, 401, 402, 403, 602, 701, 702) | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness:  KORLACH, Jonas (June 13, 2019)** | | | |
| 51:04-51:19 | CP, 611, 401, 402, 403, 602, 701, 702 | | | |
| 51:21-52:14 | CP, 611, 401, 402, 403, 602, 701, 702 | | | |
| 52:16-52:24 | CP, 611, 401, 402, 403, 602, 701, 702 | | | |
| 53:01-53:04 | CP, 611, 401, 402, 403, 602, 701, 702 | | | |
| 53:06-53:15 | CP, 611, 401, 402, 403, 602, 701, 702 | | | |
| 53:17-53:19 | CP, 611, 401, 402, 403, 602, 701, 702 | | | |
| 53:21-54:06 | CP, 611, 401, 402, 403, 602, 701, 702 | | | |
| 54:08-55:12 | CP, 611, 401, 402, 403, 602, 701, 702 | | | |
| 55:14-56:13 | CP, 611, 401, 402, 403, 602, 701, 702 | | | |
| 56:15-56:20 | 611, 401, 402, 403, CP, 602, 701, 702 | | | |
| 56:23-57:09 | 611, 401, 402, 403, CP, 602, 701, 702 | | | |
| 60:25-61:03 | 403, 602 | 58:17-20<br>58:22-59:13<br>60:1-12<br>60:14-17<br>61:4-10<br>61:12-62:16<br>62:18-63:17 | NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR | |
| 63:24-64:03 | I, 611, MIS, 401, 402, 403 | | | |
| 64:06-64:16 | I, 611, MIS, 401, 402, 403 | | | |
| 67:05-67:07 | 403 | 65:20-21<br>65:23-66:7<br>66:9-15<br>66:17-67:3<br>67:16-17<br>67:19-68:2<br>68:4-8 | NR<br>NR<br>NR<br>NR<br>I, NR<br>I, NR<br>I, NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  KORLACH, Jonas (June 13, 2019) | | | | |
| 67:09-67:10 | 403 | | | |
| 67:11-67:14 | 403 | | | |
| 68:10-68:11 | 611, 401, 402, 403, 602, 701, 702 | | | |
| 68:13-69:03 | 403 | | | |
| 69:07-69:12 | 403 | | | |
| 69:13-70:17 | 403 (69:13-70:11); 403, I (70:12-70:17) | 70:18-73:1 | I, NR | |
| 81:08-81:24 | 401, 402, 403 | 78:14-19<br>80:4-81:7<br>82:3-8<br>82:14-19<br>82:21-24<br>83:1-24<br>84:1-24 | I, NR<br>I<br>I, NR<br>NR<br>NR<br>NR<br>NR | |
| 88:04-88:15 | 401, 402, 403, 602 | 85:20-86:6<br>86:8-87:13<br>87:15-88:2<br>88:16-25<br>89:2-11 | NR<br>NR<br>NR<br>NR<br>NR | |
| 92:08-92:17 | 403 | 92:18-94:13<br>94:16-95:16 | NR<br>NR | |
| 95:18-97:05 | MIS, 611, 403 | | | |
| 97:07-97:08 | | | | |
| 97:11-98:12 | (98:10-98:12) MIS, 611, 403 | | | |
| 98:15-98:20 | (98:15-98:17) MIS, 611, 403; (98:18-98:20) 611, 401, 402, 403, I | 98:24-99:14 | NR, NARR | |
| 99:16-99:20 | MIS, 611, 403 | | | |
| 99:22-100:10 | MIS, 611, 403 | 100:12-101:11 | NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  KORLACH, Jonas (June 13, 2019) | | | | |
| 101:12-101:22 | 403, 611, 401, 402 | | | |
| 101:24-102:20 | 403 | 102:21-25 | NR | |
| 104:04-104:10 | 611, 403 | | | |
| 108:18-109:01 | | | | |
| 109:03-109:23 | 401, 402, 403, 602 (109:03-19); 401, 402, 403, 602, I (109:20-23) | | | |
| 110:11-110:20 | 403 | | | |
| 110:22-111:04 | 403, 611, 401, 402, 602, 701, 702 | | | |
| 111:06-111:14 | 403, 611, 401, 402, 602, 701, 702 | | | |
| 111:16-111:24 | 401, 402, 403 | 111:25-112:1 112:3-10 112:12-113:4 | NR NR NR | |
| 113:06-113:10 | I, 403 | | | |
| 113:25-114:02 | | | | |
| 114:15-114:22 | 401, 402, 403, 602 | | | |
| 118:10-118:17 | 403 | 118:18-119:5 119:7-13 129:16-22 | NR NR NR | |
| 131:17-132:10 | 401, 402, 403, I | 132:17-23 | | |
| 141:12-141:13 | 611, 401, 402, 403 | | | |
| 141:15-141:17 | 611, 401, 402, 403, I | | | |
| 142:12-142:15 | 401, 402, 403 | | | |
| 143:17-143:19 | 611, 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  KORLACH, Jonas (June 13, 2019) |||| |
| 143:21-143:21 | 611, 401, 402, 403 | | | |
| 144:18-144:19 | 611, 401, 402, 403 | | | |
| 144:21-144:24 | 611, 401, 402, 403 | 144:8-10<br>144:12-16 | NR<br>NR | |
| 145:01-145:02 | 611, 401, 402, 403 | | | |
| 145:04-145:04 | 611, 401, 402, 403 | | | |
| 145:06-145:07 | 611, 401, 402, 403 | | | |
| 145:09-145:09 | 611, 401, 402, 403 | 145:11-12<br>145:14-19<br>145:21-22<br>145:24-146:6<br>146:8-11 | NR<br>NR<br>NR<br>NR<br>NR | |
| 146:13-146:14 | 611, 401, 402, 403 | | | |
| 146:16-146:16 | 611, 401, 402, 403 | | | |
| 146:18-146:19 | 611, 401, 402, 403 | | | |
| 146:21-146:22 | 611, 401, 402, 403 | | | |
| 146:24-147:01 | 611, 401, 402, 403 | | | |
| 147:03-147:04 | 611, 401, 402, 403 | | | |
| 147:23-148:02 | 611, 401, 402, 403 | | | |
| 148:04-148:05 | 611, 401, 402, 403 | 148:15-20<br>148:22-149:1 | NR<br>NR | |
| 149:03-149:07 | 611, 401, 402, 403, 602 | | | |
| 149:10-149:14 | 611, 401, 402, 403, 602 | | | |
| 149:16-149:19 | 611, 401, 402, 403 | | | |
| 149:21-149:22 | 611, 401, 402, 403 | 150:9-11<br>150:16-22 | NR<br>NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  KORLACH, Jonas (June 13, 2019) | | | |
| | | 150:25-151:9 | NR | |
| | | 151:11-12 | NR | |
| | | 151:14 | NR | |
| | | 151:16-18 | NR | |
| | | 151:20-152:4 | NR | |
| | | 154:5-6 | NR | |
| | | 154:8-15 | NR | |
| | | 171:22-172:15 | NR | |
| | | 172:18-173:2 | NR | |
| | | 173:4-5 | NR | |
| | | 173:7-12 | NR | |
| | | 174:3-6 | NR | |
| | | 180:4-5 | NR | |
| | | 180:7-17 | NR | |
| | | 180:25-181:4 | NR | |
| | | 181:10 | NR | |
| 181:11-182:04 | 611, 401, 402, 403 | | | |
| 182:05-182:05 | 611, 401, 402, 403 | | | |
| 182:07-182:23 | 401, 402, 403 | 182:24-183:1 | I, NR | |
| | | 183:3-17 | I, NR | |
| | | 183:19-24 | NR | |
| | | 184:2 | NR | |
| | | 184:4-15 | NR | |
| | | 185:2-14 | I, NR | |
| 185:15-185:16 | 611, 401, 402, 403 | | | |
| 185:18-185:18 | 611, 401, 402, 403 | 185:20-186:6 | NR | |
| | | 186:14-16 | NR | |
| | | 186:18-21 | NR | |
| | | 187:4-9 | NR | |
| | | 187:16-18 | NR | |
| | | 187:20-21 | NR | |
| 188:08-188:11 | I, 602, 701, 702, 611, 401, 402, 403 | | | |
| 188:14-188:19 | 611, 401, 402, 403 | | | |
| 188:21-188:24 | 611, 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  KORLACH, Jonas (June 13, 2019) | | | | |
| 189:01-189:04 | 611, 602, 401, 402, 403 | | | |
| 189:07-189:11 | 611, 602, 401, 402, 403 | | | |
| 189:13-189:14 | I | | | |
| 189:20-189:22 | I, 611, 401, 402, 403, 602 | | | |
| 191:07-191:16 | 403, 401, 402, 403 | 191:25<br>192:1-3<br>192:5-17<br>193:20-22<br>193:25-194:2<br>194:17-195:1<br>195:4-9<br>195:11-17<br>197:3-9<br>197:11<br>197:13<br>197:15-25<br>198:9-13<br>200:21-22<br>200:24-201:4 | NR<br>NR<br>NR<br>I, NR<br>I, NR<br>I, NR<br>I, NR<br>I, NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR | |
| 201:22-201:23 | 401, 402, 403, 602, 701, 702 | | | |
| 201:25-202:04 | 401, 402, 403, 602, 701, 702 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  MAXHAM, Kenneth (May 9, 2019) | | | | |
| 6:21-6:23 | | | | |
| 7:06-7:21 | 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | **Witness:  MAXHAM, Kenneth (May 9, 2019)** | | | |
| 12:10-13:19 | | | | |
| 21:10-21:13 | 401, 402, 403 | 19:23-20:2, 20:5-19, 20:21-21:1, 21:3-4 | NR | |
| 37:12-37:14 | 401, 402, 403 | | | |
| 37:15-38:07 | 401, 402, 403 | 38:11-13 | NR | |
| 38:09-38:09 | 401, 402, 403 | | | |
| 38:14-38:16 | 611, 401, 402, 403, CP | | | |
| 38:18-38:18 | 611, 401, 402, 403, CP | | | |
| 38:20-38:21 | 611, 401, 402, 403, 701 | 38:25-39:2, 39:4-8 | NR | |
| 38:23-38:23 | 611, 401, 402, 403, 701 | | | |
| 39:11-39:17 | 401, 402, 403 | 40:8-10, 40:12-24 | NR | |
| 48:09-48:12 | 611, 401, 402, 403, CP, 701 | | | |
| 48:14-50:09 | 611, 401, 402, 403, CP, 701 | | | |
| 50:10-51:11 | 401, 402, 403 | 51:12-22 | NR | |
| 55:01-55:11 | 401, 402, 403 | | | |
| 55:13-55:25 | 401, 402, 403 | | | |
| 56:02-56:02 | 401, 402, 403 | | | |
| 56:22-57:22 | 403 (56:22-57:7); 403 (57:8-13); 401, 402, 403 (57:14-17); CP, 611, 401, 402, 403 (57:18-22) | | | |
| 57:24-58:11 | CP, 611, 401, 402, 403 | | | |
| 123:07-123:20 | 401, 402, 403 | 123:21-25, 124:2-12, 124:14-25 | NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  REAMEY, Robert (March 8, 2018) | | | | |
| 6:20-6:20 | LW, 403 | | | |
| 7:11-7:14 | LW, 403 | | | |
| 9:02-9:22 | LW, 403 | | | |
| 10:02-10:08 | LW, 403 | | | |
| 10:11-10:20 | LW, 403 | | | |
| 13:07-13:15 | LW, 403 | | | |
| 13:20-14:10 | LW, 403 | | | |
| 14:13-14:15 | LW, 403 | | | |
| 14:17-15:05 | LW, 403 | | | |
| 16:03-16:07 | LW, 403 | | | |
| 16:08-16:18 | LW, 403 | | | |
| 16:19-17:02 | LW, 403 | | | |
| 17:07-17:23 | LW, 403 | | | |
| 18:03-18:04 | LW, 403 | | | |
| 18:09-19:22 | LW, 403 | | | |
| 19:23-23:11 | LW, 403 | | | |
| 24:04-24:20 | LW, 403 | | | |
| 24:22-25:06 | LW, 403 | | | |
| 25:09-26:13 | LW, 403 | | | |
| 27:03-27:13 | LW, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  REAMEY, Robert (March 8, 2018) | | | | |
| 27:19-27:22 | LW, 403 | | | |
| 28:22-30:03 | LW, 403 | 30:4-9 | NR | |
| 30:12-31:01 | LW, 403 | | | |
| 31:09-32:23 | LW, 403, 602 | | | |
| 34:03-37:11 | LW, 403, 402 | | | |
| 37:21-38:06 | LW, 403, 402 | | | |
| 38:22-39:07 | LW, 403 | | | |
| 39:20-40:05 | LW, 403, 402 | | | |
| 40:10-40:15 | LW, 403, 402 | | | |
| 41:05-41:17 | LW, 403, 402 | | | |
| 41:19-42:06 | LW, 403, 402 | | | |
| 42:09-43:10 | LW, 403, 402 | | | |
| 43:20-44:14 | LW  (43:20-44:14); 403, 402, 602 (43:20-44:3); 403, 402 (44:5-12); 402, 403 (44:13-14) | | | |
| 44:17-44:22 | LW, 403, 402, 602, 702 | | | |
| 45:24-46:06 | LW  (45:24-46:06); 403, 402 (45:24-46:4); 403, 402, 602, 702 (46:5-6) | | | |
| 46:09-46:20 | LW, 403, 402, 602 | | | |
| 46:23-47:07 | LW, 403, 402, 602 | | | |
| 47:19-47:24 | LW, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  REAMEY, Robert (March 8, 2018) | | | | |
| 48:23-51:09 | LW, 403 | | | |
| 51:12-51:17 | LW, 403 | | | |
| 51:19-51:23 | LW, 403 | | | |
| 52:01-53:14 | LW, 403 | | | |
| 53:16-55:10 | LW, 403 | | | |
| 56:12-56:15 | LW, 403 | | | |
| 56:17-57:01 | LW, 403 | | | |
| 57:05-59:02 | LW, 403 | | | |
| 59:04-59:23 | LW, 403 | | | |
| 60:01-60:13 | LW (60:1-13); 403 (60:1-13); 602 (60:3-13) | | | |
| 60:16-60:24 | LW (60:16-24), 403 (60:16-24); 602 (60:16-20) | | | |
| 61:03-61:08 | LW, 403 | | | |
| 61:11-63:16 | LW, 403 | | | |
| 63:18-65:09 | LW, 403 | | | |
| 65:14-66:05 | LW, 403 | | | |
| 66:07-66:17 | LW, 403 | | | |
| 66:22-68:20 | LW, 403 | | | |
| 69:11-69:14 | LW, 403 | | | |
| 69:18-69:25 | LW, 403 | | | |
| 70:02-70:17 | LW, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  REAMEY, Robert (March 8, 2018) | | | | |
| 70:19-71:03 | LW (70:19-71:03); 403 (70:19-71:3); 602 (70:23-71:3) | | | |
| 71:06-71:25 | LW (71:06-71:25); 403 (71:6-71:25); 602 (71:6-7) | | | |
| 72:03-74:22 | LW, 403 | | | |
| 74:25-77:16 | LW, 403 | | | |
| 77:21-79:01 | LW, 403 | | | |
| 79:13-79:23 | LW, 403 | | | |
| 80:02-80:13 | LW (80:2-13), 403 (80:2-13); 402, 702 (80:13) | | | |
| 80:16-82:12 | LW (80:16-12), 403 (80:16-82:12); 402 702 (80:16-25) | | | |
| 82:16-83:10 | LW (82:16-83:10), 403 (82:16-83:10); 402 (82:16-21) | | | |
| 83:13-83:15 | LW, 403 | | | |
| 83:19-85:08 | LW, 403 | | | |
| 85:10-87:17 | LW, 403 | | | |
| 88:10-88:14 | LW, 403, 602 | | | |
| 88:16-88:19 | LW, 403, 602 | | | |
| 88:24-89:15 | LW, 403 | | | |
| 89:18-90:11 | LW, 403 | | | |
| 90:14-90:20 | LW, 403 | | | |
| 91:06-91:10 | LW, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  REAMEY, Robert (March 8, 2018) | | | | |
| 91:13-91:14 | LW, 403 | | | |
| 91:16-92:21 | LW, 403 | | | |
| 92:24-93:21 | LW, 403 (92:24-93:21); 602 (93:19-21) | | | |
| 93:24-95:09 | LW, 403 (93:24-95:9); 602 (93:24-94:7) | | | |
| 95:14-97:16 | LW, 403 | | | |
| 97:18-98:22 | LW, 403 | | | |
| 98:24-99:07 | LW, 403 | | | |
| 99:10-100:6 | LW, 403 (99:10-100:6); 602 (100:1-6) | | | |
| 100:12-100:24 | LW, 403 (100:12-100:24); 602 (100:12-20) | | | |
| 101:01-101:09 | LW, 403 | | | |
| 101:23-102:08 | LW, 403 | | | |
| 102:14-104:03 | LW, 403 | | | |
| 104:06-105:11 | LW, 403 | | | |
| 106:01-107:10 | LW, 403 | | | |
| 107:13-107:24 | LW, 403 | | | |
| 108:06-109:04 | LW, 403 | | | |
| 109:14-110:09 | LW, 403 | | | |
| 110:20-111:16 | LW, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  REAMEY, Robert (March 8, 2018) | | | | |
| 111:18-112:09 | LW, 403 | | | |
| 113:03-115:04 | LW, 403 | | | |
| 115:07-115:11 | LW, 403 | | | |
| 115:21-118:06 | LW, 403 | | | |
| 118:10-119:04 | LW, 403 | | | |
| 119:06-119:20 | LW, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  REAMEY, Robert (October 16, 2019) | | | | |
| 5:02-5:04 | LW | | | |
| 7:16-8:15 | LW | | | |
| 8:16-10:10 | LW | | | |
| 10:17-11:08 | LW | | | |
| 11:10-11:13 | LW | | | |
| 12:15-12:18 | LW | | | |
| 16:10-18:01 | LW | | | |
| 18:23-19:01 | LW, 402, 403 | | | |
| 19:03-20:18 | LW | | | |
| 20:19-20:25 | LW | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| **Witness:  REAMEY, Robert (October 16, 2019)** | | | | |
| 21:01-21:14 | LW, I | | | |
| 21:16-21:16 | LW, I | 21:23-22:12 22:22-23:15 23:22-24:12 | | |
| 30:07-30:10 | LW | 29:12-15 | NR | |
| 30:12-32:21 | LW | | | |
| 32:22-33:18 | LW | | | |
| 33:19-35:23 | LW | | | |
| 36:03-37:07 | LW | | | |
| 37:24-38:13 | LW | | | |
| 39:13-39:19 | LW | | | |
| 40:11-40:16 | LW | | | |
| 40:17-40:22 | LW, 403 | | | |
| 40:24-40:24 | LW, 403 | | | |
| 41:06-41:19 | LW, 403 | | | |
| 41:21-42:08 | LW, 403 | | | |
| 42:09-43:10 | LW, 403 | | | |
| 44:01-44:03 | LW, 403 | | | |
| 44:07-44:19 | LW, 403 | | | |
| 54:02-54:08 | LW, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  SORENSON, Jon (May 24, 2019) | | | | |
| 5:10-5:11 | | | | |
| 5:17-6:11 | 403 | | | |
| 17:14-17:18 | | | | |
| 18:14-18:22 | | 18:23-19:4; 30:2-14 | NR | |
| 33:14-33:25 | 403 | | | |
| 34:02-34:02 | 403 | | | |
| 34:04-34:05 | 611, 401, 402, 403 | | | |
| 34:07-34:13 | 611, 401, 402, 403 | | | |
| 34:15-34:23 | 611, 401, 402, 403 | | | |
| 34:25-35:06 | 611, 401, 402, 403 | | | |
| 43:23-44:16 | 403, 401, 402 (43:23-44:15); 611, 401, 402, 403, 701 (44:16) | | | |
| 44:18-44:18 | 611, 401, 402, 403, 701 | | | |
| 45:08-45:12 | I | | | |
| 45:14-45:19 | 403, 401, 402(45:14-18); 611, 401, 402, 403, 701, 602 (45:19) | 45:24, 46:1, 46:3-10 | NR | |
| 45:21-45:22 | 611, 401, 402, 403, 701, 602 | | | |
| 46:11-46:18 | 403, 401, 402 | | | |
| 46:22-46:23 | 611, 401, 402, 403, 701, 602 | | | |
| 46:25-46:25 | 611, 401, 402, 403, 701, 602 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  SORENSON, Jon (May 24, 2019) | | | | |
| 47:02-47:13 | 403, 401, 402 (47:2-12); 611, 401, 402, 403, 403, 701, 602 (47:13) | | | |
| 47:15-47:17 | 611, 401, 402, 403, 701, 602 | | | |
| 47:19-47:25 | 401, 402, 403 (47:19-24); 611, 401, 402, 403, 701 (47:25) | | | |
| 48:02-48:03 | 611, 401, 402, 403, 701 | | | |
| 48:05-48:07 | 611, 401, 402, 403, 701 | | | |
| 48:09-48:20 | 611, 401, 402, 403, 403, 701 (48:9-17); 611, 401, 402, 403, 403, 701 (48:19-20) | | | |
| 48:22-49:06 | 611, 401, 402, 403, 701 | | | |
| 50:11-50:14 | 403, 401, 402 | | | |
| 50:16-50:21 | 401, 402, 403 (50:16-17); 611, 403, 401, 402, 701, 702  (50:19-21) | | | |
| 50:23-51:09 | 611, 403, 401, 402, 701, 702 | | | |
| 51:12-51:12 | 611, 401, 402, 403, 701, 702 | | | |
| 51:14-51:19 | 611, 403, 401, 402, 701, 702 | | | |
| 51:21-51:22 | 611, 401, 402, 403 | | | |
| 51:24-51:24 | 611, 401, 402, 403 | | | |
| 52:01-52:03 | 611, 401, 402, 403 | 52:4-5, 52:7-12, 52:14-15 | NR | |
| 54:19-54:21 | 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  SORENSON, Jon (May 24, 2019) | | | | |
| 54:22-54:24 | 611, 401, 402, 403 | | | |
| 55:01-55:01 | 611, 401, 402, 403 | | | |
| 55:03-55:05 | 611, 401, 402, 403 | | | |
| 55:07-55:12 | 611, 401, 402, 403 | | | |
| 55:14-55:22 | 401, 402, 403 | | | |
| 55:23-55:25 | 401, 402, 403 | | | |
| 56:01-56:08 | 401, 402, 403 (56:1-6) 611, 401, 402, 403 (56:7-8) | | | |
| 56:10-56:11 | 611, 401, 402, 403 | | | |
| 56:13-56:17 | 401, 402, 403 (56:13-15); 611, 401, 402, 403 (56:16-17) | | | |
| 56:19-56:20 | 611, 401, 402, 403 | | | |
| 56:22-57:02 | 401, 402, 403 (56:22-56:24), 611 (56:25-57:2) | | | |
| 57:09-57:10 | 401, 402, 403, 611 | | | |
| 57:12-57:12 | 401, 402, 403, 611 | | | |
| 57:14-57:16 | 401, 402, 403, 611 | | | |
| 57:18-57:18 | 401, 402, 403, 611 | | | |
| 57:20-57:22 | 401, 402, 403, 611 | 58:2-5, 58:7-12 | NR | |
| 57:24-57:25 | 401, 402, 403, 611 | | | |
| 59:17-59:21 | 611, 401, 402, 403 | 58:14-17, 58:19-25, 59:2-5, 59:7-10, 59:12-16 | NR, NARR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  SORENSON, Jon (May 24, 2019) | | | | |
| 59:24-59:25 | 611, 401, 402, 403 | | | |
| 60:02-60:07 | 401, 402, 403 | 60:8-13, 60:15-20, 60:22-24, 61:1-11 | NR | |
| 62:07-62:17 | 401, 402, 403 (62:7-12); 611, 403 (62:13-17) | 62:22-63:3; 63:5-17 | NR | |
| 62:19-62:20 | 611, 401, 402, 403 | | | |
| 63:20-63:23 | 611, 401, 402, 403 | | | |
| 63:25-63:25 | 611, 401, 402, 403 | | | |
| 64:02-64:06 | 611, 401, 402, 403 | | | |
| 64:08-64:09 | 611, 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  TRAVERS, Kevin (May 22, 2019) | | | | |
| 7:14-7:16 | | | | |
| 7:19-7:19 | 403, I | | | |
| 8:01-8:12 | 401, 402, 403 | 8:13<br>8:15-20<br>8:22-24<br>9:9-10<br>9:12<br>9:18-10:8<br>10:23-24<br>11:1-11:2 | NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR<br>NR | |
| 11:14-11:18 | 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  TRAVERS, Kevin (May 22, 2019) |
| 11:20-11:20 | 401, 402, 403 | | | |
| 12:01-12:16 | 401, 402, 403 | | | |
| 12:17-12:21 | 401, 402, 403 (12:17-19); 611, 403 (12:20-21) | | | |
| 12:23-12:25 | 611, 401, 402, 403 | 13:4-8<br>13:10-13<br>13:24-25<br>14:2-3<br>14:5-14 | NR<br>NR<br>NR | |
| 14:15-14:18 | 401, 402, 403 | | | |
| 14:24-15:01 | 611, 401, 402, 403 | | | |
| 15:03-15:04 | 611, 401, 402, 403 | | | |
| 34:02-34:05 | I, 611, 401, 402, 403 | | | |
| 34:19-34:24 | 611, 401, 402, 403 | | | |
| 35:01-35:02 | 611, 401, 402, 403 | | | |
| 35:04-35:09 | 611, 401, 402, 403 | | | |
| 35:11-35:11 | 611, 401, 402, 403 | | | |
| 35:21-35:23 | 611, 401, 402, 403 | | | |
| 35:25-36:03 | 611, 401, 402, 403 (36:2-3) | | | |
| 36:05-36:08 | 611, 401, 402, 403 (36:5), (36:7-8) | | | |
| 36:10-36:12 | 611, 401, 402, 403 | 36:14-37:3 | NR | |
| 37:07-37:10 | 611, 401, 402, 403 | | | |
| 37:12-37:12 | 611, 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  TRAVERS, Kevin (May 22, 2019) | | | | |
| 42:21-43:01 | 611, 401, 402, 403, 403 (42:21-24); 403, 701 (42:25-43:1) | | | |
| 43:03-43:09 | 611, 401, 402, 403, 701 | | | |
| 43:11-43:11 | 611, 401, 402, 403, 701 | | | |
| 72:11-73:05 | 401, 402, 403 | 73:16-20 73:22-24 | NR | |
| 76:04-76:12 | 401, 402, 403 | | | |
| 79:15-80:03 | 401, 402, 403 (79:15-24); 611, 401, 402, 403 (79:25-80:3) | | | |
| 80:05-80:10 | 611, 401, 402, 403 | 80:12-17 | | |
| 81:20-82:09 | 401, 402, 403 | 82:10-12 | | |
| 89:18-90:10 | 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  TURNER, Stephen (July 9, 2019) | | | | |
| 6:18-7:09 | LW | | | |
| 7:10-7:20 | LW, 401, 402, 403, BTS, 611 | 7:21-9:9 | NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: TURNER, Stephen (July 9, 2019) | | | | |
| 9:10-9:14 | LW, IH, 701, 702, 401, 402, 403, BTS, 611 | | | |
| 9:17-9:25 | LW, IH, 701, 702, 401, 402, 403, BTS, 611 | | | |
| 10:02-10:08 | LW, IH, 701, 702, 401, 402, 403, BTS, 611 | | | |
| 10:16-10:23 | LW, 401, 402, 403, IH, BTS, 611 | | | |
| 10:24-12:14 | LW, 401, 402, 403, BTS, 611 (10:24-12:14); IH (10:24-11:6) | | | |
| 12:15-12:20 | LW, 401, 402, 403, BTS, 611 | 12:21-25 | NR | |
| 13:01-13:06 | LW, 403 | | | |
| 13:07-13:17 | LW, 401, 402, 403, BTS, 611 | | | |
| 13:18-13:25 | LW, 401, 402, 403, BTS, 611 | | | |
| 14:01-14:10 | LW, 401, 402, 403, BTS, 611 | | | |
| 14:11-14:17 | LW, 401, 402, 403, BTS, 611 | | | |
| 14:18-15:01 | LW, 401, 402, 403, BTS, 611 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| colspan across: **Witness:  TURNER, Stephen (July 9, 2019)** | | | | |
| 15:02-15:09 | LW, 401, 402, 403, BTS, 611 | | | |
| 15:10-15:21 | LW, 401, 402, 403, BTS, 611 | | | |
| 15:22-16:08 | LW, 401, 402, 403, BTS, 611 | | | |
| 16:09-16:16 | LW, 401, 402, 403, BTS, 611 | | | |
| 16:17-16:18 | LW, 401, 402, 403, BTS, 611 | 16:19-17:7 | NR | |
| 17:08-17:12 | LW, 401, 402, 403, BTS, 611 | 17:13-18:5 | NR | |
| 18:21-19:17 | LW, 401, 402, 403, BTS, 611 | | | |
| 19:23-19:24 | LW, 401, 402, 403, BTS, 611 | | | |
| 19:25-20:01 | LW, 401, 402, 403, BTS, 611 | | | |
| 20:02-20:04 | LW, 401, 402, 403, BTS, 611 | | | |
| 20:05-20:12 | LW, 401, 402, 403, BTS, 611 | | | |
| 20:14-20:20 | LW, 401, 402, 403, BTS, 611 | | | |
| 20:24-21:05 | LW, 401, 402, 403, BTS, 611 | | | |
| 21:13-21:25 | LW, 401, 402, 403, BTS, 611 | 22:5-10 | NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  TURNER, Stephen (July 9, 2019) | | | | |
| 22:12-23:19 | LW, 401, 402, 403 (22:12-23:19); BTS, 611 (23:7-19) | | | |
| 23:20-24:08 | LW, 401, 402, 403, BTS, 611 | 24:10-22 | NR | |
| 25:08-25:16 | LW, 401, 402, 403, BTS, 611 | 25:17-21 | NR | |
| 25:25-26:14 | LW, 401, 402, 403, BTS, 611 | | | |
| 26:15-26:24 | LW, 401, 402, 403, BTS, 611 | | | |
| 27:02-27:12 | LW, 401, 402, 403, BTS, 611 | | | |
| 27:13-27:24 | LW, 401, 402, 403, BTS, 611 | 27:25-28:8 | NR | |
| 28:10-28:15 | LW, 401, 402, 403, BTS, 611 | 28:20-29:8 | I, NR | |
| | | 33:7-22 | NR | |
| | | 34:3-5 | NR | |
| | | 34:7-11 | NR | |
| | | 34:13-21 | NR | |
| 34:23-36:24 | LW, 401, 402, 403, BTS, 611 | | | |
| 37:03-37:09 | LW, 401, 402, 403, BTS, 611 | | | |
| 37:10-37:25 | LW, 401, 402, 403, BTS, 611 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  TURNER, Stephen (July 9, 2019) | | | | |
| 38:01-38:11 | LW, 401, 402, 403, BTS, 611 | 38:12-24 | NR | |
| 38:25-39:04 | LW, 401, 402, 403, BTS, 611 | 39:5-12 | NR | |
| 40:07-40:24 | LW, 401, 402, 403, BTS, 611 | 42:3-12 <br> 42:20-23 | NR <br> NR | |
| 42:24-43:08 | LW, 401, 402, 403 | | | |
| 43:09-43:18 | LW, 401, 402, 403 | 43:19-24 <br> 44:12-45:14 | NR <br> NR | |
| 45:15-45:22 | LW | | | |
| 45:23-46:07 | LW, 611, 401, 402, 403 | 46:9-48:2 | NR | |
| 48:03-50:03 | LW (48:3-50:3); 611, 403 (49:8-50:3) | | | |
| 50:05-50:12 | LW, 611, 403 | 50:13-51:21 <br> 51:23-52:15 | NR <br> NR | |
| 52:16-52:25 | LW | | | |
| 53:01-53:12 | LW | | | |
| 53:13-53:15 | LW | | | |
| 53:16-54:04 | LW, 401, 402, 403 | 54:5-24 <br> 55:5-20 | I, NR <br> I, NR | |
| 56:01-56:05 | LW, 401, 402, 403, BTS, 611 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  TURNER, Stephen (July 9, 2019) | | | | |
| 56:06-56:09 | LW, 401, 402, 403, BTS, 611 | | | |
| 57:01-57:17 | LW, 401, 402, 403, BTS, 611 | | | |
| 57:18-57:25 | LW, 401, 402, 403, BTS, 611 | 58:19-59:3 | NR | |
| 59:04-59:06 | LW, I, 401, 402, 403, BTS, 611 | 59:13-17<br>59:19-60:11 | NR<br>NR | |
| 60:12-60:17 | LW, 401, 402, 403, BTS, 611 | | | |
| 60:18-60:23 | LW, 401, 402, 403, BTS, 611 | | | |
| 60:24-62:03 | LW, 401, 402, 403 | | | |
| 62:04-62:17 | LW, 401, 402, 403 | | | |
| 62:18-63:02 | LW, 401, 402, 403 | | | |
| 63:03-63:17 | LW, 401, 402, 403 | | | |
| 63:18-64:08 | LW, 401, 402, 403 | 64:9-65:1 | NR | |
| 65:02-65:20 | LW, 401, 402, 403 | 65:21-66:5 | I, NR | |
| 66:06-66:25 | LW, 401, 402, 403 | | | |
| 67:01-67:06 | LW, 401, 402, 403 | 67:8-14 | NR | |
| 67:16-68:06 | LW, 401, 402, 403 | 68:7-25 | NR | |
| 69:14-70:02 | LW, I | | | |
| 70:07-70:12 | LW, I | | | |
| 70:13-71:25 | LW | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  TURNER, Stephen (July 9, 2019) |||||
| 72:01-72:09 | LW | 72:10-14 | NR | |
| 72:15-72:16 | LW, 401, 402, 403, 701, 702 BTS, 611 | | | |
| 72:20-72:22 | LW, 401, 402, 403, 701, 702 BTS, 611 | | | |
| 73:01-75:11 | LW, 401, 402, 403, BTS, 611 (73:1-75:11); 701, 702, I (73:1-11) | | | |
| 75:12-76:10 | LW, 401, 402, 403, BTS, 611 | | | |
| 76:11-76:18 | LW, 401, 402, 403, BTS, 611 | | | |
| 76:19-76:25 | LW, 401, 402, 403, BTS, 611 | | | |
| 77:01-77:17 | LW, 401, 402, 403, BTS, 611 | | | |
| 77:19-78:01 | LW, 401, 402, 403, BTS, 611 | | | |
| 78:03-78:05 | LW, 401, 402, 403, BTS, 611 | | | |
| 78:06-78:09 | LW, 401, 402, 403, BTS, 611 | | | |
| 78:10-78:21 | LW, 401, 402, 403, BTS, 611 | | | |
| 78:23-81:20 | LW, 401, 402, 403, BTS, 611 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  TURNER, Stephen (July 9, 2019) | | | | |
| 81:21-82:01 | LW, 401, 402, 403, BTS, 611 | | | |
| 82:02-82:05 | LW, 401, 402, 403, BTS, 611 | | | |
| 82:06-82:14 | LW, 401, 402, 403, BTS, 611 | 82:16-18<br><br>82:22-83:22<br><br>83:25-84:9<br><br>84:11-14<br><br>84:17-25 | NR<br><br>NR<br><br>NR<br><br>NR<br><br>NR | |
| 86:05-86:25 | LW, 401, 402, 403, BTS, 611 | | | |
| 87:01-87:14 | LW, 401, 402, 403, BTS, 611 | 87:22-25<br><br>88:3-13<br><br>88:15-89:21 | NR<br><br>NR<br><br>NR | |
| 89:22-90:08 | LW, 401, 402, 403, BTS, 611 | | | |
| 90:09-90:20 | LW, 401, 402, 403, BTS, 611 (90:9-20); MIS (90:18-20) | | | |
| 90:24-91:01 | LW, 401, 402, 403, BTS, 611, MIS | | | |
| 91:03-91:10 | LW, I | | | |
| 91:14-92:21 | LW, 401, 402, 403, BTS, 611 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  TURNER, Stephen (July 9, 2019) | | | | |
| 93:08-93:10 | LW, 401, 402, 403, BTS, 611 | | | |
| 93:13-94:08 | LW, 611, 401, 402, 403, BTS, 611 | 94:10-14 | I, NR | |
| 94:15-95:10 | LW, 401, 402, 403, BTS, 611 | 95:11-96:12 | NR | |
| 96:13-96:17 | LW, 401, 402, 403, BTS, 611, I | | | |
| 98:07-98:12 | LW, I, 401, 402, 403, BTS, 611 | | | |
| 99:06-99:15 | LW, 401, 402, 403, BTS, 611 | 99:16-100:21 | NR | |
| 101:03-101:11 | LW, 401, 402, 403, BTS, 611, I | | | |
| 102:03-102:17 | LW, 401, 402, 403, BTS, 611 | | | |
| 102:18-103:08 | LW, 401, 402, 403, BTS, 611 | 103:9-13 | NR | |
| 103:14-104:22 | LW, 401, 402, 403, BTS, 611 (103:14-104:22); I (104:12-22) | | | |
| 105:23-106:06 | LW, 401, 402, 403, BTS, 611 | 106:7-107:16 | NR | |
| 109:13-110:08 | LW, 401, 402, 403, BTS, 611 | | | |
| 110:14-111:01 | LW, 401, 402, 403, BTS, 611, I | 111:8-15 | NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  TURNER, Stephen (July 9, 2019) | | | | |
| 111:16-112:05 | LW, 401, 402, 403, BTS, 611 | | | |
| 113:15-113:19 | LW, 401, 402, 403, BTS, 611, 701, 702, I | | | |
| 113:24-114:02 | LW, 401, 402, 403, BTS, 611, 701, 702, I | | | |
| 115:17-115:18 | LW, 611, 401, 402, 403, BTS, 611, I, IH, 701, 702 | | | |
| 116:02-116:08 | LW, 401, 402, 403, BTS, 611, I, IH, 701, 702 | | | |
| 117:07-117:12 | LW, 401, 402, 403 | 117:13-118:1 | NR | |
| 118:08-118:14 | LW, 401, 402, 403 | 118:15-23 | NR | |
| 118:24-119:03 | LW, 401, 402, 403 | 119:8-13 | NR | |
| 119:14-119:20 | LW, 401, 402, 403 | 119:23-120:11 | NR | |
| 120:12-120:19 | LW, 401, 402, 403, BTS, 611 | 120:20-121:14 | NR | |
| 124:01-124:08 | LW, 401, 402, 403, 701, 702, BTS, 611 | | | |
| 124:11-124:19 | LW, 401, 402, 403, 701, 702, BTS, 611 | | | |
| 124:21-124:23 | LW, 401, 402, 403, 701, 702, BTS, 611 | | | |
| 125:01-125:18 | LW, 401, 402, 403, 701, 702 BTS, 611 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: TURNER, Stephen (July 9, 2019) | | | | |
| 125:20-126:12 | LW, 401, 402, 403, BTS, 611 | | | |
| 127:07-128:04 | LW, 401, 402, 403, BTS, 611 | | | |
| 128:05-128:16 | LW, 401, 402, 403, BTS, 611 | | | |
| 131:02-131:08 | LW, 401, 402, 403, BTS, 611 | | | |
| 131:09-132:18 | LW, 401, 402, 403, BTS, 611 | 132:19-133:8 <br><br> 134:2-13 | NR <br><br> NR | |
| 134:14-134:19 | LW, 401, 402, 403 | 134:20-22 <br><br> 134:24-25 | NR <br><br> NR | |
| 135:07-135:20 | LW, 401, 402, 403, MIS | | | |
| 136:16-137:03 | LW, 401, 402, 403 | | | |
| 137:10-137:23 | LW (137:10-23); 401, 402, 403 (137:16-23) | | | |
| 137:24-138:01 | LW, 401, 402, 403 | | | |
| 138:05-138:11 | LW | | | |
| 138:12-138:17 | LW, 401, 402, 403 | | | |
| 138:18-138:19 | LW, 401, 402, 403, BTS, 611, IH, 701, 702 | | | |
| 138:24-138:25 | LW, 401, 402, 403, BTS, 611, IH, 701, 702 | 139:2-140:18 | H, NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  TURNER, Stephen (July 9, 2019) | | | |
| 140:19-140:22 | LW, 401, 402, 403, BTS, 611, I | | | |
| 141:01-141:15 | LW, 401, 402, 403, BTS, 611 | 141:16-22 | NR | |
| 141:23-142:08 | LW, 401, 402, 403, BTS, 611 | | | |
| 142:09-142:23 | LW, 401, 402, 403, BTS, 611 | 142:24-144:8 | NR | |
| 144:09-144:12 | LW | 144:13-17 | NR | |
| 145:19-145:25 | LW, 401, 402, 403, BTS, 611 (145:19-25); 602, 703 (145:19-22); IH, 701, 702, I (145:23-25) | | | |
| 146:05-146:09 | LW, 401, 402, 403, BTS, 611, IH, 701, 702, I | | | |
| 147:01-147:22 | LW, 401, 402, 403, BTS, 611, IH, 701, 702, I | | | |
| 149:07-149:10 | LW, 611, 401, 402, 403, BTS, 611 | | | |
| 149:12-151:21 | LW, 401, 402, 403, BTS, 611 (149:12-151:21); 611 (149:12-20) | | | |
| 151:23-153:07 | LW, 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  TURNER, Stephen (July 9, 2019) | | | | |
| 153:13-153:15 | LW, 401, 402, 403, 701 | | | |
| 153:18-156:18 | LW, 401, 402, 403 (153:18-156:18); 701 (153:18-154:6) | | | |
| 156:19-157:02 | LW, 401, 402, 403 | | | |
| 157:03-158:20 | LW (157:3-158:20); 401, 402, 403 (157:7-158:20) | | | |
| 158:22-158:24 | LW, 401, 402, 403, BTS, 611 | | | |
| 159:01-159:18 | LW, 401, 402, 403, BTS, 611 | | | |
| 159:19-160:09 | LW, 401, 402, 403 | | | |
| 160:14-160:24 | LW, 401, 402, 403, BTS, 611 | | | |
| 161:04-162:03 | LW, 401, 402, 403, BTS, 611 | | | |
| 162:04-162:12 | LW, 401, 402, 403, BTS, 611 | 162:13-18  163:4-8 | NR  NR | |
| 165:17-165:23 | LW, 401, 402, 403, BTS, 611 | | | |
| 166:22-167:12 | LW, 401, 402, 403, BTS, 611 | | | |
| 168:25-169:16 | LW, 401, 402, 403, BTS, 611 (168:25-169:16); 611, IH, | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  TURNER, Stephen (July 9, 2019) | | | |
| | 701, 702 (169:13-16) | | | |
| 169:19-170:04 | LW, 401, 402, 403, IH, 701, 702 BTS, 611 | | | |
| 170:05-170:25 | LW (170:5-25); 401, 402, 403, BTS, 611 (170:11-25) | 171:1-172:2 | NR | |
| 172:13-173:05 | LW, 401, 402, 403, BTS, 611 (172:13-173:5); 611 (173:5) | | | |
| 173:08-173:13 | LW, 401, 402, 403, BTS, 611 (173:8-173:13); CP (173:11-13) | | | |
| 173:16-173:21 | LW, CP, 401, 402, 403, BTS, 611 | | | |
| 173:23-174:05 | LW, 611 | | | |
| 179:24-180:24 | LW, 401, 402, 403, BTS, 611 | 180:25-182:5 | NR | |
| 182:06-186:07 | LW, 401, 402, 403, BTS, 611 (182:6-186:7); 611 (182:6-183:16) | | | |
| 186:08-186:16 | LW, 401, 402, 403, BTS, 611 | | | |
| 186:18-187:06 | LW, 401, 402, 403, BTS, 611 | 187:7-24 | NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  TURNER, Stephen (July 9, 2019) | | | |
| 188:09-189:16 | LW, 401, 402, 403, BTS, 611 | | | |
| 189:17-190:12 | LW, 401, 402, 403 | | | |
| 193:03-194:07 | LW, 401, 402, 403 | 194:8-195:1 | NR | |
| 195:02-196:16 | LW, 401, 402, 403 | | | |
| 196:17-197:20 | LW, 401, 402, 403 | | | |
| 198:20-199:09 | LW, 401, 402, 403 | | | |
| 202:06-203:14 | LW, 401, 402, 403 | | | |
| 209:23-210:04 | LW, 401, 402, 403 | | | |
| 210:06-210:19 | LW, 401, 402, 403 | | | |
| 212:03-212:22 | LW, 401, 402, 403 | 212:23-215:13 | | |
| 215:14-215:24 | LW, 401, 402, 403 | 218:9-23 | NR | |
| 221:17-221:19 | LW, 401, 402, 403, BTS, 611, 701, 702 | | | |
| 221:22-221:24 | LW, 401, 402, 403, BTS, 611, 701, 702 | | | |
| 222:01-222:24 | LW, 401, 402, 403, BTS, 611 (222:1-24); I (222:24) | | | |
| 223:01-223:06 | LW, I | | | |
| 224:13-224:23 | LW, 401, 402, 403, BTS, 611, 701, 702 | | | |
| 225:02-225:19 | LW (225:2-19), 401, 402, 403, BTS, 611 (225:13-19) | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
|  | Witness:  TURNER, Stephen (July 9, 2019) |||| |
| 226:09-226:11 | LW | 226:12-14<br><br>226:19-22 | NR<br><br>NR | |
| 227:02-228:18 | LW (227:2-228:18); 401, 402, 403, BTS, 611 (227:8-17); I (228:18) | 228:21-25 | I, NR | |
| 229:13-229:21 | LW, 401, 402, 403, BTS, 611 | 229:22-232:19 | NR | |
| 238:18-239:04 | LW, 401, 402, 403, BTS, 611, I | 242:12-242:15<br><br>242:17-18<br><br>242:20-243:19<br><br>248:10-18<br><br>248:22-249:7<br><br>253:10-16<br><br>253:21-254:6<br><br>254:8-12 | H, NR<br><br>H, NR<br><br>H, NR<br><br>NR<br><br>NR<br><br>NR<br><br>NR<br><br>NR | |
| 255:23-255:25 | LW, 401, 402, 403, BTS, 611, IH, 701, 702 | | | |
| 256:04-256:23 | LW, 401, 402, 403, BTS, 611, IH, 701, 702 | | | |
| 256:24-257:09 | LW, 401, 402, 403, BTS, 611, IH, 701, 702 | 257:10-15<br><br>259:10-14<br><br>259:18-260:5 | NR<br><br>NR<br><br>NR | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness: TURNER, Stephen (July 9, 2019) | | | | |
| 260:07-261:11 | LW, 401, 402, 403, BTS, 611 | | | |
| 266:07-266:19 | LW, 401, 402, 403 | | | |
| 266:22-267:07 | LW, 401, 402, 403 | | | |
| 267:14-267:16 | LW, 401, 402, 403 | | | |
| 267:18-267:18 | LW, 401, 402, 403 | | | |
| 267:22-268:03 | LW, 401, 402, 403 | 268:5-16 | NR | |
| 273:10-274:04 | LW, 401, 402, 403, BTS, 611 | 273:2-4<br>273:6-8 | NR<br>NR | |
| 274:05-274:14 | LW, 401, 402, 403, BTS, 611 | 274:15-275:3<br>275:5-6<br>275:8-11 | NR<br>NR<br>NR | |
| 275:25-276:10 | LW, 401, 402, 403, BTS, 611 | 276:14-19 | NR | |
| 276:20-276:21 | LW, 611, 401, 402, 403, BTS, 611 | | | |
| 277:11-278:08 | LW | 278:10-279:2<br>280:5-8 | NR<br>NR | |
| 280:09-280:22 | LW, 401, 402, 403, I | | | |
| 282:09-283:04 | LW, 401, 402, 403 | | | |
| 283:05-284:08 | LW, 401, 402, 403, BTS, 611 | | | |
| 285:07-285:12 | LW, 401, 402, 403 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| **Witness:  TURNER, Stephen (July 9, 2019)** | | | | |
| 285:13-286:03 | LW, 401, 402, 403 (285:13-286:3); I (285:25-286:3) | 286:18-287:10 | NR | |
| 287:11-289:05 | LW, 401, 402, 403 (287:11-289:5); 611, BTS (288:25-289:5) | 289:6-15 | NR | |
| 294:11-294:12 | LW, 401, 402, 403, BTS, 611 | | | |
| 294:14-294:24 | LW, 611, 401, 402, 403, BTS | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| **Witness:  VOSS, Karl (June 4, 2019)** | | | | |
| 4:24-5:02 | 403 | | | |
| 20:21-21:02 | | | | |
| 21:09-21:10 | | | | |
| 50:19-51:01 | I, 402, 403 (50:19-23); 401, 402, 403 (50:24-51:11) | 50:1-3, 50:5-16 | NR | |
| 51:02-51:11 | | | | |
| 72:14-72:25 | 403 | 73:1-3 | | |
| 73:04-73:06 | | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| Witness:  VOSS, Karl (June 4, 2019) | | | | |
| 73:12-73:15 | | | | |
| 74:18-74:24 | 401, 402, 403 | | | |
| 74:25-75:02 | 401, 402, 403 | | | |
| 75:08-75:13 | 401, 402, 403 | | | |
| 76:14-76:17 | 611, 401, 402, 403 | | | |
| 76:19-76:25 | 611, 401, 402, 403 | | | |
| 77:02-77:03 | 611, 401, 402, 403 | | | |
| 77:05-77:06 | 611, 401, 402, 403 | | | |
| 77:08-77:10 | 401, 402, 403 | 77:15-17, 77:19-23 | | |
| 77:11-77:14 | 401, 402, 403 | | | |
| 78:09-78:17 | 403 (78:9-14); 611, 401, 402, 403 (78:15-17) | | | |
| 78:19-79:01 | 611, 401, 402, 403 | | | |
| 79:03-79:07 | 611, 401, 402, 403 | 79:18-19, 79:21-80:7, 80:9-10 | NR | |
| 79:09-79:16 | 611, 401, 402, 403 | | | |
| 80:12-80:14 | 611, 401, 402, 403 | | | |
| 80:16-80:21 | 611, 401, 402, 403 | | | |
| 80:23-80:25 | | | | |
| 81:02-81:06 | | | | |
| 81:08-81:11 | 611, 401, 402, 403, 602, 701, 702 | 81:20-25; 82:13-19 | NR | |
| 81:13-81:18 | 611, 401, 402, 403, 602, 701, 702 | | | |

| ONT's Initial Designations | Pac-Bio's Objections to ONT's Initial Designations | Pac-Bio's Counter Designations | ONT's Objections to Pac-Bio's Counter Designations | ONT's Counter-Counter Designations |
|---|---|---|---|---|
| **Witness:  VOSS, Karl (June 4, 2019)** | | | | |
| 84:02-84:10 | | 84:11-12 | | |
| 86:13-86:14 | 611, 401, 402, 403, 602, 701, 702 | 85:24-25, 86:2-11; 87:3-13, 87:15-88:4 | NR, NARR | |
| 86:16-87:01 | 611, 401, 402, 403, 701, 702, 602 | | | |
| 88:06-88:19 | 401, 402, 403 | | | |
| 97:05-97:09 | 401, 402, 403 | | | |
| 97:11-98:09 | 401, 402, 403 | | | |
| 102:22-102:23 | 611, 401, 402, 403, 602, 703 | 101:22-102:10, 102:12-21; 103:17-104:2 | NR | |
| 102:25-103:04 | 611, 401, 402, 403, 602, 703 | | | |
| 103:06-103:08 | 611, 401, 402, 403 | | | |
| 103:10-103:10 | 611, 401, 402, 403 | | | |
| 103:12-103:13 | 611, 401, 402, 403 | | | |
| 103:15-103:15 | 611, 401, 402, 403 | | | |
| 104:17-105:17 | 401, 402, 403 | | | |
| 110:10-110:18 | 401, 402, 403 | | | |
| 114:08-115:09 | 401, 402, 403 | | | |

# EXHIBIT E

| Letter | Objection | Applicable Rules |
|---|---|---|
| ABBREVIATION AND FEDERAL RULE OF EVIDENCE KEY TO OXFORD'S OBJECTIONS | | |
| A | Requires authentication or identification | FRE 901 |
| B | Best evidence rules prohibit introduction | FRE 1001-1002 |
| C | Improper compilation of separate documents | FRE 403, 901 |
| D | Duplicative | |
| E | Improper examination (vague, ambiguous, loaded, leading, etc.) | FRE 402, 403, 602, 611 |
| F | Lack of foundation/personal knowledge (incl. calls for speculation) | FRE 402, 403, 602, 611 |
| H | Hearsay if offered for the truth of the matter asserted | FRE 801, 802 |
| I | Incomplete document or testimony | FRE 106, 403 |
| IP | Reserving objections until party can inspect the exhibit in-person | |
| M | Offer or discussion for settlement or compromise | FRE 408 |
| MIL | Subject of outstanding Motion in Limine | |
| N | Exhibit not produced in discovery | FRE 403 |
| O | Improper opinion testimony | FRE 701-704 |
| P | Privileged or attorney work product | FRE 501, 502 |
| R | Lack of relevance | FRE 401, 402 |
| S | Summary requiring underlying data or information | FRE 1006 |
| U | Unduly prejudicial, wasteful, confusing, misleading or cumulative | FRE 403 |
| OB | Attorney Objection improperly designated/Improper designation | |
| ARG | Argumentative, or attorney argument | FRE 611 |
| NARR | Narrative | |
| MIS | Mischaracterization of testimony or evidence | |
| OS | Outside scope of witness testimony | |
| IH | Incomplete hypothetical | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) | PCB-DE-0000001 | PCB-DE-0000060 | JTX | | | | |
| 2 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) [Turner Depo Ex. 3] | PCB-DE-0000001 | PCB-DE-0000060 | D | | | | |
| 3 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) [Flusberg Depo Ex. 2] | | | D | | | | |
| 4 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) [Fehr Depo Ex. 19] | | | D | | | | |
| 5 | | | Withdrawn | | | | | | | |
| 6 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) [Korlach Depo Ex. 19] | PCB-DE-0000001 | PCB-DE-0000060 | D | | | | |
| 7 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) [Gong Depo Ex. 2] | PCB-DE-0000001 | PCB-DE-0000060 | D | | | | |
| 8 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) [Dessimoz Depo Ex. 1] | PCB-DE-0000001 | PCB-DE-0000060 | D | | | | |
| 9 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) [Fair Depo Ex. 3] | | | D | | | | |
| 10 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) [Sanghera Depo. Ex. 1] | PCB-DE-0000001 | PCB-DE-0000060 | D | | | | |
| 11 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) [Akeson Depo. Ex. 10] | PCB-DE-0000001 | PCB-DE-0000060 | D | | | | |
| 12 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) [Goldman Depo. Ex. 2] | PCB-DE-0000001 | PCB-DE-0000060 | D | | | | |
| 13 | | 1/17/2017 | U.S. Patent No. 9,546,400 (Turner et al.) [Goldman Depo. Ex. 9] | PCB-DE-0000001 | PCB-DE-0000060 | D | | | | |
| 14 | | 9/13/2013 | File History of U.S. Patent No. 9,546,400 | PCB-DE-0000200 | PCB-DE-0000695 | JTX | | | | |
| 15 | | 6/13/2017 | U.S. Patent No. 9,678,056 (Turner et al.) | PCB-DE-0000061 | PCB-DE-0000128 | JTX | | | | |
| 16 | | 6/13/2017 | U.S. Patent No. 9,678,056 (Turner et al.) [Turner Depo Ex. 1] | PCB-DE-0000061 | PCB-DE-0000128 | D | | | | |
| 17 | | 6/13/2017 | U.S. Patent No. 9,678,056 (Turner et al.) [Flusberg Depo Ex. 16] | | | D | | | | |
| 18 | | 6/13/2017 | U.S. Patent No. 9,678,056 (Turner et al.) [Fehr Depo Ex. 18] | | | D | | | | |
| 19 | | | Withdrawn | | | | | | | |
| 20 | | 6/13/2017 | U.S. Patent No. 9,678,056 (Turner et al.) [McHenry Depo Ex. 2] | | | D | | | | |
| 21 | | 6/13/2017 | U.S. Patent No. 9,678,056 (Turner et al.) [McHenry Depo Ex. 10] | | | D | | | | |
| 22 | | 6/13/2017 | U.S. Patent No. 9,678,056 (Turner et al.) [Sanghera Depo. Ex. 3] | PCB-DE-0000061 | PCB-DE-0000128 | D | | | | |
| 23 | | 6/13/2017 | U.S. Patent No. 9,678,056 (Turner et al.) [Reid Depo. Ex. 17] | PCB-DE-0000061 | PCB-DE-0000128 | D | | | | |
| 24 | | 6/13/2017 | U.S. Patent No. 9,678,056 (Turner et al.) [Akeson Depo. Ex. 13] | PCB-DE-0000061 | PCB-DE-0000128 | D | | | | |
| 25 | | 6/13/2017 | U.S. Patent No. 9,678,056 (Turner et al.) [Ha Depo. Ex. 1] | | | D | | | | |
| 26 | | 6/13/2017 | U.S. Patent No. 9,678,056 (Turner et al.) [Ha Depo. Ex. 9] | PCB-DE-0000061 | PCB-DE-0000128 | D | | | | |
| 27 | | 6/13/2017 | File History of U.S. Patent No. 9,678,056 | PCB-DE-0000696 | PCB-DE-0001373 | JTX | | | | |
| 28 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) | PCB-DE-0000129 | PCB-DE-0000199 | JTX | | | | |
| 29 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) [Turner Depo Ex. 4] | PCB-DE-0000129 | PCB-DE-0000199 | D | | | | |
| 30 | | | Withdrawn | | | | | | | |
| 31 | | | Withdrawn | | | | | | | |
| 32 | | | Withdrawn | | | | | | | |
| 33 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) [Maxham Depo Ex. 2] | PCB-DE-0000129 | PCB-DE-0000199 | D | | | | |
| 34 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) [Eid Depo Ex. 2] | PCB-DE-0000129 | PCB-DE-0000199 | D | | | | |
| 35 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) [Fehr Depo Ex. 17] | | | D | | | | |
| 36 | | | Withdrawn | | | | | | | |
| 37 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) [Korlach Depo Ex. 17] | PCB-DE-0000129 | PCB-DE-0000199 | D | | | | |
| 38 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) [Gong Depo Ex. 3] | PCB-DE-0000129 | PCB-DE-0000199 | D | | | | |
| 39 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) [Dessimoz Depo Ex. 15] | PCB-DE-0000129 | PCB-DE-0000199 | D | | | | |
| 40 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) [Sanghera Depo. Ex. 2] | PCB-DE-0000129 | PCB-DE-0000199 | D | | | | |
| 41 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) [Akeson Depo. Ex. 12] | PCB-DE-0000129 | PCB-DE-0000199 | D | | | | |
| 42 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) [Hrdlicka Depo. Ex. 1] | PCB-DE-0000129 | PCB-DE-0000199 | D | | | | |
| 43 | | 8/22/2017 | U.S. Patent No. 9,738,929 (Turner et al.) [Hrdlicka Depo. Ex. 7] | PCB-DE-0000129 | PCB-DE-0000199 | D | | | | |
| 44 | | 8/22/2017 | File History of U.S. Patent No. 9,738,929 | PCB-DE-0001374 | PCB-DE-0002231 | JTX | | | | |
| 45 | | 9/26/2017 | U.S. Patent No. 9,772,323 (Turner et al.) | PCB-DE-0984496 | PCB-DE-0984555 | JTX | | | | |
| 46 | | 9/26/2017 | U.S. Patent No. 9,772,323 (Turner et al.) [Turner Depo Ex. 2] | PCB-DE-0984496 | PCB-DE-0984555 | D | | | | |
| 47 | | 9/26/2017 | U.S. Patent No. 9,772,323 (Turner et al.) [Flusberg Depo Ex. 1] | | | D | | | | |
| 48 | | 9/26/2017 | U.S. Patent No. 9,772,323 (Turner et al.) [Gong Depo Ex. 4] | | | D | | | | |
| 49 | | 9/26/2017 | U.S. Patent No. 9,772,323 (Turner et al.) [Dessimoz Depo Ex. 2] | | | D | | | | |
| 50 | | 9/26/2017 | U.S. Patent No. 9,772,323 (Turner et al.) [Sanghera Depo. Ex. 4] | PCB-DE-0984496 | PCB-DE-0984555 | D | | | | |
| 51 | | 9/26/2017 | U.S. Patent No. 9,772,323 (Turner et al.) [Akeson Depo. Ex. 11] | PCB-DE-0984496 | PCB-DE-0984555 | D | | | | |
| 52 | | 9/26/2017 | U.S. Patent No. 9,772,323 (Turner et al.) [Goldman Depo. Ex. 3] | | | D | | | | |
| 53 | | 9/26/2017 | U.S. Patent No. 9,772,323 (Turner et al.) [Goldman Depo. Ex. 11] | PCB-DE-0984496 | PCB-DE-0984555 | D | | | | |
| 54 | | 9/26/2017 | File History of U.S. Patent No. 9,772,323 | PCB-DE-0984556 | PCB-DE-0985009 | JTX | | | | |
| 55 | | | "How it Works," https://nanoporetech.com/how-itworks | | | A, F, H, N | | | | |
| 56 | | 07/00/2018 | Oxford Nanopore Technologies Product Brochure | | | A, F, H, N | | | | |
| 57 | OAEO | 4/1/2016 | Oxford Nanopore Technologies Community, Nanopore sensing - how it works, Nanopore sensor, https://community.nanoporetech.com/technical_documents/nanopore-sensing/v/nst_5000_v1_revg_01apr2016/nanopore-sensor | ONT_DEL00009277 | ONT_DEL00009277 | A, F | | | | |
| 58 | OAEO | | Oxford Nanopore Technologies, Nanopore sensing; nucleic acid | ONT_DEL00189228 | ONT_DEL00189231 | A, F, H | | | | |
| 59 | OAEO | | Oxford Nanopore Technologies, Nanopore sensing; nucleic acid [Clarke Depo. Ex. 13] | ONT_DEL00189228 | ONT_DEL00189231 | A, F, H | | | | |
| 60 | | 00/00/2015 | Oxford Nanopore Technologies, Owl Stretching; with Examples by Clive Brown Video, https://youtu.be/JmncdnQgalE | PCB-DE-1029258 | PCB-DE-1029258 | A, F, H, R | | | | |
| 61 | | 00/00/2015 | Oxford Nanopore Technologies, Owl Stretching; with Examples by Clive Brown Video transcription, https://youtu.be/JmncdnQgalE | | | A, B, F, H, N, R | | | | |
| 62 | | 00/00/2015 | Oxford Nanopore Technologies, Owl Stretching; with Examples by Clive Brown Video transcription, https://youtu.be/JmncdnQgalE [Brown Depo. Ex. 15] | | | A, B, D, F, H, N, R | | | | |
| 63 | | 00/00/2015 | Oxford Nanopore Technologies, Owl Stretching; with Examples by Clive Brown Video transcription, https://youtu.be/JmncdnQgalE [Reid Depo. Ex. 18] | | | A, B, D, F, H, N, R | | | | |
| 64 | OAEO | 5/3/2016 | Oxford Nanopore Technologies Community, MinION and flow cells, SpotON™ Flow Cells, https://community.nanoporetech.com/technical_documents/hardware/v/hwtd_5000_v1_03may2016/spoton-flow-cells | ONT_DEL00009263 | ONT_DEL00009263 | A, F, H | | | | |
| 65 | | 11/00/1996 | John J. Kasianowicz, Eric Brandin, Daniel Branton and David W. Deamer, "Characterization of individual polynucleotide molecules using a membrane channel," Proc. Natl. Acad. Sci. USA, Vol. 93, pp. 13770-13773, November 1996 Biophysics | PCB-DE-0009226 | PCB-DE-0009229 | JTX | | | | |
| 66 | OAEO | 11/30/2017 | Oxford Nanopore Technologies, Nanopore Community Meeting 2017 | ONT_DEL00061862 | ONT_DEL00061890 | A, F, H, R | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 67 | OAEO | 11/30/2017 | Oxford Nanopore Technologies, Nanopore Community Meeting 2017 [Jensen Depo. Ex. 6] | ONT_DEL0061862 | ONT_DEL0061890 | A, D, F, H, R | | | | |
| 68 | OAEO | 4/4/2016 | Oxford Nanopore Technologies Community, Overview of Nanopore sensing, https://community.nanoporetech.com/technical_documents/nanopore-sensing/v/ntsd_5000_v1_revg_04apr2016/overview-of-nanopore-sensi | ONT_DEL00009272 | ONT_DEL00009272 | A, F, H, R | | | | |
| 69 | | | Oxford Nanopore Technologies, Products, https://nanoporetech.com/products | | | A, F, H, N | | | | |
| 70 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, Some mundane and incremental updates, London Calling 2017 | ONT_DEL00011332 | ONT_DEL00011422 | A, F, H, R | | | | |
| 71 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, Some mundane and incremental updates, London Calling 2017 [Brown Depo. Ex 18] | ONT_DEL00011332 | ONT_DEL00011422 | A, D, F, H, R | | | | |
| 72 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | | Oxford Nanopore Technologies, PromethION | ONTS.ITC.00544181 | ONTS.ITC.00544181 | A, F, H | | | | |
| 73 | OAEO | 5/2/2018 | Oxford Nanopore Technologies, Fishmongers | ONT_DEL00498592 | ONT_DEL00498592 | A, F, H, R | | | | |
| 74 | | | Oxford Nanopore Technologies, GitHub, https://github.com/nanoporetech | | | A, F, H, N, R | | | | |
| 75 | | | Oxford Nanopore Technologies, Github, https://github.com/nanoporetech | | | A, D, F, H, N, R | | | | |
| 76 | | 11/6/2015 | Sisel Juul, Fernando Izquierdo, Adam Hurst, Xiaoguang Dai, Amber Wright, Eugene Kulesha, Roger Pettett, Daniel J. Turner, "What's in my pot? Real-time species identification on the MinION," https://www.biorxiv.org/content/10.1101/030742v1 | PCB-DE-0019279 | PCB-DE-0019287 | A, F, H | | | | |
| 77 | | 7/26/2019 | Oxford Nanopore Technologies, About us: Biology for anyone, anywhere, https://nanoporetech.com/about-us | | | A, F, H, N | | | | |
| 78 | OAEO | 3/8/2016 | Oxford Nanopore Technologies, 'No thanks, I've already got one' | ONT_DEL00009380 | ONT_DEL00009415 | A, F, H | | | | |
| 79 | OAEO | 5/3/2016 | Oxford Nanopore Technologies Community, MinIon and flow cells, Flow cell chip, https://community.nanoporetech.com/technical_documents/hardware/v/hwtd_5000_v1_03may2016/flow-cell-chip | ONT_DEL00009266 | ONT_DEL00009267 | A, F, H | | | | |
| 80 | OAEO | 7/16/2017 | 1D^2 sequencing of genomic DNA (with SQK-LSK308) - GridION, GLSD_9032_v11_revG_16Jul2017 | ONT_DEL00000169 | ONT_DEL00000204 | A, F, H | | | | |
| 81 | OAEO | 00/00/2014 | Oxford Nanopore Technologies, Squiggle it…Just a little bit | ONT_DEL00003954 | ONT_DEL00003969 | JTX | | | | |
| 82 | OAEO | 09/19/2018 | Oxford Nanopore Technologies, Forward-backward followed by Viterbi decoding on 5-mer transducer output | ONT_DEL00499206 | ONT_DEL00499206 | A, F, H | | | | |
| 83 | OAEO | 11/28/2018 | Oxford Nanopore Technologies, Signal to sequence base calling | ONT_DEL00557371 | ONT_DEL00557384 | A, F, H | | | | |
| 84 | | 00/00/2019 | Oxford Nanopore Technologies, London Calling 2019 by Clive Brown video, https://youtu.be/7HR0QEJpwiQ | PCB-DE-1029265 | PCB-DE-1029265 | A, F, H, R | | | | |
| 85 | OAEO | 09/00/2018 | Oxford Nanopore Technologies, Oxford Nanopore & accuracy | ONT_DEL00207436 | ONT_DEL00207455 | A, F, H | | | | |
| 86 | OAEO | 4/22/2016 | Oxford Nanopore Technologies, The homopolymer problem | ONT_DEL00499401 | ONT_DEL00499401 | A, F, H, R | | | | |
| 87 | OAEO | 9/28/2015 | Spooky action at a distance - long range signal context | ONT_DEL00369649 | ONT_DEL00369651 | JTX | | | | |
| 88 | OAEO | 9/28/2015 | Spooky action at a distance - long range signal context [Dessimoz Depo Ex. 8] | ONT_DEL00369649 | ONT_DEL00369651 | D | | | | |
| 89 | OAEO | 9/28/2015 | Spooky action at a distance - long range signal context [Fair Depo Ex. 9] | ONT_DEL00369649 | ONT_DEL00369651 | D | | | | |
| 90 | OAEO | 9/28/2015 | Spooky action at a distance - long range signal context [Massingham Depo. Ex. 14] | ONT_DEL00369649 | ONT_DEL00369651 | D | | | | |
| 91 | | | Franka J. Rang, Wigard P. Kloosterman and Jeroen de Ridder, "From squiggle to basepair: computational approaches for improving nanopore sequencing read accuracy, Genome Biology (2018) 19:90, https://doi.org/10.1186/s13059-018-1462-9 | | | A, F, H, N, R | | | | |
| 92 | OAEO | 5/29/2015 | Oxford Nanopore Technologies, Neural Networks | ONT_DEL00498440 | ONT_DEL00498440 | A, F, H | | | | |
| 93 | | 00/00/2019 | Github - nanoporetech/taiyaki: training models for basecalling Oxford Nanopore reads, https://github.com/nanoporetech/taiyaki | | | A, F, H, N | | | | |
| 94 | | | taiyaki/README.md at master, nanoporetech/taiyaki, Github, https://github.com/nanoporetech/taiyaki/blob/master/README.md#walk-through | | | A, F, H, N | | | | |
| 95 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 00/00/2014 | Oxford Nanopore Technologies, Squiggle it…Just a little bit | ONTS.ITC.00033375 | ONTS.ITC.00033390 | A, F, H | | | | |
| 96 | OAEO | 02/29/2017 | 1D^2 Product and Process Description, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984168 | PCB-DE-0984213 | A, F, H, MIL, R, U | | | | |

3

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 97 | OAEO | 02/29/2017 | 1D² Product and Process Description, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 [Reid Depo. Ex. 24] | PCB-DE-0984168 | PCB-DE-0984213 | A, D, F, H, MIL, R, U | | | | |
| 98 | | 7/28/2019 | Nanopore Store, Flongle, https://store.nanoporetech.com/flowcells.html | | | A, F, H, N | | | | |
| 99 | OAEO | 8/31/2017 | Oxford Nanopore Technologies, Promethion Slides | ONT_DEL00078477 | ONT_DEL00078490 | A, F, H | | | | |
| 100 | OAEO | | Oxford Nanopore Technologies, Single Molecule Accuracy | ONT_DEL00415518 | ONT_DEL00415523 | A, F, H | | | | |
| 101 | OAEO | 04/00/2016 | Oxford Nanopore Technologies, KeyGene Nanopore Seminar, Clive G. Brown, C.T.O. | ONT_DEL00014122 | ONT_DEL00014181 | A, F, H | | | | |
| 102 | OAEO | 9/29/2016 | Oxford Nanopore Technologies, and finally, monsieur, a wafer-thin update, Clive Brown (CTO) | ONT_DEL00003970 | ONT_DEL00004041 | A, F, H, R | | | | |
| 103 | OAEO | 11/13/2014 | Oxford Nanopore Technologies, Cold Spring Harbor Laboratories Next Generation Sequencing Course, James Brayer, Market Development Manager | ONT_DEL00020130 | ONT_DEL00020175 | A, F, H, R | | | | |
| 104 | OAEO | 3/23/2017 | Oxford Nanopore Technologies, 1D^2 sequencing of genomic DNA (with SQK-LSK308) | ONT_DEL00000824 | ONT_DEL00000846 | A, F, H | | | | |
| 105 | OAEO | 7/13/2016 | Oxford Nanopore Technologies, Oxford Nanopore Technologies Biochemical Processing Procedure, Document Number BP-335 | ONT_DEL00009416 | ONT_DEL00009421 | A, F, H | | | | |
| 106 | | | E8 enzyme and earlier versions [Reid Depo Ex. 13] | | | A, F, H, N | | | | |
| 107 | OAEO | 4/4/2016 | Oxford Nanopore Technologies Community, The Application-Specific Integrated Circuit (ASIC), https://community.nanoporetech.com/technical_documents/nanopore-sensing/v/nstd_5000_v1_revg_04apr2016/the-application-specific-i | ONT_DEL00009278 | ONT_DEL00009278 | A, F, H | | | | |
| 108 | OAEO | 11/13/2014 | Oxford Nanopore Technologies, Cold Spring Harbor Laboratories Next Generation Sequencing Course, James Brayer, Market Development Manager | ONT_DEL00020130 | ONT_DEL00020175 | A, F, H | | | | |
| 109 | OAEO | 4/4/2016 | Oxford Nanopore Technologies Community, Nanopore sensing - how it works, Nanopores, https://community.nanoporetech.com/technical_documents/nanopore-sensing/v/nstd_5000_v1_revg_04apr2016/nanopores | ONT_DEL00009274 | ONT_DEL00009274 | A, F, H | | | | |
| 110 | OAEO | 09/00/2018 | Oxford Nanopore Technologies, Oxford Nanopore & accuracy | ONT_DEL00207456 | ONT_DEL00207475 | JTX | | | | |
| 111 | OAEO | 09/00/2018 | Oxford Nanopore Technologies, Oxford Nanopore & accuracy [Jensen Depo. Ex. 7] | ONT_DEL00207456 | ONT_DEL00207475 | D | | | | |
| 112 | OAEO | 09/00/2018 | Oxford Nanopore Technologies, Oxford Nanopore & accuracy [Massingham Depo. Ex. 15] | ONT_DEL00207456 | ONT_DEL00207475 | D | | | | |
| 113 | OAEO | 09/00/2018 | Oxford Nanopore Technologies, Oxford Nanopore & accuracy [Pettett Depo. Ex. 3] | ONT_DEL00207456 | ONT_DEL00207475 | D | | | | |
| 114 | OAEO | 09/00/2018 | Oxford Nanopore Technologies, Oxford Nanopore & accuracy [Reid Depo. Ex. 5] | ONT_DEL00207456 | ONT_DEL00207475 | D | | | | |
| 115 | OAEO | 00/00/2015 | Oxford Nanopore Technologies, Introduction to Nanopore Sequencing, James Brayer, Associate Director, Market Development | ONT_DEL00143643 | ONT_DEL00143643 | A, F, H | | | | |
| 116 | OAEO | 12/12/2017 | Oxford Nanopore Technologies, Advanced Training Day, Akelia Wauchope-Odumbo PhD, Technical Applications Specialist | ONT_DEL00277966 | ONT_DEL00278039 | A, F, H, R | | | | |
| 117 | | 00/00/2017 | Oxford Nanopore Technologies, London Calling 2017 by Clive Brown video | PCB-DE-0019528 | PCB-DE-0019528 | A, F, H, R, U | | | | |
| 118 | OAEO | 3/14/2017 | Oxford Nanopore Technologies, GridION X5 - The Sequel, Google Hangout | ONT_DEL00011256 | ONT_DEL00011331 | A, F, H | | | | |
| 119 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 10/00/2016 | Oxford Nanopore Technologies, Product info | ONTS.ITC.00544167 | ONTS.ITC.00544240 | A, F, H | | | | |
| 120 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 00/00/2016 | Oxford Nanopore Technologies, 1D² | ONTS.ITC.00762169 | ONTS.ITC.00762177 | A, F, H | | | | |
| 121 | OAEO | 9/18/2017 | Email from Nanopore Community to Customer Wiki re 1D²2 data analysis | ONT_DEL00044684 | ONT_DEL00044685 | A, F, H, R | | | | |
| 122 | Confidential | 4/18/2016 | Letter from Norton Rose Fulbright LLP to Carpmaels & Ransford LLP re Pacific Biosciences of California, Inc. -v- Oxford Nanopore Technologies Limited & Metrichor Limited (Claim number: HP-2017-000008) | PCB-DE-0019529 | PCB-DE-0019529 | A, F, H, MIL, R, U | | | | |
| 123 | OAEO | 2/5/2018 | Email from Spike Willcocks to Matthew Pendleton and Eoghan Harrington re multi dimensional base calling for 1D^2 | ONT_DEL00024027 | ONT_DEL00024027 | A, F, H | | | | |
| 124 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | | Oxford Nanopore Technologies, Conference Name, Location and date, FAQs and Tech info | ONTS.ITC.00025256 | ONTS.ITC.00025310 | A, F, H, R | | | | |
| 125 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | | Oxford Nanopore Technologies, Conference Name, Location and date, FAQs and Tech info [McDougall Depo Ex. 9] | ONTS.ITC.00025256 | ONTS.ITC.00025310 | A, D, F, H, R | | | | |
| 126 | OAEO | 3/1/2018 | Amended 2D Product and Process Description, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984248 | PCB-DE-0984283 | A, F, H, MIL, R, U | | | | |
| 127 | OAEO | 11/16/2015 | Artificial Neural Network Project, Project Review and Future Directions | ONT_DEL00017163 | ONT_DEL00017220 | JTX | | | | |
| 128 | OAEO | 11/16/2015 | Artificial Neural Network Project, Project Review and Future Directions [Dessimoz Depo Ex. 7] | ONT_DEL00017163 | ONT_DEL00017220 | D | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 129 | | 8/28/2015 | Sara Goodwin, James Gurtowski, Scott Ethe-Sayers, Panchajanya Deshpande, Michael C. Schatz, and W. Richard McCombie, "Oxford Nanopore sequencing, hybrid error correction, and de novo assembly of a eukaryotic genome," Genome Research 25:1750-1756 | | | A, D, F, H, N, R | | | | |
| 130 | OAEO | 9/30/2016 | Sara Goodwin, James Gurtowski, Scott Ethe-Sayers, Panchajanya Deshpande, Michael C. Schatz, and W. Richard McCombie, "Oxford Nanopore sequencing, hybrid error correction, and de novo assembly of a eukaryotic genome," Genome Research 25:1-7 | PCB-DE-0794299 | PCB-DE-0794306 | A, D, F, H, R | | | | |
| 131 | | 3/15/2018 | Oxford Nanopore Technologies, Inc. v. Pacific Biosciences of California, Inc., Petition for Inter Partes Review of Claims 1-15 of U.S. Patent No. 9,546,400, IPR2018-00789 | | | A, H, MIL, R, U | | | | |
| 132 | | 9/25/2018 | Oxford Nanopore Technologies, Inc. v. Pacific Biosciences of California, Inc., Petition for Inter Partes Review of Claims 1-17 of U.S. Patent No. 9,738,929, IPR2018-01792 | | | A, H, MIL, R, U | | | | |
| 133 | | 3/26/2019 | Oxford Nanopore Technologies, Inc. v. Pacific Biosciences of California, Inc., Decision Denying Institution of Inter Partes Review, IPR2018-01792 | | | A, H, MIL, R | | | | |
| 134 | | 3/26/2019 | Oxford Nanopore Technologies, Inc. v. Pacific Biosciences of California, Inc., Decision Denying Institution of Inter Partes Review, IPR2018-00789 (Goldman Depo. Ex. 17) | | | A, H, MIL, R | | | | |
| 135 | | 3/26/2019 | Oxford Nanopore Technologies, Inc. v. Pacific Biosciences of California, Inc., Decision Denying Institution of Inter Partes Review, IPR2018-01792 (Hrdlicka Depo. Ex. 12) | | | A, H, , MIL, R | | | | |
| 136 | | 11/23/2016 | Github kmer_models / r9.4_180mv_450bps_6mer / template_median68pA.model, https://github.com/nanoporetech/kmer_models/blob/master/r9.4_180mv_6mer/template_median68pA.model | | | A, F, H, N, R | | | | |
| 137 | | 11/07/2008 | Provisional Application No. 61/112,351 (Lathrop) | PCB-DE-1029901 | PCB-DE-1029920 | A, F, H, R | | | | |
| 138 | | | Github - Taiyaki walkthrough.rst, https://github.com/nanoporetech/taiyaki/blob/master/docs/walkthrough.rst, https://s3-eu-west-1.amazonaws.com/ont-research/taiyaki_walkthrough.tar.gz | | | A, F, H, N, R | | | | |
| 139 | OAEO | 12/18/2015 | Second Amended and Restated License Agreement between Oxford Nanopore Technologies Limited and President and Fellows of Harvard College | ONT_DEL00536535 | ONT_DEL00536568 | A, F, H | | | | |
| 140 | OAEO | 12/18/2015 | Second Amended and Restated License Agreement between Oxford Nanopore Technologies Limited and President and Fellows of Harvard College [Prowse Depo. Ex. 6] | ONT_DEL00536535 | ONT_DEL00536568 | JTX | | | | |
| 141 | OAEO | 2/3/2016 | License Agreement between VIB vzw and Oxford Nanopore Technologies Limited | ONT_DEL00500155 | ONT_DEL00500210 | JTX | | | | |
| 142 | OAEO | 2/3/2016 | License Agreement between VIB vzw and Oxford Nanopore Technologies Limited [Prowse Depo. Ex. 7] | ONT_DEL00500155 | ONT_DEL00500210 | D | | | | |
| 143 | OAEO | 2/3/2016 | License Agreement between VIB vzw and Oxford Nanopore Technologies Limited [Willcocks Depo. Ex. 15] | ONT_DEL00500155 | ONT_DEL00500210 | D | | | | |
| 144 | OAEO | 12/13/2010 | License Agreement between Oxford Nanopore Technologies Limited and the Regents of the University of California | ONT_DEL00502874 | ONT_DEL00502912 | JTX | | | | |
| 145 | OAEO | 12/13/2010 | License Agreement between Oxford Nanopore Technologies Limited and Regents of the University of California [Prowse Depo. Ex. 8] | ONT_DEL00502874 | ONT_DEL00502912 | D | | | | |
| 146 | OAEO | 12/13/2010 | License Agreement between Oxford Nanopore Technologies Limited and Regents of the University of California [Willcocks Depo. Ex. 22] | ONT_DEL00502874 | ONT_DEL00502912 | D | | | | |
| 147 | | 08/18/1998 | U.S. Patent No. 5,795,782 (Church et al.) | PCB-DE-0002280 | PCB-DE-0002298 | JTX | | | | |
| 148 | OAEO | 05/00/2017 | Oxford Nanopore Technologies, Some mundane and incremental updates, London Calling 2017 | ONT_DEL00129195 | ONT_DEL00129287 | A, F, H, R | | | | |
| 149 | | 3/8/2016 | Oxford Nanopore Technologies, 'No thanks, I've already got one' video, Clive G. Brown CTO | PCB-DE-1029259 | PCB-DE-1029259 | A, F, H, R | | | | |
| 150 | OAEO | | Oxford Nanopore Technologies Community, Chemistry Technical Document, Sequencing speeds | ONT_DEL00000369 | ONT_DEL00000370 | A, F, H | | | | |
| 151 | | 9/29/2016 | Oxford Nanopore Technologies, and finally, monsieur, a wafer-thin update video, Clive Brown (CTO), https://register.nanoporetech.com/techupdate | PCB-DE-1029263 | PCB-DE-1029263 | A, F, H, R | | | | |
| 152 | OAEO | | New Enzyme mutant: E6-C1144/K177M | ONT_DEL00156618 | ONT_DEL00156623 | A, F, H, R | | | | |
| 153 | | 3/14/2017 | Oxford Nanopore Technologies, Webcast, "GridION X5 - The Sequel" video, Clive Brown, CTO | PCB-DE-1029264 | PCB-DE-1029264 | A, F, H, R | | | | |
| 154 | OAEO | | Oxford Nanopore Technologies Community, Chemistry Technical Document, Ligation Sequencing Kit family | ONT_DEL00000353 | ONT_DEL00000357 | A, F, H | | | | |
| 155 | | 07/00/2010 | Daniel L. Floyd, Stephen C. Harrison, and Antoine M. van Oijen, "Analysis of Kinetic Intermediates in Single-Particle Dwell Time Distributions," Biophysical Journal, Volume 99, July 2010, 360-366 | | | A, F, H, N, R | | | | |
| 156 | OAEO | | Oxford Nanopore Technologies, Enzyme Movement | ONT_DEL00014376 | ONT_DEL00014381 | JTX | | | | |
| 157 | OAEO | | Oxford Nanopore Technologies, Enzyme Movement [Clarke Depo. Ex. 5] | ONT_DEL00014376 | ONT_DEL00014381 | D | | | | |
| 158 | | 3/8/2018 | 0173_Substeps (62990) - Experiment Plans and Results - Oxford Nanopore's Wiki, https://wiki.oxfordnanolabs.local/pages/viewpage.action?pageID=60098521 | ONT_DEL00196028 | ONT_DEL00196037 | JTX | | | | |
| 159 | | 3/8/2018 | 0173_Substeps (62990) - Experiment Plans and Results - Oxford Nanopore's Wiki, https://wiki.oxfordnanolabs.local/pages/viewpage.action?pageID=60098521 [Clarke Depo. Ex. 7] | ONT_DEL00196028 | ONT_DEL00196037 | D | | | | |
| 160 | | 3/8/2018 | 0173_Substeps (62990) - Experiment Plans and Results - Oxford Nanopore's Wiki, https://wiki.oxfordnanolabs.local/pages/viewpage.action?pageID=60098521 [Reid Depo. Ex. 16] | ONT_DEL00196028 | ONT_DEL00196037 | D | | | | |
| 161 | | 3/8/2018 | 0173_Substeps (62990) - Experiment Plans and Results - Oxford Nanopore's Wiki, https://wiki.oxfordnanolabs.local/pages/viewpage.action?pageID=60098521 [Reid Depo. Ex. 20] | ONT_DEL00196028 | ONT_DEL00196037 | D | | | | |
| 162 | | 6/28/2016 | Oxford Nanopore Technologies, Fast Mode - technical guide for advanced users (NOT part of main tech guide) | ONT_DEL00498746 | ONT_DEL00498746 | A, F, H | | | | |
| 163 | OAEO | 6/28/2016 | Oxford Nanopore Technologies, Fast Mode - technical guide for advanced users (NOT part of main tech guide) [Reid Depo. Ex. 14] | | | A, D, F, H, N | | | | |
| 164 | OAEO | 12/00/2015 | Oxford Nanopore Technologies, Enzyme Movement | ONT_DEL00014430 | ONT_DEL00014449 | A, F, H | | | | |
| 165 | | 7/24/2018 | sloika, Github, https://github.com/nanoporetech/sloika/tree/master/data/reads | | | A, F, H, N | | | | |
| 166 | | 7/24/2018 | sloika, Github, https://github.com/nanoporetech/sloika/tree/master/data/reads [Massingham Depo. Ex. 3] | | | A, D, F, H, N | | | | |
| 167 | OAEO | | Oxford Nanopore Technologies Community, Data analysts, 1D basecalling overview | ONT_DEL00004045 | ONT_DEL00004047 | A, F, H | | | | |
| 168 | OAEO | 7/13/2016 | Oxford Nanopore Technologies, Oxford Nanopore Technologies Biochemical Processing Procedure, Document Number BP-342 | ONT_DEL00009422 | ONT_DEL00009426 | A, F, H | | | | |
| 169 | OAEO | 11/3/2017 | Oxford Nanopore Technologies, Oxford Nanopore Technologies Biochemical Processing Procedure, Document Number BP-357 | ONT_DEL00009491 | ONT_DEL00009530 | A, F, H | | | | |
| 170 | OAEO | 1/28/2016 | Oxford Nanopore Technologies Protein Production Batch Report ONLP10799 | ONT_DEL00010258 | ONT_DEL00010319 | A, F, H | | | | |
| 171 | OAEO | 7/27/2017 | Oxford Nanopore Technologies, Oxford Nanopore Technologies Biochemical Processing Procedure, Document Number BP-344 | ONT_DEL00009427 | ONT_DEL00009465 | A, F, H | | | | |
| 172 | OAEO | 11/14/2016 | Oxford Nanopore Technologies Protein Production Batch Report ONLP11945 | ONT_DEL00011017 | ONT_DEL00011084 | A, F, H | | | | |
| 173 | | | Tau9 - all ratios, Kinetic Models vs Duration Histogram | | | A, F, H, N, R | | | | |
| 174 | | | Tau10 - all ratios, Kinetic Models vs Duration Histogram | | | A, F, H, N, R | | | | |
| 175 | | | Tau11 - all ratios, Kinetic Models vs Duration Histogram | | | A, F, H, N, R | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 176 | | | Tau2 - all ratios, Kinetic Models vs Duration Histogram | | | A, F, H, N, R | | | | |
| 177 | | | Tau12.55 - all ratios, Kinetic Models vs Duration Histogram | | | A, F, H, N, R | | | | |
| 178 | | | Tau3 - all ratios, Kinetic Models vs Duration Histogram | | | A, F, H, N, R | | | | |
| 179 | | | Tau14 - all ratios, Kinetic Models vs Duration Histogram | | | A, F, H, N, R | | | | |
| 180 | | 09/25/2018 | Oxford Nanopore Technologies, Inc. v. Pacific Biosciences of California, Inc., Petition for *Inter Partes* Review of Claims 1-16 of U.S. Patent No. 9,678,056, IPR2018-01795 | | | A, H, MIL, R, U | | | | |
| 181 | | 5/4/2012 | Elizabeth Pennisi, "Search for Pore-fection," Science, Vol 336, 534-537 | PCB-DE-1030229 | PCB-DE-1030234 | JTX | | | | |
| 182 | | | sloika read 1 lengths | | | A, F, H, N | | | | |
| 183 | | 12/31/2018 | Pacific Biosciences of California, Inc., Form 10-K, https://www.sec.gov/Archives/edgar/data/1299130/000129913019000014/pacb-20181231x10k.htm | PCB-DE-0985094 | PCB-DE-0985183 | JTX | | | | |
| 184 | | 12/31/2018 | Pacific Biosciences of California, Inc., Form 10-K, https://www.sec.gov/Archives/edgar/data/1299130/000129913019000014/pacb-20181231x10k.htm [Gong Depo Ex 7] | PCB-DE-0985094 | PCB-DE-0985183 | D | | | | |
| 185 | | 4/24/2019 | Pacific Biosciences Launches New Sequel II System, Featuring ~8 Times the DNA Sequencing Data Output, https://www.pacb.com/press_releases/pacific-biosciences-launches-new-sequel-ii-system-featuring-8-times-the-dna-sequencing-data-output/ | ONT-EXP-003985 | ONT-EXP-003987 | JTX | | | | |
| 186 | OAEO | 12/31/2017 | Oxford Nanopore Technologies Limited, Annual report and financial statements for the year ended 31 December 2017 | ONT_DEL00285224 | ONT_DEL00285264 | JTX | | | | |
| 187 | OAEO | 12/31/2017 | Oxford Nanopore Technologies Limited, Annual report and financial statements for the year ended 31 December 2017 [McDonald Depo. Ex. 15] | ONT_DEL00285224 | ONT_DEL00285264 | D | | | | |
| 188 | OAEO | 3/29/2017 | Cowen and Company, Equity Research, Life Science & Diagnostic Tools, Proprietary Core Lab Sequencing Survey; Focus on Illumina NovaSeq | ONT_DEL00539686 | ONT_DEL00539759 | JTX | | | | |
| 189 | OAEO | 3/29/2017 | Cowen and Company, Equity Research, Life Science & Diagnostic Tools, Proprietary Core Lab Sequencing Survey; Focus on Illumina NovaSeq [Layne-Farrar Depo Ex. 6] | ONT_DEL00539686 | ONT_DEL00539759 | D | | | | |
| 190 | | 1/11/2019 | Oxford Nanopore Technologies, Inc. v. Pacific Biosciences of California, Inc., Patent Owner Pacific Biosciences of California, Inc.'s Preliminary Response, IPR2018-01792 | | | A, H, MIL, R | | | | |
| 191 | | 7/5/2018 | Oxford Nanopore Technologies, Inc. v. Pacific Biosciences of California, Inc., Patent Owner Pacific Biosciences of California, Inc.'s Preliminary Response, IPR2018-00789 | | | A, H, MIL, R | | | | |
| 192 | | 2/13/2019 | Oxford Nanopore Technologies, Inc. v. Pacific Biosciences of California, Inc., Patent Owner Pacific Biosciences of California, Inc.'s Preliminary Response, IPR2018-01795 | | | A, H, MIL, R | | | | |
| 193 | OAEO | 9/15/2016 | Oxford Nanopore Technologies, Discussion Materials, Initial Draft of Lazard Materials [Cowper Depo Ex. 6] | ONT_DEL00556474 | ONT_DEL00556502 | A, F, H, R | | | | |
| 194 | OAEO | 9/15/2016 | Oxford Nanopore Technologies, Discussion Materials, Initial Draft of Lazard Materials | ONT_DEL00556474 | ONT_DEL00556502 | A, D, F, H, R | | | | |
| 195 | OAEO | 01/00/2018 | Oxford Nanopore Technologies, Financial Information: 2 Year Forecasts presentation [Cowper Depo Ex. 9] | ONT_DEL00556783 | ONT_DEL00556801 | A, F, H | | | | |
| 196 | OAEO | 01/00/2019 | Oxford Nanopore Technologies, 2019 Forecasted Revenue spreadsheet [Cowper Depo Ex. 11] | ONT_DEL00556058 | ONT_DEL00556058 | A, F, H | | | | |
| 197 | OAEO | 01/00/2018 | Oxford Nanopore Technologies, ONT - Market Model - Draft spreadsheet [Cowper Depo Ex. 12] | ONT_DEL00363078 | ONT_DEL00363078 | A, F, H | | | | |
| 198 | OAEO | 00/00/2018 | Oxford Nanopore Technologies, Oxford Nanopore, CCB Investment [Cowper Depo Ex. 14] | ONT_DEL00288490 | ONT_DEL00288512 | A, F, H | | | | |
| 199 | OAEO | 00/00/2018 | Oxford Nanopore Technologies, Oxford Nanopore, CCB Investment [McDonald Depo. Ex. 4] | ONT_DEL00288490 | ONT_DEL00288512 | A, D, F, H | | | | |
| 200 | | | Pacific Biosciences, Sales of Sequencing Instruments and Consumables by Customer spreadsheet | PCB-DE-1029628 | PCB-DE-1029628 | JTX | | | | |
| 201 | | | Pacific Biosciences, Instruments spreadsheet, Gross Margins on Consumable Products | PCB-DE-0987157 | PCB-DE-0987157 | JTX | | | | |
| 202 | OAEO | 12/14/2016 | Non-Exclusive License Agreement between Pacific Biosciences of California and Life Technologies Corporation | PCB-DE-0984479 | PCB-DE-0984495 | A, F, H, R | | | | |
| 203 | OAEO | 8/27/2007 | Patent Purchase Agreement between LI-COR, Inc., and Pacific Biosciences of California | PCB-DE-0984465 | PCB-DE-0984478 | JTX | | | | |
| 204 | OAEO | 10/18/2013 | Amendment No. 2 to License Agreement between GE Healthcare Bio-Sciences Corp., and Pacific Biosciences of California | PCB-DE-0984462 | PCB-DE-0984464 | JTX | | | | |
| 205 | OAEO | 9/11/2006 | Amendment No. 1 to License Agreement between GE Healthcare Bio-Sciences Corp., and Pacific Biosciences of California | PCB-DE-0984460 | PCB-DE-0984461 | JTX | | | | |
| 206 | OAEO | 9/11/2006 | License Agreement between GE Healthcare Bio-Sciences Corp., and Pacific Biosciences of California | PCB-DE-0984444 | PCB-DE-0984459 | JTX | | | | |
| 207 | OAEO | 9/24/2013 | Development, Commercialization and License Agreement between Pacific Biosciences of California and F. Hoffmann-LA Roche Ltd. | PCB-DE-0984334 | PCB-DE-0984443 | A, F, H, R | | | | |
| 208 | OAEO | 10/17/2012 | Non-Exclusive License Agreement between Pacific Biosciences of California and Wisegene LLC for 5-Methylcytosine Detection Technology | PCB-DE-0982727 | PCB-DE-0982744 | A, F, H, R | | | | |
| 209 | OAEO | 10/9/2012 | Exclusive License Agreement between The University of Chicago and Pacific Biosciences of California, Inc. for 5-Methylcytosine Detection Technology | PCB-DE-0982704 | PCB-DE-0982726 | JTX | | | | |
| 210 | OAEO | 11/8/2012 | First Amendment to Exclusive License Agreement between The University of Chicago and Pacific Biosciences of California, Inc. for 5-Methylcytosine Detection Technology | PCB-DE-0982702 | PCB-DE-0982703 | D | | | | |
| 211 | OAEO | 0615/2005 | Exclusive License Agreement between Indiana University Research and Technology Corporation and Nanofluidics, Inc. | PCB-DE-0982680 | PCB-DE-0982701 | A, F, H, R | | | | |
| 212 | OAEO | 4/1/2006 | Amendment to the Exclusive License Agreement between Pacific Biosciences of California, Inc. and Cornell Research Foundation, Inc. | PCB-DE-0982679 | PCB-DE-0982679 | JTX | | | | |
| 213 | OAEO | 1/11/2007 | Amendment to the Exclusive License Agreement between Pacific Biosciences of California, Inc. and Cornell Research Foundation, Inc. | PCB-DE-0982678 | PCB-DE-0982678 | JTX | | | | |
| 214 | OAEO | 2/1/2004 | Exclusive License Agreement between Nanofluidics, Inc. and Cornell Research Foundation, Inc. | PCB-DE-0982662 | PCB-DE-0982677 | A, F, H, R | | | | |
| 215 | | 00/00/2018 | PacBio, 2018 Global Commercial Meeting | PCB-DE-0919489 | PCB-DE-0919489 | A, F, H | | | | |
| 216 | OAEO | 4/19/2018 | PacBio, Bio-Rad - Pacific Biosciences Meeting | PCB-DE-0919311 | PCB-DE-0919388 | A, F, H | | | | |
| 217 | | | PacBio spreadsheet tracking Sales Opportunities | PCB-DE-0900630 | PCB-DE-0900630 | A, F, H | | | | |
| 218 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 12/15/2015 | Developer License Agreement between the University of East Anglia and Oxford Nanopore Technologies Limited | ONTS.ITC.00012950 | ONTS.ITC.00012967 | A, F, H, R | | | | |
| 219 | OAEO | 00/00/2018 | Oxford Nanopore Technologies, Royalty Calculation 2018 spreadsheet | ONT_DEL00557474 | ONT_DEL00557474 | JTX | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 220 | OAEO | | Oxford Nanopore Technologies, Sales and Costs of the Accused Products for the years 2014 through 2019 | ONT_DEL00557473 | ONT_DEL00557473 | JTX | | | | |
| 221 | OAEO | | Oxford Nanopore Technologies, ONT - Market Model | ONT_DEL00556585 | ONT_DEL00556585 | A, F, H, R | | | | |
| 222 | OAEO | 3/14/2017 | Morgan Stanley Research, Illumina Inc., Nanoupdates | ONT_DEL00528885 | ONT_DEL00528892 | A, F, H, R | | | | |
| 223 | OAEO | 03/00/2017 | Northeastern University, University - Industry Sponsored Research Agreement between Northeastern University and Oxford Nanopore Technologies, Ltd. | ONT_DEL00526027 | ONT_DEL00526041 | A, F, H, R | | | | |
| 224 | OAEO | 1/7/2009 | Subscription Agreement between Illumina Cambridge Limited and Oxford Nanopore Technologies Limited | ONT_DEL00522625 | ONT_DEL00522655 | A, F, H, R | | | | |
| 225 | OAEO | 6/23/2015 | Amendment No.3 to Sponsored Research Agreement between President and Fellows of Harvard College and Oxford Nanopore Technologies, Ltd. | ONT_DEL00510958 | ONT_DEL00511018 | A, F, H, R | | | | |
| 226 | OAEO | 02/00/2018 | Oxford Nanopore Technologies, February 2018, Oxford Nanopore Overview | ONT_DEL00509090 | ONT_DEL00509123 | A, F, H | | | | |
| 227 | OAEO | 08/00/2017 | Oxford Nanopore Technologies, August 2017, Oxford Nanopore Overview | ONT_DEL00508900 | ONT_DEL00508945 | A, F, H | | | | |
| 228 | OAEO | 7/13/2012 | First Amendment to Exclusive License Agreement between The Board of Trustees of the University of Illinois and Oxford Nanopore Technologies, Ltd. | ONT_DEL00508039 | ONT_DEL00508040 | A, F, H | | | | |
| 229 | OAEO | 6/16/2014 | Research and License Agreement between Yissum Research Development Company of the Hebrew University of Jerusalem, Ltd. And Fulcrum Sp Ltd. | ONT_DEL00507996 | ONT_DEL00508038 | JTX | | | | |
| 230 | OAEO | 6/16/2014 | Research and License Agreement between Yissum Research Development Company of the Hebrew University of Jerusalem, Ltd. And Fulcrum Sp Ltd. [Willcocks Depo. Ex. 21] | ONT_DEL00507996 | ONT_DEL00508038 | D | | | | |
| 231 | OAEO | 12/24/2012 | Exclusive Patent Licence Agreement between Cambridge Enterprise Limited and Oxford Nanopore Technologies Limited | ONT_DEL00507969 | ONT_DEL00507995 | JTX | | | | |
| 232 | OAEO | 12/24/2012 | Exclusive Patent Licence Agreement between Cambridge Enterprise Limited and Oxford Nanopore Technologies Limited [Willcocks Depo. Ex. 20] | ONT_DEL00507969 | ONT_DEL00507995 | D | | | | |
| 233 | OAEO | 7/13/2012 | Exclusive License Agreement between The Board of Trustees of the University of Illinois and Oxford Nanopore Technologies, Ltd. | ONT_DEL00507948 | ONT_DEL00507968 | JTX | | | | |
| 234 | OAEO | 10/14/2016 | Northeastern University, University Exclusive Patent Licence Agreement between Northeastern University and Oxford Nanopore Technologies Limited | ONT_DEL00507922 | ONT_DEL00507947 | JTX | | | | |
| 235 | OAEO | 10/14/2016 | Northeastern University, University Exclusive Patent Licence Agreement between Northeastern University and Oxford Nanopore Technologies Limited [Willcocks Depo. Ex. 19] | ONT_DEL00507922 | ONT_DEL00507947 | D | | | | |
| 236 | OAEO | 8/26/2014 | Nonexclusive License Agreement between California Institute of Technology and Oxford Nanopore Technologies Ltd. | ONT_DEL00507899 | ONT_DEL00507921 | JTX | | | | |
| 237 | OAEO | 8/15/2017 | Amended and Restated License Agreement between Oxford Nanopore Technologies Limited and the Regents of the University of California | ONT_DEL00506755 | ONT_DEL00506831 | JTX | | | | |
| 238 | OAEO | 8/15/2017 | Amended and Restated License Agreement between Oxford Nanopore Technologies Limited and the Regents of the University of California | ONT_DEL00506677 | ONT_DEL00506754 | JTX | | | | |
| 239 | OAEO | 00/00/2012 | Exclusive Licence of Technology (ISIS Project No. 2808) between Isis Innovation Limited and Oxford Nanopore Technology Limited | ONT_DEL00503455 | ONT_DEL00503478 | A, F, H | | | | |
| 240 | OAEO | 7/17/2012 | Option Extension and Variation Agreement between Isis Innovation Limited and Oxford Nanopore Technologies Limited | ONT_DEL00503451 | ONT_DEL00503454 | A, F, H | | | | |
| 241 | OAEO | 6/22/2012 | Supplemental Letter re Licence Agreements 16th May 2011, re Isis Project No. 3732, 28th January 2011 re Isis Project No. 4093, 31st August 2011 re Isis Project No. 7318 and 11th April 2012 re Isis Project No. 2808 made between Isis Innovation Limited and Oxford Nanopore Technology Limited | ONT_DEL00503449 | ONT_DEL00503450 | A, F, H, R | | | | |
| 242 | OAEO | 1/2/2014 | Letter enclosing fully signed Licence Agreement between Isis Innovation Ltd and Oxford Nanopore Technology Limited, Isis Project: 10469 | ONT_DEL00503423 | ONT_DEL00503448 | A, F, H, R | | | | |
| 243 | OAEO | 4/24/2014 | Letter enclosing fully signed Licence Agreement between Isis Innovation Ltd and Oxford Nanopore Technology Limited, Isis Projects: 9363 & 9258 | ONT_DEL00503397 | ONT_DEL00503422 | JTX | | | | |
| 244 | OAEO | 4/24/2014 | Letter enclosing fully signed Licence Agreement between Isis Innovation Ltd and Oxford Nanopore Technology Limited, Isis Projects: 9363 & 9258 [Willcocks Depo. Ex. 18] | ONT_DEL00503397 | ONT_DEL00503422 | D | | | | |
| 245 | OAEO | 5/10/2013 | Exclusive Licence of Technology (ISIS Project No. 8176) between Isis Innovation Limited and Oxford Nanopore Technology Limited | ONT_DEL00503373 | ONT_DEL00503396 | A, F, H, R | | | | |
| 246 | OAEO | 2/4/2010 | Option Agreement (Isis Project 4433) between Isis Innovation Limited and Oxford Nanopore Technologies | ONT_DEL00503359 | ONT_DEL00503372 | A, F, H, R | | | | |
| 247 | OAEO | 2/9/2011 | Exclusive Licence of Technology (ISIS Project No. 4093) between Isis Innovation Limited and Oxford Nanopore Technology Limited | ONT_DEL00503335 | ONT_DEL00503358 | A, F, H, R | | | | |
| 248 | OAEO | 5/16/2011 | Exclusive Licence of Technology (ISIS Project No. 3732) between Isis Innovation Limited and Oxford Nanopore Technology Limited | ONT_DEL00503311 | ONT_DEL00503334 | A, F, H, R | | | | |
| 249 | OAEO | 1/2/2014 | Letter enclosing fully signed Licence Agreement between Isis Innovation Ltd and Oxford Nanopore Technology Limited, Isis Project: 3329 | ONT_DEL00503285 | ONT_DEL00503310 | JTX | | | | |
| 250 | OAEO | 4/11/2012 | Exclusive Licence of Technology (ISIS Project No. 2808) between Isis Innovation Limited and Oxford Nanopore Technology Limited | ONT_DEL00503262 | ONT_DEL00503284 | A, F, H, R | | | | |
| 251 | OAEO | 5/20/2005 | Exclusive Licence of Technology (ISIS Project No. 2386) between Isis Innovation Limited and Oxford Nanolabs Limited | ONT_DEL00503224 | ONT_DEL00503254 | A, F, H, R | | | | |
| 252 | OAEO | 4/3/2013 | License Agreement between Oxford Nanopore Technologies Ltd. and the Regents of the University of Michigan | ONT_DEL00503206 | ONT_DEL00503223 | A, F, H, R | | | | |
| 253 | OAEO | 12/19/2008 | Letter Amending the Licence Agreement between Isis Innovation Limited and Oxford Nanopore Technologies Limited dated 20 May 2005, and subsequently amended on 8 June 2007 | ONT_DEL00503203 | ONT_DEL00503205 | A, F, H, R | | | | |
| 254 | OAEO | 5/17/2005 | Amendment No. 2 to the License Agreement L-677 between Oxford Nanolabs Ltd. and The Texas A&M University System | ONT_DEL00503189 | ONT_DEL00503202 | A, F, H, R | | | | |
| 255 | OAEO | 5/17/2005 | License Agreement between STS Diagnostics GmbH and The Texas A&M University System | ONT_DEL00503166 | ONT_DEL00503188 | A, F, H, R | | | | |
| 256 | OAEO | 6/8/2007 | Deed of Amendment to Exclusive Licence of Technology (ISIS Project No. 2386 and 2587) between Isis Innovation Limited and Oxford Nanolabs Limited | ONT_DEL00503159 | ONT_DEL00503165 | A, F, H, R | | | | |
| 257 | OAEO | 12/5/2016 | Exclusive License Agreement between the University of Massachusetts Limited and Oxford Nanopore Technologies Limited | ONT_DEL00503141 | ONT_DEL00503158 | A, F, H, R | | | | |
| 258 | OAEO | 5/9/2012 | Exclusive License Agreement between the Board of Trustees of the Leland Stanford Junior University and Oxford Nanopore Technologies Ltd | ONT_DEL00503124 | ONT_DEL00503140 | A, F, H, R | | | | |
| 259 | OAEO | 6/30/2011 | License Agreement between Oxford Nanopore Technologies Ltd and the President and Fellows of Harvard College | ONT_DEL00503082 | ONT_DEL00503123 | A, F, H, R | | | | |
| 260 | OAEO | 6/30/2011 | License Agreement between Oxford Nanopore Technologies Ltd and the President and Fellows of Harvard College [Willcocks Depo. Ex. 23] | ONT_DEL00503082 | ONT_DEL00503123 | A, D, F, H, R | | | | |
| 261 | OAEO | 8/31/2015 | IP Management and Collaboration Agreement between VIB vzw and Oxford Nanopore Technologies Ltd | ONT_DEL00503061 | ONT_DEL00503081 | A, F, H, R | | | | |

7

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 262 | OAEO | 12/18/2015 | Amended and Restated License Agreement between Oxford Nanopore Technologies Ltd and the President and Fellows of Harvard College | ONT_DEL00503025 | ONT_DEL00503060 | A, F, H, R | | | | |
| 263 | OAEO | 5/26/2016 | License Agreement between Oxford Nanopore Technologies Limited and the President and Fellows of Harvard College | ONT_DEL00502995 | ONT_DEL00503024 | A, F, H, R | | | | |
| 264 | OAEO | 8/29/2013 | License Agreement between BioCure, Inc. and Oxford Nanopore Technologies Limited | ONT_DEL00502743 | ONT_DEL00502759 | A, F, H, R | | | | |
| 265 | OAEO | 9/30/2013 | First Amendment to License Agreement between Oxford Nanopore Technologies Ltd. and the Regents of the University of Michigan (University of Michigan Files 4807 and 5515) | ONT_DEL00502693 | ONT_DEL00502694 | A, F, H, R | | | | |
| 266 | OAEO | 8/31/2011 | Exclusive Licence of Technology (Isis Project No. 7318) between Isis Innovation Limited and Oxford Nanopore Technology Limited | ONT_DEL00502596 | ONT_DEL00502628 | A, F, H, R | | | | |
| 267 | OAEO | 2/10/2017 | Third Amendment to License Agreement between Oxford Nanopore Technologies Ltd. and the Regents of the University of Michigan (University of Michigan Files 4807 and 5515) | ONT_DEL00502572 | ONT_DEL00502573 | A, F, H, R | | | | |
| 268 | OAEO | 8/1/2014 | Research Agreement between Oxford Nanopore Technologies Ltd. and the Katholieke Universiteit Leuven | ONT_DEL00500811 | ONT_DEL00500821 | A, F, H, R | | | | |
| 269 | OAEO | 8/1/2014 | Patent and Know-How License Agreement between the Katholieke Universiteit Leuven and Oxford Nanopore Technologies Ltd. | ONT_DEL00500791 | ONT_DEL00500810 | JTX | | | | |
| 270 | OAEO | 2/3/2012 | Sponsored Research Agreement between Brown University and Oxford Nanopore Technologies Ltd. | ONT_DEL00500491 | ONT_DEL00500505 | A, F, H, R | | | | |
| 271 | OAEO | 1/23/2011 | Sponsored Research Agreement between the President and Fellows of Harvard College and Oxford Nanopore Technologies Ltd | ONT_DEL00500312 | ONT_DEL00500335 | A, F, H, R | | | | |
| 272 | OAEO | 10/15/2012 | License Agreement between Trustees of Boston University and Oxford Nanopore Technologies Ltd | ONT_DEL00497294 | ONT_DEL00497333 | JTX | | | | |
| 273 | OAEO | 4/11/2016 | Amendment No. 1 to License Agreement between Trustees of Boston University and Oxford Nanopore Technologies Ltd | ONT_DEL00497283 | ONT_DEL00497287 | A, F, H, R | | | | |
| 274 | OAEO | 12/20/2018 | Third Option Extension and Variation Agreement between Oxford University Innovation Limited and Oxford Nanopore Technologies Limited | ONT_DEL00497279 | ONT_DEL00497282 | A, F, H, R | | | | |
| 275 | OAEO | 11/1/2016 | Sublicense Agreement between Oxford Nanopore Technologies Limited and Ohio State Innovation Foundation | ONT_DEL00376879 | ONT_DEL00376882 | A, F, H, R | | | | |
| 276 | OAEO | 11/1/2016 | Sublicense Agreement between Oxford Nanopore Technologies Limited and Ohio State Innovation Foundation | ONT_DEL00376762 | ONT_DEL00376797 | A, F, H, R | | | | |
| 277 | OAEO | 11/1/2016 | Agreement for the Sponsored Program between The Ohio State University and Oxford Nanopore Technologies Ltd | ONT_DEL00376742 | ONT_DEL00376761 | A, F, H, R | | | | |
| 278 | OAEO | 11/22/2018 | Oxford Nanopore Technology Limited, Ownership Sponsor | ONT_DEL00366919 | ONT_DEL00366919 | A, F, H, R | | | | |
| 279 | OAEO | 10/17/2017 | Seeking Alpha, PacBio is A DNA Sequencing Standout, https://seekingalpha.com/article/4114022-pacbio-dna-sequencing-standout?page=2 | ONT_DEL00328791 | ONT_DEL00328806 | A, F, H, R | | | | |
| 280 | OAEO | 9/12/2016 | Oxford Nanopore Technologies - ONT Control Tab spreadsheet | ONT_DEL00299656 | ONT_DEL00299656 | A, F, H, R | | | | |
| 281 | OAEO | 10/4/2017 | Oxford Nanopore Technologies, Sequencing Market Discussion Document | ONT_DEL00285290 | ONT_DEL00285329 | A, F, H, R | | | | |
| 282 | OAEO | 7/22/2017 | Morgan Stanley, Next Generation Sequencing (NGS) Market Size, Growth and Trends (2014-2020) | ONT_DEL00285074 | ONT_DEL00285112 | JTX | | | | |
| 283 | OAEO | 7/22/2017 | Morgan Stanley, Next Generation Sequencing (NGS) Market Size, Growth and Trends (2014-2020) [Layne-Farrar Depo Ex. 7] | ONT_DEL00285074 | ONT_DEL00285112 | D | | | | |
| 284 | OAEO | 8/1/2014 | Sponsored Research Agreement between Brown University and Oxford Nanopore Technologies | ONT_DEL00262395 | ONT_DEL00262412 | A, F, H, R | | | | |
| 285 | OAEO | 8/1/2014 | Sponsored Research Agreement between Brown University and Oxford Nanopore Technologies Ltd. | ONT_DEL00258325 | ONT_DEL00258342 | A, F, H, R | | | | |
| 286 | OAEO | 10/18/2018 | Berenberg, IP Group plc, Med. Tech/Services | ONT_DEL00238850 | ONT_DEL00238911 | JTX | | | | |
| 287 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, Investor Update, Q3 2017 | ONT_DEL00199632 | ONT_DEL00199641 | A, F, H, R | | | | |
| 288 | OAEO | 00/00/2018 | Oxford Nanopore Technologies, 1D² Relaunch, Q4 2018 | ONT_DEL00198982 | ONT_DEL00199006 | A, F, H | | | | |
| 289 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, Investor Update, Q2 2017 | ONT_DEL00115253 | ONT_DEL00115261 | A, F, H, R | | | | |
| 290 | | 9/18/2019 | Research Focus, PacBio, https://www.pacb.com/research-focus/ | ONT-EXP-004048 | ONT-EXP-004049 | JTX | | | | |
| 291 | | 12/31/2019 | Latest System Release - Sequel II System - PacBio, https://www.pacb.com/products-and-services/sequel-system/latest-system-release/ | | | JTX | | | | |
| 292 | | 12/31/2019 | SMRT Cells, Sequencing Reagent Kits, and Accessories -PacBio, https://www.pacb.com/products-and-services/consumables/smrt-cells-sequencing-reagent-kits-and-accessories/ | | | JTX | | | | |
| 293 | | 12/31/2019 | Consumables - PacBio, https://www.pacb.com/products-and-services/consumables/ | | | JTX | | | | |
| 294 | | 12/31/2019 | SMRT Solutions: DNA Sequencing Products + Services - PacBio, https://www.pacb.com/products-and-services/ | | | JTX | | | | |
| 295 | | 12/31/2019 | IP Group plc, https://www.ipgroupplc.com/ | | | A, F, H, N, R | | | | |
| 296 | | 7/8/2019 | Genomeweb, Oxford Nanopore 2018 Revenues More Than Double; Firm Opens New Production Facility, https://www.genomeweb.com/sequencing/oxford-nanopore-2018-revenues-more-double-firm-opens-new-production-facility#.XS95-OhKh_E | | | A, F, H, N, R | | | | |
| 297 | | 7/7/2019 | Financial Times, Oxford Nanopore opens DNA decoding kit factory, https://www.ft.com/content/24d68f66-9da4-11e9-9c06-a4640c9feebb | | | A, F, H, N, R | | | | |
| 298 | | 12/31/2019 | Training - Nanopore Store, https://store.nanoporetech.com/training | | | A, F, H, N, R | | | | |
| 299 | | 12/31/2019 | Nanopore Store, Flow Cell (R9.5.1), https://store.nanoporetech.com/spoton-flow-cell-mk-i-r9.html | | | A, F, H, N, R | | | | |
| 300 | | 12/31/2019 | About Seeking Alpha, Seeking Alpha, https://seekingalpha.com/page/about_us | | | A, F, H, N, R | | | | |
| 301 | | 3/14/2019 | Oxford Nanopore Technologies, Terabases of long-read sequence data, analysed in real time, PromethION, https://nanoporetech.com/sites/default/files/s3/literature/PromethION-Brochure-14Mar2019.pdf | | | A, F, H, N, R | | | | |
| 302 | | 3/19/2019 | Oxford Nanopore Technologies, Product, https://nanoporetech.com/sites/default/files/s3/literature/Product-Brochure-19Mar2019.pdf | ONT-EXP-003992 | ONT-EXP-004006 | JTX | | | | |
| 303 | | 3/14/2019 | Oxford Nanopore Technologies, Powerful, real-time, long-read sequencing in the palm of your hand, https://nanoporetech.com/sites/default/files/s3/literature/MinION-Brochure-14Mar2019.pdf | | | A, F, H, N | | | | |
| 304 | | 3/14/2019 | Oxford Nanopore Technologies, High-throughput, real-time and on-demand sequencing for your lab, https://nanoporetech.com/sites/default/files/s3/literature/GridION-Brochure-14Mar2019.pdf | | | A, F, H, N | | | | |
| 305 | | 9/10/2019 | SmidgION, https://nanoporetech.com/products/smidgion | ONT-EXP-004061 | ONT-EXP-004063 | JTX | | | | |
| 306 | | 9/7/2019 | PromethION, https://nanoporetech.com/products/promethion | ONT-EXP-004019 | ONT-EXP-004025 | JTX | | | | |
| 307 | | 12/31/2019 | MinIT, https://nanoporetech.com/products/minit# | | | A, F, H, N, R | | | | |
| 308 | | 9/7/2019 | MinION, https://nanoporetech.com/products/minion | ONT-EXP-003837 | ONT-EXP-003842 | JTX | | | | |
| 309 | | 9/7/2019 | GridION Mk1, https://nanoporetech.com/products/gridion | ONT-EXP-003924 | ONT-EXP-003928 | JTX | | | | |
| 310 | | 9/7/2019 | Flongle, https://nanoporetech.com/products/flongle | ONT-EXP-003920 | ONT-EXP-003923 | JTX | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 311 | | 9/7/2019 | Longer and longer: DNA sequence of more than two million bases now achieved with nanopore sequencing, https://nanoporetech.com/about-us/news/longer-and-longer-dna-sequence-more-two-million-bases-now-achieved-nanopore | PCB-DE-1029746 | PCB-DE-1029747 | A, F, H, R | | | | |
| 312 | | 8/25/2019 | About us: Biology for anyone, anywhere, https://nanoporetech.com/about-us | ONT-EXP-003901 | ONT-EXP-003903 | JTX | | | | |
| 313 | | 12/31/2019 | Sequencing for anyone, anywhere: Oxford Nanopore sequencing is now being used in nearly 100 countries, https://nanoporetech.com/# | | | A, F, H, N, R | | | | |
| 314 | | 6/19/2017 | Comprehensive comparison of Pacific Biosciences and Oxford Nanopore Technologies and their applications to transcriptome analysis [version 2; peer review: 2 approved], F1000 Research, https://f1000research.com/articles/6-100 | | | A, F, H, N, R | | | | |
| 315 | | 00/00/2016 | Sebastian Magierowski, Yiyun Huang, Chengjie Wang and Ebrahim Ghafar-Zadeh, Review, "Nanopore-CMOS Interfaces for DNA Sequencing," Biosensors, 2016, 6, 42 | PCB-DE-1029631 | PCB-DE-1029658 | JTX | | | | |
| 316 | OAEO | 5/5/2011 | Oxford Nanopore Technologies, Technical Review Chip Development | ONT_DEL00130486 | ONT_DEL00130553 | A, F, H, R | | | | |
| 317 | OAEO | 7/4/2011 | Oxford Nanopore Technologies, Technical Review Chip Development | ONT_DEL00133852 | ONT_DEL00133886 | A, F, H, R | | | | |
| 318 | | 00/00/2017 | Chengjie Wang, Zhongpan Wu, Ebrahim Ghafar-Zadeh, and Sebastian Magierowski, "Embedded CMOS Bioinformatics for Nanopore Sequencers, 2017 IEEE 30th Canadian Conference on Electrical and Computer Engineering (CCECE) | PCB-DE-1029680 | PCB-DE-1029683 | A, F, H, R | | | | |
| 319 | | 7/13/2018 | Franka J. Rang, Wigard P. Kloosterman and Jeroen de Ridder, "From Squiggle to basepair: computational approaches for improving nanopore sequencing read accuracy," Genome Biology (2018) 19:90 | PCB-DE-1029659 | PCB-DE-1029669 | JTX | | | | |
| 320 | | 7/13/2018 | Franka J. Rang, Wigard P. Kloosterman and Jeroen de Ridder, "From Squiggle to basepair: computational approaches for improving nanopore sequencing read accuracy," Genome Biology (2018) 19:90 [Fair Depo Ex. 6] | PCB-DE-1029659 | PCB-DE-1029669 | D | | | | |
| 321 | | 10/00/2015 | Chung-Lun Hsu, Haowei Jiang, A.G. Venkatesh and Drew A. Hall, "A Hybrid Semi-Digital Transimpedance Amplifier with Noise Cancellation Technique for Nanopore-Based DNA Sequencing," 2015 IEEE Transactions on Biomedical Circuits and Systems, Vol 9, No. 5 | PCB-DE-1029670 | PCB-DE-1029679 | A, F, H, R | | | | |
| 322 | | | U.S. Patent Application Publication No. 2018/0143178 | | | A, F, H, N, R | | | | |
| 323 | | 00/00/2013 | Silicon Labs, Improving ADC Resolution By Oversampling And Averaging, AN118, Rev. 1.3 7/13 | PCB-DE-1030235 | PCB-DE-1030255 | A, F, H, R | | | | |
| 324 | OAEO | | Oxford Nanopore Technologies, ASIC OP4 (and OP3) | ONT_DEL00092499 | ONT_DEL00092552 | A, F, H, R | | | | |
| 325 | | 00/00/2014 | Adrian Balan, Bartholomeus Machielse, David Niedzwiecki, Jianxun Lin, Peijie Ong, Rebecca Engelke, Kenneth L. Shepard and Marija Drndic, "Improving Signal-to-Noise Performance for DNA Translocation in Solid-State Nanopores at MHz Bandwidths," Nano Letters, 2014, 14, 7215-7220 | PCB-DE-1030273 | PCB-DE-1030278 | A, F, H, R | | | | |
| 326 | | 00/00/2012 | Dongsoo Kim, Brian Goldstein, Wei Tang, Fred J. Sigworth and Eugenio Culurciello, "Boise Analysis and Performance Comparison of Low Current Measurement Systems for Biomedical Applications," IEEE Transactions on Biomedical Circuits and Systems | PCB-DE-1030288 | PCB-DE-1030298 | A, F, H, R | | | | |
| 327 | OAEO | 5/26/2016 | Oxford Nanopore Technologies, Inside the SkunkWorx | ONT_DEL00023481 | ONT_DEL00023533 | A, F, H, R | | | | |
| 328 | OAEO | 5/26/2016 | Oxford Nanopore Technologies, Inside the SkunkWorx [Brown Depo. Ex. 16] | ONT_DEL00023481 | ONT_DEL00023533 | A, D, F, H, R | | | | |
| 329 | OAEO | | Oxford Nanopore Technologies, 2018 London Calling, Clive Brown CTO, Live, unmedicated and unsupervised | ONT_DEL00202634 | ONT_DEL00202708 | A, F, H, R | | | | |
| 330 | OAEO | 3/14/2017 | Oxford Nanopore Technologies, [ Clive's Title ], Google Hangout | ONT_DEL00202782 | ONT_DEL00202843 | A, F, H, R | | | | |
| 331 | OAEO | 10/18/2018 | Oxford Nanopore Technologies, Nanopore accuracy: overtaking the competition | ONT_DEL00203921 | ONT_DEL00203921 | A, F, H, R | | | | |
| 332 | OAEO | 00/00/2018 | Oxford Nanopore Technologies, [ Clive's Talk Title ] | ONT_DEL00427886 | ONT_DEL00427962 | A, F, H, R | | | | |
| 333 | | 5/26/2016 | Oxford Nanopore Technologies, Inside the SkunkWorx video, Clive Brown, CTO | PCB-DE-1029260 | PCB-DE-1029260 | A, F, H, R | | | | |
| 334 | | 5/26/2016 | Oxford Nanopore Technologies, Inside the SkunkWorx video transcription, Clive Brown, CTO | | | A, B, F, H, N, R | | | | |
| 335 | | 12/1/2016 | Oxford Nanopore Technologies, "...we need a better name than follow through..." video, Clive Brown CTO | PCB-DE-1029261 | PCB-DE-1029261 | A, F, H, R | | | | |
| 336 | | 00/00/2017 | Oxford Nanopore Technologies, Some mundane and incremental updates video, London Calling 2017, Clive Brown CTO | PCB-DE-1029262 | PCB-DE-1029262 | A, F, H, R | | | | |
| 337 | | 00/00/2017 | Oxford Nanopore Technologies, Some mundane and incremental updates video transcription, London Calling 2017, Clive Brown CTO | | | A, B, F, H, N, R | | | | |
| 338 | OAEO | 12/4/2008 | Benjamin Flusberg Notebook No. 288 [Turner Depo Ex. 5] | PCB-DE-0018719 | PCB-DE-0018922 | JTX | | | | |
| 339 | OAEO | 12/4/2008 | Benjamin Flusberg Notebook No. 288 [Flusberg Depo Ex. 14] | PCB-DE-0018719 | PCB-DE-0018922 | D | | | | |
| 340 | | | Withdrawn | | | | | | | |
| 341 | | | Withdrawn | | | | | | | |
| 342 | | | Withdrawn | | | | | | | |
| 343 | | | Withdrawn | | | | | | | |
| 344 | | | Withdrawn | | | | | | | |
| 345 | | | Withdrawn | | | | | | | |
| 346 | | | Withdrawn | | | | | | | |
| 347 | | | Withdrawn | | | | | | | |
| 348 | | | Withdrawn | | | | | | | |
| 349 | | | Withdrawn | | | | | | | |
| 350 | | | Withdrawn | | | | | | | |
| 351 | | | Withdrawn | | | | | | | |
| 352 | | | Withdrawn | | | | | | | |
| 353 | | | Withdrawn | | | | | | | |
| 354 | | | Withdrawn | | | | | | | |
| 355 | | | Withdrawn | | | | | | | |
| 356 | | | Withdrawn | | | | | | | |
| 357 | | | Withdrawn | | | | | | | |
| 358 | | | Withdrawn | | | | | | | |
| 359 | | | Withdrawn | | | | | | | |
| 360 | | | Withdrawn | | | | | | | |
| 361 | | 3/14/2016 | Response to Second Non-final Office Action, Application No. 14/026,906 [Goldman Depo. Ex. 4] | | | A, F, H, N, R | | | | |
| 362 | OAEO | 4/2/2008 | Email from S. Turner to B. Flusberg re clarification on fluid channel conductivity [Flusberg Depo Ex. 5] | PCB-DE-0025985 | PCB-DE-0025986 | JTX | | | | |
| 363 | | | Withdrawn | | | | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 364 | | | Withdrawn | | | | | | | |
| 365 | OAEO | 1/12/2009 | Email from S. Turner to J. Korlach and B. Flusberg re Oxford nanopore [Flusberg Depo Ex. 8] | PCB-DE-0042624 | PCB-DE-0042625 | JTX | | | | |
| 366 | OAEO | 1/19/2009 | Email from S. Turner to B. Flusberg re a different protein for nanopores [Flusberg Depo Ex. 9] | PCB-DE-0043019 | PCB-DE-0043019 | JTX | | | | |
| 367 | OAEO | 1/26/2009 | Email from B. Flusberg to S. Turner re nanopore IP [Flusberg Depo Ex. 10] | PCB-DE-0044687 | PCB-DE-0044687 | JTX | | | | |
| 368 | OAEO | 2/27/2009 | Email from B. Flusberg to S. Turner re question about bubbles in nanopores [Flusberg Depo Ex. 11] | PCB-DE-0044839 | PCB-DE-0044839 | JTX | | | | |
| 369 | OAEO | 6/12/2009 | Email from B. Flusberg to S. Turner re Summary of document + preliminary analysis [Flusberg Depo Ex. 12] | PCB-DE-0048986 | PCB-DE-0048986 | JTX | | | | |
| 370 | CONF BUSINESS INFO SUBJECT TO PO | 6/12/2009 | Email from B. Flusberg to S. Turner re additional nanopore note [Flusberg Depo Ex. 13] | PCB-ONT-ITC-0142153 | PCB-ONT-ITC-0142153 | JTX | | | | |
| 371 | OAEO | 3/31/2008 | Benjamin Flusberg Notebook No. 1 [Flusberg Depo Ex. 15] | PCB-DE-0018522 | PCB-DE-0018718 | JTX | | | | |
| 372 | | | Withdrawn | | | | | | | |
| 373 | | | Withdrawn | | | | | | | |
| 374 | | 1/2/2009 | John Eid et al, "Real Time DNA Sequencing from Single Polymerase Molecules," Science, Vol 323, 133-137 [Maxham Depo Ex. 4] | | | JTX | | | | |
| 375 | | | Withdrawn | | | | | | | |
| 376 | | | Withdrawn | | | | | | | |
| 377 | | | Withdrawn | | | | | | | |
| 378 | | | Withdrawn | | | | | | | |
| 379 | | | Withdrawn | | | | | | | |
| 380 | | | Withdrawn | | | | | | | |
| 381 | | | Withdrawn | | | | | | | |
| 382 | | | Withdrawn | | | | | | | |
| 383 | | | Withdrawn | | | | | | | |
| 384 | | | Withdrawn | | | | | | | |
| 385 | CONF BUSINESS INFO SUBJECT TO PO | 3/9/2009 | Email from T. Rard to A. Fehr and S. Turner re Pacific Biosciences - poster & talk abstract submission [Fehr Depo Ex. 6] | PCB-ONT-ITC-0065656 | PCB-ONT-ITC-0065656 | JTX | | | | |
| 386 | CONF BUSINESS INFO SUBJECT TO PO | 3/29/2009 | Sequencing Technology Development Grantee Meeting, Applying Single Molecule Real Time DNA Sequencing by Stephen W. Turner and Adrian Fehr [Fehr Depo Ex. 7] | PCB-ONT-ITC-0065657 | PCB-ONT-ITC-0065657 | JTX | | | | |
| 387 | | | Withdrawn | | | | | | | |
| 388 | | | Withdrawn | | | | | | | |
| 389 | | | Withdrawn | | | | | | | |
| 390 | | | Withdrawn | | | | | | | |
| 391 | OAEO | 4/1/2009 | Email from S. Turner to A. Fehr re Polymerase-assisted nanopore sequencing [Fehr Depo Ex. 15] | PCB-DE-0043358 | PCB-DE-0043358 | JTX | | | | |
| 392 | CONF BUSINESS INFO SUBJECT TO PO | 4/1/2009 | Email from M. Collins to S. Tuner and A. Fehr re Nanopores and possible employment [Fehr Depo Ex. 16] | PCB-ONT-ITC-0628745 | PCB-ONT-ITC-0628745 | JTX | | | | |
| 393 | | | Withdrawn | | | | | | | |
| 394 | | | Withdrawn | | | | | | | |
| 395 | | | Withdrawn | | | | | | | |
| 396 | | | Withdrawn | | | | | | | |
| 397 | | | Withdrawn | | | | | | | |
| 398 | | | Withdrawn | | | | | | | |
| 399 | | | Withdrawn | | | | | | | |
| 400 | | | Withdrawn | | | | | | | |
| 401 | | | Withdrawn | | | | | | | |
| 402 | | | Withdrawn | | | | | | | |
| 403 | | | Withdrawn | | | | | | | |
| 404 | | | Withdrawn | | | | | | | |
| 405 | | | Withdrawn | | | | | | | |
| 406 | | | Withdrawn | | | | | | | |
| 407 | | | Withdrawn | | | | | | | |
| 408 | | | Withdrawn | | | | | | | |
| 409 | | | Withdrawn | | | | | | | |
| 410 | | | Withdrawn | | | | | | | |
| 411 | | | Withdrawn | | | | | | | |
| 412 | Confidential AEO | | Notes from discussion with Sales Team [Keho Depo Ex. 2] | | | JTX | | | | |
| 413 | | | Withdrawn | | | | | | | |
| 414 | | | Withdrawn | | | | | | | |
| 415 | | | Withdrawn | | | | | | | |
| 416 | OAEO | | PacBio, What We Heard from Sales Presentation [Keho Depo Ex. 5] | PCB-DE-0876534 | PCB-DE-0876534 | JTX | | | | |
| 417 | OAEO | 12/6/2017 | Email from K. Keho to Vertical Marketing Team re Global sales meeting action items [Keho Depo Ex. 6] | PCB-DE-0880890 | PCB-DE-0880893 | JTX | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 418 | | | Withdrawn | | | | | | | |
| 419 | | | Withdrawn | | | | | | | |
| 420 | | | Withdrawn | | | | | | | |
| 421 | | | Withdrawn | | | | | | | |
| 422 | | | Withdrawn | | | | | | | |
| 423 | OAEO | 6/3/2015 | Email from J. Korlach to K. Keho et al. re Focus on Consensus Accuracy? [Keho Depo Ex. 12] | PCB-DE-0381125 | PCB-DE-0381127 | JTX | | | | |
| 424 | OAEO | 5/24/2018 | Email from M. Ashby to J. Korlach, W. Weise and K. Keho re: Interesting blog post about trouble with Minions [Keho Depo Ex. 13] | PCB-DE-0848354 | PCB-DE-0848356 | JTX | | | | |
| 425 | OAEO | 6/14/2018 | Email from K. Keho to K. Corcoran, W. Weise and M. Badgett re resurrections of long-read tagline - a plan? [Keho Depo Ex. 14] | PCB-DE-0898956 | PCB-DE-0898958 | JTX | | | | |
| 426 | | | Withdrawn | | | | | | | |
| 427 | | | Withdrawn | | | | | | | |
| 428 | | | Withdrawn | | | | | | | |
| 429 | | 3/13/2018 | PacBio, Accessing the Full Size-Spectrum of Human Genetic Variation Using PacBio Long-Read SMRT Sequencing on the Sequel System [Korlach Depo Ex. 4] | | | JTX | | | | |
| 430 | OAEO | 6/19/2015 | Email from J. Korlach to L. Hickey re Competitive Positioning - Human Applications [Korlach Depo Ex. 5] | PCB-DE-0381987 | PCB-DE-0381987 | JTX | | | | |
| 431 | | | Withdrawn | | | | | | | |
| 432 | | | Withdrawn | | | | | | | |
| 433 | | | Withdrawn | | | | | | | |
| 434 | OAEO | 11/1/2018 | Email from G. Fang to J. Korlach re Some feedback that might help [Korlach Depo Ex. 9] | PCB-DE-0878812 | PCB-DE-0878812 | JTX | | | | |
| 435 | | | Withdrawn | | | | | | | |
| 436 | CONF BUSINESS INFO SUBJECT TO PO | 11/12/2012 | Email from J. Korlach to S. Turner et al. re Oxford intel [Korlach Depo Ex. 11] | PCB-ONT-ITC-0097792 | PCB-ONT-ITC-0097795 | JTX | | | | |
| 437 | CONF BUSINESS INFO SUBJECT TO PO | | Pacific Biosciences, Understanding Accuracy in SMRT Sequencing [Korlach Depo Ex. 12] | PCB-ONT-ITC-0524153 | PCB-ONT-ITC-0524160 | JTX | | | | |
| 438 | | | Withdrawn | | | | | | | |
| 439 | OAEO | 6/27/2014 | Email from J. Korlach to Y. Tsai and NGAT Team Distribution group re A nanopore sequencing paper from the University of Washington [Korlach Depo Ex. 15] | PCB-DE-0340550 | PCB-DE-0340551 | JTX | | | | |
| 440 | | | Withdrawn | | | | | | | |
| 441 | | | Withdrawn | | | | | | | |
| 442 | | | Withdrawn | | | | | | | |
| 443 | | | Withdrawn | | | | | | | |
| 444 | | | Withdrawn | | | | | | | |
| 445 | | | Withdrawn | | | | | | | |
| 446 | | | Withdrawn | | | | | | | |
| 447 | | | Withdrawn | | | | | | | |
| 448 | | | Withdrawn | | | | | | | |
| 449 | | | Withdrawn | | | | | | | |
| 450 | | 3/29/2019 | Notice of Deposition Pursuant to Fed. R. Civ. P. 30(B)(6) to Plaintiff Pacific Biosciences of California, Inc. [Gong Depo Ex. 1] | | | JTX | | | | |
| 451 | | 11/2/2016 | Letter from E. Reines to Honorable L. Barton attaching Pacific Biosciences of California, Inc.'s Complaint and requesting Commission to commence investigation [Gong Depo Ex. 5] | | | JTX | | | | |
| 452 | OAEO | | Instruments, Consumables and Services Quarterly Numbers [Gong Depo Ex. 6] | PCB-DE-0987157 | PCB-DE-0987157 | JTX | | | | |
| 453 | | 12/31/2016 | Pacific Biosciences of California, Inc.'s Form 10-K, https://www.sec.gov/Archives/edgar/data/1299130/000129913017000016/pacb-20161231x10k.htm [Gong Depo Ex. 8] | PCB-DE-0985273 | PCB-DE-0985355 | JTX | | | | |
| 454 | OAEO | 2/23/2017 | Email from P. Kotturi to E. Hauw, et al. re Impact of price changes in January [Gong Depo Ex. 9] | PCB-DE-0888942 | PCB-DE-0888943 | JTX | | | | |
| 455 | | 9/27/2019 | Third Notice of Deposition Pursuant to Fed. R. Civ. P. 30(B)(6) to Plaintiff Pacific Biosciences of California, Inc. [Gong Depo Ex. 10] | | | JTX | | | | |
| 456 | | 8/2/2018 | Pacific Biosciences of California, Inc. NasdaqGS: PACB FQ2 2018 Earnings Call Transcripts [Gong Depo Ex. 11] | | | JTX | | | | |
| 457 | | | List of Competitive Discounts on Instruments and Lost Sales on Consumables [Gong Depo Ex. 12] | | | JTX | | | | |
| 458 | | | Withdrawn | | | | | | | |
| 459 | | | Withdrawn | | | | | | | |
| 460 | | | Withdrawn | | | | | | | |
| 461 | | | Withdrawn | | | | | | | |
| 462 | | | Withdrawn | | | | | | | |
| 463 | HC - OAEO | 7/29/2019 | Expert Report of Dr. Christophe Dessimoz [Dessimoz Depo Ex. 4] | | | JTX | | | | |
| 464 | | | Withdrawn | | | | | | | |
| 465 | | | Withdrawn | | | | | | | |
| 466 | HC - OAEO | 9/24/2019 | Rebuttal Expert Report of Nick Goldman, Ph.D. Regarding US Patent Nos. 9,546,400 and 9,772,323 [Goldman Depo Ex. 6] | | | JTX | | | | |
| 467 | HC - OAEO | 10/8/2019 | Expert Reply Report of Dr. Christophe Dessimoz [Dessimoz Depo Ex. 6] | | | JTX | | | | |
| 468 | | | Withdrawn | | | | | | | |
| 469 | | | Withdrawn | | | | | | | |
| 470 | HC - OAEO | 10/8/2019 | Reply Expert Report of Nick Goldman, Ph.D. Regarding US Patent Nos. 9,546,400 and 9,772,323 [Goldman Depo Ex. 16] | | | JTX | | | | |
| 471 | | 10/26/2008 | Daniel Branton, et al., "The potential and challenges of nanopore sequencing," NIH Public Manuscript, Nat Biotechnol., 2008 October, 26(10): 1146-1153 [Dessimoz Depo Ex. 10] | | | JTX | | | | |
| 472 | | 10/26/2008 | Daniel Branton, et al., "The potential and challenges of nanopore sequencing," NIH Public Manuscript, Nat Biotechnol., 2008 October, 26(10): 1146-1153 [Fair Depo Ex. 10] | | | JTX | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 473 | | | Withdrawn | | | | | | | |
| 474 | | | Withdrawn | | | | | | | |
| 475 | | 7/29/2019 | Expert Report of  Dr. Joshua P. Earl [Dessimoz Depo Ex. 13] | | | JTX | | | | |
| 476 | | | Withdrawn | | | | | | | |
| 477 | | | Withdrawn | | | | | | | |
| 478 | | | Withdrawn | | | | | | | |
| 479 | | | Withdrawn | | | | | | | |
| 480 | HC - OAEO | 9/24/2019 | Expert Rebuttal Report of Charles S. McHenry, Ph.D. [McHenry Depo Ex. 5] | | | JTX | | | | |
| 481 | HC - OAEO | 7/29/2019 | Expert Report of Dr. Charles McHenry [McHenry Depo Ex. 6] | | | JTX | | | | |
| 482 | HC - OAEO | 10/8/2019 | Expert Reply Report of Dr. Charles McHenry, Ph.D. [McHenry Depo Ex. 7] | | | JTX | | | | |
| 483 | | | Withdrawn | | | JTX | | | | |
| 484 | | | Withdrawn | | | | | | | |
| 485 | | | Withdrawn | | | | | | | |
| 486 | HC - OAEO | 10/8/2019 | Appendix B, Materials Considered List for Expert Reply Report of Dr. Richard Fair [Fair Depo Ex. 1] | | | JTX | | | | |
| 487 | HC - OAEO | 9/10/2019 | Appendix B, Materials Considered List for Expert Report of Dr. Richard Fair [Fair Depo Ex. 2] | | | JTX | | | | |
| 488 | HC - OAEO | 9/10/2019 | Expert Report of Dr. Richard Fair [Fair Depo Ex. 5] | | | JTX | | | | |
| 489 | HC - OAEO | 10/8/2019 | Expert Reply Report of Dr. Richard Fair [Fair Depo Ex. 7] | | | JTX | | | | |
| 490 | | 00/00/2010 | David Stoddart, Giovanni Maglia, Ellina Mikhailova, Andrew J. Heron and Hagan Bayley, "Multiple base-recognition sites in a biological nanopore - two heads are better than one," NIH Public Manuscript, Angew Chem Int Ed Engl. 2010, 49(3): 556-559 [Fair Depo Ex. 11] | | | JTX | | | | |
| 491 | HC - OAEO | 7/29/2019 | Expert Report of Stephen D. Prowse and Exhibits 1-7 [Prowse Depo. Ex. 1] | | | JTX | | | | |
| 492 | HC - OAEO | 7/29/2019 | Expert Report of Stephen D. Prowse and Exhibits 1-7 [Layne-Farrar Depo Ex. 3] | | | D | | | | |
| 493 | | | Withdrawn | | | | | | | |
| 494 | HC - OAEO | 9/24/2019 | Expert Rebuttal Report of Dr. Anne Layne-Farrar [Layne-Farrar Depo Ex. 1] | | | JTX | | | | |
| 495 | HC - OAEO | 10/24/2019 | Reply Expert Report of Stephen D. Prowse [Prowse Depo. Ex. 3] | | | JTX | | | | |
| 496 | | | Withdrawn | | | | | | | |
| 497 | | | Withdrawn | | | | | | | |
| 498 | | 5/13/2019 | Amended Notice of Deposition of James Brayer [Brayer Depo. Ex. 1] | | | JTX | | | | |
| 499 | OAEO | 00/00/2016 | Oxford Nanopore Technologies, Market Development [Brayer Depo. Ex. 2] | ONT_DEL0059525 | ONT_DEL0059534 | A, F, H | | | | |
| 500 | OAEO | 3/9/2017 | Oxford Nanopore Technologies, Market Development [Brayer Depo. Ex. 3] | ONT_DEL0060326 | ONT_DEL0060331 | A, F, H | | | | |
| 501 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, Gridion and Promethion, Instrument Sales and Certification for Service Providers [Brayer Depo. Ex. 4] | ONT_DEL0059912 | ONT_DEL0059918 | A, F, H | | | | |
| 502 | OAEO | | James Brayer Notebook [Brayer Depo. Ex. 5] | ONT_DEL0054632 | ONT_DEL0054712 | A, F, H | | | | |
| 503 | OAEO | 11/00/2017 | Oxford Nanopore Technologies, Performance Updates & Sales & Marketing Dev team [Brayer Depo. Ex. 6] | ONT_DEL0354204 | ONT_DEL0354209 | A, F, H | | | | |
| 504 | OAEO | | Oxford Nanopore Technologies, Porecamps and training bundles [Brayer Depo. Ex. 7] | ONT_DEL0162303 | ONT_DEL0162308 | A, F, H | | | | |
| 505 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 00/00/2015 | Oxford Nanopore Technologies, Commercial [Brayer Depo. Ex. 8] | ONTS.ITC.00044399 | ONTS.ITC.00044414 | A, F, H | | | | |
| 506 | OAEO | 9/24/2015 | Oxford Nanopore Technologies, Commercial Meeting [Brayer Depo. Ex. 9] | ONT_DEL0515478 | ONT_DEL0515518 | A, F, H | | | | |
| 507 | OAEO | 7/18/2018 | Email from L. Ludbrook to T. Bray et al. re Piper/PACB: Channel Checks Suggest Sequentially Higher Sequel Placements [Brayer Depo. Ex. 10] | ONT_DEL0058798 | ONT_DEL0058801 | A, F, H | | | | |
| 508 | OAEO | 7/18/2018 | Email from L. Ludbrook to T. Bray et al. re Piper/PACB: Channel Checks Suggest Sequentially Higher Sequel Placements | ONT_DEL0058798 | ONT_DEL0058801 | A, D, F, H | | | | |
| 509 | OAEO | 7/18/2018 | Email from L. Ludbrook to T. Bray et al. re Piper/PACB: Channel Checks Suggest Sequentially Higher Sequel Placements [Layne-Farrar Depo Ex. 13] | ONT_DEL0058798 | ONT_DEL0058801 | A, D, F, H | | | | |
| 510 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 11/22/2014 | Email from S. Willcocks to S. Brooking re MAP Wave 2.3 applicants for consideration [Brayer Depo. Ex. 11] | ONTS.ITC.00004176 | ONTS.ITC.00004178 | A, F, H | | | | |
| 511 | OAEO | | Excerpt from Excel Spreadsheet [Brayer Depo. Ex. 12] | | | JTX | | | | |
| 512 | OAEO | 5/20/2015 | Oxford Nanopore Technologies, MAP, Terms and Conditions [Brayer Depo. Ex. 13] | ONT_DEL0327090 | ONT_DEL0327103 | JTX | | | | |
| 513 | OAEO | 5/20/2015 | Oxford Nanopore Technologies, MAP, Terms and Conditions [Jensen Depo. Ex. 8] | ONT_DEL0327090 | ONT_DEL0327103 | D | | | | |
| 514 | OAEO | 5/20/2015 | Oxford Nanopore Technologies, MAP, Terms and Conditions [Willcocks Depo. Ex. 3] | ONT_DEL0327090 | ONT_DEL0327103 | D | | | | |
| 515 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 9/26/2014 | Email from S. Willcocks to C. Brown re MAP Publication - Brook Milligan (New Mexico State University) [Brayer Depo. Ex. 14] | ONTS.ITC.00004590 | ONTS.ITC.00004594 | A, F, H | | | | |
| 516 | OAEO | 5/15/2019 | Piper Jaffray, Industry Note, Life Science Tools, Oxford Nanopore's Pipeline Unveiled at London Calling [Brayer Depo. Ex. 15] | ONT_DEL0512943 | ONT_DEL0512947 | A, F, H, R | | | | |
| 517 | | 5/17/2019 | LinkedIn Page for Clive Brown [Brown Depo. Ex. 1] | | | A, F, H, N | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 518 | | 11/30/2017 | First Amended Complaint for Patent Infringement Exhibit 30, Respondents Oxford Nanopore Technologies Ltd., Oxford Nanopore Technologies, Inc., and Metrichor, Ltd.'s Response to Complainant Pacific Bioscience of California Inc.'s Petition for Review of Initial Determination Granting Summary Determination of Noninfringement dated August 7, 2017, C.A. No. 17-1353, Docket No. 13-30 [Brown Depo. Ex. 2] | | | A, F, H, MIL, R, U | | | | |
| 519 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 3/17/2010 | Oxford Nanopore Technologies, Board Meeting [Brown Depo. Ex. 3] | ONTS.ITC.00527249 | ONTS.ITC.00527256 | A, F, H | | | | |
| 520 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 03/00/2010 | Oxford Nanopore Technologies, March 2010 Board Meeting [Brown Depo. Ex. 4] | ONTS.ITC.00022727 | ONTS.ITC.00022770 | A, F, H | | | | |
| 521 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 11/16/2010 | Oxford Nanopore Technologies, Board Meeting 16 November 2010 [Brown Depo. Ex. 5] | ONTS.ITC.00527257 | ONTS.ITC.00527268 | A, F, H | | | | |
| 522 | | 02/00/2012 | Oxford Nanopore Technologies, Single Molecule 'strand' sequencing using protein nanopores and scalable electronic devices [Brown Depo. Ex. 6] | | | JTX | | | | |
| 523 | OAEO | 2/2/2014 | Email from C. Brown to S. Willcocks re are you confident that the new calls will be much better? [Brown Depo. Ex. 7] | ONT_DEL00064207 | ONT_DEL00064210 | A, F, H | | | | |
| 524 | OAEO | 2/2/2014 | Email from C. Brown to S. Willcocks re are you confident that the new calls will be much better? [Willcocks Depo. Ex. 11] | ONT_DEL00064207 | ONT_DEL00064210 | A, D, F, H | | | | |
| 525 | OAEO | 4/13/2016 | Email from S. Willcocks to C. Brown re small update [Brown Depo. Ex. 8] | ONT_DEL00067998 | ONT_DEL00067999 | A, F, H | | | | |
| 526 | OAEO | 4/13/2016 | Email from S. Willcocks to C. Brown re small update [Willcocks Depo. Ex. 13] | ONT_DEL00067998 | ONT_DEL00067999 | A, D, F, H | | | | |
| 527 | OAEO | 8/17/2017 | Email from J. Clarke to C. Brown re We need to fic our reference(s) [Brown Depo. Ex. 9] | ONT_DEL00074524 | ONT_DEL00074525 | A, F, H | | | | |
| 528 | OAEO | 2/6/2017 | Email from S. Willcocks to M. Micorescu et al. re Comprehensive comparison of Pacific Biosciences and Oxford Nanopore Technologies and their applications to transcriptome analysis [Brown Depo. Ex. 10] | ONT_DEL00189235 | ONT_DEL00189238 | A, F, H | | | | |
| 529 | OAEO | 2/6/2017 | Email from S. Willcocks to M. Micorescu et al. re Comprehensive comparison of Pacific Biosciences and Oxford Nanopore Technologies and their applications to transcriptome analysis [Willcocks Depo. Ex. 12] | ONT_DEL00189235 | ONT_DEL00189238 | A, D, F, H | | | | |
| 530 | OAEO | 9/19/2018 | Email from C. Brown to A. Heron et al. re We have a problem [Brown Depo. Ex. 11] | ONT_DEL00064350 | ONT_DEL00064350 | A, F, H | | | | |
| 531 | OAEO | 9/19/2018 | Email from C. Brown to A. Heron et al. re We have a problem | ONT_DEL00064350 | ONT_DEL00064350 | A, D, F, H | | | | |
| 532 | OAEO | 9/19/2018 | Email from C. Brown to A. Heron et al. re We have a problem [Layne-Farrar Depo. Ex. 12] | ONT_DEL00064350 | ONT_DEL00064350 | A, D, F, H | | | | |
| 533 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 10/29/2014 | Email from G. Sanghera to C. Brown and S. Willcocks re: PacBio's patent [Brown Depo. Ex. 12] | ONTS.ITC.00004332 | ONTS.ITC.00004333 | A, F, H, MIL, R | | | | |
| 534 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 10/29/2014 | Email from G. Sanghera to C. Brown and S. Willcocks re: PacBio's patent [Willcocks Depo. Ex. 6] | ONTS.ITC.00004332 | ONTS.ITC.00004333 | A, D, F, H, MIL, R | | | | |
| 535 | OAEO | | Fast Mode Technical Guide [Brown Depo. Ex. 13] | ONT_DEL00416639 | ONT_DEL00416644 | A, F, H | | | | |
| 536 | OAEO | | Fast Mode Technical Guide [Reid Depo. Ex. 19] | ONT_DEL00416639 | ONT_DEL00416644 | A, D, F, H | | | | |
| 537 | OAEO | 00/00/2015 | Oxford Nanopore Technologies, Owl Stretching with Examples + Clive Brown, London Calling 2015 [Brown Depo. Ex. 14] | ONT_DEL00014227 | ONT_DEL00014307 | A, F, H | | | | |
| 538 | | 00/00/2016 | Oxford Nanopore Technologies, London Calling - 2016 transcription [Brown Depo. Ex. 17] | | | A, B, F, H, N | | | | |
| 539 | | | Oxford Nanopore Technologies, Sequencing Chemistry, Single molecule consensus [Brown Depo. Ex. 19] | | | A, F, H, N | | | | |
| 540 | | 10/18/2018 | Oxford Nanopore Technologies, Nanopore accuracy; overtaking the competition [Brown Depo. Ex. 20] | ONT_DEL00202113 | ONT_DEL00202156 | A, F, H | | | | |
| 541 | | 11/30/2017 | First Amended Complaint for Patent Infringement Exhibit 30, Amendment and Response Pursuant to 37 C.F.R. §1.114 to Accompany a Request for Continued Examination dated December 17, 2014, C.A. No. 17-1353, Docket No. 13-30 [Brown Depo. Ex. 21] | | | A, F, H, R, U | | | | |
| 542 | | | LinkedIn Page for James Clarke [Clarke Depo. Ex. 1] | | | JTX | | | | |
| 543 | OAEO | 01/00/2018 | Oxford Nanopore Technologies, Organisation Chart [Clarke Depo. Ex. 2] | ONT_DEL00313507 | ONT_DEL00313511 | A, F, H | | | | |
| 544 | OAEO | 01/00/2018 | Oxford Nanopore Technologies, Organisation Chart [McDonald Depo. Ex. 3] | ONT_DEL00313507 | ONT_DEL00313511 | A, D, F, H | | | | |
| 545 | OAEO | | Advanced Research Movement Zumbador, Pore Sensitivity, Data analysis Algorithms, Platform Membrane, Chemistry Support [Clarke Depo. Ex. 3] | ONT_DEL00071872 | ONT_DEL00071876 | A, F, H | | | | |
| 546 | OAEO | | Advanced Research Movement Zumbador, Pore Sensitivity, Data analysis Algorithms, Platform Membrane, Chemistry Support [Willcocks Depo. Ex. 14] | ONT_DEL00071872 | ONT_DEL00071876 | A, D, F, H | | | | |
| 547 | OAEO | | Oxford Nanopore Technologies, Non Exponential Movement | ONT_DEL00196048 | ONT_DEL00196067 | A, F, H | | | | |
| 548 | OAEO | | Oxford Nanopore Technologies, Non Exponential Movement [Clarke Depo. Ex. 4] | ONT_DEL00196048 | ONT_DEL00196067 | A, D, F, H | | | | |
| 549 | OAEO | | Oxford Nanopore Technologies, Non Exponential Movement [Reid Depo. Ex. 15] | ONT_DEL00196048 | ONT_DEL00196067 | A, D, F, H | | | | |
| 550 | OAEO | | Oxford Nanopore Technologies, Non Exponential Movement [Reid Depo. Ex. 21] | ONT_DEL00196048 | ONT_DEL00196067 | A, D, F, H | | | | |
| 551 | OAEO | | Oxford Nanopore Technologies, Enzyme Movement [Clarke Depo. Ex. 6] | ONT_DEL00014354 | ONT_DEL00014368 | A, F, H | | | | |
| 552 | OAEO | | Oxford Nanopore Technologies, Enzyme Movement | ONT_DEL00014354 | ONT_DEL00014368 | A, D, F, H | | | | |

13

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 553 | OAEO | 3/8/2018 | Non-exponential Movement - Research - Oxford Nanopore's Wiki, https://wiki.oxfordnanolabs.local/pages/viewpage.action?spaceKey=RES&title=Non-exponential+M... [Clarke Depo. Ex. 8] | ONT_DEL00196068 | ONT_DEL00196073 | A, F, H | | | | |
| 554 | OAEO | 3/8/2018 | Non-exponential Movement - Research - Oxford Nanopore's Wiki, https://wiki.oxfordnanolabs.local/pages/viewpage.action?spaceKey=RES&title=Non-exponential+M... | ONT_DEL00196068 | ONT_DEL00196073 | A, D, F, H | | | | |
| 555 | | 3/8/2012 | Third Amended Complaint for Patent Infringement Exhibit 32, US Patent Application Publication No. 2012/0058468, C.A. No. 17-1353, Docket No. 113-32 [Clarke Depo. Ex. 9] | | | A, F, H, R, U | | | | |
| 556 | OAEO | | Oxford Nanopore's Technology, How does it work? [Clarke Depo. Ex. 10] | ONT_DEL00016423 | ONT_DEL00016447 | A, F, H | | | | |
| 557 | | 12/17/2014 | Third Amended Complaint for Patent Infringement Exhibit 31, Amendment and Response Pursuant to 37 C.F.R. §1.114 to Accompany a Request for Continued Examination, Application No. 13/147,159, C.A. No. 17-1353, Docket No. 113-31 [Clarke Depo. Ex. 11] | | | A, D, F, H, R, U | | | | |
| 558 | OAEO | | Oxford Nanopore Technologies, Nanopore News [Clarke Depo. Ex. 12] | ONT_DEL00203790 | ONT_DEL00203835 | A, F, H | | | | |
| 559 | OAEO | 8/8/2014 | Email from C. Brown to G. Sanghera re research meeting [Clarke Depo. Ex. 14] | ONT_DEL00067426 | ONT_DEL00067426 | A, F, H | | | | |
| 560 | OAEO | 11/13/2015 | Email from C. Brown to S. Willcocks and G. Sanghera re fwd: had a good catch up with andy yesterday [Clarke Depo. Ex. 15] | ONT_DEL00067608 | ONT_DEL00067608 | A, F, H | | | | |
| 561 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 12/2/2010 | Email from J. Clarke to D. Branton et al. re PacBio Nanopore Work [Clarke Depo. Ex. 16] | ONTS.ITC.00610433 | ONTS.ITC.00610433 | A, F, H, MIL, R | | | | |
| 562 | | 05/17/2019 | LinkedIn Page for Rosemary Dokos [Dokos Depo. Ex. 1] | | | A, F, H, N | | | | |
| 563 | | 04/05/2019 | Defendants Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd.'s Objections and Responses to Plaintiff Pacific Biosciences of California, Inc.'s First Notice of Deposition Pursuant to Federal Rule of Civil Procedure 30(B)(6) [Dokos Depo. Ex. 2] | | | JTX | | | | |
| 564 | Confidential Filed Under Seal | 04/25/2018 | Oxford's Answer, Defenses, and Counterclaims to PacBio's Second Amended Complaint for Patent Infringement, C.A. No. 17-1353, Docket No. 64 [Dokos Depo. Ex. 3] | | | A, F, H, MIL, R, U | | | | |
| 565 | OAEO | 00/00/2018 | Oxford Nanopore Technologies, 1D2 2018 Relaunch [Dokos Depo. Ex. 4] | ONT_DEL00199001 | ONT_DEL00199018 | A, F, H | | | | |
| 566 | OAEO | 06/00/2018 | Oxford Nanopore Technologies, June 2018 [Dokos Depo. Ex. 5] | ONT_DEL00511072 | ONT_DEL00511186 | A, F, H | | | | |
| 567 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, How do the Unique Features of Nanopore Map Across the Needs of Different Market Segments? Are nanopore features: Groundbreaking - very important - good to have - not required [Dokos Depo. Ex. 6] | ONT_DEL00235687 | ONT_DEL00235701 | A, F, H | | | | |
| 568 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, How do the Unique Features of Nanopore Map Across the Needs of Different Market Segments? Are nanopore features: Groundbreaking - very important - good to have - not required [Dokos Depo. Ex. 7] | ONT_DEL00235687 | ONT_DEL00235701 | A, D, F, H | | | | |
| 569 | OAEO | 05/00/2018 | Oxford Nanopore Technologies, Global Sales Meeting [Dokos Depo. Ex. 7] | ONT_DEL00145073 | ONT_DEL00145107 | A, F, H | | | | |
| 570 | OAEO | 05/00/2018 | Oxford Nanopore Technologies, Global Sales Meeting | ONT_DEL00145073 | ONT_DEL00145107 | A, D, F, H | | | | |
| 571 | OAEO | 05/00/2018 | Oxford Nanopore Technologies, Global Sales Meeting [Layne-Farrar Depo Ex. 11] | ONT_DEL00145073 | ONT_DEL00145107 | A, D, F, H | | | | |
| 572 | OAEO | 5/3/2017 | Email from J. Pugh to R. Dokos re [JIRA] (HELP-1259) DuPont PromethION runs with low open pore and low accuracy from basecall [Dokos Depo. Ex. 8] | ONT_DEL00081038 | ONT_DEL00081038 | A, F, H | | | | |
| 573 | OAEO | 12/19/2017 | Email from Unspecified Sender to M. Miyamoto and J. Pugh re: Some comments from David Eccles [Dokos Depo. Ex. 9] | ONT_DEL00076715 | ONT_DEL00076719 | A, F, H | | | | |
| 574 | | 01/25/2019 | Omics! Omics! A computational biologist's personal views on new technologies & publications on genomics & proteomics and their impact on drug discovery, omicsomics.blogspot.com/2019/01/2019-tech-speculations-oxford-nanopore.html#more [Dokos Depo. Ex. 10] | | | A, F, H, N | | | | |
| 575 | OAEO | 6/8/2017 | Email from A. Thielen to R. Dokos re 1D^2 Amplicon sequencing [Dokos Depo. Ex. 11] | ONT_DEL00415822 | ONT_DEL00415828 | A, F, H | | | | |
| 576 | OAEO | 9/19/2018 | Email from L. Ludbrook to R. Dokos re We have a problem [Dokos Depo. Ex. 12] | ONT_DEL00085132 | ONT_DEL00085133 | A, F, H | | | | |
| 577 | OAEO | 1/12/2017 | Oxford Nanopore Technologies, Sales & Market Dev [Dokos Depo. Ex. 13] | ONT_DEL00374331 | ONT_DEL00374366 | A, F, H | | | | |
| 578 | OAEO | 1/12/2017 | Oxford Nanopore Technologies, Sales & Market Dev [Layne-Farrar Depo Ex. 10] | ONT_DEL00374331 | ONT_DEL00374366 | A, D, F, H | | | | |
| 579 | OAEO | 1/29/2019 | Oxford Nanopore Technologies, Production Jan 29th 2019 [Dokos Depo. Ex. 14] | ONT_DEL00132291 | ONT_DEL00132335 | A, F, H | | | | |
| 580 | OAEO | 7/11/2018 | Email from S. Juul to E. Cooper re SF interviews and job offer [Jensen Depo. Ex. 1] | ONT_DEL00061267 | ONT_DEL00061263 | A, F, H | | | | |
| 581 | OAEO | 12/14/2017 | Email from J. Lloyd to S. Juul re [confluence] Product Management > Fishmongers [Jensen Depo. Ex. 2] | ONT_DEL00062830 | ONT_DEL00062832 | A, F, H, R | | | | |
| 582 | OAEO | 8/12/2015 | Email from D. Turner to S. Juul re Slides [Jensen Depo. Ex. 3] | ONT_DEL00018220 | ONT_DEL00018223 | A, F, H | | | | |
| 583 | OAEO | 9/3/2015 | Oxford Nanopore Technologies, Applying the MinION: Microbial Genomics and Complex Metagenomics [Jensen Depo. Ex. 4] | ONT_DEL00018241 | ONT_DEL00018279 | A, F, H | | | | |
| 584 | OAEO | 09/00/2016 | Oxford Nanopore Technologies, MinION applications: Microbial genomics and direct RNA sequencing [Jensen Depo. Ex. 5] | ONT_DEL00189895 | ONT_DEL00189946 | A, F, H | | | | |
| 585 | | 5/17/2019 | LinkedIn Page for Tim Massingham [Massingham Depo. Ex. 1] | | | A, F, H, N | | | | |
| 586 | OAEO | 9/27/2016 | Jiajie Zhang, Chris Wright, Clive Brown and Tim Massingham, "Decoding nanopore signals using recurrent neural networks," Nanopore Basecaller [Massingham Depo. Ex. 2] | ONT_DEL00417209 | ONT_DEL00417213 | A, F, H | | | | |
| 587 | | | Basecall 1D - Creation Order NOT Tracked [Massingham Depo. Ex. 4] | | | A, F, H, N | | | | |
| 588 | | | Basecall Fast5 read [Massingham Depo. Ex. 5] | | | A, F, H, N | | | | |
| 589 | | | Read2.fast5 file in program HDFView [Massingham Depo. Ex. 6] | | | A, F, H, N | | | | |
| 590 | | | Event log for fast5_reads [Massingham Depo. Ex. 7] | | | A, F, H, N | | | | |
| 591 | | | Event log for read7.fast5 [Massingham Depo. Ex. 8] | | | A, F, H, N | | | | |
| 592 | | | Model of read7.fast5 [Massingham Depo. Ex. 9] | | | A, F, H, N | | | | |
| 593 | | | Event log for read7.fast5 [Massingham Depo. Ex. 10] | | | A, F, H, N | | | | |
| 594 | | | Model of read7.fast5 [Massingham Depo. Ex. 11] | | | A, F, H, N | | | | |
| 595 | | | Read7.fast5 file in program HDFView [Massingham Depo. Ex. 12] | | | A, F, H, N | | | | |
| 596 | OAEO | | Read7.fast5 file in program HDFView [Massingham Depo. Ex. 13] | | | A, F, H, N | | | | |
| 597 | OAEO | 12/00/2017 | Oxford Nanopore Technologies, HR Overview [McDonald Depo. Ex. 2] | ONT_DEL00169127 | ONT_DEL00169136 | A, F, H | | | | |
| 598 | OAEO | | Ownership Structure: Oxford Nanopore Technologies Limited chart [McDonald Depo. Ex. 3] | ONT_DEL00554876 | ONT_DEL00554876 | A, F, H | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 599 | | 4/5/2019 | Defendants Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd.'s Objections and Responses to Plaintiff Pacific Biosciences of California, Inc.'s First Notice of Deposition Pursuant to Federal Rule of Civil Procedure 30(B)(6) Topic Nos. 1-45 [McDonald Depo. Ex. 5] | | | A, F, H, R, U | | | | |
| 600 | | 4/5/2019 | Defendants Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd.'s Objections and Responses to Plaintiff Pacific Biosciences of California, Inc.'s First Notice of Deposition Pursuant to Federal Rule of Civil Procedure 30(B)(6) Topic Nos. 1-45 [Reid Depo. Ex. 1] | | | D | | | | |
| 601 | | 01/00/2019 | FTI Consulting, Oxford Nanopore Technologies -- Proposed transfer pricing polices for sales related functions, DRAFT [McDonald Depo. Ex. 6] | ONT_DEL00361300 | ONT_DEL00361329 | A, F, H | | | | |
| 602 | OAEO | 00/00/2018 | Geographical breakdown for 2018, Global Monthly Breakdown for 2018 [McDonald Depo. Ex. 7] | ONT_DEL00556057 | ONT_DEL00556057 | A, F, H | | | | |
| 603 | OAEO | | Oxford Nanopore Technologies, Invoiced lines 15-18 spreadsheet [McDonald Depo. Ex. 8] | ONT_DEL00536128 | ONT_DEL00536128 | A, F, H | | | | |
| 604 | OAEO | | Oxford Nanopore Technologies, Invoiced lines 15-18 spreadsheet [Cowper Depo. Ex. 15] | ONT_DEL00536128 | ONT_DEL00536128 | A, D, F, H | | | | |
| 605 | OAEO | 8/23/2017 | Distribution Agreement by and between Oxford Nanopore Technologies, Ltd. and Nanodigmbio [McDonald Depo. Ex. 9] | ONT_DEL00285343 | ONT_DEL00285394 | A, F, H, R | | | | |
| 606 | Highly Conf - OAEO | 4/30/2019 | Defendants Oxford Nanopore Technologies, Inc.'s Second Supplemental Responses to Plaintiff Pacific Biosciences of California, Inc.'s First Set of Interrogatories (No. 1) and Its Third Supplemental Response to Plaintiff's First Set of Interrogatories (No. 5) [McDonald Depo. Ex. 11] | | | A, F, H, R, U | | | | |
| 607 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 2/10/2015 | Email from S. Willcocks to M. Andrews et al. re PacBio nanopore related patent [McDonald Depo. Ex. 12] | ONTS.ITC.00762348 | ONTS.ITC.00762350 | A, F, H, MIL, R | | | | |
| 608 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 2/10/2015 | Email from S. Willcocks to M. Andrews et al. re PacBio nanopore related patent [Sanghera Depo. Ex. 10] | ONTS.ITC.00762348 | ONTS.ITC.00762350 | A, D, F, H, MIL, R | | | | |
| 609 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 2/10/2015 | Email from S. Willcocks to M. Andrews et al. re PacBio nanopore related patent [Willcocks Depo. Ex. 7] | ONTS.ITC.00762348 | ONTS.ITC.00762350 | A, D, F, H, MIL, R | | | | |
| 610 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, Product Development Pipeline [McDonald Depo. Ex. 13] | ONT_DEL00235642 | ONT_DEL00235686 | A, F, H | | | | |
| 611 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, Product Development Pipeline | ONT_DEL00233621 | ONT_DEL00233686 | A, D, F, H | | | | |
| 612 | OAEO | 00/00/2018 | ONT Market Model, last mod 2018 spreadsheet [McDonald Depo. Ex. 14] | ONT_DEL00366361 | ONT_DEL00366361 | A, F, H | | | | |
| 613 | OAEO | 00/00/2018 | ONT Market Model, last mod 2018 spreadsheet | ONT_DEL00366361 | ONT_DEL00366361 | A, D, F, H | | | | |
| 614 | | 5/21/2019 | LinkedIn Page for Roger Pettett [Pettett Depo. Ex. 1] | | | A, F, H, N | | | | |
| 615 | OAEO | 00/00/2015 | Oxford Nanopore Technologies, Owl Stretching with Examples + Clive Brown, London Calling 2015 [Pettett Depo. Ex. 2] | ONT_DEL00009298 | ONT_DEL00009379 | A, F, H | | | | |
| 616 | OAEO | 00/00/2015 | Oxford Nanopore Technologies, Owl Stretching with Examples + Clive Brown, London Calling 2015 | ONT_DEL00009298 | ONT_DEL00009379 | A, D, F, H | | | | |
| 617 | OAEO | | Oxford Nanopore Technologies, Nanopore Accuracy, How to talk about it with notes [Pettett Depo. Ex. 4] | ONT_DEL00205066 | ONT_DEL00205099 | A, F, H | | | | |
| 618 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | | Extract for (Pacific Bio*) or PacificBio* for US 2009/32526 [Sanghera Depo. Ex. 5] | ONTS.ITC.00029657 | ONTS.ITC.00029692 | A, F, H, MIL, R | | | | |
| 619 | | | Withdrawn | | | | | | | |
| 620 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 7/19/2011 | Email from J. Clarke to G. Sanghera, S. Reid and G. Harper re PacBio [Sanghera Depo. Ex. 7] | ONTS.ITC.00117044 | ONTS.ITC.00117044 | A, F, H, MIL, R | | | | |
| 621 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 7/21/2011 | Email from G. Sanghera to C. Brown, S. Reid and S. Willcocks re: Patents [Sanghera Depo. Ex. 8] | ONTS.ITC00767700 | ONTS.ITC00767701 | A, F, H, MIL, R | | | | |
| 622 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 10/29/2014 | Email from G. Sanghera to C. Brown and S. Willcocks re: pacbio patent [Sanghera Depo. Ex. 9] | ONTS.ITC00004332 | ONTS.ITC00004333 | A, F, H, MIL, R | | | | |
| 623 | | 5/10/2019 | LinkedIn Page for Tim Cowper [Cowper Depo. Ex. 1] | | | A, F, H, N | | | | |
| 624 | OAEO | 09/00/2018 | Oxford Nanopore Technologies, Oxford Nanopore Board Update September 2018 [Cowper Depo. Ex. 2] | ONT_DEL00556158 | ONT_DEL00556158 | A, F, H | | | | |
| 625 | OAEO | | Oxford Nanopore Technologies, Income Statement spreadsheet [CORRECTED VERSION] [Cowper Depo. Ex. 3] | ONT_DEL00554712 | ONT_DEL00554712 | A, F, H | | | | |
| 626 | | 3/29/2019 | Plaintiffs' Second Amended Disclosure of Accused Products [Cowper Depo. Ex. 4] | | | JTX | | | | |
| 627 | OAEO | | Oxford Nanopore Technologies, MinION returns spreadsheet [Cowper Depo. Ex. 5] | ONT_DEL00122991 | ONT_DEL00122991 | A, F, H | | | | |
| 628 | | 5/20/2019 | Oxford Nanopore Technologies, Product Comparison, https://nanoporetech.com/products/comparison [Cowper Depo. Ex. 7] | | | A, F, H, N | | | | |
| 629 | OAEO | | Excerpt from Excel Spreadsheet - ONT P&L [Cowper Depo. Ex. 8] | ONT_DEL00554712 | ONT_DEL00554712 | A, D, F, H | | | | |
| 630 | OAEO | | Oxford Nanopore Technologies, Monthly Summary spreadsheet [Cowper Depo. Ex. 10] | ONT_DEL00556369 | ONT_DEL00556369 | A, F, H | | | | |
| 631 | OAEO | 11/15/2018 | Oxford Nanopore Technologies, Board Meeting Minutes [Cowper Depo. Ex. 13] | ONT_DEL00238834 | ONT_DEL00238837 | A, F, H | | | | |

15

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 632 | | 5/10/2019 | Defendant Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd.'s Objections and Responses to Plaintiff Pacific Biosciences of California, Inc.'s Second Notice of Deposition Pursuant to Federal Rule of Civil Procedure 30(B)(6) Topic Nos. 46-65 [Reid Depo. Ex. 2] | | | A, F, H, N, R | | | | |
| 633 | | 9/21/2012 | EP 3 269 825 A1 [Reid Depo. Ex. 3] | | | A, F, H, N, R | | | | |
| 634 | CONF - AEO | 03/29/2017 | Mini Deposition of Stuart Reid, USITC, 337-TA-1032 [Reid Depo. Ex. 4] | | | A, F, H, N | | | | |
| 635 | HC - OAEO | 05/28/2019 | Defendant Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd.'s Responses to Plaintiff Pacific Biosciences of California, Inc.'s Third Set of Interrogatories (Nos. 8-18) [Reid Depo. Ex. 6] | | | A, F, H, N, R, U | | | | |
| 636 | OAEO | 00/00/0000 | Oxford Nanopore Technologies, London Calling, Custom HMMs Designed for your biological context [Reid Depo. Ex. 7] | ONT_DEL00018366 | ONT_DEL00018385 | A, F, H | | | | |
| 637 | | | Github - Shell script, exampletraining.shell [Reid Depo. Ex. 8] | | | A, F, H, N | | | | |
| 638 | | | chunkify.py file [Reid Depo. Ex. 9] | | | A, F, H, N | | | | |
| 639 | HC - OAEO | 06/03/2019 | Defendant Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd.'s First Supplemental Response to Plaintiff Pacific Biosciences of California, Inc.'s Third Set of Interrogatories (No. 17) [Reid Depo. Ex. 10] | | | A, F, H, N, R, U | | | | |
| 640 | | | read1.fast5 file [Reid Depo. Ex. 11] | | | A, F, H, N | | | | |
| 641 | | | read7.fast5 file [Reid Depo. Ex. 12] | | | A, F, H, N | | | | |
| 642 | OAEO | | Oxford Nanopore Technologies, Enzyme Movement [Reid Depo. Ex. 22] | ONT_DEL00014394 | ONT_DEL00014406 | A, F, H | | | | |
| 643 | OAEO | | Oxford Nanopore Technologies, Enzyme Movement | ONT_DEL00014394 | ONT_DEL00014406 | A, D, F, H | | | | |
| 644 | OAEO | 2/11/2016 | Email from A. Heron to S. Willcocks and C. Brown re R&D&P overview [Reid Depo. Ex. 23] | ONT_DEL00190982 | ONT_DEL00190982 | A, F, H | | | | |
| 645 | OAEO | 2/11/2016 | Email from A. Heron to S. Willcocks and C. Brown re R&D&P overview | ONT_DEL00190982 | ONT_DEL00190982 | A, D, F, H | | | | |
| 646 | | | Oxford Nanopore Technologies, Fast Mode - technical guide for advanced users (NOT part of main tech guide) [Reid Depo. Ex. 25] | | | A, B, F, H, I, N | | | | |
| 647 | OAEO | | Letter from US Department of Homeland Security to Dr. James Peter Willcocks re I-129 Petition for Extension of L-1A Nonimmigrant Status [Willcocks Depo. Ex. 1] | ONT_DEL00299743 | ONT_DEL00299747 | A, F, H | | | | |
| 648 | | | Screenshot of Dr. Spike Willcocks' Bio from Oxford Nanopore's Website [Willcocks Depo. Ex. 2] | | | A, F, H, N | | | | |
| 649 | OAEO | 12/31/2017 | FTI Consulting, Oxford Nanopore Technologies -- BioScience Computation Disclosure Pack, Tab 10 [Willcocks Depo. Ex. 4] | ONT_DEL00381168 | ONT_DEL00381168 | A, F, H, R | | | | |
| 650 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 4/26/2012 | Patent Search Document [Willcocks Depo. Ex. 8] | ONTS.ITC.00029591 | ONTS.ITC.00029599 | A, F, H, MIL, R | | | | |
| 651 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 10/19/2015 | Patent Search Document [Willcocks Depo. Ex. 9] | ONTS.ITC.00029693 | ONTS.ITC.00029734 | A, F, H, MIL, R | | | | |
| 652 | OAEO | 11/4/2011 | Email from S. Willcocks to Z. McDougall re laying out nanopore IP to beginners [Willcocks Depo. Ex. 10] | ONT_DEL00295231 | ONT_DEL00295232 | A, F, H | | | | |
| 653 | OAEO | 11/1/2016 | Sublicense Agreement between Oxford Nanopore Technologies Limited and Ohio State Innovation Foundation [Willcocks Depo. Ex. 16] | ONT_DEL00500822 | ONT_DEL00500857 | A, F, H, R | | | | |
| 654 | OAEO | 5/26/2016 | License Agreement between Oxford Nanopore Technologies Limited and President and Fellows of Harvard College [Willcocks Depo. Ex. 17] | ONT_DEL00500858 | ONT_DEL00500887 | JTX | | | | |
| 655 | OAEO | 5/26/2016 | License Agreement between Oxford Nanopore Technologies Limited and President and Fellows of Harvard College [Layne-Farrar Depo Ex. 4] | ONT_DEL00500858 | ONT_DEL00500887 | D | | | | |
| 656 | OAEO | 12/20/2012 | Email from M. Akeson to S. Willcocks re ONT License Agreement with Mark Ups [Akeson Depo. Ex. 1] | ONT_DEL00377478 | ONT_DEL00377486 | A, F, H, R | | | | |
| 657 | OAEO | 10/23/2017 | Email from S. Willcocks to M. Akeson re New structural variant content from PacBio Akeson Depo. Ex. 2] | ONT_DEL00456602 | ONT_DEL00456605 | A, F, H, R | | | | |
| 658 | OAEO | 6/14/2017 | Email from J. Clarke to M. Akeson re Letter of support for NHGRI application [Akeson Depo. Ex. 3] | ONT_DEL00457535 | ONT_DEL00457537 | A, F, H, R | | | | |
| 659 | OAEO | 8/17/2011 | Email from M. Akeson to S. Willcocks re UCSC - ONT research [Akeson Depo. Ex. 4] | ONT_DEL00505755 | ONT_DEL00505757 | A, F, H, R | | | | |
| 660 | OAEO | 2/5/2016 | Email from M. Akeson to S. Willcocks re Can you fill me in on the timeline of inventions [Akeson Depo. Ex. 5] | ONT_DEL00377132 | ONT_DEL00377138 | A, F, H, R | | | | |
| 661 | | 8/30/2005 | U.S. Patent No. 6,936,433 (Akeson et al.) [Akeson Depo. Ex. 6] | | | A, F, H, R, U | | | | |
| 662 | | 5/24/2011 | U.S. Patent No. 7,947,454 (Akeson et al.) [Akeson Depo. Ex. 7] | | | A, F, H, R, U | | | | |
| 663 | | 11/21/2001 | Patent Application No. 09/990,102 [Akeson Depo. Ex. 8] | | | A, F, H, R, U | | | | |
| 664 | | 1/18/2000 | U.S. Patent No. 6,015,714 (Baldarelli et al.) [Akeson Depo. Ex. 9] | | | A, F, H, R, U | | | | |
| 665 | | 1/18/2000 | U.S. Patent No. 6,015,714 (Baldarelli et al.) [Goldman Depo. Ex. 19] | | | A, D, F, H, R, U | | | | |
| 666 | | 3/8/2012 | U.S. Patent Application Publication No. 2012/0058468 [Akeson Depo. Ex. 14] | | | A, F, H, R, U | | | | |
| 667 | OAEO | 2/12/2018 | First Witness Statement of James Anthony Clarke, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 [Akeson Depo. Ex. 15] | PCB-DE-0984099 | PCB-DE-0984118 | A, F, H, MIL, R, U | | | | |
| 668 | OAEO | 2/12/2018 | Confidential First Witness Statement of James Anthony Clarke, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984099 | PCB-DE-0984118 | A, D, F, H, MIL, R, U | | | | |
| 669 | | 5/28/2013 | U.S. Patent No. 8,452,546 (Lathrop) [Akeson Depo. Ex. 16] | ONT_DEL00012748 | ONT_DEL00012780 | JTX | | | | |
| 670 | Highly Conf - AEO | 10/8/2019 | Reply Expert Report of Mark Akeson, Ph.D. [Akeson Depo. Ex. 17] | | | JTX | | | | |
| 671 | | 6/8/2010 | U.S. Patent No. 7,731,826 (Hibbs et al.) [Akeson Depo. Ex. 18] | ONT_DEL00011977 | ONT_DEL00011990 | JTX | | | | |
| 672 | | 6/8/2010 | U.S. Patent No. 7,731,826 (Hibbs et al.) [Goldman Depo. Ex. 15] | ONT_DEL00011977 | ONT_DEL00011990 | D | | | | |
| 673 | | 7/11/2000 | U.S. Patent No. 6,087,099 (Gupte et al.) [Akeson Depo. Ex. 19] | ONT_DEL00011899 | ONT_DEL00011908 | JTX | | | | |
| 674 | | 6/30/2005 | U.S. Patent Application Publication No. 2005/0142559 [Akeson Depo. Ex. 20] | ONT_DEL00012205 | ONT_DEL00012230 | JTX | | | | |
| 675 | | 8/23/2007 | U.S. Patent Application Publication No. 2007/0196846 [Akeson Depo. Ex. 21] | | | JTX | | | | |
| 676 | | 8/23/2007 | U.S. Patent Application Publication No. 2007/0196846 [Ha Depo. Ex. 12] | | | D | | | | |
| 677 | | 7/29/2019 | Initial Expert Report of Mark Akeson, PH.D. [Akeson Depo. Ex. 22] | | | JTX | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 678 | | 4/22/2005 | Jung-Chi Liao, Yong-Joo Jeong, Dong-Eun Kim, Smita S. Patel and George Oster, "Mechanochemistry of T7 DNA Helicase," J. Mol. Biol (2005) 350, 452-475 [Akeson Depo. Ex. 23] | ONT_DEL00011591 | ONT_DEL00011614 | JTX | | | | |
| 679 | | 4/22/2005 | Jung-Chi Liao, Yong-Joo Jeong, Dong-Eun Kim, Smita S. Patel and George Oster, "Mechanochemistry of T7 DNA Helicase," J. Mol. Biol (2005) 350, 452-475 [Ha Depo. Ex. 8] | | | D | | | | |
| 680 | | 12/17/2014 | Amendment and Response Pursuant to 37 C.F.R. §1.114 to Accompany a Request for Continued Examination, Application No. 13/147,159 [Akeson Depo. Ex. 24] | | | A, D, F, H | | | | |
| 681 | | 12/17/2014 | Amendment and Response Pursuant to 37 C.F.R. §1.114 to Accompany a Request for Continued Examination, Application No. 13/147,159 [Hrdlicka Depo. Ex. 18] | | | A, D, F, H | | | | |
| 682 | | 3/13/2007 | U.S. Patent No. 7,189,503 (Akeson et al.) [Akeson Depo. Ex. 25] | | | A, F, H | | | | |
| 683 | | 3/13/2007 | U.S. Patent No. 7,189,503 (Akeson et al.) [Goldman Depo. Ex. 20] | | | A, D, F, H | | | | |
| 684 | | 3/13/2007 | U.S. Patent No. 7,189,503 (Akeson et al.) [Ha Depo. Ex. 15] | | | A, D, F, H | | | | |
| 685 | | 7/29/2011 | Provisional Application No. 13/147,159 [Akeson Depo. Ex. 26] | | | A, F, H | | | | |
| 686 | | 9/7/2018 | Declaration of Nick Goldman in Support of Defendant Oxford Nanopore Technologies, Inc. Opening Claim Construction Brief, C.A. No. 17-275, Docket No. 96 [Goldman Depo. Ex. 1] | | | JTX | | | | |
| 687 | Conf - AEO | 7/29/2019 | Initial Expert Report of Nick Goldman, PH.D. Regarding US Patent Nos. 9,546,400 and 9,772,323 [Goldman Depo. Ex. 5] | | | JTX | | | | |
| 688 | | 5/8/2017 | Oxford's Opening Brief in Support of Its Motion to Dismiss Pacbio's Complaint for patent Infringement on the Ground that the Asserted Claims Invalid Under 35 U.S.C. § 101, C.A. No. 17-275, Docket No. 10 [Goldman Depo. Ex. 7] | | | JTX | | | | |
| 689 | | 11/8/2017 | Transcript of Motion to Dismiss, C.A. No. 17-275, Docket No. 24 [Goldman Depo. Ex. 8] | | | JTX | | | | |
| 690 | | | Claim Chart attached to Akeson Grant Pages 56-75 [Goldman Depo. Ex. 10] | ONT-EXP-002082 | ONT-EXP-002101 | JTX | | | | |
| 691 | | 10/18/2019 | Deposition Transcript of Mark Akeson [Goldman Depo. Ex. 12] | | | A, F, H | | | | |
| 692 | | 10/18/2019 | Deposition Transcript of Mark Akeson [Hrdlicka Depo. Ex. 11] | | | D | | | | |
| 693 | | 7/26/2019 | Letter from Q. Ola to J. Fernandes re NIH FOIA Case Number: 51189 [Goldman Depo. Ex. 13] | ONT-EXP-002322 | ONT-EXP-002368 | JTX | | | | |
| 694 | | 6/21/2019 | Letter from L. Wyner to J. Fernandes re FOIA Case Number: 51188 [Goldman Depo. Ex. 14] | ONT-EXP-002370 | ONT-EXP-002411 | JTX | | | | |
| 695 | OAEO | 9/28/2015 | Email from S. Reid to C. Brown et al. re Long range context community post [Goldman Depo. Ex. 18] | ONT_DEL00369648 | ONT DEL00369651 | JTX | | | | |
| 696 | | 9/7/2018 | Declaration of Takijip Ha, Ph.D. in Support of Defendant Oxford Nanopore Technologies, Inc. Opening Claim Construction Brief, C.A. No. 17-275, Docket No. 95 [Ha Depo. Ex. 2] | | | JTX | | | | |
| 697 | | 9/25/2018 | Declaration of Takijip Ha, Ph.D. in Support of Petition for Inter Partes Review of U.S. Patent No. 9,678,056, IPR2018-01795 [Ha Depo. Ex. 3] | | | JTX | | | | |
| 698 | | 9/25/2018 | Declaration of Takijip Ha, Ph.D. in Support of Petition for Inter Partes Review of U.S. Patent No. 9,678,056, IPR2018-01795 [Ha Depo. Ex. 10] | | | D | | | | |
| 699 | | 8/20/2010 | Jeehae Park, Sua Myong, Anita Niedziela-Majka, Kyung Suk Lee, Jin Yu, Timothy M. Lohman and Takjip Ha, "PcrA Helicase Dismantles RecA Filaments by Reeling in DNA in Uniform Steps," Cell 142, 544-555 [Ha Depo. Ex. 4] | | | A, F, H | | | | |
| 700 | | 6/9/2006 | Exhibit GGG to Defendant Oxford Nanopore Technologies, Inc. Opening Claim Construction Brief, C.A. No. 17-275, Docket No. 95-4, Joshua L. Adelman, Yong-Joo Jeong, Jung-Chi Liao, Gayatri Patel, Dong-Eun Kim, George Oster and Smita S. Patel, "Mechanochemistry of Transcription Termination Factor Rho," Molecular Cell 22, 611-621 [Ha Depo. Ex. 5] | | | JTX | | | | |
| 701 | | 3/23/2006 | U.S. Patent Application Publication No. 2006/0063171 [Ha Depo. Ex. 6] | | | JTX | | | | |
| 702 | | 3/23/2006 | U.S. Patent Application Publication No. 2006/0063171 [Ha Depo. Ex. 7] | | | D | | | | |
| 703 | | 3/23/2006 | U.S. Patent Application Publication No. 2006/0063171 [Hrdlicka Depo. Ex. 4] | | | D | | | | |
| 704 | | 3/23/2006 | U.S. Patent Application Publication No. 2006/0063171 [Hrdlicka Depo. Ex. 10] | ONT_DEL00012286 | ONT_DEL00012312 | D | | | | |
| 705 | | 7/28/2019 | Exhibit BBB to Defendant Oxford Nanopore Technologies, Inc. Opening Claim Construction Brief, C.A. No. 17-275, Docket No. 95-1, Chart showing survey of the prior art at the time of the claimed invention re polymerase mediated synthesis process [Ha Depo. Ex. 7] | | | JTX | | | | |
| 706 | OAEO | 7/28/2019 | Initial Expert Report of Taekjip Ha, Ph.D. Regarding US Patent No. 9,678,056 [Ha Depo. Ex. 13] | | | JTX | | | | |
| 707 | Highly Conf - OAEO | 9/24/2019 | Rebuttal Expert Report of Taekjip Ha, Ph.D. Regarding US Patent No. 9,678,056 [Ha Depo. Ex. 14] | | | JTX | | | | |
| 708 | | 5/1/2008 | U.S. Patent Application Publication No. 2008/0102504 [Ha Depo. Ex. 16] | | | JTX | | | | |
| 709 | | 12/18/2003 | Patent Application No. 10/079,178 [Ha Depo. Ex. 17] | | | A, F, H | | | | |
| 710 | Highly Conf - AEO | 10/8/2019 | Reply Expert Report of Taekjip Ha, Ph.D. Regarding US Patent No. 9,678,056 [Ha Depo. Ex. 18] | | | JTX | | | | |
| 711 | | 3/13/2012 | U.S. Patent No. 8,133,672 (Bjornson et al.) [Ha Depo. Ex. 19] | | | JTX | | | | |
| 712 | | 9/24/2018 | Declaration of  Patrick Hrdlicka, Ph.D in Support of Petition for Inter Partes Review of U.S. Patent No. 9,738,929, IPR2018-01792 [Hrdlicka Depo. Ex. 2] | | | A, H, MIL | | | | |
| 713 | | 9/24/2018 | Declaration of  Patrick Hrdlicka, Ph.D in Support of Petition for Inter Partes Review of U.S. Patent No. 9,738,929, IPR2018-01792 [Hrdlicka Depo. Ex. 8] | ONT-EXP-002491 | ONT-EXP-002596 | A, D, H, MIL | | | | |
| 714 | | 9/7/2018 | Declaration of Patrick Hrdlicka, Ph.D. in Support of Defendant Oxford Nanopore Technologies, Inc. Opening Claim Construction Brief, C.A. No. 17-275, Docket No. 97 [Hrdlicka Depo. Ex. 3] | | | JTX | | | | |
| 715 | | 9/7/2018 | Declaration of Patrick Hrdlicka, Ph.D. in Support of Defendant Oxford Nanopore Technologies, Inc. Opening Claim Construction Brief, C.A. No. 17-275, Docket No. 97 [Hrdlicka Depo. Ex. 14] | | | D | | | | |
| 716 | Highly Conf - OAEO | 7/29/2019 | Initial Expert Report of Patrick Hrdlicka, Ph.D. Regarding U.S. Patent No. 9,738,929 [Hrdlicka Depo. Ex. 5] | | | JTX | | | | |
| 717 | Highly Conf - OAEO | 7/29/2019 | List of Materials Consider for Initial Expert Report of Patrick Hrdlicka, Ph.D. Regarding U.S. Patent No. 9,738,929 [Hrdlicka Depo. Ex. 6] | | | JTX | | | | |
| 718 | Highly Conf - OAEO | 10/8/2019 | Reply Expert Report of Patrick Hrdlicka, Ph.D. Regarding Invalidity of U.S. Patent No. 9,738,929 [Hrdlicka Depo. Ex. 9] | | | JTX | | | | |
| 719 | Highly Conf - OAEO | 9/24/2019 | Responsive Expert Report of Patrick Hrdlicka, Ph.D. Regarding Non-Infringement of U.S. Patent No. 9,738,929 [Hrdlicka Depo. Ex. 12] | | | JTX | | | | |
| 720 | | 10/23/2018 | Deposition Transcript of Patrick Hrdlicka, Ph.D. [Hrdlicka Depo. Ex. 15] | | | A, F, H | | | | |
| 721 | | 6/8/2017 | Declaration of Patrick Hrdlicka, Ph.D. in Support of Respondents Oxford Nanopore Technologies Ltd., Oxford Nanopore Technologies, Inc. and Metrichor, Ltd.'s Motion for Summary Determination of Noninfringement, USITC, 337-TA-1032 [Hrdlicka Depo. Ex. 16] | | | A, D, H, MIL, R | | | | |
| 722 | OAEO | 8/5/2010 | WO 2010/086622 A1 [Hrdlicka Depo. Ex. 17] | ONT_DEL00557083 | ONT_DEL00557156 | JTX | | | | |
| 723 | Highly Conf - OAEO | 9/24/2019 | Expert Rebuttal Report of Dr. Christophe Dessimoz [Hrdlicka Depo. Ex. 19] | | | JTX | | | | |
| 724 | Highly Conf - OAEO | 10/30/2019 | Supplemental Report of Dr. Anne Layne-Farrar [Layne-Farrar Depo Ex. 2] | | | JTX | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 725 | OAEO | 12/18/2015 | Amended and Restated License Agreement between Oxford Nanopore Technologies Ltd and the President and Fellows of Harvard College [Layne-Farrar Depo Ex. 5] | ONT_DEL00500888 | ONT_DEL00500924 | JTX | | | | |
| 726 | Confidential | 9/6/2018 | Oxford Nanopore Technologies Inc.'s Answer, Defenses, and Counterclaims to Plaintiff's First Amended Complaint for Patent Infringement, C.A. No. 17-275, Docket No. 89 [Layne-Farrar Depo Ex. 8] | | | JTX | | | | |
| 727 | OAEO | 6/7/2019 | Deposition Transcript of Rosemary Dokos [Layne-Farrar Depo Ex. 9] | | | A, F, H | | | | |
| 728 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 3/18/2016 | Oxford Nanopore Technologies, 'No thanks, I've already got one' [McDougall Depo Ex. 1] | ONTS.ITC.00000952 | ONTS.ITC.00000987 | A, F, H | | | | |
| 729 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 9/4/2016 | Oxford Nanopore Technologies, What's in a Squiggle? [McDougall Depo Ex. 2] | ONTS.ITC.00191629 | ONTS.ITC.00191655 | A, F, H | | | | |
| 730 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 8/9/2016 | Email from D. Turner to Z. McDougall and J. Evans re New protocol for accurate nanopore reads [McDougall Depo Ex. 3] | ONTS.ITC.00648126 | ONTS.ITC.00648132 | A, F, H | | | | |
| 731 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 2/11/2014 | Email from J. McDonald to M. Molinari re FW: Piper note [McDougall Depo Ex. 4] | ONTS.ITC.00066525 | ONTS.ITC.00066527 | A, F, H | | | | |
| 732 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 9/14/2015 | Email from E. White to Z. McDougall et al. re material for you to see, Nature Methods [McDougall Depo Ex. 5] | ONTS.ITC.00103891 | ONTS.ITC.00103895 | A, F, H | | | | |
| 733 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 11/00/2015 | Vivien Marx, "Nanopores: a sequencer in your backpack," Nature Methods, Vol. 12, No. 11 [McDougall Depo Ex. 6] | ONTS.ITC.00077873 | ONTS.ITC.00077876 | A, F, H | | | | |
| 734 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 5/18/2016 | Email from Z. McDougall to S. Brooking et al. re Nature REV Genetics paper in case you hadn't seen [McDougall Depo Ex. 7] | ONTS.ITC.00191819 | ONTS.ITC.00191820 | A, F, H | | | | |
| 735 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 12/3/2016 | Email from Z. McDougall to  bmlathbury re New York Nanopore Community Meeting [McDougall Depo Ex. 8] | ONTS.ITC.00712888 | ONTS.ITC.00712889 | A, F, H | | | | |
| 736 | OAEO | | Native Excel Spreadsheet | ONT_DEL00539133 | ONT_DEL00539133 | A, F, H | | | | |
| 737 | | | Oxford Nanopore Technologies, MinION Video | | | A, F, H, N | | | | |
| 738 | | | Oxford Nanopore Technologies, DNA Sequencing Method Video | | | A, F, H, N | | | | |
| 739 | | | Oxford Nanopore Technologies, PromethION Video | | | A, F, H, N | | | | |
| 740 | | 2/20/2013 | Pacific Biosciences, Overview of SMRT Technology Video, https://www.youtube.com/watch?v=WMZmG00uhwU | | | A, F, H, N | | | | |
| 741 | | 10/5/2015 | Pacific Biosciences, The Sequel System - The premier solution for SMRT Sequencing Video, https://www.youtube.com/watch?v=icicrZbtgYpS8 | | | A, F, H, N | | | | |
| 742 | OAEO | 10/00/2016 | Oxford Nanopore Technologies, CS Product Update | ONT_DEL00004048 | ONT_DEL00004092 | A, F, H | | | | |
| 743 | OAEO | 9/14/2016 | Oxford Nanopore Technologies, Oxford Nanopore Technologies Biochemical Processing Procedure, Document Number BP-346 | ONT_DEL00009466 | ONT_DEL00009470 | A, F, H | | | | |
| 744 | OAEO | 04/00/2015 | Oxford Nanopore Technologies, High Speed Movement | ONT_DEL00014021 | ONT_DEL00014043 | A, F, H | | | | |
| 745 | OAEO | 10/22/2015 | Oxford Nanopore Technologies, Fastmode | ONT_DEL00014182 | ONT_DEL00014190 | A, F, H | | | | |
| 746 | OAEO | | Oxford Nanopore Technologies, Enzyme Movement | ONT_DEL00014369 | ONT_DEL00014375 | A, F, H | | | | |
| 747 | OAEO | 1/9/2015 | Oxford Nanopore Technologies, Movement Research | ONT_DEL00014382 | ONT_DEL00014393 | A, F, H | | | | |
| 748 | OAEO | 00/00/2015 | Oxford Nanopore Technologies, Enzyme Movement | ONT_DEL00014407 | ONT_DEL00014420 | A, F, H | | | | |
| 749 | OAEO | 11/00/2015 | Oxford Nanopore Technologies, Enzyme Movement | ONT_DEL00014421 | ONT_DEL00014429 | A, F, H | | | | |
| 750 | OAEO | 1/22/2016 | Oxford Nanopore Technologies, Enzyme Movement | ONT_DEL00014450 | ONT_DEL00014458 | A, F, H | | | | |
| 751 | OAEO | 7/15/2016 | Oxford Nanopore Technologies, Movement Update | ONT_DEL00014459 | ONT_DEL00014474 | A, F, H | | | | |
| 752 | OAEO | 4/22/2016 | Oxford Nanopore Technologies, Enzyme Movement | ONT_DEL00014483 | ONT_DEL00014497 | A, F, H | | | | |
| 753 | OAEO | 2/26/2015 | Oxford Nanopore Technologies, Movement Research (AH) | ONT_DEL00014498 | ONT_DEL00014512 | A, F, H | | | | |
| 754 | OAEO | 8/23/2016 | Oxford Nanopore Technologies, Pore update | ONT_DEL00014778 | ONT_DEL00014790 | A, F, H | | | | |
| 755 | OAEO | 12/22/2015 | Email from O. Kuznetsova to S. Reid re [confluence] Product Documentation > Fast Mode - technical guide for advanced users | ONT_DEL00016520 | ONT_DEL00016527 | A, F, H | | | | |
| 756 | OAEO | 12/22/2015 | Email from A. Heron to C. Brown and L. Jayasinghe re hows it going ? | ONT_DEL00017254 | ONT_DEL00017255 | A, F, H | | | | |
| 757 | OAEO | 10/20/2015 | Oxford Nanopore Technologies, Sequencing Chemistry Review | ONT_DEL00022886 | ONT_DEL00022907 | A, F, H | | | | |
| 758 | OAEO | 2/12/2016 | Oxford Nanopore Technologies, R9.2 transfer | ONT_DEL00023339 | ONT_DEL00023356 | A, F, H | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 759 | OAEO | 6/14/2017 | Nanopore Project Update to ONT | ONT_DEL00036073 | ONT_DEL00036093 | A, F, H | | | | |
| 760 | OAEO | 10/22/2015 | Oxford Nanopore Technologies, Fastmode | ONT_DEL00147493 | ONT_DEL00147501 | A, F, H | | | | |
| 761 | OAEO | | Oxford Nanopore Technologies, Enzymes | ONT_DEL00156605 | ONT_DEL00156617 | A, F, H | | | | |
| 762 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, NS3 Movement | ONT_DEL00195773 | ONT_DEL00195788 | A, F, H | | | | |
| 763 | OAEO | 3/8/2016 | Event detection evaluation, part deux - Forrest Brennen - Oxford Nanopore's Wiki, https://wiki.oxfordnanolabs.local/display/~FBrennen/2015/07/27/Event+detection+evaluation,+part+deux | ONT_DEL00196038 | ONT_DEL00196047 | A, F, H | | | | |
| 764 | OAEO | 8/12/2011 | Oxford Nanopore Technologies, Assay Update | ONT_DEL00390458 | ONT_DEL00390474 | A, F, H | | | | |
| 765 | OAEO | | Second Expert Report of Gerald Zon Confidential Annex ¶¶ 110-141, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0983887 | PCB-DE-0983894 | A, F, H, MIL, S, R, U | | | | |
| 766 | OAEO | 03/00/2018 | Expert Report of Gerald Zon Confidential Annex ¶¶ 174-271, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0983895 | PCB-DE-0983916 | A, F, H, MIL, S, R, U | | | | |
| 767 | OAEO | 3/29/2018 | Expert Report of Christophe Dessimoz Confidential Annex ¶¶ 157-201, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0983917 | PCB-DE-0983925 | A, F, H, MIL, S, R, U | | | | |
| 768 | OAEO | | Exhibit GZ7, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0983926 | PCB-DE-0983926 | A, F, H, MIL, R, U | | | | |
| 769 | OAEO | 3/29/2018 | First Expert Report of Douglas R. Smith, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0983927 | PCB-DE-0984027 | A, F, H, MIL, S, R, U | | | | |
| 770 | OAEO | 4/18/2018 | Second Expert Report of Douglas R. Smith, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984028 | PCB-DE-0984043 | A, F, H, MIL, S, R, U | | | | |
| 771 | OAEO | 4/18/2018 | Second Expert Report of Andrea Marziali, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984044 | PCB-DE-0984054 | A, F, H, MIL, S, R, U | | | | |
| 772 | OAEO | 4/18/2018 | Confidential First Witness Statement of Dr James Philip White, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984055 | PCB-DE-0984060 | A, F, H, MIL, R, U | | | | |
| 773 | OAEO | 4/18/2018 | Confidential First Witness Statement of Dr Stuart William Reid, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984061 | PCB-DE-0984073 | A, F, H, MIL, R, U | | | | |
| 774 | OAEO | 3/15/2018 | Second Witness Statement of David Lawrence Wilson, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984074 | PCB-DE-0984086 | A, F, H, MIL, R, U | | | | |
| 775 | OAEO | 1/29/2018 | Second Witness Statement of Huw Nigel Evans, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984087 | PCB-DE-0984098 | A, F, H, MIL, R, U | | | | |
| 776 | OAEO | 6/8/2017 | $1D^2$ Process Description, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984119 | PCB-DE-0984129 | A, F, H, MIL, R, U | | | | |
| 777 | OAEO | | Confidential - Questions on the $1D^2$ Doc, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984130 | PCB-DE-0984134 | A, F, H, MIL, R, U | | | | |
| 778 | OAEO | 10/19/2017 | Amended $1D^2$ Process Description, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984135 | PCB-DE-0984149 | A, F, H, MIL, R, U | | | | |
| 779 | OAEO | | Confidential - Answers to Questions on the Amended $1D^2$ Process Description ("$1D^2$ PPD"), UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984150 | PCB-DE-0984154 | A, F, H, MIL, R, U | | | | |
| 780 | OAEO | 3/28/2018 | Statement of the Case on Infringement of the $1D^2$ Process, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984155 | PCB-DE-0984167 | A, F, H, MIL, R, U | | | | |
| 781 | OAEO | 10/17/2017 | 2D Product and Process Description, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984214 | PCB-DE-0984247 | A, F, H, MIL, R, U | | | | |
| 782 | OAEO | | Confidential Part 18 Request, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984284 | PCB-DE-0984287 | A, F, H, MIL, R, U | | | | |
| 783 | OAEO | 3/20/2018 | Claimant's Confidential Response to the Defendants' Confidential Part 18 Request Dated 16 February 2018 As Amended By The Order Of Mr Justice Norris Dated 20 March 2018, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984288 | PCB-DE-0984293 | A, F, H, MIL, R, U | | | | |
| 784 | OAEO | | Confidential Request For Further Information pursuant to CPR Part 18, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984294 | PCB-DE-0984296 | A, F, H, MIL, R, U | | | | |
| 785 | OAEO | | Oxford Nanopore Technologies, Dyes in duplexes | PCB-DE-0984297 | PCB-DE-0984299 | A, F, H, MIL, R, U | | | | |
| 786 | OAEO | | Confidential Annex 2, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984300 | PCB-DE-0984300 | A, F, H, MIL, R, U | | | | |
| 787 | OAEO | 10/00/2014 | Oxford Nanopore Technologies, E5 Stalling:BNA, Oct 2014, AH (movement group) | PCB-DE-0984301 | PCB-DE-0984311 | A, F, H, MIL, R, U | | | | |
| 788 | OAEO | | Confidential Annex 4, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984312 | PCB-DE-0984313 | A, F, H, MIL, R, U | | | | |
| 789 | OAEO | | Confidential Annex 5, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984314 | PCB-DE-0984315 | A, F, H, MIL, R, U | | | | |
| 790 | OAEO | 3/14/2018 | Defendants' Confidential Response to Confidential Request for Further Information Dated 14 March 2018, UK Litigation, Pacific Biosciences of California, Inc., and (1) Oxford Nanopore Technologies Limited (2) Metrichor Limited, Chancery Division Claim No. HP-2017-000008 | PCB-DE-0984316 | PCB-DE-0984326 | A, F, H, MIL, R, U | | | | |
| 791 | OAEO | 4/16/2018 | Letter from Carpmaels & Ransford LLP to Norton Rose Fulbright LLP re HP-2017-000008 - Pacific Biosciences of California, Inc. v Oxford Nanopore Technologies Ltd & Metrichor Limited | PCB-DE-0984327 | PCB-DE-0984333 | A, F, H, MIL, R, U | | | | |
| 792 | OAEO | 12/14/2018 | Oxford Nanopore Technologies, Pre-release of Stand Alone Guppy - Guppy v2.1.3 | ONT_DEL00497524 | ONT_DEL00497524 | A, F, H | | | | |
| 793 | OAEO | 8/7/2018 | Oxford Nanopore Technologies, Training process for basecallers | ONT_DEL00497535 | ONT_DEL00497535 | A, F, H | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 794 | OAEO | 4/6/2017 | Oxford Nanopore Technologies, Basecalling | ONT_DEL00497547 | ONT_DEL00497547 | A, F, H | | | | |
| 795 | OAEO | | Oxford Nanopore Technologies, 1D Neural Network Basecalling | ONT_DEL00498442 | ONT_DEL00498442 | A, F, H | | | | |
| 796 | OAEO | 2/15/2016 | Oxford Nanopore Technologies, Current-based neural network hand-over | ONT_DEL00498444 | ONT_DEL00498444 | A, F, H | | | | |
| 797 | OAEO | 2/21/2017 | Oxford Nanopore Technologies, RNA basecalling - further HMM and RNN training | ONT_DEL00498448 | ONT_DEL00498448 | A, F, H | | | | |
| 798 | OAEO | 6/3/2017 | Oxford Nanopore Technologies, Introduction to RNN basecaller training | ONT_DEL00498449 | ONT_DEL00498449 | A, F, H | | | | |
| 799 | OAEO | 2/1/2017 | Oxford Nanopore Technologies, Comparison of neural network activation functions | ONT_DEL00498450 | ONT_DEL00498450 | A, F, H | | | | |
| 800 | OAEO | 8/19/2016 | Oxford Nanopore Technologies, R9 2D RNN basecalling | ONT_DEL00498451 | ONT_DEL00498451 | A, F, H | | | | |
| 801 | OAEO | 7/6/2018 | Oxford Nanopore Technologies, Introduction, Soft neural network architecture | ONT_DEL00498454 | ONT_DEL00498454 | A, F, H | | | | |
| 802 | OAEO | | Oxford Nanopore Technologies, R9.4 E8 complement RNN | ONT_DEL00498456 | ONT_DEL00498456 | A, F, H | | | | |
| 803 | OAEO | 10/25/2016 | Oxford Nanopore Technologies, Training neural network models with Sloika | ONT_DEL00498457 | ONT_DEL00498457 | A, F, H | | | | |
| 804 | OAEO | 4/26/2016 | Oxford Nanopore Technologies, Basecalling Bias | ONT_DEL00498459 | ONT_DEL00498459 | A, F, H | | | | |
| 805 | OAEO | 10/25/2016 | Oxford Nanopore Technologies, Neural network (Current) JSON model format | ONT_DEL00498461 | ONT_DEL00498461 | A, F, H | | | | |
| 806 | OAEO | 10/25/2016 | Oxford Nanopore Technologies, 09 RNN training of R9.4 | ONT_DEL00498463 | ONT_DEL00498463 | A, F, H | | | | |
| 807 | OAEO | 8/26/2016 | Oxford Nanopore Technologies, Training and running a RNN | ONT_DEL00498466 | ONT_DEL00498466 | A, F, H | | | | |
| 808 | OAEO | 1/18/2018 | Oxford Nanopore Technologies, 1dsq complement RNN | ONT_DEL00498475 | ONT_DEL00498475 | A, F, H | | | | |
| 809 | OAEO | 5/13/2016 | Oxford Nanopore Technologies, Direct basecalling from raw data | ONT_DEL00498476 | ONT_DEL00498476 | A, F, H | | | | |
| 810 | OAEO | 1/11/2016 | Oxford Nanopore Technologies, New submap HMM | ONT_DEL00498477 | ONT_DEL00498477 | A, F, H | | | | |
| 811 | OAEO | 9/14/2015 | Oxford Nanopore Technologies, Window / kmer-length trade-off | ONT_DEL00498483 | ONT_DEL00498483 | A, F, H | | | | |
| 812 | OAEO | 2/22/2019 | Oxford Nanopore Technologies, txr2 Basecalling Using Flipflop RNN Internally. | ONT_DEL00498484 | ONT_DEL00498484 | A, F, H | | | | |
| 813 | OAEO | 5/13/2016 | Oxford Nanopore Technologies, MinKNOW protocol script structure (0.51.3) | ONT_DEL00498485 | ONT_DEL00498485 | A, F, H | | | | |
| 814 | OAEO | 10/30/2018 | Oxford Nanopore Technologies, Homopolymer run lengths | ONT_DEL00498486 | ONT_DEL00498486 | A, F, H | | | | |
| 815 | OAEO | 6/28/2016 | Oxford Nanopore Technologies, Changes to scripts since MinKNOW v0.51.3 | ONT_DEL00498487 | ONT_DEL00498487 | A, F, H | | | | |
| 816 | OAEO | 10/12/2015 | Oxford Nanopore Technologies, 1D Basecalling (v1.16) | ONT_DEL00498488 | ONT_DEL00498488 | A, F, H | | | | |
| 817 | OAEO | 5/26/2009 | Oxford Nanopore Technologies, HMM for sequence structure | ONT_DEL00498491 | ONT_DEL00498491 | A, F, H | | | | |
| 818 | OAEO | 3/11/2016 | Oxford Nanopore Technologies, Software products Feb/March 2016 | ONT_DEL00498496 | ONT_DEL00498496 | A, F, H | | | | |
| 819 | OAEO | 1/31/2019 | Oxford Nanopore Technologies, M1 DNA HMM model training | ONT_DEL00498502 | ONT_DEL00498502 | A, F, H | | | | |
| 820 | OAEO | 7/12/2016 | Oxford Nanopore Technologies, 1D Basecalling (v1.22) | ONT_DEL00498508 | ONT_DEL00498508 | A, F, H | | | | |
| 821 | OAEO | 1/30/2018 | Oxford Nanopore Technologies, Follow-on 2D (1D*2) Analysis | ONT_DEL00498520 | ONT_DEL00498520 | A, F, H | | | | |
| 822 | OAEO | 7/22/2015 | Oxford Nanopore Technologies, Nanopore sequencing primer, Primer for DSTL | ONT_DEL00498521 | ONT_DEL00498521 | A, F, H | | | | |
| 823 | OAEO | 3/12/2019 | Oxford Nanopore Technologies, E3CC HMM Mapping and Training | ONT_DEL00498522 | ONT_DEL00498522 | A, F, H | | | | |
| 824 | OAEO | 7/1/2016 | Oxford Nanopore Technologies, CP1 fastmode | ONT_DEL00498528 | ONT_DEL00498528 | A, F, H | | | | |
| 825 | OAEO | 8/8/2016 | Oxford Nanopore Technologies, 2D Basecalling (v1.22) | ONT_DEL00498530 | ONT_DEL00498530 | A, F, H | | | | |
| 826 | OAEO | 7/22/2016 | Oxford Nanopore Technologies, E6C basecalling | ONT_DEL00498534 | ONT_DEL00498534 | A, F, H | | | | |
| 827 | OAEO | 10/24/2016 | Oxford Nanopore Technologies, K-mer-less Tombo (Tombo2) | ONT_DEL00498556 | ONT_DEL00498556 | A, F, H | | | | |
| 828 | OAEO | | Oxford Nanopore Technologies, Albacore Setting and data analysis | ONT_DEL00498558 | ONT_DEL00498558 | A, F, H | | | | |
| 829 | OAEO | 1/10/2019 | Oxford Nanopore Technologies, On training and tests sets for basecallers | ONT_DEL00498563 | ONT_DEL00498563 | A, F, H | | | | |
| 830 | OAEO | 12/2/2016 | Oxford Nanopore Technologies, RNN systematic error mitigation | ONT_DEL00498579 | ONT_DEL00498579 | A, F, H | | | | |
| 831 | OAEO | 6/21/2016 | Oxford Nanopore Technologies, RNN model training | ONT_DEL00498583 | ONT_DEL00498583 | A, F, H | | | | |
| 832 | OAEO | 11/14/2017 | Oxford Nanopore Technologies, Read until: training a basecaller | ONT_DEL00498591 | ONT_DEL00498591 | A, F, H | | | | |
| 833 | OAEO | 3/5/2015 | Oxford Nanopore Technologies, Squiggle Mapping for Dummies | ONT_DEL00498593 | ONT_DEL00498593 | A, F, H | | | | |
| 834 | OAEO | 10/11/2016 | Oxford Nanopore Technologies, Non-exponential Movement | ONT_DEL00498599 | ONT_DEL00498599 | A, F, H | | | | |
| 835 | OAEO | 12/18/2015 | Oxford Nanopore Technologies, Fastmode_Squiggle_Gallery | ONT_DEL00498603 | ONT_DEL00498603 | A, F, H | | | | |
| 836 | OAEO | 4/15/2016 | Oxford Nanopore Technologies, .fast file format for HMM basecalled data | ONT_DEL00498616 | ONT_DEL00498616 | A, F, H | | | | |
| 837 | OAEO | 8/7/2018 | Oxford Nanopore Technologies, Training process for basecallers | ONT_DEL00498619 | ONT_DEL00498619 | A, F, H | | | | |
| 838 | OAEO | 4/15/2016 | Oxford Nanopore Technologies, .fast file structure for RNN basecalled data | ONT_DEL00498622 | ONT_DEL00498622 | A, F, H | | | | |
| 839 | OAEO | 10/1/2018 | Oxford Nanopore Technologies, Guppy summary telemetries | ONT_DEL00498664 | ONT_DEL00498664 | A, F, H | | | | |
| 840 | OAEO | 6/12/2018 | Oxford Nanopore Technologies, abacute summary telemetries | ONT_DEL00498666 | ONT_DEL00498666 | A, F, H | | | | |
| 841 | OAEO | 6/2/2017 | Oxford Nanopore Technologies, Albacore v1.2 | ONT_DEL00498694 | ONT_DEL00498694 | A, F, H | | | | |
| 842 | OAEO | 1/31/2018 | Oxford Nanopore Technologies, 'Nanopore 101' written content | ONT_DEL00498697 | ONT_DEL00498697 | A, F, H | | | | |
| 843 | OAEO | 12/17/2018 | Oxford Nanopore Technologies, GridION Release 18.12.1 | ONT_DEL00498744 | ONT_DEL00498744 | A, F, H | | | | |
| 844 | OAEO | 8/30/2017 | Oxford Nanopore Technologies, Albacore v2.0.1 | ONT_DEL00498747 | ONT_DEL00498747 | A, F, H | | | | |
| 845 | OAEO | 11/10/2015 | Oxford Nanopore Technologies, v1.16 workflow components | ONT_DEL00498758 | ONT_DEL00498758 | A, F, H | | | | |
| 846 | OAEO | 8/15/2018 | Oxford Nanopore Technologies, Ostra: Homopolymer Length Prediction/Polishing from Anchored Raw Signal | ONT_DEL00499205 | ONT_DEL00499205 | A, F, H | | | | |
| 847 | OAEO | 2/21/2017 | Oxford Nanopore Technologies, Downsampling to smaller kmer | ONT_DEL00499207 | ONT_DEL00499207 | A, F, H | | | | |
| 848 | OAEO | 7/27/2012 | Oxford Nanopore Technologies, Comparison of 3mer models | ONT_DEL00499209 | ONT_DEL00499209 | A, F, H | | | | |
| 849 | OAEO | 3/5/2014 | Oxford Nanopore Technologies, kmer spread problem | ONT_DEL00499212 | ONT_DEL00499212 | A, F, H | | | | |
| 850 | OAEO | 2/5/2014 | Oxford Nanopore Technologies, Systematic Kmer Variation | ONT_DEL00499213 | ONT_DEL00499213 | A, F, H | | | | |
| 851 | OAEO | 7/12/2017 | Oxford Nanopore Technologies, Trained full 4mer model | ONT_DEL00499214 | ONT_DEL00499214 | A, F, H | | | | |
| 852 | OAEO | 11/8/2016 | Oxford Nanopore Technologies, Homopolymers | ONT_DEL00499215 | ONT_DEL00499215 | A, F, H | | | | |
| 853 | OAEO | 1/15/2016 | Oxford Nanopore Technologies, From discriminative kmer probabilities to basecall | ONT_DEL00499228 | ONT_DEL00499228 | A, F, H | | | | |
| 854 | OAEO | 6/29/2011 | Oxford Nanopore Technologies, Updating Base Estimates | ONT_DEL00499236 | ONT_DEL00499236 | A, F, H | | | | |
| 855 | OAEO | 11/4/2015 | Oxford Nanopore Technologies, Mapping transitional kmer space, predicting substeps | ONT_DEL00499237 | ONT_DEL00499237 | A, F, H | | | | |
| 856 | OAEO | 8/25/2017 | Oxford Nanopore Technologies, Determining inter-kmer spacing for all kmers | ONT_DEL00499238 | ONT_DEL00499238 | A, F, H | | | | |
| 857 | OAEO | 4/25/2012 | Oxford Nanopore Technologies, Example_5kb_Cond07 | ONT_DEL00499242 | ONT_DEL00499242 | A, F, H | | | | |
| 858 | OAEO | 7/11/2013 | Oxford Nanopore Technologies, Ossetra - Model Files and Model Prediction | ONT_DEL00499244 | ONT_DEL00499244 | A, F, H | | | | |
| 859 | OAEO | 7/10/2017 | Oxford Nanopore Technologies, Roadmap for training a 5-basecaller | ONT_DEL00499251 | ONT_DEL00499251 | A, F, H | | | | |
| 860 | OAEO | 7/19/2014 | Oxford Nanopore Technologies, Refining and validating models | ONT_DEL00499253 | ONT_DEL00499253 | A, F, H | | | | |
| 861 | OAEO | 6/23/2014 | Oxford Nanopore Technologies, R7 Model | ONT_DEL00499326 | ONT_DEL00499326 | A, F, H | | | | |
| 862 | OAEO | 3/8/2018 | Oxford Nanopore Technologies, Flip-flop Modified Base Refactor | ONT_DEL00499337 | ONT_DEL00499337 | A, F, H | | | | |
| 863 | OAEO | 2/8/2018 | Oxford Nanopore Technologies, SeqModels to demonstrate distinct homopolymer signal for CP1 complex (GF) and Lysenin | ONT_DEL00499361 | ONT_DEL00499361 | A, F, H | | | | |
| 864 | OAEO | 4/4/2016 | Oxford Nanopore Technologies, Strand sequencing method | ONT_DEL00499379 | ONT_DEL00499379 | A, F, H | | | | |
| 865 | OAEO | 10/22/2018 | Oxford Nanopore Technologies, What are E8/R9/M1? | ONT_DEL00499624 | ONT_DEL00499624 | A, F, H | | | | |
| 866 | OAEO | 1/14/2016 | Oxford Nanopore Technologies, E6 kinetics and substeps | ONT_DEL00499638 | ONT_DEL00499638 | A, F, H | | | | |
| 867 | OAEO | 8/25/2015 | Oxford Nanopore Technologies, Substeps or soft edges in E5 squiggle | ONT_DEL00499646 | ONT_DEL00499646 | A, F, H | | | | |
| 868 | OAEO | 10/11/2016 | Oxford Nanopore Technologies, Non-exponential Movement | ONT_DEL00499652 | ONT_DEL00499652 | A, F, H | | | | |
| 869 | OAEO | 5/18/2017 | Oxford Nanopore Technologies, 0173_Substeps (62990) | ONT_DEL00499655 | ONT_DEL00499655 | A, F, H | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 870 | OAEO | 6/12/2015 | Oxford Nanopore Technologies, Next-gen enzyme | ONT_DEL00499667 | ONT_DEL00499667 | A, F, H | | | | |
| 871 | OAEO | 6/4/2018 | Oxford Nanopore Technologies, Pore Interacting - CP1 | ONT_DEL00499681 | ONT_DEL00499681 | A, F, H | | | | |
| 872 | OAEO | 11/4/2015 | Oxford Nanopore Technologies, Mapping transitional kmer space, predicting substeps | ONT_DEL00499718 | ONT_DEL00499718 | A, F, H | | | | |
| 873 | OAEO | 4/22/2016 | Oxford Nanopore Technologies, The homopolymer problem | ONT_DEL00499856 | ONT_DEL00499856 | A, F, H | | | | |
| 874 | OAEO | 11/8/2016 | Oxford Nanopore Technologies, Homopolymers | ONT_DEL00499866 | ONT_DEL00499866 | A, F, H | | | | |
| 875 | OAEO | 1/26/2015 | Oxford Nanopore Technologies, Movement template | ONT_DEL00499869 | ONT_DEL00499869 | A, F, H | | | | |
| 876 | | 12/1/2019 | "From a mass photometer to improved breath biopsy probes, these new products are poised for scientific success," The Scientist, https://www.the-scientist.com/features/2019-top-10-innovations-66738 | | | A, F, H, N, R | | | | |
| 877 | | 10/1/2015 | Aaron Krol, "A Worthy Sequel: PacBio's New Sequencing System," Bio-IT World, www.bio-itworld.com/2015/10/1/a-worthy-sequel.aspx | | | A, F, H, N, R | | | | |
| 878 | | 4/27/2018 | Kyle Peterson, "Cracking the Code of Life - at Light Speed," WSJ, https://www.wsj.com/articles/cracking-the-code-of-lifeat-light-speed-1524866614 | | | A, F, H, N, R | | | | |
| 879 | | 00/00/2019 | Genomics - The 2019 Life Science Industry Awards - Innovation, Best New Product - Genomics, www.lifescienceindustryawards.com/genomics/ | | | A, F, H, N, R | | | | |
| 880 | | 2/3/2016 | Kevin Kelly, "Menlo Park: Biotech firm's invention puts it at the forefront of DNA-related research," https://www.mercurynews.com/2016/02/03/menlo-park-biotech-firms-invention-puts-it-at-the-forefront-of-dna-related-research/ | | | A, F, H, N, R | | | | |
| 881 | | 00/00/2013 | MIT Technology Review, 50 Disruptive Companies, Company Profile: Pacific Biosciences | | | A, F, H, N, R | | | | |
| 882 | | 12/10/2010 | Andrew Pollack, "Sequencing Machine Helped Trace Cholera in Haiti," The New York Times, https://prescriptions.blogs.nytimes.com/2010/12/10/sequencing-machine-aided-in-cholera-project/?searchResultPosition=4 | | | A, F, H, N, R | | | | |
| 883 | | 5/2/2011 | Ashley Vance, The $600 Million Decoder Ring, Bloomberg Businessweek, May 2 - May 8, 2011 | | | A, F, H, N, R | | | | |
| 884 | | 12/00/2010 | Megan Scudellari, "Top Ten innovations 2010," The Scientist, https://www.the-scientist.com/uncategorized/top-ten-innovations-2010-42947 | | | A, F, H, N, R | | | | |
| 885 | | 3/12/2010 | Two Postdoctoral Entrepreneurs are Recognized for Excellence, https://web.archive.org/web/20100621084046/http://www.kauffman.org/two_postdoctural_entrepreneurs_are_reconized_for_excellence.aspx | | | A, F, H, N, R | | | | |
| 886 | | 12/4/2009 | Ryan Kim, World Economics Forum honors Bay Area techies, https://www.sfgate.com/business/article/World-Economic-Forum-honors-Bay-Area-techies-3207802.php | | | A, F, H, N, R | | | | |
| 887 | | 2/4/2020 | Pacific Biosciences, Introduction to PacBio Highly Accurate Long-Read Sequencing, https://www.youtube.com/watch?v=iT3NqhKD840&feature=emb_title | | | A, F, H, N, R | | | | |
| 888 | OAEO | 05/00/2011 | Oxford Nanopore Technologies Ltd, Board Meeting | ONT_DEL00239552 | ONT_DEL00239830 | A, F, H, R | | | | |
| 889 | OAEO | 5/23/2007 | Oxford NanoLabs, Board Meeting | ONT_DEL00297916 | ONT_DEL00297918 | A, F, H, R | | | | |
| 890 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, Board Review 2017 | ONT_DEL00306949 | ONT_DEL00307047 | A, F, H, R | | | | |
| 891 | OAEO | 1/21/2016 | Oxford Nanopore Technologies, Minutes for the board meeting | ONT_DEL00314833 | ONT_DEL00314842 | A, F, H, R | | | | |
| 892 | OAEO | 11/19/2015 | Oxford Nanopore Technologies, Minutes for the board meeting | ONT_DEL00314861 | ONT_DEL00314864 | A, F, H, R | | | | |
| 893 | OAEO | 05/00/2018 | Oxford Nanopore Technologies, May 2018 board meeting minutes | ONT_DEL00326022 | ONT_DEL00326024 | A, F, H, R | | | | |
| 894 | OAEO | 11/00/2012 | Oxford Nanopore Technologies Ltd, Board Meeting | ONT_DEL00345350 | ONT_DEL00345366 | A, F, H, R | | | | |
| 895 | OAEO | 9/17/2018 | Oxford Nanopore Technologies, Minutes for the board meeting | ONT_DEL00362247 | ONT_DEL00362250 | A, F, H, R | | | | |
| 896 | OAEO | 10/16/2018 | Oxford Nanopore Technologies, Minutes for the board meeting | ONT_DEL00362251 | ONT_DEL00362254 | A, F, H, R | | | | |
| 897 | OAEO | 3/23/2018 | Oxford Nanopore Technologies, Minutes for the board meeting | ONT_DEL00363102 | ONT_DEL00363105 | A, F, H, R | | | | |
| 898 | OAEO | 3/26/2015 | Oxford Nanopore Technologies, Minutes for the board meeting | ONT_DEL00397559 | ONT_DEL00397564 | A, F, H, R | | | | |
| 899 | OAEO | 5/19/2015 | Oxford Nanopore Technologies, Agenda for Board meeting on 19th May 2015 | ONT_DEL00397565 | ONT_DEL00397565 | A, F, H, R | | | | |
| 900 | | 4/10/2017 | Notice of Deposition of Spike Willcocks, USITC, 337-TA-1032 [Willocks Depo. Ex. 1] | | | A, F, H, R | | | | |
| 901 | | 3/15/2017 | Notice of Deposition of Respondents, USITC, 337-TA-1032 [Willocks Depo. Ex. 2] | | | A, F, H, R | | | | |
| 902 | | 3/15/2017 | Oxford's Rule 7.2 "Disclosure of Products Within the Scope of NOI," USITC, 337-TA-1032 [Willocks Depo. Ex. 3] | | | A, F, H, R | | | | |
| 903 | | 11/21/2016 | Complainants' Reply Statement on the Public Interest, USITC, 337-TA-1032 [Willocks Depo. Ex. 4] | | | A, F, H, R | | | | |
| 904 | | 3/31/2017 | Respondents Oxford's Fifth Amended and Supplemental Objections and Responses to Complainant Pacific Biosciences of California, Inc.'s First Set of Interrogatories (Nos. 1-55) [Willocks Depo. Ex. 5] | | | A, F, H, R, U | | | | |
| 905 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 6/15/2016 | Deposition of Spike Willcocks, USITC, 337-TA-991 | ONTS.ITC.00796712 | ONTS.ITC.00796801 | A, F, H | | | | |
| 906 | OAEO | 1/14/2016 | Email from S. Willocks to D. Turner re Replacement hire in NY | ONT_DEL00068011 | ONT_DEL00068012 | A, F, H, R | | | | |
| 907 | OAEO | 2/9/2018 | University of Maryland Baltimore Purchase Orders | ONT_DEL00271734 | ONT_DEL00271766 | A, F, H, R | | | | |
| 908 | OAEO | 6/16/2017 | National Institutes of Health Order for Supplies or Services | ONT_DEL00274801 | ONT_DEL00274804 | A, F, H, R | | | | |
| 909 | OAEO | 7/6/2018 | Email from K. Stoops to J. Medlin re Request for Quotation 3000006073 | ONT_DEL00275702 | ONT_DEL00275711 | A, F, H, R | | | | |
| 910 | OAEO | 6/25/2018 | The University of North Carolina at Chapel Hill Request for Quotation | ONT_DEL00275712 | ONT_DEL00275764 | A, F, H, R | | | | |
| 911 | OAEO | 11/14/2018 | D&B Credit, Summary for Oxford Nanopore Technologies Limited | ONT_DEL00314309 | ONT_DEL00314345 | A, F, H, R | | | | |
| 912 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, Supply Chain Director | ONT_DEL00314653 | ONT_DEL00314721 | A, F, H, R | | | | |
| 913 | OAEO | | Executive Team | ONT_DEL00319702 | ONT_DEL00319702 | A, F, H, R | | | | |
| 914 | OAEO | 5/1/2018 | Mississippi State University Invitation for Bids | ONT_DEL00341960 | ONT_DEL00342033 | A, F, H, R | | | | |
| 915 | OAEO | 4/30/2018 | Email from K. Stoops to S. Juul re Health care | ONT_DEL00353355 | ONT_DEL00353355 | A, F, H, R | | | | |
| 916 | OAEO | 2/15/2016 | Email from E. Birney re Tweet by Jason Chin on Twitter | ONTS.ITC.00001189 | ONTS.ITC.00001189 | A, F, H, R | | | | |
| 917 | | 4/13/2018 | Oxford Nanopore Technologies Inc., Business Entity Summary | | | A, F, H, N, R | | | | |
| 918 | | 7/9/2015 | U.S. Patent Application Publication No. 2015/0191709 | | | A, F, H, N, R | | | | |
| 919 | | 6/7/2018 | WO 2018/100370 A1 | | | A, F, H, N, R | | | | |
| 920 | | 3/15/2017 | Notice of Deposition of Respondents, USITC, 337-TA-1032 [Clarke ITC Depo Ex. 1] | | | A, F, H, N, R | | | | |
| 921 | | | LinkedIn Page for James Clarke [Clarke Depo. Ex. 2] | | | A, F, H, N | | | | |
| 922 | | 9/20/2016 | U.S. Patent No. 9,447,152 (Clarke et al.), USITC, 337-TA-1032 [Clarke ITC Depo Ex. 3] | | | A, F, H, N, R | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 923 | | 04/00/2009 | James Clarke, Hai-Chen Wu, Lakmal Jayasinghe, Alpesh Patel, Stuart Reid and Hagan Bayley, "Continuous base identification for single-molecule nanopore DNA sequencing," Nature Nanotechnology [Clarke ITC Depo Ex. 4] | PCB-ONT-ITC-0000902 | PCB-ONT-ITC-0000925 | JTX | | | | |
| 924 | Conf Business Info - Subject to PO | | Respondents Oxford's Fifth Amended and Supplemental Objections and Responses to Complainant Pacific Biosciences of California, Inc.'s First Set of Interrogatories (Nos. 1-55) [Clarke ITC Depo Ex. 5] | | | A, F, H, N, R, U | | | | |
| 925 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 07/00/2013 | Oxford Nanopore Technologies, Devices and Methods for Nucleic Acid Analysis Using Nanopores [Clarke ITC Depo Ex. 6] | ONTS.ITC.00023825 | ONTS.ITC.00023880 | A, F, H | | | | |
| 926 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | | Oxford Nanopore Technologies, An introduction to nanopore sensing [Clarke ITC Depo Ex. 7] | ONTS.ITC.00098649 | ONTS.ITC.00096717 | A, F, H | | | | |
| 927 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 00/00/2014 | Squiggle it...Just a little bit [Clarke ITC Depo Ex. 8] | ONTS.ITC.00003375 | ONTS.ITC.00003390 | A, F, H, R | | | | |
| 928 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 10/15/2015 | Email from O. Kuznetsova to S. Reid re [confluence] Product Documentation > Example fast5 read file after 2D Basecalling workflow has been applied (v1.16) [Clarke ITC Depo Ex. 9] | ONTS.ITC.00127378 | ONTS.ITC.00127384 | A, F, H, R | | | | |
| 929 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | | EpitoME [Clarke ITC Depo Ex. 10] | ONTS.ITC.00077234 | ONTS.ITC.00077275 | A, F, H, R | | | | |
| 930 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | | Oxford Nanopore Technologies, 01 PromethION [Clarke ITC Depo Ex. 11] | ONTS.ITC.00560315 | ONTS.ITC.00560377 | A, F, H, R | | | | |
| 931 | Conf Business Info - Subject to PO | 3/31/2017 | Respondents Oxford's Responses to Complainant Pacific Bioscience's Third Set of Interrogatories (Nos. 57-64) [Clarke ITC Depo Ex. 12] | | | A, F, H, R, U | | | | |
| 932 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 00/00/2016 | Oxford Nanopore Technologies, 1D$^2$ [Clarke ITC Depo Ex. 13] | ONTS.ITC.00762169 | ONTS.ITC.00782177 | A, F, H | | | | |
| 933 | OAEO | | Patent Chart [Clarke ITC Depo Ex. 14] | | | A, F, H, N | | | | |
| 934 | OAEO | 3/31/2017 | Invalidity Contentions of Respondents Oxford Nanopore Technologies Ltd., Oxford Nanopore Technologies, Inc., and Metrichor, Ltd. [Clarke ITC Depo Ex. 15] | | | A, F, H, N | | | | |
| 935 | | 6/11/2002 | U.S. Patent No. 6,404,907 (Gilchrist et al.)  [Clarke ITC Depo Ex. 16] | | | JTX | | | | |
| 936 | | 8/2/2016 | U.S. Patent No. 9,404,146 (Travers et al.) [Clarke ITC Depo Ex. 17] | | | JTX | | | | |
| 937 | | 1/10/2017 | U.S. Patent No. 9,542,527 (Travers et al.) [Clarke ITC Depo Ex. 18] | | | A, F, H | | | | |
| 938 | | 3/27/2003 | U.S. Patent Application Publication No. 2003/0059778 [Clarke ITC Depo Ex. 19] | | | JTX | | | | |
| 939 | | 1/25/2007 | WO 2007/010263 A2 [Clarke ITC Depo Ex. 20] | | | JTX | | | | |
| 940 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 5/8/2015 | Email from J. Clarke to Nanopore Patents re Nanopore Report-019 Competative: PacBio, Raindance Technologies Partner to Commercialize Whole-Genome Assembly Solution [Clarke ITC Depo Ex. 22] | ONTS.ITC.00768050 | ONTS.ITC.00768051 | A, F, H, R | | | | |

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 941 | ONT(S) CONF BUSINESS INFO SUBJECT TO PO | 7/19/2011 | Email from J. Clarke to S. Reid re Specific areas of PacBio Patent [Clarke ITC Depo Ex. 23] | ONTS.ITC.00767983 | ONTS.ITC.00767984 | A, F, H, R | | | | |
| 942 | OAEO | 1/18/2017 | Email from Z. McDougall to J. McDonald re Pacbio slide | ONT_DEL00285863 | ONT_DEL00285868 | A, F, H, R | | | | |
| 943 | OAEO | 11/19/2016 | Email from R. Compton to C. Brown et al. re France | ONT_DEL00029284 | ONT_DEL00029285 | A, F, H, R | | | | |
| 944 | OAEO | 02/00/2018 | Oxford Nanopore Technologies, February 2018 Confidential | ONT_DEL00512724 | ONT_DEL00512717 | A, F, H, R | | | | |
| 945 | OAEO - SC | | Source Code | ONT-DEL-SRC-00001 | ONT-DEL-SRC-00349 | JTX | | | | |
| 946 | | | Source Code - Taiyaki_walkthrough.tar, https://s3-eu-west-1.amazonaws.com/ont-research/taiyaki_walkthrough.tar.gz. | | | A, F, H, N | | | | |
| 947 | | | SMRT Cell Physical Sample | | | IP | | | | |
| 948 | OAEO | 6/7/2017 | Email from Unspecified Sender to A. Thielen re 1D^2 Amplicon sequencing | ONT_DEL00457666 | ONT_DEL00457670 | A, F, H, R | | | | |
| 949 | OAEO | 8/2/2018 | Email from R. Dokos to G. Sanghera re Making cDNA a Success | ONT_DEL00306811 | ONT_DEL00306813 | A, F, H, R | | | | |
| 950 | OAEO | 5/21/2016 | Oxford Nanopore Technologies, ESHG 2016 | ONT_DEL00194437 | ONT_DEL00194488 | A, F, H, R | | | | |
| 951 | OAEO | 5/13/2018 | Email from J. Pugh to R. Dokos re [JIRA] (HELP-1832) UCSC PromethION - Low Accuracy | ONT_DEL00088954 | ONT_DEL00088954 | A, F, H, R | | | | |
| 952 | OAEO | 3/20/2018 | Email from R. Dokos to L. Ludbrook et al. re Wonder | ONT_DEL00082376 | ONT_DEL00082380 | A, F, H, R | | | | |
| 953 | OAEO | 6/9/2017 | Email from S. Reid to R. Dokos re (confluence) Stuart Reid > 201706_1D2 and amplicons | ONT_DEL00080440 | ONT_DEL00080442 | A, F, H, R | | | | |
| 954 | OAEO | 4/6/2018 | Email from M. Ferre to Customer Support re R9.4FC and 2D chemistry | ONT_DEL00051748 | ONT_DEL00051749 | A, F, H, R | | | | |
| 955 | OAEO | 3/20/2015 | Email from R. Dokos to S. Willcocks re MinION Purchasing Options.pptx | ONT_DEL00088114 | ONT_DEL00088117 | A, F, H, R | | | | |
| 956 | OAEO | 00/00/2015 | Oxford Nanopore Technologies, Native Excel, Pricing Matrix | ONT_DEL00088089 | ONT_DEL00088089 | A, F, H, R | | | | |
| 957 | OAEO | 00/00/2018 | Oxford Nanopore Technologies, Native Excel | ONT_DEL00089418 | ONT_DEL00089418 | A, F, H, R | | | | |
| 958 | OAEO | | Oxford Nanopore Technologies, Your Nanopore, CRM Customer Relationship Management | ONT_DEL00367507 | ONT_DEL00367536 | A, F, H, R | | | | |
| 959 | OAEO | 05/00/2014 | OEM Supply Agreement between Qiagen GmbH and Oxford Nanopore Technologies | ONT_DEL00379241 | ONT_DEL00379256 | A, F, H, R | | | | |
| 960 | OAEO | 6/26/2017 | Email from Unspecified Sender to M. Jain and T. John re [Timeline and sequencing] Nanopore Human Transcriptome | ONT_DEL00076962 | ONT_DEL00076978 | A, F, H, R | | | | |
| 961 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, Nanopore Sequencing, How it works | ONT_DEL00024664 | ONT_DEL00024666 | A, F, H, R | | | | |
| 962 | OAEO | 6/7/2017 | Email from Nanopore Community to R. Dokos re Guidance on talking about 1D^2 | ONT_DEL00080489 | ONT_DEL00080489 | A, F, H, R | | | | |
| 963 | OAEO | 7/6/2017 | Email from Nanopore Community to R. Dokos re Guidance on talking about 1D^2 | ONT_DEL00079336 | ONT_DEL00079337 | A, F, H, R | | | | |
| 964 | OAEO | 9/6/2017 | Email from R. Dokos to A. Heron re David Dulin looking to use nanopore technology for enzyme kinetic research | ONT_DEL00082686 | ONT_DEL00082689 | A, F, H, R | | | | |
| 965 | OAEO | 00/00/2018 | Oxford Nanopore Technologies, CCB Investment | ONT_DEL00157128 | ONT_DEL00157150 | A, F, H, R | | | | |
| 966 | OAEO | 05/00/2018 | Oxford Nanopore Technologies, Product Development Pipeline | ONT_DEL00345609 | ONT_DEL00345732 | A, F, H, R | | | | |
| 967 | OAEO | 07/00/2018 | Oxford Nanopore Technologies, Oxford Nanopore, Board Update July 2018 | ONT_DEL00362928 | ONT_DEL00362950 | A, F, H, R | | | | |
| 968 | OAEO | | Oxford Nanopore Technologies, Production Pricing | ONT_DEL00109214 | ONT_DEL00109214 | A, F, H, R | | | | |
| 969 | OAEO | | Draft Redlined Co-Marketing and Collaboration Agreement between Oxford Nanopore, Inc. and PerkinElmer Health Sciences, Inc. | ONT_DEL00304144 | ONT_DEL00304144 | A, F, H, R | | | | |
| 970 | OAEO | 01/00/2018 | Oxford Nanopore Technologies, January 2018, Financial Information: 2 Year Forecasts | ONT_DEL00556783 | ONT_DEL00556801 | A, F, H, R | | | | |
| 971 | OAEO | 12/7/2018 | Email from I. MacLaren to R. Dokos re Monthly Update: Global Team Sales & Market Dev | ONT_DEL00165847 | ONT_DEL00165850 | A, F, H, R | | | | |
| 972 | OAEO | 11/00/2018 | Commercial Summary for Remcom November 2018 | ONT_DEL00166239 | ONT_DEL00166241 | A, F, H, R | | | | |
| 973 | OAEO | | Oxford Nanopore Technologies, Training and Services | ONT_DEL00460217 | ONT_DEL00460225 | A, F, H, R | | | | |
| 974 | OAEO | 01/00/2019 | FTI Consulting, Oxford Nanopore Technologies - Proposed transfer pricing policies for sales related functions | ONT_DEL00361300 | ONT_DEL00361329 | A, F, H, R | | | | |
| 975 | OAEO | | Process Sales/FAS/TAS | ONT_DEL00084930 | ONT_DEL00084930 | A, F, H, R | | | | |
| 976 | OAEO | 11/00/2017 | Oxford Nanopore Technologies, Performance Updates, Sales & Marketing Dev team | ONT_DEL00165956 | ONT_DEL00165961 | A, F, H, R | | | | |
| 977 | OAEO | 12/4/2017 | Email from O. Hartwell to S. Willcocks re Seque(s) field feedbacks | ONT_DEL00555030 | ONT_DEL00555032 | A, F, H, R | | | | |
| 978 | OAEO | 09/00/2017 | Oxford Nanopore Technologies, Oxford Nanopore Technologies September 2017 | ONT_DEL00230504 | ONT_DEL00230533 | A, F, H, R | | | | |
| 979 | OAEO | 1/11/2017 | Email from O. Hartwell to R. Dokos re Pacbio slide | ONT_DEL00250591 | ONT_DEL00250592 | A, F, H, R | | | | |
| 980 | OAEO | 12/15/2017 | Email from L. Ludbrook to J. Brayer re Competition Rattled? | ONT_DEL00281869 | ONT_DEL00281869 | A, F, H, R | | | | |
| 981 | OAEO | 6/4/2018 | Email from M. Coccia to R. Dokos et al. re GrandOmics Summary | ONT_DEL00063341 | ONT_DEL00063342 | A, F, H, R | | | | |
| 982 | OAEO | 00/00/2018 | Oxford Nanopore Technologies, October cDNA Relaunch update | ONT_DEL00127881 | ONT_DEL00127917 | A, F, H, R | | | | |
| 983 | OAEO | 1/8/2019 | Email from Z. McDougall to R. Dokos et al. re notes from ILMN presentation | ONT_DEL00114448 | ONT_DEL00114450 | A, F, H, R | | | | |
| 984 | OAEO | | Deliver Disruptive Innovation | ONT_DEL00307582 | ONT_DEL00307583 | A, F, H, R | | | | |
| 985 | OAEO | 9/19/2008 | Letter from J. Flatley to G. Sanghera re BASE Nanopore technology | ONT_DEL00370408 | ONT_DEL00370412 | A, F, H, R | | | | |
| 986 | OAEO | 5/16/2017 | Email from S. Willcocks to D. Tsavachidou re follow up | ONT_DEL00503545 | ONT_DEL00503567 | A, F, H, R | | | | |
| 987 | | | Basecall Network | | | A, F, H, N, R | | | | |
| 988 | | | Example training | | | A, F, H, N, R | | | | |
| 989 | | | Extract reference | | | A, F, H, N, R | | | | |
| 990 | | | Train network | | | A, F, H, N, R | | | | |
| 991 | | | Validate Network | | | A, F, H, N, R | | | | |
| 992 | | | Verify Network | | | A, F, H, N, R | | | | |
| 993 | OAEO | 6/6/2018 | Email from R. Dokos to G. Sanghera et al. re GrandOmics Summary | ONT_DEL00066109 | ONT_DEL00066109 | A, F, H | | | | |
| 994 | OAEO | 3/20/2015 | Email from R. Dokos to G. Sanghera re MinION Purchasing Options.pptx | ONT_DEL00088114 | ONT_DEL00088117 | A, F, H | | | | |
| 995 | OAEO | 00/00/2017 | Oxford Nanopore Technologies, Gridion & Promethion, Instrument Sales and Certification for Service Providers | ONT_DEL00064907 | ONT_DEL00064913 | A, F, H | | | | |
| 996 | OAEO | 04/00/2017 | Oxford Nanopore Technologies, Product Information, April 2017, Version 4 | ONT_DEL00081082 | ONT_DEL00081095 | A, F, H | | | | |
| 997 | OAEO | | Oxford Nanopore Technologies, PromethION, Product Overview | ONT_DEL00081205 | ONT_DEL00081226 | A, F, H | | | | |
| 998 | OAEO | 00/00/2014 | Oxford Nanopore Technologies, MinION and PromethION sales | ONT_DEL00078831 | ONT_DEL00078831 | A, F, H | | | | |
| 999 | OAEO | 11/3/2015 | Email from R. Dokos to C. Brown et al. re Final Version from me | ONT_DEL00087832 | ONT_DEL00087835 | A, F, H | | | | |
| 1000 | OAEO | 00/00/2014 | Oxford Nanopore Technologies, Pricing Guidance for MinION & PromethION | ONT_DEL00088090 | ONT_DEL00088113 | A, F, H | | | | |
| 1001 | OAEO | 3/8/2015 | Email from R. Dokos to S. Willcocks re MinION Purchasing Options.pptx | ONT_DEL00088143 | ONT_DEL00088145 | A, F, H | | | | |
| 1002 | OAEO | 3/24/2016 | Oxford Nanopore Technologies, Order Exports | ONT_DEL00103664 | ONT_DEL00103664 | A, F, H | | | | |
| 1003 | OAEO | 2/23/2018 | Email from L. Ludbrook to R. Dokos re Porecamps and Non-Pore Camps 2018 | ONT_DEL00163562 | ONT_DEL00163562 | A, F, H | | | | |
| 1004 | OAEO | | Oxford Nanopore Technologies, Manual Sales Order Field and Pricing Matrix | ONT_DEL00165066 | ONT_DEL00165066 | A, F, H | | | | |
| 1005 | OAEO | 00/00/2018 | Oxford Nanopore Technologies, How will we achieve sales growth with efficient commercial infrastructure | ONT_DEL00165854 | ONT_DEL00165867 | A, F, H | | | | |
| 1006 | OAEO | 3/29/2017 | Oxford Nanopore Technologies, Change Note, CN No. CN1172 | ONT_DEL00166216 | ONT_DEL00166218 | A, F, H | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 1007 | OAEO | 05/00/2018 | Oxford Nanopore Technologies, Targeted Sequencing | ONT_DEL00234953 | ONT_DEL00234998 | A, F, H | | | | |
| 1008 | OAEO | | Oxford Nanopore Technologies, US Shipping Register | ONT_DEL00307509 | ONT_DEL00307509 | A, F, H | | | | |
| 1009 | | | Flusberg-Turner nmer algorithm printout | PCB-ONT-ITC-0628929 | PCB-ONT-ITC-0628929 | A, B, F, H | | | | |
| 1010 | | 12/00/2015 | Alan C. Ward and Wonyong Kim, "Minlon: New, Long read, Portable Nucleic Acid Sequencing Device," Journal of Bacteriology and Virology 2015, Vol. 45, No. 4 p.285-303 | | | A, F, H, N | | | | |
| 1011 | | | How it works, A nanopore is a very small hole, https://nanoporetech.com/how-it-works | | | A, F, H, N | | | | |
| 1012 | | 10/13/2016 | Biostars, News: MinION Community Meeting: Thursday Dec 3rd (now live), https://www.biostars.org/p/168345/ | | | A, F, H, N | | | | |
| 1013 | | 10/31/2016 | Nanopore screenshot, https://nanoporetech.com/sites/default/files/s3/inlineimages/ sequencinganimated_0.gif | | | A, F, H, N | | | | |
| 1014 | | 3/13/2017 | Oxford Nanopore Technologies, Nanopore DNA Sequencing: what does it offer?, https://nanoporetech.com/ | | | A, F, H, N | | | | |
| 1015 | | 3/13/2017 | Getting started with Minion, MinION Starter Pack, https://nanoporetech.com/getting-started-with-minion | | | A, F, H, N | | | | |
| 1016 | | 10/13/2016 | PromethION Early Access Programme, What is PEAP?, https://nanoporetech.com/community/promethion-early-access-programme | | | A, F, H, N | | | | |
| 1017 | | 3/21/2016 | Supplemental Information Disclosure Statement (SIDS), Application No. 13/147,159 | | | A, F, H, N | | | | |
| 1018 | | 00/00/2015 | Wisser Laboratory Senior Personnel, https://sites.udel.edu/wisserlab/people/ | | | A, F, H, N | | | | |
| 1019 | | 3/30/2017 | Oxford Nanopore Technologies Ltd., Nanopore Community, Terms and Conditions | | | A, F, H, N | | | | |
| 1020 | | 8/17/2017 | Nanopore Product Terms and Conditions | | | A, F, H, N | | | | |
| 1021 | | 5/17/2018 | LinkedIn Page for Sissel Juul Jensen | | | A, F, H, N | | | | |
| 1022 | | 5/17/2018 | LinkedIn Page for Spike Willcocks | | | A, F, H, N | | | | |
| 1023 | | 5/17/2018 | LinkedIn Page for James Brayer | | | A, F, H, N | | | | |
| 1024 | | 5/17/2018 | Oxford Headquarters, Contact us, https://nanoporetech.com/contact | | | A, F, H, N | | | | |
| 1025 | | 9/22/2017 | SmidgION, https://nanoporetech.com/products/smidgion | | | A, F, H, N | | | | |
| 1026 | | 9/22/2017 | GridION X5, https://nanoporetech.com/products/gridion | | | A, F, H, N | | | | |
| 1027 | | 9/00/2014 | Oxford Nanopore, CGB | | | A, F, H, N | | | | |
| 1028 | | 9/24/2017 | Oxford Nanopore Technologies, London Calling Conference, Data Structure, Base Calling RNN | | | A, F, H, N | | | | |
| 1029 | | 10/9/2016 | The nanopore sequencing woflow, https://nanoporetech.com/how-it-works/nanopore-sequencing-workflow | | | A, F, H, N | | | | |
| 1030 | | 10/14/2016 | PromethION, System overview & technical specifications, About PromethION, https://nanoporetech.com/products/promethion | | | A, F, H, N | | | | |
| 1031 | | 9/24/2017 | 1D squared mechanism, 1D squared kit available in the store: boost accuracy, simple prep | | | A, F, H, N | | | | |
| 1032 | | 10/14/2016 | MinION and PromethION Product specifications comparison | | | A, F, H, N | | | | |
| 1033 | | 11/21/2017 | Advanced Sequencing Kits - Nanopore Store, Ligation Sequencing Kit 2D, https://store.nanoporetech.com/advanced-sequencing-kits?___store=us_store | | | A, F, H, N | | | | |
| 1034 | | 11/21/2017 | 1D² Sequencing Kit (R9.5), https://store.nanoporetech.com/catalog/product/view/id/175/s/1d-2-sequencing-kit/category/28/ | | | A, F, H, N | | | | |
| 1035 | | 2/00/2017 | Nanopore sequencing of a human genome, Jared Simpson, Ontario Institute for Cancer Research & Department of Computer Science University of Toronto | | | A, F, H, N | | | | |
| 1036 | | 9/29/2016 | U.S. Patent Application Publication No. 2016/0281159 | | | A, F, H, N | | | | |
| 1037 | | 3/9/2018 | About Flongle, https://nanoporetech.com/products/flongle | | | A, F, H, N | | | | |
| 1038 | | 9/00/2012 | Box 2: High-throughput bacterial genome sequencing: an embarrassment of choice, a world of opportunity: Nature Reviews Microbiology, http://www.nature.com/nrmicro/journal/v10/n9/box/nrmicro2850_BX2.html | | | A, F, H, N | | | | |
| 1039 | | | Oxford Nanopore Technologies, Neural Networks for Basecalling, Capturing Subtleties Provides Higher Accuracy | | | A, F, H, N | | | | |
| 1040 | OAEO | 11/17/2015 | Configuration for MinKNOW_CTE_1000_v1_revAl_17Nov2015 | ONT_DEL00000847 | ONT_DEL00000862 | A, F, H | | | | |
| 1041 | OAEO | 2/8/2018 | 1D Lambda Control Experiment (Kit 9 chemistry) - PromethION, LCE_9057_v109_revC_08Feb2018 | ONT_DEL00001514 | ONT_DEL00001524 | A, F, H | | | | |
| 1042 | | 3/00/2003 | Stephen Winters-Hilt, Machine Learning Methods for Channel Current Cheminformatics, Biophysical Analysis, and Bioinformatics | ONT_DEL00012814 | ONT_DEL00012990 | A, F, H | | | | |
| 1043 | OAEO | 00/00/2015 | Oxford Nanopore Technologies, Owl Stretching with Examples + Clive Brown, London Calling 2015 | ONT_DEL00014227 | ONT_DEL00014308 | A, F, H, R, U | | | | |
| 1044 | OAEO | 11/24/2014 | Email from D. Eccles (MAP Community) to S. Reid re [MAP Community] Algorithm discussions > Base calling Ideas | ONT_DEL00017062 | ONT_DEL00017063 | A, F, H | | | | |
| 1045 | OAEO | 1/15/2018 | Email from P. James to Customer Wiki re What are the RT and strand switch primers used in the cDNA-PCR Sequencing Kit (SQK-PCS108)? | ONT_DEL00044680 | ONT_DEL00044681 | A, F, H | | | | |
| 1046 | OAEO | | Pre-release of Stand Alone Guppy - Guppy 2.1.1 | ONT_DEL00128115 | ONT_DEL00128118 | A, F, H | | | | |
| 1047 | OAEO | 00/00/2016 | Data Structure and Basecalling | ONT_DEL00189217 | ONT_DEL00189225 | A, F, H | | | | |
| 1048 | OAEO | 00/00/2018 | Oxford Nanopore Technologies, Accuracy - Base Callers | ONT_DEL00195842 | ONT_DEL00195848 | A, F, H | | | | |
| 1049 | OAEO - SC | | align.kmers.py | PCB-DE-0019288 | PCB-DE-0019291 | A, F, H | | | | |
| 1050 | OAEO - SC | | nanonetcall_2d.py | PCB-DE-0019376 | PCB-DE-0019381 | A, F, H | | | | |
| 1051 | OAEO - SC | | nanonetcall.py | PCB-DE-0019382 | PCB-DE-0019392 | A, F, H | | | | |
| 1052 | OAEO - SC | | nanonettrain.py | PCB-DE-0019393 | PCB-DE-0019396 | A, F, H | | | | |
| 1053 | OAEO - SC | | util.py | PCB-DE-0019464 | PCB-DE-0019472 | A, F, H | | | | |
| 1054 | | 3/17/1995 | File History of U.S. Patent No. 5,795,782 | | | A, F, H, N, R, U | | | | |
| 1055 | | 6/16/1998 | File History of U.S. Patent No. 6,015,714 | | | A, F, H, N, R, U | | | | |
| 1056 | | 2/20/2002 | File History of U.S. Patent No. 6,673,615 | | | A, F, H, N, R, U | | | | |
| 1057 | | 11/21/2001 | File History of U.S. Patent No. 6,936,433 | | | A, F, H, N, R, U | | | | |
| 1058 | | 12/18/2003 | File History of U.S. Patent No. 7,189,503 | | | A, F, H, N, R, U | | | | |
| 1059 | | 11/25/2009 | File History of U.S. Patent No. 7,947,454 | | | A, F, H, N, R, U | | | | |
| 1060 | | 3/23/2005 | File History of U.S. Patent Application Publication No. 2006/0063171 | | | A, F, H, N, R, U | | | | |
| 1061 | | 7/3/2007 | File History of U.S. Patent Application Publication No. 2008/0102504 | | | A, F, H, N, R, U | | | | |
| 1062 | OAEO | 5/17/2005 | Amendment No. 1 to the License Agreement L-677 between Oxford Nanolabs Ltd. and The Texas A&M University System | ONT_DEL00497288 | ONT_DEL00497293 | JTX | | | | |

Plaintiff's Trial Exhibit List

| Exhibit No. | Conf | Date | Description | Bates Beg No. | Bates End No. | Oxford's Objections | Admitted | Stipulated | Witness | Sponsoring Witness |
|---|---|---|---|---|---|---|---|---|---|---|
| 1063 | OAEO | 11/1/2009 | Option Agreement (Isis Project 4433) between Isis Innovation Limited and Oxford Nanopore Technologies | ONT_DEL00497334 | ONT_DEL00497346 | A, F, H, R | | | | |
| 1064 | OAEO | 5/20/2005 | Exclusive Licence of Technology (ISIS Project No. 2386) between Isis Innovation Limited and Oxford Nanolabs Limited | ONT_DEL00497347 | ONT_DEL00497377 | JTX | | | | |
| 1065 | OAEO | 6/8/2007 | Deed of Amendment to Exclusive Licence of Technology (ISIS Project No. 2386 and 2587) between Isis Innovation Limited and Oxford Nanolabs Limited | ONT_DEL00497378 | ONT_DEL00497384 | A, F, H, R | | | | |
| 1066 | OAEO | 5/17/2005 | License Agreement between STS Diagnostics GmbH and The Texas A&M University System | ONT_DEL00497385 | ONT_DEL00497407 | JTX | | | | |
| 1067 | OAEO | 8/31/2011 | Amendment No. 2 to the License Agreement L-677 between Oxford Nanolabs Ltd. and The Texas A&M University System | ONT_DEL00497408 | ONT_DEL00497421 | JTX | | | | |
| 1068 | OAEO | 12/13/2010 | License Agreement between Oxford Nanopore Technologies Limited and the Regents of the University of California | ONT_DEL00500449 | ONT_DEL00500487 | JTX | | | | |
| 1069 | OAEO | 8/31/2015 | IP Management and Collaboration Agreement between VIB vzw and Oxford Nanopore Technologies Ltd | ONT_DEL00502349 | ONT_DEL00502369 | A, F, H, R | | | | |
| 1070 | OAEO | 6/30/2011 | License Agreement between Oxford Nanopore Technologies, Ltd. And President and Fellows of Harvard College | ONT_DEL00502406 | ONT_DEL00502447 | JTX | | | | |
| 1071 | OAEO | 5/9/2012 | Exclusive License Agreement between The Board of Trustee of the Leland Stanford Junior University and Oxford Nanopore Technologies Ltd | ONT_DEL00502487 | ONT_DEL00502503 | JTX | | | | |
| 1072 | OAEO | 12/5/2016 | Exclusive License Agreement between the University of Massachusetts and Oxford Nanopore Technologies Limited | ONT_DEL00502504 | ONT_DEL00502521 | JTX | | | | |
| 1073 | OAEO | 00/00/2013 | License Agreement between Oxford Nanopore Technologies Ltd and the Regents of the University of Michigan | ONT_DEL00502522 | ONT_DEL00502595 | JTX | | | | |
| 1074 | OAEO | 5/17/2005 | Amendment No. 1 to the License Agreement L-677 between Oxford Nanolabs Ltd. and The Texas A&M University System | ONT_DEL00502634 | ONT_DEL00502639 | A, F, H, R | | | | |
| 1075 | OAEO | 10/15/2012 | License Agreement between Boston University and Oxford Nanopore Technologies, Ltd. | ONT_DEL00502640 | ONT_DEL00502679 | A, F, H, R | | | | |
| 1076 | OAEO | 11/1/2009 | Option Agreement (Isis Project 4433) between (1) Isis Innovation Limited and (2) Oxford Nanopore Technologies | ONT_DEL00502680 | ONT_DEL00502692 | A, F, H, R | | | | |
| 1077 | OAEO | 5/20/2005 | Exclusive Licence of Technology (ISIS Project No. 2386) between Isis Innovation Limited and Oxford Nanopore Technologies Limited | ONT_DEL00502695 | ONT_DEL00502725 | A, F, H, R | | | | |
| 1078 | OAEO | 8/30/2013 | License Agreement with Biocure Inc. and Oxford Nanopore Technologies Limited | ONT_DEL00502760 | ONT_DEL00502760 | A, F, H, R | | | | |
| 1079 | OAEO | 11/1/2016 | Sublicense Agreement between Oxford Nanopore Technologies Limited and Ohio State Innovation Foundation | ONT_DEL00502959 | ONT_DEL00502994 | A, F, H, R | | | | |
| 1080 | OAEO | 6/8/2007 | Deed of Amendment to Exclusive Licence of Technology (ISIS Project No. 2386 and 2587) between Isis Innovation Limited and Oxford Nanolabs Limited | ONT_DEL00503255 | ONT_DEL00503261 | A, F, H, R | | | | |
| 1081 | OAEO | 8/1/2014 | Sponsored Research Agreement between Brown University and Oxford Nanopore Technologies Ltd. | ONT_DEL00524384 | ONT_DEL00524401 | A, F, H, R | | | | |
| 1082 | OAEO | 2/3/2012 | Sponsored Research Agreement between Brown University and Oxford Nanopore Technologies Ltd. | ONT_DEL00524402 | ONT_DEL00524416 | A, F, H, R | | | | |
| 1083 | OAEO | | Pacific Biosciences, Updated Sales of Consumables by Customer spreadsheet | | | A, F, H, N | | | | |

# EXHIBIT F

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

Pursuant to D. Del. LR 16.3, Plaintiff Pacific Biosciences of California, Inc. ("PacBio"), provides the following list of objections corresponding to the list of exhibits identified by Defendants Oxford Nanopore Technologies, Inc. and Oxford Nanopore Technologies, Ltd. ("Defendants").

PacBio reserves the right to add to, remove from, and/or supplement this list of objections.  PacBio reserves the right to object, or not object, to the offering as an exhibit at trial any item listed herein by Defendants.  PacBio reserves the right to assert any one, part, or all of the objections listed for any item.  PacBio reserves the right to assert additional objections to any item.  The listing of objection(s), or not, as to any item is neither an admission nor a representation as to the admissibility of or relevance to any issue of any item.  PacBio reserves the right to use any exhibit set forth in Defendants' trial exhibit list for any purpose, including offering as an exhibit at trial, and/or for impeachment or rebuttal, notwithstanding any objections by PacBio to its use by Defendants for any purpose.  In addition to its specific objections, PacBio generally objects to any document or exhibit identified on Defendants' exhibit list that is the subject of an agreed motion *in limine* and/or stipulation, any of the parties' motions *in limine*, any other motions to exclude certain evidence, and any dispositive motions that may affect PacBio's ability to use certain exhibits at trial.

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| PacBio's Objection Codes | | |
|---|---|---|
| **Description** | **Abbreviation** | **Objection** |
| 403 | 403 | Prejudice, Misleading, Confusion of Issues, Duplicative, and/or Cumulative (FRE 403) |
| Settlement offer | 408 | Inadmissible settlement offer |
| Attorney-Client | AC | Attorney-Client Privilege or Work Product (FRE 502) |
| Authenticity | A | The exhibit has not been properly authenticated for admission into evidence.   (FRE 104, 901) |
| Best Evidence | BE | Best Evidence (FRE 1002-03) |
| Confidentiality | CO | The exhibit contains confidential business information but is not properly labeled pursuant to the Protective Orders. |
| Cumulative | CU | Cumulative |
| Description Error | DE | The descriptive title used for the proposed exhibit is inaccurate, misleading or incomplete. |
| Discovery Deadline | DI | The exhibit has not been produced or was produced after the close of discovery. |
| Duplication | DU | The document is included on the exhibit list more than one time or contains other documents that are included on the exhibit list. |
| Exhibit not provided | E | Exhibit not provided |
| Foreign Language | FL | Foreign Language Document that does not include certified translation. |
| Hearsay | H | Hearsay (FRE 802) |
| Hearsay Within Hearsay | HH | Hearsay Within Hearsay (FRE 802) |
| Improper Opinion | IO | Proposed testimony or exhibit contains improper opinion testimony from a fact witness or improper expert opinion testimony |
| Incomplete | I | The copy of the exhibit provided by Defendants is incomplete. (FRE 106) |
| Improper Character | IC | Proposed testimony or exhibit contains evidence of a crime, wrong, or other act improperly being used to show that on a particular occasion a party acted in accordance with that character.  (FRE 404(b)) |
| Illegible | IL | The copy of the exhibit provided by Defendants is illegible |
| Lacks Foundation | LF | There is no foundation for the proposed exhibit or for testimony contained in the exhibit (FRE 104). |
| Lacks Knowledge | LK | Proposed testimony or exhibit contains material that is not within the personal knowledge of the witness (FRE 602). |
| Motion in Limine | MIL | Subject to motion to limine |
| Multiple Documents | MD | Proposed exhibit is actually multiple documents. |
| Not Proper Evidence | NP | The exhibit is not proper evidence. |
| Relevance | R | Relevance (FRE 402) |
| Untimely | U | The proposed exhibit was not timely produced or contains contentions, opinions, claim construction positions, facts and/or information that were not timely disclosed. |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-1 | U.S. Patent 6,673,615 | PCB-DE-0002415 | PCB-DE-0002449 | Cited on the face of '929 Patent; Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-2 | Austin et al. "Fabrication of 5nm linewidth and 14 nm pitch features by nanoimprint lithography" Apps Phys Lett (2004) 84(26):5299-5301. | PCB-DE-0008234 | PCB-DE-0008236 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-3 | Bashir, A. et al., "Evaluation of paired-end sequencing strategies for detection of genome rearrangements in cancer" Plos CompBiol (2008) 4(4):1-14. | PCB-DE-0008776 | PCB-DE-0008789 | Cited on the face of '929 Patent | 403, R |
| DTX-4 | Bayley et al. "Nanotechnology: Holes with an edge" Nature (2010) 567:164-165. | PCB-DE-0008309 | PCB-DE-0008313 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-5 | Chang et al. "Electronic signatures of all four DNA nucleosides in a tunneling gap" Nano Lett (2010) 10:1070-1075. | PCB-DE-0008211 | PCB-DE-0008227 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-6 | Chen et al. "Atomic layer deposition to fine-tune the surface properties and diameters of fabricated nanopores" Nano Lett (2004) 4(7):1333-1337. | PCB-DE-0008108 | PCB-DE-0008117 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-7 | Chou et al. "Electrodeless dielectrophoresis of single- and double-stranded DNA" Biophys J (2002) 83:2170-2179. | PCB-DE-0008201 | PCB-DE-0008210 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-8 | Complaint for Patent Infringement of U.S. Pat. No. 9,546,400, filed on Mar. 15, 2017 in the United States District for the District of Delaware (Pacific Biosciences of California vs. Oxford Nanopore Technologies, Inc.) Court. | | | Cited on the face of '323 Patent | |
| DTX-9 | Definition of "Consensus Sequence" from Medical dictionary, Printed on Feb. 6, 2017. | PCB-DE-0008749 | PCB-DE-0008751 | Cited on the face of '929 Patent | 403, R |
| DTX-10 | Eid, et al., "Real-time DNA sequencing from single polymerase molecules" Science (2009) 323(5910):133-138. | PCB-DE-0009366 | PCB-DE-0009372 | Cited on the face of '929 Patent | 403, R |
| DTX-11 | EP 1225234 | PCB-DE-0004287 | PCB-DE-0004323 | Cited on the face of '929 Patent | 403, R |
| DTX-12 | EP 1712909 | PCB-DE-0002232 | PCB-DE-0002250 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-13 | Expert Report of Floyd Romesberg, Ph.D. Regarding U.S. Pat. No. 9,404,146 and U.S. Pat. No. 9,542,527 as they relate to the Complaint filed by Pacific Biosciences Under Section 337 of the Tariff Act of 1930 with the United States International Trade Commission on Nov. 2, 2016. | PCB-DE-0008790 | PCB-DE-0009098 | Cited on the face of '929 Patent | 403, R |
| DTX-14 | First Exam Report dated Jul. 18, 2013 of related EP 09816557.4. | PCB-DE-0009099 | PCB-DE-0009104 | Cited on the face of '929 Patent | 403, R |
| DTX-15 | Geirhart et al., "Nanopore with Transverse Nanoelectrodes for Electrical Characterization and Sequencing of DNA," Sensors and Actuators B (2008) 132:593-600. | PCB-DE-0008288 | PCB-DE-0008308 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-16 | Gramlich et al. "Click-click-click: Single to triple modification of DNA" Angew Chem Int Ed (2008) 47:3442-3444. | PCB-DE-0008127 | PCB-DE-0008129 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-17 | Greenleaf et al., "Single-Molecule, Motion-Based DNA Sequencing Using RNAPolymerase," Science, 313(5788): 801 (Aug. 2006). | PCB-DE-0009427 | PCB-DE-0009427 | Cited on the face of '929 Patent | 403, R |
| DTX-18 | Harrer et al. "Electrochemical characterization of thin film electrodes toward developing a DNA transistor" Langmuir (2010) 26(24):19191-19198. | PCB-DE-0008193 | PCB-DE-0008200 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |

## EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| **DTX-19** | Harris, T.D. et al., "Single-molecule DNA sequencing of a viral genome" Science (2008) 320:106-109. | PCB-DE-0009422 | PCB-DE-0009426 | Cited on the face of '929 Patent | 403, R |
| **DTX-20** | Hattori et al, "Dideoxy Sequering Method Using Denatured Plasmid Templates," Analytical Biochemistry, vol. 152, pp. 232-238 (1986). | PCB-DE-0009151 | PCB-DE-0009157 | Cited on the face of '929 Patent | 403, R |
| **DTX-21** | Hayashizaki et al., "A new method for constructing NotI linking and boundary libraries using a restriction trapper," Genomics, vol. 14, pp. 733-739 (1992). | PCB-DE-0009158 | PCB-DE-0009164 | Cited on the face of '929 Patent | 403, R |
| **DTX-22** | He et al. "A hydrogen-bonded electron-tunneling circuit reads the base composition of unmodified DNA" Nanotech (2009) 20(7):075102. | PCB-DE-0008086 | PCB-DE-0008099 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-23** | Holden et al. "Direct introduction of single protein channels and pores into lipid bilayers" JACS (2005) 127 (18):6502-6503. | PCB-DE-0008154 | PCB-DE-0008155 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-24** | Hong, Y.S. et al., "Construction of a BAC library and generation of BAC end sequence-tagged connectors for genome sequencing" Mol Genet Genomics (2003) 268:720-728. | PCB-DE-0008712 | PCB-DE-0008721 | Cited on the face of '929 Patent | 403, R |
| **DTX-25** | Hopfner et al. "Mechanisms of nucleic acid translocases: lessons from structural biology and single-molecule biophysics" Curr Opin Struct Biol (2007) 17(1):87-95. | PCB-DE-0009236 | PCB-DE-0009247 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-26** | Hormozdiari, et al. "Combinatorial algorithms for structural variation detection in high-throughput sequenced genomes," Genome Research (2009) 19:1270-1278. | PCB-DE-0008674 | PCB-DE-0008683 | Cited on the face of '929 Patent | 403, R |
| **DTX-27** | Howorka et al. "Sequence-specific detection of individual DNA strands using engineered nanopores" Nature Biotech (2001) 19:636-639. | PCB-DE-0008469 | PCB-DE-0008472 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-28** | Hughes et al. "Optical absorption of DNA-carbon nanotube structures" Nano Lett (2007) 7(5):1191-1194. | PCB-DE-0008357 | PCB-DE-0008360 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-29** | International Preliminary Report on Patentability dated Apr. 7, 2011 for related case PCT/US2009/001927. | PCB-DE-0009180 | PCB-DE-0009185 | Cited on the face of '929 Patent | 403, R |
| **DTX-30** | International Preliminary Report on Patentability dated Apr. 7, 2011 for related case PCT/US2009/005169. | PCB-DE-0009186 | PCB-DE-0009192 | Cited on the face of '929 Patent | 403, R |
| **DTX-31** | International Preliminary Report on Patentability dated Oct. 20, 2011 for related case PCT/US2010/001072. | PCB-DE-0008363 | PCB-DE-0008367 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-32** | International Preliminary Report on Patentability dated Oct. 7, 2010 for related case PCT/US2009/001930. | PCB-DE-1003673 | PCB-DE-1003677 | Cited on the face of '929 Patent | 403, R |
| **DTX-33** | International Search Report and Written Opinion dated Apr. 29, 2010 for related case PCT/US2009/005169. | PCB-DE-0009223 | PCB-DE-0009225 | Cited on the face of '929 Patent | 403, R |
| **DTX-34** | International Search Report and Written Opinion dated Jan. 25, 2011 for related case PCT/US2010/001072. | PCB-DE-0008368 | PCB-DE-0008375 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-35** | International Search Report and Written Opinion dated Nov. 17, 2009 for related case PCT/US2009/001926. | PCB-DE-1003678 | PCB-DE-1003688 | Cited on the face of '929 Patent | 403, R |
| **DTX-36** | International Search Report and Written Opinion dated Nov. 3, 2009 for related case PCT/US2009/001927. | PCB-DE-0009220 | PCB-DE-0009222 | Cited on the face of '929 Patent | 403, R |
| **DTX-37** | International Search Report and Written Opinion dated Oct. 27, 2009 for related case PCT/US2009/001930. | PCB-DE-1003689 | PCB-DE-1003699 | Cited on the face of '929 Patent | 403, R |
| **DTX-38** | Jarvie et al., "3K Long-Tag Paired End sequencing with the Genome Sequencer FLX System," BioTechniques, vol. 44, No. 6, pp. 829-831 (2008). | PCB-ONT-ITC-0838608 | PCB-ONT-ITC-0838609 | Cited on the face of '929 Patent | 403, R |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| **DTX-39** | Jiang et al. "The open pore conformation of potassium channels" Nature (2002) 47:523-526. | PCB-DE-0008527 | PCB-DE-0008530 | Cited on the face of '056 Patent; Cited on the face of '323 Patent and '400 Patent | 403, R |
| **DTX-40** | Withdrawn | | | | |
| **DTX-41** | Kalisch et al., "Covalently linked sequencing primer linkers (splinkers) for sequence analysis of restriction fragments," Gene, vol. 44, pp. 263-270 (1986). | PCB-DE-0008727 | PCB-DE-0008734 | Cited on the face of '929 Patent | 403, R |
| **DTX-42** | Kambara et al., "Real Time Automated Simultaneous Double-Stranded DNA Sequencing Using Two-Color Fluorophore Labeling," Biotechnology, vol. 9, pp. 648-651 (Jul. 1991). | PCB-ONT-ITC-0838621 | PCB-ONT-ITC-0838624 | Cited on the face of '929 Patent | 403, R |
| **DTX-43** | Kang et al. "A storable encapsulated bilayer chip containing a single protein nanopore" JACS (2007) 129:4701-4705. | PCB-DE-0008103 | PCB-DE-0008107 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-44** | Keane, T. et al., "Assessing Assemblability of Reads from New sequencing Platforms" Wellcome Trust Poster, p. 1, 15th Annual International Conference on Intelligent Systems for Molecular Biology (ISMB) & 6th European Conference on Computational Biology (ECCB), Vienna, Austria Jul. 21-25, 2007. | PCB-DE-0008635 | PCB-DE-0008635 | Cited on the face of '929 Patent | 403, R |
| **DTX-45** | Kim et al. "Rapid fabrication of uniformly sized nanopores and nanopore arrays for parallel DNA analysis" Adv Mat (2006) 18:3149-3153. | PCB-DE-0008420 | PCB-DE-0008424 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-46** | Kim et al., "DARFA: a novel technique for studying differential gene expression and bacterial comparative genomics," Biochemical and Biophysical Research Communications, vol. 336, pp. 168-174 (2005). | PCB-DE-0008735 | PCB-DE-0008741 | Cited on the face of '929 Patent | 403, R |
| **DTX-47** | Koonin et al. "Computer-assisted dissection of rolling circle DNA replication" Biosystems (1993) 30(1-3):241-268. | PCB-DE-0008684 | PCB-DE-0008711 | Cited on the face of '929 Patent | 403, R |
| **DTX-48** | Korbel, J.O. et al. "Paired-end mapping reveals extensive structural variation in the human genome" Science (2007) 318:420-426. | PCB-DE-0009328 | PCB-DE-0009335 | Cited on the face of '929 Patent | 403, R |
| **DTX-49** | Kuhn et al., "High-Purity Preparation of a Large DNA Dumbbell," Antisense & Nucleic Acid Drug Development, vol. 11, pp. 149-153 (2001). | PCB-DE-0009175 | PCB-DE-0009179 | Cited on the face of '929 Patent | 403, R |
| **DTX-50** | Kuhn et al., "Rolling-circle amplificaiton under topological constraints" Nucl Acids Res (2002) 30(2):574-580. | PCB-DE-0009398 | PCB-DE-0009404 | Cited on the face of '929 Patent | 403, R |
| **DTX-51** | Kumar et al., "PEG-Labeled Nucleotides and Nanopore Detection for Single Molecule DNA Sequencing by Synthesis," Scientific Reports (2012) 2:684 DOI:10.1038-srep00684. | PCB-DE-0008376 | PCB-DE-0008383 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-52** | Lee, et al., "A robust framework for detecting structural variations in a genome," Bioinformatics (2008) 24:i59-i67. | PCB-DE-0008617 | PCB-DE-0008625 | Cited on the face of '929 Patent | 403, R |
| **DTX-53** | Levene et al., "Zero-mode waveguides for single-molecule analysis at high concentrations" Science (2003) 299(5607):682-686. | PCB-DE-0009558 | PCB-DE-0009563 | Cited on the face of '929 Patent | 403, R |
| **DTX-54** | Li et al. "DNA molecules and configurations in a solidstate nanopore microscope" Nature Mat (2003) 2:611-615. | PCB-DE-0008156 | PCB-DE-0008176 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-55** | Liang et al. "Nanogap detector inside nanofluidic channel for fast real-time label-free DNA analysis" Nano Lett (2008) 8(5):1472-1476. | PCB-DE-0008274 | PCB-DE-0008278 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-56** | Lindsay et al. "Recognition tunneling" Nanotech (2010) 21:262001. | PCB-DE-0008425 | PCB-DE-0008447 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| **DTX-57** | Liu et al. "Descreening of field effect in electrically gated nanopores" Appl Phys Lett (2010) 97:143109. | PCB-DE-0008141 | PCB-DE-0008153 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-58** | Liu et al. "Translocation of single-stranded DNA through single-walled carbon nanotubes" Science (2010) 327:64-67. | PCB-DE-0008555 | PCB-DE-0008565 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-59** | Liu et al., "Rolling Circle DNA Synthesis: Small Circular Oligonucleotides as Efficient Templates for DNA Polymerases," J. Am. Chem. Soc., vol. 118, pp. 1587-1594 (1996). | PCB-DE-0009377 | PCB-DE-0009397 | Cited on the face of '929 Patent | 403, R |
| **DTX-60** | Lohman et al. "Non-hexameric DNA helicase and translocases: mechanisms and regulation" Nature Rev Mol Cell Biol (2008) 9:391-401. | PCB-DE-0008337 | PCB-DE-0008348 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-61** | Lu et al. "Nanowire transistor performance limits and applications" IEEE Trans on Electron Dev (2008) 55 (11):2859-2876. | PCB-DE-0008314 | PCB-DE-0008331 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-62** | Luan et al. "Base-by-base ratcheting of single stranded DNA through a solid-state nanopore" Phys Rev Lett (2010) 104:8103-8106. | PCB-DE-0008118 | PCB-DE-0008126 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-63** | Luo et al., "Small interfering RNA production by enzymatic engineering of DNA (SPEED)," PNAS, vol. 101 No. 15, pp. 5494-5499 (Apr. 2004). | PCB-DE-0009440 | PCB-DE-0009445 | Cited on the face of '929 Patent | 403, R |
| **DTX-64** | Margulies, et al., "Genome sequencing in microfabricated high-density picolitre reactors," Nature (2005), 437:376-382. | PCB-DE-0009120 | PCB-DE-0009133 | Cited on the face of '929 Patent | 403, R |
| **DTX-65** | Matray, T.J. et al. "A specific partner for abasic damage in DNA" Nature (1999) 399:704-708. | PCB-DE-0008626 | PCB-DE-0008630 | Cited on the face of '929 Patent | 403, R |
| **DTX-66** | Meller et al. "Voltage-driven DNA translocation through a nanopore" Phys Rev Lett (2001) 86(15):3435-3438. | PCB-DE-0008566 | PCB-DE-0008570 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-67** | Merchant et al. "DNA Translocation Through Graphene Nanopores, " NanoLetters (2010) 10:2915-2921. | PCB-DE-0008267 | PCB-DE-0008273 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-68** | Metzker, M.I., "Emerging Technologies in DNA Sequencing," Genome Research (2005) 15:1767-1776. | PCB-DE-0008760 | PCB-DE-0008769 | Cited on the face of '929 Patent | 403, R |
| **DTX-69** | Myers, G. "Whole-genome DNA sequencing" IEEE (May-Jun. 1999) pp. 33-43. | PCB-DE-0009537 | PCB-DE-0009547 | Cited on the face of '929 Patent | 403, R |
| **DTX-70** | Novick "Contrasting lifestyles of rolling-circle phages and plasmids" Trends Biochem Sci (1998) 23(11):434-438. | PCB-DE-0008722 | PCB-DE-0008726 | Cited on the face of '929 Patent | 403, R |
| **DTX-71** | Oxford Nanopore's Motion and Opening Brief in Support of its Motion to Dismiss Pacific Biosciences' Complaint dated May 8, 2017, on the Ground That the Asserted Claims are Invalid; with Exhibits included. | | | Cited on the face of '323 Patent | H |
| **DTX-72** | Pacific Biosciences Presentation for Cold Spring Harbor Personal Genomics Meeting on Oct. 12, 2008. | PCB-DE-0009306 | PCB-DE-0009327 | Cited on the face of '929 Patent | 403, R |
| **DTX-73** | Pease et al. "Sequence-directed DNA translocation by purified FtsK" Science (2005) 307:586-590. | PCB-DE-0008448 | PCB-DE-0008453 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-74** | Pedler, "Occupation Times for Two State Markov Chains," Journ Appl Probability (1971), 8(2):381-90. | PCB-DE-0009296 | PCB-DE-0009305 | Cited on the face of '929 Patent | 403, R |
| **DTX-75** | Polonsky et al. "Nanopore in metal-dielectric sandwich for DNA position control" Appl Phys Lett (2007) 91:153103-153103-3. | PCB-DE-0008285 | PCB-DE-0008287 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |

## EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-76 | Reifenberger, J. et al., Advances in Genome Biol and Tech (AGBT) (2009) Abstract Feb. 4-7, 2009. | PCB-DE-0009373 | PCB-DE-0009374 | Cited on the face of '929 Patent | 403, R |
| DTX-77 | Reifenberger, J. et al., Biophys Soc 53rd Ann Meeting (2009) Abstract, Feb. 28, 2009. | PCB-DE-0009375 | PCB-DE-0009376 | Cited on the face of '929 Patent | 403, R |
| DTX-78 | Reimhult et al. "Membrane biosensor platforms using nano- and microporous supports" Trends in Biotech (2007) 26 (2):82-89. | PCB-DE-0008259 | PCB-DE-0008266 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-79 | Response and Exhibit List of Oxford Nanopore Technologies Ltd., Oxford Nanopore Technologies, Inc., and Metrichor, Ltd. Dated Jan. 6, 2017 to the Complaint of Pacific Biosciences of California, Inc., and Notice of Investigation in the Matter of Certain Single-Molecule Nucleic Acid Sequencing Systems and Reagents, Consumables, and Software for Use with Same (Investigation No. 337-TA-1032). | PCB-ONT-ITC-0838712 | PCB-ONT-ITC-0838744 | Cited on the face of '929 Patent | H |
| DTX-80 | Schneider et al. "DNA translocation through graphene nanopores" Nano Lett (2010) 10:3163-3167. | PCB-DE-0008177 | PCB-DE-0008192 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-81 | Second Exam Report dated Apr. 9, 2015 of related EP 09816557.4. | PCB-DE-0009405 | PCB-DE-0009411 | Cited on the face of '929 Patent | 403, R |
| DTX-82 | Shchepinov et al. "Oligonucleotide dendrimers: synthesis and use as polylabelled DNA probes" Nucl Acids Res (1997) 25(22):4447-4454. | PCB-DE-0008349 | PCB-DE-0008356 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-83 | Singleton et al. "Structure and mechanism of helicases and nucleic acid translocases" Ann Rev Biochem (2007) 76:23-50. | PCB-DE-0008496 | PCB-DE-0008526 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-84 | Smeets et al. "Noise in solid-state nanopores" PNAS (2008) 105(2):417-421. | PCB-DE-0008332 | PCB-DE-0008336 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-85 | Smith, M. et al., "Genomic sequence sampling: a strategy for high resolution sequence-based physical mapping of complex genomes" Nature Genetics (1994) 7:40-47. | PCB-DE-0009134 | PCB-DE-0009142 | Cited on the face of '929 Patent | 403, R |
| DTX-86 | Spinella et al., "Tandem arrayed ligation of expressed sequence tags (TALEST): a new method for generating global gene expression profiles" Nucl Acids Res (1999) 27(18):e22-e22. | PCB-DE-0009469 | PCB-DE-0009476 | Cited on the face of '929 Patent | 403, R |
| DTX-87 | Stoddart et al. "Single-nucleotide discrimination in immobilized DNA oligonucleotides with a biological nanopore" PNAS (2009) 106:7702-7707. | PCB-DE-0008483 | PCB-DE-0008488 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-88 | Storm et al. "Fabrication of solid-state nanopores with single-nanometre precision" Nature Mat (2003) 2:537-540. | PCB-DE-0008237 | PCB-DE-0008241 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-89 | Supplementary European Search Report dated Mar. 20, 2012 for related case EP 09816557.4. | PCB-DE-1003824 | PCB-DE-1003833 | Cited on the face of '929 Patent | 403, R |
| DTX-90 | Svoboda, et al., "Fluctuation analysis of motor protein movement and single enzyme kinetics," PNAS (1994), 91:11782-86. | PCB-DE-0009105 | PCB-DE-0009109 | Cited on the face of '929 Patent | 403, R |
| DTX-91 | Tanaka et al. "Partial sequencing of a single DNA molecule with a scanning tunnelling microscope" Nature Nanotech (2009) 4:518-522. | PCB-DE-0008361 | PCB-DE-0008362 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-92 | Technology Spotlight: Illumina Sequencing Technology, current of Oct. 8, 2008, pp. 1-4 | PCB-DE-1003842 | PCB-DE-1003845 | Cited on the face of '929 Patent | 403, R |
| DTX-93 | Thelwell et al., "Mode of action and application of Scorpion primers to mutation detection," Nucleic Acids Research, vol. 28, No. 19, pp. 3752-3761 (2000). | PCB-DE-0009269 | PCB-DE-0009278 | Cited on the face of '929 Patent | 403, R |
| DTX-94 | Third Exam Report dated Mar. 30, 2016 of related EP 09816557.4. | PCB-DE-0009481 | PCB-DE-0009486 | Cited on the face of '929 Patent | 403, R |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-95 | Tian et al. "Three-dimensional, flexible nanoscale field-effect transistors as localized bioprobes" Science (2010) 329:830-834. | PCB-DE-0008539 | PCB-DE-0008548 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-96 | Tsutsui et al. "Identifying singl-e nucleotides by tunnelling current" Nature Nanotech (2010) 5:286-290. | PCB-DE-0008242 | PCB-DE-0008246 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-97 | Turner et al. "Confinement-induced entropic recoil of single DNA molecules in a nanofluidic structure" Phys Rev Lett (2002) 88(12):128103-1-4. | PCB-DE-0008130 | PCB-DE-0008133 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-98 | U.S. Patent Pub. 2003/0215862 | PCB-DE-0006124 | PCB-DE-0006154 | Cited on the face of '929 Patent | 403, R |
| DTX-99 | U.S. Patent Pub. 2003/0232346 | PCB-DE-0002709 | PCB-DE-0002723 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-100 | U.S. Patent Pub. 2004/0002077 | PCB-DE-0006155 | PCB-DE-0006217 | Cited on the face of '929 Patent | 403, R |
| DTX-101 | U.S. Patent Pub. 2004/0048300 | PCB-DE-0006218 | PCB-DE-0006231 | Cited on the face of '929 Patent | 403, R |
| DTX-102 | U.S. Patent Pub. 2004/0152119 | PCB-DE-0006232 | PCB-DE-0006257 | Cited on the face of '929 Patent | 403, R |
| DTX-103 | U.S. Patent Pub. 2004/0203008 | PCB-DE-0006258 | PCB-DE-0006287 | Cited on the face of '929 Patent | 403, R |
| DTX-104 | U.S. Patent Pub. 2004/0224319 | PCB-DE-0006288 | PCB-DE-0006309 | Cited on the face of '929 Patent | 403, R |
| DTX-105 | U.S. Patent Pub. 2004/0248161 | PCB-DE-0006310 | PCB-DE-0006341 | Cited on the face of '929 Patent | 403, R |
| DTX-106 | U.S. Patent Pub. 2004/0259082 | PCB-DE-0006342 | PCB-DE-0006465 | Cited on the face of '929 Patent | 403, R |
| DTX-107 | U.S. Patent Pub. 2005/0069939 | PCB-DE-0006466 | PCB-DE-0006487 | Cited on the face of '929 Patent | 403, R |
| DTX-108 | U.S. Patent Pub. 2005/0176035 | PCB-DE-0006488 | PCB-DE-0006518 | Cited on the face of '929 Patent | 403, R |
| DTX-109 | U.S. Patent Pub. 2006/0019247 | PCB-DE-0002724 | PCB-DE-0002737 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-110 | U.S. Patent Pub. 2006/0061754 | PCB-DE-0006574 | PCB-DE-0006617 | Cited on the face of '929 Patent | 403, R |
| DTX-111 | U.S. Patent Pub. 2006/0147935 | PCB-DE-0006618 | PCB-DE-0006640 | Cited on the face of '929 Patent | 403, R |
| DTX-112 | U.S. Patent Pub. 2006/0231419 | PCB-DE-0002765 | PCB-DE-0002792 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-113 | U.S. Patent Pub. 2006/0246497 | PCB-DE-0002793 | PCB-DE-0002809 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-114 | U.S. Patent Pub. 2006/0292611 | PCB-DE-0006641 | PCB-DE-0006720 | Cited on the face of '929 Patent | 403, R |
| DTX-115 | U.S. Patent Pub. 2007/0048745 | PCB-DE-0002810 | PCB-DE-0002827 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-116 | U.S. Patent Pub. 2007/0062934 | PCB-DE-0006721 | PCB-DE-0006735 | Cited on the face of '929 Patent | 403, R |
| DTX-117 | U.S. Patent Pub. 2007/0099191 | PCB-DE-0002828 | PCB-DE-0002848 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-118 | U.S. Patent Pub. 2007/0161017 | PCB-DE-0006736 | PCB-DE-0006762 | Cited on the face of '929 Patent | 403, R |
| DTX-119 | U.S. Patent Pub. 2007/0178482 | PCB-DE-0006763 | PCB-DE-0006787 | Cited on the face of '929 Patent | 403, R |
| DTX-120 | U.S. Patent Pub. 2007/0190556 | PCB-DE-0006788 | PCB-DE-0006804 | Cited on the face of '929 Patent | 403, R |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-121 | U.S. Patent Pub. 2007/0205098 | PCB-DE-0002849 | PCB-DE-0002854 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-122 | U.S. Patent Pub. 2007/0231808 | PCB-DE-0006805 | PCB-DE-0006831 | Cited on the face of '929 Patent | 403, R |
| DTX-123 | U.S. Patent Pub. 2007/0269825 | PCB-DE-0006832 | PCB-DE-0006880 | Cited on the face of '929 Patent | 403, R |
| DTX-124 | U.S. Patent Pub. 2007/0298511 | PCB-DE-0002855 | PCB-DE-0002873 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-125 | U.S. Patent Pub. 2008/0009007 | PCB-DE-0006881 | PCB-DE-0006890 | Cited on the face of '929 Patent | 403, R |
| DTX-126 | U.S. Patent Pub. 2008/0026393 | PCB-DE-0006891 | PCB-DE-0007073 | Cited on the face of '929 Patent | 403, R |
| DTX-127 | U.S. Patent Pub. 2008/0041733 | PCB-DE-0002874 | PCB-DE-0002887 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-128 | U.S. Patent Pub. 2008/0051294 | PCB-DE-0007074 | PCB-DE-0007096 | Cited on the face of '929 Patent | 403, R |
| DTX-129 | U.S. Patent Pub. 2008/0176241 | PCB-DE-0007097 | PCB-DE-0007119 | Cited on the face of '929 Patent | 403, R |
| DTX-130 | U.S. Patent Pub. 2008/0218184 | PCB-DE-0002888 | PCB-DE-0002917 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent; Cited on the face of '929 Patent | 403, R |
| DTX-131 | U.S. Patent Pub. 2008/0233575 | PCB-DE-0007150 | PCB-DE-0007162 | Cited on the face of '929 Patent | 403, R |
| DTX-132 | U.S. Patent Pub. 2008/0254995 | PCB-DE-0002918 | PCB-DE-0002942 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-133 | U.S. Patent Pub. 2009/0005252 | PCB-DE-0007163 | PCB-DE-0007229 | Cited on the face of '929 Patent | 403, R |
| DTX-134 | U.S. Patent Pub. 2009/0029477 | PCB-DE-0002984 | PCB-DE-0003015 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-135 | U.S. Patent Pub. 2009/0087850 | PCB-DE-0007230 | PCB-DE-0007246 | Cited on the face of '929 Patent | 403, R |
| DTX-136 | U.S. Patent Pub. 2009/0197257 | PCB-DE-0007247 | PCB-DE-0007263 | Cited on the face of '929 Patent | 403, R |
| DTX-137 | U.S. Patent Pub. 2009/0233291 | PCB-DE-0007264 | PCB-DE-0007355 | Cited on the face of '929 Patent | 403, R |
| DTX-138 | U.S. Patent Pub. 2009/0269771 | PCB-DE-0007356 | PCB-DE-0007370 | Cited on the face of '929 Patent | 403, R |
| DTX-139 | U.S. Patent Pub. 2009/0305248 | PCB-DE-0007371 | PCB-DE-0007381 | Cited on the face of '929 Patent | 403, R |
| DTX-140 | U.S. Patent Pub. 2010/0216151 | PCB-DE-0007382 | PCB-DE-0007403 | Cited on the face of '929 Patent | 403, R |
| DTX-141 | U.S. Patent Pub. 2010/0289505 | PCB-DE-0003016 | PCB-DE-0003037 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-142 | U.S. Patent Pub. 2011/0014612 | PCB-DE-0003097 | PCB-DE-0003243 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-143 | U.S. Patent Pub. 2011/0081647 | PCB-DE-0003244 | PCB-DE-0003291 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-144 | U.S. Patent Pub. 2011/0193570 | | | Cited on the face of '323 Patent | 403, R |
| DTX-145 | U.S. Patent Pub. 2011/0214991 | PCB-DE-0003292 | PCB-DE-0003305 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |

## EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-146 | U.S. Patent Pub. 2014/0051069 | PCB-DE-0003306 | PCB-DE-0003397 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-147 | Velculescu et al. "Serial analysis of gene expression" Science (1995) 270(5235): 484-487. | PCB-DE-0009412 | PCB-DE-0009416 | Cited on the face of '929 Patent | 403, R |
| DTX-148 | Volik, S. et al., "End-sequence profiling: sequence-based analysis of aberrant genomes" PNAS (2003) 100(13):7696-7701. | PCB-DE-0008770 | PCB-DE-0008775 | Cited on the face of '929 Patent | 403, R |
| DTX-149 | Wanunu et al. "Rapid electronic detection of probe-specific microRNAs using thin nanopore sensors" Nature Nanotech (2010) 5:807-814. | PCB-DE-0008412 | PCB-DE-0008419 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-150 | White et al. "Single ion-channel recordings using glass nanopore membranes" JACS (2007) 129(38):11766-11775. | PCB-DE-0008473 | PCB-DE-0008482 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-151 | Wiemann et al., "Simultaneous On-Line DNA Sequencing on Both Strands with Two Fluourescent Dyes," Analytical Biochemistry, vol. 224, pp. 117-121 (1995). | PCB-DE-0009417 | PCB-DE-0009421 | Cited on the face of '929 Patent | 403, R |
| DTX-152 | Wiley, G. et al., "Methods for generating shotgun and mixed shotgun/paired-end libraries for the 454 DNA sequencer" Current Protocols in Human Genomics (2009) Chapter 18; Unit 18.1, pp. 1-21. | PCB-DE-0009248 | PCB-DE-0009268 | Cited on the face of '929 Patent | 403, R |
| DTX-153 | WO 0028312 | PCB-DE-0003398 | PCB-DE-0003456 | Cited on the face of '323 Patent; Cited on the face of '056 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-154 | WO 1907573 | | | Cited on the face of '929 Patent | 403, R |
| DTX-155 | WO 2007003017 | PCB-DE-0007616 | PCB-DE-0007684 | Cited on the face of '929 Patent | 403, R |
| DTX-156 | WO 2007010263 | PCB-DE-0007685 | PCB-DE-0007737 | Cited on the face of '929 Patent | 403, R, H |
| DTX-157 | WO 2007025124 | PCB-DE-0007738 | PCB-DE-0007767 | Cited on the face of '929 Patent | 403, R, H |
| DTX-158 | WO 2007070572 | PCB-DE-0007768 | PCB-DE-0007906 | Cited on the face of '929 Patent | 403, R |
| DTX-159 | WO 2008058282 | PCB-DE-0007907 | PCB-DE-0008015 | Cited on the face of '929 Patent | 403, R |
| DTX-160 | WO 2008064905 | PCB-DE-0008016 | PCB-DE-0008033 | Cited on the face of '929 Patent | 403, R |
| DTX-161 | WO 2008102121 | PCB-DE-0003457 | PCB-DE-0003520 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-162 | WO 2009077734 | PCB-DE-0003521 | PCB-DE-0003602 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-163 | WO 2009124255 | PCB-DE-0008034 | PCB-DE-0008085 | Cited on the face of '929 Patent | 403, R |
| DTX-164 | WO 2010086603 | PCB-DE-0003603 | PCB-DE-0003688 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-165 | WO 2012083249 | PCB-DE-0003689 | PCB-DE-0003885 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-166 | Withdrawn | | | | |
| DTX-167 | WO 9106678 | | | Cited on the face of '929 Patent | 403, R |
| DTX-168 | WO 9416090 | | | Cited on the face of '929 Patent | 403, R |
| DTX-169 | WO 9627025 | | | Cited on the face of '929 Patent | 403, R |
| DTX-170 | WO 9905315 | | | Cited on the face of '929 Patent | 403, R |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-171 | Wu et al. "Protein nanopores with covalently attached molecular adapters" JACS (2007) 129:16142-16148. | PCB-DE-0008405 | PCB-DE-0008411 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-172 | Zanta et al., "Gene delivery: a single nuclear localization signal peptide is sufficient to carry DNA to the cell nucleus," Proc. Natl. Acad. Sci. USA, vol. 96, pp. 91-96 (Jan. 1999). | PCB-DE-0009114 | PCB-DE-0009119 | Cited on the face of '929 Patent | 403, R |
| DTX-173 | Church, G. M., "*Genomes for All*" Scientific American, Jan. 2006, 47-54 | ONT_DEL00011468 | ONT_DEL00011476 | | |
| DTX-174 | Clarke, James, et al., "*Continuous base identification for single-molecule nanopore DNA sequencing*" Nature Nanotechnology Articles, 02/22/09 | ONT_DEL00011477 | ONT_DEL00011482 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| DTX-175 | Deamer, et al. "*Characterization of Nucleic Acids by Nanopore Analysis*" Acc. Chem. Res., Vol. 35, No. 10, pp. 817-825 (2002) | ONT_DEL00011510 | ONT_DEL00011518 | | |
| DTX-176 | DeGuzman, et al., "*Sequence- dependent gating of an ion channel by DNA hairpin molecules*" Nucleic Acids Research, Vol. 34, No. 22, pp. 6425-6437 (2006) | ONT_DEL00011519 | ONT_DEL00011531 | | 403, R |
| DTX-177 | Ezzevaz- Roulet, et al. "*Mechanical Separation of the Complementary Strands of DNA*" Proc. Natl. Acad. Sci. USA, Vol. 94, pp. 11935-11940 (1997) | ONT_DEL00011542 | ONT_DEL00011547 | Cited on the face of '929 Patent | 403, R |
| DTX-178 | Kambara, et al. "*Real Time Automated Simultaneous Double-Stranded DNA Sequencing Using Two-Color Fluorophore Labeling*" Biotechnology, Vol 9, pp. 648-651 (1991) | ONT_DEL00011555 | ONT_DEL00011558 | | 403, R |
| DTX-179 | Kaur, et al. "*Novel amplification of DNA in a hairpin structure: towards a radical elimination of PCR errors from amplified DNA*" Nucleic Acids Research, Vol. 31, No. 6 e26 (2003) | ONT_DEL00011563 | ONT_DEL00011569 | Cited on the face of '929 Patent | 403, R |
| DTX-180 | Laird, et al. "*Hairpin-bisulfite PCR: Assessing epigenetic methylation patterns on complementary strands of individual DNA molecules*" Proc. Natl. Acad. Sci. USA, Vol. 101, pp. 204-209 (2004) | ONT_DEL00011570 | ONT_DEL00011575 | | 403, R |
| DTX-181 | Miller, et al. "*Chain Terminator Sequencing of Double-stranded DNA with Built-In Error Detection*" J. Theor. Biol., Vol. 161, pp. 407-429 (1993) | ONT_DEL00011635 | ONT_DEL00011657 | Cited on the face of '929 Patent | 403, R |
| DTX-182 | Sambrook, et al., "*Molecular Cloning*"A Laboratory Manual (1989, 2nd Ed.) | ONT_DEL00011798 | ONT_DEL00011824 | | |
| DTX-183 | Sanger "*Determination of Nucleotide Sequences in DNA*" Chemistry, pp. 431-447 (1980) | ONT_DEL00011825 | ONT_DEL00011841 | | |
| DTX-184 | Taki, et al. "*Small-interfering- RNA expression in cells based on an efficiently constructed dumbbell-shaped DNA*" Angew. Chem. Int. Ed., Vol. 43, pp. 3160-3163 (2004) | ONT_DEL00011863 | ONT_DEL00011866 | Cited on the face of '929 Patent | 403, R |
| DTX-185 | Thelwell et al., "*Mode of action and application of Scorpion primers to mutation detection*" Nucleic Acids Research, Vol. 28, No. 19, pp. 3752-3761 (2000) | ONT_DEL00011867 | ONT_DEL00011876 | | 403, R |
| DTX-186 | Withdrawn | | | | |
| DTX-187 | U.S. Patent 6,404,907 | ONT_DEL00011919 | ONT_DEL00011932 | | |
| DTX-188 | U.S. Patent 7,282,337 | ONT_DEL00011968 | ONT_DEL00011976 | | H |
| DTX-189 | U.S. Patent 7,767,400 | ONT_DEL00011991 | ONT_DEL00012007 | | H |
| DTX-190 | U.S. Patent Pub. 2003/0059778 | ONT_DEL00012156 | ONT_DEL00012168 | | 403, R, H |
| DTX-191 | U.S. Patent Pub. 2005/0042633 | ONT_DEL00012169 | ONT_DEL00012204 | | 403, R, H |
| DTX-192 | U.S. Patent Pub. 2005/0266456 | ONT_DEL00012231 | ONT_DEL00012263 | Cited on the face of '929 Patent | 403, R, H |
| DTX-193 | U.S. Patent Pub. 2006/0024711 | ONT_DEL00012264 | ONT_DEL00012285 | Cited on the face of '929 Patent | 403, R, H |
| DTX-194 | U.S. Patent Pub. 2007/0087358 | ONT_DEL00012313 | ONT_DEL00012380 | | 403, R, H |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| **DTX-195** | Vercoutere, et al., "*Rapid discrimination among individual DNA hairpin molecules at single-nucleotide resolution using an ion channel*" Nat Biotechnol. 19(3): 248-52 (2001) | ONT_DEL00012781 | ONT_DEL00012785 | Cited on the face of '929 Patent | |
| **DTX-196** | Vercoutere, et al., "*Discrimination among individual Watson-Crick base pairs at the termini of single DNA hairpin molecule*" Nucleic Acids Res. 31(4):1311-8 (2003) | ONT_DEL00012786 | ONT_DEL00012793 | Cited on the face of '929 Patent | |
| **DTX-197** | WO 2007/010263 | ONT_DEL00013168 | ONT_DEL00013220 | | |
| **DTX-198** | WO 2007/025124 | ONT_DEL00013221 | ONT_DEL00013250 | | |
| **DTX-199** | WO 2007/057668 | ONT_DEL00013251 | ONT_DEL00013331 | | 403, R, H |
| **DTX-200** | WO 2008/041002 | ONT_DEL00013332 | ONT_DEL00013459 | | 403, R, H |
| **DTX-201** | WO 2008/124107 | ONT_DEL00013460 | ONT_DEL00013560 | | |
| **DTX-202** | Woodside et al., "*Nanomechanical Measurements of the Sequence-Dependent Folding Landscapes of Single Nucleic Acid Hairpins*" Proc. Natl. Acad. Sci. USA, Vol. 103, pp. 6190-6195 (2006) | ONT_DEL00013561 | ONT_DEL00013566 | Cited on the face of '929 Patent | 403, R |
| **DTX-203** | GB 2389301 | ONT_DEL00555276 | ONT_DEL00555349 | | |
| **DTX-204** | WO 2010/086622 | ONT_DEL00557083 | ONT_DEL00557156 | | |
| **DTX-205** | WO 2013/014451 | ONT_DEL00557157 | ONT_DEL00557248 | | |
| **DTX-206** | Winters-Hilt, "*The alpha-Hemolysin nanopore transduction detector single-molecule binding studies and immunological screening of antibodies and aptamers*" BMC Informatics, 8(Suppl 7):S9 (2007) | ONT_DEL00557482 | ONT_DEL00557510 | | |
| **DTX-207** | U.S. Department of Health and Human Services Public Health Service Grant Application (PHS 398) | ONT_DEL00558974 | ONT_DEL00559045 | | 403, R |
| **DTX-208** | Response to Notice of Possible Remedies, November 7, 2019 (hereafter, "Response"), available at https://assets.publishing.service.gov.uk/media/5dcbc8ba40f0b64250f50116/Remedy-proposal | ONT_DEL00569498 | ONT-DEL00569502 | | 403, R, A, LF, LK, MIL |
| **DTX-209** | Withdrawn | | | | |
| **DTX-210** | Withdrawn | | | | |
| **DTX-211** | Withdrawn | | | | |
| **DTX-212** | Withdrawn | | | | |
| **DTX-213** | ONT Biochemical Processing Procedure, Doc. No. BP-342 - Reference Document for the preparation of SK75, E7/Y-adapter complex 200nM - ESNAP Report, grant number 5R21GM73617-02 (2007) | ONT-DEL-00009422 | ONT-DEL-00009426 | McHenry Report 51 | |
| **DTX-214** | Withdrawn | | | | |
| **DTX-215** | Withdrawn | | | | |
| **DTX-216** | Withdrawn | | | | |
| **DTX-217** | Withdrawn | | | | |
| **DTX-218** | Agah et al., "*A multi-enzyme model for pyrosequencing*" Nucleic Acids Res. 32(21), p. e166 (12/02/2004) | ONT-DEL-00011423 | ONT-DEL00011437 | | 403, R |
| **DTX-219** | Bakhtina, et al., "*Use of Viscogens, dNTPRS, and Rhodium(III) as Probes in Stopped-Flow Experiments To Obtain New Evidence for the Mechanism of Catalysis by DNA Polymerase* β" Biochemistry 44, pp. 5177-5187 (2005) | ONT-DEL-00011438 | ONT-DEL00011448 | | 403, R |
| **DTX-220** | Capson et al., "*Kinetic characterization of the polymerase and exonuclease activities of the gene 43 protein of bacteriophage T4*" Biochemistry 31(45), pp. 10984-10994 (11/1992) | ONT-DEL-00011449 | ONT-DEL00011459 | | 403, R |

## EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-221 | Chu et al., "*Real-Time Monitoring of DNA Polymerase Function and Stepwise Single-Nucleotide DNA strand Translocation through a Protein Nanopore*" Angew Chem. Int. Ed. Engl. 49(52), pp. 10106-10109 | ONT-DEL-00011460 | ONT-DEL00011467 | | |
| DTX-222 | Cockroft, et al., "*A single-molecule nanopore device detects DNA polymerase activity with single-nucleotide resolution*" J. Am. Chem. Soc. 130, 818–820 (2008) | ONT-DEL-00011483 | ONT-DEL-00011491 | | |
| DTX-223 | Dahlberg et al., "*Kinetic mechanism of DNA polymerase I (Klenow fragmentj): identification of a second conformational change and evaluation of the internal equilibrium constant*" Biochemistry 30(20), pp. 4835-4843 (05/1991) | ONT-DEL-00011492 | ONT-DEL00011500 | | 403, R |
| DTX-224 | Olson et al., "*De Novo Peptide Sequencing Using Exhaustive Enumeration of Peptide Composition*" J. Am. Soc. Of Mass Spectrometry (2006) | ONT-DEL-00011501 | ONT-DEL00011509 | | 403, R |
| DTX-225 | Esteban et al., "*Metal activation of synthetic and degradative activities of -029 DNA polymerase, a model enzyme for protein-primed DNA replication*" Biochemistry 31, pp. 350-359 (1992) | ONT-DEL-00011532 | ONT-DEL-00011541 | | 403, R |
| DTX-226 | Hurt, et al., "*Specific Nucleotide Binding nad Rebinding to Individual DNA Polymerase Complexes Captured on a Nanopore*" J. Am. Chem. Soc. 131(10), pp. 3772-3778 (02/20/2009) | ONT-DEL-00011548 | ONT-DEL-00011554 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| DTX-227 | Kasianowics, et al., "*Characterization of individual polynucleotide molecules using a membrane channel*" Proc. Natl. Acad. Sci. USA 93, 13770-13773 (1996) | ONT-DEL-00011559 | ONT-DEL00011562 | | |
| DTX-228 | Laszlo et al., "*MspA nanopore as a single-molecule tool:  From Sequencinig to SPRNT*" Methods 105, pp. 75-89 (08/01/2016) | ONT-DEL-00011576 | ONT-DEL00011590 | | 403, R |
| DTX-229 | Liao, et al., "*Mechanochemistry of T7 DNA Helicase*" J. Mol. Biol. 350(3), pp. 452-75 (07/15/2005) | ONT-DEL-00011591 | ONT-DEL-00011614 | Akeson Dep 23 | |
| DTX-230 | Lieberman et al., "*Kinetic Mechanism of Translocation and dNTP binding in Individual DNA Polymerase Complexes*" J. Am. Chem. Soc. 131(10), pp. 3772-3778 (02/20/2009) | ONT-DEL-00011615 | ONT-DEL00011621 | | |
| DTX-231 | Manrao, E.A. et al., "*Reading DNA at single-nucleotide resolution with a mutant MspA nanopore and phi29 DNA polymerase*" Nat. Biotechnol. 30(4), pp.349–353 (03/25/2012) | ONT-DEL-00011629 | ONT-DEL00011634 | | 403, R |
| DTX-232 | Patel et al, "*Pre-steady-state kinetic analysis of processive DNA replication includinig complete characterization of an exonuclease-deficient mutant*" Biochemistry 30(2), pp. 511-525 (1991) | ONT-DEL-00011658 | ONT-DEL00011672 | | 403, R |
| DTX-233 | Preugschat et al., "*Kinetic Analysis of the Effects of Mutagenesis of W501 and V432 of the Hepatitis C Virus NS3 Helicase Domain on ATPase and Strand-Separating Activity*" Biochemistry 39(17):5174–5183 (2000) | ONT-DEL-00011673 | ONT-DEL00011682 | | |
| DTX-234 | Sigalov et al., II "*Supporting Information to the Manuscript Detection of DNA Sequences Using an Alternating Electric Field in a Nanopore Capacitor*" American Chemical Society (12/11/2007) | ONT-DEL-00011842 | ONT-DEL-00011854 | | |
| DTX-235 | Sigalov et al., "*Detection of DNA Sequences Using an Alternating Electric Field in a Nanopore Capacitor*" American Chemical Society (12/11/2008), Nano Letters 8(1), pp. 56-63 (12/2007) | ONT-DEL-00011855 | ONT-DEL-00011862 | | |
| DTX-236 | U.S. Patent 6,087,099 | ONT-DEL-00011899 | ONT-DEL-00011908 | Akeson Dep 19 | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-237 | U.S. Patent 6,251,610 | ONT-DEL-00011909 | ONT-DEL-00011918 | | 403, R |
| DTX-238 | U.S. Patent 6,673,615 | ONT-DEL-00011933 | ONT-DEL00011967 | | 403, R |
| DTX-239 | U.S. Patent 7,731,826 | ONT-DEL-00011977 | ONT-DEL-00011990 | Akeson Dep 18; Goldman Dep 15 | |
| DTX-240 | U.S. Patent 7,972,858 | ONT-DEL-00012008 | ONT-DEL00012039 | | 403, R, H |
| DTX-241 | U.S. Patent 8,133,672 | ONT-DEL-00012040 | ONT-DEL-00012090 | Cited on the face of '056 Patent; Cited on the face of '323 Patent | |
| DTX-242 | U.S. Patent 8,257,954 | ONT-DEL-00012091 | ONT-DEL00012155 | | 403, R, H |
| DTX-243 | U.S. Patent Pub. 2005/0142559 | ONT-DEL-00012205 | ONT-DEL-00012230 | Akeson Dep 20 | |
| DTX-244 | U.S. Patent Pub. 2006/0063171 | ONT-DEL-00012286 | ONT-DEL-00012312 | Ha Dep 6; Hrdlicka Dep 4; Hrdlicka Dep 10; Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| DTX-245 | U.S. Patent Pub. 2007/0196846 | ONT-DEL-00012381 | ONT-DEL-00012505 | Akeson Dep 21; Ha Reply Rpt 17 | |
| DTX-246 | U.S. Patent Pub. 2008/0102504 | ONT-DEL-00012506 | ONT-DEL-00012531 | | |
| DTX-247 | U.S. Patent Pub. 2009/0286245 | ONT-DEL-00012532 | ONT-DEL00012582 | Cited on the face of '056 Patent; Cited on the face of '323 Patent | |
| DTX-248 | U.S. Patent Pub. 2010/0112645 | ONT-DEL-00012583 | ONT-DEL00012649 | | 403, R, H |
| DTX-249 | U.S. Patent 5,795,782; Church et al. | ONT-DEL-00012650 | ONT-DEL00012668 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| DTX-250 | U.S. Patent 6,446,198 | ONT-DEL-00012669 | ONT-DEL00012679 | | |
| DTX-251 | U.S. Patent 7,258,838 | ONT-DEL-00012680 | ONT-DEL00012733 | | |
| DTX-252 | U.S. Patent 8,452,546 | ONT-DEL-00012748 | ONT-DEL00012780 | Akeson Dep 16 | |
| DTX-253 | Winters-Hilt, *"Highly Accurate Classification of Watson- Crick Basepairs on Termini of Single DNA Molecules"* Biophysical Journal, Vol. 84 pp. 967-976 (02/2003) | ONT-DEL-00012794 | ONT-DEL00012803 | Cited on the face of '929 Patent | |
| DTX-254 | Winters-Hilt et al. II, *"Nanopore Cheminformatics"* DNA and Cell Biology (2004) | ONT-DEL-00012804 | ONT-DEL00012813 | | |
| DTX-255 | Winters-Hilt, The Dissertation of Stephen Winters-Hilt: *"Machine Learning Methods for Channel Current Cheminformatics, Biophysical analysis, and Bioinformatics,"* UMI Microform 3080505 (03/2003) | ONT-DEL-00012814 | ONT-DEL00012990 | | |
| DTX-256 | PCT Appl. WO 2007/057668 - Bayley et al | ONT-DEL-00013251 | ONT-DEL00013331 | | 403, R |
| DTX-257 | PCT Appl. WO 2008/124107 - Akeson III | ONT-DEL-00013460 | ONT-DEL00013560 | | |
| DTX-258 | PowerPoint titled "Enzyme Movement" | ONT-DEL-00014376 | ONT-DEL-00014381 | Clarke Dep 5; McHenry Report 35 | |
| DTX-259 | Artificial Neural Network Project, Project Review and Future Directions | ONT-DEL-00017163 | ONT-DEL-00017220 | Dessimoz Dep 7; Dessimoz Report 69 | |
| DTX-260 | Withdrawn | | | | |
| DTX-261 | Withdrawn | | | | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-262 | Email from Amanda Murphy - William Blair to Spike Wilcocks regarding Life Sciences - Conclusions From NGS Survey Conducted in Collaboration with Genome Web (n=303) | ONT-DEL-00068625 | ONT-DEL-00068627 | | 403, R, H, LF, LK |
| DTX-263 | Patent App. Pub. WO 2012/107778 Clarke, J. et al. (priority date Feb. 11 2011) | ONT-DEL-00132411 | ONT-DEL-00132513 | | 403, R |
| DTX-264 | Withdrawn | | | | |
| DTX-265 | Withdrawn | | | | |
| DTX-266 | Withdrawn | | | | |
| DTX-267 | Schreiber, et al., "*Error rates for nanopore discrimination among cytosine, methylcytosine, and hydroxymethylcytosine along individual DNA strands*" National Academy of Sciences (USA). 47:18910-18915 (2013) | ONT-DEL-00194637 | ONT-DEL-00194642 | | 403, R |
| DTX-268 | Withdrawn | | | | |
| DTX-269 | Withdrawn | | | | |
| DTX-270 | Oxford Nanopore & accuracy - September 2018 | ONT-DEL-00207456 | ONT-DEL-00207475 | Pettett Dep 3; Jensen Dep 7; Massingham Dep 15;  Dessimoz Report 57; Reid Dep 5 | |
| DTX-271 | Withdrawn | | | | |
| DTX-272 | Withdrawn | | | | |
| DTX-273 | IP Group plc by Berenberg dated 10/18/18 | ONT-DEL-00238850 | ONT-DEL-00238911 | | LF, LK, 403/402 |
| DTX-274 | Withdrawn | | | | |
| DTX-275 | Withdrawn | | | | |
| DTX-276 | Withdrawn | | | | |
| DTX-277 | Withdrawn | | | | |
| DTX-278 | PowerPoint titled "Next Generation Sequencing (NGS) Market Size, Growth and Trends (2014-2020)" dated 07/17 | ONT-DEL-00285074 | ONT-DEL-00285112 | Layne-Farrar Dep 7 | |
| DTX-279 | Oxford Nanopore Technologies Limited Annual report and financial statements for the year ended 31 December 2017; Registered number 05386273 | ONT-DEL-00285224 | ONT-DEL-00285264 | McDonald Dep 15 | |
| DTX-280 | Withdrawn | | | | |
| DTX-281 | Bhattacharya, et al., "*Water Mediates Recognition of DNA Sequence via Ionic Current Blockade in a Biological Nanopore*" ACS Nano 10 (4), 4644-4651 (2016) | ONT-DEL-00322884 | ONT-DEL-00322906 | | 403, R |
| DTX-282 | The MinION Early Access Program, or MAP | ONT-DEL-00327090 | ONT-DEL-00327103 | | |
| DTX-283 | Withdrawn | | | | |
| DTX-284 | Spooky action at a distance - long range signal context | ONT-DEL-00369649 | ONT-DEL-00369651 | Dessimoz Dep 8; Dessimoz Report 38; Massingham Dep 14; Fair Dep 9 | A |
| DTX-285 | PowerPoint titled "01 Base Calling" | ONT-DEL-00417139 | ONT-DEL-00417151 | Ha Rebuttal Rpt 16 | A |
| DTX-286 | Manrao, E.A. et al., "*Reading DNA at single-nucleotide resolution with a mutant MspA nanopore and phi29 DNA polymerase*" Nat. Biotechnol. 30, 349–353 (2012) | ONT-DEL-00425170 | ONT-DEL-00425175 | | 403, R |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-287 | Withdrawn | | | | |
| DTX-288 | Withdrawn | | | | |
| DTX-289 | License Agreement with Texas A&M University | ONT-DEL-00497288 | ONT-DEL-00497293 | | |
| DTX-290 | License Agreement between Oxford Nanopore Technologies Ltd.and Boston University titled "Chemical Functionization of Solid-state Nanopores and Nanopore Arrays and Appl.s thereof" dated 10/15/12 | ONT-DEL-00497294 | ONT-DEL-00497333 | | |
| DTX-291 | Withdrawn | | | | |
| DTX-292 | Exclusive Licence of Technology (ISIS Project No. 2386) between ISIS Innovation Limited and Oxford Nanolabs Limited dated 05/20/05 | ONT-DEL-00497347 | ONT-DEL-00497377 | | |
| DTX-293 | Withdrawn | | | | |
| DTX-294 | License Agreement between Texas A&M University and STS Diagnostics GmbH dated 05/07/05 | ONT-DEL-00497385 | ONT-DEL-00497407 | | |
| DTX-295 | License Agreement with Texas A&M University | ONT-DEL-00497408 | ONT-DEL-00497421 | | |
| DTX-296 | Song, L. et al., "*Structure of staphylococcal alpha-hemolysin, a heptameric transmembrane pore*" Science 274, 1859–1866 (1996) | ONT-DEL-00498341 | ONT-DEL-00498349 | | |
| DTX-297 | Withdrawn | | | | |
| DTX-298 | Withdrawn | | | | |
| DTX-299 | License agreement between VIB vzw and Oxford Nanopore Technologies Limited dated 02/03/16 | ONT-DEL-00500155 | ONT-DEL-00500210 | Willcocks Dep 15; Earl Report 5; McHenry Report 63; Prowse Dep 7 | |
| DTX-300 | License Agreement between Oxford Nanopore Technologies Limited and Regents of the University of California dated 12/13/10 | ONT-DEL-00500449 | ONT-DEL-00500487 | | |
| DTX-301 | Withdrawn | | | | |
| DTX-302 | Patent and Know-How License Agreement between The Katholieke Universiteit Leuven and Oxford Nanopore Technologies Ltd. dated 08/01/14 | ONT-DEL-00500791 | ONT-DEL-00500810 | | |
| DTX-303 | Withdrawn | | | | |
| DTX-304 | Withdrawn | | | | |
| DTX-305 | License agreement between Oxford Nanopore Technologies Limited and President and Fellows of Harvard College dated 05/26/16 | ONT-DEL-00500858 | ONT-DEL-00500887 | Layne-Farrar Dep 4; Willcocks Dep 17; | |
| DTX-306 | Amended and Restated Licence Agreement between Oxford Nanopore Technologies, Ltd. And Harvard College dated 12/18/11 | ONT-DEL-00500888 | ONT-DEL-00500924 | | |
| DTX-307 | Withdrawn | | | | |
| DTX-308 | License Agreement with Harvard University | ONT-DEL-00502406 | ONT-DEL-00502447 | | |
| DTX-309 | License Agreement with Stanford University | ONT-DEL-00502487 | ONT-DEL-00502503 | | |
| DTX-310 | License Agreement with University of Massachusetts | ONT-DEL-00502504 | ONT-DEL-00502521 | | |
| DTX-311 | Withdrawn | | | | |
| DTX-312 | License Agreement with University of Michigan | ONT-DEL-00502578 | ONT-DEL-00502595 | | |
| DTX-313 | Withdrawn | | | | |
| DTX-314 | Withdrawn | | | | |
| DTX-315 | Withdrawn | | | | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-316 | Withdrawn | | | | |
| DTX-317 | Withdrawn | | | | |
| DTX-318 | Withdrawn | | | | |
| DTX-319 | Withdrawn | | | | |
| DTX-320 | Withdrawn | | | | |
| DTX-321 | License Agreement between the Regents of the University of California and Oxford Nanopore Technologies, Ltd. Dated 12/13/2010 | ONT-DEL-00502874 | ONT-DEL-00502912 | Willcocks Dep 22; | |
| DTX-322 | License Agreement btween Oxford Nanopore Technologies Limited and University of California dated 12/13/10 | ONT-DEL-00502874 | ONT-DEL-00502912 | Prowse Dep 8 | |
| DTX-323 | Withdrawn | | | | |
| DTX-324 | Withdrawn | | | | |
| DTX-325 | Withdrawn | | | | |
| DTX-326 | Withdrawn | | | | |
| DTX-327 | Withdrawn | | | | |
| DTX-328 | Withdrawn | | | | |
| DTX-329 | Withdrawn | | | | |
| DTX-330 | Withdrawn | | | | |
| DTX-331 | Withdrawn | | | | |
| DTX-332 | Withdrawn | | | | |
| DTX-333 | Exclusive License of Technology (ISIS Project No. 3329) between ISIS Innovation Limited and Oxford Nanopore Technology Limited dated 01/02/14 | ONT-DEL-00503285 | ONT-DEL-00503310 | | |
| DTX-334 | | | | | |
| DTX-335 | Withdrawn | | | | |
| DTX-336 | Withdrawn | | | | |
| DTX-337 | Withdrawn | | | | |
| DTX-338 | Exclusive License of Technology (ISIS Project Nos. 9363 & 9258) between ISIS Innovation Limited and Oxford Nanopore Technology Limited | ONT-DEL-00503397 | ONT-DEL-00503422 | Willcocks Dep 18 | |
| DTX-339 | Withdrawn | | | | |
| DTX-340 | Withdrawn | | | | |
| DTX-341 | Withdrawn | | | | |
| DTX-342 | Withdrawn | | | | |
| DTX-343 | Amended and Restated Licence Agreement between Oxford Nanopore Technologies, Ltd. and the Regents of the University of California dated 08/15/17 | ONT-DEL-00506677 | ONT-DEL-00506754 | | |
| DTX-344 | Amended and Restated Licence Agreement between Oxford Nanopore Technologies, Ltd. and the Regents of the University of California dated 08/15/17 | ONT-DEL-00506755 | ONT-DEL-00506831 | | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-345 | Non-Exclusive Licence Agreement between California Institute of Technology and Oxford Nanopore Technologies, Ltd. dated 08/26/14 | ONT-DEL-00507899 | ONT-DEL-00507921 | | |
| DTX-346 | Northeastern University Exclusive Patent License Agreement with Oxford Nanopore Technologies Limited dated 10/14/16 | ONT-DEL-00507922 | ONT-DEL-00507947 | Willcocks Dep 19 | |
| DTX-347 | Exclusive License Agreement between The Board of Trustees of the University of Illinois and Oxford Nanopore Technologies Ltd. | ONT-DEL-00507948 | ONT-DEL-00507968 | | |
| DTX-348 | Exclusive Patent License Agreement between Cambridge Enterprise Limited and Oxford Nanopore Technologies Limited | ONT-DEL-00507969 | ONT-DEL-00507995 | Willcocks Dep 20 | |
| DTX-349 | Research and License Agreement between Yissum Research Development Company of the Hebrew University of Jerusalem, LTD, Fulcrum SP LTD, and Oxford Nanopore Technologies Limited | ONT-DEL-00507996 | ONT-DEL-00508038 | Willcocks Dep 21 | |
| DTX-350 | Withdrawn | | | | |
| DTX-351 | Withdrawn | | | | |
| DTX-352 | Withdrawn | | | | |
| DTX-353 | Butler, et al., "*Single-molecule DNA detection with an engineered MspA protein nanopore*" Proc. Natl. Acad. Sci. USA 105, 20647–20652 (2008) | ONT-DEL-00534309 | ONT-DEL-00534314 | | |
| DTX-354 | Cowen & Company, "*Proprietary Core Lab Sequencing Survey; Focus on Illumina NovaSeq*" March 29, 2017 | ONT-DEL-00539686 | ONT-DEL-00539759 | Layne-Farrar Dep 6 | |
| DTX-355 | Winters-Hilt ("Winters-Hilt VI") "LaSPACE Narrative" (2003) | ONT-DEL-00555088 | ONT-DEL00555096 | | 403, R, I, LK, H |
| DTX-356 | Branton et al., "*The Potential and Challenges of Nanpore Sequencing*" Nature Biotechnology (10/09/2008) | ONT-DEL-00555212 | ONT-DEL00555219 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| DTX-357 | Winters-Hilt ("Winters-Hilt III") "Nanopore Detection Using Channel Current Cheminformatics" SPIE Second International Symposium on Fluctuations and Noise" (2004) | ONT-DEL-00555275 | ONT-DEL00555275 | | 403, R, LK, H |
| DTX-358 | Winters-Hilt ("Winters-Hlt Grant") "National Institutes of Health (HIH) K-22 grant proposal" NIH (2005) | ONT-DEL-00555528 | ONT-DEL00555548 | | 403, R, LK, H |
| DTX-359 | PCT Appl. WO 2006/041983 Winters-Hilt | ONT-DEL00555660 | ONT-DEL00555724 | | 403, R, H |
| DTX-360 | Winters-Hilt ("Winters-Hilt VII") "RCS Narrative" (2003) | ONT-DEL-00555744 | ONT-DEL00555760 | | 403, R, LK, H |
| DTX-361 | Stoddart et al., "NHGRI Poster Presentation: Toward Single-Molecule DNA Sequencing" National Human Genome Research Institute (NHGRI) Conference, (03/2009) | ONT-DEL00555792 | ONT-DEL00555792 | | 403, R, LK, H |
| DTX-362 | Winters-Hilt, Highly Accurate Real-Time Classification of Channel-Captured DNA Termini (Presentation), Third International Conference on Unsolved Problems of Noise and Fluctuations (2002) | ONT-DEL00555831 | ONT-DEL00555855 | | 403, R, LK, H |
| DTX-363 | Winters-Hilt , Highly Accurate Real-Time Classification of Channel-Captured DNA Termni (Presentation) , Third International Conference on Unsolved Problems of Noise and Fluctuations (2003) (2004) | ONT-DEL00555881 | ONT-DEL00555892 | | 403, R, LK, H |
| DTX-364 | Winters-Hilt, "Forcing DNA through Nanostructures" Oklahoma NSF EPSCoR Annual State Conference (2004) | ONT-DEL-00555938 | ONT-DEL00555970 | | 403, R, LK, H |
| DTX-365 | Stoddart et al., ("Stoddart II") "*DNA Sequencing with a-Hemolysin*" NHGRI (03/2009) | ONT-DEL00557249 | ONT-DEL00557259 | | 403, R, LK, H |
| DTX-366 | Hagan and Reza Grant, "*NIH Grant*" NIH (2004) [Proposal for NIH Grant No. 1R01HG003709-01] | ONT-DEL-00557263 | ONT-DEL00557303 | | 403, R, LK, H |
| DTX-367 | Akeson and Winters-Hilt, "*National Institutes of Health (HIH) R-21 grant proposal draft*" NIH (2004) | ONT-DEL-00557311 | ONT-DEL-00557329 | | 403, R, I, H |
| DTX-368 | Withdrawn | | | | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-369 | Withdrawn | | | | |
| DTX-370 | Withdrawn | | | | |
| DTX-371 | Spreadsheet regarding '929 Patent ONT Revenue Base 8/22/17 - Q1 2019 | ONT-DEL-00557473 | ONT-DEL-00557473 | Prowse Report 7 | |
| DTX-372 | Spreadsheet showing additional royalties paid by ONT pursuant to Agreements | ONT-DEL-00557474 | ONT-DEL-00557474 | | |
| DTX-373 | Withdrawn | | | | |
| DTX-374 | Laboratory Notebook, L31 300 R, UCSC Assigned to Mark Akeson | ONT-DEL-00557959 | ONT-DEL-00558030 | | 403, R, LF, H, DI |
| DTX-375 | Laboratory Notebook, L21 300 R "Unfinished" Assigned to Anne M. Corbett 03/01/06 | ONT-DEL-00558031 | ONT-DEL-00558151 | | 403, R, LF, LK, H, DI |
| DTX-376 | Laboratory Notebook, L21 300 R "Experiments III" | ONT-DEL-00558152 | ONT-DEL-00558488 | | 403, R, LF, LK, H, DI |
| DTX-377 | Laboratory Notebook, L21 300 R "Experiment IV" | ONT-DEL-00558489 | ONT-DEL-00558822 | | 403, R, LF, LK, H, DI |
| DTX-378 | Akeson and Winters-Hilt, "*National Institutes of Health (NIH) R-21 grant proposal*" NIH (2005) | ONT-DEL00558928 | ONT-DEL00558967 | | 403, R, LF, DI |
| DTX-379 | Withdrawn | | | | |
| DTX-380 | Adelman, et al., "*Mechanochemistry of Transcription Termination Factor Rho*" Molecular Cell 22(5), 611-621 (06/2006) | ONT-DEL-00559341 | ONT-DEL-00559351 | | |
| DTX-381 | Buttner et al., "*Structural basis for DNA duplex separation by a superfamily-2 helicase*" Nat. Struct. Nol. Biol. 14(7), 647-652 | ONT-DEL-00559352 | ONT-DEL-00559357 | | |
| DTX-382 | Dumont et al., "*RNA translocation and unwinding mechanism of HCV helicase and its coordination by ATP*", Nature 439(7072), 105-108 (01/2006) | ONT-DEL-00559358 | ONT-DEL-00559371 | McHenry Dep 11 | |
| DTX-383 | Hornblower, B. et al., "*Single-molecule analysis of DNA-protein complexes using nanopores*" Nat. Methods 4(4), 315–317 (2007) | ONT-DEL-00559372 | ONT-DEL00559376 | | |
| DTX-384 | Johnson, "Role of induced fit in enzyme specificity: a molecular forward/reverse switch" J. Biol. Chem. 283(39):26297–26301 (2008) | ONT-DEL-00559377 | ONT-DEL-00559383 | | |
| DTX-385 | Myong, et al., "*Spring-Loaded Mechanism of DNA Unwinding by Hepatitis C Virus NS3 Helicase*" Science 317(5837):513–516 (2007) | ONT-DEL-00559384 | ONT-DEL-00559400 | | |
| DTX-386 | Pourmand et al., "*Direct electrical detection of DNA synthesis*" Proc. Nat'l Acad. Sci. 103(17):6466–6470 (2006) | ONT-DEL-00559401 | ONT-DEL-00559405 | | |
| DTX-387 | Schnitzer, et al., "*Statistical Kinetics of Processive Enzymes*" a chapter in Protein Kinesis: The Dynamics of Protein Trafficking and Stability, Vol. 60 of the Cold Spring Harbor Symposia on Quantitative Biology, 793–802 (1995) | ONT-DEL-00559406 | ONT-DEL-00559415 | | |
| DTX-388 | Gyarfas et al., "*Mapping the Position of DNA Polymerase-Bound DNA Templates in a Nanopore at 5 Å Resolution*" ACS Nano. 2009, Jun 23;3(6):1457-66. doi: 10.1021/nn900303g | ONT-DEL-00559536 | ONT-DEL-00559545 | | 403, R |
| DTX-389 | Olasagasti, F. et al., "*Replication of individual DNA molecules under electronic control using a protein nanopore*" Nat. Nanotechnol. 5, 798–806 (2010) | ONT-DEL-00559546 | ONT-DEL-00559554 | | 403, R |
| DTX-390 | Attachment to parties' remedies proposal (Nov. 13, 2019) | ONT-DEL00569503 | ONT-DEL00569503 | | 403, 408, R, LF, LK, H, DI, MIL |
| DTX-391 | Revised remedies proposal (Nov. 19, 2019) | ONT-DEL00569504 | ONT-DEL00569506 | | 403, 408, R, LF, LK, H, DI, MIL |
| DTX-392 | Illumina Patents: attachment to revised remedies proposal (Nov. 19, 2019) | ONT-DEL00569510 | ONT-DEL00569510 | | 403, 408, R, LF, LK, H, DI, MIL |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| **DTX-393** | PacBio Patents: attachment to revised remedies proposal (Nov. 19, 2019) | ONT-DEL00569511 | ONT-DEL00569511 | | 403, 408, R, LF, LK, H, DI, MIL |
| **DTX-394** | ONT Produced Source Code | ONT-DEL-SRC-00001 | ONT-DEL-SRC-00349 | | |
| **DTX-395** | ONT Source Code showing how Oxford uses reference sequences and corresponding raw training data to build a neural network model | ONT-DEL-SRC-00001 | ONT-DE-SRC-00142 | | |
| **DTX-396** | Sanger, *"Determination of Nucleotide Sequences in DNA"* Science 214:1205-1210 | ONT-EXP-000001 | ONT-EXP-000009 | | |
| **DTX-397** | MARC Record for Exhibit 3A from the Geology & Geophysics Library at the University of Wisconsin-Madison ("Exhibit 3B"). | ONT-EXP-000010 | ONT-EXP-000017 | Hall-Ellis Report 3B | |
| **DTX-398** | MARC Record for Exhibit 3A from the OCLC bibliographic database ("Exhibit 3C"). | ONT-EXP-000018 | ONT-EXP-000022 | Hall-Ellis Report 3C | |
| **DTX-399** | Miner, et al., *"Molecular barcodes detect redundancy and contamination in hairpin-bisulfite PCR"* Nucleic Acids Res. 32(17):e135 (2004) ("Exhibit 4A"). | ONT-EXP-000023 | ONT-EXP-000032 | Hall-Ellis Report 4A; Cited on the face of '929 Patent | |
| **DTX-400** | MARC Record for Exhibit 4A from the National Library of Medicine ("Exhibit 4B"). | ONT-EXP-000033 | ONT-EXP-000035 | Hall-Ellis Report 4B | |
| **DTX-401** | MARC Record for Exhibit 4A from the OCLC bibliographic database ("Exhibit 4C"). | ONT-EXP-000036 | ONT-EXP-000038 | Hall-Ellis Report 4C | |
| **DTX-402** | O'Dea and McLaughlin, *"Engineering Specific Cross-Links in Nucleic Acids Using Glycol Linkers"* Current Protocols in Nucleic Acid Chemistry 5.3.1-5.3.8 (2000) ("Exhibit 5A"). | ONT-EXP-000039 | ONT-EXP-000053 | Hall-Ellis Report 5A | |
| **DTX-403** | MARC Record for Exhibit 5A from the Ebling Library for the Health Sciences at the University of Wisconsin-Madison ("Exhibit 5B"). | ONT-EXP-000054 | ONT-EXP-000055 | Hall-Ellis Report 5B | |
| **DTX-404** | MARC Record for Exhibit 5A from the OCLC bibliographic database ("Exhibit 5C"). | ONT-EXP-000056 | ONT-EXP-000056 | Hall-Ellis Report 5C | |
| **DTX-405** | MARC Record for Exhibit 5A from the Library of Congress ("Exhibit 5D"). | ONT-EXP-000057 | ONT-EXP-000058 | Hall-Ellis Report 5D | |
| **DTX-406** | Ng, et al., *"Endcaps for Stabilizing Short DNA Duplexes"* Nucleosides, Nucleotides and Nucleic Acids, 22(5-8):1635-1637 (2003) ("Exhibit 5E"). | ONT-EXP-000059 | ONT-EXP-000063 | Hall-Ellis Report 5E | |
| **DTX-407** | Sambrook, et al., *"DNA Sequencing"* Molecular Cloning, 2nd Ed. Chapter 13 (1989) (Ex. 6A) | ONT-EXP-000064 | ONT-EXP-000090 | Hall-Ellis Report 6A; | |
| **DTX-408** | MARC Record for Exhibit 6A from the National Library of Medicine ("Exhibit 6B"). | ONT-EXP-000091 | ONT-EXP-000092 | Hall-Ellis Report 6B | |
| **DTX-409** | MARC Record for Exhibit 6A from the OCLC bibliographic database ("Exhibit 6C"). | ONT-EXP-000093 | ONT-EXP-000094 | Hall-Ellis Report 6C | |
| **DTX-410** | Google Scholar Results for Exhibit 6A ("Exhibit 6D"). | ONT-EXP-000095 | ONT-EXP-000095 | Hall-Ellis Report 6D | |
| **DTX-411** | Venter et al., *"The Sequence of the Human Genome"* Science 291(5507):1304-1351 (2001) ("Exhibit 6E"). | ONT-EXP-000096 | ONT-EXP-000146 | Hall-Ellis Report 6E | |
| **DTX-412** | Tenover et al., *"Interpreting chromosomal DNA restriction patterns produced by pulsed-field gel electrophoresis: criteria for bacterial strain typing"* Journal of Clinical Microbiology, 33(9): 2233–2239 (1995) ("Exhibit 6F"). | ONT-EXP-000147 | ONT-EXP-000153 | Hall-Ellis Report 6F | |
| **DTX-413** | C. Tuerk and L. Gold, *"Systematic evolution of ligands by exponential enrichment: RNA ligands to bacteriophage T4 DNA polymerase"* Science 249(4968):505-510 (1990) ("Exhibit 6G"). | ONT-EXP-000154 | ONT-EXP-000160 | Hall-Ellis Report 6G | |
| **DTX-414** | Struhl, *"Book review: Cloning cookbook for the laboratory"* Nature 316:222 (1985) ("Exhibit 7A"). | ONT-EXP-000161 | ONT-EXP-000164 | Hall-Ellis Report 7A | |
| **DTX-415** | MARC Record for Exhibit 7A from the Linda Hall Library ("Exhibit 7B"). | ONT-EXP-000165 | ONT-EXP-000166 | Hall-Ellis Report 7B | |
| **DTX-416** | MARC Record for Exhibit 7A from the OCLC bibliographic database ("Exhibit 7C"). | ONT-EXP-000167 | ONT-EXP-000168 | Hall-Ellis Report 7C | |
| **DTX-417** | Liao, et al., *"Mechanochemistry of T7 DNA Helicase"* Journal of Molecular Biology 350(3):452–75 (2005) ("Exhibit 8A"). | ONT-EXP-000169 | ONT-EXP-000196 | Hall-Ellis Report 8A; Ha Reply Rpt 18 | |
| **DTX-418** | MARC Record for Exhibit 8A from the National Library of Medicine ("Exhibit 8B"). | ONT-EXP-000197 | ONT-EXP-000199 | Hall-Ellis Report 8B | |
| **DTX-419** | MARC Record for Exhibit 8A from the OCLC bibliographic database ("Exhibit 8C"). | ONT-EXP-000200 | ONT-EXP-000202 | Hall-Ellis Report 8C | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-420 | Adelman, et al., "*Mechanochemistry of Transcription Termination Factor Rho*" Molecular Cell 22:611-612 (2006) ("Exhibit 9A"). | ONT-EXP-000203 | ONT-EXP-000217 | Hall-Ellis Report 9A; Ha Reply Rpt 30 | |
| DTX-421 | MARC Record for Exhibit 9A from the Steenbock Memorial Library at the University of Wisconsin-Madison ("Exhibit 9B"). | ONT-EXP-000218 | ONT-EXP-000220 | Hall-Ellis Report 9B | |
| DTX-422 | MARC Record for Exhibit 9A from the OCLC bibliographic database ("Exhibit 9C"). | ONT-EXP-000221 | ONT-EXP-000223 | Hall-Ellis Report 9C | |
| DTX-423 | Preugschat et al., "*Kinetic analysis of the effects of mutagenesis of W501 and V432 of the hepatitis C virus NS3 helicase domain on ATPase and strand-separating activity*" Biochemistry 39(17):5174–5183 (2000) ("Exhibit 10A"). | ONT-EXP-000224 | ONT-EXP-000236 | Hall-Ellis Report 10A; Ha Report | |
| DTX-424 | MARC Record for Exhibit 10A from the Linda Hall Library ("Exhibit 10B"). | ONT-EXP-000237 | ONT-EXP-000238 | Hall-Ellis Report 10B | |
| DTX-425 | MARC Record for Exhibit 10A from the OCLC bibliographic database ("Exhibit 10C"). | ONT-EXP-000239 | ONT-EXP-000240 | Hall-Ellis Report 10C | |
| DTX-426 | Myong, et al., "*Spring-Loaded Mechanism of DNA Unwinding by Hepatitis C Virus NS3 Helicase,*" Science 317(5837):513–516 (2007) ("Exhibit 11A"). | ONT-EXP-000241 | ONT-EXP-000249 | Ha Reply Rpt 19; Hall-Ellis Report 11A | |
| DTX-427 | Withdrawn | | | | |
| DTX-428 | MARC Record for Exhibit 11A from the Linda Hall Library ("Exhibit 11B"). | ONT-EXP-000250 | ONT-EXP-000251 | Hall-Ellis Report 11B | |
| DTX-429 | MARC Record for Exhibit 11A from the OCLC bibliographic database ("Exhibit 11C"). | ONT-EXP-000252 | ONT-EXP-000256 | Hall-Ellis Report 11C | |
| DTX-430 | Dumont, et al., "*RNA translocation and unwinding mechanism of HCV NS3 helicase and its coordination by ATP*" Nature 439 (7072):105–108 (2006) ("Exhibit 12A"). Dated 01/05/06 | ONT-EXP-000257 | ONT-EXP-000263 | Hall-Ellis Report 12A; Ha Rebuttal 11; Ha Reply Rpt 22 | |
| DTX-431 | MARC Record for Exhibit 12A from the Linda Hall Library ("Exhibit 12B"). | ONT-EXP-000264 | ONT-EXP-000265 | Hall-Ellis Report 12B | |
| DTX-432 | MARC Record for Exhibit 12A from the OCLC bibliographic database ("Exhibit 12C"). | ONT-EXP-000266 | ONT-EXP-000267 | Hall-Ellis Report 12C | |
| DTX-433 | Büttner, et al., "*Structural basis for DNA duplex separation by a superfamily-2 helicase*" Nature Structure & Molecular Biology 14 (7): 647–652 (2007) ("Exhibit 13A"). | ONT-EXP-000268 | ONT-EXP-000273 | Hall-Ellis Report 13A | |
| DTX-434 | MARC Record for Exhibit 13A from the Ebling Library for the Health Sciences at the University of Wisconsin-Madison ("Exhibit 13B"). | ONT-EXP-000274 | ONT-EXP-000278 | Hall-Ellis Report 13B | |
| DTX-435 | MARC Record for Exhibit 13A from the OCLC bibliographic database ("Exhibit 13C"). | ONT-EXP-000279 | ONT-EXP-000280 | Hall-Ellis Report 13C | |
| DTX-436 | Hurt, et al., "*Specific nucleotide binding and rebinding to individual DNA polymerase complexes captured on a nanopore*" J. Am. Chem. Soc. 131(10):3772–3778 (2009) ("Exhibit 14A"). | ONT-EXP-000281 | ONT-EXP-000305 | Hall-Ellis Report 14A; Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| DTX-437 | MARC Record for Exhibit 14A from the Linda Hall Library ("Exhibit 14B"). | ONT-EXP-000306 | ONT-EXP-000307 | Hall-Ellis Report 14B | |
| DTX-438 | MARC Record for Exhibit 14A from the OCLC bibliographic database ("Exhibit 14C"). | ONT-EXP-000308 | ONT-EXP-000309 | Hall-Ellis Report 14C | |
| DTX-439 | Schnitzer, et al., "*Statistical Kinetics of Processive Enzymes*" a chapter in Protein Kinesis: The Dynamics of Protein Trafficking and Stability, Vol. 60 of the Cold Spring Harbor Symposia on Quantitative Biology, 793–802 (1995) ("Exhibit 15A"). | ONT-EXP-000310 | ONT-EXP-000319 | Hall-Ellis Report 15A; Ha Reply Rpt 26 | |
| DTX-440 | MARC Record for Exhibit 15A from the University of Colorado – Boulder Libraries ("Exhibit 15B"). | ONT-EXP-000320 | ONT-EXP-000320 | Hall-Ellis Report 15B | |
| DTX-441 | MARC Record for Exhibit 15A from the OCLC bibliographic database ("Exhibit 15C"). | ONT-EXP-000321 | ONT-EXP-000322 | Hall-Ellis Report 15C | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-442 | Google Scholar Results for Exhibit 15A ("Exhibit 15D"). | ONT-EXP-000323 | ONT-EXP-000323 | Hall-Ellis Report 15D | |
| DTX-443 | Abbondanzieri et al., "*Direct observation of base-pair stepping by RNA polymerase*" Nature 438(7067):460-465 (2005) ("Exhibit 15E"). | ONT-EXP-000324 | ONT-EXP-000337 | Hall-Ellis Report 15E | |
| DTX-444 | English et al., "*Ever-fluctuating single enzyme molecules: Michaelis-Menten equation revisited*" Nature Chemical Biology 2(2):87-94 (2006) ("Exhibit 15F"). | ONT-EXP-000338 | ONT-EXP-000346 | Hall-Ellis Report 15F | |
| DTX-445 | Reimann, "*Brownian motors: noisy transport far from equilibrium*" Physics Reports 361(2-4)57-265 (2002) ("Exhibit 15G"). | ONT-EXP-000347 | ONT-EXP-000555 | Hall-Ellis Report 15G | |
| DTX-446 | Johnson, "*Role of induced fit in enzyme specificity: a molecular forward/reverse switch*" J. Biol. Chem. 283(39):26297–26301 (2008) ("Exhibit 16A"). | ONT-EXP-000556 | ONT-EXP-000564 | Hall-Ellis Report 16A; Ha Reply Rpt 27 | |
| DTX-447 | MARC Record for Exhibit 16A from the Linda Hall Library ("Exhibit 16B"). | ONT-EXP-000565 | ONT-EXP-000566 | Hall-Ellis Report 16B | |
| DTX-448 | MARC Record for Exhibit 16A from the OCLC bibliographic database ("Exhibit 16C"). | ONT-EXP-000567 | ONT-EXP-000568 | Hall-Ellis Report 16C | |
| DTX-449 | Pourmand et al., "*Direct electrical detection of DNA synthesis*" Proc. Nat'l Acad. Sci. 103(17):6466–6470 (2006) ("Exhibit 17A"). | ONT-EXP-000569 | ONT-EXP-000578 | Hall-Ellis Report 17A | |
| DTX-450 | MARC Record for Exhibit 17A from the Linda Hall Library ("Exhibit 17B"). | ONT-EXP-000579 | ONT-EXP-000580 | Hall-Ellis Report 17B | |
| DTX-451 | MARC Record for Exhibit 17A from the OCLC bibliographic database ("Exhibit 17C"). | ONT-EXP-000581 | ONT-EXP-000582 | Hall-Ellis Report 17C | |
| DTX-452 | Cockroft *et al.,* "*A Single-Molecule Nanopore Device Detects DNA Polymerase Activity with Single-Nucleotide Resolution,*" J. Am. Chem. Soc. 130(3):818–820 (2008) ("Exhibit 18A"). | ONT-EXP-000583 | ONT-EXP-000607 | Hall-Ellis Report 18A; Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| DTX-453 | MARC Record for Exhibit 18A from the Linda Hall Library ("Exhibit 18B"). | ONT-EXP-000608 | ONT-EXP-000609 | Hall-Ellis Report 18B | |
| DTX-454 | MARC Record for Exhibit 18A from the OCLC bibliographic database ("Exhibit 18C"). | ONT-EXP-000610 | ONT-EXP-000611 | Hall-Ellis Report 18C | |
| DTX-455 | Hornblower, B. et al., "*Single-molecule analysis of DNA-protein complexes using nanopores*" Nat. Methods 4, 315–317 (2007) ("Exhibit 19A") | ONT-EXP-000612 | ONT-EXP-000617 | Hall-Ellis Report 19A | |
| DTX-456 | MARC Record for Exhibit 19A from the Linda Hall Library ("Exhibit 19B"). | ONT-EXP-000618 | ONT-EXP-000618 | Hall-Ellis Report 19B | |
| DTX-457 | MARC Record for Exhibit 19A from the OCLC bibliographic database ("Exhibit 19C"). | ONT-EXP-000619 | ONT-EXP-000620 | Hall-Ellis Report 19C | |
| DTX-458 | Branton, et al., "*The potential and challenges of nanopore sequencing*" Nat. Biotech. 26(10):1146–1153 (2008) ("Exhibit 20A") | ONT-EXP-000621 | ONT-EXP-000633 | Hall-Ellis Report 20A | |
| DTX-459 | MARC Record for Exhibit 20A from the Linda Hall Library ("Exhibit 20B"). | ONT-EXP-000634 | ONT-EXP-000634 | Hall-Ellis Report 20B | |
| DTX-460 | MARC Record for Exhibit 20A from the OCLC bibliographic database ("Exhibit 20C"). | ONT-EXP-000635 | ONT-EXP-000636 | Hall-Ellis Report 20C | |
| DTX-461 | Sigalov et al., "*Detection of DNA Sequences Using an Alternating Electric Field in a Nanopore Capacitor*" Nano Lett. 8:56-63 ("Exhibit 21A") | ONT-EXP-000637 | ONT-EXP-000645 | Hall-Ellis Report 21A | |
| DTX-462 | Sigalov et al., "*Supporting Information to the Manuscript Detection of DNA Sequences Using an Alternating Electric Field in a Nanopore Capacitor*" Nano Letters, Vol. 8, No. 1 at 9-10 (2007) ("Exhibit 21B") | ONT-EXP-000646 | ONT-EXP-000658 | Hall-Ellis Report 21B; | |
| DTX-463 | MARC Record for Exhibit 21A from the Chemistry Library at the University of Illinois at Urbana-Champaign Library ("Exhibit 21C"). | ONT-EXP-000659 | ONT-EXP-000660 | Hall-Ellis Report 21C | |
| DTX-464 | MARC Record for Exhibit 21A from the OCLC bibliographic database ("Exhibit 21D"). | ONT-EXP-000661 | ONT-EXP-000662 | Hall-Ellis Report 21D | |
| DTX-465 | Declaration of Eric S. Slater, Senior Manager, Copyright, Permissions, & Licensing at the American Chemical Society ("Exhibit 21E"). | ONT-EXP-000663 | ONT-EXP-000684 | Hall-Ellis Report 21E | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-466 | Olson, et al., "*De Novo Peptide Sequencing Using Exhaustive Enumeration of Peptide Composition*" Journal of the American Society for Mass Spectrometry, 17(8): 1041-1049 (2006) ("Exhibit 22A"). | ONT-EXP-000685 | ONT-EXP-000693 | Hall-Ellis Report 22A | |
| DTX-467 | MARC Record for Exhibit 22A from the University of Illinois at Urbana-Champaign Library ("Exhibit 22B"). | ONT-EXP-000694 | ONT-EXP-000695 | Hall-Ellis Report 22B | |
| DTX-468 | MARC Record for Exhibit 22A from the OCLC bibliographic database ("Exhibit 22C"). | ONT-EXP-000696 | ONT-EXP-000698 | Hall-Ellis Report 22C | |
| DTX-469 | Purnell, et al., "*Discrimination of Single Base Substitutions in a DNA Strand Immobilized in a Biological Nanopore*" ACS Nano 3(9):2533-2538 (2009) ("Exhibit 23A"). | ONT-EXP-000699 | ONT-EXP-000711 | Hall-Ellis Report 23A; | |
| DTX-470 | MARC Record for Exhibit 23A from the Linda Hall Library ("Exhibit 23B"). | ONT-EXP-000712 | ONT-EXP-000712 | Hall-Ellis Report 23B | |
| DTX-471 | MARC Record for Exhibit 23A from the OCLC bibliographic database ("Exhibit 23C"). | ONT-EXP-000713 | ONT-EXP-000714 | Hall-Ellis Report 23C | |
| DTX-472 | Robert Purnell, "*The Interpretation of Ionic Currents Produced by Controlled DNA Translocation Through the Alpha-Hemolysin Nanopore 6-9*"; 18-23; 58-71; 80-81 (2009) ("Exhibit 24A") | ONT-EXP-000715 | ONT-EXP-000823 | Hall-Ellis Report 24A | |
| DTX-473 | MARC Record for Exhibit 24A from the University of California, Los Angeles Libraries ("Exhibit 24B"). | ONT-EXP-000824 | ONT-EXP-000825 | Hall-Ellis Report 24B | |
| DTX-474 | MARC Record for Exhibit 24A from the OCLC bibliographic database ("Exhibit 24C"). | ONT-EXP-000826 | ONT-EXP-000826 | Hall-Ellis Report 25C | |
| DTX-475 | *Machine Learning Methods for Channel Current Chemiformatics, Biophysical Analysis, and Bioinformatics*, a dissertation by Stephen Winters-Hilt ("Exhibit 25A"). | ONT-EXP-000827 ONT-DEL-00012814 | ONT-EXP-001003 | Hall-Ellis Report 25A; Dessimoz Dep 11 | |
| DTX-476 | Declaration of Carol Wadke, Author/School Relations Specialist at ProQuest LLC ("Exhibit 25B"). | ONT-EXP-001004 | ONT-EXP-001006 | Hall-Ellis Report 25B | |
| DTX-477 | Stoddart et al., "*Toward Single Molecule DNA Sequencing: Single-Base Recognition and Real-Time Polymerase Activity Detected by a Protein Nanopore*" Presentation at the NHGRI Advanced DNA Sequencing Technology Development Meeting (April 1, 2009) ("Exhibit 26A"). | ONT-EXP-001007 | ONT-EXP-001007 | Hall-Ellis Report 26A | |
| DTX-478 | Schedule of Events for the 2009 NHGRI Advanced DNA Sequencing Technology Development Meeting ("Exhibit 26B"). | ONT-EXP-001008 | ONT-EXP-001009 | Hall-Ellis Report 26B | |
| DTX-479 | Proposal for NIH Grant No. 1R21GM073617-01A1 Winters-Hill "*Nanopore study of single antibody-antigen interactions*" ("Exhibit 27A") | ONT-EXP-001010 | ONT-EXP-001056 | Hall-Ellis Report 27A | |
| DTX-480 | Excerpt from the FY 2005 CRISP Project Data file "*Nanopore study of single antibody-antigen interactions*" ("Exhibit 27B") | ONT-EXP-001057 | ONT-EXP-001057 | Hall-Ellis Report 27B | |
| DTX-481 | Excerpt from the FY 2005 CRISP Project Abstract file "*Nanopore-based single-molecule detection has recently become established as a new tool in single molecule biophysics*" ("Exhibit 27C") | ONT-EXP-001058 | ONT-EXP-001058 | Hall-Ellis Report 27C | |
| DTX-482 | Affidavit of Chris Butler, Office Manager at the Internet Archive ("Exhibit 27D"). | ONT-EXP-001059 | ONT-EXP-001212 | Hall-Ellis Report 27D | |
| DTX-483 | NIH Grants Policy Statement, effective 12/1/2003 to 10/1/2010 ("Exhibit 27E") | ONT-EXP-001213 | ONT-EXP-001507 | Hall-Ellis Report 27E | |
| DTX-484 | Progress Report for NIH Grant No. 1R21GM073617-02 ("Exhibit 27F") | ONT-EXP-001508 | ONT-EXP-001528 | Hall-Ellis Report 27F | |
| DTX-485 | Progress Report for NIH Grant No. 1R21GM073617-03 ("Exhibit 27G") | ONT-EXP-001529 | ONT-EXP-001541 | Hall-Ellis Report 27G | |
| DTX-486 | Proposal for NIH Grant No. 1K22LM008794-01 ("Exhibit 28A") | ONT-EXP-001542 | ONT-EXP-001583 | Hall-Ellis Report 28A | |
| DTX-487 | Excerpt from the FY 2006 CRISP Project Data file ("Exhibit 28B"). | ONT-EXP-001584 | ONT-EXP-001584 | Hall-Ellis Report 28B | |
| DTX-488 | Excerpt from the FY 2006 CRISP Project Abstract file ("Exhibit 28C"). | ONT-EXP-001585 | ONT-EXP-001585 | Hall-Ellis Report 28C | |
| DTX-489 | Progress Report for NIH Grant No. 1K22LM008794-02 ("Exhibit 28D") | ONT-EXP-001586 | ONT-EXP-001596 | Hall-Ellis Report 28D | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| **DTX-490** | Progress Report for NIH Grant No. 1K22LM008794-03 ("Exhibit 28E") | ONT-EXP-001597 | ONT-EXP-001614 | Hall-Ellis Report 28E | |
| **DTX-491** | Deamer, et al., "*Three decades of nanopore sequencing*" Nat. Biotech. 34(5): 518–524 (2016) ("Exhibit 29A"). | ONT-EXP-001615 | ONT-EXP-001626 | Hall-Ellis Report 29A | |
| **DTX-492** | MARC Record for Exhibit 29A from the Linda Hall Library ("Exhibit 29B"). | ONT-EXP-001627 | ONT-EXP-001627 | Hall-Ellis Report 29B | |
| **DTX-493** | MARC Record for Exhibit 29A from the OCLC bibliographic database ("Exhibit 29C"). | ONT-EXP-001628 | ONT-EXP-001629 | Hall-Ellis Report 29C | |
| **DTX-494** | Akeson, et al., "*Microsecond time-scale discrimination among polycytidylic acid, polyadenylic acid, and polyuridylic acid as homopolymers or as segments within single RNA molecules*" Biophys. J. 77, 3227–3233 (1999) | ONT-EXP-001725 | ONT-EXP-001731 | | |
| **DTX-495** | Ashkenasy et al., "*Recognizing a single base in an individual DNA strand: a step toward DNA sequencing in nanopores*" Angew. Chem. Int. Ed. 44, 1401–1404 (2005) | ONT-EXP-001769 | ONT-EXP-001772 | | |
| **DTX-496** | Astier et al. "Toward Single Molecule DNA Sequencing: Direct Identification of Ribonucleoside andd Deoxyribonucleoside 5'--Monophosphates by Using an Engineered Protein Nanopore Equipped with a Molecular Adapter" JACS (2006) 128:1705-1710. | ONT-EXP-001773 | ONT-EXP-001778 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| **DTX-497** | Church, G. M., "*Genomes for All*" Scientific American, Jan. 2006, 47-54 | ONT-EXP-001901 | ONT-EXP-001910 | | |
| **DTX-498** | U.S. Patent 5,795,782 | ONT-EXP-001911 | ONT-EXP-001929 | | |
| **DTX-499** | Deamer, et al., "*Nanopores and Nucleic Acids: Prospects for Ultra-Rapid Sequencing*" Trends in Biotech. 18(4): p. 147-151 (2000) | ONT-EXP-001930 | ONT-EXP-001934 | | |
| **DTX-500** | Esteban, et al., "*Metal Activation of Synthetic and Degradative Activities of ø29 DNA Polymerase, a Model Enzyme for Protein-Primed DNA Replication*" (1992) | ONT-EXP-001942 | ONT-EXP-001951 | | |
| **DTX-501** | Claim Chart re Disclosure of Winters-Hilt Dissertation (Ex. 3) | ONT-EXP-001952 | ONT-EXP-001970 | Goldman Report 3 | H |
| **DTX-502** | Claim Chart re Disclosure of U.S. Patent 7,731,826 to Hibbs (Ex. 4) | ONT-EXP-001971 | ONT-EXP-001985 | Goldman Report 4 | H |
| **DTX-503** | Claim Chart re Disclosure of U.S. Patent 8,542,546 to Lathrop (Ex. 5) | ONT-EXP-001986 | ONT-EXP-001996 | Goldman Report 5 | H |
| **DTX-504** | Claim Chart re Disclosure of Akeson Grant (Ex. 6) | ONT-EXP-001997 | ONT-EXP-002009 | Goldman Report 6 | H |
| **DTX-505** | Claim Chart re Disclosure of Winters-Hilt Grant (Ex. 7) | ONT-EXP-002010 | ONT-EXP-002026 | Goldman Report 7 | H |
| **DTX-506** | Claim Chart re Disclosure of Winters-Hilt Dissertation (Ex. 8) | ONT-EXP-002027 | ONT-EXP-002050 | Goldman Report 8 | H |
| **DTX-507** | Claim Chart re Disclosure of U.S. Patent 7,731,826 to Hibbs (Ex. 9) | ONT-EXP-002051 | ONT-EXP-002068 | Goldman Report 9 | H |
| **DTX-508** | Claim Chart re Disclosure of U.S. Patent 8,542,546 to Lathrop (Ex. 10) | ONT-EXP-002069 | ONT-EXP-002080 | Goldman Report 10 | H |
| **DTX-509** | Claim Chart re Disclosure of Akeson Grant (Ex. 11) | ONT-EXP-002081 | ONT-EXP-002101 | Goldman Report 11 | H |
| **DTX-510** | Claim Chart re Disclosure of Akeson Grant | ONT-EXP-002082 | ONT-EXP-002101 | Goldman Dep 10 | H |
| **DTX-511** | Claim Chart re Disclosure of Winters-Hilt Grant (Ex. 12) | ONT-EXP-002102 | ONT-EXP-002133 | Goldman Report 12 | H |
| **DTX-512** | Claim Chart re Disclosure of U.S. Patent 7,238,485 to Akeson et al. (Ex. 13) | ONT-EXP-002134 | ONT-EXP-002138 | Goldman Report 13 | H |
| **DTX-513** | Dissertation of Stephen Winters-Hilt "*Machine Learning Methods for Channel Current Chamiformatics, biophysical analysis, and bioinformatics*" March 2003 | ONT-EXP-002139 | ONT-EXP-002316 | Goldman Report 14 | |
| **DTX-514** | Dissertation 3080505 "*Machine Learning Methods for Channel Current Chamiformatics, biophysical analysis, and bioinformatics*" Wadke Declaration | ONT-EXP-002317 | ONT-EXP-002320 | Goldman Report 15 | |
| **DTX-515** | NIH Grant App. 1K22LM008794-01 "*Nanopore study of single antibody-antigen interactions*" | ONT-EXP-002321 | ONT-EXP-002368 | Goldman Report 16 | |
| **DTX-516** | Letter from NIH to Jordan Fernandes re/enclosing Grant Appl. 1K22LM008794-01 dated 07/26/19 | ONT-EXP-002322 | ONT-EXP-002368 | Goldman Dep 13 | |
| **DTX-517** | NIH Grant App. 1R21GM073617-01A1 "*A Comprehensive Structural and Dynamic Map of DNA Duplex Ends*" | ONT-EXP-002369 | ONT-EXP-002411 | Goldman Report 17 | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-518 | Letter from NIH to Jordan Fernandes re/enclosing Grant Appl. 1R21GM073617-01A1 dated 06/21/19 | ONT-EXP-002370 | ONT-EXP-002411 | Goldman Dep 14 | |
| DTX-519 | U.K. Patent Publication No. 2398301 | ONT-EXP-002417 | ONT-EXP-002490 | | |
| DTX-520 | Kasianowics, et al., "*Characterization of individual polynucleotide molecules using a membrane channel*" Proc. Natl. Acad. Sci. USA 93, 13770-13773 (1996) | ONT-EXP-002604 | ONT-EXP-002607 | | |
| DTX-521 | Meller, et al "*D. Rapid nanopore discrimination between single polynucleotide molecules*" Proc. Natl. Acad. Sci. USA 97, 1079–1084 (2000) | ONT-EXP-002686 | ONT-EXP-002691 | | |
| DTX-522 | GENETIConcept, "Pharmacogenetics" available at https://geneticoncept.com/pharmacogenetics | ONT-EXP-003586 | ONT-EXP-003588 | | |
| DTX-523 | https://www.researchgate.net/publication/267203796-Pharmacogenetic studies-of-thiopurines---focus-on-thiopurine-methyltransferase | ONT-EXP-002692 | ONT-EXP-002775 | | |
| DTX-524 | https://www.illumina.com/documents/products/techspotlights/techspotlight-sequencing] | ONT-EXP-002844 | ONT-EXP-002848 | | |
| DTX-525 | Vercoutere, et al., "*Rapid discrimination among individual DNA hairpin molecules at single-nucleotide resolution using an ion channel*" Nat Biotechnol. 19(3): 248-52 (2001) | ONT-EXP-002906 | ONT-EXP-002910 | Cited on the face of '929 Patent | |
| DTX-526 | Vercoutere, et al., "*Discrimination among individual Watson-Crick base pairs at the termini of single DNA hairpin molecule*" Nucleic Acids Res. 31(4):1311-8 (2003) | ONT-EXP-002911 | ONT-EXP-002918 | Cited on the face of '929 Patent | |
| DTX-527 | Winters-Hilt, et al., "*Highly Accurate Classification of Watson-Crick Basepairs on Termini of Single DNA Molecules*" Biophys. J. 84(2):967-976 (2003) | ONT-EXP-002923 | ONT-EXP-002932 | Cited on the face of '929 Patent | |
| DTX-528 | Chang Ming Li & Kai H. Goh. Biochips – "*Fundamentals and Appl.s in Electrochemical Sensors*" Biosensors and their Biomedical Appl.s (2008) | ONT-EXP-003122 | ONT-EXP-003198 | | |
| DTX-529 | Breast and Ovarian Hereditary Cancer Syndrome (BRCA1 and BRCA2) Sequencing (available at http://ltd.aruplab.com/Tests/Pub/2011954) | ONT-EXP-003202 | ONT-EXP-003203 | | 403, R, LF, LK, H |
| DTX-530 | Drmanac, R., Labat, I., Brukner, I. and Crkvenjakov, R., "*Sequencing of Megabase Plus DNA by Hypridization:  Theory of the Mehod* Genomics" 4, 114-128 (1989) | ONT-EXP-003204 | ONT-EXP-003218 | | |
| DTX-531 | Smith, et al "*Complete genomic sequence and analysis of 117 kb of human DNA containing the gene BRCA1*" Genome Res. 6:1029-1049 (1996) | ONT-EXP-003219 | ONT-EXP-003240 | | |
| DTX-532 | Mirzabekov, A.D., "*DNA sequencing by hybridization — a megasequencing method and a diagnostic tool?*" Trends in Biotech. 12(1) 27-32 (Jan 1994) (citing Khrapko, K. R., Lysov, Yu. P., Khorlin, A. A., Ivanov, I. B., Yershov, G. M., Vasilenko, S. K., Florentiev, V. L. and Mirzabekov, A. D. DNA Sequence 1, 375-388 (1991)). | ONT-EXP-003256 | ONT-EXP-003261 | | |
| DTX-533 | Nyren P, et al., "*Solid Phase DNA Minisequencing by an Enzymatic Luminometric Inorganic Pyrophosphate Detection Assay*" Anal. Bioch. 208 (1), 171-175 (1993) | ONT-EXP-003262 | ONT-EXP-003266 | | |
| DTX-534 | Faller, et al., "*The structure of a mycobacterial outermembrane channel*" Science 303, 1189–1192 (2004) | ONT-EXP-003298 | ONT-EXP-003302 | | |
| DTX-535 | Walker, et al., "*A pore-forming protein with a metal-actuated switch*" Protein Eng. 7, 655-662 (1994) | ONT-EXP-003303 | ONT-EXP-003310 | | |
| DTX-536 | U.S. Patent Pub. 2019/0203288 (Exhibit 12  Ha Rebuttal Rpt) | ONT-EXP-003311 | ONT-EXP-003407 | Ha Rebuttal Rpt 12; McHenry Reply Rpt 12 | |
| DTX-537 | Donmez, Ilker et al. "*Coupling of DNA unwinding to nucleotide hydrolysis in a ring-shaped helicase*" EMBO Journal (2008) 1718-1726 | ONT-EXP-003408 | ONT-EXP-003416 | Ha Rebuttal Rpt 14 | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-538 | Ha Simulation (Exhibit 17 Ha Rebuttal Rpt) | ONT-EXP-003417 | ONT-EXP-003417 | Ha Rebuttal Rpt 17 | H |
| DTX-539 | Histogram produced by analyzing Oxford's github 6-mer model (Exhibit 18 Ha Rebuttal Rpt) | ONT-EXP-003418 | ONT-EXP-003418 | Ha Rebuttal Rpt 18 | H, I |
| DTX-540 | Ha Simulation - plotted histogram (Exhibit 19 Ha Rebuttal Rpt) | ONT-EXP-003419 | ONT-EXP-003419 | Ha Rebuttal Rpt 19 | H, I |
| DTX-541 | Single paired-window t-test with a width of 4 and a threshold of 1.5 (Exhibit 20 Ha Rebuttal Rpt) | ONT-EXP-003420 | ONT-EXP-003420 | Ha Rebuttal Rpt 20 | H, I |
| DTX-542 | Ha Simulation - plotted histogram showing all move 1 events (Exhibit 21 Ha Rebuttal Rpt) | ONT-EXP-003421 | ONT-EXP-003421 | Ha Rebuttal Rpt 21 | H, I |
| DTX-543 | BLAST search also reveals that there are 567 "gaps" in the base-called read (Exhibit 22 Ha Rebuttal Rpt) | ONT-EXP-003422 | ONT-EXP-003422 | Ha Rebuttal Rpt 22 | H |
| DTX-544 | 23andMe, available at https://www.23andme.com/?myg01=true | ONT-EXP-003423 | ONT-EXP-003438 | | 403, R, LF, LK, H |
| DTX-545 | Ancestry, available at http://ancestry.com/ | ONT-EXP-003439 | ONT-EXP-003442 | | 403, R, LF, LK, H |
| DTX-546 | Ardui et al., "*Single molecule real-time (SMRT) sequencing comes of age: Appl.s and utilities for medical diagnostics*" Nucleic Acids Res., March 2018, 46(5): 2159–2168 (hereafter, "Ardui et al."), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5861413/, citing Rhoads A., Au K.F. PacBio sequencing and its Appl.s. Genomics Proteomics Bioinformatics. 2015; 13:278–289 | ONT-EXP-003448 | ONT-EXP-003468 | | |
| DTX-547 | PacBio,"*At Maryland Genomics, Scientists Deploy Sequel II System for a Wide Range of Appl.s*" available at https://www.pacb.com/blog/at-maryland-genomics-scientists-deploy-sequel-ii-system-for-a-wide-range-ofAppl.s/ | ONT-EXP-003469 | ONT-EXP-003471 | | |
| DTX-548 | Biocompare, "*The Long and the Short of Sequencing*" available at https://www.biocompare.com/Editorial-Articles/349220-The-Long-and-the-Short-of-Sequencing/ | ONT-EXP-003479 | ONT-EXP-003486 | | |
| DTX-549 | CMA,et al., "*Anticipated acquisition by Illumina, Inc. of Pacific Biosciences of California, Inc., Decision on relevant merger situation and substantial lessening of competition, ME/6795/18*" 18 June, 2019 | ONT-EXP-003487 | ONT-EXP-003548 | | 403, R, LF, LK, MIL |
| DTX-550 | Center for Technology Licensing at Cornell University, "*PacBio RS*" available at https://ctl.cornell.edu/wpcontent/uploads/products/pacbiors-web | ONT-EXP-003549 | ONT-EXP-003549 | | |
| DTX-551 | U.S. Food & Drug Administration,"*Direct-to-Consumer Tests*" available at https://www.fda.gov/medical-devices/vitro-diagnostics/directconsumer-tests#list | ONT-EXP-003550 | ONT-EXP-003561 | | |
| DTX-552 | Eisenstein, Michael, "*Illumina swallows PacBio in long shot for market domination*" Nature BioTechnology, Vol. 37 No. 1, January 2019, at pp. 3–4, available at https://www.nature.com/articles/nbt0119-3 | ONT-EXP-003562 | ONT-EXP-003563 | | 403, R, LF, LK, MIL |
| DTX-553 | EquipNet, "*Pacific Biosciences RS II Sequencer*" available at https://www.equipnet.com/pacific-biosciences-rs-ii-sequencer-listid-704170/ | ONT-EXP-003564 | ONT-EXP-003567 | | |
| DTX-554 | Fuselli et al., "*A new hybrid approach for MHC genotyping: high-throughput NGS and long read MinION nanopore sequencing, with Appl. to the non-model vertebrate Alpine chamosis (Rupicapra rupicapra)*" Heredity (Edinb), October 2018, 121(4): 293–303, available at https://www.ncbi.nlm.nih.gov/pubmed/?term=PMID%3A+29572469 | ONT-EXP-003575 | ONT-EXP-003576 | | |
| DTX-555 | Genetic Engineering & Biotechnology News, "*Top 10 Sequencing Companies*" available at https://www.genengnews.com/a-lists/top-10-sequencing-companies-2/ | ONT-EXP-003580 | ONT-EXP-003585 | | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-556 | GenomeWeb, "*UK Request Pushes Illumina's Timeline for Completion of PacBio Acquisition to Q4*" June 18, 2019, available at https://www.genomeweb.com/sequencing/uk-request-pushes-illuminas-timeline-completionpacbio-acquisition-q4#.XQuvBuhKiUk | ONT-EXP-003594 | ONT-EXP-003596 | | 403, R, LF, LK, MIL |
| DTX-557 | Oxford Nanopore Technologies, "*GridION Mk1 CapEX*" available at https://store.nanoporetech.com/configure-gridion-capex | ONT-EXP-003640 | ONT-EXP-003643 | | |
| DTX-558 | GridION Mk1 (https://nanoporetech.com/products/gridion) | ONT-EXP-003644 | ONT-EXP-003648 | | |
| DTX-559 | Thermo Fisher Scientific, *"How Does Sanger Sequencing Work?"* available at https://www.thermofisher.com/blog/behindthebench/how-does-sanger-sequencing-work/ | ONT-EXP-003649 | ONT-EXP-003651 | | |
| DTX-560 | Illumina, "*Buyer's Guide: Next-Generation Sequencing Systems*" available athttps://www.illumina.com/content/dam/illumina-marketing/documents/products/brochures/ngs-buyersguide | ONT-EXP-003652 | ONT-EXP-003667 | | 403, R |
| DTX-561 | Illumina, "*Understanding the genetic code*" available at https://www.illumina.com/techniques/sequencing/dnasequencing.html | ONT-EXP-003668 | ONT-EXP-003670 | | 403, R |
| DTX-562 | Illumina, "*Key differences between next-generation sequencing and Sanger sequencing*" available at https://www.illumina.com/science/technology/next-generation-sequencing/ngs-vs-sanger-sequencing.html | ONT-EXP-003671 | ONT-EXP-003675 | | 403, R |
| DTX-563 | Illumina, "*Illumina @ A Glance*" available at https://www.illumina.com/company/news-center/featurearticles/illumina-at-a-glance.html | ONT-EXP-003676 | ONT-EXP-003678 | | 403, R |
| DTX-564 | Illumina 2018 10-K, available at https://investor.illumina.com/financials/sec-filings-details/default.aspx?FilingId=13211273 | ONT-EXP-003679 | ONT-EXP-003771 | | 403, R |
| DTX-565 | Illumina, "*Illumina Fact Sheet*" available at https://www.illumina.com/company/about-us/fact-sheet.html | ONT-EXP-003772 | ONT-EXP-003773 | | 403, R |
| DTX-566 | Seeking Alpha, "*Illumina is Dominating the Genome Sequencing Market*" available at https://seekingalpha.com/instablog/127148-michael-michaud/3643956-illumina-is-dominating-the-genomesequencing-market | ONT-EXP-003774 | ONT-EXP-003780 | | 403, R |
| DTX-567 | Illumina,available at https://www.illumina.com/ | ONT-EXP-003781 | ONT-EXP-003785 | | 403, R |
| DTX-568 | Image of MinION from Oxford Nanopore Technologies, available at https://nanoporetech.com/sites/default/files/s3/2016-07/generic-publication4-2.jpg | ONT-EXP-003786 | ONT-EXP-003786 | | |
| DTX-569 | Interxion, "*Truth and Lies About Latency in the Cloud*" available online at https://www.interxion.com/globalassets/-documents/whitepapers-andpdfs/cloud/WP-TRUTHANDLIES-en-0715 | ONT-EXP-003787 | ONT-EXP-003794 | | |
| DTX-570 | Oxford Nanopore Technologies, "*Introducing GridION Mk1*" available at https://nanoporetech.com/about-us/news/introducing-gridion-mk1 | ONT-EXP-003795 | ONT-EXP-003798 | | |
| DTX-571 | Oxford Nanopore Technologies, "*Introducing GridION X5*" available at https://nanoporetech.com/aboutus/news/introducing-gridion-x5 | ONT-EXP-003799 | ONT-EXP-003802 | | |
| DTX-572 | PacBio, "*Introducing the Sequel System: The Scalable Platform for SMRT Sequencing*" available at https://www.pacb.com/blog/introducing-the-sequel-system-the-scalable-platform-for-smrt-sequencing/ | ONT-EXP-003803 | ONT-EXP-003805 | | |
| DTX-573 | Kchouk,et al., "*Generations of Sequencing Technologies: From First to Next Generation*" Biology and Medicine, Vol. 9 No. 395 (2017), available online at https://www.longdom.org/open-access/generations-of-sequencing-technologies-from-first-to-next-generation-0974-8369-1000395 | ONT-EXP-003806 | ONT-EXP-003813 | | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-574 | LabTube, "*Terabases of sequence data in real time*" from Oxford Nanopore, available at https://www.labtube.tv/video/promethion-from-oxford-nanopore-technologies# | ONT-EXP-003814 | ONT-EXP-003814 | | |
| DTX-575 | Bryan Koenig, "*Genomic Sequencing Cos. Face FTC Scrutiny On $1B Deal*" January 4, 2019, Law360, available at https://www.law360.com/articles/1115494/print?section=competition | ONT-EXP-003815 | ONT-EXP-003816 | | |
| DTX-576 | Lee et al., "*Third-generation sequencing and the future of genomics*" April 2016, available at https://www.biorxiv.org/content/10.1101/048603v1 | ONT-EXP-003817 | ONT-EXP-003836 | | |
| DTX-577 | Oxford Nanopore Technologies, "*MinION*" available at https://nanoporetech.com/products/minion | ONT-EXP-003837 | ONT-EXP-0038425 | | |
| DTX-578 | Oxford Nanopore Technologies, "*MinION Mk1B*" available at https://store.nanoporetech.com/media/wysiwyg/pdfs/MIN101B/MinION-Mk1B. | ONT-EXP-003843 | ONT-EXP-003847 | | |
| DTX-579 | Morningstar, "Illumina's Dominance of the Genome Sequencing Market Keeps Attractive Opportunities on the Horizon" | ONT-EXP-003848 | ONT-EXP-003851 | | |
| DTX-580 | Nature, "*Genome sequencing: the third generation*" available at https://www.nature.com/news/2009/090206/full/news.2009.86.html | ONT-EXP-003852 | ONT-EXP-003854 | | |
| DTX-581 | National Human Genome Research Institute, "15 for 15: Direct-to-Consumer Genomic Testing" available at https://www.genome.gov/dna-day/15-for-15/direct-to-consumer-genomic-testing | ONT-EXP-003855 | ONT-EXP-003858 | | |
| DTX-582 | National Human Genome Research Institute, "*DNA Sequencing Fact Sheet*" available at https://www.genome.gov/10001177/dna-sequencing-fact-sheet/ | ONT-EXP-003859 | ONT-EXP-003861 | | |
| DTX-583 | National Human Genome Research Institute, "Research Areas" available at https://www.genome.gov/researchat-nhgri/Areas | ONT-EXP-003862 | ONT-EXP-003865 | | |
| DTX-584 | Dewey, et al., "*DNA sequencing: Clinical Appl.s of new DNA sequencing technologies*" Circulation, February 2012, 125(7): 931–944, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3364518/ | ONT-EXP-003866 | ONT-EXP-003892 | | |
| DTX-585 | Pollard et al., "*Long reads: their purpose and place*" Human Molecular Genetics, 2018, Vol. 27 No. R2, pp. R234-R241 | ONT-EXP-003893 | ONT-EXP-003900 | | |
| DTX-586 | Oxford Nanopore Technologies, "*About us: Biology for anyone, anywhere*" available at https://nanoporetech.com/about-us | ONT-EXP-003901 | ONT-EXP-003903 | | |
| DTX-587 | Oxford Nanopore Technologies, "*About VolTRAX*" available at https://nanoporetech.com/products/voltrax | ONT-EXP-003904 | ONT-EXP-003908 | | |
| DTX-588 | Oxford Nanopore Technologies, "Applications" available at https://nanoporetech.com/Appl.s | ONT-EXP-003909 | ONT-EXP-003913 | | |
| DTX-589 | Oxford Nanopore Technologies, "*Flongle Starter Packs*" available at https://store.nanoporetech.com/flongle.html | ONT-EXP-003917 | ONT-EXP-003919 | | |
| DTX-590 | Flongle (https://nanoporetech.com/products/flongle) | ONT-EXP-003920 | ONT-EXP-003923 | | |
| DTX-591 | Withdrawn | | | | |
| DTX-592 | Oxford Nanopore Technologies, "*Intellectual Property*" available at https://nanoporetech.com/aboutus/intellectual-property | ONT-EXP-003936 | ONT-EXP-003938 | | |
| DTX-593 | Oxford Nanopore Technologies, "*Analysis solutions for nanopore sequencing data*" available at https://nanoporetech.com/nanopore-sequencing-data-analysis | ONT-EXP-003939 | ONT-EXP-003944 | | |
| DTX-594 | Oxford Nanopore Official Twitter, "*GS: come and see 'Flongle' Flow Cell loading in the demo zone: single-use adaptor for MinION*" available at https://twitter.com/nanopore/status/936245271406809088 | ONT-EXP-003945 | ONT-EXP003945 | | |
| DTX-595 | Oxford Nanopore Technologies, "GridION X5" available at https://store.nanoporetech.com/media/wysiwyg/pdfs/GridIONX5/GridION-X5 | ONT-EXP-003946 | ONT-EXP-003951 | | |
| DTX-596 | PacBio, "*Appl.s*" available at https://www.pacb.com/Appl.s/ | ONT-EXP-003958 | ONT-EXP-003959 | | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-597 | PacBio, "Start Your Journey to Discovery with SMRT Consumables" available at https://www.pacb.com/products-and-services/consumables/ | ONT-EXP-003960 | ONT-EXP-003962 | | |
| DTX-598 | PacBio RS II Sequencing System, available at https://www.genehk.com/news/doc/PacBio-RS-II-Brochure | ONT-EXP-003963 | ONT-EXP-003970 | | |
| DTX-599 | PacBio RS System, available at https://www.mscience.com.au/upload/pages/pacbio/pacbio-rsbrochure-2012 | ONT-EXP-003971 | ONT-EXP-003978 | | |
| DTX-600 | PacBio Sequel II System, available at https://www.pacb.com/wp-content/uploads/Sequel-II-System-Brochure-Delivering-highly-accurate-longreads | ONT-EXP-003979 | ONT-EXP-003980 | | |
| DTX-601 | PacBio Sequel System, available at https://www.pacb.com/wp-content/uploads/Sequel-System-Brochure-The-Premier-Solution-for-Long-Read-Sequencing | ONT-EXP-003981 | ONT-EXP-003982 | | |
| DTX-602 | PacBio, "Pacific Biosciences Launches New Sequel II System, Featuring ~8 Times the DNA Sequencing Data Output" available at https://www.pacb.com/press-releases/pacific-biosciences-launches-new-sequel-ii-system-featuring-8-times-thedna-sequencing-data-output/ | ONT-EXP-003985 | ONT-EXP-003987 | | |
| DTX-603 | Oxford Nanopore Technologies, "sample preparation" available at https://nanoporetech.com/prepare | ONT-EXP-003988 | ONT-EXP-003991 | | |
| DTX-604 | Oxford Nanopore Technologies, "*Oxford Product Brochure*" available at https://nanoporetech.com/sites/default/files/s3/literature/Product-Brochure-19Mar2019 | ONT-EXP-003992 | ONT-EXP-004006 | | |
| DTX-605 | Oxford Nanopore Technologies, "*Products*" available at https://nanoporetech.com/products | ONT-EXP-004007 | ONT-EXP-004012 | | |
| DTX-606 | Oxford Nanopore Technologies, "*PromethION 24 CapEX*" available at https://store.nanoporetech.com/promethion-24-capex.html | ONT-EXP-004013 | ONT-EXP-004014 | | |
| DTX-607 | Oxford Nanopore Technologies, "*PromethION 48 CapEX*" available at https://store.nanoporetech.com/configure-promethion-capex-48 | ONT-EXP-004015 | ONT-EXP-004018 | | |
| DTX-608 | Withdrawn | | | | |
| DTX-609 | PromethION (https://nanoporetech.com/products/promethion) | ONT-EXP-004019 | ONT-EXP-004025 | | |
| DTX-610 | Oxford Nanopore Technologies, "*PromethION Alpha-Beta IT Requirements*" available at https://store.nanoporetech.com/media/PromethION-Alpha-Beta-IT-Requirements-v0 | ONT-EXP-004026 | ONT-EXP-004034 | | |
| DTX-611 | Quantapore, Inc., available at https://quantapore.com/ | ONT-EXP-004035 | ONT-EXP-004038 | | 403, R, H, LF, LK |
| DTX-612 | Quantapore Inc., "*Quantapore Inc. closes Series 3 Financing Round to fund Beta Launch of DNA sequencer*" available at https://quantapore.com/2018/07/18/effective-product-promo-videos/ | ONT-EXP-004039 | ONT-EXP-004042 | | 403, R, H, LF, LK |
| DTX-613 | PacBio, "*Research Focus*" available at https://www.pacb.com/research-focus/ | ONT-EXP-004048 | ONT-EXP-004049 | | |
| DTX-614 | *Roche acquires Genia Technologies to strengthen next generation sequencing pipeline* available at https://www.roche.com/media/releases/med-cor-2014-06-02.htm | ONT-EXP-004050 | ONT-EXP-004052 | | |
| DTX-615 | Sigma-Aldrich, "*Sanger Sequencing Steps & Method*" available at https://www.sigmaaldrich.com/technicaldocuments/articles/biology/sanger-sequencing.html | ONT-EXP-004058 | ONT-EXP-004059 | | |
| DTX-616 | Withdrawn | | | | |
| DTX-617 | SmidgION (https://nanoporetech.com/products/smidgion) | ONT-EXP-004061 | ONT-EXP-004062 | | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-618 | Stratos Genomics, available at https://www.stratosgenomics.com/, and particularly their news page, Stratos Genomics, "*Stratos Genomics Raises Funds to Ready For Commercialization*" available at https://www.stratosgenomics.com/-news/2018/6/11/stratos-genomics-raises-funds-to-ready-forcommercialization | ONT-EXP-004064 | ONT-EXP-004064 | | 403, R, H, LF, LK |
| DTX-619 | Thermo Fisher Scientific, "*About Us*" available at https://corporate.thermofisher.com/en/about-us.html | ONT-EXP-004070 | ONT-EXP-004071 | | |
| DTX-620 | Thermo Fisher Scientific, "*Applied Biosystems Genetic Analysis Systems*" available at https://www.thermofisher.com/us/en/home/life-science/sequencing/sanger-sequencing/sanger-sequencingtechnology-accessories.html | ONT-EXP-004072 | ONT-EXP-004073 | | |
| DTX-621 | U.S. Food & Drug Administration, "*Sharing Whole Genome Sequencing with the World*" available at https://www.fda.gov/food/conversations-experts-food-topics/sharing-whole-genome-sequencing-world | ONT-EXP-004079 | ONT-EXP-004083 | | |
| DTX-622 | U.S. Patent 9,546,400 | ONT-EXP-004084 | ONT-EXP-004126 | | |
| DTX-623 | U.S. Patent 9,678,056 | ONT-EXP-004127 | ONT-EXP-004178 | | |
| DTX-624 | U.S. Patent 9,772,323 | ONT-EXP-004179 | ONT-EXP-004222 | | |
| DTX-625 | U.S. Patent 9,738,929 | ONT-EXP-004223 | ONT-EXP-004290 | | |
| DTX-626 | PacBio, "*Use of four next-generation sequencing platforms to determine HIV-1 coreceptor tropism.*" available at https://www.pacb.com/publications/use-of-four-next-generationsequencing- platforms-to-determine-hiv-1-coreceptor-tropism/ | ONT-EXP-004291 | ONT-EXP-004292 | | |
| DTX-627 | Oxford Nanopore Technologies, "GridION X5" available at https://web.archive.org/web/20190403014615/https://nanoporetech.com/products/gridion | ONT-EXP-004293 | ONT-EXP-004297 | | |
| DTX-628 | U.S. National Library of Medicine, "*What is direct-to-consumer genetic testing?*" available at https://ghr.nlm.nih.gov/primer/dtcgenetictesting/directtoconsumer | ONT-EXP-004308 | ONT-EXP-004309 | | |
| DTX-629 | PacBio, "*Your Sequencing Workflow, Redefined*" available at https://www.pacb.com/products-and-services/sequel-system/workflow/ | ONT-EXP-004310 | ONT-EXP-004311 | | |
| DTX-630 | Goldman, Nick Expert Rebuttal Report  [337-TA-1032] | ONT-EXP-004358 | ONT-EXP-004391 | | 403, R, H |
| DTX-631 | Transcript of Markman Hearing (ITC Investigation No. 337-TA-1032) | ONT-EXP-004392 | ONT-EXP-004667 | | 403, R |
| DTX-632 | Genomeweb Article titled "*European Patent Office Revokes Second Pacific Biosciences Patent*" | ONT-EXP-004668 | ONT-EXP-004669 | | |
| DTX-633 | 2018-02-07 Notice of Commission Final Determination Finding No Violation of Sec. 337 (ITC Inv. No. 337-TA-1032) | ONT-EXP-005532 | ONT-EXP-005535 | | 403, R, LF |
| DTX-634 | 2018-02-13 [001-03] Exh C (2017-05-23 Order No. 10 Construing Terms) (ITC Inv. No. 337-TA-1032) | ONT-EXP-005536 | ONT-EXP-005555 | | 403, R, LF |
| DTX-635 | 2018-02-14 Commission Opinion (ITC Inv. No. 337-TA-1032) | ONT-EXP-005556 | ONT-EXP-005578 | | 403, R, LF |
| DTX-636 | 2018-02-20 Notice of Final Determination, 83 FR 6213 | ONT-EXP-005579 | ONT-EXP-005580 | | 403, R, LF |
| DTX-637 | PacBio v. ITC (2018-1587) (Fed. Cir. 2019) | ONT-EXP-005581 | ONT-EXP-005582 | | 403, R, LF |
| DTX-638 | Initial Determination Granting Summary Determination of Noninfringement of U.S. Patent Nos. 9,404,146 and 9,542,527 (ITC Inv. No. 337-TA-1032) | ONT-EXP-005583 | ONT-EXP-005591 | | 403, R, LF |
| DTX-639 | Oxford Nanopore Technologies, "How does nanopore DNA/RNA sequencing work?" available at https://nanoporetech.com/how-it-works | ONT-EXP-03929 | ONT-EXP-003935 | | |
| DTX-640 | ONT PowerPoint titled "*An introduction to nanopore sensing*" (Ex. 20 Ha Rebuttal Report) | ONTS-ITC-00096649 | ONTS-ITC-00096717 | Ha Rebuttal Rpt 20 | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| **DTX-641** | ONT PowerPoint titled "*Movement 22Apr16 RG*" (Ex. 13 Ha Rebuttal Report) | ONTS-ITC-00111619 | ONTS-ITC-00111633 | Ha Rebuttal Rpt 13 | |
| **DTX-642** | PowerPoint titled "*Product info - October 2016*" | ONTS-ITC-00544167 | ONTS-ITC-00544240 | | |
| **DTX-643** | 1D² Implementation Plan - 2017 | ONTS-ITC-00773061 | ONTS-ITC-00773063 | | |
| **DTX-644** | U.S. Patent 9,546,400 | PCB-DE-0000001 | PCB-DE-0000060 | Akeson Dep 10; Chin Dep 19; Earl Dep 5; Goldman Dep 2; Gong Dep 2; Korlach Dep 19 (6/13/2019); Sanghera Dep 1; Dessimoz Dep 1; Fair Dep 3; Fehr Dep 19; Flusberg Dep 2; Goldman Dep 9; Reamey Dep 3; Turner Dep 3; Cited on the face of '056 Patent; Cited on the face of '323 Patent | |
| **DTX-645** | U.S. Patent 9,678,056 | PCB-DE-0000061 | PCB-DE-0000128 | Akeson Dep 13; Chin Dep 4; Earl Dep 3; Reid Dep 17; Sanghera Dep 3; Fehr Dep 18; Flusberg Dep 16; Ha Dep 1; McHenry Dep 2; McHenry Dep 10; Reamey Dep 1; Turner Dep 1 | |
| **DTX-646** | U.S. Patent 9,738,929 | PCB-DE-0000129 | PCB-DE-0000199 | Akeson Dep 12; Chin Dep 9; Dessimoz Dep 15; Earl Dep 4; Gong Dep 3; Heiner Dep 8; Hrdlicka Dep 1; Korlach Dep 17 (6/13/2019); Maxham Dep 2; Sanghera Dep 2; Sorenson Dep 2; Travers Dep 1; Eid Dep 2; Fehr Dep 17; Hrdlicka Dep 7; Reamey Dep 2; Turner Dep 4 | |
| **DTX-647** | U.S. Patent 9,546,400 File History | PCB-DE-0000200 | PCB-DE-0000695 | | |
| **DTX-648** | Response to Second Non-Final Office Action dated 04/14/16 | PCB-DE-0000586 | PCB-DE-0000593 | Dessimoz Dep 14; Earl Dep 7; Flusberg Dep 4 | |
| **DTX-649** | U.S. Patent 9,678,056 File History | PCB-DE-0000696 | PCB-DE-0001373 | | |
| **DTX-650** | Withdrawn | | | | |
| **DTX-651** | U.S. Patent 9,738,929 File History | PCB-DE-0001374 | PCB-DE-0002231 | | |
| **DTX-652** | U.S. Patent 4,720,786 | PCB-DE-0002251 | PCB-DE-0002263 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-653** | U.S. Patent 5,795,782 | PCB-DE-0002280 | PCB-DE-0002298 | | |
| **DTX-654** | U.S. Patent 6,056,922 | PCB-DE-0002321 | PCB-DE-0002340 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| **DTX-655** | U.S. Patent 6,362,002 | PCB-DE-0002341 | PCB-DE-0002376 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-656 | U.S. Patent 6,627,067 | PCB-DE-0002377 | PCB-DE-0002414 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-657 | U.S. Patent 7,211,789 | PCB-DE-0002450 | PCB-DE-0002474 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-658 | Withdrawn | | | | |
| DTX-659 | U.S. Patent 7,258,838 | PCB-DE-0002475 | PCB-DE-0002528 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| DTX-660 | U.S. Patent 7,312,046 | PCB-DE-0002529 | PCB-DE-0002543 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-661 | U.S. Patent 7,488,671 | PCB-DE-0002544 | PCB-DE-0002555 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-662 | U.S. Patent 7,625,701 | PCB-DE-0002556 | PCB-DE-0002595 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-663 | U.S. Patent 8,324,914 | PCB-DE-0002596 | PCB-DE-0002621 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-664 | U.S. Patent 8,652,779 | PCB-DE-0002622 | PCB-DE-0002676 | Reamey Dep 3 (10-16-19 Depo.); Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-665 | Withdrawn | | | | |
| DTX-666 | U.S. Patent Pub. 2002/0197618 | PCB-DE-0002677 | PCB-DE-0002708 | Cited on the face of '400 Patent | 403, R |
| DTX-667 | U.S. Patent Pub. 2008/0041733(A1) to Hibbs et al. | PCB-DE-0002874 | PCB-DE-0002887 | | |
| DTX-668 | U.S. Patent Pub. 2008/0311582(A1) | PCB-DE-0002943 | PCB-DE-0002983 | | 403, R |
| DTX-669 | U.S. Patent Pub. 2010/0331194 | PCB-DE-0003038 | PCB-DE-0003096 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | 403, R |
| DTX-670 | U.S. Patent 7,504,058 | PCB-DE-0003930 | PCB-DE-0003942 | Cited on the face of '056 Patent; Cited on the face of '323 Patent | 403, R |
| DTX-671 | U.S. Patent 8,133,672 | PCB-DE-0003943 | PCB-DE-0003993 | | |
| DTX-672 | U.S. Patent 8,986,928 | PCB-DE-0003994 | PCB-DE-0004053 | Cited on the face of '056 Patent; Cited on the face of '323 Patent | 403, R |
| DTX-673 | Withdrawn | | | | |
| DTX-674 | U.S. Patent 5,001,050 | PCB-DE-0004351 | PCB-DE-0004361 | Cited on the face of '929 Patent | 403, R |
| DTX-675 | U.S. Patent 5,198,543 | PCB-DE-0004362 | PCB-DE-0004371 | Cited on the face of '929 Patent | 403, R |
| DTX-676 | U.S. Patent 5,308,751 | PCB-DE-0004372 | PCB-DE-0004396 | Cited on the face of '929 Patent | 403, R |
| DTX-677 | U.S. Patent 5,350,686 | PCB-DE-0004397 | PCB-DE-0004401 | Cited on the face of '929 Patent | 403, R |
| DTX-678 | U.S. Patent 5,470,724 | PCB-DE-0004402 | PCB-DE-0004446 | Cited on the face of '929 Patent | 403, R |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-679 | U.S. Patent 5,547,839 | PCB-DE-0004447 | PCB-DE-0004473 | Cited on the face of '929 Patent | 403, R |
| DTX-680 | U.S. Patent 5,576,204 | PCB-DE-0004474 | PCB-DE-0004483 | Cited on the face of '929 Patent | 403, R |
| DTX-681 | U.S. Patent 5,648,245 | PCB-DE-0004484 | PCB-DE-0004504 | Cited on the face of '929 Patent | 403, R |
| DTX-682 | U.S. Patent 5,674,683 | PCB-DE-0004505 | PCB-DE-0004523 | Cited on the face of '929 Patent | 403, R |
| DTX-683 | U.S. Patent 5,674,716 | PCB-DE-0004524 | PCB-DE-0004547 | Cited on the face of '929 Patent | 403, R |
| DTX-684 | U.S. Patent 5,714,320 | PCB-DE-0004548 | PCB-DE-0004587 | Cited on the face of '929 Patent | 403, R |
| DTX-685 | U.S. Patent 5,854,033 | PCB-DE-0004588 | PCB-DE-0004629 | Cited on the face of '929 Patent | 403, R |
| DTX-686 | U.S. Patent 6,210,891 | PCB-DE-0004630 | PCB-DE-0004650 | Cited on the face of '929 Patent | 403, R |
| DTX-687 | U.S. Patent 6,210,896 | PCB-DE-0004651 | PCB-DE-0004680 | Cited on the face of '929 Patent | 403, R |
| DTX-688 | U.S. Patent 6,255,083 | PCB-DE-0004681 | PCB-DE-0004700 | Cited on the face of '929 Patent | 403, R |
| DTX-689 | U.S. Patent 6,261,808 | PCB-DE-0004701 | PCB-DE-0004746 | Cited on the face of '929 Patent | 403, R |
| DTX-690 | U.S. Patent 6,369,038 | PCB-DE-0004747 | PCB-DE-0004784 | Cited on the face of '929 Patent | 403, R |
| DTX-691 | U.S. Patent 6,404,907 | PCB-DE-0004785 | PCB-DE-0004798 | Cited on the face of '929 Patent | |
| DTX-692 | U.S. Patent 6,451,563 | PCB-DE-0004799 | PCB-DE-0004810 | Cited on the face of '929 Patent | 403, R |
| DTX-693 | U.S. Patent 6,498,023 | PCB-DE-0004811 | PCB-DE-0004825 | Cited on the face of '929 Patent | 403, R |
| DTX-694 | Withdrawn | | | | |
| DTX-695 | U.S. Patent 6,787,308 | PCB-DE-0004861 | PCB-DE-0004879 | Cited on the face of '929 Patent | 403, R |
| DTX-696 | U.S. Patent 6,849,404 | PCB-DE-0004880 | PCB-DE-0004887 | Cited on the face of '929 Patent | 403, R |
| DTX-697 | U.S. Patent 6,917,726 | PCB-DE-0004888 | PCB-DE-0004920 | Cited on the face of '929 Patent | 403, R |
| DTX-698 | U.S. Patent 7,013,054 | PCB-DE-0004921 | PCB-DE-0004950 | Cited on the face of '929 Patent | 403, R |
| DTX-699 | U.S. Patent 7,033,764 | PCB-DE-0004951 | PCB-DE-0004978 | Cited on the face of '929 Patent | 403, R |
| DTX-700 | U.S. Patent 7,045,362 | PCB-DE-0004979 | PCB-DE-0004996 | Cited on the face of '929 Patent | 403, R |
| DTX-701 | U.S. Patent 7,052,847 | PCB-DE-0004997 | PCB-DE-0005024 | Cited on the face of '929 Patent | 403, R |
| DTX-702 | U.S. Patent 7,056,661 | PCB-DE-0005025 | PCB-DE-0005052 | Cited on the face of '929 Patent | 403, R |
| DTX-703 | U.S. Patent 7,056,676 | PCB-DE-0005053 | PCB-DE-0005080 | Cited on the face of '929 Patent | 403, R |
| DTX-704 | U.S. Patent 7,170,050 | PCB-DE-0005081 | PCB-DE-0005109 | Cited on the face of '929 Patent | 403, R |
| DTX-705 | U.S. Patent 7,181,122 | PCB-DE-0005110 | PCB-DE-0005140 | Cited on the face of '929 Patent | 403, R |
| DTX-706 | U.S. Patent 7,229,799 | PCB-DE-0005141 | PCB-DE-0005160 | Cited on the face of '929 Patent | 403, R |
| DTX-707 | U.S. Patent 7,282,337 | PCB-DE-0005161 | PCB-DE-0005169 | Cited on the face of '929 Patent | 403, R |
| DTX-708 | U.S. Patent 7,292,742 | PCB-DE-0005170 | PCB-DE-0005199 | Cited on the face of '929 Patent | 403, R |
| DTX-709 | U.S. Patent 7,361,466 | PCB-DE-0005200 | PCB-DE-0005228 | Cited on the face of '929 Patent | 403, R |
| DTX-710 | U.S. Patent 7,368,265 | PCB-DE-0005229 | PCB-DE-0005245 | Cited on the face of '929 Patent | 403, R |
| DTX-711 | U.S. Patent 7,416,844 | PCB-DE-0005246 | PCB-DE-0005272 | Cited on the face of '929 Patent | 403, R |
| DTX-712 | U.S. Patent 7,476,503 | PCB-DE-0005273 | PCB-DE-0005316 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '929 Patent | 403, R |
| DTX-713 | U.S. Patent 7,485,424 | PCB-DE-0005317 | PCB-DE-0005343 | Cited on the face of '929 Patent | 403, R |
| DTX-714 | U.S. Patent 7,601,495 | PCB-DE-0005344 | PCB-DE-0005483 | Cited on the face of '929 Patent | 403, R |
| DTX-715 | U.S. Patent 7,601,499 | PCB-DE-0005484 | PCB-DE-0005561 | Cited on the face of '929 Patent | 403, R |
| DTX-716 | U.S. Patent 7,700,287 | PCB-DE-0005562 | PCB-DE-0005592 | Cited on the face of '929 Patent | 403, R |
| DTX-717 | U.S. Patent 7,754,429 | PCB-DE-0005593 | PCB-DE-0005643 | Cited on the face of '929 Patent | 403, R |
| DTX-718 | U.S. Patent 7,767,400 | PCB-DE-0005644 | PCB-DE-0005662 | Cited on the face of '929 Patent | 403, R |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| **DTX-719** | U.S. Patent 8,143,030 | PCB-DE-0005663 | PCB-DE-0005702 | Cited on the face of '929 Patent | 403, R |
| **DTX-720** | U.S. Patent 8,168,380 | PCB-DE-0005703 | PCB-DE-0005777 | Cited on the face of '929 Patent | 403, R |
| **DTX-721** | U.S. Patent Pub. 2001/0030290 | PCB-DE-0005778 | PCB-DE-0005822 | Cited on the face of '929 Patent | 403, R |
| **DTX-722** | U.S. Patent Pub. 2002/0028458 | PCB-DE-0005823 | PCB-DE-0005892 | Cited on the face of '929 Patent | 403, R |
| **DTX-723** | U.S. Patent Pub. 2002/0094526(A1) | PCB-DE-0005893 | PCB-DE-0005933 | Cited on the face of '929 Patent | 403, R |
| **DTX-724** | U.S. Patent Pub. 2002/0168645 | PCB-DE-0005934 | PCB-DE-0005952 | Cited on the face of '929 Patent | 403, R |
| **DTX-725** | U.S. Patent Pub. 2002/0197618 | PCB-DE-0005953 | PCB-DE-0005984 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '929 Patent | 403, R |
| **DTX-726** | U.S. Patent Pub. 2003/0044781 | PCB-DE-0005985 | PCB-DE-0006011 | Cited on the face of '929 Patent | 403, R |
| **DTX-727** | U.S. Patent Pub. 2003/0044816(A1) | PCB-DE-0006012 | PCB-DE-0006043 | Cited on the face of '929 Patent | 403, R |
| **DTX-728** | U.S. Patent Pub. 2003/0096253 | PCB-DE-0006044 | PCB-DE-0006063 | Cited on the face of '929 Patent | 403, R |
| **DTX-729** | U.S. Patent Pub. 2003/0143550 | PCB-DE-0006064 | PCB-DE-0006072 | Cited on the face of '929 Patent | 403, R |
| **DTX-730** | U.S. Patent Pub. 2003/0190647 | PCB-DE-0006073 | PCB-DE-0006083 | Cited on the face of '929 Patent | 403, R |
| **DTX-731** | U.S. Patent Pub. 2003/0207279 | PCB-DE-0006084 | PCB-DE-0006112 | Cited on the face of '929 Patent | 403, R |
| **DTX-732** | U.S. Patent Pub. 2003/0213771 | PCB-DE-0006113 | PCB-DE-0006123 | Cited on the face of '929 Patent | 403, R |
| **DTX-733** | Deamer, et al. "*Nanopores and Nucleic Acids: Prospects for Ultra-Rapid Sequencing*" Trends in Biotech. 18(4): p. 147-151 (2000) | PCB-DE-0008742 | PCB-DE-0008746 | | |
| **DTX-734** | Discrimination among individual Watson-Crick base pairs at the termini of single DNA hairpin molecules | PCB-DE-0008752 | PCB-DE-0008759 | | |
| **DTX-735** | Fologea, D., et al. "*Slowing DNA Translocation in a Solid-State Nanopore*" (2005) Nano Lett 5(9):1734-1737 | PCB-DE-0009110 | PCB-DE-0009113 | | |
| **DTX-736** | Kasianowics, et al., "*Characterization of individual polynucleotide molecules using a membrane channel*" Proc. Natl. Acad. Sci. USA 93, 13770-13773 (1996) | PCB-DE-0009226 | PCB-DE-0009229 | Dessimoz Report 9 | |
| **DTX-737** | Winters-Hilt Dissertation (2003) (B5 - Winters-Hilt) | PCB-DE-0009548 | PCB-DE-0009557 | | |
| **DTX-738** | Withdrawn | | | | |
| **DTX-739** | Withdrawn | | | | |
| **DTX-740** | Withdrawn | | | | |
| **DTX-741** | Withdrawn | | | | |
| **DTX-742** | Laboratory Notebook, No. 145, PacBio | PCB-DE-0018388 | PCB-DE-0018521 | Eid Dep 7 | |
| **DTX-743** | Laboratory Notebook, No. 1, PacBio 221 | PCB-DE-0018522 | PCB-DE-0018718 | Flusberg Dep 15 | |
| **DTX-744** | Benjamin Flusberg Lab Notebook 288 | PCB-DE-0018719 | PCB-DE-0018922 | Flusberg Dep 14; Turner Dep 5 | |
| **DTX-745** | Withdrawn | | | | |
| **DTX-746** | Email string between Kevin Corcoran, Mike Hunkapiller, and others regarding, "Everything You Want to Know about Oxford Nanopore" | PCB-DE-0025001 | PCB-DE-0025001 | | |
| **DTX-747** | Email string between Eric Schadt, Kevin Corcoran, and others regarding, "RE: inside oxford nano" | PCB-DE-0025048 | PCB-DE-0025048 | | 403, R, H, HH |
| **DTX-748** | Email from Steve Turner to Benjamin Flusberg regarding clarification on fluid channel conductivity dated 04/02/2008 | PCB-DE-0025985 | PCB-DE-0025986 | Flusberg Dep 5 | 403, R, LF |
| **DTX-749** | PacBio Project Product Requirement Document (Feb. 13, 2008) | PCB-DE-0029150 | PCB-DE-0029207 | | 403, R, LF, LK |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-750 | Email from Benjamin Flusberg to ResearchDistributionGroup (@pacificbiosciences.com dated 9/25/2008 | PCB-DE-0040080 | PCB-DE-0040081 | Flusberg Dep 6 | 403, R |
| DTX-751 | Email from Steve Turner to Jonas Korlach, Benjamin Flusberg regarding Oxford Nanopore dated 01/12/09 | PCB-DE-0042623 | PCB-DE-0042623 | Flusberg Dep 7 | 403, R |
| DTX-752 | Email from Steve Turner to  Benjamin Flusberg, Jonas Korlach regarding Oxford Nanopore dated 01/12/09 | PCB-DE-0042624 | PCB-DE-0042625 | Flusberg Dep 8 | 403, R |
| DTX-753 | Email string between Steve Turner, Michael Phillips, Jonas Korlach, and Hugh Martin regarding "Oxford Nanopore competitive analysis" | PCB-DE-0042656 | PCB-DE-0042658 | | 403, LF |
| DTX-754 | Email string between Steve Turner, Michael Phillips, and Hugh Martin regarding "Oxford Nanopore competitive analysis" | PCB-DE-0042859 | PCB-DE-0042861 | | 403, LF |
| DTX-755 | Email from Steve Turner to Benjamin Flusberg regarding a different protein for nanopores dated 01/19/09 | PCB-DE-0043019 | PCB-DE-0043019 | Flusberg Dep 9 | 403, R |
| DTX-756 | Email from Steve Turner to Adrian Fehr regarding Polymerase-assisted nanopore sequencing dated 04/01/09 | PCB-DE-0043358 | PCB-DE-0043358 | Fehr Dep 15 | 403, R, LK |
| DTX-757 | Email from Steve Turner to Adrian Fehr, Trevin Rard regarding NHGRI wrap up dated 04/07/09 | PCB-DE-0043377 | PCB-DE-0043377 | Fehr Dep 14 | 403, R, LK |
| DTX-758 | Email string between Benjamin Flusberg, Steve Turner, Jonas Korlach, Hugh Martin, and Martha Trela regarding "FW: Oxford Nanopore and Illumina Enter into Broad Commercialization Agreement" | PCB-DE-0044026 | PCB-DE-0044027 | | |
| DTX-759 | Technology synopsis of Oxford's technology | PCB-DE-0044287 | PCB-DE-0044291 | | 403, R, LK, LF |
| DTX-760 | Email from Benjamin Flusberg to Steve Turner regarding  nanopore IP dated 01/26/09 | PCB-DE-0044687 | PCB-DE-0044687 | Flusberg Dep 10 | 403, R, |
| DTX-761 | Email from Benjamin Flusberg to Steve Turner regarding  question about bubbles in nanopores dated 02/27/09 | PCB-DE-0044839 | PCB-DE-0044839 | Flusberg Dep 11 | 403, R |
| DTX-762 | Email from Adrian Fehr to Steve Turner, et al regarding :NHGRI Grantee Meeting Summary with attachment dated 04/06/09 | PCB-DE-0046297 | PCB-DE-0046298 | Fehr Dep 11 | 403, R |
| DTX-763 | Email from Adrian Fehr to Steve Turner regarding NHGRI company talk dated 04/09/09 | PCB-DE-0046345 | PCB-DE-0046345 | | 403, R, LK, LF |
| DTX-764 | NHGRI summary for PB meeting.ppt | PCB-DE-0046346 | PCB-DE-0046354 | | 403, R, LK, LF |
| DTX-765 | Email sent from Adrian Fehr to Steve Turner and Trevin Rard regarding "Friday's Tech Update ‖ MspA: Nanopore DNA Sequencing Past, Present and Future. Marcus Collins (UWash)" | PCB-DE-0048743 | PCB-DE-0048743 | | 403, R, LK, LF |
| DTX-766 | Email from Benjamin Flusberg to Steve Turner regarding  Summary of document + preliminary analysis dated 6/12/2009 | PCB-DE-0048986 | PCB-DE-0048986 | Flusberg Dep 12 | 403, R |
| DTX-767 | Email string between Nicole Litchfield, Martha Trela, and others regarding, "RE: Thoughts on Beyond Next Gen Sequencing… | PCB-DE-0051221 | PCB-DE-0051221 | | 403, R, LK, LF, H |
| DTX-768 | Email string between Steve Turner, Brook Byers and others regarding "SPAM- FW: July 2, 2010 - Roche teams up with IBM to develop genome-sequencing technology" | PCB-DE-0057706 | PCB-DE-0057708 | | 403, R, LF, H |
| DTX-769 | Email string between Hugh Martin, Steve Turner, Eric Schadt, Martha Trela, and Nicole Litchfield regarding [Xconomy] Comment: "Genomic Advances of the 2000s Will Demand an Informatics Revolution in the 2010s" | PCB-DE-0059787 | PCB-DE-0059788 | | 403, R, LF, LK |
| DTX-770 | Email string between Eric Schadt, Andrew Kasarskis, and Steve Turner regarding, "RE: News Alert: Roche and IBM Collaborate to Develop Nanopore-Based DNA Sequencing Technology" | PCB-DE-0066166 | PCB-DE-0066168 | | 403, R, LF, LK, H, HH, A |
| DTX-771 | Email string between Eric Schadt, Steve Turner, and others regarding, "RE: Roche, IBM Enter Partnership on DNA Sequencing Technology" | PCB-DE-0066171 | PCB-DE-0066172 | | 403, R, LF, LK, H, HH, A |
| DTX-772 | T.E. Cloutier and J. Widom, *"DNA twisting flexibility and the formation of sharply looped protein-DNA complexes"* Dept. of Biochemistry, Molecular Biology and Cell Biology, Northwestern University, Evanston Il | PCB-DE-0066477 | PCB-DE-0066482 | Travers Dep 6 | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-773 | Email between Eric Schadt, Steve Turner, and Jonas Korlach regarding, "PNAS paper on nanopore sequencing" | PCB-DE-0068207 | PCB-DE-0068207 | | 403, R, LF, LK |
| DTX-774 | Derrington, I.M. et al. "*Nanopore DNA sequencing with MspA*" Proc. Natl. Acad. Sci. USA 107, 16060–16065 (2010) | PCB-DE-0068208 | PCB-DE-0068213 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| DTX-775 | Email from Jonas Korlach to Nathaniel McCaffrey and Steve Turner regarding  Call for proposals NHGRI dated 09/14/10 | PCB-DE-0070775 | PCB-DE-0070776 | Korlach Dep 13 (6/13/2019) | 403, R |
| DTX-776 | Email string between Eric Schadt, Jonas Korlach, and Steve Turner regarding "Thoughts on Ox. Nano paper" | PCB-DE-0074793 | PCB-DE-0074794 | | 403, R, H, HH, LF, LK |
| DTX-777 | Email between Eric Schadt, Steve Turner, and Jonas Korlach | PCB-DE-0076458 | PCB-DE-0076458 | | 403, R, LF, LK |
| DTX-778 | BIOSCRIBE Weekly Media Report Prepared for Pacific Biosciences (Week of September 26, 2011) | PCB-DE-0081593 | PCB-DE-0081600 | | 403, R, LF, LK, H |
| DTX-779 | Email from Karl Voss to Hugh Martin, et al regarding Nanopore sequencing with PacBio polymerases and macro-analogs dated 11/10/11 | PCB-DE-0082708 | PCB-DE-0082708 | Voss Dep 1 | 403, R, LF, LK |
| DTX-780 | Email from Jonas Korlach to Steve Turner cc Igor Vilfan re nanopores with attachment Nanopore Sequencing Devices and Methods dated 04/04/11 | PCB-DE-0084762 | PCB-DE-0084762 | Korlach Dep 18 (6/13/2019) | 403, R |
| DTX-781 | Email from Steve Turner to Hugh Martin regarding "nanopore is making progress" | PCB-DE-0084771 | PCB-DE-0084771 | | 403, R |
| DTX-782 | Email between Steve Turner and High Martin regarding, "notes on electrical detection" | PCB-DE-0085255 | PCB-DE-0085255 | | 403, R |
| DTX-783 | Withdrawn | | | | 403, R |
| DTX-784 | Email string between Steve Turner, Hugh Martin, Karl Voss, Keith Bjornson, and Jeremiah Hanes regarding "Nanopore sequencing with PacBio polymerases and macro-analogs" | PCB-DE-0086177 | PCB-DE-86178 | | 403, R, LF, LK |
| DTX-785 | Email string between Hugh Martin, Steve Turner, and Ben Gong regarding "GridIon" | PCB-DE-0087961 | PCB-DE-0087962 | | 403, R, LF, LK |
| DTX-786 | Oxford Nanopore IP Research (March 22, 2012) | PCB-DE-0089567 | PCB-DE-0089575 | | 403, R, LF, LK, H, A |
| DTX-787 | Email sent from Steve Turner to Steve Turner regarding "notes from Jens gundlach talk" | PCB-DE-0090301 | PCB-DE-0090302 | | 403, R, LF |
| DTX-788 | Email between Gary Paul Magnant and Steve Turner regarding, "Another strategic positioning. Idea." | PCB-DE-0091177 | PCB-DE-0091177 | | 403, R, H, LF, LK |
| DTX-789 | Clawed Back for Privilege | PCB-DE-0106535 | PCB-DE-0106535 | | AC, 403, LF, LK |
| DTX-790 | Clawed Back for Privilege | PCB-DE-0106575 | PCB-DE-0106577 | | AC, 403, LF, LK |
| DTX-791 | Email from Steve Turner to Mike Hunkapiller regarding Circular re-coding conversion dated 04/11/12 | PCB-DE-0106917 | PCB-DE-0106917 | Hunkapiller Dep 6 | 403, R |
| DTX-792 | Email between Edwin Hauw, Steve Turner, and others regarding, "New Nanopore released data" | PCB-DE-0108431 | PCB-DE-0108431 | | 403, R, LF, LK |
| DTX-793 | Email string between Shaym Prabhakar and others including Steve Turner regarding "Follow up 1st discussion on GIS Scientific Vision Forum Meeting" | PCB-DE-0110961 | PCB-DE-0110964 | | 403, R, LF, LK, H, HH |
| DTX-794 | Email from Jeremiah Hanes to Aaesha Sheikh re Enzymology Weekly Highlights dated 07/14/14 - Extraction of Detailed Kinetic Data from Sequencing Reactions | PCB-DE-0111211 | PCB-DE-0111227 | Chin Dep 3 | 403, R, LK, LF |
| DTX-795 | Clawed Back for Privilege | PCB-DE-0111495 | PCB-DE-0111495 | | AC, 403, R |
| DTX-796 | Email string between Cheryl Heiner, Richard Hall, and others regarding, "RE: Matagenomic 16S Sequencing by Oxford Nanopore" | PCB-DE-0113579 | PCB-DE-0113579 | | 403, LF, LK |
| DTX-797 | Email from Kathyryn Keho to Cheryl Heiner, regarding FW: PacBio consumable price change notification - January 2014 Price List | PCB-DE-0143812 | PCB-DE-0143813 | Keho Dep 11; Layne-Farrar Report; Layne-Farrar Report | 403, R, LK, H |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-798 | Email string between Cheryl Heiner and Yi Han regarding, "RE: Conference call tomorrow?" | PCB-DE-0169791 | PCB-DE-0169792 | | 403, R, LK, LF, H |
| DTX-799 | Email string from Jonas Korlach to Jason Chin, et al regarding Daly Linkage based seq reanalysis find cryptic MCKD1 mutation NG 2013 dated 10/23/13 | PCB-DE-0295735 | PCB-DE-0295740 | Chin Dep 7 | 403, R, LK |
| DTX-800 | Email from Hunkapiller to Picton et al regarding Clive Brown, HLA NGS dated 09/02/13 | PCB-DE-0319777 | PCB-DE-0319780 | Hunkapiller Dep 3 | 403, LF |
| DTX-801 | Email sent from Jonash Korlach to Jonas Korlach regarding "notes on Clive Brown talk" | PCB-DE-0319816 | PCB-DE-0319816 | | 403, LF |
| DTX-802 | Email from Jonas Korlach to Yu-Chih Tsai, NGAT Team Distribution group regarding A nanopore sequencing paper from the University of Washington dated 06/27/14 | PCB-DE-0340550 | PCB-DE-0340551 | Korlach Dep 15 (6/13/2019) | 403, R |
| DTX-803 | Email from Jonas Korlach to Kathryhn Heho, et al regarding Focus on Consensus Accuracy? dated 06/03/15 | PCB-DE-0381125 | PCB-DE-0381127 | Keho Dep 12 | |
| DTX-804 | Email string from Jonas Korlach to Elizabeth Tseng regarding A paper on transcript sequencing with Nanopore dated 06/07/15 | PCB-DE-0381177 | PCB-DE-0381179 | Chin Dep 11 | 403, LK |
| DTX-805 | Email from Jonas Korlach to Luke Hickey regarding  Competitive Positioning - Human Appl. dated 06/19/15 | PCB-DE-0381987 | PCB-DE-0381987 | Korlach Dep 5 (6/13/2019) | 403, R, LK |
| DTX-806 | Email string between Jonas Korlach and Paul Kotturi regarding, "Re: you latest blog post;RE: your MHAP Nature Biotechnology publication;RE: meeting" | PCB-DE-0383630 | PCB-DE-0383631 | | 403, R, LK, LF |
| DTX-807 | Email string between Steve Turner and Jonas Korlach regarding, "FW: Conference call" | PCB-DE-0396253 | PCB-DE-0396253 | | 403, R, LK, LF, H |
| DTX-808 | Email from Kevin Corcoran to Jonas Korlach re Possibly Jason on twitter (with notation below is what I talked about on the phone - at this point I have NOT confirmed that this really came from Jason, it is possible that he was hacked) dated 06/22/15 | PCB-DE-0401219 | PCB-DE-0401220 | Chin Dep 20 | 403, R |
| DTX-809 | Email string between Meredith Ashby, Jason Chin, and others regarding, "RE: Leuven Haplotyping conference, Day 1" | PCB-DE-0427933 | PCB-DE-0427934 | | 403, R, LK, H |
| DTX-810 | Adrian Fehr email calendar meeting time and location regarding Nanopore patent prep dated 04/02/09 | PCB-DE-0456188 | PCB-DE-0456188 | Fehr Dep 13 | 403, R, LK |
| DTX-811 | U.S. Patent Pub. 2014/0061048 | PCB-DE-0456286 | PCB-DE-0456344 | | |
| DTX-812 | Email string between Steve Turner, Jonas Korlach, and others regarding, "RE: mole data alignment" | PCB-DE-0464671 | PCB-DE-0464672 | | 403, R |
| DTX-813 | Email string between Steve Turner and Ram Laxman regarding, "RE: [ICHG2016] 2nd Reminder: Request for abstract submission for invited speakers (Thu(5)-PCS1-)" | PCB-DE-0466160 | PCB-DE-0466162 | | 403, R |
| DTX-814 | Email from Karl Voss to Kevin Travers, et al regarding If it wasn't for nanopores we'd all be speaking german dated 06/09/14 | PCB-DE-0467413 | PCB-DE-0467413 | Voss Dep 2 | 403, R |
| DTX-815 | Email from Terry Pizzie to Mike Hunkapiller, et al regarding ONT intel dated 02/19/14 | PCB-DE-0542359 | PCB-DE-0542359 | Hunkapiller Dep 7 | 403, R, LK, LF |
| DTX-816 | Email string between Kevin Corcoran and B.F. Luisi regarding, "RE: visiting Cambridge UK" | PCB-DE-0549699 | PCB-DE-0549700 | | 403, R, H, HH, LF, LK |
| DTX-817 | Email string between Kevin Corcoran and Lei Sun regarding, "RE: Link from Twitter – Minion Experience" | PCB-DE-0550128 | PCB-DE-0550128 | | 403, R, LK |
| DTX-818 | Email string between Kevin Corcoran, Ben Gong, and others regarding, "RE: Third party paper on Oxford - very bad impression" | PCB-DE-0550637 | PCB-DE-0550638 | | 403, R, LF, LK |
| DTX-819 | A flexible and efficient template format for circular consensus sequencing and SNP detection | PCB-DE-0677954 | PCB-DE-0677961 | Travers Dep 7 | |
| DTX-820 | Poster Presentation, Applying Single Molecule Real Time DNA Sequencing | PCB-DE-0681536 | PCB-DE-0681536 | Fehr Dep 8 | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-821 | Stoddard et al., "*Toward Single-Molecule DNA Seequencing: Single Base Recognition and Real-Time Polymerase Activity Detected by a Protein Nanopore*" | PCB-DE-0681593 | PCB-DE-0681593 | Fehr Dep 9; Heiner Dep 4 | |
| DTX-822 | Stoddard et al., "Toward Single-Molecule DNA Seequencing: Single Base Recognition and Real-Time Polymerase Activity Detected by a Protein Nanopore" | PCB-DE-0681595 | PCB-DE-0681595 | | |
| DTX-823 | Stoddard, et al., "*Toward Single-Molecule DNA Seequencing: Single Base Recognition and Real-Time Polymerase Activity Detected by a Protein Nanopore*" (closeup of graph) | PCB-DE-0681596 | PCB-DE-0681596 | Fehr Dep 10; Heiner Dep 5 | |
| DTX-824 | Sales Meeting 01Oct15 | PCB-DE-0690476 | PCB-DE-0690565 | | |
| DTX-825 | Kevin Travers Scientist Sample Prep Objectives, Accommplishments Q1 and Q4 | PCB-DE-0816412 | PCB-DE-0816413 | Travers Dep 2 | 403, R |
| DTX-826 | Email chain from Jonas Korlach to Cheryl Heiner et al regarding full-length 16S sequencing w attachment dated 03/01/07 | PCB-DE-0824838 | PCB-DE-0824841 | Korlach Dep 10 (6/13/2019) | 403, R, H |
| DTX-827 | NGS Market Opportunity - DeciBio Perspectives (March 15, 2017) | PCB-DE-0825762 | PCB-DE-0825798 | | 403, R, LF, LK, H |
| DTX-828 | Email chain from Jonas Korlach to Luke Hickey et al regarding ONT preprints dated 04/21/17 | PCB-DE-0828668 | PCB-DE-0828672 | Korlach Dep 6 (6/13/2019) | 403, R |
| DTX-829 | Email string between Emily Hatas, Mike Hunkapiller, and others regarding, "RE: FAW for ONT.PDF;Internal Review of ONT Preprints.docx" | PCB-DE-0828864 | PCB-DE-0828866 | | 403, R, LF, LK |
| DTX-830 | Email string between Emily Hatas, Kathryn Keho, and others regarding, "RE: ONT vs. PacBio Arabidopsis preprint" | PCB-DE-0832730 | PCB-DE-0832735 | | 403, R, LF, LK |
| DTX-831 | Spider Start Manufacturing Checkpoint, Instrument (8/16/18) | PCB-DE-0837534 | PCB-DE-0837581 | | |
| DTX-832 | Email from Meredith Ashby to Jonas Korlach et al regarding Interesting blog post about trouble with Minions dated 05/24/18 | PCB-DE-0848354 | PCB-DE-0848356 | Keho Dep 13 | 403 |
| DTX-833 | Email from Jonas Korlach to Meredith Ashby et al regarding Interesting blog post about trouble with Minions dated 05/24/18 | PCB-DE-0854256 | PCB-DE-0854257 | Korlach Dep 7 (6/13/2019) | 403 |
| DTX-834 | Email string between Jonas Korlach, Alix Kieu, and others regarding, "RE: ONT summary from ASHG" | PCB-DE-0868526 | PCB-DE-0868527 | | 403 |
| DTX-835 | Competitive Positiong Whitepaper - Global Sales Meeting, January 2018 | PCB-DE-0873565 | PCB-DE-0873579 | Keho Dep 3; Korlach Dep 3 (6/13/2019) | |
| DTX-836 | De Novo Assembly (Plant/Animal): Battlecard | PCB-DE-0873580 | PCB-DE-0873580 | Keho Dep 10 | |
| DTX-837 | ISO-SEQ Method: Battlecard | PCB-DE-0873581 | PCB-DE-0873581 | Keho Dep 7 | |
| DTX-838 | Battle Card: Microbial Multiplexing | PCB-DE-0873582 | PCB-DE-0873582 | Keho Dep 9 | |
| DTX-839 | Battle Card: Structural Variation | PCB-DE-0873584 | PCB-DE-0873584 | Keho Dep 8 | |
| DTX-840 | Email from Paul Kotturi to Thanh Pham et al regarding ONT Competitive Review & Strategy dated 10/24/18 | PCB-DE-0876533 | PCB-DE-0876533 | Keho Dep 4 | 403, LK |
| DTX-841 | What We Heard from Sales | PCB-DE-0876534 | PCB-DE-0876534 | Keho Dep 5 | LF, LK |
| DTX-842 | Email from Kathryn Keho to Jonas Korlach Re Sanger Long Read summit: Brainstorming and Innovation/Collaboration workshop dated 10/30/18 | PCB-DE-0876716 | PCB-DE-0876719 | Korlach Dep 8 (6/13/2019) | |
| DTX-843 | Email from Gang Fang to Jonas Korlach Re Some feedback that might help dated 11/01/18 | PCB-DE-0878812 | PCB-DE-0878812 | Korlach Dep 9 (6/13/2019) | 403, R, H, HH, LK |
| DTX-844 | Email from Kathryn Keho to Vertical Marketing Team, et al., regarding Global sales meeting action items w attachment dated 12/06/17 | PCB-DE-0880890 | PCB-DE-0880893 | Keho Dep 6 | 403 |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-845 | Email chain from Paul Kotturi to Edwin Hauw, et al regarding Impact of Price changes in January dated 02/23/17 | PCB-DE-0888942 | PCB-DE-0888943 | Gong Dep 9 | 403, LK, LF |
| DTX-846 | Email from Kathryn Keho to Kevin Corcoran, et al., regarding Resurrection of long-read tagline - a plan? dated 06/14/18 | PCB-DE-0898956 | PCB-DE-0898958 | Keho Dep 14 | 403, R, LF |
| DTX-847 | Email from Kathryn Keho to Kevin Corcoran, regarding Email chain with trademark costs dated 09/27/18 | PCB-DE-0899204 | PCB-DE-0899206 | Keho Dep 15 | 403, R |
| DTX-848 | Pacific Biosciences Sequel System Site Preparation Guide - Sequel II System | PCB-DE-0920399 | PCB-DE-0920421 | | 403, R |
| DTX-849 | Email from Kurt Heidrich to Order@pacificbiosciences, et al regarding BPA Order from the USDA and attached purchase order from the USDA for 2 Sequel instruments and additional reagents dated 09/29/18 | PCB-DE-0927580 | PCB-DE-0927581 | Gong Dep 13 | |
| DTX-850 | Quotation number 20002903 | PCB-DE-0927582 | PCB-DE-0927591 | Gong Dep 14 | |
| DTX-851 | Order for Supplies or Services from the USDA for two Sequel instruments dated 09/29/18 | PCB-DE-0927592 | PCB-DE-0927609 | Gong Dep 15 | |
| DTX-852 | U.S. Patent 6,446,198 | PCB-DE-0934387 | PCB-DE-0934397 | | |
| DTX-853 | Email chain from Jeremiah Hanes to Karl Voss regarding perfect RLF-CCS reads dated 09/17/18 | PCB-DE-0980669 | PCB-DE-0980670 | Voss Dep 3 | 403, R, LF, LK |
| DTX-854 | Email chain from Jeremiah Hanes to Keith Bjornson, et al regarding Efficient generation of complete sequences of MDR-encoding plasmids dated 01/23/18 | PCB-DE-0981225 | PCB-DE-0981225 | Voss Dep 4 | 403, R, LF, LK |
| DTX-855 | Email from Jeremiah Hanes to Karl Voss regarding ONT ccs dated 06/05/18 | PCB-DE-0981675 | PCB-DE-0981675 | Voss Dep 5 | 403, R, AC |
| DTX-856 | R2C2: Improving nanopore read accuracy enables the sequencing of highly-multiplexed full-length 15 single-cell cDNA | PCB-DE-0981676 | PCB-DE-0981706 | Voss Dep 6 | 403, R, LF, LK, H, A |
| DTX-857 | Email chain from Karl Voss to Jeremiah Hanes regarding Slide decks from Jared Simpson & Chris Mason (ONT talks) dated 02/17/17 | PCB-DE-0981901 | PCB-DE-0981902 | Voss Dep 7 | 403, LK, H |
| DTX-858 | Email chain from Karl Voss to John Lyle regarding Interesting benchmark dated 03/22/18 | PCB-DE-0982051 | PCB-DE-0982052 | Voss Dep 8 | 403, LK, LF |
| DTX-859 | Email string between Karl Voss and Jeremiah Hanes regarding, "RE: Emailing: tandem repeats – promethion data" | PCB-DE-0982501 | PCB-DE-0982502 | | 403, R, LF, LK |
| DTX-860 | Cornell Research Foundation, Inc. Amendment dated 01/11/07 | PCB-DE-0982678 | PCB-DE-0982678 | | |
| DTX-861 | Cornell Research Foundation, Inc. Amendment dated 04/01/06 | PCB-DE-0982679 | PCB-DE-0982679 | | |
| DTX-862 | University of Chicago, The-1st Amendment to Exclusive License Agmt 11/08/12 | PCB-DE-0982702 | PCB-DE-0982703 | | |
| DTX-863 | University of Chicago, The-Exclusive License Agmt 10/09/12 | PCB-DE-0982704 | PCB-DE-0982726 | | |
| DTX-864 | Licence Agreement between GE Healthcare Bio-Sciences Corp. and Pacific Biosciences of California, Inc. dated 09/11/06 | PCB-DE-0984444 | PCB-DE-0984459 | | |
| DTX-865 | Agreement Letter between Pacific Biosciences and GE Healthcare Bio-Sciences Corp. re Amendment No. 1 to GEHC-PacBio License Agreement dated 09/11/96 | PCB-DE-0984460 | PCB-DE-0984461 | | |
| DTX-866 | Amendment No. 2 to Licence Agreement between GE Healthcare Bio-Sciences Corp. and Pacific Biosciences of California, Inc. dated 10/18/13 | PCB-DE-0984462 | PCB-DE-0984464 | | |
| DTX-867 | Patent Purchase Agreement between LI-COR, Inc. and Pacific Biosciences of California, Inc.dated 08/27/07 | PCB-DE-0984465 | PCB-DE-0984478 | | |
| DTX-868 | U.S. Patent 9,772,323 | PCB-DE-0984496 | PCB-DE-0984555 | Akeson Dep 11; Earl Dep 6; Sanghera Dep 4; Dessimoz Dep 2; Flusberg Dep 1; Goldman Dep 3; Goldman Dep 11; Turner Dep 2; Gong Dep 4 | |
| DTX-869 | U.S. Patent 9,772,323 File History | PCB-DE-0984556 | PCB-DE-0985009 | | |
| DTX-870 | Form 10-K, Pacific Biosciences of California, Inc. - 2018 | PCB-DE-0985094 | PCB-DE-0985183 | Gong Dep 7 | |
| DTX-871 | Form 10-K, Pacific Biosciences of California, Inc. - 2016 | PCB-DE-0985273 | PCB-DE-0985355 | Gong Dep 8 | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| **DTX-872** | Spreadsheet of GM and Revenue Summary (2015-Q1 2019) | PCB-DE-0987157 | PCB-DE-0987157 | Gong Dep 6 | |
| **DTX-873** | Benner, et al., "*Sequence-specific detection of individual DNA polymerase complexes in real time using a nanopore*" Nat. Nanotechnol. 2, 718–724 (2007) | PCB-DE-1024308 | PCB-DE-1024323 | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| **DTX-874** | Cockcroft, et al., "*A single-molecule nanopore device detects DNA polymerase activity with single-nucleotide resolution*" J Am Chem Soc. 2008 Jan 23;130(3):818-20. doi: 10.1021/ja077082c. Epub 2008 Jan 1 | PCB-DE-1024324 | PCB-DE-1024333 | | |
| **DTX-875** | Kasianowicz, et al., "*Characterization of individual polynucleotide molecules using a membrane channel*" Proc. Natl. Acad. Sci. USA 93, 13770-13773 (1996) | PCB-DE-1029273 | PCB-DE-1029276 | | |
| **DTX-876** | Withdrawn | | | | |
| **DTX-877** | Fologea, D., et al. "*Slowing DNA Translocation in a Solid-State Nanopore*" (2005) Nano Lett 5(9):1734-1737 | PCB-DE-1029289 | PCB-DE-1029299 | | |
| **DTX-878** | Withdrawn | | | | |
| **DTX-879** | Withdrawn | | | | |
| **DTX-880** | Customer List | PCB-DE-1029628 | PCB-DE-1029628 | | |
| **DTX-881** | S. Magierowski, et al.,"*Nanopore-CMOS interfaces for DNA sequencing*" Biosensors, 6, 42 (2016) | PCB-DE-1029631 | PCB-DE-1029658 | Goldman Rebuttal Rpt 9 | |
| **DTX-882** | U.S. Prov. App. No. 61/168,431 | PCB-DE-1029750 | PCB-DE-1029843 | | |
| **DTX-883** | Pennisi, E. "*Search for Pore-fection*" Science, Vol. 336 | PCB-DE-1030229 | PCB-DE-1030234 | | |
| **DTX-884** | Laboratory Notebook Pacific BioSciences 180 - Mary 2007 | PCB-ONT-ITC-0008180 | PCB-ONT-ITC-0008397 | | R |
| **DTX-885** | Notebook VI - SMS dated 05/17/08 - 08/01/08 | PCB-ONT-ITC-0008609 | PCB-ONT-ITC-0008765 | | R |
| **DTX-886** | Pacific Biosciences Sequel System Site Preparation Guide | PCB-ONT-ITC-0035847 | PCB-ONT-ITC-0035868 | | R |
| **DTX-887** | Email from Trevin Rard to cutilloc@mail.nih, Jeff Schloss, Adrian Fehr, Steve Turner regarding Pacific Biosciences - poster & talk abstract submission w attachment dated 03/09/09 | PCB-ONT-ITC-0065656 | PCB-ONT-ITC-0065656 | Fehr Dep 6 | 403, R |
| **DTX-888** | Sequencing Technology Development Grantee Meeting | PCB-ONT-ITC-0065657 | PCB-ONT-ITC-0065657 | Fehr Dep 7 | |
| **DTX-889** | Direct, Real-Time Transcriptome Sequencing | PCB-ONT-ITC-0071207 | PCB-ONT-ITC-0071219 | Korlach Dep 2 (4/13/2019) | DE (wrong deposition date) |
| **DTX-890** | Email from Jonas Korlach to Steve Turner et al regarding Oxford intel information was able to gather during ASHG, it is very clear to me now what is going on and why Oxford is doing what they are doing….dated 11/12/12 | PCB-ONT-ITC-0097792 | PCB-ONT-ITC-0097795 | Korlach Dep 10 (4/13/2019); Korlach Dep 11 (6/13/2019) | 403, R, DE |
| **DTX-891** | Email string between Benjamin Flusberg, Steve Turner, and Jonas Korlach regarding: "Oxford nanopore" | PCB-ONT-ITC-0141897 | PCB-ONT-ITC-0141898 | | 403, R |
| **DTX-892** | Email from Benjamin Flusberg to Steve Turner regarding additional nanopore note dated 6/12/2009 | PCB-ONT-ITC-0142153 | PCB-ONT-ITC-0142153 | Flusberg Dep 13 | 403 |
| **DTX-893** | Email string between Jonas Korlach and Steve Turner regarding, "RE: Jingjue Ju" | PCB-ONT-ITC-0149148 | PCB-ONT-ITC-0149148 | | 403, R, LF |
| **DTX-894** | Email between Steve Turner, Mike Hunkapiller, and others regarding, "RE: Comments from Mark Akeson on Oxford at Foresight conference" | PCB-ONT-ITC-0194329 | PCB-ONT-ITC-0194329 | | 403, R, LF, H |
| **DTX-895** | Email string between Jonas Korlach and Steve Kujawa regarding "RE: nanopore and modified bases…" | PCB-ONT-ITC-0213893 | PCB-ONT-ITC-0213893 | | 403, R, LF |
| **DTX-896** | Email string between Jonas Korlach, Madoo Varma, and Steve Turner regarding, "RE: significance paragraph – need input" | PCB-ONT-ITC-0220371 | PCB-ONT-ITC-0220373 | | 403, R, LF, LK, H |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-897 | Email from Jonas Korlach to Wendy Weise regarding Clive Brown, UK NGS dated 09/02/13 | PCB-ONT-ITC-0303918 | PCB-ONT-ITC-0303920 | Korlach Dep 11 (4/13/2019) | 403, R, H, DE |
| DTX-898 | Email from Jonas Korlach to Kevin Corcoran et all regarding Clive Brown, UK NGS - Presentation dated 09/02/13 | PCB-ONT-ITC-0303933 | PCB-ONT-ITC-0303938 | Korlach Dep 12 (4/13/2019); Korlach Dep 16 (6/13/2019) | 403, LF, H, DE |
| DTX-899 | Email from Jonas Korlach to Jonas Korlach regarding notes on Clive Brown talk dated 09/02/13 | PCB-ONT-ITC-0329857 | PCB-ONT-ITC-0329857 | Korlach Dep 8 (4/13/2019) | 403, LF, DE |
| DTX-900 | Email string between Jonas Korlach, Jason Chin, and others regarding "RE: Quick look at NL ONT data 9-10-2014" | PCB-ONT-ITC-0353703 | PCB-ONT-ITC-0353706 | | 403, R, LF, LK, H |
| DTX-901 | Laboratory Notebook No. 227 - Pacific Biosciences - Issued to Susana Wang on April 28, 2008 - Department Sample Prep | PCB-ONT-ITC-0386354 | PCB-ONT-ITC-0386567 | | R |
| DTX-902 | Laboratory Notebook No. 228 - Pacific Biosciences - Issued to Jason Londry on April 28, 2008 - Department Sample Prep | PCB-ONT-ITC-0386568 | PCB-ONT-ITC-0386783 | | R |
| DTX-903 | Laboratory Notebook No. 274 - Pacific Biosciences - Issued to Jason Londry on 10/01/2008 - Department Sample Prep (SMS) | PCB-ONT-ITC-0386784 | PCB-ONT-ITC-0387000 | | R |
| DTX-904 | Laboratory Notebook, Pacific Biosciences | PCB-ONT-ITC-0387001 | PCB-ONT-ITC-0387198 | Eid Dep 8 | |
| DTX-905 | Email from Jonas Korlach to Martha Trela regarding SMS entry.doc regarding Invitation to the Project: Encyclopedia of Biophysics to contribute on: (1) Single molecule sequencing; and (2) Zero-mode waveguides with attached SMS entry doc; sms table dated 12/30/10 | PCB-ONT-ITC-0388865 | PCB-ONT-ITC-0388866 | Korlach Dep 14 (4/13/2019) | 403, R, DE |
| DTX-906 | Single-Molecule Sequencing | PCB-ONT-ITC-0388867 | PCB-ONT-ITC-0388871 | Korlach Dep 15 (4/13/2019) | 403, R, DE |
| DTX-907 | Email from Ken Dewar to Jonas Korlach regarding perspective on cost in sequencing dated 03/12/14 | PCB-ONT-ITC-0391718 | PCB-ONT-ITC-0391720 | Korlach Dep 17 (4/13/2019) | 403, R, DE |
| DTX-908 | Email from Jonas Korlach to Deepak Singh regarding FW: Platypus DNA for PacBio - ENQ-737 dated 05/12/15 | PCB-ONT-ITC-0406110 | PCB-ONT-ITC-0406119 | Korlach Dep 4 (4/13/2019) | 403, R, DE |
| DTX-909 | Email from Jonas Korlach to Steve Turner, Trevin Rard regarding final progress report for original grant extension dated 08/27/10 | PCB-ONT-ITC-0437309 | PCB-ONT-ITC-0437311 | Korlach Dep 16 (4/13/2019) | 403, R, DE |
| DTX-910 | Outline and Overview of Progress Report (*proprietary) | PCB-ONT-ITC-0437945 | PCB-ONT-ITC-0437957 | Korlach Dep 5 (4/13/2019) | 403, R, DE |
| DTX-911 | Email from Yu-Chih Tsai to Jonas Korlach, et al regarding PacBio Siminar Follow-Up dated 04/06/16 | PCB-ONT-ITC-0443939 | PCB-ONT-ITC-0443942 | Korlach Dep 6 (4/13/2019) | 403, R, DE |
| DTX-912 | Email from Edwin Hauw to Jonas Korlach regarding News from ONT dated 11/04/16 | PCB-ONT-ITC-0452904 | PCB-ONT-ITC-0452906 | Korlach Dep 13 (4/13/2019) | 403, R, DE |
| DTX-913 | Email from Aaron Wenger to Jonas Korlach, Mike Hunkapiller regarding ONT gene examples with attachment regarding Sequel v ONT Context Bias spreadsheet dated 12/13/16 | PCB-ONT-ITC-0454147 | PCB-ONT-ITC-0454148 | Korlach Dep 9 (4/13/2019) | 403, R, DE, LF, LK |
| DTX-914 | Email from Jonas Korlach to Wendy Weise et al regarding Shared from Twitter: Developments in high throughput sequencing - July 2016 edition In between lines of code with attachment regarding Sequel Instrument dated 07/08/16 | PCB-ONT-ITC-0463546 | PCB-ONT-ITC-0463546 | Korlach Dep 19 (4/13/2019) | 403, R, DE, H |
| DTX-915 | Email from Lex Nederbragt to Jonas Korlach cc Kjetil S. Jakobsen, Ave Toomin-Klunderud regarding Sequel Instrument dated 07/08/16 | PCB-ONT-ITC-0463547 | PCB-ONT-ITC-0463549 | Korlach Dep 20 (4/13/2019) | 403, R, DE, LF, LK, H |
| DTX-916 | Email from Jonas Korlach to Kevin Corcoran regarding your MHAP Nature Biotechnology publication dated 06/18/15 | PCB-ONT-ITC-0479306 | PCB-ONT-ITC-0479307 | Korlach Dep 22 (4/13/2019) | 403, R, DE, LF, LK, H |
| DTX-917 | Email from Jonas Korlach to Mike Hunkapiller, Cc: Kevin Corcoran regarding your latest blog post dated 09/03/15 | PCB-ONT-ITC-0479545 | PCB-ONT-ITC-0479547 | Korlach Dep 21 (4/13/2019) | 403, R, DE, LF, LK, H |
| DTX-918 | Email between Kevin Corcoran, Mike Hunkapiller, and others regarding, "RE: Gene's Quote" | PCB-ONT-ITC-0483260 | PCB-ONT-ITC-0483260 | | 403, R |
| DTX-919 | PacBio, Jonas Korlach, Understanding Accuracy in SMRT® Sequencing | PCB-ONT-ITC-0524153 | PCB-ONT-ITC-0524160 | Korlach Dep 3 (4/13/2019); Korlach Dep 12 (6/13/2019) | 403, R |
| DTX-920 | Sequel System Launch 30Sept15 | PCB-ONT-ITC-0594974 | PCB-ONT-ITC-0595024 | | 403, R |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| **DTX-921** | Email from Marcus Collins to Steve Turner, Adrian Fehr regarding Nanopores and possible employment with attachment - Collins Resume dated 04/01/09 | PCB-ONT-ITC-0628745 | PCB-ONT-ITC-0628745 | Fehr Dep 16 | 403, R, H, LF, LK |
| **DTX-922** | Email from Adrian Fehr to Steve Turner regarding NHGRI wrap up dated 04/02/09 | PCB-ONT-ITC-0628750 | PCB-ONT-ITC-0628750 | | 403, R |
| **DTX-923** | Email from Adrian Fehr to Steve Turner et al regarding NHGRI Grantee Meeting Summary w attachment dated 04/06/09 | PCB-ONT-ITC-0628751 | PCB-ONT-ITC-0628752 | Heiner Dep 2 | 403, R |
| **DTX-924** | NHGRI: Advanced Sequencing Technology Development Meeting Poster and Talk Summary March 29 to May 1, 2009 Adrian Fehr | PCB-ONT-ITC-0628753 | PCB-ONT-ITC-0628757 | Fehr Dep 12; Heiner Dep 3 | 403, R |
| **DTX-925** | Pacific Biosciences National Human Genome Research Institute Advanced Sequencing Tech Dev. Meeting | PCB-ONT-ITC-0628761 | PCB-ONT-ITC-0628761 | Fehr Dep 20 | 403, R |
| **DTX-926** | Email string between Kevin Corcoran and Jason Chin regarding, "RE: Some conversation with Joe deRisi form UCSF" | PCB-ONT-ITC-0744338 | PCB-ONT-ITC-0744338 | | 403, R |
| **DTX-927** | Email between Lawrence Lee, Cheryl Heiner, and others regarding, "RE: cagY subread stats" | PCB-ONT-ITC-0764043 | PCB-ONT-ITC-0764043 | | 403, R |
| **DTX-928** | Email string between Jane Landolin, David Rank, and others regarding, "RE: Jay Shendure's paper is behind paywall" | PCB-ONT-ITC-0764043 | PCB-ONT-ITC-0764043 | | |
| **DTX-929** | Email between Jason Chin and Saman Ta regarding, "Re: oxford" | PCB-ONT-ITC-0776655 | PCB-ONT-ITC-0776655 | | 403, R, H, LF |
| **DTX-930** | ONT Dataset Competitive Evaluation Find Meaning in Complexity | PCB-ONT-ITC-0781070 | PCB-ONT-ITC-0781079 | Travers Dep 4 | |
| **DTX-931** | Clarke, James, et al., "*Continuous base identification for single-molecule nanopore DNA sequencing*" Nature Nanotechnology Articles, 02/22/09 | PCB-ONT-ITC-0782083 | PCB-ONT-ITC-0782088 | Chin Dep 15 | |
| **DTX-932** | Email string from Jason Chin to John Eid, et al regarding Nanopore paper dated 02/26/09 | PCB-ONT-ITC-0783089 | PCB-ONT-ITC-0783089 | Chin Dep 14 | 403, R, LF, LK |
| **DTX-933** | Email string from Luke Hickey to Edwin Hauw, et al regarding Oxford nanopore and Iso-Seq dated 05/18/15 | PCB-ONT-ITC-0794055 | PCB-ONT-ITC-0794056 | Chin Dep 16 | 403, LF, LK |
| **DTX-934** | Email string from Kathryn Keho to Wendy Weise, et al regarding Last FAQ for Oxford Nanopore dated 05/19/15 | PCB-ONT-ITC-0794058 | PCB-ONT-ITC-0794059 | Chin Dep 13 | |
| **DTX-935** | Email string between Ben Gong, Mike Hunkapiller, and Susan Barnes regarding, "FW: SPAM-ISI LST&D: ILMN and ONT to end partnership in 2016" | PCB-ONT-ITC-0807588 | PCB-ONT-ITC-0807589 | | |
| **DTX-936** | Withdrawn | | | | |
| **DTX-937** | Email string from Jason Chin to Kevin Travers regarding ONT data, fwd as you see proper dated 07/07/14 | PCB-ONT-ITC-0862054 | PCB-ONT-ITC-0862054 | Travers Dep 3 | 403, R |
| **DTX-938** | Email string from Kevin Corcoran to Michael Phillips, et al regarding Clive Brown, UK NGS dated 09/03/13 | PCB-ONT-ITC-0865800 | PCB-ONT-ITC-0865806 | Chin Dep 17 | 403, R |
| **DTX-939** | Korlach, Jonas "Five Considerations when Evaluating Cost in DNA Sequencing" | PCB-ONT-ITC-1040970 | PCB-ONT-ITC-1040976 | Korlach Dep 18 (4/13/2019); Korlach Dep 2 (6/13/2019) | 403, R |
| **DTX-940** | PacBio Update Jonas Korlach dated 01/18/16 | PCB-ONT-ITC-1131793 | PCB-ONT-ITC-1131867 | Korlach Dep 7 (4/13/2019) | 403, R |
| **DTX-941** | 0173-Subsets (62990) - Experiments Plans and Results - Oxford Nanopore's Wiki | ONT-DEL-00196028 | ONT-DEL-00196037 | Ha Rebuttal Rpt 25; Ha Reply Rpt 28 | |
| **DTX-942** | Email from Stuart Reid to Clive Brown et al regarding Long range context community post w attachement Exhibit 38 "Spooky action at a distance - long range signal context dated 09/28/15 | ONT-DEL-00369648 | ONT-DEL-00369651 | Goldman Dep 18 | 403, LF, H |
| **DTX-943** | CMA - Illumina's takeover of PacBio raises competition concerns (June 18, 2019) | | | | 403, R, LF, LK, U, DI, MIL |
| **DTX-944** | CMA - Illumina's takeover of PacBio raises competition concerns (Oct. 24, 2019) | | | | 403, R , LF, LK, U, DI, MIL |
| **DTX-945** | CMA - Notice_of_commencement_-_Illumina_PacBio (Apr. 17, 2019) | | | | 403, R , LF, LK, U, DI, MIL |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-946 | CMA (ME/6795/18) - Appendices and Glossary to Provisional Findings Report | | | | 403, R, LF, LK, U, DI, MIL |
| DTX-947 | CMA (ME/6795/18) - Decision on relevant merger situation and substantial lessening of competition (July 19, 2019) | | | | 403, R, LF, LK, U, DI, MIL |
| DTX-948 | CMA (ME/6795/18) - Decision to refer (June 27, 2019) | | | | 403, R, LF, LK, U, DI, MIL |
| DTX-949 | CMA (ME/6795/18) - Issues Statement (Aug. 1, 2019) | | | | 403, R, LF, LK, U, DI, MIL |
| DTX-950 | CMA (ME/6795/18) - Merger Notice (Apr. 17, 2019) | | | | 403, R, LF, LK, H, U, DI, MIL |
| DTX-951 | CMA (ME/6795/18) - Notice of Cancellation (Jan. 6, 2020) | | | | 403, R, LF, LK, U, DI, MIL |
| DTX-952 | CMA (ME/6795/18) - Notice of extension of inquiry period under section 39(3) of the Enterprise Act 2002 | | | | 403, R, LF, LK, U, DI, MIL |
| DTX-953 | CMA (ME/6795/18) - Notice of Possible Remedies (Oct. 24, 2019) | | | | 403, R, LF, LK, U, DI, MIL |
| DTX-954 | CMA (ME/6795/18) - Notice of provisional findings made under Rule 11.3 of the Competition and Markets Authority Rules of Procedure (Oct. 24, 2019) | | | | 403, R, LF, LK, U, DI, MIL |
| DTX-955 | CMA (ME/6795/18) - ONT's Views on Remedies Proposal Dated Nov. 7, 2019 (Nov. 19, 2019) | | | | 403, R, LF, H, HH, U, DI, MIL |
| DTX-956 | CMA (ME/6795/18) - ONT's Views on Revised Remedies Proposal Dated Nov. 19, 2019 - ANNEX (Nov. 21, 2019) | | | | 403, R, LF, H, HH, U, DI, MIL |
| DTX-957 | CMA (ME/6795/18) - ONT's Views on Revised Remedies Proposal Dated Nov. 19, 2019 (Nov. 21, 2019) | | | | 403, R, LF, H, HH, U, DI, MIL |
| DTX-958 | CMA (ME/6795/18) - Provisional Findings Report (Oct. 24, 2019) | | | | 403, R, LF, LK, H, HH, U, DI, MIL |
| DTX-959 | CMA (ME/6795/18) - Response to Notice of Possible Remedies (Nov. 19, 2019) | | | | 403, R, LF, LK, H, HH, U, DI, MIL |
| DTX-960 | CMA (ME/6795/18) - Response to Notice of Possible Remedies (Nov. 7, 2019) | | | | 403, R, LF, LK, H, HH, DI, MIL |
| DTX-961 | CMA (ME/6795/18) - Response to Referral Decision | | | | 403, R, LF, LK, H, HH, U, DI, MIL |
| DTX-962 | CMA (ME/6795/18) - Response to Remedies Working Paper (Dec. 10, 2019) | | | | 403, R, LF, LK, H, HH, U, DI, MIL |
| DTX-963 | CMA (ME/6795/18) - Response to the Provisional Findings Report (Nov. 14, 2019) | | | | 403, R, LF, H, HH, U, DI, MIL |
| DTX-964 | CMA (ME/6795/18) - Shawn C. Baker Submission Response Submitted in a Personal Capacity | | | | 403, R, LF, LK, H, HH, U, DI, MIL |
| DTX-965 | CMA (ME/6795/18) - Shawn C. Baker Submission Response to Provisional Findings | | | | 403, R, LF, LK, H, HH, U, DI, MIL |
| DTX-966 | CMA (ME/6795/18) - Submission (Aug. 27, 2019) | | | | 403, R, LF, LK, H, HH, U, DI, MIL |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-967 | CMA (ME/6795/18) - Summary of Customer Calls | | | | 403, R, LF, LK, H, U, DI, MIL |
| DTX-968 | CMA (ME/6795/18) - Summary of Provisional Findings | | | | 403, R, LF, LK, U, DI, MIL |
| DTX-969 | CMA (ME/6795/18) - Terms of Reference (June 27, 2019) | | | | 403, R, LF, LK, U, DI, MIL |
| DTX-970 | Expert Report of Sylvia Hall-Ellis (July 29, 2019) | | | | H |
| DTX-971 | First Supplemental Report on Damages of Anne Layne-Farrar (October 30, 2019) | | | | H |
| DTX-972 | FTC Complaint (Docket No. 9387) - In the Matter of Illumina Inc. and Pacific Biosciences of California Inc. (Dec. 17, 2019) | | | | 403, R, MIL |
| DTX-973 | Opening Expert Report of Charles McHenry (July 29, 2019) | | | | |
| DTX-974 | Opening Expert Report of Christophe Dessimoz (July 29, 2019) | | | | |
| DTX-975 | Opening Expert Report of Joshua Earl (July 29, 2019) | | | | |
| DTX-976 | Opening Expert Report of Mark Akeson (July 29, 2019) | | | | H |
| DTX-977 | Opening Expert Report of Nick Goldman (July 29, 2019) | | | | H |
| DTX-978 | Opening Expert Report of Patrick Hrdlicka (July 29, 2019) | | | | H |
| DTX-979 | Opening Expert Report of Richard Fair (September 10, 2019) | | | | H |
| DTX-980 | Opening Expert Report of Stephen Prowse (July 29, 2019) | | | | H |
| DTX-981 | Opening Expert Report of Taekjip Ha (July 29, 2019) | | | | H |
| DTX-982 | PacBio's Response to ONT's First Set of RFAs (1-23) dated March 22, 2019 | | | | |
| DTX-983 | PacBio's Response to ONT's Second Set of RFAs (24-26) dated April 30, 2019 | | | | |
| DTX-984 | PacBio's Response to ONT's Third Set of RFAs (27-51) dated May 15, 2019 | | | | |
| DTX-985 | Rebuttal Expert Report of Charles McHenry (September 24, 2019) | | | | |
| DTX-986 | Rebuttal Expert Report of Christophe Dessimoz (September 24, 2019) | | | | |
| DTX-987 | Rebuttal Expert Report of Nick Goldman (September 24, 2019) | | | | |
| DTX-988 | Rebuttal Expert Report of Patrick Hrdlicka (September 24, 2019) | | | | H |
| DTX-989 | Rebuttal Expert Report of Taekjip Ha (September 24, 2019) | | | | H |
| DTX-990 | Rebuttal Report on Damages of Anne Layne-Farrar (September 24, 2019) | | | | H |
| DTX-991 | Reply Expert Report of Charles McHenry (October 8, 2019) | | | | |
| DTX-992 | Reply Expert Report of Christophe Dessimoz (October 8, 2019) | | | | |
| DTX-993 | Reply Expert Report of Joshua Earl (October 8, 2019) | | | | |
| DTX-994 | Reply Expert Report of Mark Akeson (October 8, 2019) | | | | H |
| DTX-995 | Reply Expert Report of Nick Goldman (October 8, 2019) | | | | H |
| DTX-996 | Reply Expert Report of Patrick Hrdlicka (October 8, 2019) | | | | H |
| DTX-997 | Reply Expert Report of Richard Fair (October 8, 2019) | | | | |
| DTX-998 | Reply Expert Report of Stephen Prowse (October 8, 2019) | | | | |
| DTX-999 | Reply Expert Report of Taekjip Ha (October 8, 2019) | | | | H |
| DTX-1000 | Second Supplemental Report on Damages of Anne Layne-Farrar (November 19, 2019) | | | | H |
| DTX-1001 | U.S. Patent 8,628,940 | | | | |
| DTX-1002 | U.S. Patent 9,057,102 | | | | |
| DTX-1003 | U.S. Patent 9,556,480 | | | | |
| DTX-1004 | U.S. Patent Appl. 15/337,312 | | | | |
| DTX-1005 | U.S. Patent Pub. 2010/0075309 | | | | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-1006 | U.S. Patent Pub. 2011/0195406 | | | | |
| DTX-1007 | U.S. Patent Pub. 2014/0134629 | | | | |
| DTX-1008 | U.S. Patent Pub. 2015/0307934 | | | | |
| DTX-1009 | U.S. Patent Pub. 2017/0121764 | | | | |
| DTX-1010 | U.S. Patent Pub. 2017/0122929 | | | | |
| DTX-1011 | U.S. Patent Pub. 2017/0168040 | | | | |
| DTX-1012 | Stoddart et al., "Multiple Base-Recognition Sites in a Biological Nanoporegarding Two Heads are Better than One.". Angew Chem Int Ed Engl. 49(3):556-9 (2010) (doi: 10.1002/anie.200905483). | | | Fair Dep 11 | |
| DTX-1013 | US 2006/0063171 | | | Goldman Reply Rpt. Ex. E | |
| DTX-1014 | AGBT: Single molecule 'strand' sequencing using protein nanopores and scalable electronic devices | | | Brown Dep 6 | |
| DTX-1015 | Aoki, et al. - Antifungal Azoxybacilin Exhibits Activity by Inhibiting Gene Expression of Sulfite Reductase | | | Ha Reply Rpt 6 | |
| DTX-1016 | Beard, et al., "*Structure and Mechanism of DNA Polymerase* β" (2006) | | | | |
| DTX-1017 | Buttner, et al. - Structural basis for DNA duplex separation by a superfamily-2 helicase | | | Ha Reply Rpt 24 | |
| DTX-1018 | Byrd, et al. - Dda Helicase Tightly Couples Translocation on Single-Stranded DNA to Unwinding of Duplex DNA:<br>Dda Is an Optimally Active Helicase | | | Ha Reply Rpt 21 | |
| DTX-1019 | Cherf, G.M. et al. *"Automated forward and reverse ratcheting of DNA in a nanopore at 5-Å precision"* Nat. Biotechnol. 30, 344–348 (2012) | | | | |
| DTX-1020 | Cheryl Heiner Linked In Page | | | Heiner Dep 1 | |
| DTX-1021 | Competitive Discounts on Instruments | | | Gong Dep 12 | |
| DTX-1022 | Complaint for Patent Infringement between Personal Genomics Taiwan, Inc. and PacBio California dated 09/26/19 | | | Hunkapiller Dep 4; Reamey Dep 2 (10-16-19 Depo.) | 403, R |
| DTX-1023 | Comprehensive Dictionary of Electrical Engineering - Definition of "sensitivity" (1999) | | | | |
| DTX-1024 | Craig, et al., *"Revealing dynamics of helicase translocation on single-stranded DNA using high-resolution nanopore tweezers"* (2017) | | | | |
| DTX-1025 | Declaration of Dr. Taekjip Ha ISO Petition for Inter Partes Review of U.S. Patent No. 9,678,056 (Oxford, Exh. 1002) | | | Ha Reply Rpt 13 | H |
| DTX-1026 | Financial Spreadsheet 2014-2019 Q1 | | | Brayer Dep 12; Cowper Dep 3 | |
| DTX-1027 | From squiggle to basepair: computational approaches for improving nanopore sequencing read accuracy, Rang, et al | PCB-DE-1029659 | PCB-DE-1029669 | Fair Dep 6 | |
| DTX-1028 | Genetics Home Reference - *Help Me Understand Genetics Cells and DNA* (https.ghr.nlm.nih.gov) | | | | |
| DTX-1029 | Hedges, et al. - Extracellular Enzyme From Myxobacter AL-1 That Exhibits Both β-1,4-Glucanase and Chitosanase Activities (1974) | | | Ha Reply Rpt 7 | |
| DTX-1030 | http.github.com.nanoporetech.scrappie | | | | |
| DTX-1031 | http://atlasgeneticsoncology.org/Genes/GC-BRCA1.html | | | | |
| DTX-1032 | http://www.pacb.com/smrt-science/smrt-sequencing/epigenetics/ | | | | |
| DTX-1033 | https://ghr.nlm.nih.gov/primer/basics/dna | | | | |
| DTX-1034 | https://github.com/nanoporetech | | | | |
| DTX-1035 | https://github.com/nanoporetech/taiyaki/blob/master/docs/abinitio.rst | | | | |
| DTX-1036 | https://github.com/nanoporetech/taiyaki/blob/master/docs/walkthrough.rst | | | | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-1037 | https://github.com/nanoporetech/taiyaki/blob/master/docs/walkthrough.rst#downloadandunpack-training-data, | | | | |
| DTX-1038 | https://grants.nih.gov/grants/guide/rfa-files/RFA-HG-04-003.html | | | | |
| DTX-1039 | https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4767527/figure/F6/ | | | | |
| DTX-1040 | https://www.thermofisher.com/blog/behindthebench/designing-pcr-and-sanger-sequencing-primers-seq-itout-5-2 (around timestamp 0:56-1:04). | | | | 403, R |
| DTX-1041 | Illumina to Acquire Pacific Biosciences for $1.2 Billion, www.genomeweb.com, Nov. 1, 2018 | | | Hunkapiller Dep 5 | 403, R, MIL |
| DTX-1042 | Illumina, "Flexibility for multiple sequencing Appl.s" available at https://www.illumina.com/systems/sequencing-platforms/nextseq/Appl.s.html | | | | 403, R |
| DTX-1043 | In Between Lines of Code, Biology,Sequencing, Bioinformatics and more; Appl. for PacBio Circular Consensus Sequencing dated 02/11/13 | | | Chin Dep 18 | |
| DTX-1044 | John Eid, et al., "*AAAS Real-Time DNA Sequencing from Single Polymerase Molecules*" Science 323, 133 (2009) | | | Maxham Dep 4 | |
| DTX-1045 | Joyce, et al., "*DNA Polymerase Fidelity: Kinetics, Structure, and Checkpoints*" (2004) | | | | |
| DTX-1046 | Keyser, U. et al., "*Direct force measurements on DNA in a solid-state nanopore*" Nat. Physics 2, 473-477 (2006) | | | | |
| DTX-1047 | Lieberman, K.R. et al."*Processive replication of single DNA molecules in a nanopore catalyzed by phi29 DNA polymerase*" J. Am. Chem. Soc. 132, 17961–17972 (2010) | | | | |
| DTX-1048 | Lin, et al. - MLN4924, a Novel NEDD8-activating enzyme inhibitor, exhibits antitumor activity and enhances cisplatin-induced cytotoxicity in human cervical carcinoma: in vitro and in vivo study (2015) | | | Ha Reply Rpt 8 | |
| DTX-1049 | Lindqvist, Pharmacogenetic studies of thiopurines – focus on thiopurine methyltransferase (2005) | | | | |
| DTX-1050 | LinkedIn page of James Clarke | | | Clarke Dep 1 | |
| DTX-1051 | LinkedIn profile of Adrian Fehr dated 07/06/19 | | | Fehr Dep 2 | |
| DTX-1052 | Lysov, et al "*Proc. USSR*" Acad. Sci. 303 1508-1511 (1988). | | | | |
| DTX-1053 | Marziali, et al., "*New DNA Sequencing Methods*" Annual Review in Biomedical Engineering 3:195-223 (2001) | | | | |
| DTX-1054 | Notes from discussion with sales team. | | | Keho Dep 2 | |
| DTX-1055 | Office Action | | | Ha Reply Rpt 15 | |
| DTX-1056 | Oxford's Profit Margins and Price Comparison with PacBio Appendix C - Exhibit C-1 | | | | |
| DTX-1057 | PacBio NasdaqGSD: PACB, FQ2 201 Earnings Call Transcripts | | | Gong Dep 11 | |
| DTX-1058 | PacBio, "Illumina to Acquire Pacific Biosciences for Approximately $1.2 Billion, Broadening Access to Long-Read Sequencing and Accelerating Scientific Discovery" available athttps://www.pacb.com/press-releases/illumina-to-acquire-pacific-biosciences-for-approximately-1-2-billionbroadening-access-to-long-read-sequencing-and-accelerating-scientific-discovery/ | | | | 403, R, MIL |
| DTX-1059 | PacBio, Jonas Korlach,  Accessing the Full Size-Spectrum of Human Genetic Variation Using PacBio Long-Read SMRT Sequencing on the Sequel System | | | Korlach Dep 4 (6/13/2019) | |
| DTX-1060 | Patent Appl. Fee Determination Record 9/13/13 | | | Reamey Dep 4 | 403, R |
| DTX-1061 | PCT Patent Appl. GB 89/00460 (priority date May 3, 1988);  Southern, E.M, Bains, W. and Smith, G.C. J. Theoret. Biol. 135, 303-307 (1988). | | | | |
| DTX-1062 | PCT Patent Appl. WO 2013/057495 Moysey, R. & Heron, A.J. (priority dates Oct. 21, 2011 & Feb. 15, 2012) | | | | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-1063 | Presentation" *Toward Single-Molecule DNA Sequencing: Single-Base Recognition and REal-Time Polymerase Activity Detecty by a Protein Nanopore*" | | | Fehr Dep 3 | |
| DTX-1064 | Printout of Tweets by Jason Chin dated 02/07/16 | | | Chin Dep 12 | 403, R |
| DTX-1065 | Printout of Tweets by Jason Chin dated 02/19/14 | | | Chin Dep 5 | 403, R |
| DTX-1066 | Printout of Tweets by Jason Chin dated 03/18/16 | | | Chin Dep 6 | 403, R |
| DTX-1067 | Printout of Tweets by Jason Chin dated 09/04/15 | | | Chin Dep 8 | 403, R |
| DTX-1068 | Printout of Tweets by Jason Chin dated 11/06/18 | | | Chin Dep 10 | 403, R |
| DTX-1069 | Provisional Appl. for Patent "Compositions and Methods for Nucleic Acid Sequencing" | | | Heiner Dep 6 | |
| DTX-1070 | Provisional Appl. for Patent "Intermittent Detection During Analytical Reactions" | | | Heiner Dep 7 | |
| DTX-1071 | Provisional Appl. No. 61099696 | | | Eid Dep 4 | |
| DTX-1072 | Provisional Appl. No. 61139402 | | | Eid Dep 3 | |
| DTX-1073 | Provisional Patent Appl. | | | Fehr Dep 5 | |
| DTX-1074 | PubMed Central, Fig. 6: Lab Chip | | | | |
| DTX-1075 | Raper, et al., "*Kinetic Mechanism of DNA Polymerases: Contributions of Conformational Dynamics and a Third Divalent Metal Ion*" (2018) | | | | |
| DTX-1076 | RCE 9/13/13 | | | Reamey Dep 5 | 403, R |
| DTX-1077 | Redacted Email btw Eric Schadt and Steve Turner et al regarding Roche, IBM Enter Partnership On DNA Sequencing Technology | | | Korlach Dep 14 (6/13/2019) | 403, R |
| DTX-1078 | Response to Non-Final Action | | | Ha Reply Rpt 16 | |
| DTX-1079 | Response to Office Action dated 03/14/16 | | | Goldman Dep 4 | |
| DTX-1080 | Roche, *"Nanopore Sequencing"* available at https://sequencing.roche.com/en/technologyresearch/technology/nanopore-sequencing.html | | | | |
| DTX-1081 | Sapranauskas, et al. - Novel Subtype of Type IIs Restriction Enzymes | | | Ha Reply Rpt 5 | |
| DTX-1082 | Second Amended and Restated License Agreement btween Oxford Nanopore Technologies Limited and Harvard College dated 12/18/15 | | | Prowse Dep 6 | |
| DTX-1083 | Section 4 (Market Definition) of the Federal Trade Commission's Merger Guidelines, available at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010 | | | | 403, R |
| DTX-1084 | Sikora, et al. - Hepatitis C Virus NS3 Helicase Forms Oligomeric Structures That Exhibit Optimal DNA Unwinding Activity in Vitro | | | Ha Reply Rpt 9 | |
| DTX-1085 | Slides 2A - 2H | | | Akeson Report 2 | 403, R, DI, IO, H |
| DTX-1086 | Stoddart, D. et al. "*Nucleobase recognition in ssDNA at the central constriction of the alpha-hemolysin pore*" Nano Lett. 10, 3633–3637 (2010) | | | | |
| DTX-1087 | Stoddart, D., et al., "*Single-nucleotide discrimination in immobilized DNA oligonucleotides with a biological nanopore*" Proc. Natl. Acad. Sci. USA 106 (19): 7702-7707 (2009) | | | | |
| DTX-1088 | Technology Spotlight: Illumina Sequencing Technology | | | | 403, R |
| DTX-1089 | The National Law Review, "*Billion-Dollar Merger of DNA Sequencing Firms Opposed by U.K., Questioned in U.S.*" November 5, 2019, available at https://www.natlawreview.com/article/billiondollar-merger-dna-sequencing-firms-opposed-uk-questioned-us | | | | |
| DTX-1090 | The potential and challenges of nanopore sequencing, NIH dated 10/26/08 | | | Dessimoz Dep 10; Fair Dep 10 | |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-1091 | U.S. Patent 5,748,491 | | | Cited on the face of '056 Patent; Cited on the face of '323 Patent; Cited on the face of '400 Patent | |
| DTX-1092 | Withdrawn | | | | |
| DTX-1093 | U.S. Patent 8,304,191 | | | Eid Dep 5 | |
| DTX-1094 | U.S. Patent 9,758,823 | | | Ha Reply Rpt 25 | |
| DTX-1095 | U.S. Patent Pub. 2005/0266416 to Guo | | | Cited on the face of '056 Patent; Cited on the face of '323 Patent | |
| DTX-1096 | U.S. Patent Pub. 2009/0286245 to Bjornson et al. | | | | |
| DTX-1097 | Vollger, et al., "*Improved assembly and variant detection of a haploid human genome using single-molecule, high-fidelity long reads*" | | | Hunkapiller Dep 2 | |
| DTX-1098 | WO 2006/020775 | | | Cited on the face of '056 Patent; Cited on the face of '323 Patent | |
| DTX-1099 | WO 2010/086622 | | | | |
| DTX-1100 | WO 2013/014451A1 | | | | |
| DTX-1101 | 2019-03-06 [D.I. 153] ORDER re Claim Construction [17-275] | | | Flusberg Dep 3 | |
| DTX-1102 | Illumina Press Release - Illumina and Oxford Nanopore Enter into Broad Commercialization Agreement (Jan. 12, 2009) | | | | 403, R, MIL |
| DTX-1103 | *Pacific Biosciences of California, Inc. v. Oxford Nanopore Technologies Inc.* (DDE-1-17-cv-00275) - Official Transcript of Claim Construction held on December 17, 2018 before Chief Judge Leonard P. Stark [D.I. 135] | | | | |
| DTX-1104 | https://github.com/nanoporetech/kmer-models/tree/master/r9.4-180mv-450bps-6mer | | | Goldman Rebuttal Rpt 8 | |
| DTX-1105 | Nakane,et al., "*Nanopore sensors for nucleic acid analysis*" Journal of Physics-Condensed Matter, 2003. 15(32): p. R1365-R1393 | | | | 403, R |
| DTX-1106 | Nivala J, et al "*Discrimination among protein variants using an unfoldase-coupled nanopore*" ACS Nano. 8:12365–12375 (2014) | | | | 403, R |
| DTX-1107 | Supplementary Information - Synthesis of aminocyclodextrin with a reactive linker arm, am6amPDP1βCD | | | Ha Rebuttal Rpt 15 | |
| DTX-1108 | Science Direct – Sanger Sequencing (https://www.sciencedirect.com/topics/neuroscience/sanger-sequencing) | | | | |
| DTX-1109 | Oxford Researchers Show Protein Nanopore Can Discriminate Single Bases in DNA Anchored Inside, www.genomeweb.com, Apr. 21, 2009 | | | | |
| DTX-1110 | Q&A: U Washington's Jens Gundlach on a New, Protein Nanopore for Sequencing, www.genomeweb.com, Jan. 13, 2009 | | | | 403, R, LF, LK |
| DTX-1111 | Dessimoz Supplemental Expert Report, Oct. 23, 2019 | | | | |
| DTX-1112 | Flow-Cell [PHYSICAL EXHIBT] | | | PHYSICAL EXHIBT | |
| DTX-1113 | MinION Device [PHYSICAL EXHIBT] | | | PHYSICAL EXHIBT | |
| DTX-1114 | 1D^2 Sequencing Kit (SQK-LSK308) [PHYSICAL EXHIBT] | | | PHYSICAL EXHIBT | |
| DTX-1115 | 1D^2 Sequencing Kit (SQK-LSK309) [PHYSICAL EXHIBT] | | | PHYSICAL EXHIBT | |
| DTX-1116 | Ligation Sequencing Kit (SQK-LSK109) [PHYSICAL EXHIBT] | | | PHYSICAL EXHIBT | |
| DTX-1117 | Rapid Sequencing Kit (SQK-RAD004) [PHYSICAL EXHIBT] | | | PHYSICAL EXHIBT | |
| DTX-1118 | Email from Steve Turner to Steve Turner regarding "notes from oxfern nanopore" | PCB-DE-0087950 | PCB-DE-0087950 | | 403, R, LF |
| DTX-1119 | Heather JM, Chain B. "*The sequence of sequencers: The history of sequencing DNA.*" Genomics. 2016;107(1):1–8. doi:10.1016/j.ygeno.2015.11.003 | PCB-ONT-ITC-0623476 | PCB-ONT-ITC-0623483.001 | | 403, R |
| DTX-1120 | Email string between Jonas Korlach, Deepak Singh, Terry Pizzie, and Mike Hunkapiller regarding, "FW: SMRT sequencing" | PCB-ONT-ITC-0291497 | PCB-ONT-ITC-0291499 | | 403, R, H, LF, LK |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-1121 | Email string between Kevin Corcoran, Michael Phillips, and others regarding, "RE: Our Sequel competitor" | PCB-DE-0549872 | PCB-DE-0549873 | | 403, R |
| DTX-1122 | Email string between Kevin Corcoran, Mio Tonouchi, and others regarding, "RE: Dear Team2" | PCB-DE-0551981 | PCB-DE-0551991 | | 403, R, LF |
| DTX-1123 | Email string between Jonas Korlach and Steve Picton regarding, "RE: Exeter and Oxford Nanopore" | PCB-DE-0380976 | PCB-DE-0380979 | | 403, R, LF, LK |
| DTX-1124 | Presentation by Paul Kotturi titled, "Competitive Landscape- Oxford Nanopore" | PCB-DE-0402903 | PCB-DE-0402919 | | 403, R, LF, LK, A |
| DTX-1125 | PowerPoint presentation | PCB-ONT-ITC-0144066 | PCB-ONT-ITC-0144068 | | 403, R, LF, LK, A |
| DTX-1126 | Weekly Media Report Prepared for Pacific Biosciences | PCB-ONT-ITC-0148131 | PCB-ONT-ITC-0148138 | | 403, R, H, LF, LK, A |
| DTX-1127 | Email between Terry Pizzie, Mike Hunkapiller, and others regarding, "Exec Forum Tuesday Sales Meeting" | PCB-ONT-ITC-1200516 | PCB-ONT-ITC-1200516 | | 403, R, LF, LK |
| DTX-1128 | Email between Steve Turner and Jonas Korlach regarding "work on RNA polymerase" | PCB-DE-0042369 | PCB-DE-0042372 | | 403, R |
| DTX-1129 | Email between Steve Turner, Raskin George, Hugh Martin, and Trevin Rard regarding "Oxford Nanopore slide deck | PCB-DE-0043017 | PCB-DE-0043018 | | 403, R, H, LF |
| DTX-1130 | Email from Steve Turner to Steve Turner, Jonas Korlach, and Benjamin Flusberg regarding "NLAD agend" | PCB-DE-0043102 | PCB-DE-0043102 | | 403, R |
| DTX-1131 | Email from Benjamin Flusberg to Jonas Korlach and Steve Turner regarding "a different protein for nanopores" | PCB-DE-0044584 | PCB-DE-0044584 | | 403, R, LF, LK, H |
| DTX-1132 | Clawed Back for Privilege | PCB-DE-0044767 | PCB-DE-0044767 | | AC, 403, R |
| DTX-1133 | Email from Benjamin Flusberg to bflusberg@pacificbiosciences.com, jkorlach@pacificbiosciences.com, and sturner@pacificbiosciences.com | PCB-DE-0044811 | PCB-DE-0044812 | | 403, R, LF, LK, H, A |
| DTX-1134 | Email from Andrei Fedorov to Steve Turner, rreamey@pacificbiosciences.com, and John Lyle regarding "support for slowing of steps with D20" | PCB-DE-0045997 | PCB-DE-0045997 | | 403, R, LF, LK, H |
| DTX-1135 | Email string between Jonas Korlach, Steve Turner, John Eid, and Mike Hunkapiller regarding "FW: New Nanopore Paper" | PCB-DE-0089446 | PCB-DE-0089446 | | 403, R, LF |
| DTX-1136 | Email from Nicole Litchfield to Steve Turner and Mike Glynn regarding "Oxford IP announcements" | PCB-DE-0089566 | PCB-DE-0089566 | | 403, R, H, LF, LK |
| DTX-1137 | Email from Steve Turner to David Singer regarding "Piper/Quirk, CFA, William: Expert Call Reinforces AGBT Takeaways" | PCB-DE-0106591 | PCB-DE-0106592 | | 403, R, H |
| DTX-1138 | Email string between Steve Turner and Nicole Litchfield Bioscribe regarding "Question for Meredith" | PCB-DE-0106744 | PCB-DE-0106744 | | 403, R, H, LF, LK |
| DTX-1139 | Clawed Back for Privilege | PCB-DE-0466666 | PCB-DE-0466666 | | AC, 403, R |
| DTX-1140 | Email string between Steve Turner, Jonas Korlach, Robert Reamey, Stephen Moore, Mike Hunkapiller, and Paul Kotturi regarding "oxford nanopore competition – A/C Privileged" | PCB-DE-0402993 | PCB-DE-0402993 | | AC, 403, R |
| DTX-1141 | Email string between Keith Bjornson, Steve Turner, Jonas Korlach, Satwik Kametkar, Jeremiah Hanes, Jason Underwood, and Robert Reamey regarding "Is the 3' end needed for binding of helicase?" | PCB-DE-0093158 | PCB-DE-0093158 | | 403, R |
| DTX-1142 | "10 Breakthrough Technologies" MIT Technology Review, 2012 | | | | 403, R, DI |
| DTX-1143 | "50 Smartest Companies 2016" MIT Technology Review, June 21, 2016 | | | | 403, R, DI |
| DTX-1144 | "Press Release MIT's Technology Review Identifies 10 Technologies Set to Transform Our World" MIT Technology Review, April 25, 2012 | | | | 403, R, DI |
| DTX-1145 | "10 Breakthrough Technologies- Nanopore Sequencing" MIT Technology Review, 2012 | | | | 403, R, DI |

**EXHIBIT F TO PRETRIAL ORDER - DEFENDANTS' EXHIBIT LIST**

| EXHIBIT # | DESCRIPTION | BEGBATES | ENDBATES | PREVIOUS DESIGNATION(S) | PLAINTIFF'S OBJECTIONS |
|---|---|---|---|---|---|
| DTX-1146 | "The 5 Smartest Companies Analyzing Your DNA" MIT Technology Review, Aug. 7, 2012 | | | | 403, R, DI |
| DTX-1147 | "What are the 50 Smartest Companies?" MIT Technology Review, June 27, 2017 | | | | 403, R, DI |
| DTX-1148 | "The 50 Smartest Companies of the World (2019): MIT" Giz China, July 1, 2019 | | | | 403, R, DI |
| DTX-1149 | "Meet the British genetics boss on the frontline of the coronavirus epidemic" https://www.telegraph.co.uk/technology/2020/02/14/meet-british-genetics-start-up-frontline-chinas-coronavirus/   dated Feb. 14, 2020 | | | | 403, R, DI |
| DTX-1150 | PacBio's 7th Supplemental Clawback Privilege Log; *Pacific Biosciences of California, Inc., v. Oxford Nanopore Technologies, Inc.* (17-cv-00275) (February 19, 2020) | | | | 403, R, U, LF, AC, NP |
| DTX-1151 | Email from Paul Kotturi to Jonas Korlach regarding "oxford nanopore competition" | PCB-ONT-ITC-0417838 | PCB-ONT-ITC-0417838 | | 403, R, LF, LK |
| DTX-1152 | Attachment to email from Paul Kotturi to Jonas Korlach regarding "oxford nanopore competition" – attachment titled "NA Sales Meeting – Oxford Nanopore 20150714.pptx" | PCB-ONT-ITC-0417839 | PCB-ONT-ITC-0417855 | | 403, R, LF, LK |
| DTX-1153 | National Human Genome Research Institute Advanced Sequencing Technology Development Meeting – Abstracts & General Information (March 31-April 1, 2009) | | | | 403, R, LF, LK, U, DI |

# EXHIBIT G

# REDACTED